RECEIPT # 54373
AMOUNT $ 150
SUMMONS ISSUED Y 1
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 3-8-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
AVX CORPORATION and )
AVX LIMITED, )
    )
    Plaintiffs, )
    )
v. ) C.A. No.
    )
CABOT CORPORATION, )
    )
    Defendant. ) **04 CV 10467 RWZ**
)

**COMPLAINT AND JURY DEMAND**

MAGISTRATE JUDGE Bowler

**INTRODUCTION**

1.    Plaintiffs and defendant had a contract for the supply of tantalum. Despite that agreement, when the market for tantalum went from relatively stable to extremely volatile, defendant, one of the largest companies in the market, took advantage of both its strong position in the market and its patents on some forms of tantalum essential to plaintiffs' business to force plaintiffs into executing a new, highly unfavorable set of terms for the supply of the tantalum that defendant had already contracted to supply. Specifically, knowing that plaintiff made certain products that could only be manufactured with the "flake" form of tantalum made by defendant, designated as C275 and C255, defendant conditioned plaintiff's purchase of flake powders on its purchase of non-flake powders. At the time defendant engaged in this conduct, it had sufficient market power in the market for flake powder - in fact, it had monopolistic power as a result of patents held by it - to restrain free competition in the market for non-flake

powder. In fact, defendant's actions substantially lessened competition in the market for non-flake powder.

## PARTIES

2. Plaintiff, AVX Corporation is a Delaware corporation with its principal place of business at 801 17th Avenue, South, Myrtle Beach, South Carolina. Plaintiff AVX Limited is a United Kingdom corporation with its principal place of business at Admiral House, Harlington Way, Fleet, Hampshire, in England.

3. Plaintiff, AVX Limited is a wholly owned subsidiary of AVX Corporation. Collectively, AVX Corporation and AVX Limited will be referred to as "AVX."

4. Defendant, Cabot Corporation ("Cabot") is a Delaware corporation with its principal place of business at Two Seaport Lane, Suite 1300, Boston, Massachusetts.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

### AVX Manufactures Passive Electronic Components And Uses Tantalum in that Process

7. AVX is a manufacturer and supplier of passive electronic components and related products that are used in a variety of electronic devices. Passive components are not those "smart" parts of the numerous computerized devices available today, but rather

those components that facilitate the passing of electrical charges by which those devices work.

8.  Tantalum, a naturally occurring element, is used by AVX and others in its industry to create capacitors, devices that store electric charges. Because tantalum forms a dense, stable, tightly adhering, electrically insulating oxide, tantalum capacitors have a much higher ability to store electricity in a much smaller space than those made out of other materials. Tantalum is available in several forms, including wire and several different grades of powder, including flake.

9.  AVX purchases tantalum from Cabot in the form of flake, wire, and nodular, as well as a material known as KTAF. AVX has developed several specifications for the tantalum it buys that are well-known to Cabot. Different grades of tantalum products are used to make different kinds of capacitors.

10.  AVX has numerous customers for its tantalum capacitors, including original electronic equipment manufacturers, medical device companies, and military contractors. AVX's relationships with its customers depend on its ability to supply them with timely production which in turn depends on AVX's ability to procure specific grades of tantalum powder.

**The Tantalum Market is Controlled by a Few Key Players and Can Be Volatile**

11.  Commercially mined tantalum ores containing the mineral tantalite are the primary source of tantalum. Australia has the biggest confirmed ore reserves, approximately 42% of the global total. Thailand, Nigeria, the Congo, Canada, Brazil, and Malaysia are potential other sources of tantalum, but there are various difficulties in

accessing the ore in those countries. The recycling/scrap market also provides some tantalum.

12. Cabot is one of four companies worldwide that processes tantalum for sale to companies like AVX. Tantalum represents approximately 14% of Cabot's sales, but a substantially higher percentage of its profits. Two of the other tantalum processing companies are H.C. Starck ("Starck") and NEICC. The last of the four is Showa Cabot, formerly a 50% joint venture between Cabot and the Japanese company Showa Denko, and now a wholly-owned subsidiary of Cabot.

13. The Australian tantalum mines are controlled by the Sons of Gwalia. Cabot owns 8% of the Sons of Gwalia and takes 75% of the output from its mines, some or all of which is pursuant to long-term contract. Cabot also has its own tantalum mining facility at Lac du Bonnet, Manitoba. Cabot's operation processes 50% of the world's tantalum and Cabot is the dominant company in high voltage tantalum powder processing.

14. Cabot markets its patented "flake" form of tantalum as unique in the industry.

15. The demand for tantalum is largely tied to the electronics and telecommunications markets. For example, as the demand for electronic devices has grown, so has the demand for tantalum. Tantalum is also used in the aerospace industry. Specialty alloys containing tantalum were and are used in the International Space Station.

16. In the past several years, the tantalum market has exhibited some instability. Despite what appears to be the general availability of tantalum, short term increases in marginal demand can drive the price up dramatically. In part, this results

from the long lead time in developing new sources of the element and in part because much of the world's supply of the basic ore is subject to long term contracts. In the last five years, the market has seen occasions when spot prices have increased by multiples.

17. A great deal of the tantalum supply is locked up in long term contract and the parties to those contracts can and do exert substantial control over the market. Half of the Sons of Gwalia's world-wide production is committed to long-term contracts with Cabot and Starck, giving those two companies substantial control over the tantalum prices and supplies.

