# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                               SUPERIOR COURT

|  |  |
|---|---|
| CABOT CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AVX CORPORATION )<br>and AVX LIMITED, )<br>)<br>Defendants. )<br>) | **COPY**<br><br>CIVIL ACTION NO. 03-1235<br><br>RECEIVED<br>MAR 18 2003<br>SUPERIOR COURT<br>DEPARTMENT OF THE TRIAL COURT<br>FOR CIVIL BUSINESS |

**COMPLAINT
FOR DECLARATORY JUDGMENT**

## Introduction

1. This action is commenced pursuant to M.G.L. c. 231A, §§ 1 and 2. Plaintiff Cabot Corporation, through its Performance Materials Division ("CPM"), seeks a judicial declaration that: (a) defendants AVX Corporation and AVX Limited (collectively, "AVX") are bound by the terms of the Supply Agreement for tantalum products that they entered into with CPM in January 2001; (b) the prior "Letter of Intent" between CPM and AVX Limited did not constitute a valid and binding contract, and in any event all rights, obligations and claims arising from, or relating to, that Letter of Intent were superceded, released, novated and/or satisfied by the parties' subsequent Supply Agreement; (c) CPM has not breached its obligations, if any, under the prior Letter of Intent; (d) CPM has not violated any covenant of good faith and fair dealing in its business transactions with AVX; (e) CPM has not engaged in

any unfair or deceptive act or practice in violation of M.G.L. c. 93A in its business transactions with AVX; and (f) CPM has not breached any of its obligations under the 2001 Supply Agreement.

2.  The declaratory relief requested by CPM is appropriate because there is an actual dispute between the parties with respect to each of the issues described above, as demonstrated by the fact that, in July 2002, AVX commenced an action against CPM in United States District Court for the District of Massachusetts (<u>AVX Corporation and AVX Limited v. Cabot Corporation</u>, Civil Action No. 02-11524-RGS [the "Federal Action"]) challenging the validity of the parties' current Supply Agreement, alleging that CPM has breached that Agreement and the prior Letter of Intent, and asserting violations by CPM of M.G.L. c. 93A and the implied covenant of good faith and fair dealing. AVX recently filed an Amended Complaint in the Federal Action, a copy of which is attached hereto as <u>Exhibit A</u>, which establishes that there is a lack of complete diversity of citizenship between CPM and AVX, with the result that CPM has moved to dismiss all of AVX's claims in the Federal Action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3). CPM brings this action for the purpose of resolving, once and for all, the actual controversies that still will exist upon the anticipated dismissal of the Federal Action.

### The Parties

3.  Plaintiff Cabot Corporation is a Delaware corporation which maintains its corporate headquarters at Two Seaport Lane, Boston, Suffolk County, Massachusetts. Cabot Corporation is a specialty chemicals company. Cabot Corporation, through its Performance Materials Division ("CPM"), also is a supplier of tantalum, a rare metal used in the production

of high performance electronic capacitors. Cabot Corporation's stock is publicly traded on the New York Stock Exchange under the symbol "CBT."

4.  Defendant AVX Corporation ("AVX Corp.") is a Delaware corporation which maintains its principal place of business at 801 17th Avenue South, Myrtle Beach, South Carolina. AVX is one of the world's largest manufacturers and suppliers of tantalum capacitors, passive components that are used in a variety of electronic devices. AVX Corp.'s total sales in 2002 exceeded $1.2 billion. Its stock is publicly traded on the New York Stock Exchange under the symbol "AVX." Upon information and belief, the majority of AVX's outstanding shares are owned by Kyocera Corporation, a multi-national electronics, imaging and chemicals conglomerate based in Kyoto, Japan.

5.  Defendant AVX Limited ("AVX Ltd." or, collectively with AVX Corp., "AVX") is a United Kingdom corporation with its principal place of business at Admiral House, Harlington Way, Fleet, Hampshire, in England. AVX Ltd. is a wholly owned subsidiary of AVX Corp. that also is engaged in the manufacture and supply of passive electronic components and related products.

