# Exhibit B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                         SUPERIOR COURT

_____
                                )
CABOT CORPORATION,              )
                                )
        Plaintiff,              )
                                )
        v.                      )        No. 03-1235-BLS
                                )
AVX CORPORATION and             )
AVX LIMITED,                    )
                                )
        Defendants.             )
_____)

### ANSWER, COUNTER-CLAIM AND JURY DEMAND

1.   This paragraph merely characterized the action and no response is required.

2.   Admitted.

3.   Admitted.

4.   Admitted.

5.   Admitted.

6.   It is admitted that this Court has personal jurisdiction over the defendants. The balance of the paragraph is denied.

7.   Admitted.

8.   Admitted.

9.   Admitted.

10.  The first sentence is admitted.  The second and third sentences are incomplete and are therefore denied.

11.     The first sentence is admitted. As to the second sentence, it is admitted except that the characterization of the Letters of Intent as mere descriptions in general terms of the arrangement between AVX and CPM is denied. Further answering, AVX asserts that such Letters of Intent constituted binding contracts. The third sentence is admitted.

12.     Denied.

13.     Denied.

14.     AVX lacks sufficient information to form a belief as to the truth of these allegations and they are therefore denied.

15.     It is admitted that AVX was aware of market conditions for tantalum in 2000; the balance of the first paragraph is denied. As to the second sentence, AVX lacks sufficient information to form a belief as to the truth of these allegations and they are therefore denied.

16.     The first sentence is admitted except that any attempt to characterize Mr. Odle's intent or that of CPM is denied. The balance of the paragraph is admitted.

17.     The first sentence is admitted except that AVX denies that its assertions were contrary to its prior statements. The second and third sentences are denied as incomplete and mischaracterizing the nature and context of the negotiations.

18.     It is admitted that the parties executed Exhibit D. The balance of the first sentence is denied as incomplete and mischaracterizing the nature and context of the negotiations. The balance of the paragraph is denied insofar as any attempt to summarize or characterize the document is incomplete and misleading.

2

19.    It is admitted that this paragraph reproduces Section 10 of Exhibit D, but the paragraph is denied insofar as any attempt to excerpt, summarize or characterize the document is incomplete and misleading.

20.    It is admitted that AVX continued to purchase tantalum from CPM; the balance of the first sentence is denied.  The second sentence is admitted except that the last five words are denied.

21.    It is admitted that AVX experienced a decrease in demand for certain products but the balance of the paragraph is denied as inaccurate, incomplete and misleading.  It is admitted that there were communications between AVX and CPM concerning the purchase of tantalum, but the balance of the second sentence is denied as inaccurate, incomplete and misleading.  The third and fourth sentences are admitted except for the first two words of the third sentence.

22.    Denied.

23.    Admitted.

24.    Admitted.

25.    It is admitted that CPM filed such a motion although such filing was not in compliance with the Local Rules of the United States District Court for the District of Massachusetts and was, therefore, returned by the clerk for such non-compliance.  The second sentence is admitted.  The third sentence is denied.  Further answering, AVX notes that the parties have stipulated to the dismissal of the Federal Action.

26.    Admitted.

3

## COUNT I

27.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

28.    Admitted.

29.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

30.    Admitted.

## COUNT II

31.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

32.    Admitted.

33.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

34.    Admitted.

## COUNT III

35.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

36.    Admitted.

37.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

38.    Admitted.

## COUNT IV

39.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

40.    Admitted.

41.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

42.    Admitted.

## COUNT V

43.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

44.    Admitted.

45.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

46.    Admitted.

## COUNT VI

47.    AVX repeats and reincorporates by reference its responses to the foregoing paragraphs.

48.    Admitted.

49.    This paragraph does not contain any allegations of fact but simply asserts CPM's position and therefore no answer is required.  To the extent an answer is required, it is denied.

50.    Admitted.

## COUNTERCLAIMS

### INTRODUCTION

1.    Plaintiffs and defendant had a contract for the supply of tantalum.  Despite that agreement, when the market for tantalum went from relatively stable to extremely volatile, defendant, one of the largest companies in the market, took advantage of its strong position and plaintiff's weakened position to force plaintiff into executing a new, highly unfavorable set of terms for the supply of the tantalum that defendant had already contracted to supply.  Without these new terms, and despite the parties' previous enforceable agreement, defendant said it would be "simply unable" to supply plaintiff with the tantalum it needed.  Plaintiffs, to their significant detriment, had no choice but to execute a new long-term agreement.  Further, as time has passed, defendant has not even lived up to the terms of the new agreement but has supplied product that does not meet the required specifications and has failed to deliver according to the schedule.

