UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-10467-RGS |
| CABOT CORPORATION, | ) ) | |
| Defendant. | ) ) | |

_____)

**MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION FOR JUDGMENT OR, IN THE ALTERNATIVE, FOR A STAY**

The focus of the federal antitrust laws is on the abuse of market power. In some circumstances, such abuse may also constitute economic duress; in other circumstances it may not. The two concepts are independent. In its motion, Cabot wrongly seeks to create an identity of definition where none exists. In fact, all that is required for a finding of illegal tying is that one party has conditioned the purchase of one good on the purchase of another and the other party agreed.

Cabot's motion fails both procedurally and substantively. From a procedural point of view, Cabot has waived any defense of collateral estoppel by failing to comply with the applicable rules of procedure. Substantively, Cabot misunderstands and misstates the entire issue of "coercion." Not only is "coercion" – to the extent it even exists in tying cases as an element – the very simple requirement that a plaintiff show that the seller imposed the condition of purchasing one product on the purchase of another, ***but when written contracts are involved, the courts accept that coercion – in the sense that it is used in the context of***

{

***the antitrust laws – has been demonstrated by the very existence of the contract itself which demonstrates the connection between the two products***.  In any event, what was before the Superior Court was the requirement of a very high standard of "economic duress" rather than the very minimal showing of tying one product to another required in federal antitrust litigation.

Cabot cannot argue that the Superior Court addressed the issue of coercion in the context of the federal antitrust laws.  In this case, with respect to antitrust claims, the state court did not and could not do so because only federal courts can render decisions concerning federal antitrust issues.  Thus, the Superior Court was not a court of "competent jurisdiction" with respect to the elements of a federal tying claim.

Finally, collateral estoppel will not apply when the factual determination is not necessary to the ultimate conclusion of the court making the decision.  In the instant case, Cabot cannot demonstrate that the Superior Court's analysis of economic duress was necessary to its decision – at least as important, if not decisive, was its finding of ratification.  Again, Cabot's failure on this element will preclude application of collateral estoppel.

## BACKGROUND FACTS

AVX and Cabot had a contract for the supply of tantalum.  Complaint ¶ 1.  Despite that agreement, when the market for tantalum went from relatively stable to extremely volatile, Cabot, one of the largest companies in the market, took advantage of its patents on some forms of tantalum essential to AVX's business to force AVX into executing a new, highly unfavorable set of terms for the supply of the tantalum that Cabot had already contracted to supply.  *Id*.  Specifically, knowing that AVX made certain products that could only be manufactured with the "flake" form of tantalum exclusively made by Cabot, it conditioned AVX's purchase of flake powders on the purchase of non-flake powders.  *Id*.  At

2

the time Cabot engaged in this conduct, it had sufficient market power in the market for flake powder – in fact, it had monopolistic power as a result of patents held by it – to restrain free competition in the market for non-flake powder. *Id.* Cabot markets its patented "flake" form of tantalum as unique in the industry. *Id.* at ¶ 14. In fact, Cabot's actions substantially lessened competition in the market for non-flake powder. *Id.*

### B.    *Cabot and AVX Signed an Enforceable Agreement*

In November, 1999, Cabot approached AVX to negotiate a two year contract for the pricing and supply of tantalum powder (the "2000 Agreement"). The parties' relationship had been governed by similar agreements in the past without either party requesting the execution of any further documentation. *Id.* at ¶ 19. Shortly thereafter, both AVX and Cabot, acting through authorized employees, John Chapple and Earl H. Tyler respectively, executed a written agreement. For most of the year 2000, both AVX and Cabot operated under the terms and conditions of that agreement. Among the terms contained in that executed document were the prices at which Cabot would sell and AVX would buy various tantalum products, the amounts and conditions for delivery, and a reference to specifications for the products. *Id.* at ¶¶ 20-22.

### C.    *Despite the 2000 Agreement, Cabot Coerced AVX Into Executing a New Agreement on Terms Far More Advantageous to Cabot*

Towards the end of 2000, Cabot approached AVX, claiming for the first time that the then-existing contract was invalid. Cabot was aware that it was the only source of the "flake" high voltage tantalum powders that AVX used. Cabot was also aware that failure to secure sufficient tantalum would be devastating to AVX's business, both in its revenues and in its reputation among its customers and in the industry generally. *Id.* at ¶¶ 23-24.

