# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT

|  |  |
|---|---|
| CABOT CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) No. 03-1235-BLS |
| AVX CORPORATION and AVX LIMITED, | ) |
| Defendants. | ) |

# OPPOSITION TO PARTIAL MOTION
# FOR SUMMARY JUDGMENT

## INTRODUCTION

In making its motion for partial summary judgment, Cabot Corporation has a high, and ultimately impossible, burden to carry. It raises two points. First, it asserts that any cause of action AVX might have was released by the Long Term Supply Contract (what Cabot calls the "2001 Supply Agreement"). Second, it claims that even if the Long Term Supply Contract were invalid at its inception, AVX has ratified that contract by its conduct. Neither claim can be resolved at this stage of the case.

As to the release, Cabot's motion fails because it involves a defense – duress – that simply cannot be resolved as a matter of law.[1] There is no question that the following propositions are true and Cabot does not meaningfully contest them:

---

[1] Cabot makes a curious statement on page 14 of its supporting memorandum that the Court need not

{00006151.6}

- Duress will void a contract

- Economic duress is recognized as a form of duress

- A release is a contract

Thus, there can be no question that **if** AVX can prove duress, **then** the release on which

Cabot relies is not valid.

The Court, therefore, is faced with a question of fact. The record shows that AVX

has put forward a serious claim of economic duress. Indeed, AVX can demonstrate that

such conduct happened not just to it, but to at least one other capacitor manufacturer

during the same period. Given that (i) the Court must take all disputed facts in favor of

AVX, and (ii) the quantification or evaluation of the level or amount of duress is uniquely

a fact question to be resolved by a jury, Cabot cannot now prevail on this argument.

A similar problem arises in connection with the defense of ratification. This

assertion – as to which Cabot will have the ultimate burden of proof – depends entirely on

a factual evaluation of AVX's intent and conduct. Did it intend to ratify the contract?

Did it wait too long to bring suit? Is the delay justified by (i) the continuing negotiations

to ameliorate the contractual provisions that began almost immediately after the contract

was signed, (ii) the length and magnitude of the contract itself, and (iii) the fact that the

economic duress was not removed until substantially later when market conditions

changed? Was Cabot prejudiced in any way by any delay? All of these are also questions

---

resolve the issue of duress to decide its motion, but then goes on to give that defense some cursory
treatment. If all Cabot is seeking in its motion is the determination that *if* the release is valid, *then* AVX's
substantive claims (other than those based on defective products) were released, AVX does not contest that
proposition. If, on the other hand, Cabot also seeks summary judgment on the issue of duress, then AVX
does contest that point.

that must be decided by a fact finder and not at the summary judgment stage of the proceedings.

## STATEMENT OF FACTS

### A.   Background

AVX[2] makes tantalum[3] capacitors. Defendants' Statement of Material Facts ("SOF") at ¶ 1. Not surprisingly, tantalum powder is an essential element. SOF ¶ 2. There are only three significant producers of such powder – Cabot Corporation, H. C. Starck, and Ningxia – each of which produces the powder from ore.[4] Another supplier is Showa-Cabot – then a joint venture of Cabot and another company and now wholly-owned by Cabot – which could make powder from an intermediate product called KTaF. By mid-2000 industry reports indicated that Cabot and H. C. Starck together had a market share of approximately 90% of the world's tantalum powder and mill products, and that Cabot produced about 50% of the world's total processed tantalum. SOF ¶ 3.

There are two types of powder relevant to this case. Nodular powder is the basic powder and is made by all the suppliers. Flake powder, which can operate at higher voltages, is only made by Cabot because Cabot holds a patent on the process. No one else in the world produces products that compete with Cabot's C255 or C275, the

---

[2] The other Defendant, AVX Limited is a United Kingdoms corporation with its principal place of business in Fleet, England. It is a wholly owned subsidiary of AVX. For purposes of this motion, the two entities will collectively be referred to as "AVX." SOF ¶ 1.

[3] Tantalum is an elemental metal (chemical symbol Ta) that is approximately as rare in nature as uranium. SOF ¶ 2.

[4] During the relevant period, Showa Cabot, then a partially owned by Cabot and now a wholly owned subsidiary, was able to supply some types of tantalum powder that it produced from an intermediate type of tantalum product called KTaF, also largely controlled by Cabot. Indeed, during the relevant period, Cabot was also shorting Show-Cabot of KTaF and used its position on the Board to prevent it from getting KTaF

designation used for flake powder. SOF ¶ 4. AVX uses both types and is dependent on flake for certain products, including pacemakers and certain military technology.

The market for tantalum is cyclical. SOF ¶ 5. Although in the long run, there is an adequate supply of tantalum, there can be short term periods of shortage. SOF ¶ 6. Because the supply of ore and the capacity of ore processors cannot respond quickly, in those periods of shortage, not only does the price rise, but there are times when there is simply no tantalum powder available at any price because it is either all committed or controlled by one of the three suppliers. SOF ¶ 7.

Cabot's relevant manufacturing facility is in Boyertown, Pennsylvania. Cabot gets its ore from a variety of sources, but principally from its own mine in Canada, or several related mines in which it owns an interest and with which it has long term contracts located in Australia operated by the Sons of Gwalia. SOF ¶ 8.

### B.    Prior Relationship Between Cabot and AVX

#### 1.    General Background

AVX has purchased tantalum from Cabot for many years. SOF ¶ 9. For most of those years, the relationship has been cooperative and productive. *Id.* Thus, AVX and Cabot have worked together to develop new tantalum products, to work out quality issues with existing products, and even to develop newer, non-tantalum technologies. *Id.* There were exchanges of technology, joint development projects, and collaborative working groups. *Id.*

---

from any other source.
{00006151.6}                        4

### 2.    *The Supply Agreements*

For many years, the supplier/customer relationship between Cabot and AVX was documented in certain short term agreements (the "short term agreements"), each entitled a "letter of intent."[5] This nomenclature was apparently chosen by AVX because the agreements did not fix specific amounts of product that were required to be purchased, but, rather, were what is more commonly known as "requirements contracts." SOF ¶ 10. Although Cabot now takes the position that these documents were non-binding statements of unfettered intention, both the contemporaneous treatment of the agreements and an examination of the agreements themselves bely that position. The Court need not – indeed may not – address this dispute.

For the purposes of this motion, because there is support in the record that these agreements constitute binding agreements, they ***must*** be taken as such for the purposes of the pending motion for summary judgment. SOF ¶ 11. To the extent the Court wishes to review in more detail the record on this issue, it is set forth in Appendix A.

### C.    **The Events Leading Up to the Long Term Supply Contract**

### 1.    *The Change in the Market*

As early as February, 1998, Cabot began laying the groundwork for what it saw as an upcoming shortage of tantalum powder. SOF ¶ 37. Mr. Odle, Mr. Fisher, and Mr. Burnes met with Mr. Chilton, Vice President of AVX's Tantalum Division, and stated

---

[5] Cabot makes much of the title of these agreements. Since it must concede that the name was chosen by AVX, its inferences about the purpose of the title are, of course, speculation and without foundation. After months of discovery, Cabot has failed to discover one shred of evidence that indicates that this particular title was intended to mean that the agreements were entirely non-binding.

that they saw an ore shortage on the horizon. Mr. Burnes stated that "in a market going short, we don't have to live in a cost-plus pricing world (as AVX does)." *Id.* Cabot continued to harp on this theme, continually asking for long term "take or pay"[6] contracts. SOF ¶ 38. For example, in 1999, Cabot told AVX of a potential tantalum shortage and sought a longer term contract. *Id.* Indeed, Cabot communicated its view of the shortage to all of its customers in a coordinated effort. *Id.*

Cabot continued to pursue the accumulation of market strength to accomplish this goal. Nor is this a mere inference from the actions of Cabot; Cabot's own employees confirmed that it was a premeditated plan to control the market and extort its customers. It was an "$800 million gamble on ore *to hold the industry captive . . . .*" SOF ¶ 39. Under its own analysis, by September, 1998, Cabot had leveraged its market position and had the best position of any supplier. *Id.*

Cabot's goal was clear. It sought to shift all price risk to its customers such as AVX. SOF ¶ 40. In essence, it wanted not only to lock in a much larger profit, it sought to shift all market hazard to others.

> [A]t the CEO level and at the board level and at the shareholder level, and at, with the investment community we were under a lot of pressure during this time period to rationalize why our performance was below expectations and our customers' performance was record-breaking, and so we, it was incumbent upon us, we were chartered, we were charged and chartered with executing a business plan that allowed us to capture some of this value in the supply chain.

---

[6] A "take or pay" contract sets forth a mandatory amount of product to be purchased. Even if the customer does not take it, it must pay for it. Logically, the phrase should be "take and pay" since the customer does not face any choice, but the nomenclature as stated appears to be common to all parties to this case.

SOF ¶ 40. In a description of Kemet that exemplifies Cabot's attitude towards all of its customers including AVX, Mr. Young put it more simply: "Kemet should be viewed as a big ole milk cow for us, not a hamburger meat cow, a big difference." *Id.*

For the 1999 and 2000-01 agreements, Cabot did not have sufficient leverage to force a long term take or pay contract, and so it signed those documents. SOF ¶ 41. It was not until the summer of 2000, that the situation had changed in Cabot's favor. Cabot then began a calculated strategy simultaneously (i) to starve AVX of product, and (ii) to issue threats that Cabot would breach the existing short term agreement unless AVX caved into its demands. *Id.* Thus, under the 2000-01 agreement, AVX was to get 3,200 kilograms per month of C606 but, by May, was in fact was only getting 2,000 kilograms a month. SOF ¶ 42. Cabot was now in a position to threaten its customers with a restriction or elimination of supply. *Id.*

> In the beginning in the, I want to say late summer of 2000, we began to tell our customers that based on what we saw the demand levels rising to as early as calendar 2001, we may not be able to supply to their satisfaction all of their needs, and when we quantified that and they compared what we suggested we could do in that time frame versus what they wanted from us, they became very upset.

