UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CABOT CORPORATION, | ) ) ) |
| Defendant. | ) ) |

CIVIL ACTION NO.: 04-10467-RGS

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RULE 37 MOTION TO COMPEL DISCOVERY**

The plaintiffs AVX Corporation and AVX Limited ("AVX") file this memorandum in support of their motion to compel discovery under Rule 37.

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT[1]

In this action AVX alleges that Cabot violated Section 1 of the Sherman Act by tying AVX's crucial purchases of Cabot's patented flake tantalum to Cabot's nodular tantalum products[2]. Potentially relevant questions include whether: (1) the patented flake and the nodular tantalum sold by Cabot have been and are two distinct products in different markets whose sales to AVX in 2001 through 2005 were tied; (2) Cabot has appreciable economic power in the tying product (patented flake tantalum) market

---

[1] The statement of legal principles set forth herein is intended to describe potentially relevant legal issues with which AVX arguably must contend. Nothing herein contained shall constitute an admission by AVX that is required to prove any of these elements.

[2] "Generally speaking, an impermissible 'tie-in' occurs if a seller … enjoys either a monopoly or 'appreciable economic power' ('AEP') in the 'tying' product … and uses its considerable market leverage to 'coerce' a buyer     already intent on purchasing the tying product from the seller     into buying a second, 'tied' product that the buyer would not have bought based solely on the quality or price of the tied product itself...." *Lee v. the Life Insurance Co.*, 23 F. 3d 14, 16 (1st Cir. 1994).

sufficient to coerce AVX to buy the tied (nodular) tantalum; and, (3) that this tying arrangement affected a "not insubstantial volume of commerce" in the tied market.

To be examined is Cabot's power to affect prices independent of general and specific economic conditions. According to its 2006 10K Cabot is one of three principal producers of tantalum in the world and the "leading producer of electronic grade tantalum powder products."  Cabot insists there are and have historically been "volatile" swings or variations in relevant economic conditions occurring over broad periods of time that have caused "sharply rising prices" in some periods, episodes of "rapidly falling prices" and that there are historic trends of "dramatic fluctuations" in pricing over several years. Answer ¶ 16. To determine among other things whether AVX's payment of higher prices in the four year period was attributable to Cabot's power and not to general and/or specific economic and market conditions, it is appropriate to examine periods before the term of the alleged tying sales, the four year period of the contract and a reasonable period thereafter. Affidavit of Lauren Stiroh, dated February 20, 2007 ("Stiroh Aff.").

Upon information and belief, Cabot has planned and executed broad timeline business plans.  According to its 2006 10K "[s]ince 1996, Cabot has relied on long-term supply contracts to secure the majority of its raw material requirements."

Over the mid to late 1990's Cabot and AVX were seller and buyer respectively of Cabot's patented flake and non-flake tantalum products under a series of short-term purchase agreements.  According to the United States Patent Office, in 1993 Cabot was issued a patent for flake tantalum and then in 1996 a patent for an improved flake tantalum process.  Upon information and belief Cabot is sole producer of flake tantalum. In late 1999, Cabot first approached AVX about entering into a multi-year contract.

Discussions and negotiations continued through 2000 and in early 2001 the parties

entered into a supply agreement requiring AVX to purchase over a four-year term both

flake tantalum and the allegedly coerced non-flake, nodular tantalum products at

monopoly-like prices for both.

AVX seeks to discover materials concerning the parties' competing definitions of

market, the separate product-tying predicate issue and Cabot's market power.

A.    <u>Relevant Time Period for Discovery</u>

AVX seeks information from January 1, 1996 to the present. According to

Cabot's 2005 10K, its tantalum "sales to three capacitor materials customers [upon

information and belief AVX, Vishay and Kemet] represent a material portion of total net

sales and operating revenues" of its Supermetals business.  According to Cabot's 10Ks

for 2004 and 2005, more than half the volume of tantalum revenues in those two years

was generated under supply contracts with Cabot's three primary customers. In addition

to its three primary customers, Cabot sells to a host of smaller purchasers for electronic

grade tantalum products.

Upon information and belief, Cabot's tantalum customers differ in their needs for

tantalum, sensitivities to prices, and access to potential substitutes for Cabot's products.

To assess the market(s), Cabot's market power and the separate product issue, AVX' s

experts[3] need to examine data over a broad window of time beginning before Cabot

pressed for the allegedly coercive agreement, during the four-year term of the agreement

and for the last year or so. Stiroh Aff. ¶ 4.  Damages might be calculated with reference

---

[3] Cabot and AVX agreed in the usual fashion that highly confidential materials produced in discovery and
appropriately so earmarked are for "eyes only" of experts, counsel and necessary witnesses and will not be
disclosed to the parties.

to the greater of the excess of prices paid by AVX from January 2001 through year end 2005 for both the patented flake and the tied nodular tantalum over the fair market value of those products at the time of each sale[4].

Despite its portrayal of the economics of tantalum with broad chronological brush strokes, Cabot insists it will produce only materials and information from 1999 to early 2001, the year plus period leading up to the parties' entry into the supply agreement at issue.

