**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.: 04-10467-RGS |
| v. | ) ) ) | |
| CABOT CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANT'S MOTION TO COMPEL DISCOVERY**

**I.  INTRODUCTION**

Cabot filed a motion to compel largely because it does not believe responses that AVX has provided to Cabot's discovery requests. In other instances, it has simply asked for information that is not relevant to the case and/or seeks discovery that is unduly burdensome.

At the outset, it should be noted that AVX believes that it has produced all documents responsive to Cabot's discovery requests except in a few instances where AVX has clearly stated that it would not produce documents. Nevertheless, at the request of Cabot's counsel, AVX is double-checking to make sure that there are no documents that are responsive to any of the document requests that have not been produced. Due in part to certain presently unavailable personnel that renewed search remains to be completed. While AVX believes that its response is complete, it will produce additional documents should they be discovered in this supplemental search.

As to Cabot's claims that AVX has not responded truthfully, AVX asserts that it has. If Cabot wants to test these assertions or probe further substantively it can do so in depositions of appropriate AVX personnel.

## II.  BACKGROUND

Before turning to the specific issues raised by Cabot, it is worth exploring briefly the issues raised in the Complaint.

AVX is a manufacturer and supplier of capacitors manufactured from tantalum, a corrosion resistant metallic element. Capacitors can be made from a myriad of materials, including tantalum. All capacitors, no matter what material they are made from, store electricity. Cabot's patented flake tantalum serves the same raw material function as its nodular tantalum but, as Cabot touts, its flake is a unique product. After securing patents for flake, in the mid 1990's Cabot encouraged AVX, historically one of the world's three largest tantalum capacitor manufacturers and often Cabot's largest tantalum customer, to develop AVX's flake based capacitors. AVX spent years conceiving, designing, developing, tooling and successfully marketing a series of AVX's flake tantalum capacitors that serve the same basic function of storing electricity as other tantalum capacitors. But AVX's flake tantalum capacitors have superior performance characteristics to AVX's nodular tantalum capacitors including without limitation, their respective: Cv/gm, Cv/cc, surge performance, breakdown voltage, ESR, capacitance and frequency response. AVX's flake based capacitors and nodular based capacitors are different products. With the hook firmly in place, in 2000 Cabot threatened to withhold from AVX the unique flake unless AVX entered into a supply agreement committing for

five years to purchase minimum amounts of flake as well as the tied, non-flake, *i.e.,* nodular tantalum, both at fixed prices based on then current market conditions.[1]

Cabot raises several red herrings about AVX's possible "substitutes" for Cabot's patented flake tantalum. Cabot's inquiries about whether niobium, nodular or other materials might be used in place of Cabot's patented flake for AVX's high voltage flake based capacitors are meaningless exercises that can lead to no probative evidence.

Cabot argues that AVX has failed to produce discovery as to what efforts, if any, it made to procure or develop a substitute for Cabot's patented flake required for some of AVX's high voltage capacitors during and after the five year term of the January 2001 Supply Agreement. AVX complains that at the time it entered into the Supply Agreement its only viable economic option was to accept the five year package bundling the tying product, the flake tantalum it needed for certain of its high voltage capacitors, with the tied product, nodular tantalum, at prices fixed at the then confluence of a peak in demand and a short supply. The question is whether *at that time* AVX had available a commercially reasonable substitute to make its flake based products. It is and can be of no consequence whatsoever whether after entry into the five year agreement AVX had any economically viable option to buying the two bundled products.

While AVX had no niobium products at the time it entered to the Agreement, Cabot insists that AVX is obstructing Cabot's defense by not producing information

---

[1] In its brief (at 2 note 2) Cabot points to deposition testimony in a related case and suggests that in less than a year AVX could have conceived and designed a nodular based capacitor as a "substitute" for AVX's flake based capacitors. Because the flake is unique any such substitute while serving the same basic function of storing electricity would necessarily be different from AVX's flake capacitors. One can only imagine the potentially catastrophic economic consequences of losing all sales to AVX customers who have developed products that rely on the unique characteristics of AVX's flake based capacitors, while spending say six months in design and development of a new, but different product, followed by some period for retooling of one or more plants, followed by a period for a new marketing and sales effort and then of course the basic initial business cycle from production to collection of receivables.

