UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-10467-RGS |
| CABOT CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' SUPPLEMENTAL FILING ON OPEN DISCOVERY ISSUES**

Plaintiffs AVX Corporation and AVX Limited (collectively "AVX") hereby file their briefing on AVX's open discovery issues as identified in the joint letter of the parties dated September 12, 2007. For the convenience of the Court and in the interest of brevity Defendant Cabot Corporation's Objections and Responses to Plaintiffs' First Set of Interrogatories is attached hereto as Exhibit A, Defendant Cabot Corporation's Objections and Responses to Plaintiffs' Second Set of Interrogatories is attached hereto as Exhibit B, Defendant Cabot Corporation's Objections and Responses to Plaintiffs' First Request for Production of Documents is attached hereto as Exhibit C, and Defendant Cabot Corporation's Objections and Responses to Plaintiffs' Second Request for Production of Documents is attached hereto as Exhibit D.

*I. Product Specification; Interrogatories 8, 9; Technical Specifications*

After Cabot objected to the interrogatories asking it to identify the technical characteristics of each form of flake and nodular powder, at the May hearing AVX

1

proposed that Cabot just produce all its written product specifications. Cabot objected to producing specifications of "every product ever manufactured … because there … [were] products … that never hit the market …" and committed to working out with AVX "the specific products" to be produced. While the evidence is clear that Cabot has written specifications for all its flake and nodular powder products, Cabot now insists that it will only produce "the technical specifications for products sold to AVX."

Cabot's website touts that each tantalum product is manufactured to the exact requirements or specifications of each customer. That there are and have been different specifications for each Cabot tantalum product is probative of whether Cabot's flake tantalum products are separate products from non-flake tantalum. Qualitative differences in the technical specifications in particular concerning what Cabot calls the distinctive technical advantages of flake for certain functions[1] and certain small sized capacitors are clearly discoverable. Cabot concedes the relevance of a buyer's "exact requirements" for Cabot's tantalum products but has agreed only to search for the "exact requirements" of the AVX products from time to time over the period from 1996 to date.

By producing some but not all of the product specifications for some third parties Cabot has waived any objection on this issue. Cabot produced contract specifications for **some** of the products sold to Kemet, Vishay and Epcos, three of AVX's competitors, by both Cabot and its wholly owned subsidiary, Cabot Supermetals KK, also known as Cabot Supermetals (hereinafter "Cabot Supermetals"), for portions of the relevant

---

[1] "Flake capacitor powders have superior high formation voltage performance as compared to nodular powders …[and] have higher CV/g potential than nodular powders at any given formation voltage." Cabot Website article.

2

period.[2]  But Cabot did not produce its then "effective written specifications" for the rest of the tantalum products to be sold under that Kemet agreement.  Nor did Cabot produce its written specifications for other products sold over the 11 year period to Kemet, Vishay, Epcos and all other customers of Cabot.

Cabot must be ordered to produce for each year from 1996 through 2006 each of the written specifications for each flake and non flake tantalum powder it sold or marketed as well as the "exact requirements" of each customer for which a flake and non-flake tantalum products was developed by Cabot.

### II. Completeness of and adequacy of Cabot's Electronic Production of sale records to all customers (Interrogatories 8, 14); production from Showa Cabot joint venture and Cabot Supermetals (Request 24).

At the May hearing, Cabot agreed, with regard to sales from its Boyertown facility, that "to the extent that we have that information [price, terms, quantities for each transaction from 1996 through 2006] by the customer and by the product and quantities and price, we'll put it in a spreadsheet in some form and compile it and give it to him."  But even that limited commitment has not been fulfilled.  The sales database produced contains transactions from February 18, 1998 through March 2006.[3]

In a related case pending in Suffolk Superior Court, Cabot has produced paper invoice records of sales from its Boyertown facility solely to AVX, Kemet and Vishay for 2002 through 2005.  AVX has identified more than 500 invoices produced in the Suffolk Superior Court case from just these years solely to AVX that are not reflected in the electronic record of sales produced by Cabot in this case.  And, in just 2002 to 2005

---

[2] Contracts produced were C(AII) 900633-670 (Kemet), C(AII) 090569-585 (Vishay) and C(AII) 090697-716 (Epcos).

