UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION and AVX LIMITED,  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>CABOT CORPORATION,  )<br>)<br>Defendant.  )<br>) | Civil Action No. 04-10467-RGS |

**PLAINTIFFS' MOTION FOR RECONSIDERATION**

Notwithstanding two appearances before Magistrate Bowler in May and September 2007, and despite their good faith efforts the parties struggle to complete fact discovery and continue to dispute what is to be produced. Plaintiffs AVX CORPORATION and AVX LIMITED ("AVX") move for reconsideration of a portion of Magistrate Bowler's September 21st bench rulings[1] denying discovery from both the former joint venture Showa Cabot for the period January 1996 through February 2002 in which the defendant Cabot Corporation ("Cabot") was nominally a 50% owner, and by its successor, Cabot's 100% subsidiary Cabot Supermetals KK ("Cabot Supermetals KK") for the period March 2002 through December 2006. It appears Magistrate Bowler denied discovery based on Cabot's representation that it did not control the Aizu Japan operation and also

---

[1] AVX's email request for a transcript of the September 21st hearing was made on October 6, 2007. But the transcript, Exhibit A, was not docketed until October 31st. In a LR 37.1 conference on November 8, 2007 Cabot insisted it would not produce this discovery absent a court order reconsidering Magistrate Bowler's rulings.

based on Cabot's argument that only the products sold at Cabot's Boyertown Pennsylvania facility were relevant to this Sherman Act tying case.

But a little more than a month after obtaining those rulings Cabot has demonstrated the fallacy of its representations and its argument. Cabot now takes the position that the tantalum products produced by the Aizu Japan operation both while a joint venture from 1996 to February 2002[2] and thereafter as a wholly owned subsidiary[3] are probative to the issues of this case. And in late October Cabot produced the operative joint venture agreement between Cabot and Showa Denko which demonstrates that while nominally a 50% owner, in fact Cabot had substantial *de facto* economic control over the former joint venture.

Accordingly AVX requests the Court to issue an order compelling Cabot to:

- produce the sales and cost data for the manufacture and sale of all tantalum powder products by both the former joint venture, Showa Cabot for the period January 1996 through February 2002, and by Cabot Supermetals KK for the period March 2002 through December 2006; and,

- produce the product specifications of all the flake and non-flake (nodular) powders manufactured and marketed by the former joint venture, Showa Cabot from 1996 through February 2002 and by Cabot Supermetals KK for the period from March 2002 through December 2006.

---

[2]  From 1996 to February 2002 Showa Cabot, the Japanese 50-50 joint venture, sold tantalum powder products to AVX. In February 2002 Cabot acquired the half interest it did not own and since then its 100% subsidiary Cabot Supermetals KK, the successor in interest to the joint venture, also located in Japan has also sold tantalum powder products to AVX.

[3] According to its 2006 10K: (i) Cabot is structured "into four reportable segments: the Carbon Black Business, the Metal Oxides Business, the Supermetals Business and the Specialty Fluids Business … [and] manage[s] … [its] businesses on a regional basis … organized into five business regions:  North America, South America, Europe, Asia Pacific, and China"; (ii) "Tantalum … accounts for substantially all of [the Supermetal segment's] sales;" (iii) "Cabot operates manufacturing facilities for … [the tantalum, Supermetals business] in Boyertown, Pennsylvania and Kawahigashi-machi, Fukushima-ken, [Aizu] Japan" (iii) "[tantalum s]ales in the United States are made by Cabot employees, in Europe by Cabot employees and a sales representative, and in Japan and other parts of Asia primarily through Cabot employees." According its 2005 10K, Cabot has three Japanese subsidiaries, Aizu Holdings KK, Showa Cabot KK and Cabot Supermetals KK KK. In an affidavit dated April 14, 2007 filed in a  companion case Cabot's William J. Young  describes himself as the "Strategic Business Manager of … [Cabot's] Supermetals Division." It is undisputed that both the Boyertown facility and the Aizu Japan facility are operated as a single, integrated business known and operated as the Supermetals Division.

