# EXHIBIT

# A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
AVX CORPORATION, et al  .  CIVIL ACTION NO. 04-10467-RGS
   Plaintiffs            .
                         .
   V.                    .  BOSTON, MASSACHUSETTS
                         .  SEPTEMBER 21, 2007
CABOT CORPORATION        .
   Defendant             .
. . . . . . . . . . . .  .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

```
For the plaintiff:      Richard A. Goren, Esquire
                        Bodoff & Associates
                        225 Friend Street
                        Suite 704
                        Boston, MA 02114
                        617-742-7300
                        rgoren@bodofflaw.com


For the defendant:      Brian A. Davis, Esquire
                        Julie C. Rising, Esquire
                        Choate, Hall & Stewart
                        Two International Place
                        100-150 Oliver Street
                        Boston, MA 02110
                        617-248-5000
                        Fax: 617-248-4000
                        BDavis@choate.com
                        jrising@choate.com
```

Court Reporter:

Proceedings recorded by digital sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**



2

1                          **I N D E X**

2  Proceedings                                              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        P R O C E E D I N G S

2        (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4   presiding.  Today is September 21, 2007.  The case of AVX

5   Corporation v. Cabot Corporation, Civil Action No. 04-10467

6   will now be heard.  Would counsel please identify themselves

7   for the record.

8              MR. GOREN:  Good afternoon, Your Honor, Richard Goren

9   for the plaintiffs.

10             THE COURT:  Thank you.

11             MR. DAVIS:  Good afternoon, Your Honor, Brian Davis,

12   and with me is Julie Rising representing Cabot Corporation.

13             THE COURT:  Thank you very much.  Well, it seems that

14   we have some unresolved discovery issues, the story of my life.

15   Mr. Goren, tell me what it is you think you don't have that you

16   should have.

17             MR. GOREN:  I would take them seriatim off my memory,

18   Your Honor,--

19             THE COURT:  Okay.

20             MR. GOREN:  --and the first one are the product

21   specifications.  We first asked Cabot Corporation in an

22   interrogatory to identify all the technical characteristics of

23   all of their products.  They objected.  They squawked.  And so

24   we came into court and before you in late May--

25             THE COURT:  Look, if you're going to have a

4

1  conference do it outside, okay,  Ms. Conrad, and group.

2          MS. CONRAD:  Sorry, Your Honor.

3          THE COURT:  All right.

4          MR. GOREN:  And we suggested well just produce the

5  written specifications.  They had written specifications for

6  each product.  And Cabot said, well gee, there was some

7  products that never made it to market.  These are highly

8  material and probative on whether the flake tantalum is a

9  product separate and apart nodular.  It all goes to the

10 technical characteristics of each of these products.  Cabot

11 tells the world that each of their products is manufactured to

12 the exact requirements of each customer.  Well, Cabot says that

13 they're willing to produce the technical specifications for the

14 products sold to AVX but not the technical specifications for

15 the products sold to third parties, and the same thing for the

16 exact requirements that the customer submitted.  These are what

17 we're looking for.  And it's as I say highly probative on

18 separate product as between the flake and the nodular.  And,

19 Your Honor, they really waived any squawk that they have

20 because buried in the production of what they did produce was

21 some of the specifications for the, some of the products that

22 they sold to Chemic and Vishay.  And, Your Honor, some of the

23 specs that they produced were sold - remember there's another

24 issue about the subsidiary and the joint venture--

25          THE COURT:  Uh-huh.

5

1          MR. GOREN:  --well, they produced specs for products

2    that were sold by the subsidiary under contracts that Cabot

3    signed.  Cabot treated that subsidiary as a division.  That's

4    the nutshell on specifications that - so that I don't get

5    confused, Your Honor, I'd kind of ask you to address each one--

6          THE COURT:  One at a time, sure.

7          MR. GOREN:  --one at a time.

8          THE COURT:  All right, Mr. Davis, why not?

9          MR. DAVIS:  Thank you, Your Honor.  First, we recall

10   that this is again AVX's I think third or fourth suit against

11   Cabot.  I've lost count under this contract.  And it's simply a

12   tying claim.  And the tying claim is that Cabot forced AVX to

13   take certain nodular powder products in order to get Cabot's

14   flake powder products.  That's the only claim left in this

15   case.  All of AVX's other claims have been dismissed.  And with

16   respect to the product specifications we have given, and in

17   fact gave AVX some time ago and having final convinced

18   Mr. Goren that he had them and gave him the Bates numbers for

19   all of the product specs for the products that were sold to

20   AVX.  So AVX has everything that it needs to be able to compare

21   the products that were sold, the nodular--

22          THE COURT:  Well, it may be everything you think it

23   needs, but obviously Mr. Goren thinks there's something else he

24   needs.

25          MR. DAVIS:  Well again, Your Honor, we've offered the

6

1    specs and we've provided the specs for all of the products

2    that AVX ever purchased.  Now what AVX is looking for are

3    product specs for products that AVX never purchased from Cabot

4    and, therefore, they're not products that we supposedly tied.

5    They're not products that we supposedly used to tie other

6    products, okay.  They're products that AVX never, never

7    purchased.  So--

8                THE COURT:  So what's the relevance, Mr. Goren?

9                MR. GOREN:  Your Honor, part of the necessary proof

10   in this case is that the flake products, and there are more

11   than one.

12               THE COURT:  How many?

13               MR. GOREN:  There are two that, in particular that

14   are sold to AVX.  They're also sold to other customers, Vishay

15   in particular, but we have to demonstrate that that is a

16   separate product from the nodular.  And there are I don't know

17   how many have been nodular products and the experts need to

18   compare the specifications for each flake product as against

19   each of the nodular products and then come to court and tell

20   you their opinions as to whether they're separate products for

21   the antitrust law.  And then if so whether Cabot has market

22   power in flake.  To make that analysis they should look at all

23   of the flake and nodular products that Cabot manufactures.

24               THE COURT:  All right, it should be produced.  Next?

25               MR. GOREN:  Next, Your Honor, this is the

7

1  completeness and adequacy of the sales records.  We were in

2  here the last time and Mr. Davis said, well, okay, we'll to the

3  extent we got it we'll produce all the sales records going back

4  to 1996 through 2006.  We'll put it into a database and we'll

5  produce it to AVX.  Well, the sales database that they produced

6  only contains transactions from February 18, 1998 through March

7  2006.  Now there's another case that Mr. Davis keeps bringing

8  up.  There's another case in superior court and Cabot has

9  produced paper invoice records of sales from just its Boyertown

10  facility of sales to AVX, Chemic and Vishay for 2002 to 2005.