### Cabot and AVX Signed an Enforceable Agreement

18. AVX and Cabot have had and continue to have a long-standing business relationship. AVX has historically bought 50% of its high voltage powder from Cabot. AVX also historically has bought 10% of all its other tantalum, including wire, from Cabot. Cabot is aware of AVX's reliance on reliable supplies of tantalum from Cabot.

19. In November, 1999, Cabot approached AVX to negotiate a two year contract for the pricing and supply of tantalum powder. The parties' relationship had been governed by similar agreements in the past without either party requesting the execution of any further documentation.

20. Shortly thereafter, both AVX and Cabot, acting through authorized employees, John Chapple and Earl. H. Tyler respectively, executed a written agreement. A true copy of that agreement is attached hereto as Exhibit A.

21. At and after the time of the execution of Exhibit A, neither party sought or requested the execution of any further documentation. For most of the year 2000, both AVX and Cabot operated under the terms and conditions of Exhibit A.

22. Among the terms contained in that executed document were the prices at which Cabot would sell and AVX would buy various tantalum products, the amounts and conditions for delivery, and a reference to specifications for the products.

### Despite the Existing Agreement, Cabot Coerced AVX Into Executing a New Agreement on Terms Far More Advantageous to Cabot

23. Towards the end of 2000, a tantalum shortage became evident. Because of its industry expertise, Cabot understood that shortage to be transitory.

24. Cabot approached AVX, claming for the first time since Exhibit A was executed that Exhibit A was invalid. Cabot was aware that it was the only source of the "flake" high voltage tantalum powders that AVX used. Cabot was also aware that failure to secure sufficient tantalum would be devastating to AVX's business, both in its revenues and in its reputation among its customers and in the industry generally.

25. On August 7, 2000, Thomas Odle, acting on behalf of Cabot, wrote a letter to John Gilbertson, President of AVX (the "August 7 Letter"). A true and correct copy of that letter is attached hereto as Exhibit B.

26. In the August 7 Letter, Odle states that "I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years." In fact, at the time of that statement Cabot had the ability to meet the quantities and delivery schedule set forth in Exhibit A.

27. AVX believed that Exhibit A was valid, but also believed that it had no choice other than to bargain with Cabot. Among other reasons, Cabot was the sole producer of the "flake" form of tantalum.

28. AVX continued the discussions in good faith. Cabot, knowing that AVX could not fulfill its customers' needs without Cabot's "flake" form of tantalum, continued to insist upon a long-term contract for quantities of both "flake" and "nodular" tantalum at higher prices than those set forth in Exhibit A. Cabot also threatened to halt negotiations entirely and cease delivery of tantalum should AVX take any steps to have the terms of Exhibit A enforced.

29. AVX, still at Cabot's mercy, continued the discussions in good faith to attempt to secure the best possible arrangement under the circumstances. Cabot continued to insist on a long term contract for lesser supplies of tantalum at much higher prices. Finally, because AVX needed to be able to assure its customers that it would have sufficient tantalum to meet their demands, AVX had no choice but to execute the 2001 Supply Agreement. A true and correct copy of such supply agreement is attached hereto as Exhibit C.

30. AVX was not the only company subjected to Cabot's coercive strategies.

31. Cabot management has disclosed publicly that they recognize that the committed quantities under its long term supply contracts with it customers for tantalum are problematic for the manufacturers of capacitors.

32. Cabot continues to attempt to enforce the 2001 Supply Agreement containing the tying provisions.

## COUNT I
## Violation of Federal Antitrust Laws

33. AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

34. Cabot had a patent on the production of the "flake" form of tantalum powder, designated C275 and C255 by Cabot.

35. No other tantalum powder sold in the world during the relevant period had the same characteristics as C255 and C275.

36. AVX made certain products that could only be manufactured with C275 and C255.

37. Flake powders and non-flake powders are separate products. In fact, each specific type of tantalum powder sold by Cabot constitutes a separate product.

38. When Cabot engaged in the conduct set forth in ¶¶ 23-32 above, it conditioned AVX's purchase of flake powders on its purchase of non-flake powders.

39. When Cabot engaged in the conduct set forth in ¶¶ 23-32 above, Cabot had sufficient market power in the market for flake powder – in fact, it had monopolistic power as a result of its patents – to restrain free competition in the market for non-flake powder.

40. A substantial amount of interstate commerce in both flake and non-flake powder was affected by the actions of Cabot. The effect of Cabot's actions was to substantially lessen competition.

41. The actions of Cabot violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 14.

**WHEREFORE**, AVX respectfully requests that the Court:

1. Enter judgment in favor of AVX in an amount to be proven at trial;

2. Award punitive or treble damages and attorneys' fees; and,

3. Enter such other orders and relief as may be just and appropriate under the circumstances.

## JURY DEMAND

Plaintiff requests a jury trial on all matters triable to a jury.

> AVX CORPORATION
> AVX LIMITED
>
> By their attorneys,
>
> *Richard P. O'Neil*
> Evan Slavitt (466510)
> Richard P. O'Neil (645214)
> Bodoff & Slavitt LLP
> 225 Friend Street
> Boston, MA 02114-1812
> 617/742-7300

Dated: March 8, 2004