### Jurisdiction and Venue

6.  This Court has personal jurisdiction over the defendants pursuant to M.G.L. c. 223, § 38, because AVX is engaged in, or soliciting business in, the Commonwealth of Massachusetts, permanently or temporarily, and M.G.L. c. 223A, § 3, because AVX, directly or through its agents, has transacted business in this Commonwealth as to the transactions at issue.

7.     Venue properly lies in Suffolk County pursuant to M.G.L. c. 223, § 8(2), because Cabot Corporation has a usual place of business in this County.

8.     As set forth more fully below, an actual and justiciable controversy currently exists within the meaning of M.G.L. c. 231A, §§ 1 and 2, concerning the parties' respective rights and obligations under the Supply Agreement, dated as of January 1, 2001, and the Letter of Intent that was signed in or about January 2000.

## The Facts

### *The Tantalum Market*

9.     Tantalum is an elemental metal (chemical symbol "Ta", atomic number 73) that is approximately as rare in nature as uranium. Tantalum has unique properties that make it essential to certain applications and highly desirable for others. For example, tantalum is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures. These characteristics, among others, make tantalum the preferred raw material for high performance electronic capacitors that are, in turn, components of a wide range of modern electronic devices, including cellular telephones and personal computers.

10.    Historically, the market for tantalum has been highly volatile. Periods of high demand, intermittent supply shortages, inventory hoarding, and sharply-rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly-falling prices. Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical

susceptibility to supply shortages have caused fluctuations in the price of tantalum to be much more pronounced than those of other industrial metals.

### *CPM and AVX's Prior Dealings*

11.   In the years prior to 2001, AVX purchased substantial quantities of tantalum powder and tantalum wire (collectively, with semi-refined tantalum ore ["$K_2TaF_7$"], "Tantalum Products" or "Products") from CPM for use in the manufacture of tantalum capacitors. During that time period, AVX and CPM executed a series of one or two page "Letters of Intent," which described, in general terms, the quantities of Tantalum Products that AVX then anticipated buying from CPM, and the prices that AVX then was willing to pay CPM for those products. A true copy of the most recent Letter of Intent signed by AVX Ltd. and CPM in January 2000 (the "2000 Letter of Intent") is appended to this Complaint as Exhibit B.

12.   Although it did so in the years prior to 2001, CPM strongly preferred not to sell Tantalum Products to AVX based on "Letters of Intent" because AVX frequently declined to honor the terms of those documents. AVX often purchased quantities of Tantalum Products than were different from those stated in the parties' then-existing Letter of Intent depending on its purported needs, and AVX periodically insisted upon receiving prices below those listed in the parties' then-existing Letter of Intent when it believed that market conditions justified its demands. As a result, CPM experienced fluctuating demand for its Tantalum Products, and had great difficulty generating a stable revenue stream that would protect CPM against market downturns and support an expansion of its productive capacity. Notwithstanding the difficulties that the parties' use of Letters of Intent posed for CPM, AVX steadfastly resisted

CPM's efforts to negotiate and execute binding, long-term supply contracts for CPM's Tantalum Products.

### *The 2001 Supply Agreement*

13. In the late 1990s and continuing into the year 2000, demand for tantalum experienced a period of unprecedented growth that led to a severe product shortage and sharply rising prices. Vastly increased demand for tantalum capacitors by manufacturers of wireless telephone equipment in particular, and electronic equipment in general, created great concern among tantalum purchasers (including AVX) that the worldwide demand for tantalum had, or would soon, exceed the existing productive capacity of the principal suppliers of tantalum, including CPM.

14. CPM, for example, operated its Boyertown Plant at maximum capacity in 1999 and 2000, but still had difficulty meeting the demand for Tantalum Products from its various customers. CPM was, however, reluctant to invest the millions of dollars of capital necessary to substantially increase the output of its Boyertown Plant because it feared that a cyclical decline in demand for Tantalum Products would leave it with significant overcapacity and substantial financial losses.

15. AVX was acutely aware of the severe tantalum shortage that existed in 2000 because that shortage placed AVX in competition with other capacitor manufacturers for the limited supply of Tantalum Products from CPM and others. For its part, CPM was faced with rapidly escalating prices for the tantalum ore that it must procure for use in its production process, and a need to develop a stable, long-term business environment to justify an expansion of its operations.