6

## PARTIES

2.    Plaintiff AVX Corporation is a Delaware corporation with its principal place of business at 801 17th Avenue, South, Myrtle Beach, South Carolina. Plaintiff AVX Limited is a United Kingdom corporation with its principal place of business at Admiral House, Harlington Way, Fleet, Hampshire, in England.

3.    AVX Limited is a wholly owned subsidiary of AVX Corporation. Collectively, AVX Corporation and AVX Limited will be referred to as "AVX."

4.    Defendant Cabot Corporation ("Cabot") is a Delaware corporation with its principal place of business at Two Seaport Lane, Suite 1300, Boston, Massachusetts.

## FACTS

### AVX Manufactures Passive Electronic Components And Uses Tantalum in that Process

5.    AVX is a manufacturer and supplier of passive electronic components and related products that are used in a variety of electronic devices. Passive components are not those "smart" parts of the numerous computerized devices available today, but rather those components that facilitate the passing of electrical charges by which those devices work.

6.    Tantalum, a naturally occurring element, is used by AVX and others in its industry to create capacitors, devices that store electric charges. Because tantalum forms a dense, stable, tightly adhering, electrically insulating oxide, tantalum capacitors have a much higher ability to store electricity in a much smaller space than those made out of other materials. Tantalum is available in several forms, including wire and several different grades of powder, including flake.

7

7.    AVX purchases tantalum from Cabot in the form of flake, wire, and nodular, as well as a material known as KTAF. AVX has developed several specifications for the tantalum it buys that are well-known to Cabot. Different grades of tantalum products are used to make different kinds of capacitors.

8.    AVX has numerous customers for its tantalum capacitors, including original electronic equipment manufacturers, medical device companies, and military contractors. AVX's relationships with its customers depend on its ability to supply them with timely production which in turn depends on AVX's ability to procure a high enough grade of tantalum.

**The Tantalum Market is Controlled by a Few Key Players and Can Be Volatile**

9.    Commercially mined tantalum ores containing the mineral tantalite are the primary source of tantalum. Australia has the biggest confirmed ore reserves, approximately 42% of the global total. Thailand, Nigeria, the Congo, Canada, Brazil, and Malaysia are potential other sources of tantalum,, but there are various difficulties in accessing the ore in those countries. The recycling/scrap market also provides some tantalum.

10.    Cabot is one of four companies worldwide that processes tantalum for sale to companies like AVX. Tantalum represents approximately 14% of Cabot's sales, but a substantially higher percentage of its profits. Two of the other tantalum processing companies are H.C. Starck ("Starck") and NEICC. The last of the four is Showa Cabot, formerly a 50% joint venture between Cabot and the Japanese company Showa Denko, and now a wholly owned subsidiary of Cabot.

8

11.    The Australian tantalum mines are controlled by the Sons of Gwalia. Cabot owns 8% of the Sons of Gwalia and takes 75% of the output from its mines, some or all of which is pursuant to long-term contract. Cabot also has its own tantalum mining facility at Lac du Bonnet, Manitoba. Cabot's operation processes 50% of the world's tantalum and Cabot is the dominant company in high voltage tantalum powder processing.

12.    Cabot markets its "flake" form of tantalum as unique in the industry.

13.    The demand for tantalum is largely tied to the electronics and telecommunications markets. For example, as the demand for electronic devices has grown, so has the demand for tantalum. Tantalum is also used in the aerospace industry. Specialty alloys containing tantalum were and are used in the International Space Station.

14.    In the past several years, the tantalum market has exhibited some instability. Despite what appears to be the general availability of tantalum, short term increases in marginal demand can drive the price up dramatically. In part, this results from the long lead time in developing new sources of the element and in part because much of the world's supply of the basic ore is subject to long term contracts. In the last five years, the market has seen occasions when spot prices have increased by multiples.