Cabot then threatened to cut off AVX's supply of tantalum, both flake and nodular. Although AVX believed it had a valid contract, it also believed that it had no choice other than to bargain with Cabot. Among other reasons, Cabot was the sole producer of the "flake" form of tantalum. *Id*. at ¶¶ 25-27. Cabot, knowing that AVX could not fulfill its customers' needs without Cabot's "flake" form of tantalum, continued to insist upon a long-term contract for quantities of both "flake" and "nodular" tantalum. Cabot also threatened to halt negotiations entirely and cease delivery of tantalum should AVX take any steps to have the terms of the then-existing contract enforced. *Id*. at ¶¶ 28-29.

## ARGUMENT

### A.    *Cabot Is Not Entitled To Assert A Defense Of Collateral Estoppel*

### 1.    **Cabot Has Waived This Defense**

Cabot avers that it could not bring this motion when it originally moved to dismiss the case in 2004. This is true, but irrelevant. The state court decision on which this motion is premised was issued on October 6, 2005, ***two months*** before Cabot filed its Answer in this case. Thus, Cabot chose not to bring this as an additional threshold motion; instead, it answered the Complaint, the parties and the Court participated in the Rule 16 conference, and both parties issued document discovery – some of which has already been completed.

That Answer puts forward a multiplicity of ***possible*** affirmative defenses. Indeed, Cabot – in an apparent attempt to avoid the strictures of Rule 11 – does not assert that it has a good faith basis to assert any of those defenses, only that

> Discovery and investigation ***may*** reveal that any one or more of the following defenses should be available to Cabot in this matter. Cabot therefore asserts said defenses in order to preserve the right to assert them.

Answer at 7 (emphasis added). This attempt to assert a laundry list of all possible defenses that could possibly apply should not be accepted by this Court. Rule 12 requires that "every

defense, in law and fact, . . . ***shall be asserted*** in the responsive pleading if one is required."
Fed. R. Civ. P. 12(b) (emphasis added). It does not permit a party to include all theoretical
defenses on a contingent basis. This is confirmed by Rule 11. That rule states that the
attorney signature constitutes a certificate that, *inter alia*, any defense is "warranted by
existing law or by a non-frivolous argument for the extension, modification, or reversal of
existing law or the establishment of new law. . . ." Fed. R. Civ. P. 11(b)(2). It does not allow
counsel to evade its certification requirement by advancing contingent defenses. To read the
rule as Cabot does would eviscerate its purpose; every counsel would simply put in
contingency language and assert absolution from the certification requirement.

By analogy, if a plaintiff filed a complaint that explicitly admitted that it had no good
faith basis for the various counts, but was bringing all possible counts as a matter of caution
and that it would tell the Court and the defendant later which counts were real, this Court
would have no hesitation in dismissing such a complaint. There should be no difference
when a defendant fires off a shotgun of affirmative defenses – as to which it has the burden
of proof – without troubling itself to determine which can be asserted in accordance with the
rules.

The only conclusion, therefore, is that Cabot has not, in fact, effectively asserted ***any***
affirmative defenses within the meaning of the Federal Rules. Thus, if collateral estoppel is
such an affirmative defense, then Cabot has waived such defense for failure properly to have
asserted it. In fact, it is settled law that collateral estoppel is an affirmative defense which is
ordinarily deemed waived if not raised in the pleadings. *Gilbert v. Ferry*, 413 F.3d 578, 579
(6th Cir. 2005); *Curry v. City of Syracuse*, 316 F.3d 324, 330-31 (2nd Cir. 2003) ("Under
Fed. R. Civ. P. 8(c), collateral estoppel, like res judicata, is an affirmative defense. As such,

it normally must be pled in a timely manner or it may be waived."); *Caldera v. Northrop Worldwide Aircraft Servs., Inc.*, 192 F.3d 962, 970 (9th Cir. 1999) (collateral estoppel is an affirmative defense which must be timely pled or generally it is deemed waived); *Entrup v. Colorado*, 1994 U.S. App. LEXIS 19751 (10th Cir. 1994) (same); Fed. R. Civ. P. 8(c).

Cabot cannot now be heard to protest this result. It is represented by a sophisticated law firm familiar with the Federal Rules and fully cognizant of Rules 8(c), 11, and 12. By making it clear that the defenses were listed only as a precautionary device – and then listing nineteen separate defenses, some of which are facially absurd[1] – Cabot has attempted to avoid the requirements of Rule 11. Given that (i) Cabot knew of the Superior Court's decision for almost two months before it filed its Answer, (ii) chose to Answer as it did, and then (iii) let the deadline for amendment of pleadings pass as well as an additional three months allowing the case to proceed and discovery to take place, it has made the bed in which it now lies.