SOF ¶ 43. Of course, *this was not true.* As Cabot would make clear, if and only if customers such as AVX or others signed the long term contract Cabot was insisting on, the supply of powder would magically reappear.

The fact that this was an intentional strategy is demonstrated by Cabot's own internal communications. As Hugh Tyler made clear, "[o]ur obvious strategy should be to leverage our ore position for maximum CPM [Cabot] profit." SOF ¶ 44. Nor was this

leverage merely discussed internally. Mr. Odle later put the position starkly to Mr.

Gilbertson.

> Ken [Burnes] is in a position to go short and make more money that [*sic*,
> probably "than"] we would generate in a series of long term contracts. He
> understands the industry, but, pushed into a corner he will come out
> fighting and *he clearly has both the raw material leverage and
> toughness*.

SOF ¶ 44.[7]  Cabot then proceeded down this path.

Further proof that this was a cold-blooded tactic is demonstrated by the fact that

Cabot used this strategy on others. As David Maguire, Kemet's former CEO explained,

> My understanding is Cabot told us, again, in the late '99 period we can't
> live with this '01 part of the agreement. Others are signing up for five
> years at $500 a pound, that Vishay had already signed and they were going
> to consume 65 percent of Cabot's fixed quantity of 530,000 pounds. AVX
> has already signed for at least 100,000 pounds, and there is only 100,000
> pounds left. And, you know, you could have that on some of these sole
> source powders, but if you don't sign up for five years right now, that we're
> going to auction those off to the highest bidder beginning in mid
> December of '99. So sign up now or you guys are SOL, out of luck.

SOF ¶ 44.

By July, 2000, Cabot had publicly changed its approach to its customers. Even

though it had contracts with its customers such as AVX and Kemet,[8] it now informed

them that it would now put its product up for bid. Beginning of the Paradigm Shift. In

essence, Cabot began a strategy of putting essential supplies at risk to induce its

customers to accede to its demands.

---

[7] For confirmation of Cabot's leverage position in the industry, *see* Reynolds Aff. ¶ 21 (Slavitt Aff., <u>Tab 1</u>).
[8] Kemet is important in this context because although Cabot is now denying a contractual relationship with AVX, it has never denied being in a contractual relationship with Kemet. Nonetheless, Cabot engaged in the same course of conduct with Kemet at the same time. Thus, it is clear that its actions have nothing to do with the asserted lack of contract, and everything to do with it decision to use leverage unfairly and improperly.

On August 7, 2000, Mr. Odle wrote to Mr. Gilbertson expressing concern about a long term contract and raising, for the first time, the claim that the 2000 short term agreement was not binding. SOF ¶ 46. The sword was now officially unsheathed. Mr. Odle's goal was

> To inform you that without a contract, I am concerned that we will not be able to supply your business

He continued

> I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years.

*Id.* Nowhere does Mr. Odle acknowledge that the 2000-01 short term agreement did indeed have "take" or pay provisions in addition to its other contractual provisions.

AVX responded by asserting that the 2000 short term agreement was, indeed binding. SOF ¶ 47. Nonetheless, at this point, it became clear that Cabot was seeking to extort an outcome by violating an existing contract and disputing its existence. As Mr. Odle explained to his team, in order to overcome AVX's resistance to signing a long term supply contract, "I don't think that anything less than "Brute Force" is going to bring that about and that is too bad." SOF ¶ 48. This strategy became even clearer as events progressed. As Mr. Tyler stated in response to a July, 2000, statement by Mr. Rosen, then-CEO of AVX, that he did not see a drastic powder shortage, "*We'll make him pay for his arrogance.*" *Id.* In August, Cabot threw down the gauntlet by saying "we are not under any obligation to supply AVX in 2001 and beyond. I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years."

*Id.*

Having forced AVX to negotiate even in the face of an existing contract, Cabot turned up the temperature in late summer of 2000. At that point, Cabot informed AVX that the package of proposals that were under discussion were now "withdrawn." SOF ¶ 49.

Negotiations continued in the context of Cabot's commercial threats.[9] SOF ¶ 50. On or about September 1, 2000, Mr. Tyler called Mr. Chapple to tell him that all the available tantalum powder had been "sold" as of the previous day. *Id.* In addition to being blatant coercion, this statement, of course, was untrue. All AVX had to do was to agree to the Long Term Supply Contract, and suddenly the powder would become available. AVX understood the nature of the threat.

> Mr. Tyler summarized the situation for internal consumption quite neatly.
>
> I actually made contact with Biddeford first (Gail Lahey, buyer, in Bob Fairey's absence). Advised Gail of our plans to hold out 20,000 lbs of powder for Biddeford in 2001. Told her we will sell no powder to Paignton. Suggested that since we do no know how Chapple would react to this plan they (Biddeford) should be ready to defend itself and the 20,000. Gail was very appreciative of the heads up and the 20,000 allocation (even though they will need 30,000 lbs and we are their sole supplier), and asked me to get back to her after the Chapple call. I agreed.
>
> Finally reached Chapple at – 10:45 and gave him the plan. It's an understatement to say that he was insensed [*sic*]. After I went through the entire scenario: no powder in 2001 (except Biddeford), KTaF @ $90/lb . . .

SOF ¶ 50. Mr. Tyler also reported that Mr. Odle had informed Mr. Chilton that Cabot did not have any flake left. *Id.*[10] Cabot repeated this threat on more than one occasion. *Id.*

---

[9] This was also termed the "auction" strategy. SOF ¶ 50.
[10] The threats to sell powder were continuing. SOF ¶ 50.

AVX was not the only recipient of these threats. Kemet, with whom Cabot had a contract that it does not contest, faced the same strategy. As Mr. Young explained to Mr. Fisher in the context of the Cabot/Kemet negotiations, "Huge increases [in Cabot's prices] are expected and Kemet's position has softened greatly *with the threat of no or less powder next year.*" SOF ¶ 51. The CEO of Kemet described Cabot's conduct as an "extortion hammer." *Id.*

At the same time that these threats were being issued, Cabot was also shorting AVX of product that was required to be delivered under the 2000-01 short term agreement. Cabot cannot deny this action either. As its own internal documentation states: "Our failure to ship to promised schedule has caused a crisis." SOF ¶ 52. Again, this was a strategy that Cabot used with its other customers. *Id.* Even for 2000, Cabot now began to refuse any orders.

> Regarding the powder, wire, and K salts prices which Hugh [Tyler] discussed with John [Chapple] on August 18, that offer has been retracted, and thus, the orders which John mailed to us are not accepted.

*Id.* Instead, Cabot informed AVX that it would entertain multi-year proposals to begin in 2001.

Facing the termination of the supply of a critical manufacturing product which could not be replaced, AVX faced no commercial choice. SOF ¶ 53.[11] It was obliged to concede even in the face of an existing contract. *Id.* Mr. Fisher explained in an internal email that "[c]ustomers at first had difficulty with this paradigm shift, but we are confident they will come around. All cap customers are experiencing lower-than-

---

[11] In September, 2000, John Chapple made clear that he understood the threat. "You are saying that you will not be supplying Ta powder to us for 2001 [20000 lbs for Biddeford accepted {*sic*, probably

promised shipments from our competitors, and they value reliable supply." SOF ¶ 53.

Cabot made clear that its position was not negotiable, as Mr. Tyler described, "Reminded

him that Ken [Burnes] expects AVX to come in with a 5 year plan; that Ken would listen,

but not negotiate . . . ."[12]  SOF ¶ 54. As Mr. Gilbertson explained, the only other

perceived choice was commercial catastrophe.

> I authorized the execution of the Long Term Supply Contract for one
> reason and one reason only. Even though I believed that AVX and Cabot
> still had one year left on the 2000-01 short term agreement, Cabot's threats
> to cut off supply of tantalum to AVX left AVX with no commercial free
> will. If Cabot had done so – and Cabot was already shorting AVX on
> material to which it was entitled – AVX would have been commercially
> crippled, perhaps permanently. The financial devastation to the company,
> to its employees and to its customers would have been staggering and
> incalculable.
>
> I was also aware that some of the products made by AVX are essential for
> the continued health, and even life, of some end users. For example, there
> is no meaningful alternative for some of the pacemakers manufactured by
> AVX's Biddeford facility. Further, there are some military products that
> are also difficult or impossible to replace.

SOF ¶ 55.[13]  This perception was not unique to AVX. A competitor, Kemet, faced the

same threat and made the same evaluation.

> Q.    Had Cabot cut off Kemet's supply of powder?
>
> A.    Not at that point.

---

"excepted"}] . . . ." SOF ¶ 53.

[12] There was no doubt that Cabot believed that what Ken Burnes wanted, Ken Burnes got. "I reminded
Chapple that Ken Burns [sic] is now controlling this process and that he would like to see a creative
proposal from AVX." SOF ¶ 54.