To assess the separate product issue and the conceded long-term fluctuations in both supply of raw material and customer demand requires examination of each and every flake and non-flake tantalum product sold over the relevant period. Stiroh Aff. ¶ ¶ 5, 6.  In its written Rule 34 response, Cabot objected stating that it would produce only records of sales to AVX. During the parties' initial discovery conference Cabot indicated that if AVX backed off its demand for individual records, it would produce records of annual aggregate sales for each product going back to the extent possible to 1996. Annual aggregates of individual product sales going back to 1996 just do not set the table for a meaningful antitrust analysis[5].   *See* Stiroh Aff. ¶ 6.

To assess possible price discrimination between and/or among customers, to determine whether over months, calendar quarters, years or more, there were different product pricing trends moving in different directions, to compare pricing terms across

---

[4] AVX might also  present evidence of lost profits.  *See, e.g., Cambridge Plating Co. v. Napco, Inc*., 85 F. 3d. 752, 772 (1st Cir. 1996).
[5] According to *Areeda & Hovenkamp*, "substantial market power that concerns antitrust law arises" when the "market power … is both substantial in magnitude and durable. For antitrust purposes, therefore, market power is the ability (1) to price substantially above the competitive level and to persist in doing so for a significant period without erosion by new entry or expansion."…The "prerequisites for market power express short- and long-run elements." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, An Analysis of Antitrust Principles and Their Application at Para. 502, (President and Fellows of Harvard College, 2006) ("Antitrust Law").

different customers with different tantalum needs and requirements (pricing might vary depending on the mix of tantalum products a particular customer requested) and to enable assessments over time of the spot market, the experts should examine individual customer contracts and individual transactions over this eleven year period.[6] See Stiroh Aff. ¶¶ 4-6.

In a related case, Cabot demonstrated that it has individual records for each purchaser, reflecting the date, customer number, customer name, tantalum product number, product description, number of pounds, the gross price, any credit, the net price and the price per pound. Moreover, Cabot made no objection that it lacked the individual records; it complained only about undue burden and relevance.

B.    Cabot's subsidiaries, R&D facilities, Marketing facilities, Affiliates.

According to its 2006 10K: (i) Cabot is structured "into four reportable segments: the Carbon Black Business, the Metal Oxides Business, the Supermetals Business and the Specialty Fluids Business … [and] manage[s] … [its] businesses on a regional basis … organized into five business regions:  North America, South America, Europe, Asia Pacific, and China"; (ii) "Tantalum … accounts for substantially all of [the Supermetal segment's] sales;" (iii) "Cabot operates manufacturing facilities for … [the tantalum, Supermetals business] in Boyertown, Pennsylvania and Kawahigashi-machi, Fukushima-ken, Japan;" (iv) not including Cabot's Boston headquarters, there are four Supermetals "principal manufacturing and/or administrative facilities" in North America and two in

---

[6] According to Antitrust Law at Para. 504a, "Many firms do not sell their products at single price. Rather they have a schedule of prices, to which they may not adhere consistently. They have different prices for differing conditions of sale, … different transaction sizes, and perhaps for different classes of customers." "[Taking an average of total revenue of some time period by the number of units sold] might obscure relevant differences." "If the firm practices price discrimination, averaging will understate its market power over the 'disfavored' customers."

Japan; (v)  R&D is conducted outside of the four segments in unspecified locations[7] with "expenditures for such activities generally … spread among … [its] businesses and .. shown in the consolidated statements of operations;" and (vi) "[tantalum s]ales in the United States are made by Cabot employees, in Europe by Cabot employees and a sales representative, and in Japan and other parts of Asia primarily through Cabot employees."

In an affidavit dated February 12, 2007 and filed in the pending state court action, William J. Young describes Cabot's worldwide Supermetals business as a division and himself as the "Strategic Business Manager of the Supermetals Division of … Cabot."

On December 20, 2006, Cabot finally responded to AVX's January 2006 interrogatories and document request. These initial discovery requests sought information without limitation from all Cabot facilities, such as technical R&D functions, production and sales planning, accounting, marketing, sales, and electronic record keeping.  In its responses, Cabot generally objected on the basis of undue burden, over-breadth and beyond the scope of proper discovery; Cabot did not explain that it had limited its investigation for the materials. In the first of the parties' two discovery conferences pointing to its objections of over-breadth and undue burden, Cabot stated it had examined, and would produce only, records from its Boston headquarters and just one of its Supermetals production facilities in Boyertown Pennsylvania.

In the initial and follow-up discovery conferences, Cabot refused to provide discovery from any of its Japanese subsidiaries[8] including specifically its wholly-owned Japanese subsidiary, Cabot Supermetals KK, which produces the same electronic grade

---

[7] In its September 1999 10K Cabot stated that it had R&D facilities in Massachusetts, Illinois and Pennsylvania.

[8] According its 2005 10K, Cabot has three Japanese subsidiaries, Aizu Holdings, KK, Showa Cabot KK and Cabot Supermetals KK.

tantalum products as Boyertown and for the past four or more years has sold flake and

upon information and belief nodular tantalum to AVX[9].

According to Cabot's website, this Japanese subsidiary, which is operated as a

division, has 29 main customers including AVX, Kemet, Vishay and a host of Japanese

electronics firms. While not denying that one or more of its wholly-owned subsidiaries

has possession of discoverable materials, Cabot insists that during the period it says is at

issue, from late 1999 to early January 2001, this business was a joint venture of which

Cabot owned 50% and had nothing to do with this litigation.