3

about its niobium products[2]. Somehow Cabot argues that as of the end of 2000 and January 2001 niobium was a potentially viable substitute for AVX's "high voltage" flake capacitors and in support points to an undated AVX publication stating that its niobium technology will be developed for "low voltage" capacitors. *See* Cabot Exhibit Tab 2 at pp 2 ("niobium … technology … recently developed targeting the low voltage … space") and 6 ("these [niobium] technologies promising alternatives to low voltage tantalum and ceramic capacitors").

Cabot posits that because AVX could purchase $K_2TaF_7$ a semi-refined tantalum, it might have had a third party further refine or toll the $K_2TaF_7$ and therefore may have had an economically viable substitute for the flake. Flake is a patented product that can only be produced by Cabot. While AVX could have tolled $K_2TaF_7$ into nodular it could not toll $K_2TaF_7$ into flake because only Cabot has the right to do that. AVX had other sources of nodular but alleges it had no reasonable economic option but to purchase the nodular from Cabot at prices preset for five years as part of Cabot's package deal to secure the crucial flake. It is therefore totally immaterial that AVX could have tolled $K_2TaF_7$ into nodular.

### III. "DEFINITIONS OF RELEVANT MARKETS" FOR FLAKE AND NODULAR.

*Interrogatories No. 1 and 2 and Requests No. 1 and 2 – As to AVX's contentions as to definition of relevant markets for each of flake and nodular.*

AVX contends that Cabot's flake and nodular tantalum products are "separate products" for purposes of its Sherman Act Antitrust claims. This contention should be

---

[2] While objecting AVX did produce two of its catalogues from the period after expiration of the five year term of the Supply Agreement which exhaustively list and provide detailed specifications for all AVX's tantalum and niobium capacitors.

4

admitted because Cabot markets its patented flake as unique and different from its nodular tantalum products.  AVX also contends that Cabot effectively compelled AVX to purchase nodular tantalum at pre-set prices as a condition of being able to purchase Cabot's unique, patented flake tantalum.

AVX has retained an expert who after reviewing Cabot's completed discovery will issue her report including therein her opinion(s) as to the market for Cabot's flake and whether it constitutes a market separate from the market for nodular.  In its answers to Cabot's so-called contention interrogatories concerning "relevant markets" AVX has informed Cabot that AVX will rely on the opinions of its antitrust expert as to the definitions of the relevant markets.  That is sufficient notice to Cabot of AVX's theory.

The rules provide a precise road map for Cabot to discover the expert opinions of AVX' s experts whom AVX anticipates will testify at trial. FRCP 26 (b) (4).  In phase one in late February 2007 AVX identified Lauren Stiroh, Ph.D. as an economics and antitrust expert expected to testify at trial.  Once Cabot produces all its documents AVX's expert will digest all discovery and other materials and then  prepare one or more reports.  At that point, if Cabot wants further discovery, it must adhere to the procedures of Rule 26 (b) (4).   To order AVX to provide a supplemental answer particularly at this preliminary phase of discovery would fly in the face of Rule 26.  *Hockley v. Zent, Incorporated*, 89 F.R.D. 26 (M.D. Pa. 1980).   None of Cabot's unremarkable citations suggest any authority to the contrary.

### IV.  POTENTIAL OR KNOWN SUBSTITUTES FOR CABOT'S FLAKE TANTALUM.

*Interrogatory No. 7 – Identify all capacitors that AVX understands "competes" with AVX's flake capacitors.*

5

AVX stands on its objections of undue burden and lack of materiality.

There are a host of passive electronic component products ("capacitors") that may be said to compete with AVX's flake based capacitors in the sense that those capacitors serve the same basic function each however with different characteristics, varying strengths/weaknesses for specific end uses, and different performance under different stresses and environmental variables. The needs of buyers of capacitors are as varied as the thousands of products that incorporate these passive electronic components from military applications, automotive electronics, televisions, industrial equipment, cell phones to cite but a handful. Some capacitors work at low voltage but fail at high voltage, others work at high voltage but not for extended durations. Some uses permit larger sized capacitors while others require miniaturized capacitors. For some uses, the capacitors must be rugged and able to withstand the force of a collision. Some are sensitive to certain environmental extremes while other uses require exposure to lesser extremes but for extended periods. And like many species of products there are the interrelated variables of cost and add-on performance attributes which distinguish capacitors that might perform the same functions but with certain baggage or limitations.

It is unduly burdensome for AVX to list all products known to it that presently perform, or in the past have performed, more or less the same basic functions but at different prices, for different end users and featuring differing qualities.