[3] Cabot states that the sales records go back to 1996. However the data preceding February 1998 concerns different Cabot profit centers and does not include sales to customers.

3

there are over 48,000 pounds of tantalum powder sold to Vishay and Kemet that are not to be found in the electronic sales records produced.

Cabot refuses to produce records of tantalum sales by its subsidiary Cabot Supermetals as well as the sales records of the predecessor Showa Cabot joint venture. Yet we know that some of Cabot's sales to Vishay, Kemet and Epcos were under contracts with Cabot which specifically called for sales of some powders to be made by or through Showa Cabot the Japanese subsidiary. *See* note 2 *supra*.

Analysis of the sales and costs of tantalum products by the joint venture and the subsidiary will allow the experts "to compare pricing terms across different customers with different needs and requirements, and distinguish more accurately deviations in Cabot's pricing from costs for its range of tantalum products, particularly how margins across different flake tantalum products compare with margins for non-flake products tantalum products across its different manufacturing locations." Affidavit of Lauren Stiroh, dated Aug. 3, 2007 ("Second Stiroh Aff.") ¶ 5.[4] In late February AVX filed its expert's affidavit averring among things that an analysis of the customer level sales transaction data by each of Cabot, its subsidiary and the former joint venture affiliate from 1996 to date will assist the Court in its assessments of (i) whether flake, the alleged tying product, and nodular, the alleged tied products, are separate products, (ii) the definition and scope of the relevant market(s), (iii) Cabot's power in each of the relevant product markets and (iv) the fair market value of both the alleged tying and the tied products from 2001 through 2005 for a damages calculation. Affidavit of Lauren Stiroh, dated Feb. 20, 2007 ("Stiroh Aff.") ¶¶ 4-7. In opposing AVX's March 2007 motion to compel, Cabot did not file any affidavit disagreeing with Dr. Stiroh.

---

[4] The Second Stiroh Aff. is filed herewith.

The sales by the Japanese affiliate from 1996 through February 2002 are probative of whether there are separate markets for flake and nodular and will evidence Cabot's power in each. In 2000, Showa Cabot sold 62 tons of tantalum to AVX. In 2001, the year in that the contract at issue became effective, Showa Cabot sold only 23 tons to AVX.[5] If, as Cabot insists, it did not control or exert influence over the former 50-50 Showa Cabot joint venture, the prices charged by that Japanese affiliate from 1996 through February 2002 would be all the more material as to Cabot's ability to affect pricing independent of general market conditions. Interestingly Cabot refuses to produce documentation of its relationship with the Showa Cabot joint venture. The wholly-owned subsidiary's transactions from February 2002 through 2006 are material to market power, impact on commerce and to the determination of the fair market prices of the alleged tying and tied products. By way of example, in Cabot's Amendment of its agreement with Epcos dated June 30, 2004 (effective as of Oct. 1, 2003), powder sales might be made from either Boyertown or Aizu Japan and in some instances the contract price would be adjusted to take into account the subsidiary's "weighted average sale price" over different periods of time.[6]

Cabot must be ordered to produce electronically the records of all individual sales of tantalum products for each year from 1996 through 2006 by Cabot, its subsidiary Cabot Supermetals and the Showa Cabot joint venture, identifying the product, Cabot's product number, customer (or affiliate), the quantity, price, whether spot market[7] or pursuant to contract and all material terms.

---

[5] *See* AVX 1283.
[6] Epcos Agreement C(AII) 090724-732.
[7] Cabot's objection that it did not possess such spot market information is belied by some of its customer contracts. For example, in Cabot's Dec. 2000 agreement with Epcos, Cabot agreed at Epcos' option during

### III. *Showa Cabot joint venture and Cabot Supermetals subsidiary documents of agreements and dealings (Request 24).*

Cabot must be ordered to produce documents of its wholly-owned subsidiary and of its predecessor, the former Cabot joint venture known as Showa Cabot. The contracts, understandings and dealings between Cabot and its affiliate from 1996 to February 2002 are probative on the questions of separate markets, Cabot's market power and Cabot's impact on commerce. *See* Stiroh Aff ¶¶ 5-7; Second Stiroh Aff. ¶ 5. There is some evidence that Cabot influenced the supply of raw material to the joint venture.[8] Any dealings between Cabot and its subsidiary from February 2002 through 2006 concerning allocation of raw material, semi-refined KTaf or customers are probative on market power, impact on commerce and the fair market prices of the alleged tying and tied products.