2

**I.  Reconsideration of rulings denying discovery from Cabot's Japanese facility.**

    A.  <u>Cabot's Production of sales and cost accounting records for Cabot, the former joint venture and its successor the wholly owned subsidiary.</u> [4]

Since January 2006 AVX has sought to discover the sales and cost accounting records of Cabot, Cabot Supermetals KK and the former joint venture.  In late February 2007 to support its discovery demands, AVX filed its expert's affidavit averring among things that an analysis of the customer level sales transaction data by each of Cabot, its subsidiary and the former joint venture from 1996 to date will assist the Court in its assessments of (i) whether flake, the alleged tying product, and nodular, the alleged tied products, are separate products, (ii) the definition and scope of the relevant market(s), (iii) Cabot's power in each of the relevant product markets and (iv) the fair market value of both the alleged tying and the tied products from 2001 through 2005 for a damages calculation.  Affidavit of Lauren Stiroh, dated Feb. 20, 2007 ("Stiroh Aff.") ¶¶ 4-7 (Docket entry 49).  *See also* Affidavit of Lauren Stiroh, dated August 3, 2007 ("Second Stiroh Aff.") (Docket entry 66) averring in ¶¶ 3, 5:

> The excess of price over marginal cost is an indicator of market power; as such, the extent to which a change in product price results from factors other than changes in product costs will greatly inform an analysis of Cabot's market power and damages to AVX, if any…..  Cabot's tantalum production takes place at different manufacturing facilities around the world, including factories in Aizu, Japan and Boyertown, Pennsylvania; up until 2002 Cabot was also in a joint venture with Showa Denko for the design and manufacture of tantalum powder (*see* Cabot's webpage, "IS0 Certified Manufacturing Facilities" and "About CSM Japan").  Manufacturing and input costs may differ across these locations as

---

[4]  AVX's interrogatories 6, 7, 8, 9, 14, 16, Requests 21, 22 and 24 and Cabot's responses thereto are Exhibit C. The interrogatories and document requests sought information from Cabot, its 100% subsidiary Cabot Supermetals KK and the former joint venture Showa Cabot. *See* uniform instruction.  *Id.* While Request 24 was not the subject of a formal separate motion to compel, the question of the discoverability of documents from the former joint venture and Cabot Supermetals KK, the 100% subsidiary, was fully briefed by the parties in support of, and in opposition to, AVX's March 2007 Motion to Compel Discovery. *See* docket entries 49, 51 and 54.  At the September 21, 2007 hearing the parties squarely addressed these questions and Magistrate Bowler made clear no separate motion was necessary. Exhibit A at 21.

3

well. Product-level data on sales and costs across these different facilities over the relevant period will therefore allow us to compare pricing terms across different customers with different tantalum needs and requirements, and distinguish more accurately deviations in Cabot's pricing from costs for its range of tantalum products, particularly how margins across different flake tantalum products compare with margins for non-flake tantalum products across its manufacturing locations. If cost data were available only in more aggregate form (such as marginal costs for flake versus non-flake tantalum), information would need to be provided as to how and why these costs vary across Cabot's different tantalum products within these broader categories.

In its opposition to AVX's March 2007 motion to compel and at each of the May and September hearings before Magistrate Bowler, Cabot asserted that it was not required to produce otherwise discoverable documents of the former joint venture and/or its successor, Cabot Supermetals KK. But Cabot has not filed any expert affidavit or other evidence disagreeing with Dr. Stiroh. It is undisputed that the sales and cost accounting data of Cabot, the former joint venture, and its successor, Cabot Supermetals KK, the wholly owned subsidiary are material and that the experts' assessments thereof will greatly inform the Court in adjudicating this Sherman Act tying claim. *Id*.

In its March 2007 Motion to compel AVX demonstrated that the records of the 100% subsidiary and the former joint venture were fair game under Rule 34 and also that these materials were proper grist for this Sherman Act tying case. *See Societe Internationale, etc. v. Rogers,* 357 U.S. 197 (1958); *United States v Standard Oil Company*, 23 F.R.D. 1, 3-5 (S.D. N.Y. 1958); *Banana Serv. Co. v. United Fruit Co.,* 15 F.R.D. 106, 108 (D. Mass. 1953); AVX's Mem. in Support of Mot. To Compel at 5-11 (Docket entry 49).