11          THE COURT:  And do you have those?

12          MR. GOREN:  We have those, Your Honor, but we've

13  identified more than 500 invoices that were produced in the

14  Superior Court that aren't in the electronic database.  And in

15  just--

16          THE COURT:  Well, can you reach some kind of

17  stipulation that they should be in the database and--

18          MR. GOREN:  Well, that's what we've sought is--

19          THE COURT:  And to the best of your knowledge there's

20  nothing else out there?

21          MR. DAVIS:  Yeah, actually I can address that, Your

22  Honor.  What he's calling sales invoices he's wrong on.

23  They're consignment invoices, I can explain.  The way Cabot

24  sold product to AVX was it would, AVX would take the product on

25  consignment, which didn't mean that AVX was actually purchasing

8

 1   it.   It would go to the AVX facility.  If AVX used it within a

 2   certain period of time then it would be deemed purchased and an

 3   invoice would be issued.  That's all reflected in all of the

 4   sales data that we produced, the spreadsheets, all those sales

 5   are there.  Where there were consignments that didn't turn into

 6   sales, it's never a transaction, it's never a sale.  We've gone

 7   through the list of missing invoices and those appear to be

 8   all, and in fact his list itself identifies them all as

 9   consignment invoices.

10          THE COURT:  Well can't we have some kind of an

11   affidavit to that effect?

12          MR. DAVIS:  Oh that would be fine, Your Honor.

13          THE COURT:  All right.

14          MR. DAVIS:  Not a problem.

15          MR. GOREN:  Your Honor, we also informed Mr. Davis

16   that we have located invoices not reflected in the database of

17   over 48,000 pounds of tantalum powder sold to Vishay and Chemic

18   and it's just for 2002 to 2005.  So we have reason to believe -

19   and all we're asking for is set the table up fairly so that we

20   have all of the data.  And another material issue for the Court

21   here is that they committed only to produce sales records from

22   Boyertown.  The experts - Judge, back in February AVX's

23   antitrust experts submitted an affidavit in connection with

24   seeking these records and there's no expert affidavit

25   countering that.  And the experts say that they need in order

9

1   to assess Cabot's market power the sales transactions of the

2   subsidiary from February 2002 through 2006 and also the sales

3   of the former joint venture and there are suggestions that

4   Cabot controlled it.  Cabot says it didn't.  But, Judge, those

5   are all, those sales are relevant to, they'll help you or Judge

6   Stearns who will hear the case, to assess whether the flake is,

7   the tying product is a separate product from the nodular, the

8   definition and scope of relevant markets, Cabot's power in each

9   of these markets and in the alleged damage period the fair

10  market value of the products sold.  And that's the only expert

11  opinions or affidavits that are before you on that subject.

12          Now, Judge, Cabot says, but we didn't control or

13  influence the prior joint venture, okay.  But, Judge, if they

14  didn't control or influence the joint venture it seems to me

15  that the prices charged by that affiliate would be all the more

16  material to, as to whether Cabot could affect pricing by itself

17  independent of other market conditions but curiously they

18  refuse to produce that documentation.  That's later on on my

19  list so our request or demand, and time is running short, we

20  have until October 31.

21          THE COURT:  I realize that.

22          MR. GOREN:  We want Cabot to produce electronically

23  the records of all individual sales of all tantalum products,

24  `96 to 2006 by Cabot, by its subsidiary, they call it Cabot

25  Super Metals, and by the former joint venture Showa Cabot.  And

10

1   to identify on there the product, the product number, the

2   customer, how much stuff it was, the quantity, the poundage,

3   the price, whether it was spot market and or to a contract.

4   And, Judge, they say they don't have information as to whether

5   a sale is by spot market but buried in their production is a

6   December 2000 with EPCOS and Cabot agreed that they're going to

7   sell in a period 2003 to 2005 standard commercial grade Cabot

8   tantalum powder at the greater of the contract price or the

9   market price at the time. They've got this information.

10  Judge, they should be--

11          THE COURT: Well, Mr. Davis, do you have it?

12          MR. DAVIS: No. And what we have done is, as we told

13  Mr. Goren many times over now, we went ahead and pulled

14  together all of the sales information that we have from Cabot's

15  Boyertown facility. That is the facility that is subject, the

16  only facility that's subject to this contract, okay. And in

17  fact the subsidiary that he keeps calling, the Japanese

18  subsidiary, was a joint venture that Cabot did not acquire

19  until February `02 after this contract was signed. And this

20  case turns on, his tying claim turns on what happened back in

21  2000, 2001, not the events subsequent cause there was either a

22  tie when that agreement was signed or not. So that's why he

23  keeps searching for information subsequently but it's not

24  relevant. We have given him all of the sales data that we have

25  which includes invoices, pounds, pricing, customers, not just

11

1   for AVX but for every other customer that purchased the

2   products that AVX bought from Cabot. All of that has been made

3   available to him in electronic format to make it more

4   searchable by his experts. He's got it.

5           THE COURT: Okay. There's a pretty long list here on

6   both sides and I have a criminal case and I'm going to take a

7   recess in the civil case and I'm going to send you out in the

8   hall to see if you can narrow this, and then I'll resume when I

9   finish with the criminal case. But looking at the demands on

10  both sides, I think you can narrow it a little bit. All right,

11  we stand in recess--

12          MR. GOREN: Thank you, Your Honor.

13          THE COURT: --on this matter.

14                      (RECESS)

15          THE COURT: All right, sorry for that, counsel, but

16  it - we had somebody in custody and so it made more sense to

17  deal with that. And I'm sure that given a little time out in

18  the corridor you just got together on everything.

19          MR. DAVIS: No, Your Honor.

20          MR. GOREN: No.

21          MR. DAVIS: I apologize, but that's not actually the

22  first time that we've had discussions and we've tried to

23  resolve some of these issues and--

24          THE COURT: Okay.

25          MR. DAVIS: --it's very clear that we're making no

12

1   headway with AVX given in on any of the facts of their

2   request.  We did offer - they asked for some surveys.

3             THE COURT:  We're back on the record, Mr. Duffy.

4             MR. DAVIS:  I apologize.

5             THE CLERK:  Resuming on the record.

6             THE COURT:  AVX v. Cabot.

7             THE CLERK:  AVX Corp. v. Cabot Corp., Civil Action

8   No. 04-10467.

9             THE COURT:  Thank you, sir.

10            MR. GOREN:  The parties report no progress, Your

11  Honor, and to pick up from where we left off--

12            MR. DAVIS:  Actually can I interrupt there.  Actually

13  there were surveys that AVX was looking for.  They have the

14  results of the surveys.  That's the only survey that we're

15  aware of that Cabot ever did.  They've already got the results.

16  They now want the forms.  We said we'd go and look and see if

17  the 31 response forms are still available.  But, so we did

18  compromise on that issue.