16. On August 7, 2000, CPM's Vice President and General Manager, Thomas H. Odle, wrote to John Gilbertson, the President of AVX Ltd., to express CPM's concern about AVX's continued reliance on letters of intent and the parties' corresponding lack of a binding, long-term supply contract. The full text of Mr. Odle's letter, a true copy of which is appended to this Complaint as <u>Exhibit C</u>, is as follows:

> Dear John,
>
> I had tried to schedule a phone conversation with you several times but was unable to do so. Since your office has not returned my calls I wanted to send this letter to make sure that you understood my issues. It is my hope that I can also at some point understand your perspective of the global tantalum issues as well. My goal for this call was two fold:
>
> 1. To set up a time when we could meet face-to-face
> 2. To inform you that without a contract, I am concerned that we will not be able to supply your business
>
> As you know, I have discussed long term contracts with Ernie Chilton and he has informed me that AVX would, "Never sign that type of take or pay contract with any supplier." I realize that this is AVX's stated position but as you know, we are not under any obligation to supply AVX in 2001 and beyond. I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years.
>
> Our goal would be to become an important supplier to the world's largest tantalum capacitor manufacturer, but we must form some type of contractual arrangement to do so for the short and long term. In the past we have operated, and currently we are operating, without contracts. By relying only on nonbinding "Letters of Intent" (LOI) from AVX, Cabot is entirely at risk without any guarantee of sale.
>
> In 1996 and 1997, AVX informed (John Chappel to Tom Odle) [CPM] that without price reductions in the middle of the year, we would lose sales. In fact, in each of those years when we refused to drop prices below the level AVX had included in its LOI, AVX refused to purchase the full sales volumes set forth in the LOI. AVX has utilized this non-contract position effectively to their benefit and it has left us holding the "bag."
>
> We cannot continue on this basis. We are anxious to compete for your business, but we need to be able to term contract to insure supply and share the risk but we have received very clear communication that this is not your philosophy relative to suppliers.

> We are trying to seek partners that will sign long-term agreements and share the risks of mining, exploration, and the high cost of inventory management as well as R&D in this business. Please let me know if you would like to discuss this issue (Phone: 1-601-369-8203).
>
> Best regards,
>
> Thomas H. Odle
> Vice President and General Manager

17.  AVX responded to Mr. Odle's letter by asserting, contrary to its prior statements, that the 2000 Letter of Intent was a binding contract. AVX nevertheless agreed in August 2000 to commence negotiations with CPM for a long-term supply agreement. Those negotiations continued over the course of the next several months, with each side making proposals and counterproposals in an attempt to reach agreement on the terms of a multi-year contract for the supply of tantalum products.

18.  The negotiations between CPM and AVX culminated, in early 2001, in the execution of a binding, multi-year Supply Agreement (the "2001 Supply Agreement" or "Agreement"), a true copy of which is appended to this Complaint as <u>Exhibit D</u>. Pursuant to the terms of the 2001 Supply Agreement, AVX is obligated to buy, and CPM is obligated to sell, more than 1,500,000 pounds of Tantalum Products over a five-year period at the prices set forth in the Agreement. Other provisions of the 2001 Supply Agreement address, *inter alia*, ordering and payment procedures, product warranties, scrap purchases, and other issues.

19.  Section 10 of the 2001 Supply Agreement is entitled "COMPLETE AGREEMENT; RELEASE." Section 10 reads, in its entirety:

> [t]his Agreement constitutes the entire understanding of the parties and supersede[s] all prior purchases orders (except to the extent expressly incorporated herein by reference) discussions, agreements and letters of intent between the parties, including, without limitation, AVX purchase orders listed on Appendix A and the existing Letters of Intent between CPM and AVX respecting tantalum wire and tantalum (individually and

-8-

collectively the "Prior Agreements") all of which shall have no force and effect and shall create no liabilities or obligations for either party or any affiliate of either party. This Agreement also constitutes full accord and satisfaction between Buyer and CPM with respect to the Prior Agreements. Buyer and CPM hereby release each other from any and all claims and causes of action relating to, or arising under, the Prior Agreements that Buyer and CPM may now or hereafter have.