15.    A great deal of the tantalum supply is locked up in long term contract and the parties to those contracts can and do exert substantial control over the market. Half of the Sons of Gwalia's world-wide production is committed to long-term contracts with Cabot and Starck, giving those two companies substantial control over the tantalum prices and supplies.

### Cabot and AVX Signed an Enforceable Agreement

16.     AVX and Cabot have had and continue to have a long-standing business relationship. AVX has historically bought 50% of its high voltage powder from Cabot. AVX also historically has bought 10% of all its other tantalum, including wire, from Cabot. Cabot is aware of AVX's reliance on reliable supplies of tantalum from Cabot.

17.     In November, 1999, Cabot approached AVX to negotiate a two year contract for the pricing and supply of tantalum powder. The parties' relationship had been governed by similar agreements in the past without either party requesting the execution of any further documentation.

18.     Exhibit A attached hereto is a true and correct copy of a letter dated November 30, 1999, from Kurt Habecker to John Chapple.

19.     Shortly thereafter, both AVX and Cabot, acting through authorized employees, John Chapple and Earl. H. Tyler respectively, executed a written document containing terms substantially similar to Exhibit A. A true copy of that document is attached hereto as Exhibit B.

20.     At and after the time of the execution of Exhibit B, neither party sought or requested the execution of any further documentation. For most of the year 2000, both AVX and Cabot operated under the terms and conditions of Exhibit B.

21.     Among the terms contained in that executed document were the prices at which Cabot would sell and AVX would buy various tantalum products, the amounts and conditions for delivery, and a reference to specifications for the products.

**Despite the Existing Agreement, Cabot Coerced AVX
Into Executing a New Agreement on Terms Far More
Advantageous to Cabot**

22.    Towards the end of 2000, a tantalum shortage became evident. Because of its industry expertise, Cabot understood that shortage to be transitory.

23.    Cabot approached AVX, claming for the first time since Exhibit B was executed that Exhibit B was invalid. Cabot was aware that it was the only source of the flake high voltage tantalum powders that AVX used. Cabot was also aware that failure to secure sufficient tantalum would be devastating to AVX's business, both in its revenues and in its reputation among its customers and in the industry generally.

24.    On August 7, 2000, Thomas Odle, acting on behalf of Cabot, wrote a letter to John Gilbertson, President of AVX (the "August 7 Letter"). A true and correct copy of that letter is attached hereto as Exhibit C.

25.    In the August 7 Letter, Odle states that "I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years." In fact, at the time of that statement Cabot had the ability to meet the quantities and delivery schedule set forth in Exhibit B.

26.    AVX believed that Exhibit B was valid, but also believed that it had no choice other than to bargain with Cabot. Upon information and belief, had AVX chosen to litigate to enforce the terms of Exhibit B, Cabot would have ceased delivery of the tantalum that AVX desperately needed.

27.    On August 18, 2000, Tyler and Chapple met to discuss tantalum supplies and prices going forward. Tyler sent an e-mail to Chapple on September 5, 2000 (the "September 5 e-mail"), confirming the terms of Cabot's offer. A true and correct copy of

11

the September 5 e-mail is attached hereto as Exhibit D. Chapple responded by sending AVX's powder requirements.

28.    AVX was convinced that the parties had reached some common ground until Tyler telephoned Chapple to tell him that Cabot had sold all its tantalum powder for 2001, reserving only a small – and from AVX's point of view, inadequate – quantity for AVX. A true and correct copy of the letter from Chapple to Tyler is attached as Exhibit E.

29.    AVX continued the discussions in good faith. Cabot, knowing that AVX could not fulfill its customers' needs without Cabot's tantalum, continued to insist upon a long-term contract for lesser quantities of tantalum at higher prices than those set forth in Exhibit B. Cabot also threatened to halt negotiations entirely and cease delivery of tantalum should AVX take any steps to have the terms of Exhibit B enforced.

30.    AVX, still at Cabot's mercy, continued the discussions in good faith to attempt to secure the best possible arrangement under the circumstances. Cabot continued to insist on a long term contract for lesser supplies of tantalum at much higher prices. Finally, because AVX needed to be able to assure its customers that it would have sufficient tantalum to meet their demands, AVX had no choice but to execute the 2001 Supply Agreement. A true and correct copy of such supply agreement is attached hereto as Exhibit G.