## 2. AVX Will Be Prejudiced By Cabot's Failure To Timely Assert This Defense

Even if the Court were to give any credence to Cabot's collateral estoppel argument, it would work a substantial prejudice to AVX. Cabot could have raised this issue at the time it filed its answer. It chose not to do so. Instead, it waited over five months and forced AVX to engage in discovery – discovery that was not necessary to its motion related to collateral estoppel. If Cabot truly thought this motion had merit, why did it wait to raise this issue? Cabot cannot be allowed to sit on its defense, force AVX to participate in discovery and

---

[1]       For example, the Seventh Affirmative Defense asserts the state statute of frauds as a defense to a Sherman Antitrust claim, an assertion that appears to have no conceivable support in the case law. Similarly, given (i) that the statute of limitations in Sherman Act cases is four years, (ii) all the actions complained of took place on or after August 7, 2000, and (iii) the second federal complaint was filed on March 8, 2004, it is hard to see how the assertion of a statute of limitations defense can be made in good faith.

attend a scheduling conference, and then, only after it has needlessly increased AVX's costs,

assert what is clearly a threshold dispositive motion. Cabot had its chance, and it chose to do

nothing. It must now live with its tactical decision.

###    B.    Substantive Standard of Review

In considering a motion to dismiss for failure to state a claim, a court must take the

allegations in the plaintiff's pleadings as true and must make all reasonable inferences in

favor of the plaintiff. *See Pena-Borrero v. Estremeda*, 365 F.3d 7, 11 (1st Cir. 2004). A

complaint may be dismissed for failure to state a claim "only if it is clear that no relief could

be granted under any set of facts that could be proved consistent with the allegations." *Id.*

(internal quotation marks omitted); *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d

289, 290-91 (3rd Cir. 1988). The standard is the same for motions denominated as 12(c)

motions for judgment on the pleadings.

> In deciding a motion made under Fed. R. Civ. P. 12(c), the Court "applies the
> same standard as that applicable to a motion under Rule 12(b)(6), accepting
> the allegations contained in the complaint as true and drawing all reasonable
> inferences in favor of the nonmoving party...." The complaint should not be
> dismissed unless it appears beyond doubt that the plaintiff can prove no set of
> facts in support of his claim which would entitle him to relief...." The issue is
> not whether a plaintiff will ultimately prevail but whether the claimant is
> entitled to offer evidence to support the claims. Indeed it may appear on the
> face of the pleadings that a recovery is very remote and unlikely but that is not
> the test."

*Scala v. Am. Airlines*, 249 F. Supp. 2d 176, 177-178 (D. Conn. 2003) (internal citations

omitted). Judgment may only be entered where "no set of facts could be adduced to support

the plaintiff's claim for relief." *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3rd Cir.

1980). Thus, the central question is whether, interpreting the facts in the light most favorable

to AVX, does collateral estoppel apply to all plausible sets of facts?

### C.    *Cabot Has Failed To Prove All Elements Of A Collateral Estoppel Defense*

**1.    Overview of Collateral Estoppel**

Turning to the substance of the motion, in order to demonstrate that the doctrine of collateral estoppel is applicable, Cabot must prove all of the following:

- A final judgment on the merits by a court of competent jurisdiction in a prior adjudication;
- The party against whom estoppel is asserted was a party to the prior adjudication;
- The issue decided in the prior adjudication is identical to the one presented to this Court; and
- The issue decided in the prior adjudication was essential to the judgment in the prior adjudication.

*See Alba v. Raytheon Co.*, 441 Mass. 836 (2004); *Green v. Town of Brookline*, 53 Mass. App. Ct. 120, 757 N.E.2d 731 (2001); *In re Goldstone*, 445 Mass. 551 (2005). It appears that Cabot does not disagree with this general outline of elements.

**2.    The Issue Decided In The State Court Action Is Not Identical To The Issue Raised In AVX's Federal Antitrust Claims.**

It is essential for collateral estoppel purposes that the issue decided in one court is identical to the one at issue in the second court *and* that such issue is essential for the claim in the second court. If the factual issue was not actually decided, then there is no collateral estoppel because the matter was not resolved by judicial decision. If the issue is not an essential element of the claim in the second court, then it does not matter whether it was decided or not – the plaintiff can still proceed.

Here, Cabot argues (i) that "coercion" is an essential element of any tying case, and (ii) that the Superior Court decided that issue in that action. In fact, however, there are strong arguments that neither of those aspects of this part of the collateral estoppel doctrine are satisfied.

a.     **What Is "Coercion" For Purposes of Tying?**

Cabot's analysis depends on its assertion that "coercion" – in the precise sense used by the Superior Court as meaning exactly the same thing as the common law concept of "economic duress" – is an element of a federal tying claim.  A review of the law, however, demonstrates that the term "coercion" as used by courts discussing illegal tying arrangements is not the same as that faced by the Superior Court as a common law defense to a contract claim ("economic duress").  Instead, in the federal context, the term simply means that the offending party has "conditioned" the purchase of one good on the purchase of another.  Put another way, the complaining party asserts that it would not have bought the tied good but for the condition that it do so to get the tying good as opposed to making the totally free an unconstrained choice to do so.  This is a far cry from the issue before the Superior Court.