[13] It is in this context that statements such as "I think we are getting a fair agreement" must be understood.
Once AVX accepted the inevitable, it did not complain and whine in every subsequent email, but tried to
maintain at least the semblance of a civil relationship. Thus, while taken on their own some isolated
comments may seem to indicate that AVX was satisfied with the Long Term Agreement, in context it is
clear what was happening. In any event, at this stage of the proceeding the Court must make inferences
favorable to AVX on this point.

Q.    If they had done so, what would the impact have been on Kemet?

A.    Devastating.

*Id.*

Having put AVX in the position of being forced to choke down large quantities of powder on a take or pay basis, Cabot now turned to price extortion. Rather than looking at what the market price would be over the five years, Cabot instead engaged in an internal analysis of what AVX could pay.[14]  SOF ¶ 56. Thinking more about actual Ta Capacitor Prices. It then informed AVX that all price offers were now off the table and AVX would have to pay a multiple of what was established in the 2000-01 short term agreement.

As negotiations continued, Cabot continued to issue threats. In October, 2000, Mr. Odle again told AVX that without a long term take or pay contract, Cabot would not supply tantalum powder to AVX in 2001 or beyond. SOF ¶ 57. Mr. Chilton responded to this naked threat by once again pointing out that AVX believed the 2000-01 short term agreement was a binding contract and that Cabot's threatened actions would be in breach of that contract. *Id.*

By this point, Cabot's employees were internally gloating over AVX's situation. In an internal email, Mr. Tyler recounted a meeting with Mr. Collis and noted that AVX was desperate for the flake powders that were sole sourced to Cabot. He pointed out that

---

[14] It is basic economics that any company that can set price based on a customer-by-customer ability to pay basis -- generally called price discrimination -- has that ability only because of market power. It is typical of a monopolist or an extremely strong oligopolist and confirms that Cabot not only had market power but knew it and was consciously taking advantage of it.

this was "really a big stick in our negotiations with Chilton" and emphasized AVX's shortage problems. SOF ¶ 58.

November brought no relief for AVX. As it continued to negotiate, it put Cabot on notice that it was not waiving its rights. SOF ¶ 59. Nevertheless, Cabot's duress eventually won the day. In January, 2001, having been forced to accept the terms in the Long Term Supply Agreement or face the threat of crippling shortages, AVX signed.

Even though the standards of summary judgment require that the Court accept AVX's narrative as long as it is reasonably supported in the record, Cabot's own CEO summarized the situation quite nicely:

> "We took advantage of the shortage to enter into long term contracts with
> our customers."

> "They were pure margin improvement contracts."

SOF ¶ 60. AVX or Kemet, formal contract or not, Cabot ran roughshod over its customers and was proud of it.

### 2.    *Cabot Made Knowingly False Statements To Obtain the Long Term Supply Agreement*

One of the constant themes that Cabot played during its negotiations with AVX was that it (Cabot) had already sold all of the available powder. SOF ¶ 61. These statements were simply lies. It is now apparent that when AVX acceded to Cabot's demands, powder that was "sold" turned out to be available. It seems beyond peradventure that it is improper for entities to commit fraud to obtain a more favorable contract.

A second claim made by Cabot to AVX was that Cabot was locked into taking a fixed amount of product from its own ore suppliers and, therefore, was justified in seeking to lock AVX into a take or pay contract. These statements were not true. In fact, Cabot had substantial flexibility in the amount of ore it took. One of its sources of supply was its wholly-owned mine in Canada over which it had total control as to production. As to the Australian mine run by the Sons of Gwalia, it has now been determined during discovery that the contract contains terms allowing Cabot flexibility. SOF ¶ 62. *See*, Email from T. Odle to K. Hunt (Sept. 6, 2001) ("Roger is correct that we have the right to take 50% of the Greenbushes material but not the obligation.") (Slavitt Aff., Tab 56).

### D.    After the Long Term Contract Is Signed

#### 1.    *Cabot and AVX Immediately Start Negotiations to Modify the Long Term Supply Agreement*

Almost immediately after the Long Term Supply Agreement was signed, Cabot and AVX began negotiations concerning modification of its terms. SOF ¶ 63. Thus, during May, 2001, Cabot was participating in discussions of various forms of contract relief. *Id.* The discussions continued through the balance of 2001. *Id.*

These negotiations were neither collegial nor free from coercion. Thus, Cabot always kept a threat handy and at the forefront of the discussions. For example, in August, 2001, the threat that Cabot used was a large, expensive and unneeded shipment of KTaF. SOF ¶ 64. *See*, Email from T. Odle to K. Burnes (August 21, 2001) ("I wanted you to know that if AVX does not sign the contract that is now on the table, they get another KSalt [KTaF] shipment on 9/5/2001. **These are painful shipments to them and**

**I expect that they will be motivated  to bring closure to the extension.**") (Slavitt Aff.,
Tab 74).

The negotiations continued into 2002.  In February, 2002, Thomas Odle met with
AVX's CEO, John Gilbertson, to discuss contract changes and amendments.  Cabot
continued to participate in such discussions in March and April, 2002. SOF ¶ 65.  These
negotiations were detailed, extensive, and ultimately fruitless.  It was not until *the
summer of 2002*, however, that it became clear to AVX that it could not achieve a result
that was livable.  It finally became apparent that Cabot was not willing to discuss any
modifications that would affect its profits.  SOF ¶ 66.  AVX filed the federal action on
July 26, 2002, once it became clear that all of AVX's attempts to achieve a negotiated
settlement were unproductive.  At this point, the Long Term Supply Agreement still had
over three and a half years to run.

### 2.    *Cabot Continues To Shortchange AVX*

Notwithstanding the extortion of the Long Term Supply Contract, Cabot itself was
unable or unwilling to comply with its terms.  In fact, it kept AVX on short rations,
providing less tantalum powder than was called for either under the short term agreement
or the Long Term Supply Contract.  SOF ¶ 67.  The effect of this shortage was to keep
AVX hand to mouth in terms of supply and entirely dependent on the continuing supply
from Cabot.  *Id.*.  Instead of supplying powder Cabot supplied schedules to try to catch up
some time in the future.  *Id.*

The shortages were not contested by Cabot.  Mr. Odle himself acknowledged that
Cabot was not meeting the deliveries.

{00006151.6}                                                   16

### 3.    *Cabot Suffers No Harm*

It is clearly the case that at no point during the activities under the Long Term Contract did Cabot ever ship material to AVX at less than the market price. Indeed, for most of that period, AVX was paying, and Cabot was accepting, prices far above the market. SOF ¶ 68.

## ARGUMENT

### A.    Because the Long Term Supply Agreement Was Obtained by Duress, the Release is Ineffective

### 1.    *Duress Will Nullify A Contract*

It is hornbook law that a contract that is obtained by duress is voidable. "Conduct by one party which causes another to enter into a contract 'under the influence of such fear as precludes him from exercising free will and judgment' constitutes a basis for avoiding the contract. Restatement: Contracts, §§ 492, 495. Williston, Contracts (Rev. ed.) § 1603." *Avallone v. Elizabeth Arden Sales Corp.*, 344 Mass. 556, 561 (1962). Put another way, "a person whose will and judgment are overcome by threats, fear or some other influence, and who is thereby compelled to execute a contract that he would not have made in the free exercise of his will and independent judgment, may avoid the contract on the ground of duress." *Cappy's Inc. v. Dorgan*, 313 Mass. 170, 174 (1943) (citing *Bryant v. Peck & Whipple Co.*, 154 Mass. 460 (1891); *Morse v. Woodworth*, 155 Mass. 233 (1891); *Silsbee v. Webber*, 171 Mass. 378 (1898); *Webb v. Lothrop*, 224 Mass. 103 (1916); *Stevens v. Thissell*, 240 Mass. 541 (1922); *Rosenbloom v. Kaplan*, 273 Mass. 411 (1930); *Freeman v. Teeling*, 290 Mass. 93 (1935); *Fleming v. Dane*, 298 Mass. 216

{00006151.6}                              17

(1937)); *Page v. Trufant*, 2 Mass. 159, 162 (1806). *See, Dematteo v. Dematteo*, 436

Mass. 18, 26 n. 16 (2002)(An antenuptial agreement must also, of course, comport with

the rules governing the formation of all contracts, for example, the necessity of

consideration and the absence of fraud, misrepresentation, and duress.); *Saladini v.*

*Righellis*, 426 Mass. 231, 235 (1997) As the First Circuit summarized the law, "[u]nder

Massachusetts law, a party claiming duress can prevail if he shows that (1) 'he has been

the victim of a wrongful or unlawful act or threat' of a kind that (2) 'deprives the victim of

his unfettered will' with the result that (3) he was 'compelled to make a disproportionate

exchange of values.' " *Vasapolli v. Rostoff*, 39 F.3d 27, 34 (1994). *See Langdale v.*

*Menendez*, 1997 Mass. Super. LEXIS 233, No. 94-1436A (Worc. Super. Ct. July 28,

1997).

        This analysis is consistent with the Uniform Commercial Code. "Unless

displaced by the particular provisions of this chapter, the principles of law and equity,

including the law merchant and the law relative to capacity to contract, principal and

agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other

validating or invalidating cause shall supplement its provisions." G. L. c. 106, § 1-103.