1.  *Discovery from wholly-owned subsidiary.*

Rule 34 requires Cabot to produce documents "within its possession, custody or

control."  Cabot Supermetals KK, a Japanese corporation, is a 100% subsidiary of Cabot

and also produces and sells tantalum products, including to AVX, as part of Cabot's

unitary worldwide Supermetals business. As the sole stockholder of this Japanese

company Cabot has the legal control, power, authority, and ability to produce the

documents and potential witnesses.  *See Societe Internationale, etc.  v. Rogers,* 357 U.S.

197 (1958).

Cabot has not asserted it lacks the power or is restricted by Japanese law from

producing the records of its subsidiary.  If defending an antitrust lawsuit by producing

records of its worldwide Supermetals business is an undue burden, then the Sherman Act

would be a hollow protection.

---

[9]  Prior to 2002 Showa Cabot Supermetals KK, a 50/50 joint venture with Showa Denko, the predecessor of
Cabot Supermetals KK, sold tantalum to AVX, Kemet, Vishay and the other buyers in the flake and
nodular markets.

For the past five years Cabot has treated and recorded the operation of Cabot Supermetals KK, including its revenues and expenses, as part of a single unitary business enterprise reported on a consolidated basis. *See* Cabot 10K Annual Reports 2002-2006.

*United States v Standard Oil Company*, 23 F.R.D. 1 (S.D. N.Y. 1958) was a civil antitrust action under sections 1 and 2 of the Sherman Act complaining of "a conspiracy to monopolize international commerce in oil … commencing in 1928 … [and allegedly continuing] to the date of the complaint." As in this case, the plaintiff had served interrogatories and requests for documents seeking records of the defendants' world-wide business operations going back to 1941. *Id.* at 3, 5. The defendants objected and produced only documents and records "of what they deemed relevant from their domestic files." *Id*. at 3. The District Court overruled the defendants' objections, ruling the discovery properly sought information concerning the relationship of the U.S. defendants with "their subsidiaries or joint companies as those relationships existed throughout the [relevant] period …". *Id*. The Court held that subject only to foreign law restrictions, if any, discovery should be had on "these foreign operations of defendants … conducted through subsidiaries, affiliates or corporations jointly owned by defendants or defendants and co-conspirators and third parties." *Id.* at 4.

Cabot must produce the records of its wholly-owned Japanese subsidiary. *Id.; Banana Serv. Co. v. United Fruit Co.,* 15 F.R.D. 106, 108 (D. Mass. 1953) (Sherman Act case); *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)("corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls"); *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 442 (D. N.J. 1991). *See Addamax Corp. v. Open*

*Software Foundation, Inc.*, 148 F.R.D. 462, 467-68 (D. Mass. 1993) (expansive interpretation of "control;" compelling discovery from a resistant non-party witness which had access to the documents and the ability to obtain them from its parent).

If and to the extent the subsidiary does not have possession of some of the records, Cabot "must make a good faith attempt to obtain the requisite information." *Standard Oil Company*, 23 F.R.D. at 4. It is inconceivable Cabot could not obtain such information to the extent Cabot deemed the material useful to it in this litigation.

From 1979 until February 2002, Cabot owned a 50% interest in Showa Cabot Supermetals KK ("Showa Cabot"), a joint venture with Showa Denko KK. According to Cabot's September 30, 2002 10K, in February 2002 Cabot acquired Showa Denko's 50% interest in the former joint venture[10]. Prior to 2002, Cabot reported its 50% share of the joint venture's results of operation on the so-called equity method of accounting applicable to investments.

Independent of the possession of the materials by Cabot's subsidiary, the materials of the former joint venture are discoverable. The joint venture standing alone, allegedly involving the economic integration of two firms in the same business, is susceptible to antitrust examination by the courts. *See Broadcast Music, Inc., et al., v. Columbia Broadcasting System, Inc., et al.,* 441 U.S. 1 (1979); *National Collegiate Athletic Association v. Bd. of Regents of U. Oklahoma*, 468 U.S. 85 (1984). The Sherman Act may be applied to a foreign joint venture if its alleged business practices had a "direct, substantial, and reasonably foreseeable effect … on the commerce of a person

---

[10] The 2006 10K also reported Cabot's October 2005 acquisition of Showa Denko KK's 50% interest in another joint venture called Showa Cabot KK. Discovery may well reveal the involvement of this second Showa Cabot joint venture in the procurement of raw materials, the production and/or marketing and distribution of Cabot's flake and nodular products at issue in this case.

9

engaged in trade or commerce in the United States". *See* U.S. Dept. of Justice, Antitrust

Enforcement Guidelines for International Operations § 4.0 (1988).

There are allegations, and even without discovery some evidence, that Cabot

played an active role in the operation and control of this joint venture.  According to a

January 2001 press release, Cabot worked with Gwalia, the Australian mine in which

Cabot had a minority ownership and with which Cabot has had a series of long-term

supply contracts, to "double the production of tantalum ores" so as "[t]o secure a stable

supply of raw materials" to the Showa Cabot joint venture.  According to its 10K's in

1999 Cabot reduced its R&D expense in the Supermetals business.  Upon information

and belief, in the mid 1990's Cabot planned to have the Showa Cabot joint venture

increase its R&D in the late 1990's while reducing its direct R&D expense.  According to

a January 2001 press release, expansion work on the Showa Cabot's Higashinagahara

plant in Fukushima commenced in 1999 including an expansion of R&D facilities as part

of the venture's "five year business plan."