Because all tantalum capacitors serve the same basic function, having AVX list its understanding of all capacitors of competitors that serve the same or similar functions as AVX's flake capacitors cannot lead to any probative evidence. Under the Sherman Act given the circumstances at the time it entered into the Supply Agreement the question is

whether AVX had a reasonable substitute for Cabot's flake tantalum. *See* footnote 1 *supra*. It is simply immaterial to the Sherman Act issues in this case whether there were in 2000 or early 2001 other products made by other companies that performed the same or similar functions at different prices with differing performance-based characteristics including without limitation, their respective: Cv/gm, Cv/cc, surge performance, breakdown voltage, ESR, capacitance and frequency response, crush strength, wet leakage, and consistency of quality over entire lots.

> *Interrogatories No.8 and No.9 – Nodular as a Substitute for Flake.*

The question asks whether AVX contends that nodular can never be used as a substitute for flake in the production of capacitors. Cabot should be estopped to deny that flake and nodular are different products as it marketed flake as unique and different from its nodular products. AVX objected because the word "substitute" is vague and contextually immaterial but did answer that only certain AVX products, identified in response to interrogatory No.4, can be made with flake. In that context, AVX's contention that nodular cannot be substituted for flake is clear.

As explained above, whether there are other products that perform the same or similar functions as AVX's flake-based products is immaterial. AVX does not contend that nodular can never be used as a substitute for flake in the production of its capacitors made with flake in the sense that as general matter such substitute would serve the same basic function of storing electricity as AVX's flake based capacitors.

> *Interrogatories No. 10 and 11 – Does AVX contend that capacitors made with nodular can never be used in substitution for capacitors made with flake.*

7

AVX stands on its objections. At the relevant time leading up to the execution of the January 2001 Agreement the products AVX manufactured with nodular while performing many of the same or similar functions could not be sold as reasonable or acceptable substitutes for the products AVX manufactured with flake. AVX does contend that at the relevant time it could not economically feasibly substitute nodular for the flake products it then sold, and in all events such hypothetically developed nodular products would be different from AVX's flake-based products.

> *Interrogatories No. 12 and 13 and Document Requests 7 and 9 – Does AVX contend that capacitors made with materials other than tantalum including niobium can never be used in substitution for capacitors made with flake.*

AVX stands on its objections. As explained above, whether there are other products that perform the same or similar functions as AVX's flake-based products is immaterial. In addition, as Cabot knows, AVX had no niobium products at the time it entered into the January 2001 Supply Agreement. In addition, the products AVX presently manufactures with niobium or other materials, while performing many of the same or similar functions, cannot be sold as reasonable or acceptable substitutes for the products AVX manufactures with flake.[3]

### V. AVX'S DESIRE TO PURCHASE NON FLAKE PRODUCTS.

*Interrogatory No.15 – AVX's desire to purchase specific amounts of nodular.*

AVX stands by its objection and response. Prior to January 2001, AVX's purchase of tantalum was made pursuant to short-term supply agreements. As Cabot

---

[3] In connection with its document production, AVX produced a catalog, which, in addition to nodular and flake-based capacitors, also listed, described and provided full specifications for AVX's niobium capacitors. While AVX still contends that the information about niobium capacitors is immaterial, the Court should note that Cabot is not without information as to AVX's niobium capacitors, as currently manufactured.

knows from other litigation between the parties, AVX did not want to commit to the purchase of particular amounts of tantalum on a long-term basis. This was no different when AVX entered into the 5-year agreement that Cabot imposed on it in January 2001. In short, as in the past, AVX had made a determination of the amount that it wanted to purchase for the upcoming year, as contained in the short-term supply agreement for 2001.[4]

> *Interrogatories No.16 – 20 and Document Requests 20-21 concerning AVX's intention to have $K_2TaF_7$ tolled into tantalum products; AVX's dealings with K2.*

AVX stands on its objections. At the time it entered into the January 2001 Supply Agreement while AVX had other sources for nodular, Cabot was AVX's sole source for Cabot's patented flake tantalum product. Because of Cabot's patent on flake, at no time could AVX have $K_2TaF_7$ tolled or converted $K_2TaF_7$ into flake.

Whether during the term of the January 2001 Supply Agreemeent AVX might have tolled the $K_2TaF_7$ into nodular or wire is completely beside the point. AVX was still compelled to purchase the non-flake products specified in the January 2001 Supply Agreement at the prices therein required in each year of the term of that agreement.