Cabot must also produce documents relating to or concerning its relationship with Showa Cabot, including without limitation access to or supply of tantalum ore, recycled scrap tantalum and/or partially processed tantalum, so-called KTaf or otherwise, and cost allocations for each year from 1996 through February 2002, including without limitation the joint venture agreement and all amendments thereto.

### IV. *Completeness and adequacy of Cabot's production of cost accounting records (Interrogatory 16, Request 21). .*

Cabot has committed to producing its standard cost accounting on a monthly basis going back to the extent possible to 1996 and through 2006 for its Boyertown facility but has yet to do so. The format of the standard cost accounting to be produced only states a

---

2003-2005 to sell "standard commercial grade CPM tantalum powder" at the greater of the contract price or "the market price at the time…". C(AII) 090681-696 at 090681.

[8] A 2001 news release on behalf of the joint venture touted that "to ensure a stable supply of raw materials, Cabot … has been working with Gwalia of Australia to double the production of tantalum ores by 2003."

6

total cost per product and does not break down the costs of extraction, raw material, production, distribution and sales..

Cabot must be ordered to also produce the standard cost accounting records for each tantalum product of both its subsidiary for the period February 2002 through 2006 and the Showa Cabot joint venture for the period 1996 through February 2002.

V. *Cabot's refusal to produce mining agreements and documents concening its ability to restrict or impact the supply of raw materials (Request 23, Interrogatory 16).*

Cabot insists documents relating to its relationships with the mining companies are not relevant to the tying claim. Cabot owns the Tanco mine in Canada and the Morrua mine in Mozambique and reportedly has sought to acquire additional sources of raw materials. Affidavit of Lauren Stiroh, dated September 19, 2007 ("Third Stiroh Aff.") ¶3. The Third Stiroh Aff. is filed herewith.

In the relevant period it may be Cabot had some influence over the supply and cost of tantalum ore. One possible example might prove to be reflected in Cabot's December 2000 agreement with Epcos where prices for tantalum products in 2004 and 2005 were subject to adjustment "to reflect changes in the average spot market ore prices paid by" Cabot. Yet in determining spot market ore prices under that agreement purchases by Cabot from Cabot's "affiliates and Sons of Gwalia, Ltd and its affiliates" were to be excluded. *See* C(AII) 090682.

Documents concerning Cabot's decisions to expand or restrict its supply of tantalum over the relevant period, including its mining contracts would better enable among other things a comparison of price movements for Cabot's flake and non-flake

7

products with trends in supply. *See Generally* Third Stiroh Aff. detailing bases of relevancy[9].

Any influence by Cabot over the supply of raw material might have adversely affected other tantalum producers and potentially have foreclosed competition in the alleged tied nodular market of nodular tantalum. *See id.*

Cabot must be ordered to produce its mining contracts and other documents concerning its ability to restrict or impact the tantalum raw material supply in each year from 1996 through 2006.

### VI. *Completeness and adequacy of Cabot's production of surveys of end-users/purchasers of tantalum capacitors (Requests 4 26).*

Cabot produced a 2003 survey of 31 different end users who purchase tantalum capacitors from AVX and other manufacturers. Questions included by way of example whether the respondents had any designs for which they would only consider tantalum; and whether price was the primary factor in decision making. Cabot must produce the actual responses from the 31 companies. Similar surveys and responses conducted in the period from 1996 to 2002 would be probative of whether flake and nodular are separate products and whether Cabot had market power in the market for flake. Cabot must produce any prior surveys and responses.

---

[9] The need for the mining contracts and other documents concerning Cabot's true extraction costs is greater because Cabot no longer has the cost accounting records documenting changes or variations in its standard cost accounting.