This case will turn on Cabot's economic power over, and influence in, the worldwide tantalum powder market and necessarily requires an assessment of the sales of tantalum powder by all marketplace participants. *Id. See also Broadcast Music, Inc., et*

4

*al., v. Columbia Broadcasting System, Inc., et al.,* 441 U.S. 1 (1979) and *National Collegiate Athletic Association v. Bd. of Regents of U. Oklahoma*, 468 U.S. 85 (1984) (joint venture involving the economic integration of two firms in the same business is susceptible to antitrust examination by the courts).

The sales by the Japanese affiliate from 1996 through February 2002 are probative of whether there are separate markets for flake and nodular and will evidence Cabot's power in each.[5] If Cabot did not effectively control or exert influence over the nominal 50-50 joint venture, the prices charged by that Japanese affiliate from 1996 through February 2002 would seem all the more material as to Cabot's ability to affect pricing independent of general market conditions.

At the September 21st hearing Cabot objected to discovery of the sales and cost accounting data from both the former joint venture and its successor, Cabot's wholly owned subsidiary, Cabot Supermetals KK.[6] Cabot argued that: (1) the five year January 2001 contract with the alleged tie covered sales from Cabot's Boyertown facility, and therefore only records from that single segment of its unitary, worldwide Supermetals Division were subject to discovery; (2) seeking "information about 2002 through 2006 is just a fishing expedition;" and (3) "the subsidiary that he[counsel to AVX] keeps

---

[5] Analysis of the sales and costs of tantalum products by the joint venture and the subsidiary will enable the experts "to compare pricing terms across different customers with different needs and requirements, and distinguish more accurately deviations in Cabot's pricing from costs for its range of tantalum products, particularly how margins across different flake tantalum products compare with margins for non-flake products tantalum products across its different manufacturing locations." Second Stiroh Aff. ¶ 5.

[6] At the hearing AVX demanded production of "the records of all individual sales of all tantalum products, '96 to 2006 by Cabot, its subsidiary, they call it Cabot Supermetals [KK], and by the former joint venture Showa Cabot." Exhibit A at 9. In objecting to producing these sales, Cabot insisted that only sales from the Boyertown facility were relevant, and Cabot represented: **"And, in fact the subsidiary that he [AVX's counsel] keeps calling, the Japanese subsidiary, was a joint venture that Cabot did not acquire until February '02 after this contract was signed**." Exhibit A at 10. While doubtlessly inadvertent Cabot's counsel confusingly, and again inaccurately described the corporate relationship. *See* Exhibit A at 14 ("With respect to the **subsidiary** he [**AVX's counsel] keeps referring to, that was a joint venture**, **Cabot did not control it**. He says there are illusions [ *sic* ] to the fact that Cabot controlled it. Those are his. **It was a 50-50 joint venture**…") (emphasis added).

5

referring to was a [50-50] joint venture [that] Cabot did not control… [and] **that Cabot did not acquire until February '02 after this contract was signed**."[7]

Cabot asserts that the nodular tantalum products of the other players in the marketplace are probative on this Sherman Act case but at the same time Cabot posits that the tantalum transactions by the former joint venture and the current subsidiary are not discoverable. At the hearing Cabot did not inform Magistrate Bowler that it would subsequently take the position that the products both the former joint venture and its now 100% subsidiary sold to AVX and others are probative and relevant. *See* Cabot's October 30, 2007 Supplemental Answers to Interrogatories, Exhibit B.

Moreover at the September 21st hearing Cabot three times inaccurately described the 100 % subsidiary as a joint venture. *See* notes 6 and 7 *supra*.

On the heels of Cabot's assertions, Magistrate Bowler denied discovery of the sales and cost accounting from the Japanese facility both while it was constituted as a joint venture and from and after February 2002 while a wholly owned subsidiary.[8]

About five weeks after the September 21st hearing, Cabot produced the joint venture agreement[9] which evidences that, even assuming a lack of *de jure* control, Cabot had substantial *de facto* economic control over the former joint venture.