19            THE COURT:  All right.

20            MR. DAVIS:  That's all the progress we made, Your

21  Honor.

22            MR. GOREN:  The first issue for the Court, Your

23  Honor, is whether Cabot must produce the sales of its

24  subsidiary and the former joint venture.  The fact that this is

25  a tying claim requires that the plaintiff, the AVX companies,

13

1   prove as I outlined earlier that the flake is a product that's

2   separate and apart and that it was market power in the tying,

3   in the flake.  We also have to prove that there's an impact on

4   commerce and that implicates looking at Cabot's power in the

5   nodular market, the prices charged and the costs incurred by

6   the subsidiary from 2002 to 2006 and from the prior joint

7   venture from `96 to 2002.  It's undisputed before you that the

8   experts need and want that information.

9            THE COURT:  Mr. Davis?

10           MR. DAVIS:  Your Honor, again, first the only

11  allegation is that Cabot as of 2001 when this agreement was

12  signed forced, coerced AVX to take nodular powder when they

13  only wanted flake.  And so what happened subsequent to that is

14  irrelevant because it all focuses on at that point in time.  So

15  his request for example for information about 2002 through 2006

16  is just a fishing expedition by AVX.  With respect to the

17  subsidiary that he keeps referring to, that was a joint

18  venture, Cabot did not control it.  He's never made any showing

19  that they did.  He says that there are illusions to the fact

20  that Cabot controlled it.  Those are his.  It was a 50-50 joint

21  venture that at one point in time AVX complained--

22           THE COURT:  Which company was this?

23           MR. DAVIS:  This is a company called Showa Cabot

24           THE COURT:  Showa, this is the Japanese--

25           MR. DAVIS:  It was a joint venture between Showa

14

1   Denko and Cabot in Japan.  It had independent pricing, all its

2   own independent sales organization at that point in time.  And

3   he's interested in delving into the affairs of Showa Cabot, but

4   we don't think it's relevant to a contract that prescribes

5   sales only from the Boyertown facility.

6           THE COURT:  Not to be produced.  Next category?

7           MR. GOREN:  The subsidiary or Showa?

8           THE COURT:  Both.

9           MR. GOREN:  May I argue with you?

10          THE COURT:  No.  I've made a ruling.

11          MR. GOREN:  Your Honor, related to this subject Cabot

12  says it didn't control the former joint venture and yet it

13  refuses to produce the joint venture agreement and its

14  amendments and its dealings with the joint venture.  We ask

15  that it be ordered to produce those?

16          MR. DAVIS:  First time I've ever heard that request,

17  Your Honor, but I will certainly go back to Cabot and check.  I

18  think that'll be acceptable but that's the--

19          THE COURT:  All right, so--

20          MR. DAVIS:  --the very first time that request has

21  ever been made.

22          THE COURT:  --to be produced.

23          MR. GOREN:  I need to do this for the record, Your

24  Honor.  We have just received the cost accounting information

25  literally handed to me within the half hour.  And am I to

15

1  understand we will also receive this in electronic format?

2        MS. RISING:  If you would like it in electronic

3  format we can.  That is the printout of the spreadsheet and if

4  you'd like it in electronic format I can arrange for that as

5  long as you can make sure--

6        MR. GOREN:  Okay.

7        MS. RISING:  --it's marked highly confidential.

8        MR. GOREN:  Your Honor, the cost, standard cost

9  information that Cabot produces has a simple single one line

10  cost.  It doesn't break out the cost of extraction or the costs

11  of production, which is one of the reasons that we seek the

12  mining contracts which I'm going to come to in a minute, but

13  for the record I ask the Court to order Cabot to produce the

14  standard cost accounting for the subsidiary and the former

15  Showa Cabot joint venture.  It's in a similar format.

16        MR. DAVIS:  Same issue, Your Honor.

17        THE COURT:  Same argument.

18        MR. DAVIS:  Yeah.  And the cost accounting data I'll

19  just address that very briefly, not initially requested by AVX

20  but we said we'd give it to them.  The information that we have

21  is all they have.  They take snaps and pictures in time of the

22  standard cost accounting data for each product on a product-by-

23  product basis.  The old data is washed out of the system as

24  I've explained to Mr. Goren many times.  So what we have we've

25  produced to him.  It goes back as far as we can locate it.  We

16

1  will be happy to produce it to the extent that we have it in

2  electronic format.  It is on a product by product basis so he

3  can get some data about the cost that went into those products.

4  That's it.

5          THE COURT:  All right, to the extent you have it.

6          MR. GOREN:  And, Your Honor, I ask that you rule on

7  the request that they produce the standard cost accounting for

8  the subsidiary.  It's undisputed that some sales were made by

9  Cabot during the period that this contract was executory by or

10  through the subsidiary.  We would like the cost accounting of

11  the subsidiary.

12          MR. DAVIS:  Your Honor, to the extent that any

13  products were sold by Cabot to AVX, okay, and, again, he keeps

14  defining the subsidiary, I believe that he's talking about

15  Cabot Super Metals which is the entity that existed after, that

16  came into existence after this deal was struck.

17          THE COURT:  Correct?

18          MR. GOREN:  Correct.

19          THE COURT:  Yeah.

20          MR. DAVIS:  Okay, then that cost accounting data is

21  in that package.

22          THE COURT:  All right.

23          MR. DAVIS:  That's all we have.

24          THE COURT:  Done.

25          MR. GOREN:  And for the record, Your Honor, the Showa

MARYANN V. YOUNG
Certified Court Transcriber
(508) 384-2003

17

1    Cabot joint venture cost accounting?

2            THE COURT:  Same argument, Mr. Davis?

3            MR. DAVIS:  Yes, Your Honor.

4            THE COURT:  Same ruling.

5            MR. GOREN:  Your Honor, next there's Cabot's refusal

6    to produce the mining agreements and documents concerning its

7    ability to restrict or impact the supply of raw materials.  And

8    these are outstanding requests and interrogatories and Cabot

9    insists that documents relating to its relationships with the

10   mining companies are not relevant.  They own mines in Canada

11   and in Africa, and to the extent that Cabot may have had some

12   influence over the supply and cost of tantalum ore that's

13   probative on the market power issue and the impact on commerce.

14   And, Judge, in one of their agreements that they produced, the

15   2000 agreement with EPCOS the prices for tantalum products in

16   2004 and 2005 would be subject to adjustment to reflect changes

17   in the spot ore prices that Cabot paid.  But they excluded from

18   that definition or purchases from Cabot's affiliates and Sons

19   of Gwalia and its affiliates, Your Honor, and there is some

20   suggestion in internet websites, various places, that Cabot had

21   a minority interest in the Sons of Gwalia.  And remembering

22   that the cost accounting records don't break out the cost of

23   extraction, these agreements are highly probative on the

24   antitrust issues and the experts want to look at them.

25           MR. DAVIS:  Your Honor, very briefly.  This case is

18

1  quite unusual from my perspective because typically in

2  discovery disputes you try to narrow them and work towards a

3  smaller group of documents.  Every time that we give something

4  to AVX it results in more requests.  This is the list of

5  additional documents that AVX requested when we met with Mr.