20. AVX began purchasing Tantalum Products from CPM in accordance with the terms of the 2001 Supply Agreement in January 2001. Since January 2001, AVX has purchased and paid for more than 700,000 pounds of Tantalum Products, having a combined value of more than $173,000,000, from CPM under that Agreement.

*AVX's Efforts to Escape or Void the 2001 Supply Agreement*

21. Subsequent to the execution of the 2001 Supply Agreement, AVX experienced a substantial decrease in demand for its electronic capacitors as a result of the general worldwide economic downturn. AVX responded to this decrease in demand, in part, by requesting on various occasions beginning in mid-2001 that CPM voluntarily postpone some of AVX's purchase obligations under the 2001 Supply Agreement and permanently excuse others. For example, on November 12, 2001, Bob Fairey of AVX sent a letter to Hugh Tyler of CPM asking that CPM permanently excuse AVX from its obligation to purchase 5,000 lbs. of Tantalum Products intended for AVX's Biddeford, Maine production facility. The full text of Mr. Fairey's letter, a true copy of which is appended to this Complaint as <u>Exhibit E</u>, is as follows:

> Dear Hugh,
>
> AVX Biddeford has been a loyal Cabot Performance Materials customer for many years. CPM Management has expressed appreciation for our relationship on many occasions.
>
> The tantalum powder and wire contract that we find ourselves engaged in is doing significant damage to our business. We are accumulating large amounts of material and

having to significantly write it down, generating major financial losses. The continued profitability of our business is in question.

I am writing to make a specific request of Cabot. The contract specifies that AVX Biddeford will take from you 5,000 pounds of "as available" product in calendar year 2001. The contract was executed during a period of exceptional demand for tantalum capacitors, and the intent of this clause was to allow AVX to obtain extra powder to service our customers. As you well know, at this time and for the foreseeable future, we have absolutely no use for this tantalum powder. This $2.5 million purchase will only result in further degradation of our financial health. We request that Cabot excuse this portion of our contract.

Please consider this request and respond to me at your earliest convenience.

Sincerely,

Bob Fairey
AVX Tantalum Corp.

22. AVX's requests for relief led to protracted negotiations between CPM and AVX over a period of months for the purpose of attempting to rearrange AVX's purchase obligations under the 2001 Supply Agreement. Those negotiations ultimately failed when the parties were unable to reach a mutually acceptable compromise. Accordingly, the terms of the 2001 Supply Agreement remain in full force and effect.

23. On July 26, 2002, AVX Corp. commenced an action against CPM in United States District Court for the District of Massachusetts seeking declaratory relief and damages with respect to the 2001 Supply Agreement, as well as the 2000 Letter of Intent. A true copy of AVX Corp.'s Complaint in that action, then captioned <u>AVX Corporation v. Cabot Corporation</u>, Civil Action No. 02-11524-RGS (the "Federal Action"), is appended to this Complaint as <u>Exhibit F</u>. AVX Corp. asserted claims in the Federal Action seeking, *inter alia*: (a) a declaration that the prior 2000 Letter of Intent constitutes a "valid and enforceable contract" that governs the parties' current relationship; (b) damages for breach of contract, breach of the duty of good faith and fair dealing, and violations of M.G.L. c. 93A based upon

CPM's allegedly coercive conduct in negotiating and obtaining AVX's approval of the 2001 Supply Agreement; and (c) damages for CPM's alleged failure to deliver "the proper grade and amount" of Tantalum Products to AVX Corp. under the 2001 Supply Agreement. AVX Corp. further alleged in its original Complaint that AVX Corp. is a "South Carolina corporation," that CPM is a "Delaware Corporation," and that the federal court could exercise subject matter jurisdiction over the parties' dispute pursuant to 28 U.S.C. § 1332(a)(1) because "the matter in controversy exceeds the sum or value of $75,000 ... and is between citizens of different states."