31.    AVX was not the only company subjected to Cabot's coercive strategies.

32.    Cabot was featured in the May 2, 2001, issue of Chemical Week in an article called "Investing in Itself." A true and correct copy of that article is attached hereto as Exhibit H. In that article, Ken Burnes, president of Cabot, was accurately

quoted as saying "We took advantage of the shortage to enter into long term contracts with our customers." He was also accurately quoted as saying "They were pure margin improvement contracts."

33.    As the worldwide economy softened in 2001, the demand for passive components dropped off dramatically. Reduced selling prices for tantalum capacitors coupled with increased raw material costs and low production volumes have adversely impacted profits for capacitor manufacturers such as AVX.

34.    Cabot management has disclosed publicly that they recognize that the committed quantities under its long term supply contracts with it customers for tantalum are problematic for the manufacturers of capacitors.

### To the Extent the 2001 Supply Agreement is an Enforceable Contract, Cabot Has Breached It

35.    Having had no choice, AVX executed the 2001 Supply Agreement with Cabot. Under the terms of the 2001 Supply Agreement, Cabot agreed to provide AVX with certain levels of C275 and C255 tantalum flake that met the specifications for such material.

36.    At present, Cabot is delinquent in its deliveries under the 2001 Supply Agreement. It has consistently failed to deliver on time and to meet specifications.

### COUNT I
### Declaratory Judgment

37.    AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

38.    Cabot and AVX negotiated and executed Exhibit B.  It contains specific terms of price, quantity and delivery.

39.    Exhibit B has not been superseded nor has it been released or novated.

40.    AVX hereby requests a judgment that Exhibit B is a valid and enforceable contract.


## COUNT II
### Violation of Chapter 93A

41.    AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

42.    Cabot is engaged in trade or commerce within the Commonwealth of Massachusetts.

43.    Cabot's unfair and deceptive practices occurred primarily and substantially in the Commonwealth of Massachusetts.

44.    Cabot's conduct was in knowing and willful disregard of contractual arrangements and was intended to extort greater benefits to Cabot and constitutes a series of unfair practices and acts.

45.    As a result, AVX has suffered damage and is entitled to multiple damages.


## COUNT III
### Breach of Contract

46.    AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

14

47.   Exhibit B is an enforceable contract.  The parties performed under that agreement for much of 2000.

48.   Cabot's failure to honor the terms of that agreement constitutes a material breach.

49.   AVX has suffered damages as a result of Cabot's breach.


## COUNT IV
### Breach of the Covenant of Good Faith and Fair Dealing

50.   AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

51.   Cabot and AVX had a contract.  In the Commonwealth, all contracts contain an implied covenant of good faith and fair dealing.

52.   Cabot acted in bad faith in taking advantage of its market position in the face of a tantalum shortage which it knew was only temporary to coerce AVX into executing a new, long-term agreement.

53.   AVX has suffered and continues to suffer harm as a result of Cabot's actions.


## COUNT V
### Breach of Contract

54.   AVX repeats and re-alleges the preceding paragraphs as though set forth herein.

55.     If the 2001 Supply Agreement is a valid contract, then Cabot was obligated to provide AVX with the proper grade and amount of tantalum set forth in that document.

56.     Cabot has failed to abide by the requirements set forth under the 2001 Supply Agreement.

57.     As a result of Cabot's breach, AVX has suffered damages.


**WHEREFORE**, AVX respectfully requests that the Court:

1.     Enter a declaratory judgment that Exhibit B is or was valid, enforceable and binding;

2.     Enter judgment in favor of AVX in an amount to be proven at trial;

3.     Award multiple damages and attorneys' fees; and,

4.     Enter such other orders and relief as may be just and appropriate under the circumstances.

## JURY DEMAND

Plaintiff requests a jury trial on all matters triable to a jury.


AVX CORPORATION
AVX LIMITED

By their attorneys,

*Evan Slavitt*
Evan Slavitt (466510)
Bodoff & Slavitt LLP
77 North Washington Street
Boston, MA 02114-1908
617/742-7300

Dated: April 17, 2003


## CERTIFICATE OF SERVICE

I hereby certify that I have, on the foregoing date, caused this document to be delivered by first class mail, by courier, or by hand.

*Evan Slavitt*

3871