Cabot relies heavily on *Borschow Hosp. & Medical Supplies v. Cesar Castillo Inc.*, 96 F.3d 10, 17-18 (1st Cir. 1996), but such reliance is misplaced.  All that *Borschow* requires is that one party threaten to withhold one good unless the other party purchases another.

> The fatal flaw in Borschow's tying claim is that Becton Dickinson never withheld its Deseret line. Although Borschow has adduced evidence of various threats by Becton Dickinson, it is undisputed that these threats were not carried out. Permitted to carry both the Deseret line and the Monoject line, Borschow was never injured by the threat….
>
> As a result, the second key element discussed above – evidence of a tie – is missing:
>
> > The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.
>
> *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)….

> Where a tying product has not been withheld, there is no tie. "There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one…." Thus we hold that there is no genuine issue of material fact with respect to Borschow's tying claim.

*Borschow Hosp. & Medical Supplies v. Cesar Castillo Inc.*, 96 F.3d 10, 17-18 (1st Cir. 1996) (internal citations omitted). The notion of a requirement of "economic duress" in the sense used by the Superior Court is entirely absent.

Indeed, the *Borschow* Court uses the word "coercion" only once, and only in a parenthetical citation to *Cia. Petrolera Caribe, Inc. v. Avis Rental Car Corp.*, 735 F.2d 636, 638 (1st Cir. 1984). That case, however, articulates a distinction that was not relevant to *Borschow* but is relevant here.

> As there is no express contractual tie, Caribe must prove "coercion." *See, e.g., Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823, 50 L. Ed. 2d 84, 97 S. Ct. 74 (1976).

*Cia. Petrolera Caribe, Inc. v. Avis Rental Car Corp.*, 735 F.2d 636, 638 (1st Cir. 1984). In *Petrolera*, the plaintiff could not show any contract and depended on an implied conditioning. Accordingly, since there was no explicit agreement which would evidence the tying arrangement, The First Circuit required an alternative proof that the plaintiff show that its choice was not entirely voluntarily. In essence, that case creates an alternative type of proof; a plaintiff must *either* prove an express contractual tie *or* coercion.

From a conceptual point of view, this makes sense. "Threats that are not alleged to have been carried out are insufficient to establish a tie or any injury." *Julian v. George Weston Bakeries Distrib., Inc.*, 2005 U.S. Dist. LEXIS 16750 (D. Me. 2005). Thus, to demonstrate an actual tying event when there is no document that ties the products, a plaintiff has to show that there was something that forced a connection between the purchase of both

products rather than the mere simultaneous acquisition. *Cf. Applera Corp. v. MJ Research, Inc.*, 2004 U.S. Dist. LEXIS 1072 (D. Conn. 2004) (failure to show that purchase of tying product necessary to purchase tied product fatal to a tying claim). Here, of course, there is a contract and the issue in *Petrolera* does not arise.

It is for that reason that cases since *Borschow* have recited the elements of tying without reference to coercion.

> To prove a per-se tying violation, Plaintiff must prove that: (1) the tying and tied goods are two separate products; (2) the defendant affords consumers no choice but to purchase the tied product from it as a condition of obtaining the tying product; (3) the defendant has sufficient market power in the tying product market to distort consumers' choices with respect to the tied product; and (4) the tying arrangement forecloses a substantial volume of commerce.

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 134 (D.P.R. 2005) (citing *Borschow* and *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001)).[2] Even one of the critical cases provided by Cabot that addressed tying recites these elements without mentioning coercion as such. *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994).[3] Similarly, *Lee v. The Life Ins. Co. of North America*, 23 F.3d 14 (1st Cir.), *cert. denied*, 513 U.S. 964 (1994), cited by Cabot for the proposition that coercion is an element, stands only for the proposition that a plaintiff must prove that the defendant conditioned the purchase of one good on the purchase of another – that is, engaged

_____

[2]     *See, George Lussier Enters. v. Subaru of New Eng., Inc.*, 286 F. Supp. 2d 86 (D.N.H., 2003), *aff'd* 393 F.3d 36, 52 (1st Cir. 2004), *cert. den.*, 126 S. Ct. 395; 163 L. Ed. 2d 274; 2005 U.S. LEXIS 7178; 74 U.S.L.W. 3211 (2005); *Kell v. Am. Capital Strategies Ltd.*, 278 F. Supp. 2d 156, 161 (D.P.R. 2003); *CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 154 (D. Mass. 2003).