        *2.    Economic Duress Is Recognized as a Form of Duress*

        It cannot be seriously disputed that the Commonwealth recognizes the doctrine of

economic duress. "A document signed under economic duress is not binding." *ITT*

*Commer. Fin. Corp. v. Tyler*, 1994 Mass. Super. LEXIS 729, No. 91-7660 (Suffolk

Super. Ct. August 10, 1994). To demonstrate such duress, a plaintiff must prove either (i)

that the agreement was involuntary, (ii) that there was no meaningful alternative, or (iii)

that the plaintiff was coerced into accepting the new contractual terms. *Doiron v.
Castonguay*, 401 Mass. 705, 707 (Mass. 1988). A party seeking to void a contract on the
basis of economic duress must show that "he has been the victim of a wrongful or
unlawful threat or act, and . . . such act or threat must be one which deprives the victim of
his unfettered will. As a direct result of these elements, the party threatened must be
compelled to make a disproportionate exchange of values . . . ." *International
Underwater Contractors, Inc. v. New England Telephone & Telegraph Co.*, 8 Mass. App.
Ct. 340, 342 (1979). As one court explained, under *International Underwater
Contractors* the asserting party must prove : "(1) That one side involuntarily accepted the
terms of another; (2) that circumstances permitted no other alternative; and (3) that said
circumstances were the result of coercive acts of the opposite party . . . " *Hills v.
Chambers*, 2000 Mass. Super. LEXIS 634, *22-23, No. 96-0072B (Worc. Super. Ct.
August 18, 2000).[15] The *Hills* Court further explained that "merely taking advantage of
another's financial difficulty is not duress. Rather the person alleging financial difficulty
must allege that it was contributed to or caused by the one accused of coercion . . . Thus
in order to substantiate the allegation of economic duress or business compulsion . . .
there must be a showing of acts of the part of the defendant which produced (the financial
embarrassment). The assertion of duress must be proved by evidence that the duress
resulted from the defendant's wrongful and oppressive conduct and not by plaintiff's
necessities." *Id.*

---

[15] "Although duress is difficult to prove, a showing of imminent financial distress coupled with the absence
of any reasonable alternative to the terms presented by the wrongdoer may be sufficient to establish
economic duress." *Palmer Barge Line, Inc. v. Southern Petroleum Trading Co.*, 776 F.2d 502, 505 (5th Cir.
1985) (citing *Sonnleitner v. C.I.R.*, 598 F.2d 464, 468 (5th Cir. 1979)).

These cases flow naturally from earlier Supreme Judicial Court precedent. "As respects the plaintiffs' complaint of duress, we assent to the modern view that at least in equity there need not be threat either of bodily harm or of criminal prosecution to constitute duress, and that it suffices that the person threatened is in fact coerced and deprived of his freedom of will by a wrongful influence which impels him to enter into an agreement or to consent to a disposal of property which he would not have entered into or consented to in the exercise of his free will and deliberate, independent judgment." *Rosenbloom v. Kaplan*, 273 Mass. 411, 416 (1930).

### 3.    *A Release Is a Contract and This Release Was Part of a Contract*

It is beyond question that a release is nothing more than a type of contract. *Leblanc v. Friedman*, 438 Mass. 592, 596-97 (2003) ("releases are a form of contract"); *DelSanto v. Bristol County Stadium, Inc.*, 273 F.2d 605, 607 (1st Cir. 1960) ("a release is a type of contract"). As a form of contract, a release is governed by principles of contract law. *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001); *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003); *Allapattah Sers. V. Exxon Corp.*, 188 F.R.D. 667, 682 (S.D. Fla. 1999). Among the principles of contract law that apply to releases is the one that a release obtained by duress is voidable. "It is well settled in Massachusetts that '[a] release signed under duress is not binding.'" *Langdale v. Menendez*, 1997 Mass. Super. LEXIS at \*6 (citing *International Underwater Contractors, supra*). *See Cormier v. Central Mass. Chapter of the Nat'l Safety Council*, 416 Mass. 286, 288 (1993); *Minassian v. Ogden Suffolk Downs,*

*Inc.*, 400 Mass. 490, 493 (1987); *Coveney v. President & Trustees of College of Holy Cross*, 388 Mass. 16, 22 (1983).

### 4.    *The Facts Support a Colorable Claim of Economic Duress*

There is no touchstone that determines when economic duress is present. "[O]rdinarily a claim that a contract was signed under duress presents a genuine issue of fact." *Sigma Sys. v. Rasamsetti*, 2003 Mass. Super. LEXIS 357, *15, No. 01-1435A (Worc. Super. Ct. October 28, 2003). *See Williams v. B & K Med. Sys.*, 49 Mass. App. Ct. 563, 570 (2000) (resolving claim of duress is question of fact). This rule is consistently applied. "Whether duress actually existed in this instance must be determined by the trier of fact, however, for "the issue of duress generally is one of fact, to be judged in light of all the circumstances surrounding a given transaction.' " *Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680, 682 (7th Cir. 1970) (quoting *Weather-Gard Indus., Inc. v. Fairfield Sav. & Loan Ass'n*, 110 Ill.App.2d 13, 22, 248 N.E.2d 794, 799 (1st Dist. 1969)). *See Winget v. Rockwood*, 69 F.2d 326, 330 (8th Cir. 1934) ("What constitutes duress is a matter of law, but whether duress exists in a particular transaction is usually a matter of fact. . . . . There is no legal standard of resistance with which the victim must comply at the peril of being remediless for a wrong done, and no general rule as to the sufficiency of facts to produce duress."); *FDIC v. Perry Bros.*, 854 F. Supp. 1248, 1266 (E. D. Tex. 1994) (same). More specifically, the finder of fact must determine whether AVX was, under all the circumstances, free to decline to enter into the Long Term Supply Contract. To answer this question, the finder of fact must determine whether Cabot deprived AVX of its unfettered will by means of a

wrongful or unlawful threat or act. *International Underwater Contractors,* 8 Mass. App.
Ct. at 342.

In this regard, a threat to withhold performance under an existing contract is
wrongful and will form the basis of a duress claim. *U.S. West Financial Services, Inc. v.
Tollman,* 786 F. Supp. 333, 338-39 (S.D.N.Y. 1992) ("A threat to breach a contract by
withholding performance can constitute economic duress, if the threatened breach will
result in irreparable harm."). *See also Goldstein v. S&A Restaurant Corp.,* 622 F. Supp.
139, 144 (D. D.C. 1985) ("it is a settled principle of law that one party cannot threaten
another if 'the threat is a breach of the duty of good faith and fair dealing under a contract
with the recipient.' *Restatement (Second) of Contracts* § 176(1)(d)."); *805 Third Ave. Co.
v. M.W. Realty Assoc.,* 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 448 N.E.2d 445 (1983)
("The existence of economic duress is demonstrated by proof that one party to a contract
has threatened to breach the agreement by withholding performance unless the other party
agrees to some further demand."); *David Nassif Assoc. v. United States,* 644 F.2d 4, 12,
226 Ct. Cl. 372 (Ct. Cl. 1981) ("Such forms of economic duress, or , as it is sometimes
also called, business compulsion, include threats that would breach a duty of good faith
and fair dealing under a contract[.]"). These cases apply directly. As AVX understood it,
it had a valid and binding contract that Cabot was directly threatening to breach. Indeed,
Cabot used the same threat with respect to Kemet. Maguire Dep. 95.

Q.    How would you characterize that threat?

A.    **Some guy with a gun pointed at your head.**

Maguire Dep. 96 (emphasis added).[16]  This threat exactly paralleled the threats made to

AVX.

> Yeah, it was basically restating the threat, sign up for five years or you're
> out of luck, including the next year, 2001. . . .You can't have a clearer
> threat than that.

Maguire Dep. 97.

Even if the threats were not per se illegal, they may still constitute duress.

"Threats of acts which if actually carried out would not be illegal or actionable may

amount to duress." *Freeman v. Teeling*, 290 Mass. 93, 95 (1935).  As Justice Holmes

explained, "it does not follow that, because you cannot be made to answer for the act, you

may use the threat. In the case of the threat there are no difficulties of proof, and the

relation of cause and effect is as easily shown as when the threat is of an assault.  If a

contract is extorted by brutal and wicked means, and a means which owes its immunity, if

it have immunity, solely to the law's distrust of its own powers of investigation, in our

opinion the contract may be avoided by the party to whom the undue influence has been

applied.  Some of the cases go further, and allow to be avoided contracts obtained by the

threat of unquestionably lawful acts." *Silsbee v. Webber*, 171 Mass. 378, 381 (1898).[17]

As to the impact of the duress, it requires a detailed factual evaluation.

---

[16]  Mr. Reynolds of Kemet described the situation, albeit less colorfully as follows: "In light of Cabot's comments, the fact that there was little other tantalum immediately available from alternate vendors at reasonable prices, and Kemet's rapidly increasing lost sales, Kemet had no choice but to accede to Cabot's demands . . . ." Reynolds Aff. ¶ 19.  AVX faced precisely the same situation.

[17] A typical example would be that it is improper to threaten criminal process to obtain a civil result even if it would, in fact, be proper to prosecute the coerced party.  "If he had embezzled their funds, they had a right to have him prosecuted. If he owed them a  debt, they had a right to accept security for it. But they would have no right to make use of criminal process for the collection of a debt. An arrest, even upon a legal warrant and upon a criminal charge, to compel the payment of a mere debt, would be a misuse of legal process, and the threat of such an arrest may constitute unlawful duress. *Taylor v. Jaques*, 106 Mass. 291, 294-295 (1871)

> The test is subjective and the age, sex, capacity, relation of the
> parties, and all the attendant circumstances must be considered.
> This follows the analogy of the modern doctrine of fraud which
> tends to disregard the question of whether misrepresentation were
> such as would have deceived a reasonable person, . . .