That the so-called joint venture allegedly performed a key R&D function for

Cabot and/or in light of Cabot allegedly having procured a supply of tantalum for the

joint venture, there is sufficient indicia of control to require Cabot to produce the records

that surely are available to it of the former joint venture even assuming the materials are

not presently in the possession of its wholly-owned subsidiary.  *See Advance Labor*

*Service, Inc. v. Hartford Acc. & Indemn. Co*., 60 F.R.D. 632 (N. D. Ill. 1973)

(corporation required to produce records of non-party sister corporation which performed

a primary function of the corporation); *Alimenta (USA), Inc. v. Anheuser-Busch Cos.,* 99

F.R.D. 309, 313 (N.D. Ga. 1983) (compelled production where two sister corporations

had acted as one in a transaction at issue); *United States v. Standard Oil Company*, 23

F.R.D. 1 (S.D. N.Y. 1958).  *Cf. Societe Internationale, etc.  v. Rogers,* 357 U.S. 197

(1958) (substantially identical companies).

    C.        <u>Cabot's Failure to Search its Electronic Records.</u>

Cabot was asked a series of interrogatories about its electronic record keeping

including that it identify its back-up systems and document retention policies. Cabot

responded in part by stating that "a variety of data is deleted" etc. "in the normal course

of Cabot's operations …".  During the initial discovery conference, Cabot's counsel

admitted that Cabot had not searched or examined, and that it would be unduly

burdensome for Cabot to conduct a search of its electronic archives and its back-up

systems.  During the second discovery conference, to alleviate any perceived undue

burden AVX's counsel offered to have AVX engage an independent third party to

examine, at AVX's expense, Cabot's electronic archives and back up systems particularly

for emails going back to 1996 to the present.  Cabot refused.

    D.        Rule 33 (d); Issue of Respective Burdens on Producing and Receiving
                    <u>parties; Cabot has produced not a single document</u>.

On December 20, 2006 Cabot responded to AVX's January 2006 First Set of

Interrogatories and its First Request for Production.  However Cabot has yet to produce a

single document.  In responding to interrogatories 6 and 7, Cabot invoked Rule 33(d)

stating that "it has produced or will produce … non-privileged documents … from which

the information requested reasonably can be derived or ascertained pursuant to Fed. R.

Civ. P. 33(d)."  Neither then nor since has Cabot served a privilege log.  In its written

responses Cabot failed, and in two discovery conferences Cabot twice refused, to specify

the specific documents from which the answers to the interrogatories may be derived.

In the parties' two discovery conferences Cabot has referred AVX generally, with no specificity, to its prior document productions in two separate state law cases pending in the Massachusetts courts. That prior discovery did not entail production of records as kept in the ordinary course but rather was constituted in a number of boxes filled with Bates-stamped copies of documents that Cabot deemed appropriate to produce.  In each of the two conferences, AVX's counsel demanded that Cabot identify by Bates-stamp range the documents previously produced in other cases which constitute the records from which AVX could derive answers to each interrogatory.  Cabot refused to identify the prior documents and refused to specify by Bates-stamp range the balance of the documents it would produce. In neither conference did Cabot proffer a privilege log of documents.

In both conferences Cabot's counsel insisted that because AVX has those documents produced by Cabot in other cases, the burden of deriving the answers is substantially the same for AVX as it is for Cabot. And Cabot refuses to produce any additional documents or revise any response absent a court order to do so.

## II.      LOCAL RULE 37.1(B)(4) AND (5) SPECIFICATION OF REQUEST FOR PRODUCTION, CABOT'S RESPONSES AND AVX'S POSITION.

### A.      Rule 34 Obligations

AVX's First Set of Interrogatories and First Request for Production of documents are attached as Exhibit A and Cabot's responses are attached as Exhibit B.

Cabot's responses to the document request uniformly objected on the grounds of over-breadth, undue burden and vagueness.  As with its response to interrogatories in its response to AVX's January 2006 Rule 34 request, Cabot repeatedly responded that it has or will produce responsive "non-privileged" documents.  However, Cabot has not

produced a single document nor has it produced any privilege log of otherwise responsive documents. Further, Cabot has failed to identify by Bates number range those documents previously produced in the other two state cases which are responsive to the individual requests in this action. In its responses to the document request, Cabot limited its commitment to produce documents to those that "it deems reasonably responsive to … [each] Request." Cabot must produce all responsive documents unlimited by its subjective determination of what is "reasonably responsive."

In the parties' two discovery conferences, AVX's counsel pointedly referenced Cabot's obligations under Rule 34 to organize and label its production and reminded Cabot's counsel that Cabot's prior production(s) had not consisted of records and files as kept in the usual course of Cabot's business. AVX's counsel requested that Cabot (1) specify the Bates-stamp range for documents previously produced that is/are responsive to each request in this case and (2) "organize and label" the documents to be newly produced to correspond with each request. Cabot refused, insisting that it was AVX's burden to sort through the thousands of documents, to determine which are responsive to which request.

Cabot must be ordered to supplement its response to AVX's First Document Request to specify by Bates-stamp range what documents are responsive to each request.