## IV. DAMAGES.

*Interrogatory No. 20 – State "all of the damages that AVX claims…"*

AVX stands by its response that it has not yet calculated its damages. It is premature for AVX to assert "all" of its damages. AVX has been damaged by the excess of the amounts paid under the January 2001 Supply Agreement over the term of that

---

[4] Cabot speculates there was no tie because AVX may have wanted to purchase more and not less nodular tantalum. Cabot brief at 12 n. 4. The issue is whether AVX was coerced into the bundling of the two products with mandatory minimum purchases at the pre-determined prices.

agreement over the fair market prices of those products over the term of that agreement.

AVX intends to prove its damages at trial. These calculations cannot be made at this preliminary stage of the litigation. AVX is mindful of its obligations under FRCP 26 (e) regarding supplementation of answers to interrogatories.

## V. ELECTRONIC DOCUMENTS – DOCUMENT REQUESTS 6, 8 AND 10-19.

*Requests 6 and 8 – Performance and Marketing of AVX Flake based products*

Notwithstanding Cabot's lamentations, AVX produced a plethora of documents concerning both performance and marketing of its flake based products. Documents bearing bate stamp numbers AVX 3/14/07 13751-13760 compare the performance and other qualities of nodular and flake. Similarly documents marked AVX 3/14/07 13610-13615 are technical charts specifying product qualities and features for both nodular and flake. Documents marked AVX 3/14/07 13617-13750 consist of a recent AVX marketing catalogue for all its tantalum and niobium oxide capacitors. Documents marked AVX 13878-14055 consist of AVX's latest marketing catalogue for all its current tantalum and niobium oxide capacitors.

Marked with a single bate stamp number AVX 3/14/07 13616, AVX also produced an electronic compact disc containing thousands of pages or page equivalent of material. On this CD are reposed:

1. Detailed descriptions of the manufacturing processes for tantalum and niobium capacitors;

2. A software program that analyzes the needs for tantalum and other capacitors given stated specifications;

10

      3.     A software program enabling viewing of all the basic characteristics and parameters for all ratings for all AVX tantalum and niobium capacitors;

      4.     A software program enabling circuit simulation with different AVX capacitors;

      5.     A collection of 33 technical product papers;

      6.     A collection of 19 technical presentations;

      7.     A collection of 9 product announcements;

      8.     A collection of 5 technical certificates;

      9.     A collection of 6 ReHS compliance papers and new material;

      10.    Sample kits for products;

      11.    Matrix and data sheets for the products;

      12.    A specification sheet for each and every AVX tantalum and niobium capacitor;

      13.    A video of the manufacturing process;

      14.    An animation of tantalum and niobium manufacturing processes; and,

      15.    Some general marketing materials.

AVX also produced copies of PowerPoint slides marked AVX 3/14/07 13866-13877 dealing with AVX's consideration of alternatives to flake that address performance of flake and nodular.

While AVX believes it has turned over all materials in its possession that are responsive to these requests, should its supplemental search for comparable product capabilities data turns up any materials they will be produced.

    *Requests 10 and 11 – Comparison of AVX Flake based products to AVX's nodular and niobium products.*

AVX produced what was requested. Documents marked AVX 3/14/07 13779-13807 are AVX's detailed comparisons with various technical charts assessing, reviewing and commenting on the basic different characteristics of AVX flake and AVX nodular, comparing thermal conductivity, mechanical weakness, heat dissipation, surge sensitivity, sintering issues, surge performance, breakdown voltage, surge performance plus "shell" factor, rejection rates for AS/PP, LI+SC, Age, surge, LIMEAN, ESR MEAN, comparison of steady state reliability, and customer returns.

Also included was an excerpt from an executive summary of a September 2005 Tantalum Capacitors Global Markets article published by Paumanok Publications describing and comparing nodular and flake (noting "[t]he *Flake* product is unique to Cabot" and citing Cabot as the source).

Also included were copies of a series of AVX PowerPoint slides comparing nodular and flake, comparing relative Cv/g for capacitors formed to 150 volts, particle thickness, touting "highest possible CV/g and CV/cc" and "stable CV Vs sinter losses enabling higher purity anodes, sundry charts showing relative performance of the flake and nodular for 1550 C sinter BDV, 1600 C sinter BDV, surge performance, surge performance D15-35 and reliability.

AVX also produced documents marked AVX 3/14/07 13761-13778 an April 2003 AVX report assessing flake and FTW-170 an AVX group M or nodular product. These consisted of 43 different technical chart analyses comparing flake and the nodular FTW-170.