8

VII. *Cabot's Production of its dealings with third parties concerning sales of flake and non-flake tantalum (Requests 18, 26); spot market pricing (Interrogatories 6, 7).*

Cabot insists its dealings with third parties are not relevant to the tying claim. Information as to spot or market prices for produced tantalum is clearly relevant to both market power and the fair market value of the tantalum products. Information as to forecasts of the tantalum needs of third parties is also relevant to whether flake and nodular are separate products and also market power. Moreover, Cabot did not object to producing the "spot market" information specifically sought in Interrogatories 6 and 7. The sales database produced by Cabot does not provide any information whether the price was at spot market, pursuant to contract or at some discount such as Most Favored Nation, scrap buyback or otherwise.

Information as to spot market prices for tantalum products sold by Cabot Supermetals and other suppliers as well forecasts of buyers' needs should be in Cabot's files of its dealings with Epcos, Kemet and others. The dealings should reveal whether any prices in the database were based on some discount or other special factor. The dealings with third parties are relevant.

In Cabot's 2000 contract with Epcos, prices for 2003-2005 were subject to adjustment for both "the market price" of "standard commercial grade" Cabot tantalum powder and in 2004 and 2005 for the average spot market ore price. In its June 2003 Amendment of agreement with Epcos, Cabot agreed to a mechanism for an adjusted price turning on the weighted average price for powder charged by Cabot Supermetals. In two of the Epcos agreements the buyer was to transmit forecasts of its tantalum needs to Cabot.

Under its December 2002 agreement with Kemet, Cabot required forecasts of need from its buyer and also agreed to a price calculated by reference to "the weighted average accepted bid price or otherwise committed price at the time of such Order … from Major Suppliers (other than … [Cabot] and its affiliates)." Cabot had a right to review Kemet's records presumably to audit among other things these market price determinants.

Cabot must be ordered to produce all dealings with all third party customers and potential customers of flake and non-flake tantalum from 1996 through 2006 by Cabot, Cabot Supermetals (from February 2002 through 2006) and by Showa Cabot (from 1996 through February 2002.

## VIII.   *Contention interrogatories 12 and 13; documents in support.*

In these two related contention interrogatories AVX seeks the basis for Cabot's contentions that flake and nodular are not separate products and that Cabot does not have market power in the market for flake. Cabot objected to both, stating that "depending on the desired characteristics of the final product" flake and nodular are interchangeable. In answering Cabot's interrogatory as to what makes flake unique in the industry, AVX stated flake is unique "because of the following unique characteristics: Superior Cv/gm, Cv/cc, surge performance, breakdown voltage, ESR, capacitance and frequency response."

Cabot has specifications for the flake products it has sold to AVX. Taking the Cv/gm, Cv/cc, surge performance, breakdown voltage, ESR, capacitance and frequency response of each Cabot flake product sold to AVX as the desired characteristics, Cabot

should identify the nodular products of Cabot, if any, that it contends are interchangeable with each Cabot flake product and identify all documents that support that contention.

In addition, Cabot has failed to identify all persons with knowledge of the differences and similarities of flake and nodular powder and the basis of the contention that one or more of Cabot's nodular products are interchangeable with flake given the specifications of each flake and the stated desirable characteristics.

### IX.   *Independent audit of Cabot records and archives.*

The Court should order Cabot to search its records again, the records of its subsidiary Cabot Supermetals for the period from February 2002 through 2006 and to obtain the records of the Showa Cabot joint venture for the period from 1996 through 2006.

If Cabot fails to produce a complete sales data base for all sales of flake and non-flake tantalum made by Cabot, Cabot Supermetals and Showa Cabot within ten days of its Order, the Court should hold a show cause hearing as to why an independent third party firm at AVX's sole expense should not be provided access to all Cabot's records and files in order to compile a true and accurate data base of all flake and non-flake tantalum sales made by Cabot, Cabot Supermetals and to the extent possible Showa Cabot for the period from January 1996 through December 2006.

        Respectfully Submitted,

        AVX CORPORATION and
        AVX LIMITED

        By their attorneys,

        */s/ Richard A. Goren*
        Richard A. Goren (BBO No. 203700)
        Joseph S.U. Bodoff (BBO No. 549116)
        BODOFF & ASSOCIATES
        225 Friend Street
        Boston, Massachusetts 02114
        Tele: 617-742-7300
        Fax:  617-742-9969

Date:   September 19, 2007

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on September 19, 2007.

        */s/ Richard A. Goren*