Now there is evidence that: (1) Cabot was the sole seller of raw material, the tantalum ore and/or the semi refined KTaf required by the venture;[10] (2) Cabot licensed to

---

[7] Exhibit A at 13 and 10 (emphasis added). *See* note 6 *supra*. It is undisputed that from 1996 through February 2002 Showa Cabot was a joint venture and that thereafter its successor, Cabot Supermetals KK, the 100% subsidiary, was in fact operated along with the Boyertown facility as a single division. At all times both the facility in Aizu Japan and Boyertown Pennsylvania sold tantalum products to AVX and others.

[8] *See* Exhibit A at 8:20-25, 9, 10, 12:22-25, 13, 14, 15:8-17, 16, 17:1-4.

[9] In late October 2007 Cabot produced unsigned copies of a 1971 joint venture agreement which Cabot represents is the operative joint venture agreement. Apparently there were no amendments between 1971 and 2002.

6

the joint venture its "then present rights, secret processes and know-how relating to the manufacture … of tantalum powder" and agreed to an "exchange of licenses and rights" and technology subsequently developed "during the term of" the joint venture;[11] and, (3) Cabot agreed that the joint venture would "act as … [Cabot's] exclusive independent contractor for sales … in Japan of tantalum powder and tantalum products manufactured by … [Cabot] in the United States …".[12]

Because the sales of all the participants in the marketplace are probative of Cabot's market power in both the tying and the tied markets, the sales and cost accounting data of the former joint venture whose access to technology and the crucial raw material was apparently controlled or contractually limited by Cabot is clearly discoverable.

While refusing to produce this material, Cabot does not assert it lacks possession or access to the information. Indeed almost six weeks after the September hearing Cabot served discovery responses from the records of both the former joint venture and the wholly owned subsidiary. *See* Exhibit B.

As the sole seller of tantalum ore and/or KTaf to the nominal 50-50 joint venture, Cabot could affect the availability and supply of raw material and/or the semi refined KTaf and hence have wielded a significant impact on the market for the allegedly tied nodular powders. Second Stiroh Aff. In 2000, the Showa Cabot joint venture sold 62 tons of tantalum to AVX; and, in 2001, the year in which the contract at issue became effective, Showa Cabot sold only 23 tons to AVX.[13] In the late summer, early fall of

---

[10] The joint venture and Cabot contracted that Cabot "will sell to us [the joint venture] ore and potassium tantalum fluoride as are necessary for the manufacture of tantalum products by us [the joint venture and w]e will order all our requirements of Raw Materials from you …" C(FED) 095422.
[11] C(FED)095391-399.
[12] C(FED)095410-412.
[13] *See* AVX 1283.

2000 Cabot insisted AVX enter into this five year lock up at fixed prices for both flake and nodular tantalum powder or go without flake; and while AVX was pressed to enter into this long term, fixed price contract, inquiries by AVX to Showa Cabot about 2001 availability of tantalum products allegedly went unanswered.

Limiting discovery to just the sales and costs of Cabot's Boyertown facility produces an incomplete and materially inaccurate picture of Cabot's market power in flake and Cabot's impact on commerce in the market for nodular. Cabot argues that the nodular products of third parties, and the sales of those products, are material to these issues. Cabot therefore cannot deny that the transactions of all players in the marketplace, whether or not affiliated with or controlled by Cabot, should be examined in the assessment of Cabot's power and influence in the relevant markets.

It is not fishing to seek sales and cost data for 2002 through 2006 when damages for the period may be determined by the difference between fair market prices and the contract prices for both the tying and the tied products.

It is undisputed the subsidiary was and is part of a single, integrated Supermetals Division. *See* note 2 *supra*. As such Cabot cannot deny it has the indisputably relevant cost accounting records for all tantalum powder products sold by the entire Supermetals Division.[14] Its transactions from February 2002 through 2006 are probative to market