6  Goren on August 31st, and the mining information was first

7  requested at that point in time.  Cabot has one mine that they

8  own up in Canada.  The cost data that he's referring to, there

9  are lots of costs associated with mining tantalum, but I guess

10  he wants to do is since we've given him the product standard

11  cost information he now wants to go to each and every invoice

12  and the like having to do with any other product cost that

13  would go into any of those standard costs.  That is unduly

14  burdensome and will not lead to relevant information in this

15  case.  The standard cost data is as granular as he needs for

16  purposes of any analysis being undertaken.

17       Sons of Gwalia is a separate entity demonstrated by

18  the fact that Cabot and Sons of Gwalia were involved in major

19  arbitration in Australia not that long ago.  And Cabot did I

20  think at one point in time have a minor ownership interest in

21  Sons of Gwalia.  That doesn't mean that they control them.  It

22  was never a majority stake anywhere near that.  They had a

23  contract with Sons of Gwalia that called for the purchase of

24  ore, tantalum ore in varying amounts at prices.  So how that

25  leads to any information that's relevant to this tying claim

19

1    that's being made here is beyond me.

2             MR. GOREN:  Your Honor, any influence that Cabot may

3    have had over the supply of raw materials which would probably

4    be evident in these mining contracts, surely would have had an

5    affect on other tantalum producers and possibly may have

6    foreclosed competition in the nodular market.

7             THE COURT:  How many other producers are there?

8             MR. GOREN:  There are two other, there's Ninja out of

9    China, HC Stark and there's one other player.

10            MR. DAVIS:  Yeah, actually the biggest ones are

11   Stark, HC Stark, Cabot and Ninja, but there are a number of

12   others scattered around the world.

13            MR. GOREN:  So, Your Honor, it is probative of if

14   nothing else of Cabot's impact on commerce and their mining

15   costs are not separately reflected in their standard costs.  We

16   ask that you order them to produce the mining contracts.

17            THE COURT:  It's too broad I believe.  Denied.

18            MR. GOREN:  The last one we have, Your Honor, and

19   Mr. Davis has made clear that he will produce, he says he has

20   no prior surveys of customers other than the one that he did

21   produce and if he has the responses of the 31 companies he will

22   produce them.  So that brings me to issue No. 7, Cabot's

23   dealings with third parties, the Vishay's and Chemic's and

24   others of this, in this marketplace.  And Cabot says that those

25   dealings aren't relevant to the tying case, but, for example,

20

1  information as to spot market prices for produced tantalum is

2  clearly relevant to both market power and the fair market value

3  of these products.  Information as to forecasts that the buyers

4  have and produced to Cabot is also relevant to whether these

5  are separate products and market power.  And, Your Honor, Cabot

6  didn't object to producing the spot market information that was

7  specifically sought in two of the interrogatories.  And as I

8  mentioned before, the sales database that they've produced

9  doesn't indicate whether the price was pursuant to a contract,

10  pursuant the "spot or market price" or some scrap buy back of

11  price reduction.  And, Judge, much of this information should

12  be in the files of Cabot at least for EPCOS and Chemic because

13  one of, for example Cabot's 2000 contract with EPCOS, prices

14  were subject to adjustment for both the market price of

15  standard gray tantalum for certain years.

16        In its 2003 agreement Cabot agreed to a mechanism to

17  adjust the price turning on the weighted average price for

18  powder charged by Super Metals, a subsidiary.  These agreements

19  uniformly, I shouldn't say uniformly, two that I saw provided

20  that the buyer was to transmit forecasts of its needs.  In one

21  agreement with Chemic they required forecasts and agreed to a

22  price calculated by reference to the weighted average accepted

23  bid price from major suppliers other than Cabot, and Cabot had

24  a right to review Chemic's records.  So we think that they do

25  have this information and that's why they don't want to produce

21

1  their dealings with their customers and we ask that the Court

2  so order.  And this is not a new request.  Mr. Davis keeps

3  saying these are new requests.  These were in the

4  interrogatories and the document requests.  What he means by

5  new is that they weren't squarely addressed in the first motion

6  to compel--

7          THE COURT:  Uh-huh.

8          MR. GOREN:  --and the parties had a discussion about

9  bringing all of the open issues to the Court.  If having this

10  issue heard by the Court turns on having a motion, well, we'll

11  file one early next week but we're here.

12          THE COURT:  Sure.  No, let's be as efficient as we

13  can.  Mr. Davis?

14          MR. DAVIS:  Your Honor, first, with respect to spot

15  market pricing we've asked.  They don't have it, I mean, but

16  Mr. Goren and I went through this when we produced the sales

17  data.  He wanted to know the basis for the pricing.  We went

18  back to Cabot attempting to determine what information was kept

19  as for the basis for the pricing.  It's washed out of the

20  system.  We don't have that data.

21          THE COURT:  Okay.  You can't order them to produce

22  what they don't have.

23          MR. GOREN:  Your Honor, they have records with these

24  buyers.  The buyers are going to deliver to them forecasts and

25  they agree on references to other standards for pricing and

22

1  they refuse to produce those dealings.  So Mr. Davis is being

2  slightly disingenuous with you.

3         MR. DAVIS:  I am not.  I am not in the least.  Please

4  do not accuse me of that.  Your Honor, if I may finish.  The

5  dealings, I have grave concerns about dealings, okay.  The

6  customers that Mr. Goren is referring to are AVX's competitors.

7  Cabot has many dealings with those competitors.  They have

8  email correspondence, other communications.  We've given him

9  already the sales data for those customers on a highly

10 confidential basis.  They're never to touch AVX, for outside

11 counsel only.  To open it up to all other dealings I don't

12 really honestly know the limits of that request.  I think it's

13 overly broad and I do think that AVX already has all the

14 financial data with respect to sales to those customers that

15 they need in order to make their tying case.

16        THE COURT:  Denied.

17        MR. GOREN:  Last but not least, Your Honor,

18 contention interrogatories.  These focus on the issue of

19 whether flake and nodular are separate products and then the

20 follow-up whether Cabot has market power.  Cabot objected

21 saying that, well gee, depending on the desire characteristics

22 the flake and nodular are interchangeable.  Well, I thought we

23 came up with something that where they could answer cause when

24 we were here before you said gee, you weren't sure, try to work

25 it out.  Well, this is my notion.  In answering their

23

1    interrogatories to what makes flake unique we listed the

2    following, a number of unique characteristics.  Okay?  Cabot

3    has specifications for the flake products it sold to AVX.  So

4    let's get to it because we're going to have a trial on this.

5    So taking each of these unique characteristics, they're called

6    CV per gram, CV/CC and so on.  For each Cabot flake product

7    that was sold as the desired characteristics, Cabot should

8    identify the nodular products, if any, that it contends are

9    interchangeable and identify the documents that support that

10   contention.  That's precise.  That's not vague, and I think

11   they should do that.  There should not be a trial by ambush.