24. On February 20, 2003, AVX filed an Amended Complaint in the Federal Action that: (a) added AVX Ltd., its foreign subsidiary, as a party; (b) reasserts on behalf of AVX Corp. and AVX Ltd. all of the claims set forth in Paragraph 23, *supra* (while simultaneously deleting and waiving other claims not relevant to this proceeding); (c) alleges, for the first time, that AVX Corp., like CPM, is a Delaware corporation; and (d) nonetheless asserts that federal subject matter jurisdiction exists based solely upon the purported diverse citizenship of the parties. A true copy of AVX's Amended Complaint in the Federal Action is appended to this Complaint as Exhibit A.

25. On March 18, 2003, CPM filed a Motion to Dismiss the Federal Action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3) on the basis that the Amended Complaint, on its face, establishes a lack of diversity between CPM and AVX Corp. A true copy of CPM's Motion to Dismiss is appended to this Complaint as Exhibit G. That motion currently is pending before the District Court.

26. The actual controversies that are the subject of the Federal Action will continue to exist, and will be suitable for resolution by this Court, after the dismissal of the Federal Action.

### Claims

### COUNT I
(For Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

27. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 26 of this Complaint, *supra*.

28. AVX contends that the 2000 Letter of Intent constitutes a valid and binding contract that has not been superceded, released or novated.

29. CPM contends that the 2000 Letter of Intent does not constitute a valid and binding contract. CPM further contends that, to the extent that the 2000 Letter of Intent ever constituted a valid and binding contract, all of the parties' respective rights, obligations and claims arising from, or relating to, that Letter of Intent were superceded, released, novated and/or satisfied by the terms of their subsequent 2001 Supply Agreement.

30. Accordingly, an actual and justiciable controversy exists between CPM and AVX with respect to the validity and enforceability of the 2000 Letter of Intent, and the continued viability of any claims arising from, or relating to, that Letter of Intent.

### COUNT II
(For Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

31. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 30 of this Complaint, *supra*.

32. AVX contends that the 2001 Supply Agreement is void because CPM unfairly coerced AVX into executing that Agreement.

33. CPM contends that AVX voluntarily entered into the 2001 Supply Agreement after extended negotiations, and that the terms of that Agreement are valid and binding upon the parties. CPM further contends that AVX has ratified the 2001 Supply Agreement through its statements and conduct since January 2001.

34. Accordingly, an actual and justiciable controversy exists between CPM and AVX with respect to the validity and enforceability of the 2001 Supply Agreement.

## COUNT III
### (For a Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

35. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 34 of this Complaint, *supra*.

36. AVX contends that CPM, through its conduct, has breached its obligations under the 2000 Letter of Intent, and that AVX has been damaged as a result.

37. CPM contends that the 2000 Letter of Intent does not constitute a valid and binding contract, and, therefore, does not create any obligations that could be breached by CPM. CPM further contends that, to the extent that the 2000 Letter of Intent ever constituted a valid and binding contract, CPM has not breached its obligations under that Letter of Intent, or thereby harmed AVX, and that any such breach was the subject of the release and the accord and satisfaction contained in the 2001 Supply Agreement.

38. Accordingly, an actual and justiciable controversy exists between CPM and AVX as to the existence and extent of CPM's obligations under the 2000 Letter of Intent, as to whether CPM has breached any obligations that it may have under that Letter of Intent, as to

whether any such breach has been released or otherwise satisfied, and as to whether AVX has been damaged as a result of any such breach.

## COUNT IV
### (For a Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

39. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 38 of this Complaint, *supra*.

40. AVX contends that CPM, through its conduct prior to the execution of the 2001 Supply Agreement, has violated the implied covenant of good faith and fair dealing, and that AVX has been damaged as a result.

41. CPM contends that it has not violated the implied covenant of good faith and fair dealing in its business transactions with AVX, or thereby harmed AVX, that any alleged violation was the subject of the release and the accord and satisfaction contained in the 2001 Supply Agreement.

42. Accordingly, an actual and justiciable controversy exists between CPM and AVX as to whether CPM has violated the implied covenant of good faith and fair dealing in its business transactions with AVX, as to whether any such violation has been released or otherwise satisfied, and as to whether AVX has been damaged as a result of any such violation.