[3]     Although the *Data General* case does use the word "coercion" in the text of its opinion, it equates that idea with "conditioning" the purchase of one item on another. *Id.* at 1180. It also states that "[i]n the absence of an explicit tying agreement, conditioning may be inferred from evidence indicating that the supplier has actually coerced the purchase or non-purchase of another product." *Id.* Setting aside the fact that the 2001 Supply Agreement is, itself, just the type of explicit tying agreement that the First Circuit was discussing, it is clear that coercion is simply one way of proving the tie between two products – it is not an independent element.

in tying. Nothing in *Lee* suggests that coercion as a concept separate from the act of tying itself is an element.

Outside the First Circuit, some courts appear to identify coercion as a separate element. *E.g., Conn. Mobilecom, Inc. v. Cellco P'ship (In re Conn. Mobilecom, Inc.)*, 2003 U.S. Dist. LEXIS 23063 (S.D.N.Y. 2003). A review of those cases, however, demonstrates that their concept of coercion is not "economic duress" but is merely conditioning as it is in the First Circuit. Under those cases, all a plaintiff has to show is that the purchase of one good was conditioned on the purchase of the other – there is no need for any type of dramatic or severe duress. *E.g., Hack v. President & Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000); *Unijax, Inc. v. Champion International, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982). As the Ninth Circuit explained,

> Essential to the second element of a tying claim is proof that the seller coerced a buyer to purchase the tied product. A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product. Although it may be difficult in some cases to find the dividing line between acceptable persuasion and illegal coercion, the Supreme Court's decisions and our past decisions provide guidance. ***The Supreme Court has found evidence of coercion when a plaintiff produced a written contract that required purchase of the tied product and when the plaintiff demonstrated that the defendant had leveraged its "substantial economic power" in the tying market to force buyers to accept the tie-in.*** . . . . We have found evidence of coercion when a plaintiff produced a written contract that required the purchase of the tied product on extremely onerous terms. We have found evidence of coercion when a plaintiff produced deposition testimony by a buyer that the defendant told him that the defendant would not provide the tying product (a product the buyer "could not afford to do without") unless the buyer also bought the tied product.

*Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1159-1160 (9th Cir. 2003) (citations omitted). Thus, even in jurisdictions that use the word "coercion" in describing the elements of a tying claim, that requirement is no more than the act of tying itself. To the extent the

Superior Court found there was no extreme and extraordinary economic duress, it certainly

did not exclude the possibility that Cabot conditioned the purchase of flake on the purchase

of other forms of tantalum.

This interpretation of coercion – that it simply is shorthand for the assertion that the

sale of one product to another can be satisfied – is confirmed by another element of a tying

claim. In order for a tying claim to exist, there must be an agreement between two parties –

the seller and the buyer.

> From a buyer's perspective, tying most frequently constitutes a reluctant
> combination and not an eager conspiracy. This fact does not diminish the
> adherence of our holding to the core purposes of the concerted action
> requirement of section 1. The Sherman Act subjects concerted activity to
> particular scrutiny because of the inherent anticompetitive risk that such
> activity will eliminate "independent centers of decisionmaking that
> competition assumes and demands." *Copperweld Corp.*, 467 U.S. at 769.
> Concerted action by two entities which "previously pursued their own
> interests separately . . . reduces the diverse directions in which economic
> power is aimed [and, therefore,] increases the economic power moving in one
> particular direction." *Id.* As with other concerted activity, tying agreements
> between buyer and seller deprive the market of "independent centers of
> decisionmaking" by forcing a buyer in need of the tying product to purchase
> the tied product from the same seller. *Id.* The concerted action requirement
> exists to prevent exactly such deprivation.

*Systemcare, Inc. v. Wang Lab. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997). To some

degree, every plaintiff in a tying case must at some point have agreed or acceded to the

defendant's demand.

Put another way, Cabot wrongly argues that the state court's dicta that AVX

"voluntarily" entered into the 2001 Supply Agreement demonstrates that there is no tying

claim because AVX must show that it involuntarily purchased the tied products. In

analyzing a tying claim under the Sherman Act, however, AVX must first demonstrate that

"it entered into a contract or combination with defendant – that it agreed to the alleged tying

arrangement." *R&G Affiliates, Inc. v. Knoll Int'l, Inc.*, 587 F. Supp. 1395, 1398 (S.D.N.Y.

1984). This requirement is necessary because "Section 1 of the Sherman Act, 15 U.S.C. § 1,

expressly forbids only contracts, combinations or conspiracies in restraint of trade....Thus,

[this section] require[s] concerted rather than unilateral activity." *Id.* at n. 11. It would be

illogical therefore for a court to conclude that because an agreement was entered into there

can be no coercion; an agreement is an essential element of tying, and therefore coercion.