13 Williston, Contracts § 1603, p. 669 (3rd ed. Williston & Jaeger 1970). *Id.* at.

Williston at § 1605, p. 670-1. *See United States v. McBride*, 571 F. Supp. 596, 611 (S. D.

Tex. 1983) (adopting test). It is sufficient to constitute duress that the person threatened

is in fact coerced and deprived of his freedom of will by a "wrongful influence."

*Freeman v. Teeling, supra* at 95.

In the instant case, Cabot's conduct, as set forth above, could be found to

constitute duress. First, and most importantly, Cabot's actions constituted an unjustified

and improper threat to breach an existing contract. As of the time the coercion began,

AVX and Cabot still had 18 months of a valid, binding, and enforceable contract left to

run. Thus, Cabot's conduct is not merely aggressive negotiation; it is a blatantly unfair

and deceptive trade practice.

> Q.    And, sir, you mentioned a moment ago extortion. By "extortion",
> you're referring to the circumstances leading up to Kemet's
> execution of that new supply agreement in late 2000. Is that right?
>
> A.    That's correct.
>
> Q.    And you mentioned several times in the course of your testimony
> here today threats that you say that Cabot made against Kemet in
> the time period leading up to the execution of that contract. Is that
> right?
>
> A    Threats and actual, you know, physical indications of threats, yes.

Maguire Dep. 155-56.

Second, Cabot's actions were not isolated, but part of a comprehensive scheme to violate contractual obligations. It has now been determined in discovery that what Cabot did to AVX it also did to Kemet.[18]  Fisher (Kemet) Dep. 162-64, 168-69.  As Mr. Maguire explained why Kemet renegotiated it contract:

> Q.    Did Kemet perceive that it was free to accept or reject this contract without disastrous commercial consequences?
>
> A.    No. I wouldn't have signed it otherwise.

Maguire Dep. 132.  Thus, Cabot cannot claim that the conduct was accidental or unique. Cabot intentionally launched on a pattern and practice that violated commercial norms of conduct.

Third, it is now clear that part of the negotiations involved statements that turned out be false and fraudulent.  Finally, it is apparent that Cabot launched on the effort to gain market power with the purpose and intent of exercising leverage against its customers.  Cabot's own internal communications show both that its conduct was intentional and designed to develop the ability to use leverage improperly.  Having engaged in such a premeditated effort, Cabot is not in a position to claim that this conduct is acceptable.

---

[18] Although this Court has had before it a dispute between Cabot and Kemet, the outcome of that dispute should not affect the Court's consideration of this case. First, as a legal matter, since AVX was not a party, there can be no estoppel. More important, Kemet and AVX have pursued fundamentally different theories and different types of cases. They cannot, therefore, be compared in any way.

5.     *The Fact That A Legal Remedy Might Have Been Sought Is Not
       Dispositive*

Cabot makes much of the fact that AVX did not immediately race into court.

AVX concedes, as it must, that this is a factor that the jury will ultimately have to

consider. Nonetheless, it has *never* been found to be dispositive. *E.g. ITT Commer. Fin.*

*Corp. v. Tyler, supra.*

> In addition, the availability of an adequate legal remedy is
> questionable. . . . ITT argues that Tyler could have refused to sign the
> arbitration agreement, brought suit against ITT to rescind the mortgage, or
> sought alternative financing.
>
> By March 23, 1990, Tyler was in a financially vulnerable position;
> a situation to which ITT had contributed. He was receiving no credit and
> no inventory from ITT and the original credit agreement allowed ITT to
> accelerate the entire debt upon default. Given the fact that Tyler had little
> inventory to sell, ITT's potential moves against him were a significant
> threat. Therefore, Tyler was not in a position in which he could refuse to
> sign the arbitration agreement, go to court, and continue to do business
> without financing.

*ITT Commer. Fin. Corp. v. Tyler*, 1994 Mass. Super. LEXIS at \*19-20. As the Appeals

Court has emphasized, "if recourse to courts of law is not quick enough to save the

victim's business or property interests, there is no adequate legal remedy." *International*

*Underwater Contractors, Inc., supra at* 346 (quoting 13 Williston, *supra* § 1617, at 709).

The cases relied on by Cabot are not to the contrary. *See, e.g. Ismert & Associates, Inc. v.*

*New England Mut. Life Ins. Co.*, 801 F.2d 536, 550 (1st Cir. 1986)(On facts in specific

case, legal remedy deemed adequate but First Circuit acknowledges the factual nature of

analysis).

In this case, there are two reasons that this argument fails. First, AVX did not

believe that recourse to the courts would have been adequate.

> I had no confidence that recourse to court would have yielded timely relief.
> Indeed, Cabot had made clear that they had taken such a possibility into
> account and that by the time we got any relief, AVX would have been
> irrevocably harmed. Given the state of the market, there was no
> replacement powder that was available.
>
> As result of the foregoing, I authorized the execution of the Long Term
> Supply Contract. It was clear in my mind that AVX was intentionally
> being coerced by Cabot.

Gilbertson Aff. ¶¶ 10-11. It is not up to Cabot – or even this Court – to evaluate that

concern; at the summary judgment stage Mr. Gilbertson's view *must be taken as true*. It

is also consistent with the analysis of Kemet when faced with a similar circumstance:

> We reviewed those discussions in some depth, that if we sued it really
> wouldn't do any good, that it would be tied up in court for a long period of
> time. We wouldn't get our powder, maybe they [Cabot] would even stop
> shipping to us, who knows what would happen, but they were confident
> that they could tie this thing up.

Maguire Dep. 60.

Making the case even stronger, Cabot itself acknowledged that the threat of being

cut off was a real deterrent to any suit its customers might consider bringing. At one

point Cabot made the deliberate decision to short other customers of amounts due them

under their contracts. The possibility that they – Kemet and Vishay – might bring suit

was considered and dismissed.

> **Our legal exposure here is small. Why would either customer sue us
> and risk getting zero powder in the process?**

Email from H. Tyler to M. Fisher (Sept. 26, 2000) C32297 (emphasis added). As the

CEO of Kemet recalls Cabot's reaction to a possible suit:

> Now, the business of a suit was discussed, I mean, not by me necessarily
> but others, and the word that came back particularly from Tom Odle was,
> hey, you can sue us if you want to, but we ain't going to do it and you'll be
> tied up in court for a year. And if you do win, so what.

Maguire Dep. 59. The question, in both Cabot's and AVX's mind was clear – any suit in 2000 would be too commercially risky and uncertain and therefore Cabot could violate contracts blithely and without fear. Having unsheathed the sword of commercial destruction, Cabot has no right to complain that its tactics succeeded, at least for a time.

Second, the Court must consider what would have happened had AVX gone to court in 2001. First, as a structural matter, it would have had to seek an injunction, an extraordinary equitable remedy. There is no competent lawyer that can ever guarantee to any client that such remedy will issue. Second, the injunction sought would have sought that Cabot continue to deliver product to AVX during the pendency of the dispute in light of the fact that Cabot had not yet stopped delivering product. Cabot would have pointed out – correctly – that the real issue was not the deliveries, but the price at which the product would be sold since AVX wanted the product but at the price set at the 2000-01 short term agreement level. Thus, ultimately, the dispute would have been put on hold until the very matters now before the Court have been resolved.

convince a judge that

Alternatively, AVX could have taken actions that Cabot would assert were in breach of the Long Term Supply Agreement. AVX would, therefore, not be receiving product to which it believed it was entitled under the 2000-01 short term agreement. Further, Cabot would have come into court for its own injunction asserting that the status quo should be preserved until the parties' rights had been determined. Given the power of that argument, any court hearing that assertion would most likely have told AVX to continue taking product pending resolution of this very dispute.

In either case, given the underlying facts, the claim that because AVX failed to go to court, ratification should be found turns out to be illusory. The situation would be much as it is today.

## B.     AVX Did Not Ratify the Long Term Contract

### 1.     *Ratification May Not Be·Found When Duress Is Still Present*

With respect to the claim of ratification, AVX does not so much dispute Cabot's abstract statements of law as it challenges the completeness of those statements. First, Cabot fails to identify the essential elements of ratification, which are the <u>removal of duress</u> and an <u>intent to ratify</u>. *Barnette v. Wells Fargo Nevada Nat'l Bank*, 270 U.S. 438 (1926); *United States v. McBride*, 571 F. Supp. 596, 613 (S.D. Tex. 1983); *Deren v. Digital Equipment Corp.*, 61 F.3d 1, 3 (1st Cir. 1995) (in finding ratification the First Circuit noted that "for three and one half years <u>after any claimed duress had passed,</u> the plaintiffs enjoyed the benefits of the bargain they now wish to avoid."); *Ismert and Associates, Inc. v. New England Mutual Life Insurance Co.*, 801 F.2d 536, 548 (1st Cir. 1986) (Maletz, J., dissenting) ("there can be no affirmance [of a contract] unless the duress has ended."); *Diffenderfer v. Heublein, Inc.*, 412 F.2d 184, 187-88 (8th Cir. 1969) ("An essential element in the doctrine of ratification is intention: indeed, it has authoritatively been said that it is at the foundation of the doctrine of waiver or ratification."); *General Motors Corp. v. Firepond, Inc.*, 16 Mass. L. Rep. 528, 2003 Mass. Super. LEXIS 220, *8-9, No. 01-4525 (Middlesex Super. Ct. July 3, 2003)(citing *Ford v. Retirement Bd. of Lawrence*, 315 Mass. 492, 496 (1944)) ("these actions or inactions are only relevant in determining ratification if taken after the coercion is removed.").