B.    Specific Cabot Objections; AVX's position.

Request No. 18:
      All documents concerning negotiations with any company or entity that purchased both flake tantalum and nodular tantalum from Cabot.

Response:
      Cabot objects to this Request on the grounds that it is overly broad, unduly burdensome, impermissibly vague,

and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot has produced or will produce non-privileged documents in its possession, custody or control concerning AVX's purchases of flake powder and nodular powder from Cabot that it deems reasonably responsive to this request.

This request seeks information for the period from January 1, 1996 to the present about the dealings of any buyer (including but not limited to AVX) of Cabot's flake and nodular tantalum. The request properly seeks discovery concerning the issues of separate product, market definition and market control or power. Yet Cabot's response is referenced solely to AVX's purchases of both flake and nodular over the past eleven years. In the discovery conferences, Cabot would not budge from its plainly obstructionist objection.

Cabot must be ordered to produce all documents—properly organized and labeled—concerning any negotiations over the past eleven years with each and every buyer which at any time in the relevant period has purchased flake and nodular tantalum and do so regardless of the timing of the purchases of flake and nodular whether simultaneous, serial or unconnected.

## III.     LOCAL RULE 37.1 (B)(4) AND (5) SPECIFICATION OF INTERROGATORIES, RESPONSES AND AVX'S POSITION.

Interrogatory No. 1

Identify all email systems in use, including but not limited to the following:

(a)    List all email software and versions presently and previously used by you and the dates of use;

(b)    Identify all hardware that has been used or is currently in use as a server for the email system including its name;

(c)    Identify the specific type of hardware that was used as terminals into the email systems (including home PCs, laptops, desktops, cell phones, personal digital assistants ["PDAs], etc.);

(d)    State how many users there have been on each email system (delineate between past and current users);

(e)    State whether email is encrypted in any way;

(f)    Identify all users known to you who have generated email concerning any document responsive to Plaintiff's First Request for Production of Documents and, for each, list all email addresses used.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that its facilities have utilized a wide variety of e-mail systems, including both software and hardware, since January 1, 1996. Cabot's main office in Boston, Massachusetts currently uses Lotus Notes as its primary e-mail software, running on a Hewlett-Packard server. Separate servers running Lotus Notes are used to support various other Cabot facilities. Cabot's e-mail system traditionally has been accessible to Cabot employees through PC terminals located in Cabot facilities and remotely from home computers and laptop computers, but not encrypted as a default. The number of daily users of Cabot's e-mail systems have varied over time. Cabot's e-mail system currently is used by approximately 4,400 employees (including 200 in Boston) each day.

Interrogatory No. 4:

Identify any data that has been deleted, physically destroyed, discarded, damaged (physically or logically), or overwritten, whether pursuant to a document retention policy or otherwise, since the commencement of this litigation. Specifically identify those documents that relate to or reference the subject matter of the above referenced litigation.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that a variety of data is deleted, destroyed, discarded, damaged (physically or logically), or overwritten on its computer systems in the normal course of Cabot's operations on a daily basis. To the best of Cabot's present knowledge, information, and belief, however, no data that is reasonably relevant to the claims asserted in this action has been intentionally destroyed or deleted by Cabot since the commencement of this litigation.

## **AVX Position**

AVX seeks email and other electronic records going back to 1996. Cabot has waived any objection to the period of examination. Cabot has improperly limited its production to two of the no less than four and possibly six or more of its offices/facilities and has improperly refused to produce materials from its wholly-owned subsidiary that is in fact operated as a division.

While its responses contained no objection to the requests for all of Cabot's information wherever located, in the initial discovery conference Cabot admitted it had produced records solely from the Boyertown tantalum production facility and Cabot's Boston headquarters.

16

Cabot must be ordered to produce its responsive electronic and other records from all its offices, plants and facilities worldwide and those of Cabot's subsidiaries and affiliates. *United States v Standard Oil Company*, 23 F.R.D. 1 (S.D. N.Y. 1958); *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989); *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 442 (D. N.J. 1991). *See Addamax Corp. v. Open Software Foundation, Inc*., 148 F.R.D. 462, 467-68 (D. Mass. 1993). To the extent, for example, Cabot Supermetals KK does not have possession of the records and materials of the former Cabot Showa joint venture Cabot must make a good faith effort to obtain whatever its subsidiary(ies) do not possess from the former joint venture partner or the entity itself. *See Societe Internationale, etc. v. Rogers,* 357 U.S. 197 (1958*)*.

Cabot did not explicitly object to the timeframe of January 1, 1996 to the present. Indeed in several of its responses it recited that it would produce records going back to 1996. In discovery conferences while admitting that its answers were referenced to January 1, 1996, Cabot stated that its general objection for undue burden was intended to encompass the requests that it search its electronic and other records going back to 1996. The failure to have explicitly objected to the chronological breadth and the answering of interrogatories going back to January 1, 1996 stands a waiver. *See, e.g.*, *Hobley v. Burge*, 226 F.R.D. 312, 320 (N.D. Ill. 2005) (in the absence of timely objection, waiver). AVX's experts need records and materials going back to 1996*. See Generally* Stiroh Aff.; Antitrust Law.

There is no basis for any claim of undue burden as to the electronic record search because AVX offered to have the examination performed by an independent third party.