While earmarked responsive to Requests 13, 14, 15, 16, 18 and 19, also responsive to Requests 10 and 11 are documents marked AVX 3/14/07 13866-13877

which are copies of a series of PowerPoint slides presented at "LKN Meeting" in February 2003. These documents speak to considerations of replacing flake with nodular and provide a series of several dozen comparisons and/or technical analyses of flake and nodular.

While earmarked responsive to Requests 3, 4 and 5, documents marked AVX 3/14/07 13610-13615 "Flake based products and Nodular based products" also speak to Requests 10 and 11. These are color charts with a page explaining the key as to which groups of AVX products are flake and which are nodular and specifying certain "Cap/Volt" and various technical features of the different flake and nodular products.

Also responsive to the request for specifications, technical material and product brochures were the recent and current AVX product brochures and the electronic CD the various details of which are outlined above.

Again, while AVX believes it has turned over all materials in its possession that are responsive to these requests, should its supplemental search for comparable product capabilities data turns up any materials they will be produced.

*Niobium comparisons to flake.*

AVX stands on its objection as to niobium. The potential issue of a reasonable substitute for AVX for the flake focuses necessarily at the time AVX entered into the January 2001 Supply Agreement. When the parties began discussing the agreement and through its execution AVX had no niobium products. Whether AVX might have considered niobium-based products as a substitute for flake during the term of the Supply Agreement is completely irrelevant as AVX was then bound under the Agreement. The sought after material cannot lead to any probative evidence. As demonstrated by exhibits

13

attached to Cabot's motion to compel, AVX's recent niobium technology does not serve the high voltage capacitor market segment that AVX's flake based products serve.

> *Request No.12 – Products of third parties that "compete" with AVX's flake products.*

AVX stands by its objection that it is unduly burdensome for it to search its files for documents that identify the products of third parties that at any time may have performed the same or similar functions as AVX's flake-based products. And as pointed out above, production of such documents cannot conceivably lead to any probative evidence.

Having stated its objection, AVX has, in fact, produced all of the documents that it believes are responsive to this request. This includes documents marked AVX 3/14/07 13808-13864, namely 57 pages from an undated catalogue of Kemet Electronics Corp., one of AVX's principal competitors. The documents were labeled and specifically earmarked responsive to Request No.12. The catalogue material provides detailed product information about Kemet's tantalum capacitors. While Cabot would like to believe that AVX has other documents that is simply not the case.

> *Requests No. 13-19 –Attempts or consideration of developing, marketing etc substitutes for flake powder and/or flake based AVX products.*

AVX contends that at the time it entered into the January 2001 Supply Agreement it had no reasonable substitute for the flake and hence had no alternative to committing to buy both the flake and the tied nodular products. AVX has located no documents from the period from the fall of 2000 to the first two months of 2001 that are responsive to these requests. Should any further responsive materials be located, they will be produced.

14

AVX did produce documents marked AVX 3/14/07 13866-13877 specifically earmarked responsive to these requests. As noted above these were analyses from 2004 long after AVX's entry into the January 2001 Supply Agreement.

In addition AVX produced documents marked AVX 3/14/07 13751-13760 copies of PowerPoint slides comparing the technical characteristics of nodular and flake. And as explained above AVX also produced documents marked AVX 3/14/07 13779-13807 copies of 2004 power point slides comparing flake and nodular.

*Lack of Electronic Records*

AVX does not have a company-wide central server that stores email. In response to Cabot's concern that electronic records have not been produced, AVX is in the process of having its employees search their records to see if they have electronic records that are responsive to its requests. If AVX's renewed search turns up any responsive electronic email or records, they will be produced

## VI.  CONCLUSION

For the foregoing reasons the Court should deny Cabot's motion to compel.

>Respectfully submitted,
>
>AVX CORPORATION and
>AVX LIMITED,
>
>By their attorneys,
>
>
> */s/ Richard A. Goren*
>Joseph S.U. Bodoff  (BBO No. 549116)
>Richard A. Goren (BBO No. 203700)
>Ryan D. Sullivan (BBO No. 660696)
>Bodoff & Associates
>225 Friend Street
>Boston, MA  02114-1812
>(617) 742-7300

Dated: April 27, 2007

### CERTIFICATE OF SERVICE

I, Richard A. Goren, hereby certify that I caused a true and accurate copy of the foregoing to be served upon all counsel of record via the Electronic Case Filing System or first class mail on this 27th day of April, 2007.

> */s/ Richard A. Goren*
>Richard A. Goren