---

[14] At the September 21st hearing Cabot may have misled the Court both as to the extent of its cost accounting records for the Aizu facility and as to what it has produced. At the hearing AVX asked the Court "to order Cabot to produce the standard cost accounting for the subsidiary and the former Showa Cabot joint venture." Exhibit A at 15. In response Cabot represented that it had produced all the cost accounting information that it has. *Id.* ("The information that we have is all they have…. So what we have[,] we've produced to him [counsel to AVX]"). And the Court ruled Cabot was to produce the cost accounting "to the extent you have it." *Id.* When AVX sought clarification that the cost accounting included the wholly owned subsidiary, Cabot backtracked and explained that the cost accounting produced was limited "to the extent that any products were sold by Cabot to AVX" and represented that such "cost accounting data is in that package" and "[t]hat;s all we have." *Id.* at 16. The Court merely ruled "Done" for the subsidiary's accounting records. *Id.* It is not clear whether the cost accounting that was produced

power, impact on commerce and to the determination of the fair market prices of the alleged tying and tied products. By way of example, in Cabot's Amendment of its agreement with Epcos dated June 30, 2004 (effective as of Oct. 1, 2003), powder sales by Cabot might be transacted at either of the Supermetals Division's two production facilities in Boyertown Pennsylvania or Cabot Supermetals KK's facility in Aizu Japan; and, in some instances the contract price for the product would be adjusted to take into account the "weighted average sale price" over different periods of time charged by the Aizu facility.[15]

Magistrate Bowler's ruling declining to order production of the sales and all cost accounting data of the 100% subsidiary, Cabot Supermetals KK and of Showa Cabot, the prior joint venture, should be reconsidered.

B. <u>Product Specifications for the Aizu Japan facility both while operated as a joint venture and as part of Cabot's Supermetals Division.</u>

Cabot posits that the non-flake or nodular products manufactured by others are relevant to a determination of this Sherman Act case and probative of the potential issues of separate product, separate markets, Cabot's alleged market power in flake and Cabot's alleged impact on commerce in the sale of nodular powders. Yet despite this contention Cabot refuses to produce the technical specifications and customer requirements of the powders manufactured and marketed by the former Showa Cabot joint venture and its successor, Cabot's 100% owned Japanese subsidiary, Cabot Supermetals KK all of which

---

includes costs for products produced by the Aizu plant to fill one or more AVX purchase orders issued to Cabot. The Court unequivocally denied discovery of the costs of the former joint venture. *Id.* at 17.
[15] Epcos Agreement C(AII) 090724-732.

9

are probative of a meaningful comparison of the flake and non-flake or nodular tantalum powders.

Contradicting the position it asserted to Magistrate Bowler, Cabot now insists that forty (40) products manufactured previously by the former joint venture and after February 2002 by the Aizu Japan segment of its Supermetals Division, are interchangeable with the products of its Boyertown facility and hence material to this tying case.  *See* Exhibit B, Cabot's October 30, 2007 supplemental answers to interrogatories.  Cabot cannot play fast and loose and argue the products of both the former joint venture and the current subsidiary are material and withhold both the technical characteristics and the "exact requirements" of the customers for those products.

Cabot must be ordered to produce for each year from 1996 through 2006 the written specifications for each flake and non flake tantalum powder sold or marketed by it, the former Joint Venture, and by Cabot Supermetals KK together with the "exact requirements" of each customer for which a flake and non-flake tantalum products was developed by Cabot or its prior affiliate.

## II. CONCLUSION.

Cabot should be ordered to produce the discovery in each of the foregoing two categories.

>Respectfully Submitted,
>
>AVX CORPORATION and
>AVX LIMITED
>
>By their attorneys,

Date:   November 14, 2007

>*/s/Richard A. Goren*
>Joseph S.U. Bodoff (BBO # 549116)
>Richard A. Goren (BBO # 203700)
>BODOFF & ASSOCIATES
>225 Friend Street
>Boston, Massachusetts 02114
>Tele: 617-742-7300
>Fax:  617-742-9969

## LOCAL RULE 37.1 CERTIFICATION

The undersigned certifies that he conferred with Brian A. Davis and Julie Rising of Choate Hall & Stewart, Cabot's counsel on several occasions via telephone regarding the dispute illustrated above and that on November 8, 2007 confirmed with Cabot's counsel the parties' continuing dispute as to this discovery.  Despite the efforts of both parties, motion practice is required to resolve the instant dispute.

> */s/ Richard A. Goren*
> Richard A. Goren

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on November 14, 2007.

                                              */s/ Richard A. Goren*