12   These are the characteristics--

13            THE COURT:  Well, I'm willing to order the

14   identification of the products that are interchangeable.

15            MR. GOREN:  Thank you.

16            THE COURT:  Okay.

17            MR. DAVIS:  Your Honor,--

18            MR. GOREN:  Oh, and I'm sorry, just to finish, to

19   identify the persons with knowledge of the differences and

20   similarities of the products so that we can take their

21   depositions in October.

22            MR. DAVIS:  Your Honor, we'll give them a witness on

23   that.  That's not a problem.

24            THE COURT:  Okay, so a 30(b)(6) witness on that.

25            MR. DAVIS:  With respect to the products that are

24

1  interchangeable, I'll just touch that very briefly, Your

2  Honor.  Again, flake and nodular do the same thing different

3  ways.  So again, our response--

4         THE COURT:  Trust me, I majored in chemistry.

5         MR. DAVIS:  Yes.  So you can see that what it depends

6  on is how big the case size of the component you're willing to

7  accept.  You know, you can get a nodular product that has a

8  bigger case size that'll do the same thing.  What we'll do is

9  go back and determine, for example just based on voltage, the

10 range of products that potentially I suppose could be used for

11 that purpose.

12        THE COURT:  Exactly.

13        MR. DAVIS:  It'll be quite a range but we can provide

14 him with that information and we will do that.  And I think

15 that may be his last point.  If it is that'll be a good segway

16 into one of our requests.

17        MR. GOREN:  I would just like the record to - that I

18 would like the contention interrogatory to be answered with

19 reference to each, assuming each of the listed unique

20 characteristics and our answer to interrogatory, tell us what

21 nodular product, if any, is interchangeable given those unique

22 characteristics and your caveat about size.

23        MR. DAVIS:  I think it boils down to the same thing I

24 have in mind, Your Honor, and so I think that'll be fine.

25        THE COURT:  All right.  All right, Mr. Davis it's

25

1   your turn?

2       MR. DAVIS:  And my list is shorter, Your Honor.

3   First, AVX has never defined the relevant markets here.  They

4   claim that Cabot has power in the market for flake that it used

5   to extend its grip over AVX in the market for nodular.  They

6   allege that in their complaint.  We've repeatedly asked them

7   you have to define those markets for us, please, so that we

8   know the extent of your claims what do you understand to be the

9   parameters of the products that are encompassed by those

10  markets.  We've asked this many times.  They refuse to give it

11  to us.  They state that it's an expert, matter of expert

12  opinion.  But we need to know it while discovery is underway so

13  that to the extent that there are fact issues that may be, that

14  we may need to investigate on those points that we can do it.

15  So we ask that you order to answer those contention

16  interrogatories in as much detail as possible.

17      MR. GOREN:  Your Honor, they'll have ample time to

18  depose the expert, and we believe that the contention

19  interrogatory at this time is not very helpful to anybody

20  without the expert opinion.  And what the business people would

21  say if ordered by you is that at the time they entered into the

22  supply agreement the relevant market for flake were those

23  customers and end users who needed capacitors that could best

24  or be solely made with the flake.  And the answer for nodular

25  would be similar.  I'm not sure how much help that would be to

26

1   the Court and, respectfully, I don't think there's much to

2   drill into on fact discovery but plenty of grist when you

3   depose the expert.

4           MR. DAVIS:  That's a circular definition, Your Honor.

5   The flake market--

6           THE COURT:  Yeah, I mean I think he's entitled to the

7   information.  Whether or not you think it's valuable at this

8   time or more valuable later on in the expert phase is not the

9   issue.  So to be produced, to be answered.

10          MR. DAVIS:  Your Honor, the next item, I'm just

11  jumping ahead, the sales contract that AVX and Cabot entered

12  into had AVX purchasing flake powder, which they claim they

13  wanted, nodular powder which they claim they did not want, it

14  was forced upon them.  And then they also purchased hundreds of

15  thousands of pounds per year of semi-refined tantalum ore, a

16  $K_2TaF_7$, that's referred to in the papers.

17          THE COURT:  Right.

18          MR. DAVIS:  $K_2TaF_7$, it's the intermediate.

19  And the reason why AVX they wanted that, there's no allegation

20  that they didn't, that was forced upon them, AVX wanted that

21  because Cabot didn't have the capacity to make enough nodular

22  powder and flake powder for them at the time.  Cabot said we

23  can't sell you more product because we don't have the

24  manufacturing capacity to produce it, but what we can do is we

25  can get you the intermediate product.  You can then have that

27

1  converted elsewhere.

2         THE COURT:  And then you can do what you want with

3  it.

4         MR. DAVIS:  You can do what you want with it.  We

5  believe, we have reason to believe that what AVX did was take

6  all of that and convert it to nodular, okay, the very product

7  that they claim they didn't want to buy from Cabot, that was

8  forced upon them, okay.  We believe that that's helpful

9  evidence to demonstrate because we also have testimony from

10 AVX's CEO among others that in fact they did want the nodular

11 powder that we sold and they wanted more, which will all go to

12 whether they were coerced.  We'll get to that at summary

13 judgment.  We're not there yet.  But we think that it's useful

14 to be able to demonstrate that what AVX did was take the

15 K2TaF7, convert it into nodular.  They won't tell us what they

16 did with it.  They refuse to answer our discovery request on

17 that point.  We'd like to know what they did with all the

18 K2TaF7.

19        THE COURT:  What's the basis for refusing to respond?

20        MR. GOREN:  Your Honor, we don't claim that we did

21 not want the nodular.  We don't claim that we didn't want the

22 K2TaF7.  Our claim is that we needed – January 2001, we need

23 the flake.  Cabot says you want to buy the flake you got to buy

24 these other products and you have to buy both at super

25 competitive prices.  At this time the supply of tantalum was

28

1   tight, the demand was very high and Cabot required as a

2   condition of this contract an allegedly super competitive price

3   for the five year term.  The claim is not that we didn't want

4   the nodular.  The claim is not that we didn't want the K2TaF7.

5   It was the terms, the alleged tying the nodular to the flake

6   and selling both at super competitive prices.  So what--

7           THE COURT:  Where's the harm in letting us know where

8   it went, what happened to it?

9           MR. GOREN:  The stuff that was purchased I believe

10  was in fact tolled into nodular.

11          THE COURT:  Well, that's important.

12          MR. GOREN:  But how is it--

13          MR. DAVIS:  It is.

14          THE COURT:  That's significant.  Then the information

15  is to be produced.