## COUNT V
### (For a Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

43. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 42 of this Complaint, *supra*.

44. AVX contends that CPM, through its conduct prior to the execution of the 2001 Supply Agreement, has willfully and knowingly committed unfair and deceptive acts and practices in violation of M.G.L. c. 93A, and that AVX has been damaged as a result.

45. CPM contends that it has not engaged in any unfair or deceptive acts or practices (willful, knowing, or otherwise) that violate M.G.L. c 93A in its business transactions with AVX, or thereby harmed AVX, that any alleged violation was the subject of the release and the accord and satisfaction contained in the 2001 Supply Agreement.

46. Accordingly, an actual and justiciable controversy exists between CPM and AVX as to whether CPM has engaged in any unfair or deceptive acts or practices (willful, knowing, or otherwise) that violate M.G.L. c. 93A in its business transactions with AVX, as to whether any such violation has been released or otherwise satisfied, and as to whether AVX has been damaged as a result of any such violation.

### COUNT VI
### (For a Declaratory Judgment Pursuant to M.G.L. c. 231A, §§ 1 and 2)

47. CPM hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint, *supra*.

48. AVX contends that CPM, through its conduct, has breached its obligations under the 2001 Supply Agreement, and that AVX has been damaged as a result.

49. CPM contends that it has not breached its obligations under the 2001 Supply Agreement or thereby harmed AVX.

50. Accordingly, an actual and justiciable controversy exists between CPM and AVX as to whether CPM has breached its obligations under the 2001 Supply Agreement, and as to whether AVX has been damaged as a result of any such breach.

## Prayers for Relief

WHEREFORE, CPM respectfully requests that this Court:

(a)  Enter a final judgment declaring that the 2000 Letter of Intent does not constitute a valid and binding contract, *or, in the alternative,* a final judgment declaring that, to the extent that the 2000 Letter of Intent ever constituted a valid and binding contract, all of the parties' respective rights, obligations and claims arising from, or related to, that Letter of Intent were superceded, novated and/or satisfied by their subsequent 2001 Supply Agreement;

(b)  Enter a final judgment declaring that AVX voluntarily entered into the 2001 Supply Agreement, and that the terms of that Agreement are valid and binding upon the parties, *or, in the alternative,* a final judgment declaring that, to the extent that the 2001 Supply Agreement ever was voidable by AVX, AVX subsequently has ratified that Agreement through its statements and conduct;

(c)  Enter a final judgment declaring that CPM has not breached its obligations, if any, under the 2000 Letter of Intent, or thereby harmed AVX *or, in the alternative,* that any such breach has been released or otherwise satisfied;

(d)  Enter a final judgment declaring that CPM has not violated any implied covenant of good faith and fair dealing in the 2000 Letter of Intent or thereby harmed AVX, *or, in the alternative,* that any such violation has been released or otherwise satisfied;

(e)  Enter a final judgment declaring that CPM has not engaged in any unfair or deceptive acts or practices (willful, knowing, or otherwise) that violate M.G.L.

    c. 93A in its business transactions with AVX or thereby harmed AVX, *or, in the alternative,* that any such violation has been released or otherwise satisfied;

(f)    Enter a final judgment declaring that CPM has not breached its obligations under the 2001 Supply Agreement or thereby harmed AVX;

(g)    Otherwise declare the legal rights and obligations of the parties; and

(h)    Grant such other and further relief as the Court deems just and appropriate in the circumstances.

                                                CABOT CORPORATION

                                                By its attorneys,

                                                /s/ Robert S. Frank, Jr.

                                                Robert S. Frank, Jr. (BBO No. 177240)
                                                Brian A. Davis (BBO No. 546462)
                                                CHOATE, HALL & STEWART
                                                Exchange Place
                                                53 State Street
                                                Boston, Massachusetts 02109
                                                Tele: 617-248-5000

John Traficonte (BBO No. 541931)
CABOT CORPORATION
Two Seaport Lane
Boston, Massachusetts 02210
Tele: 617-345-0100

Date: March 18, 2003

3539199.1

-17-