Indeed, the U.S. District Court for the District of Massachusetts has held that because

a plaintiff did not enter into an agreement with the defendant, it could not allege antitrust

tying claims.

> Swaney's counsel conceded at the hearing on the motions to dismiss that
> Swaney refused to accept the alleged tying or exclusive dealing
> arrangement originally offered by the Atlas Copco defendants, and that
> when it finally decided in November 1984 to agree to take on the full-line
> of Atlas Copco products, Atlas Copco said "no" to the arrangement. An
> agreement requires a meeting of the minds....There was no meeting of the
> minds between Swaney and the Atlas Copco defendants and therefore
> Swaney has failed to allege an essential elements of a section 3 claim.

*C.R. Swaney Co., Inc. v. Atlas Copco North America, Inc.*, No. 85-587-N, 1987 U.S. Dist.

LEXIS 12470, * 44 (D. Mass. October 20, 1987). Only after the concerted action is

established does the Court move to the actual elements of sustaining a tying claim.

Thus, the implication of Cabot's analysis is that there can never be a tying claim.

Any entity that agrees is not coerced; any entity that does not agree has not demonstrated the

necessary concerted activity. Such a result is, of course, absurd. The only logical reading of

the cases is that "coercion" means simply that the seller has conditioned the purchase of one

good upon the purchase of another and has sufficient market power to do so.

### b. The Superior Court Decision Addressed An Entirely Different Concept

What was at issue before the state court was the following. Cabot, for its part, asserted that the 2001 Supply Agreement superseded the 2000 Agreement. Thus, not only was such contract valid, but Cabot also asserted that the release language precluded AVX's suit. As a defense, AVX asserted that Cabot could not hide behind the 2001 Supply Agreement because that contract was obtained by "economic duress."

The concept of economic duress was discussed in the Superior Court decision. As the Superior Court saw it, the elements of economic duress were as follows:

- One side involuntarily accepted the terms of another;
- Circumstances permitted no other alternative; and
- Said circumstances were the result of coercive acts of the opposite party

*Cabot Corporation v. AVX Corporation*, No. 031235BLS, 2004 WL 1588116, *4 (Mass. Super. June 18, 2004) (citing *International Underwater Contractors, Inc. v. New England Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979)). The Superior Court added as a gloss on those elements that the defense of economic duress in the context of a release requires the demonstration of "***extreme and extraordinary***" circumstances. *Id.* Thus, the Superior Court apparently distinguished between levels of duress. Put another way, the Superior Court asserted that even if AVX had proven real duress, ***but not extreme duress***, then it could not prevail on this defense.[4] This is also clear from the Superior Court's analysis of the facts. In that discussion, the Superior Court noted that Cabot "did not commit or make any 'unlawful' act or threat; and it is doubtful that [Cabot's] hard bargaining fits within the concept of a 'wrongful act' as that phrase is used among the elements of economic duress." *Id.*

---

[4]     As discussed in the next section, it is not clear whether this analysis was necessary to the Superior Court's decision or a mere non-binding observation.

This notion of economic duress is very different from the action required under the federal antitrust laws. Economic duress appears to require either an unlawful act or threat, or at least something very close to it. This threshold is much higher and much different than the mere conditioning of the purchase of one good upon the purchase of another for federal antitrust claims that is discussed above. Put another way, there is no way of telling from the Superior Court opinion whether Cabot required the purchase of nodular as a condition of purchasing flake – Judge Van Gestel was focusing on an entirely different set of issues.

This analysis is confirmed by the fact that AVX's antitrust claims redress fundamentally different types of wrongs than its breach of contract claims. A defendant need not breach any agreement to violate antitrust laws. Indeed, a breach *vel non* is entirely irrelevant to this antitrust claim. Were AVX to seek to prove at trial the sordid tale of Cabot's breaches of agreement, the federal court would correctly rule that evidence inadmissible. Conversely, if AVX had gone into an excursus on tying in the state court, the state judge would have excluded such narrative irrelevant. There can be no better refutation of a common nucleus of operative fact if the core facts are mutually inadmissible in the separate trials. It is settled "that where the witnesses or proof needed in the second action overlap substantially with those used in the first action, the second action should ordinarily be precluded." *Porn v. National Grange Mut. Ins. Co.*, 93 F.3d 31, 36 (1st Cir. 1996). Thus, it is equally settled that when the proof does not overlap substantially, the second action should not be precluded.

The same result is obtained by applying the factors set forth in *Apparel Art Int'l v. Amertex Enters.*, 48 F.3d 576, 584 (1st Cir. 1995).