Second, Cabot does not acknowledge that ratification is an affirmative defense upon which it has the burden of proof. *Connecticut Junior Republic v. Doherty*, 20 Mass. App. Ct. 107, 111 n.7 (Mass. App. Ct. 1985); *Mountbatten Sur. Co. v. Brunswick Ins. Agency*, 2001 U.S. Dist. LEXIS 24224, *44, No. 00-CV-1255 (E.D. Pa. November 13, 2001); *General Am. Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 901 (11th Cir. 1996); *Foucher v. First Vt. Bank & Trust Co.*, 821 F. Supp. 916, 925-26 (D. Vt. 1993). Cabot's burden is particularly difficult to meet at the summary judgment stage since the question of whether a party waived its claim of duress or ratified a contract is typically a question of fact for a jury to decide. *A.J. Armstrong v. Bloomberg*, 285 Mass. 6, 9-10 (1933); *John T. Callahan & Sons, Inc. v. Dykeman Elec. Co.*, 266 F. Supp. 2d 208, 238 (D. Mass. 2003) ("Waiver, the intentional relinquishment of a known right, is ordinarily a question of fact."); *Ouimette v. E.F. Hutton & Co., Inc.*, 740 F.2d 72, 76 (1st Cir. 1984) ("waiver is a question of fact for the jury to decide"); *Manella v. Brown Co.*, 537 F. Supp. 1226, 1229 (D. Mass. 1982) (holding that whether there was a waiver is a question of fact that is incapable of resolution on a motion for summary judgment).

Cabot has failed to allege when, if at all, AVX was freed from the duress that caused it to sign the Long Term Contract. As such, Cabot has not alleged an essential element of its ratification defense.

2.   *In Order For Ratification to Apply, The Intent to Ratify by AVX Must Be Found*

As noted above, the intent to ratify is an essential element of the claim of ratification. *See e.g. Barnette v. Wells Fargo Nevada Nat'l Bank*, 270 U.S. 438 (1926).

Ratification may be manifested in one or more of several ways, but each is simply a way

of determining whether the coerced party has manifested such intent. *See, Kovian v.*

*Fulton County Nat'l Bank & Trust Co.*, 857 F. Supp. 1032, 1039 (N.D.N.Y. 1994) ("In

order to ratify a contract obtained under duress, *the duress must be removed and* the

aggrieved party *must intend to ratify the contract*.") (emphasis added); *Gallon v. Lloyd-*

*Thomas Company*, 264 F.2d 821, 825-26 (8th Cir. 1959); *Carter v. Couch*, 84 F. 735 (5th

Cir. 1897) (deed to Texas lands made to discharge indebtedness, under duress of

imprisonment, was ratified when donor delayed ten years before bringing action for false

imprisonment); *Barnett v. Wells Fargo Nevada Nat. Bank,* 270 U.S. at 445-6 (1926)

(failure of the party under duress to act for more than three years to disaffirm and reliance

on that in action by parties whose rights would be divested by disaffirmance); *Yingling*

*Aircraft, Inc. v. Budde*, 208 F. Supp. 773, 776 (D. Col. 1962) (in action on notes given in

connection with the purchase of an airplane, a defendant's repeated affirmances of the

contract by retaining the airplane, exercising dominion over it, and participating in the

sale of it, had "the legal consequence of loss of power of avoidance."). *See, United States*

*v. McBride*, 571 F. Supp. 596, 613 (S. D. Tex. 1983).

### 3.    *Even If the Court Does Not Find Specific Intent Necessary, At the Minimum There Must Be a Finding that AVX Acted Unreasonably*

Even if the Court rejects the notion that specific intent must be found, there must

be, at the very least, a showing of unreasonable conduct before the required intent may be

implied. Again, Cabot cannot avoid that such an analysis is factual and dependent on all

the facts. The test for unreasonable conduct *vel non* is not a bright line test. Instead, a

judgment must be made under all the circumstances that the party against whom the doctrine is invoked must be found to have acted unreasonably. "If the coerced party does not contest within a *reasonable* time the document allegedly executed under duress, the contract or release may be ratified and affirmed." *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989) (emphasis added) (citing *Teamsters Local No. 25 v. Penn Transportation Corp.*, 359 F. Supp. 344, 349 (D. Mass. 1973)). A party may ratify an agreement entered into under duress in a number of different ways: "first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity . . . by acting upon it, performing under it, or affirmatively acknowledging it." *United States v. McBride*, 571 F. Supp. 596, 613 (S.D.Tex. 1983). AVX did none of these things.

### a.    AVX Accepted No Benefits

As a threshold matter, any finding of benefits is inherently factual and, therefore, not well-suited for summary judgment. The question is not whether AVX and Cabot acted under the Long Term Supply Agreement, it is whether AVX, in fact, received any benefit from doing so. In fact, it did not.

For the year 2001, Cabot cannot argue at this stage of the proceeding that AVX accepted any benefits of the Long Term Supply Agreement because the Court must accept as true that the 2000-01 short term agreement was binding. Thus, all AVX got in that year was the powder to which it was entitled, but at a multiple of the price it should have paid. As a result, while it benefited from getting tantalum, this was not a new or

incremental benefit of the Long Term Supply Agreement; it was a benefit that AVX had already obtained under the 2000-01 short term agreement.

By 2002, that contract would have expired. Nonetheless, it is also true that by that time the market shortages had receded substantially and the market price had dropped. Thus, the only "benefit" is that AVX paid above-market prices for goods that Cabot would have otherwise been willing to sell to AVX at market price. As noted in the fact section, throughout 2001 and 2002, AVX was constantly trying to mitigate the onerous terms of the Long Term Supply Contract. To try to transform what was an unfair and burdensome contract that AVX was trying to mitigate and Cabot was forcing down AVX's throat into a "benefit" is creative, but not persuasive, advocacy.

The Court must also take into account the fact that the Long Term Supply Agreement was a "take or pay" contract. AVX did not have the "option" to take product – it was obliged to do so. Thus, there was no voluntariness to AVX's actions. Apparently, Cabot now takes the odd position that what AVX should have done was act in a way that Cabot would assert was a breach of the contract so that Cabot could sue AVX (as it sued Kemet). At that point, what Cabot would surely have done is run to court to get an injunction forcing AVX to comply with the terms of the Long Term Supply Agreement until the dispute was resolved – exactly the situation to which it now objects.

This makes no sense. Cabot cannot have it both ways. If it asserts that the Long Term Supply Agreement was mandatory, then AVX did nothing affirmative as it complied pending resolution of this dispute.

### b.    AVX Did Not Unreasonably Delay

The length of time that constitutes unreasonable delay is a matter of case-by-case

analysis. Thus, for example, a ten-month period has been found not to be unreasonable.

*GMC v. Firepond, Inc.*, 2003 Mass. Super. LEXIS 220, *10-11, No. 01-4525 (Middlesex

Super. Ct. July 3, 2003)(Botsford, J.)("But I cannot say as a matter of law that the ten-

month interval between GM's final dealings with Firepond and the filing of this case was

per se unreasonable in terms of time, particularly in light of the fact that GM had

apparently given Firepond consistent notice since April 2000 that it would pursue its

claims for rescission and damages on account of duress."). *Compare Hills v. Chambers,*

*supra* (three years found to be too long). In this context, the issue of delay is no different

than with other equitable remedies. Massachusetts law teaches that "what is a reasonable

time depends on all the circumstances of the case." *Mathewson Corporation v. Allied*

*Marine Industries, Inc.*, 827 F.2d 850, 853 (1st Cir. 1987) (quoting *Powers, Inc. v.*

*Wayside, Inc. of Falmouth*, 343 Mass. 686, 691, 180 N.E.2d 677 (1962)). Moreover,

"where the evidence is in dispute and open to different inferences, the question whether

an act has been done within a reasonable time after the happening of a certain event is

ordinarily a question of fact . . . ." *Elias Bros. Restaurants, Inc. v. Acorn Enterprises,*

*Inc.*, 831 F. Supp. 920, 928 (D. Mass. 1993) (quoting *Powers, Inc., supra*, 343 Mass. at

691, and *Charles River Park, Inc. v. Boston Redevelopment Authority*, 28 Mass. App. Ct.

795, 814 (1990)).

One of the factors that courts consider in evaluating delay is the harm to the other

party. Clearly, if the other party is not being harmed by the delay, then a much longer

time period is permissible.

> Nonetheless, the court holds that there is a question of material fact
> concerning the issue of plaintiffs' intent to ratify the release. If, as
> plaintiffs claim, the cancellation of the Hibjay debt was a pre-existing duty
> of the Bank, then plaintiffs can not be said to have maintained any benefit
> from the release during the two and one-half years between the execution
> of the release and the filing of the instant complaint. **Because the court
> has determined that plaintiffs' claim that the Bank already owed
> plaintiffs a duty to cancel the debt is a question of fact for the jury,
> the court can not hold as a matter of law that plaintiffs intended to
> ratify the release by retaining its benefits, no matter how long
> plaintiffs waited before bringing the instant action.**

*Kovian v. Fulton County Nat'l Bank & Trust Co.*, 857 F. Supp. 1032, 1040 (N.D.N.Y.