Counsel surely can work out an appropriate protocol and instructions for the third party to confidentially search for discoverable materials.  It cannot be unduly burdensome for Cabot to allow an independent third party at AVX's expense to inspect and search Cabot's electronic archives and back-up systems for, *inter alia*, email and other electronic records going back to 1996 and to produce to the parties--or in the case of highly confidential materials only to counsel and experts--those materials responsive to the discovery requests and the Court should so order.

> Interrogatory No. 6:
>
> Identify all purchasers of flake tantalum and, for each, state:
>
> a)    The quantities purchased by each such purchaser both in total and by year;
>
> b)    Whether such purchases were pursuant to contract or were "spot" purchases;
>
> c)    The names of the persons dealing or negotiating with Cabot with respect to such purchases;
>
> d)    The name of the persons at Cabot dealing or negotiating with such purchaser with respect to such purchases;
>
> e)    Whether such purchaser also purchased nodular tantalum.
>
> Response:
>
> Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague.  Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.
>
> Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that it has produced or will produce in response to AVX's First Request for Production of Documents in this action non-privileged documents concerning AVX's purchases of flake powder from which the information requested reasonably can be derived or ascertained pursuant to Fed. R. Civ. P. 33(d).

Interrogatory No. 7:

Identify all purchasers of nodular tantalum.

a)     The quantities purchased by each such purchaser both in total and by year;

b)     Whether such purchases were pursuant to contract or were "spot" purchases;

c)     The names of the persons dealing or negotiating with Cabot with respect to such purchases;

d)     The names of the persons at Cabot dealing or negotiating with such purchaser with respect to such purchases;

e)     Whether such purchaser also purchased flake tantalum.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that it has produced or will produce in response to AVX's First Request for Production of Documents in this action non-privileged documents concerning AVX's purchases of nodular powder from which the information requested reasonably can be derived or ascertained pursuant to Fed. R. Civ. P. 33(d).

## AVX Position

Despite the obvious and crucial relevance of all other buyers of flake and nodular to the market and separate product issues, in its responses to interrogatories 6 and 7 Cabot improperly limited its answers to purchases by AVX. And, Cabot did not explicitly object to discovery from January 1, 1996 to the present. Having invoked Rule 33(d)

Cabot must produce records from which the answers may be derived and may not withhold otherwise privileged documents.  The records and documents to be produced must include all compilations, abstracts or summaries that are available to Cabot including work product documents.  Finally, Cabot must specify by Bates range the documents from which the answers may be derived.

Cabot must identify each and every purchaser of each flake and each nodular tantalum product as required for each year from 1996 to the present.  In the parties' two discovery conferences, while acknowledging that it had not objected to going back to 1996 Cabot refused to produce individual records of individual sales to individual customers of each flake and non-flake (or nodular) product during the period.  In the two discovery conferences, as a purported compromise Cabot offered to produce, to the extent available, annual aggregate sales for each Cabot flake and non-flake tantalum product sold for each year from 1996.  However, Cabot refused to produce any records from and after the parties' entry into the Supply Agreement in early 2001 to the present.

The requested information encompassing the period of January 1, 1996 to the present is discoverable and is needed by AVX's experts to assess the market for each of Cabot's patented flake tantalum, the market for non-flake or nodular tantalum, the separate product issue and the impact on commerce.  *See* Stiroh Aff.; Antitrust Law, *supra*.

Cabot's failure to have explicitly objected to the production of individual records is fatal. *See Rivera v. Kmart Corp.,* 190 F.R.D. 298, 300-01 (D. Puerto Rico 2000); *Hobley v. Burge*, 226 F.R.D. 312, 320 (N.D. Ill. 2005)(in the absence of timely objection, waiver); *Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc*., 200 F.R.D. 255 (M.D.

N. C. 2001) (in absence of explicit objection waiver). Moreover, the request is neither overly broad nor impermissibly vague. Upon information and belief based on its prior production in another case, Cabot has electronic records of each purchase, by date, product number, product description, customer name, price, available credits (if any), poundage, gross and net price.

Cabot's response and twice-repeated objection during the discovery conferences that it has already produced some of the documents in another case through which AVX should fumble for the answers is abusive. *See Sabel v. Mead Johnson and Co.,* 110 F.R.D. 553, 556-57 (D. Mass. 1986) ("[i]t is simply absurd to contend that it is equally burdensome for the plaintiff to derive this information … when the only specification of records given by the defendant … is 154,000 pages in length"). AVX is a stranger to Cabot's records. The burden is obviously not equal. *Id.* ("the interrogated party's familiarity with its own record can fairly be taken into account in assessing relative burdens"). *See also Blake Assoc. v Omni Spectra, Inc.*, 118 F.R.D. 283, 290 (D. Mass. 1988).

Having invoked Rule 33(d) in answer to interrogatories Cabot, has waived any claim of privilege. *Blake, supra*, 118 F.R.D. at 290; *Laaman v. Powell*, 1995 U.S. Dist. LEXIS 5415 *5 (D. N.H.1995). It was improper for Cabot to not have furnished a traditional narrative answer and

> then claim that some … of the documents containing the information are privileged and not subject to disclosure. If a party is going to invoke Rule 33(c)[now d], the party must be prepared to allow inspection of the documents which contain the answers to the interrogatories. If a party is going to claim a privilege with respect to documents, the party cannot use Rule 33(c) [now d]; rather, the party must answer the interrogatory in the traditional manner.