16          MR. DAVIS:  And the last one, Your Honor, this we had

17  significant discussions with Mr. Goren on this point.  We

18  requested AVX's sales and marketing information regarding the

19  products that they used Cabot's powder to manufacture the flake

20  and nodular powder.  Part of the arguments that we will make at

21  trial, if we ever get that far, are that the customers they

22  don't care, flake and nodular are interchangeable.  They're not

23  separate products.  They exist in the same market.  We believe

24  that AVX markets its products in that fashion, that they will

25  sell it to a customer a flake product or nodular product for

29

1   the same application, okay, that that's the way they market

2   them, that AVX in its dealings with its customers acknowledges

3   that they're interchangeable.  We asked for that data.  We

4   asked for their sales and marketing materials.  We got from a

5   $2 billion corporation about this much, not much.  And - not

6   much.  We--

7            MR. GOREN:  The record does show I disagree with

8   this.

9            THE COURT:  I'm not going to go there.

10           MR. DAVIS:  Okay.  We found that unbelievable, so we

11  conducted a 30(b)(6) deposition of AVX's representative this

12  summer who testified that they never asked their sales and

13  marketing organization for responsive materials.  They have

14  sales representatives out in the field, two hundred some odd of

15  them.  They have regional sales offices.  They also have a data

16  base.  It's called the TM1 database that contains sales,

17  relevant sales information.  They were never searched for

18  responsive materials.  So we asked that they be required to

19  search those databases and those files and records to determine

20  whether they have any relevant sales and marketing information

21  that's responsive and that it be produced.

22           THE COURT:  I think you have to, have to do that

23  search.

24           MR. GOREN:  Just for the record, 30 seconds, Your

25  Honor.  All of the particular request and interrogatories by

30

1    Cabot specified and used the words flake, nodular, flake

2    versus niobium alternatives for flake and Mr. Collis testified

3    that indeed as Mr. Davis suggest the customers that would have

4    reports to sales representatives would tell them these are the

5    characteristics that we're seeking.  The sales people don't

6    know whether that's a flake or a nodular.  And as a technical

7    matter they're simply not responsive.  The TM1 system, Your

8    Honor, it's the record that names the customer, the AVX part

9    type, the selling price, the margins, the time, the stock

10   number and the order back log.  There's not a single item there

11   that's responsive to any of the particular discovery requests.

12           MR. DAVIS:  Your Honor, we'd ask them that they

13   search those for any responsive material.  He can search the

14   database.

15           THE COURT:  It may well be you don't have anything

16   but you have to conduct the search.

17           MR. GOREN:  Very well, Your Honor.

18           MR. DAVIS:  Your Honor--

19           THE COURT:  All right.

20           MR. DAVIS:  --that's the end of our list.

21           THE COURT:  All right, then and hopefully you'll get

22   everything done by October 31st.

23           MR. DAVIS:  Yes.

24           MR. GOREN:  By what date, Your Honor?

25           THE COURT:  Isn't the close of discovery October 31st?

31

1          MR. DAVIS:  It is.

2          MR. GOREN:  Yes.  Would the Court care - do you care

3  to suggest a date by which the parties finish these tasks prior

4  to--

5          MR. DAVIS:  I have no problem with that.  I can - may

6  we submit a proposed order on that point, Your Honor?

7          THE COURT:  If you think you need to.

8          MR. DAVIS:  Sure.  Sure.  I want to go back and talk

9  to my client, but we could do that next week at the latest.

10          MR. GOREN:  Okay.  And we may have some housekeeping

11  about an expert witness, but Mr.--

12          THE COURT:  I don't think I have it for that though.

13  Don't I have this just motion by motion?

14          MS. RISING:  Yes.

15          MR. DAVIS:  Yes, I think that's right, Your Honor.

16          MR. GOREN:  Okay.

17          THE COURT:  Yeah, I don't have this for general--

18          MR. GOREN:  Thank you, Your Honor.

19          THE COURT:  --management.

20          MR. DAVIS:  Thank you, Your Honor.

21          THE COURT:  You can always consent to have it heard

22  here, not that I--

23          MR. DAVIS:  You said you had a chemistry degree, Your

24  Honor.

25          THE COURT:  I do. I majored in chemistry, minored in

32

1    physics.

2              MR. DAVIS:   Thank you, Your Honor.

3    //

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

33

CERTIFICATION

1

2       I, Maryann V. Young, court approved transcriber, certify

3  that the foregoing is a correct transcript from the official

4  digital sound recording of the proceedings in the

5  above-entitled matter.

6

7  /s/ Maryann V. Young                    October 29, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MARYANN V. YOUNG**
**Certified Court Transcriber**
**(508) 384-2003**

EXHIBIT

B

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION<br>and AVX LIMITED,<br><br>        Plaintiffs,<br><br>v.<br><br>CABOT CORPORATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-10467-RGS<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT CABOT CORPORATION'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' INTERROGATORIES 12 AND 13

Defendant Cabot Corporation ("Cabot") hereby supplements its response to plaintiffs AVX Corporation and AVX Limited's (collectively, "AVX") First Set Of Interrogatories to Cabot Corporation (each an "Interrogatory" and, collectively, the "AVX Interrogatories"). These supplemental responses incorporate all the objections set forth in Cabot's Responses to AVX's First Set of Interrogatories, served on December 20, 2006.

### General Objections

In the interest of brevity, Cabot incorporates by reference its General Objections to AVX's Interrogatories as if fully restated herein.

### Specific Supplemental Responses And Objections

Subject to the foregoing General Objections, each of which is hereby incorporated by reference into each of the following responses, Cabot supplements its prior responses to specific AVX Interrogatories as follows:

Request No. 12:

If Cabot contends that flake powder and nodular powder are not separate products for the purposes of § 1 of the Sherman Act, state:

a)    The identity of all documents concerning contention;

b)    The basis for such contention;

c)    The identify of all persons with knowledge concerning (i) the differences or similarities of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable depending upon the desired characteristics of the final product. Accordingly, Cabot believes that flake powder and nodular powders are not properly regarded as "separate products" for the purposes of Section 1 of the Sherman Act. Cabot further answers that it has prepared a chart, attached hereto as Exhibit A, which describes the specific competing products that Cabot believes, within the ranges identified, reasonably could be used as substitutes for the tantalum nodular powder products produced by Cabot at its Boyertown, Pennsylvania facility from 1996 to the present. Documents that support this chart and Cabot's responses to this interrogatory can be found at Bates Nos. C(A)000001 to C(A)000723; C(A)001005 to C(A)002524; C(A)028000 to C(A)030566; C(AII)072512 to C(AII)073889; C(AII)075289 to C(AII)084927; C(FED) 94793-95275; C(FED)93664-93665.