> This Court has enumerated several factors which are useful in determining whether a party has advanced claims in multiple litigations

> which derive from the same nucleus of operative facts. These factors
> include: 1) whether the facts are related in time, space, origin or
> motivation; 2) whether the facts form a convenient trial unit; and 3)
> whether treating the facts as a unit conforms to the parties' expectations.
> Additionally, when defining the contours of the common nucleus of
> operative facts, it is often helpful to consider the nature of the injury for
> which the litigant seeks to recover.

*Id*. Using those factors, while the facts are related temporally, they are different in origin and

motivation – one set relates to contractual issues, the other relates to market participation.

The two sets of facts do not really form a convenient trial unit; there would be little savings

of time to try them all at once and the relevant facts do not substantially overlap. The third

factor cannot be usefully applied in this context. Finally the nature of injury is significantly

different. Antitrust injury and contract damages are two separate species.

### 3.    The Final Judgment Is Not From A Court of Competent Jurisdiction[5]

Although Cabot is correct that the state court judge's decision constitutes a final

judgment for purposes of collateral estoppel, a final judgment for collateral estoppel purposes

must come from a court of competent jurisdiction. The law is clear that causes of action

brought under the Sherman Act are exclusively within the jurisdiction of federal courts. *See*

*Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373 (1985); *Martin v.*

*Factory Mutual Research Corp.*, 401 Mass. 621, 625 (1988); *Codman v. New York, N.H. &*

*H.R. Co.*, 253 Mass. 144, 152 (1925).[6] Indeed, that is why the state court is adjudicating

AVX's and Cabot's state law issues, and the federal court is adjudicating AVX's antitrust

---

[5]    AVX concedes that under the *O'Brien v. Hanover Ins. Co.*, 427 Mass. 194 (1998) decision, there is a final judgment for purposes of collateral estoppel.

[6]    In fact, federal courts do not even have discretion to abstain from deciding federal antitrust issues pending resolution of a state suit involving the same parties and involving the same transactions. *Ticket Center, Inc. v. Banco Popular De Puerto Rico*, 399 F. Supp. 2d 79 (D.P.R. 2005). Federal courts must decide federal antitrust issues, regardless of what is happening in state court proceedings involving the same parties and issues.

claims. Cabot itself conceded this point to the state court. When AVX sought to amend its

state court claims to add its federal antitrust claims, Cabot successfully opposed the motion

by claiming that the state court lacked jurisdiction to hear AVX's antitrust claims.

Thus, given the admission that the state court lacked jurisdiction to hear AVX's

antitrust claims, Cabot cannot now argue that AVX's antitrust claims must be precluded

based upon legal findings of the state court – the very court Cabot admits did not have

jurisdiction to hear the antitrust claims. Cabot cannot argue that the state court lacks

jurisdiction to preclude AVX's amendment, and then argue that the state court had

jurisdiction to issue a final decision sufficient to preclude AVX's antitrust claims in federal

court.

> Claim preclusion generally does not apply where [the] plaintiff was unable to
> rely on a certain theory of the case or to seek a certain remedy because of the
> limitations on the subject matter jurisdiction of the courts....If state preclusion
> law includes this requirement of prior jurisdictional competency...a state
> judgment will not have claim preclusive effect on a cause of action within the
> exclusive jurisdiction of the federal courts.

*Frank Gener-Villar v. Adcom Group, Inc.*, 417 F.3d 210, 207 (1st Cir. 2005) (quoting

*Marrese v. Am. Acad. Of Orthopaedic Surgeons*, 470 U.S. 373 (1985)).

### 4.    The Issue Decided In The State Court Action Was Not Essential To The State Court Judge's Decision.

Finally, to the extent the state court made a determination that AVX entered into the

2001 Supply Agreement voluntarily, that determination was not essential to the state court's

decision. The claims that were pending before the state court are set forth in Appendix A.

After hearing Cabot's motion for summary judgment, the state court entered judgment

against AVX on all counts except counts VI of the Complaint and count V of the

Counterclaim. *See* Corrected Final Judgment.

The issues raised in Cabot's motion for summary judgment were whether the plain words of the 2001 Supply Agreement establish that AVX's claims were settled and released and whether AVX ratified the 2001 Supply Agreement by performing under it for years, asserting rights under the 2001 Supply Agreement and negotiating modifications to the 2001 Supply Agreement. Cabot specifically noted in its motion that because AVX had ratified the 2001 Supply Agreement, the state court did not even need to address AVX's defense of economic coercion. *See* Cabot's Memorandum in Support of its Motion for Partial Summary Judgment, pp. 14-17.