1994)(emphasis added).

A recent decision by Judge Botsford is particularly instructive on the issue of what

constitutes unreasonable delay. *See GMC v. Firepond, Inc., supra.* In that case, the

plaintiff, General Motors and defendant, Firepond, Inc. entered into a contract in 1994 for

the licensing and provision of software and services by Firepond to GM. In March 2000,

Firepond terminated the agreement and threatened to stop providing services to GM

unless it executed a new series of agreements and paid Firepond an additional $5 million

to reestablish the licenses covered by the 1994 agreement. In April and May 2000, GM

entered into the new agreements and executed a release relating to Firepond's termination

of the 1994 contract. By December 2000, GM had obtained software to replace

Firepond's and, therefore, stopped using Firepond's software and services. In October

2001, 10 months after it stopped using Firepond's software and 18 months after it

executed the first of the agreements under duress, GM filed suit claiming that it was

improperly coerced into signing the 2000 agreements and the release. Firepond moved

for summary judgment arguing that GM ratified the agreements and the release through

its 10-month delay in bringing suit.

Judge Botsford framed the question before her as follows:

> Since Firepond concedes for purposes of this motion that
> GM signed the release and other 2000 agreements under
> duress, the question is whether GM later ratified its prior
> coerced conduct. <u>The moment when the economic duress
> dissipated serves as the critical point from which to begin
> to measure GM's ratification.</u>

2003 Mass. Super. LEXIS at *9 (emphasis added) (citing *Ford v. Retirement Bd. of*

*Lawrence*, 315 Mass. 492, 496 (1944)). Considering the effect of the 10-month delay,

Judge Botsford held,

> It is well settled actions for rescission must be brought with
> reasonable promptness. *See, e.g., Solomon v. Birger*, 19
> Mass.App.Ct. 634, 638, 477 N.E.2d 137 (1985). What is
> reasonably prompt depends on all the facts and
> circumstances of the case. *See generally Powers, Inc. v.
> Wayside, Inc. of Falmouth*, 343 Mass. 686, 691, 180 N.E.2d
> 677 (1962). GM's economic duress unquestionably ended
> in late December 2000 when Chrome Data's GMAutoBook
> was installed free of any bugs and Firepond ceased
> providing any services. But **I cannot say as a matter of
> law that the ten-month interval between GM's final
> dealings with Firepond and the filing of this case was
> per se unreasonable in terms of time**, particularly in light
> of the fact that GM had apparently given Firepond
> consistent notice since April 2000 that it would pursue its
> claims for rescission and damages on account of duress.

2003 Mass. Super. LEXIS at *10 (emphasis added).

Cabot erroneously asserts that AVX delayed for 18 months before bringing suit.

The appropriate measure of time must begin when the duress was removed and it was

apparent that the negotiations had failed, not when the Long Term Supply Agreement was

signed. *Firepond*, 2003 Mass. Super. LEXIS 220, *9. Using the proper starting point,

AVX brought suit just 1-2 months after the coercion was removed and it became clear

{00006151.6}                            36

that settlement discussions were fruitless. Contrary to what Cabot suggests, whether this period of time was reasonable under the circumstances cannot be decided as a matter of law on summary judgment, as Judge Botsford decided in *Firepond*. Indeed, the 1-2 month period compares favorably to the 10-month period which Judge Botsford held was not unreasonable as a matter of law.

Making AVX's case even stronger, it is important to note that the Long Term Supply Agreement was still less than one third complete when the action was filed. Thus, unlike many – if not most – of the cases involving ratification, this case was brought relatively early in the life of the challenged contract. In that context, unlike a singular event or a fully performed contract, the delay of several months is not sufficient as a matter of law to find ratification.[19]

b.     *The Facts Indicate That Immediately After the Long Term Supply Contract Was Signed, the Parties Began Negotiating To Attempt to Modify That Contract*

In examining whether AVX unduly delayed or manifested assent, the Court must also consider whether there were efforts to mitigate or ameliorate the situation that delayed the onset of litigation. First, as a general matter, parties should be encouraged to resolve differences short of formal suit. Second, such negotiations demonstrate that there was no acquiescence.

The record is clear that almost immediately after the Long Term Supply Agreement was signed, Cabot and AVX began negotiating to change its terms. Letter

---

[19] Indeed, given the magnitude and length of the Long Term Contract, even the delay as calculated by Cabot would not be long enough to constitute ratification as a matter of law.

from John Chapple to T. Odle (June 29, 2001) Odle DX 38; Email from H. Tyler to J.

Chapple (July 17, 2001) Odle DX 39; Email from T. Odle to M. Fisher (Sept. 17, 2001)

Odle DX 40; Email from T. Odle to W. Young (Oct. 22, 2001) Odle DX 43; Email from

J. Chapple to P. Collis (Dec 12, 2001) Collis DX 43; Email from J. Chapple to P. Collis

(Dec. 13, 2001)  Collis DX 44; Email from T. Odle to J. Gilbertson (Feb. 5, 2002) Odle

DX 42; Chapple DX 29.

On some occasions, those negotiations were fruitful and some of the worst

impacts were mitigated. Collis Dep. 13-15. On other occasions they were not.

Nonetheless, the continuing discussions always gave AVX hope that the dispute would be

solved short of litigation. Gilbertson Aff. ¶ 13.

> *c.    Cabot Was On Notice That AVX Contested the Validity of the Long
> Term Supply Contract*

Even during the negotiations in 2000, AVX made clear to Cabot that AVX

believed that the 2000-01 short term agreement was binding and enforceable. In

September, 2000, Mr. Young was instructing other Cabot employees to document

discussions in case of a suit by AVX. Email from W. Young to H. Tyler (Sept. 1, 2000)

C32110

> Cabot has been a critical supplier to AVX, and is a sole source on many of
> its products. It has been a long-standing relationship, which AVX has
> replied [*sic*, probably "relied"] on in the past. As a key part of that
> relationship, ***AVX and Cabot reached an agreement governing the price
> for orders by AVX that both parties signed and on which AVX replied
> [sic, probably "relied"].  Further, we have had that agreement reviewed
> by counsel who believe it to be a valid and binding agreement.***

Letter from E. Chilton to T. Odle (Oct. 6, 2000) Odle DX 30 (emphasis added).

### 3.    *Cabot Has Been Benefited and Has Not Been Prejudiced By AVX's Attempt to Resolve This Matter Short of Litigation*

Cabot puts on the mantle of the wronged party that has been taken advantage of by AVX. This pose is unconvincing. As described above, during the entire time that the Long Term Contract has been in place, Cabot has merely sold product to AVX at prices that are never lower than market and which are generally above market. Put simply, it has sold product at prices that it could not have otherwise received. To the extent that any adjustment must be made to avoid even minimal inconvenience to Cabot, it can be done at the damages stage of the proceedings. There is no other prejudice to Cabot. Thus, there is no equitable reason to find ratification and every reason not to find ratification.

# CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment should be

denied.

AVX CORPORATION
AVX LIMITED

By their attorneys,

Evan Slavitt (466510)
Richard P. O'Neil (645214)
Bodoff & Slavitt LLP
77 North Washington Street
Boston, MA 02114-1908
617/742-7300

Dated: December 15, 2003

## CERTIFICATE OF SERVICE

I hereby certify that I have, on the foregoing date, caused this document to be
delivered by first class mail, by courier, or by hand.

## APPENDIX A

### THE LETTERS OF INTENT CONSTITUTED BINDING AGREEMENTS

The record demonstrates four independent reasons that the documents entitled

"letters of intent," that is, the short term agreements, constituted binding contracts. This

Appendix sets forth in more detail the record on this point.

First, AVX viewed the documents as binding contracts. SOF ¶ 11. As Mr. Collis

testified:

> Q. Is it fair to say that AVX resisted making forward commitments to
> Cabot and thus resisted taking on what you perceived to be the risk that
> Cabot had taken?
>
> A. *No. I believe we signed annual contracts with them for a number of
> years and a 2-year contract in 2000.*
>
> Q. And that would be what was – that was called a letter of intent; that is
> the document to which you refer?
>
> A. Yes.

*Id.* This fact is also evident from Cabot's own records. Hugh Tyler distributed this

record of his conversation with Mr. Chapple.

> Highlight of my conversation this morning with Chapple re long term
> contracts, and my recommendation:
>
> Chapple: Before we talk about next year, tell me how you're going to
> honour current order requirements". (His pain is C255 and C275 past dues
> and shortfalls of LOI requirements)
>
> I reviewed our 7/27 conversation in which I advised John that we are
> going to negotiate new multi year contracts to be effective calendar 01.
>
> *John emphasized that we are reneging on the existing contract (his
> words).*

{00006151.6}

I advised John that we are having/have had the same discussions will [*sic*, probably "with"] all out [*sic*, probably "our"] major customers and that 'two have responded already".

I reviewed the Ernie Chilton rebuffing during his visit to Boyertown.

*I advised JC that Tom Odle is emphasizing with our customer's executives that we will not be able to satisfy their requirements unless we have binding, long term contracts and that a letter is about to go out to John Gilbertson.*

SOF ¶ 12. Two points are obvious from this Cabot memo. First, it is clear that before this litigation arose or the parties began positioning for it, AVX clearly thought that the short term agreements were contracts. Second, the nature of Cabot's naked threats are clear. Indeed, it demonstrates that Cabot cannot convincingly argue that its threats were justified on the grounds that it did not have a contract with AVX; it was also issuing the same threats to Kemet with which Cabot has always conceded and asserted that it did have a contractual relationship.