*Blake*, 118 F.R.D. at 290.

Cabot must be ordered to produce all responsive records from all of its facilities and offices and to specify by Bates-stamp range for each interrogatory those documents from which each answer may be obtained. *See, e.g. ,Blake, supra; In re G-1 Holdings Inc,* 218 F.R.D. 428, 438 (D. N.J. 2003) (producing party must specify by category and location documents from which it knows the answers can be found); *S.E.C. v. Elfindepan, S.A.,* 206 F.R.D. 574, 576 (M.D. N.C. 2002) (for each interrogatory must specify the actual documents from which the answers may be obtained).

Moreover "'[i]f the information sought exists in the form of compilations, abstracts or summaries … [presently] available to [Cabot,] the responding party, those should be made available to [AVX,] the interrogating party.'" *Sabel*, 110 F.R.D. at 555 *quoting* the Rules Advisory Committee. Because Cabot has waived any work product and attorney client privilege, all such responsive compilations, abstracts or summaries must be produced, including those within the text of an otherwise privileged document or within an accompanying attachment or enclosure. *Blake*, 118 F.R.D. at 290. *See also Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F. Supp. 491, 511 (D. N.H. 1996) (attachments to otherwise privileged attorney client communications not privileged).

> Interrogatory No. 8:
>
> Identify the technical characteristics of each form of nodular or flake powder produced by Cabot (including but not limited to primary particle size, aggregate size, rated voltage, capacitance, surface area, raw Scott, raw flow, raw crust strength, sintering time and temperature, oxygen minimum and maximum, nitrogen maximum, wet DCL, BDV) and, for each, identify all known actual uses to which such powder is put.
>
> Response:
>
> Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this

22

Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that, since January 1, 1996, it has produced a variety of nodular and flake tantalum powder products having a wide range of technical characteristics, including but not limited to primary particle size, aggregate size, rated voltage, capacitance, surface area, raw Scott, raw flow, raw crust strength, sintering time and temperature oxygen tantalum powder. More than 60 percent of the world's tantalum is used in electronics products. The largest application is electronic capacitors, where tantalum's ability to form stable oxide films creates highly efficient, highly reliable and environmentally versatile components. In semiconductors, tantalum has emerged as an ideal barrier solution, since copper is replacing aluminum as the material of choice for interconnects.

### AVX Position

This information is crucial to a proper adjudication of the issues of separate product, the definition of markets, Cabot's market power, and the impact on commerce. Stiroh Aff. Upon information and belief, one or more of Cabot's production, R&D, marketing, sales and other facilities has/have all this information both current and past. Cabot must be ordered to answer this interrogatory in detail specifying for each and every year going back to 1996 both (i) the technical characteristics of each flake and non-flake (nodular) tantalum powder that it produced and (ii) all known actual and potential uses in that year of each such product.

Interrogatory No. 9:

For each form of powder identified in response to interrogatory 8 above, identify all other substitutes for such powder, and, if such substitute is not identical in performance or price, identify all differences between such powder and each such substitute.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that most, if not all, forms of tantalum powder have substitutes which can vary depending upon the desired characteristics of the final product.

### AVX Position.

It is undisputed that Cabot markets its patented flake products as unique. Answer ¶ 14. If Cabot continues to assert that its patented flake tantalum and nodular tantalum are not separate products for purposes of this Sherman Act tying claim, Cabot must be ordered to identify what it claims or perceives to have been a substitute or substitutes for its patented flake tantalum for each year of the relevant period.

Unless Cabot is prepared to admit that having a patent and hence a monopoly on its flake products determines the issue of market power, whether there is a reasonable substitute for the flake tantalum is material to the market power issue. *Illinois Tool Works, Inc., et al., v. Independent Ink, Inc.,* 126 S. Ct. 1281 (2006).

Interrogatory No. 12:

If Cabot contends that flake powder and nodular powder are not separate products for the purposes of §1 of the Sherman Act, state:

a) The identity of all documents concerning contention;

b) The basis for such contention;

c) The identi[t]y of all persons with knowledge concerning (i) the difference or similarities of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable depending upon the desired characteristics of the final product. Accordingly, Cabot believes that flake powder and nodular powders are not properly regarded as "separate products" for the purposes of Section 1 of the Sherman Act.

Interrogatory No. 13:

If Cabot contends that it does not have market power in the market for flake powder, state:

(a)     The identity of all documents concerning contention;

(b)     The basis for such contention;

(c)     The identi[t]y of all persons with knowledge concerning (i) the difference or similarities of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable depending upon the desired characteristics of the final product. Accordingly, Cabot believes that it does not have "market power" with respect to tantalum powder, including flake powder.

## AVX Position.

These two interrogatories require Cabot to identify all documents "concerning" Cabot's contentions of "separate product" and "market power. These two interrogatories also require Cabot to state its factual basis for its two contentions, that the two products are not separate products under the Sherman Act and that Cabot does not have "market

power" in the market for flake tantalum.  In reliance on general, unspecified objections of overbreadth, vagueness and impermissible legal conclusion, Cabot has not identified a single document and has not stated the basis or bases for its two contentions of separate products and market power.

The two requests are focused and neither vague nor overbroad. Cabot contends that flake and nodular are interchangeable and hence not separate products under the Sherman Act and that because they are interchangeable it does not have market power. Cabot has possession of the evidence and materials that will lead to relevant evidence on both these issues.  AVX does not seek to impermissibly discover how Cabot will try the case but rather the factual underpinnings of both sides of the case to be presented at trial. *Hickman v. Taylor,* 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession.").