Request No. 13:

If Cabot contends that it does not have market power in the market for flake powder, state:

a)    The identity of all documents concerning contention;

b)    The basis for such contention;

c)    The identify of all persons with knowledge concerning (i) the differences or similarities of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable

depending upon the desired characteristics of the final product. Accordingly, Cabot believes that it does not have "market power" with respect to flake powder for the purposes of Section 1 of the Sherman Act. Cabot further answers that it has prepared a chart, attached hereto as Exhibit A, which describes the specific competing products that Cabot believes, within the ranges identified, reasonably could be used as substitutes for the tantalum flake powder products produced by Cabot at its Boyertown, Pennsylvania facility from 1996 to the present. Documents that support this chart and Cabot's responses to this interrogatory can be found at Bates Nos. C(A)000001 to C(A)000723; C(A)001005 to C(A)002524; C(A)028000 to C(A)030566; C(AII)072512 to C(AII)073889; C(AII)075289 to C(AII)084927; C(FED) 94793-95275; C(FED)93664-93665.

As to objections,

Robert S. Frank, Jr. (BBO No. 177240)
Brian A. Davis (BBO No. 546462)
Julie C. Rising (BBO No. 666950)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

Date:   October 30, 2007

4263013.1

-3-

## **Verification**

I, Eduardo E. Cordeiro, state under the penalties of perjury that: I am Vice President and General Manager of the Cabot Supermetals Division of defendant Cabot Corporation; I have read the foregoing supplemental responses to the AVX Interrogatories and know the contents thereof; that said responses were prepared with the assistance and advice of counsel; the responses set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, collected and thus far discovered in the course of preparation of these responses; that I reserve the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; that, subject to the limitations set forth herein, these responses are true to the best of my knowledge, information and belief.

Signed under the penalties of perjury on this _29_ day of October, 2007.

_____
Eduardo E. Cordeiro

-4-

## CERTIFICATE OF SERVICE

I, Julie C. Rising, hereby certify that on this 30th day of October, 2007, I caused to be served a true and correct copy of the foregoing Cabot Corporation's Objections And Responses To Plaintiffs' First Set Of Interrogatories on the counsel of record for AVX Corporation and AVX Limited at the address and in the manner indicated below:

Richard A. Goren, Esq.                    [x] U.S. Mail
BODOFF & ASSOCIATES                       [x] Electronic Mail
225 Friend Street, 7th Floor              [ ] Overnight Delivery
Boston, MA  02114-1812                    [ ] Hand Delivery


_____
Julie C. Rising

4263013.1

-5-

**LIST OF REASONABLE SUBSTITUTES FOR CABOT NODULAR AND FLAKE POWDERS**
**1996-PRESENT**
(By Manufacturer And Product ID Number)

| CV Range (KCV/g) | Cabot Boyertown | Showa Cabot/ Cabot Japan | Starck Goslar | Starck Newton | Starck Japan | Starck Thailand | Ningxia |
|---|---|---|---|---|---|---|---|
| 100 to 150 | | S-10<br>S-12<br>S-15 | STA-100KA<br>STA-120KA<br>STA-150KA | | VFI-100K<br>STA-100KA<br>VFI-100KT<br>STA-120KA<br>VFI-150<br>STA-150KA | TTS-100K | |
| 70 to 80 | CS-706 | S-700<br>S-706<br>S-805<br>S-806 | | | VFI-70K<br>VFI-70KD<br>VFI-70KF<br>VFI-80K | TTS-70K<br>TTS-70KM | FTW-700<br>FTW-800 |
| 50 to 70 | CS-506<br>C-606<br>C-706 | S-500<br>S-506<br>S-506N | | NA-50K<br>NA-70K | VFI-50K<br>VFI-50KF<br>VFI-51K | TTS-50K<br>TTS-50KM | FTW-500 |
| 20 to 40 | C-250<br>C-300<br>C-310<br>C-350<br>C-410<br>C-415<br>C-497<br>C-500<br>C-506<br>C-515 | S-200<br>S-241<br>S-300<br>S-305<br>S-306<br>S-400<br>S-402<br>S-405<br>S-406<br>DCUH-11N<br>DCUH-12<br>DCUH-14 | STA-23K<br>STA-30K<br>STA-30KD<br>STA-40K<br>STA-40KD | NH-230<br>NH-230KD<br>NA-30K<br>NA-30KN<br>NA-40K | VFI-23K<br>VFI-29K<br>VFI-30K<br>VFI-30KD<br>VFI-30KF<br>VFI-40K<br>VFI-40KD | TTS-23R<br>TTS-30R<br>TTS-40R | FTW-230<br>FTW-300<br>FTW-400 |
| Less than 20 | C-110<br>C-112<br>C-120 | S-180<br>S-181<br>S-187<br>S-200<br>S-208<br>DCUH-6<br>DCUH-7<br>DCUH-7DXB<br>DCUH-8<br>DCUH-8W<br>DCUH-10<br>DCUH-10N | STA-18KT | SGVR-3<br>SGVR-3B<br>ZRD<br>NH-175 (SGZR)<br>NH-176 (SGZR) | VFI-10K<br>VFI-12K<br>VFI-18KT | TTS-17R<br>TTS-18KT | FTW-93<br>FTW-100<br>FTW-170<br>FTW-175<br>FTW-200 |
| Less than 10/EB | M-93<br>T-5D<br>T-11<br>TU-4A<br>TU-4D<br>TU-5A<br>Y-11<br>W-PDRS | DCTH-M<br>DCTH-T<br>DCTH-ST<br>DCTH-S<br>DCTL<br>DCTUL | 660<br>680-E<br>680-S<br>900HC | QR-3<br>QR-3F<br>QR-5<br>QR-7<br>QR-12 | | | |
| Flake | C-255<br>C-275 | | STA-18KT | NH-230<br>NH-230KD<br>NH-175 (SGZR) | VFI-29K<br>VFI-30K<br>VFI-30KF | TTS-30R | FTW-170<br>FTW-300 |

**Confidential**

# EXHIBIT

# C

## EXHIBIT C

AVX's Instructions included

3.     "You," "your" and "Cabot" shall mean defendant Cabot Corporation, its various subsidiaries, affiliates, divisions and departments, (including, without limitation, its Performance Materials Division), and any and all representatives, successors, assigns, officers, directors, employees, agents, attorneys or other persons or entities who have acted or purported to act for or on behalf of any of them.

Cabot's uniform general objection as set forth in Response to Second Request

*5.* Cabot generally objects to the definition of "you," "your" and "Cabot" set forth in the AVX Requests to the extent that it includes operations or divisions of Cabot that did not exist, or were not under Cabot's control, as of the time when the allegedly wrongfil conduct described in AVX's Amended Complaint purportedly took place. To the extent that the AVX Requests seek information concerning such operations or divisions of Cabot, it is excluded from Cabot's responses.