The precise grounds of the Superior Court decision are not entirely clear. On the one hand, the state court judge apparently agreed with Cabot's argument, because he found that AVX had indeed ratified the 2001 Supply Agreement. *Id.* at 5. This holding would tend to suggest that the entire question of economic duress was not necessary to its ultimate decision. On the other hand, the court also spends some space discussing the duress issue.

Thus, there are three possibilities. First, the central holding is the ratification holding in which case the portions of the decision on which Cabot relies are not necessary. Second, the central holding is the release analysis, in which case Cabot would be correct that that element of collateral estoppel was satisfied. The third possibility is that the Superior Court intended alternative holdings, in which case the discussion of the release is not necessary and, again, this element of collateral estoppel would not be satisfied.

Taking a step back however, it is important to remember that the burden is on Cabot to demonstrate that it *has* met the elements of collateral estoppel, *not* AVX's burden to demonstrate that it has not. In light of the various ways of interpreting the Superior Court

opinion, Cabot cannot demonstrate that the portions of the opinion on which it relies were unambiguously necessary to the final decision.

### 5.    Much of Cabot's Own Analysis Is Irrelevant

This discussion would not be complete without noting that portions of Cabot's brief swerve into an entirely different – and incorrect – argument. Cabot engages in a factual recitation that goes beyond the Complaint. Cabot Memorandum at 9-11. It does not argue that these facts are binding on this Court, nor does it attempt to demonstrate that these facts are somehow dispositive of the issues in this matter. Without this showing, Cabot cannot go beyond the pleadings in its motion, and therefore these facts are irrelevant.

Even if these facts relate to Cabot's collateral estoppel issues, they are not dispositive. Findings that AVX, once forced to enter into the tying agreement, negotiated terms favorable to it does not excuse Cabot's antitrust behavior.[7] Therefore, these allegations do not aid Cabot's collateral estoppel argument; either the Superior Court decided the precise legal issue before this Court or it did not. Cabot's desperate attempt to somehow legitimize its argument by referring to factual findings of the Superior Court that do not aid its argument only further supports AVX's position.

_____

[7]     In any event, the entire factual question of "voluntariness" is a red herring. Under federal law, even when a party has been shown to not only voluntarily enter into a contract that violates federal antitrust law, but actually benefit from that agreement, the courts still have rejected such benefit as a defense to the antitrust nature of the agreement in the first place. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (*overruled on other grounds*, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir. 1985); *McKenna-Sabean Assoc., Inc. v. Ross Indust., Inc.*, No. 76-211-S, 1977 U.S. Dist. LEXIS 16983, * 3 (D. Mass. March 9, 1977). Thus, even in cases where the coerced party not only agreed but actually benefited from the agreement, the fact that the party, once it realized it had to enter into some agreement in order to continue doing business, sought to minimize the damage by negotiating provisions of the agreement ***cannot*** be used to demonstrate that there was no illegal antitrust activity on the part of the party pushing the tying agreement.

## CONCLUSION

For the foregoing reasons, Cabot's motion should be denied.

> Respectfully submitted,
> AVX CORPORATION
> AVX LIMITED
>
> By their attorneys,
>
>
> */s/ Evan Slavitt*
> Evan Slavitt (466510)
> Bodoff & Slavitt LLP
> 225 Friend Street
> Boston, MA 02114
> 617/742-7300

April 6, 2006

# APPENDIX A

## CLAIMS AND COUNTERCLAIMS IN STATE CASE

Cabot's Claims

| | |
|---|---|
| Count I | Declaratory judgment that the 2000 Letter of Intent was not valid and enforceable. |
| Count II | Declaratory judgment that the 2001 Supply Agreement was valid and binding. |
| Count III | Declaratory judgment that 2000 Letter of Intent was not breached by Cabot. |
| Count IV | Declaratory judgment that Cabot has not breached the implied covenant of good faith and fair dealing in relation to the execution of the 2001 Supply Agreement. |
| Count V | Declaratory judgment that Cabot has not engaged in any unfair or deceptive acts or practices that violate M.G.L. c. 93A in its business transactions with AVX. |
| Count VI | Declaratory judgment that Cabot has not breached the 2001 Supply Agreement. |

AVX's Counterclaims

| | |
|---|---|
| Count I. | Declaratory judgment that the 2000 Letter of Intent is a valid and enforceable contract. |
| Count II. | Violation of M.G.L. c. 93A |
| Count III. | Breach of contract (2000 Letter of Intent) |
| Count IV. | Breach of the covenant of good faith and fair dealing |
| Count V. | Breach of contract (2001 Supply Agreement) |

See Cabot's Complaint for Declaratory Judgment; AVX's Answer, Counter-claim and Jury Demand.