Second, Cabot itself viewed the documents as binding contracts. SOF ¶ 13. In contemporaneous documents – before it was to Cabot's advantage to pretend otherwise – Cabot acknowledged that the documents were "agreements." *Id.*

- In 1996, when explaining his view of the then-existing agreement in the face of a request by AVX to cut prices, Mr. Odle explained to other Cabot employees that the C-415 powder prices "[h]ave been set *by contract* at $196.60 per pound for AVX *this year* and that is where they will stay." SOF ¶ 14. He made the same point concerning other powders. Put simply, when it was to Cabot's advantage in a weak market, it had no hesitation in calling these agreement contracts and insisting on its rights.

- In 1997, when sending off the 1997 agreement, Mr. Persico, the Cabot business unit manager in charge of AVX, stated that he was enclosing "a document outlining the *agreed upon pricing, terms, conditions, and volumes for capacitor powder and wire.* The document spells out *the*

*commitments made on the part of AVX and [Cabot]* regarding the purchase and supply of these materials." SOF ¶ 15.

- As Cabot employees were discussing the negotiation of the 1998 agreement, Mr. Fisher explained:

  "--    the new *contracts* for Paignton will go through February
  \* \* \*

  --    we should get the Biddeford *contract* in hand before we present this to Chapple. I am concerned that Chapple may react negatively . . . . While he could do this even if we had *a signed agreement* with them, he may thing twice about it or not do it at all."

  SOF ¶ 16. In this context, the only "contract" that Mr. Fisher could be talking about is the short term agreement signed for that year.

- In 1998, referring to purchases of wire, Mr. Tyler referred to the relevant agreement as an "annual contract." SOF ¶ 17.

- When Hugh Tyler was confirming the price agreement with John Chapple which included detailed terms, he referred to the document's "*contract period*." SOF ¶ 18.

  Q.    In the text of the letter [Tyler 7, 8] there is a reference to last year's powder *agreement*, correct?

  A.    Correct.

  Q.    And the agreement to which you are referring is the letter of intent for 1999.

  A.    That is correct.

  SOF ¶ 19.

- In a letter negotiating the 2000-01 short term agreement, Mr. Tyler – drafting a letter for Mr. Habecker's signature, stated: "Our original proposal and page 1 of your LOI specify a *one year contract*." SOF ¶ 20.

- When Mr. Habecker was seeking a longer term contract, he noted that his proposal could be accepted by use of a letter of intent "which has been used in the past." SOF ¶ 21.

- As they negotiated the short term agreements, Cabot called them "Contract Discussions." SOF ¶ 22.

- As late as May, 2000, as they strategized for a meeting with Mr. Chilton, Cabot employees acknowledged that Cabot and AVX "already have an agreement for 2001." SOF ¶ 23.

- In August, 2000, Cabot employees prepared a chart of "obligations" to their purchasers, and no distinction is made between the obligations to Kemet – with which even Cabot admits it had a contract – and AVX. SOF ¶ 24.

Even in the internal notes of Cabot employees, there are references to a 'contract" which can only be the then-current short term agreement. SOF ¶ 25. Similarly, when Cabot summarized the terms of the 2000 agreement, it called it a "contract summary." *Id.* Indeed, when Cabot analyzed its own production targets it referred to the agreements with AVX as "agreed" amounts. *Id.*

> Q.    Do you recall that there had been an agreement between John Chapple and Viren Pathare concerning 1999 tantalum powder volume and prices?
>
> A.    That there had been an agreement?
>
> Q.    Yes, in other words that . . . the agreement had taken place apparently in the very recent past and you had . . . .?
>
> A.    You mean had reached agreement?
>
> Q.    Yes.

SOF ¶ 26. Mr. Fisher has agreed.

> Q.    As of January of 2000, who did you have long-term contracts with?
>
> A.    Kemet – we had a letter of intent with AVX, which I believe spanned two years.

*Id.*

Third, during the course of the short term agreements, both parties treated them as contractual. SOF ¶ 27. There is nothing in the contemporaneous record that suggests that either party viewed them as other than binding. It is undisputed that AVX purchased tantalum during 2000 according to the 2000 short term agreement. *Id.* It is also apparent that they were the subject of significant negotiation. SOF ¶ 28. Among the things negotiated between Cabot and AVX for the letters of intent were not only the prices and the volumes but also various other terms of the letters. *Id.* Even small details such as shipping costs were the subject of specific negotiations.

Finally, a review of the terms of the documents confirms that they are binding contracts. They are detailed and negotiated. SOF ¶ 29. The specific terms were important enough so that even at the last minute, Mr. Tyler was making hand corrections in the final draft. *Id.* Such detailed corrections are not consistent with the idea that these were mere aspirational documents and confirm the conclusion that the documents were viewed to be binding contracts.[20]

Turning to the specifics of the short term agreements, they contain terms that specify:

- Price during the contract period
- Rebates payable if AVX met or exceeded expectations
- Release schedules
- Notice requirements

---

[20] AVX may argue such implications when Cabot may not because the rules applicable to motions for summary judgment require that all reasonable inferences must be drawn against the moving party and in favor of the non-moving party. This inference, therefore, as with other reasonable inferences cannot, therefore, be contradicted by Cabot and must be accepted by Cabot and this Court.

- Specifications applicable to the products

- Delivery terms

- Consignment terms

- Contract period

- Grant of power to Cabot to limit quarterly shipments to a pre-set margin above the "annual award"

SOF ¶ 30.

Many of the terms cannot be seriously contested to be binding. Even Cabot concedes that terms in those agreements would be binding.

Q.    Now, then there's a column marked, before rebate, and I take it that the, if I can summarize, there was a price, and then if they [AVX] met certain conditions they would get a rebate back, correct?

A.   Correct.

SOF ¶ 31.

When in the short term agreement it states that "prices include ninety days maximum consignment for payment" that meant that Cabot had a consigned inventory program in place which provided for AVX to receive material into their warehouse and store it while Cabot still retained title for up to ninety days. SOF ¶ 32. After that point, AVX was obliged to buy the material. The price was established by the agreement. Compliance with these terms was mandatory on both sides. To argue otherwise is patently absurd. Surely Cabot does not truly believe that if it had shipped product under this provision and that product had sat at AVX for 90 days, that AVX could then say to Cabot that it was under no obligation to buy the material or that after AVX had taken the

{00006151.6}                               6

material out of inventory and appropriately informed Cabot that Cabot could then assign any price it wished.

Similarly, if the short term agreements were entirely non-binding, there would be no reason for a defined term. Since either party would be free to change them at any time for any reason, a term makes no sense. SOF ¶ 33. Instead, such provision makes sense only if, within that period, both parties believed the document to be binding.

Another aspect of the 1999 agreement that demonstrates they were intended to be binding are contained in two provisions that were established to benefit Cabot:

    2.    Minimum notice for delivery 4/6 weeks.[21]

    8.    For plant capacity consideration, Cabot may elect to limit quarterly shipments of any[22] powder type not to exceed 33% of the total specified annual award. For example, Cabot may limit quarterly C110 shipments to 1650 pounds (33% x 5000).

SOF ¶ 34. Both of these provisions are designed to protect Cabot from orders that are either too short term or which would overload its plant capacity. If, as Cabot asserts, the short term agreements are not binding, *these would be entirely unnecessary*. If the agreements do not impose obligations on Cabot to sell, should AVX place an order that either gives too short a lead time or which exceeds plant capacity, Cabot would simply reject such order. AVX could not be heard to complain because, as Cabot would argue, the agreement has no binding effect.

The only way of giving meaning and effect to these provisions is to interpret the agreements as binding. Once it is understood that Cabot must sell at the specified prices,

---

[21] A similar provision also appears in the 2000-01 agreement except that the minimum notice time is "4/5 weeks." SOF ¶ 34.
[22] Also confirming the importance and binding nature of the short term agreement are the hand corrections

then the need for Cabot to impose order limitations becomes obvious. Without them, AVX could place orders that Cabot would not have the capacity to fill; with them, Cabot imposes some limits on its obligation to sell. In short, the only reason for the presence of these provisions is that both parties understood the agreements to be binding.

Perhaps the single most conclusive point that demonstrates the flaw in Cabot's analysis is that the 2000-01 short term agreement contains the very type of mandatory "take or pay" provision that even Cabot concedes and asserts is obligatory, in this case for 26,494 kilograms of C606 powder worth $15,000,000. SOF ¶ 35. Cabot cannot and does not seriously contest that this provision is not required. It can not now argue that $15 million is a minimal or inconsequential value.

Similar analysis applies to the pricing and delivery terms. If, indeed, these agreements were not binding, then the provision in ¶ 5 of the 2000-01 agreement making clear which prices apply to which year would be superfluous because Cabot – or AVX – would be free to change prices at will. SOF ¶ 36. The payment terms were sufficiently detailed – and binding – that Mr. Tyler hand-corrected ¶ 4 of the 2000-01 agreement to make it clear that AVX, not Cabot, would pay the duty on product supplied to Paignton.

---

made by Mr. Tyler to ensure accuracy, including correcting "nay" to "any" in this paragraph.