Rule 33 permits a party to "inquire into the detailed factual basis for particular allegations or alleged causes of action [or defenses] of a party." *Moore's Federal Practice* § 33.74 (2006) ("Interrogatories May Inquire Into Facts Relating to Case of Other Party.").

Rule 33(c) explicitly authorizes contention interrogatories calling for opinions and permits AVX to discover legal theories based on facts. *Moore's Federal Practice* § 33.78 (2006) ("Interrogatories may ask for opinions or contentions of the other party that relate to fact or the application of law to fact.").  Cabot is not being compelled to speculate as it has staked out its Sherman Act § 1 positions, that flake and nodular are not separate products and that Cabot does not have market power.  Cabot is not asked to identify the

documents that it will use at trial but to identify the documents known to it that "concern" or touch on its contentions.

Opinions and conclusions are inherently present in any recitation of the factual basis of an affirmative defense. Requiring Cabot to state the factual basis for its contentions that flake and nodular are interchangeable and hence not separate products and that because they are so interchangeable Cabot lacks market power will serve a substantial purpose to clarify the issues and level the playing field for trial; hence the interrogatories are not improper. *Banana Service Co. v. United Fruit Co. et al*, 15 F.R.D. 106, 110 (D. Mass. 1953); *Hodgson v. Adams Drug Co., Inc.,* 1971 U.S. Dist. LEXIS 12037, **3, 6-7 (D. R.I. 1971) (overruling objections of legal conclusion and work product as answers would serve "substantial purpose in leading to evidence or in sharpening the issues"); *Scovill Mfg. Co. v. Sunbeam Corp.*, 357 F. Supp. 943, 948 (D. Del. 1973) (because the interrogatories serve a substantial purpose—citing Moore— overruling objections of opinion, conclusions and contentions of opposing party).

Cabot should be ordered to identify all documents concerning its contentions that because flake and nodular are interchangeable they are not separate products and that because they are interchangeable Cabot lacks market power for flake. Cabot should be ordered to answer the two interrogatories, stating the basis for its factual contention that flake and nodular are interchangeable and hence not separate products and also therefore that Cabot does not have market power. To the extent Cabot relies on documents produced in the two state court lawsuits it should be ordered to identify by Bates-stamp range the documents from which the answers or portions of the answers to these two interrogatories may be obtained.

Interrogatory No. 14:

Prepare a chart or list that contains the information called for in Exhibit A attached hereto in Excel or Excel readable format.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

**AVX Position**.

This is a request for a detailing by individual transaction of the information sought by interrogatory 8. This interrogatory requires Cabot to produce electronically a listing of each transaction in each year from 1996 to date reflecting the purchaser, the date, the powder type, the quantity and the price paid. This information is needed for AVX's experts to assess and analyze the separate product and market share issues as well as one of AVX's damages claims. Stiroh Aff. ¶¶ 4, 5, 6.

In its response Cabot did not state that the records do not exist. During the initial discovery conference Cabot offered to produce to the extent available[11] annual summaries of aggregate sales of each product but only if AVX would drop its demand for all of the individual customer transactions.

The Court must order Cabot to produce electronically for each year from 1996 through and including 2006 a record of each and every sale by Cabot of tantalum powder product, specifying no less than the name of the purchaser, the date, the powder type

---

[11] Despite the lack of objection as to availability of the historic records, Cabot's counsel represented that he did not know whether Cabot still had records of individual sales for each year from 1996 forward. During the second conference, Cabot's counsel again offered to produce for each year from and including 1996 coming forward to 2001. Cabot's counsel did not state in the second conference that the records going back to 1996 were no longer in existence.

(including Cabot's product number and separate description), the quantity (ideally in pounds),the price (ideally the gross price, the available, if any, credits, and the net price).

IV.        CONCLUSION

For the foregoing reasons, the Court should order Cabot to answer each specified interrogatory and to amend its response to AVX's first request for production to both commit to producing all documents responsive to each request and to specify by Bates-stamp range which documents are responsive to individual requests.

Finally if the Court determines, as it should, that Cabot's responses were improper, AVX requests the Court to schedule a hearing for an assessment of fees and costs against Cabot pursuant to Rule 37 (d).

Respectfully submitted,

AVX CORPORATION and
AVX LIMITED

By their attorneys,

*/s/ Richard A. Goren*
Joseph S.U. Bodoff  (BBO No. 549116)
Richard A. Goren (BBO No. 203700)
Ryan D. Sullivan (BBO No. 660696)
Bodoff & Associates
225 Friend Street
Boston, MA 02114
617/742-7300

DATE: March 1, 2007

LOCAL RULE 37.1 CERTIFICATION


The undersigned certifies that on January 30, 2007 I conferred with Brian Davis of Choate Hall & Stewart, Cabot's counsel for more than one hour and thirty minutes striving to resolve AVX's concerns with Cabot's objections and responses.  I further certify that on February 6th I again conferred briefly with Brian Davis and that on February 8th, I again conferred with Mr. Davis and we then concluded motion practice was required to resolve all of our discovery disputes.


           */s/ Richard A. Goren*
           Richard A. Goren