Interrogatory No. 6:

Identify all purchasers of flake tantalum and, for each, state:

a)     The quantities purchased by each such purchaser both in total and by year;

b)     Whether such purchases were pursuant to contract or were "spot" purchases;

c)     The names of the persons dealing or negotiating with Cabot with respect to such purchases;

d)     The name of the persons at Cabot dealing or negotiating with such purchaser with respect to such purchases;

e)     Whether such purchaser also purchased nodular tantalum.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that it has produced or will produce in response to AVX's First Request for Production of Documents in this action non-privileged documents concerning AVX's purchases of flake powder from which the information requested reasonably can be derived or ascertained pursuant to Fed. R. Civ. P. 33(d).

Interrogatory No. 7:

Identify all purchasers of nodular tantalum.

a)    The quantities purchased by each such purchaser both in total and by year;

b)    Whether such purchases were pursuant to contract or were "spot" purchases;

c)    The names of the persons dealing or negotiating with Cabot with respect to such purchases;

d)    The names of the persons at Cabot dealing or negotiating with such purchaser with respect to such purchases;

e)    Whether such purchaser also purchased flake tantalum.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that it has produced or will produce in response to AVX's First Request for Production of Documents in this action non-privileged documents concerning AVX's purchases of nodular powder from which the information requested reasonably can be derived or ascertained pursuant to Fed. R. Civ. P. 33(d).

Interrogatory No. 8:

Identify the technical characteristics of each form of nodular or flake powder produced by Cabot (including but

2

not limited to primary particle size, aggregate size, rated voltage, capacitance, surface area, raw Scott, raw flow, raw crust strength, sintering time and temperature, oxygen minimum and maximum, nitrogen maximum, wet DCL, BDV) and, for each, identify all known actual uses to which such powder is put.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that, since January 1, 1996, it has produced a variety of nodular and flake tantalum powder products having a wide range of technical characteristics, including but not limited to primary particle size, aggregate size, rated voltage, capacitance, surface area, raw Scott, raw flow, raw crust strength, sintering time and temperature oxygen tantalum powder. More than 60 percent of the world's tantalum is used in electronics products. The largest application is electronic capacitors, where tantalum's ability to form stable oxide films creates highly efficient, highly reliable and environmentally versatile components. In semiconductors, tantalum has emerged as an ideal barrier solution, since copper is replacing aluminum as the material of choice for interconnects.

Interrogatory No. 9:

For each form of powder identified in response to interrogatory 8 above, identify all other substitutes for such powder, and, if such substitute is not identical in performance or price, identify all differences between such powder and each such substitute.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that

3

is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that most, if not all, forms of tantalum powder have substitutes which can vary depending upon the desired characteristics of the final product.

Interrogatory No. 12:

If Cabot contends that flake powder and nodular powder are not separate products for the purposes of §1 of the Sherman Act, state:

    a)    The identity of all documents concerning contention;

    b)    The basis for such contention;

    c)    The identi[t]y of all persons with knowledge concerning (i) the difference or similarities of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable depending upon the desired characteristics of the final product. Accordingly, Cabot believes that flake powder and nodular powders are not properly regarded as "separate products" for the purposes of Section 1 of the Sherman Act.

Interrogatory No. 13:

If Cabot contends that it does not have market power in the market for flake powder, state:

    (a)    The identity of all documents concerning contention;

    (b)    The basis for such contention;

    (c)    The identi[t]y of all persons with knowledge concerning (i) the difference or similarities

4

of flake and nodular powder or (ii) the basis for such contention.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, impermissibly vague, and calls for a legal conclusion. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that many tantalum powders, including flake and nodular, are interchangeable depending upon the desired characteristics of the final product. Accordingly, Cabot believes that it does not have "market power" with respect to tantalum powder, including flake powder.

Interrogatory No. 14:

Prepare a chart or list that contains the information called for in Exhibit A attached hereto in Excel or Excel readable format.

**EXHIBIT A to Interrogatory 14**

| PURCHASER | DATE | POWDER TYPE | QUANTITY | PRICE |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and impermissibly vague. Cabot further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory No. 16:

For each and every year of the Relevant Period (broken down quarterly or monthly if and to the extent Cabot's records are so broken down) identify the amount of, and describe, each and every direct and indirect cost incurred by Cabot or affiliate [sic] as may be applicable in producing each and every flake tantalum product and each and every nodular tantalum product offered and/or sold by Cabot or affiliate [sic] as may be applicable during any part or all of the Relevant Period; and identify all persons with knowledge concerning such direct and/or indirect costs of

producing each and every such flake tantalum product and each and every such nodular tantalum product including therein a description and identification of the direct and/or indirect cost of production of which each such individual has knowledge.

Response:

Cabot objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. It is not reasonable to expect Cabot to prepare and provide a list identifying and quantifying "each and every direct and indirect cost"that Cabot has incurred in producing the millions of pounds of various tantalum products that it has manufactured at any time during the more than twelve-year period from January 1, 1996 to the present. Cabot further states that such information, even if it were reasonably accessible and could be provided to AVX, would serve no useful purpose in resolving the only issue in this action, in which is whether Cabot forced AVX, in early 2001, into signing an agreement containing an unlawful "tying" arrangement in violation of the Sherman Antitrust Act, 15 U.S.C. gg 1, 14. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot states that persons at Cabot who have reasonable knowledge of the various types of direct and indirect costs that Cabot typically incurs in producing tantalum products include Eduardo E. Cordiero, Vice President and General Manager of Cabot's Supermetals Division, and James A. Realbuto, the Controller of Cabot's Boyertown,Pennsylvania production facility.

Request No. 21 :

All documents utilized, consulted or referenced by Cabot in answering AVX's second set of interrogatories.

Response:

Cabot objects to this Request on the grounds that it is overly broad and seeks information that is protected from disclosure by the attorney work product doctrine. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same,Cabot has produced or will produce non-privileged

documents in its possession, custody or control that are reasonably responsive to this Request.

Request No. 22:

All documents required to be identified in AVX's second set of interrogatories.

Response:

Cabot objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks the production of documents and things that are neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing specific and general objections, and without waiving or in any way compromising the same, Cabot has produced or will produce non-privileged documents in its possession, custody or control that are reasonably responsive to this Request.

Request No. 24:

All documents concerning the interrelationship during the Relevant Period between and among Cabot Corporation on the one hand and Showa Denko K.K. concerning the 50-50 joint venture sometimes called Showa Cabot Supermetals K.K. and/or Showa Cabot Supermetals KK including without limitation all joint venture agreements, all agreements or understandings between Cabot Corporation on the one hand and Showa Cabot Supermetals KK and/or Showa Denko KK concerning (i) access to and/or supply of tantalum, (ii) licensing, cross licensing and/or use of patents and other intellectual property of any one or more of Cabot Corporation, Showa Cabot Supermetals KK and Showa Denko KK, (iii) Research and Development of flake and nodular tantalum, and (iv) marketing of flake and nodular tantalum.

Response:

Cabot objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks the production of documents and things that are neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence.