# Exhibit C

Westlaw.

863 N.E.2d 503 Page 1
448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

H
Cabot Corp. v. AVX Corp.
Mass.,2007.

Supreme Judicial Court of Massachusetts,Suffolk.
CABOT CORPORATION
v.
AVX CORPORATION & another.[FN1]

FN1. AVX Limited.
Argued Jan. 3, 2007.
Decided March 28, 2007.

**Background:** Manufacturer of tantalum capacitors for electronic products brought action, in federal court, against supplier of tantalum powder and tantalum wire, alleging long-term supply contract was the product of economic duress. The suit was dismissed, based on lack of diversity jurisdiction. Thereafter, supplier sought declaration, in state court, that the supply contract was valid and binding. The Superior Court Department, Suffolk County, Allan van Gestel, J., 18 Mass.L.Rptr. 36, 2004 WL 1588116, granted summary judgment to supplier. Manufacturer appealed, and the case was transferred from the Appeals Court.

**Holdings:** The Supreme Judicial Court, Cordy, J., held that:

(1) the long-term supply contract was not the product of economic duress, and

(2) even assuming the existence of economic duress, manufacturer ratified the contract.

Affirmed.
West Headnotes
[1] Appeal and Error 30 ⇌863

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k863 k. In General. Most Cited Cases

**Appeal and Error 30 ⇌934(1)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k934 Judgment
        30k934(1) k. In General. Most Cited Cases
The appellate court reviews a grant of summary judgment to determine whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Rules Civ.Proc., Rule 56(c), 43B M.G.L.A.

[2] **Appeal and Error 30 ⇌856(1)**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k851 Theory and Grounds of Decision of Lower Court
        30k856 Grounds for Sustaining Decision Not Considered
          30k856(1) k. In General. Most Cited Cases
The appellate court may consider any ground supporting the summary judgment. Rules Civ.Proc., Rule 56(c), 43B M.G.L.A.

[3] **Judgment 228 ⇌185(6)**

228 Judgment
  228V On Motion or Summary Proceeding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503                                                                                                                          Page 2

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

      228k182 Motion or Other Application
        228k185 Evidence in General
          228k185(6) k. Existence or Non-Existence of Fact Issue. Most Cited Cases
Where the party opposing the motion for summary judgment bears the burden of proof at trial, the moving party will prevail only if it demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of the case. Rules Civ.Proc., Rule 56(c), 43B M.G.L.A.

**[4] Contracts 95 €═95(1)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(1) k. In General. Most Cited Cases

**Contracts 95 €═98**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k98 k. Effect of Invalidity. Most Cited Cases
A contract entered into under duress is voidable. Restatement (Second) of Contracts § 175.

**[5] Contracts 95 €═95(1)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(1) k. In General. Most Cited Cases
Duress, for purposes of rule that contract entered into under duress is voidable, need not be physical; it may be economic in nature.

**[6] Contracts 95 €═95(3)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(3) k. Threats in General. Most Cited Cases
To show economic duress, which makes a contract voidable, a party must show: (1) he has been victim of wrongful or unlawful act or threat, and (2) such act or threat deprived him of his unfettered will, resulting in his being compelled to make disproportionate exchange of values.

**[7] Contracts 95 €═95(1)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(1) k. In General. Most Cited Cases
The elements of economic duress, which make a contract voidable, are: (1) one side involuntarily accepted terms of another; (2) circumstances permitted no other alternative; and (3) said circumstances were result of coercive acts of opposite party.

**[8] Contracts 95 €═95(1)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(1) k. In General. Most Cited Cases
To show economic duress, which makes a contract voidable, a victim must go beyond the mere showing of a reluctance to accept and financial embarrassment; there must be a showing of acts on defendant's part which produced the financial embarrassment.

**[9] Contracts 95 €═95(1)**

95 Contracts
    95I Requisites and Validity
      95I(E) Validity of Assent
        95k95 Duress
          95k95(1) k. In General. Most Cited Cases
The assertion of economic duress, which makes a contract voidable, must be proved by evidence that the duress resulted from defendant's wrongful and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503                                                                                                                         Page 3

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

oppressive conduct and not from plaintiff's necessities.

**[10]** Sales 343 ☞52(1)

343 Sales
   343I Requisites and Validity of Contract
      343k52 Evidence
         343k52(1) k. Presumptions and Burden of Proof. Most Cited Cases
Manufacturer of tantalum capacitors for electronic products bore the burden of proving that supply contract it entered into with supplier, for tantalum powder and tantalum wire, was executed under economic duress.

**[11] Compromise and Settlement 89** ☞8(3)

89 Compromise and Settlement
   89I In General
      89k7 Validity
         89k8 Reality of Assent
           89k8(3) k. Fraud or Duress. Most Cited Cases
Requirements for establishing economic duress would be strictly construed, with respect to supply contract for tantalum powder and tantalum wire, against the party asserting it, i.e., manufacturer of tantalum capacitors for electronic products, so as not to undercut well-established public policy favoring private settlement of disputes, where manufacturer and supplier were sophisticated and substantial commercial parties who had been represented by highly competent counsel in their negotiations of supply contract that was to govern their commercial relationship over the long term, and to settle their differences over validity of prior agreements, purchase orders, and letters of intent.

**[12]** Contracts 95 ☞95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
           95k95(1) k. In General. Most Cited Cases
Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document, negotiated over several months, they are entitled to and should be held to the language they chose, rather than having the contract declared voidable, based on economic duress.

**[13]** Sales 343 ☞35

343 Sales
   343I Requisites and Validity of Contract
      343k35 k. Validity of Assent in General. Most Cited Cases
Long-term supply contract that manufacturer of tantalum capacitors for electronic products entered into, with supplier of tantalum powder and tantalum wire, was not the product of economic duress; supplier did not create worldwide shortage of tantalum product which strengthened supplier's bargaining position.

**[14]** Contracts 95 ☞95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
           95k95(1) k. In General. Most Cited Cases

**Release 331** ☞18

331 Release
   331I Requisites and Validity
      331k18 k. Duress. Most Cited Cases
Because an element of economic duress is present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release, based on economic duress, is reserved for extreme and extraordinary cases.

**[15]** Contracts 95 ☞95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
           95k95(1) k. In General. Most Cited Cases
Hard bargaining is not unlawful; it is not only acceptable, but indeed desirable, and should not be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503

Page 4

448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

discouraged by the courts.

[16] Judgment 228 ⚖ 181(19)

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(19) k. Contract Cases in General. Most Cited Cases
Where the language of a putative contract is unambiguous, its interpretation, to determine whether it creates a binding contract, is a question of law that may be resolved on a motion for summary judgment.

[17] Sales 343 ⚖ 1(1)

343 Sales
    343I Requisites and Validity of Contract
        343k1 Nature and Essentials of Contract for Sale of Personal Property in General
            343k1(1) k. In General. Most Cited Cases
Documents entitled "letters of intent," signed by manufacturer of tantalum capacitors for electronic products and supplier of tantalum powder and tantalum wire, and stating that it was manufacturer's "intention to purchase" materials listed in the documents, did not constitute a binding commitment by manufacturer to make any purchases at all.

[18] Sales 343 ⚖ 1(1)

343 Sales
    343I Requisites and Validity of Contract
        343k1 Nature and Essentials of Contract for Sale of Personal Property in General
            343k1(1) k. In General. Most Cited Cases
Document entitled "letter of intent," signed by manufacturer of tantalum capacitors for electronic products and supplier of tantalum powder and tantalum wire, and stating that manufacturer "agrees" to take or pay for a minimum of 26,494 kilograms of tantalum powder, at a set price, was a binding commitment.

[19] Sales 343 ⚖ 1(4)

343 Sales
    343I Requisites and Validity of Contract
        343k1 Nature and Essentials of Contract for Sale of Personal Property in General
            343k1(4) k. Certainty as to Subject-Matter. Most Cited Cases
A purported "contract" to purchase an unspecified amount of goods is not a contract at all.

[20] Contracts 95 ⚖ 95(1)

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k95 Duress
                95k95(1) k. In General. Most Cited Cases
The presence of an adequate legal remedy, with respect to the other party's wrongful conduct, undermines claims of economic duress.

[21] Sales 343 ⚖ 35

343 Sales
    343I Requisites and Validity of Contract
        343k35 k. Validity of Assent in General. Most Cited Cases
Even assuming that letters of intent, signed by manufacturer of tantalum capacitors for electronic products and supplier of tantalum powder and tantalum wire, were binding commitments and that supplier had been threatening to breach those alleged binding commitments, manufacturer had adequate legal remedy, and thus, long-term supply contract that manufacturer entered into, to ensure its supply of tantalum, was not product of economic duress; manufacturer could have gone immediately to court and sought preliminary injunctive relief followed by declaratory relief on merits of claim of breach of contract, with respect to letters of intent.

[22] Contracts 95 ⚖ 97(1)

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k97 Estoppel and Ratification
                95k97(1) k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503

Page 5

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

A contract that is voidable for duress may be ratified and affirmed.

**[23] Contracts 95 ⇔ 97(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k97 Estoppel and Ratification
                95k97(1) k. In General. Most Cited Cases
A party must complain promptly of coercive acts that allegedly forced it into the contract; otherwise, the defense of duress is waived, and the contract is ratified.

**[24] Contracts 95 ⇔ 97(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k97 Estoppel and Ratification
                95k97(1) k. In General. Most Cited Cases

**Release 331 ⇔ 22**

331 Release
    331I Requisites and Validity
        331k22 k. Estoppel or Waiver of Objections. Most Cited Cases
The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it.

**[25] Sales 343 ⇔ 51**

343 Sales
    343I Requisites and Validity of Contract
        343k51 k. Ratification of Voidable Contract. Most Cited Cases

**Sales 343 ⇔ 52(1)**

343 Sales
    343I Requisites and Validity of Contract
        343k52 Evidence
            343k52(1) k. Presumptions and Burden of Proof. Most Cited Cases
Ratification was affirmative defense to claim by manufacturer of tantalum capacitors for electronic products of economic duress, as to its long-term supply contract with supplier of tantalum powder and tantalum wire, and thus, supplier bore the burden to show that manufacturer ratified the contract.

**[26] Contracts 95 ⇔ 97(2)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k97 Estoppel and Ratification
                95k97(2) k. What Constitutes Ratification. Most Cited Cases
A party may ratify an agreement entered into under duress in a number of different ways: (1) by intentionally accepting benefits under the contract; (2) by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and (3) by recognizing its validity, by acting upon it, by performing under it, or by affirmatively acknowledging it.

**[27] Sales 343 ⇔ 51**

343 Sales
    343I Requisites and Validity of Contract
        343k51 k. Ratification of Voidable Contract. Most Cited Cases
Even assuming that long-term supply contract for tantalum powder and tantalum wire, entered into by manufacturer of tantalum capacitors for electronic products, was the product of economic duress, manufacturer ratified the contract; manufacturer waited at least 12 months before asserting duress, and manufacturer accepted benefits of the contract and asserted its rights under the contract while the market for electronic capacitors remained strong.

**[28] Contracts 95 ⇔ 97(1)**

95 Contracts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503

Page 6

448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

95I Requisites and Validity
   95I(E) Validity of Assent
      95k97 Estoppel and Ratification
         95k97(1) k. In General. Most Cited Cases

While an intention to ratify a contract entered into under duress is an essential element and is at the foundation of the doctrine of waiver or ratification, it may be shown by conduct inconsistent with any other hypothesis than that of approval.

**506 Joseph S.U. Bodoff, Boston (Richard A. Goren with him) for the defendants.
Robert S. Frank, Jr., Boston (Brian A. Davis with him) for the plaintiff.

Present: GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

CORDY, J.
*629 AVX Corporation (AVX) manufactures capacitors for electronic products. Tantalum is an elemental metal, as rare in nature as uranium, used in the manufacture of those products. In January, 2001, AVX entered into a multi-year supply contract with Cabot Corporation (Cabot), a major supplier of tantalum *630 powder and wire. In the years immediately preceding the contract, the tantalum market favored buyers and AVX purchased it from Cabot at preferable prices without entering binding, long-term contracts. When demand for capacitors and the tantalum used in their manufacture increased dramatically in late 2000, Cabot took advantage of what was then a seller's market to negotiate aggressively a multi-year deal. Eighteen months after executing the contract, AVX brought suit in Federal court claiming that it was the product of economic duress. When that suit was dismissed for lack of diversity jurisdiction, Cabot brought suit in the Superior Court seeking, inter alia, a declaration that the contract was valid and binding on the parties. A Superior Court judge granted summary judgment for Cabot, concluding that there was no economic duress where the contract was the product of hard bargaining and not any unlawful or wrongful act, and where the values exchanged between the parties were not disproportionate. The judge also concluded that AVX had, in any event, ratified the contract by its conduct, thereby waiving any claim of duress. AVX appealed and we transferred the case from the Appeals Court on our own motion. We affirm.

1. *Background.* We draw these facts from the undisputed facts in the record. Cabot is a specialty chemicals company, incorporated in Delaware with headquarters in Massachusetts. AVX is also a Delaware corporation and maintains its principal **507 place of business in South Carolina. A majority of its shares are owned by a Japanese conglomerate, Kyocera Corporation. AVX is one of the largest manufacturers and sellers of tantalum capacitors in the world. Both Cabot and AVX are publicly traded corporations and have annual sales of more than one billion dollars.

Tantalum is available in several forms, including wire and numerous grades of powder. The tantalum capacitors that AVX manufactures require the use of various grades of tantalum powder.[FN2] Cabot is one of three significant producers of tantalum powder. Cabot has its own tantalum mining facility in Canada, *631 partially owns some Australian mines, and uses a manufacturing facility in Pennsylvania. By mid-2000, Cabot produced approximately fifty per cent of the world's total processed tantalum. All suppliers of tantalum powder sell nodular powder but only Cabot sells flake powder, which can operate at higher voltages. Cabot holds a patent on the process to make flake powder and AVX uses that powder in certain high performance products, including pacemakers and military technology.

> FN2. Capacitors are passive components used in a wide range of modern electronic devices, including cellular telephones and personal computers. Tantalum is a preferred raw material for high performance electronic capacitors because it is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures. Tantalum capacitors can store electricity in smaller space than capacitors made out of other materials.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The market for tantalum has been volatile. Periods of high demand, supply shortages, inventory hoarding, and sharply rising prices have been followed by recurring episodes of reduced demand, over production, large customer inventories, and rapidly falling prices. The relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in its price to be significantly more pronounced than those of other industrial metals.

AVX has purchased tantalum products from Cabot for many years, and the two companies have worked together to develop new tantalum products and technology. By April, 2000, Cabot was supplying approximately twenty per cent of AVX's total tantalum product requirements. Each year, the parties signed "letters of intent" setting forth estimates of AVX's anticipated tantalum needs and agreed-on prices for each type of product. Cabot maintains that these letters were for planning purposes only, and that, in actual practice, sales deviated from the prices and quantities stated in the documents without protest from Cabot. AVX contends that the documents were binding contracts, entitled "letters of intent" only because they did not establish specific amounts of product that would be purchased, and were akin to "requirements contracts." [FN3]

> FN3. A requirements contract is one that measures the quantity of goods to be purchased as "such actual ... requirements as may occur in good faith." G.L. c. 106, § 2-306(1). There is no mention in the letters of intent that AVX to purchase its tantalum product "requirements" from Cabot.

In the late 1990's, Cabot attempted to convince AVX to enter *632 into long-term supply or "take or pay" contracts.[FN4] AVX resisted this alteration to their relationship. In January, 2000, AVX and Cabot signed two letters of intent, one pertaining to tantalum powder and the other to tantalum wire (letters of intent). Each was two pages long and stated that it was "AVX's **508 intention to purchase" particular quantities of specified tantalum powders and wires at stated prices in 2000 and 2001.[FN5] In the letter pertaining to tantalum powder, which encompassed ten different product grades, there was a "take or pay" provision for one grade of product, C606, requiring AVX to take a specified amount of that product no later than eighteen months after the commencement of "this contract" on February 1, 2000.

> FN4. The parties agree that a "take or pay" contract sets forth a mandatory amount of product to be purchased. Even if AVX does not take the product, it must pay for it.

> FN5. The letters of intent for tantalum powder products set forth prices and amounts intended to be purchased through January 31, 2002; the letters of intent for tantalum wire products applied through January 31, 2001.

Later in 2000, a worldwide shortage of tantalum developed, and demand for electronic products using tantalum capacitors reached unprecedented levels. Orders from some of AVX's customers increased by more than 200 per cent, and AVX announced a dramatic increase in sales over prior years. Supplies of raw tantalum were severely limited. Cabot and other tantalum product manufacturers found it difficult to satisfy the rising demand for tantalum products, resulting in a steep rise in its price throughout the industry. In August, 2000, Cabot notified all of its customers that, in the future, it proposed to commit its limited production capacity to those customers who were prepared to enter into binding, long-term supply contracts.

AVX contends that, in the guise of negotiating a long-term supply contract, Cabot "began a calculated strategy simultaneously (i) to starve AVX of product, and (ii) to issue threats that Cabot would [commit a breach of] the existing short term agreement unless AVX caved into its demands." Between August and November, 2000, Cabot and AVX negotiated the terms of a binding, long-term supply contract. Proposals and counterproposals were exchanged. Both parties were represented by highly competent legal counsel throughout the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503                                                                                                    Page 8

448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

process. AVX contends that these negotiations " continued in the context of *633 Cabot's commercial threats" and points to a communication on September 1, 2000, from a Cabot executive to AVX in which the Cabot executive said that all of the available tantalum powder had been sold as of the previous day. AVX maintains that this statement was false and constituted a threat not to provide any tantalum powder to AVX until a long-term contract was signed.[FN6]

> FN6. As evidence that Cabot was intentionally starving AVX of needed product, AVX points to a shipment of C606 it received in May, 2000, that was 1,200 kilograms short of the agreed amount. However, it is undisputed that Cabot was "shipping [C606] faster than AVX [was] consuming" it at that time. By August, 2000, shipments of C606 were current, while shipments of other powders were "backdue," according to Cabot records.

During the negotiation process, AVX claimed that Cabot was obligated by the letters of intent to continue selling to AVX particular quantities of tantalum powders and wire through January, 2002, and January, 2001, respectively. Cabot took a contrary position. By the end of October, however, AVX offered to waive its claims relating to the letters of intent if the parties could otherwise agree on an acceptable supply relationship.

On November 7, 2000, Cabot and AVX memorialized the terms of a basic agreement to a binding, five-year contract, under which AVX would purchase specified quantities of tantalum powder and wire at stated prices.[FN7] In an electronic mail message (e-mail) sent to a Cabot executive regarding the agreed terms, the president **509 and chief executive officer of AVX wrote, "I think we have a fair agreement for both parties ... hope you agree." The prices agreed to were no higher than the then-current market prices for tantalum products.[FN8] Cabot agreed to AVX's demand of "most favored customer" protection, which meant that if Cabot were to agree in the future to sell to one or more of AVX's competitors at a lower price a grade of tantalum powder or wire comparable to a grade that it was selling to AVX, Cabot would sell the same quantity of that grade to AVX at the lower price. AVX also obtained a right to purchase *634 additional tantalum products in the event that Cabot were to expand its plant capacity. In addition, the parties agreed that the agreement would supersede all prior agreements (including the letters of intent) and released each other from all claims arising thereunder. In November and December, 2000, Cabot and AVX exchanged drafts of a written contract. In January, 2001, they executed the contract (supply contract), effective January 1, 2001.

> FN7. The supply contract also provided for the sale of tantalum "scrap" from AVX to Cabot.
>
> FN8. For example, under the supply agreement, AVX agreed to buy tantalum powder from Cabot at $500 per pound. In late 2000, AVX purchased tantalum powder from one of Cabot's competitors for $500 per pound and agreed to purchase from another competitor at $1,000 per pound.

During the first half of 2001, demand for tantalum products and capacitors remained high. AVX insisted that Cabot make deliveries of tantalum products in strict compliance with the terms of the supply contract. When Cabot fell behind on shipments because of production constraints, AVX pressed Cabot "to catch up on the contract." Cabot agreed, proposed a schedule for future deliveries, and thereafter met the schedule.[FN9]

> FN9. Although AVX argues that Cabot was intentionally delaying shipments in 2001 as an exercise of coercion, there is no evidence in the record that supports this contention.

Sometime prior to May, 2001, executives at AVX and Cabot began discussing the possibility of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

making a number of modifications to the supply contract. Those modifications included reducing the quantity and cost of some products that AVX was obligated to take, increasing the amounts of flake powder AVX would be entitled and required to purchase, making changes (sought by AVX) to certain mix restrictions on flake powder products, extending the time for billing and payment, and extending the term of the contract on flake powder by two years. In communications with AVX, Cabot valued its concessions with respect to the principal product on which AVX sought price and quantity reductions at $47.8 million.

These discussions led to an agreement in principle that, in accord with AVX's corporate policy, needed to be submitted to the AVX "executive group" headed by the company's president and chief executive officer for approval. This was done in July, 2001, and the agreement was rejected.[FN10]

> FN10. It is not entirely clear why the proposed agreement was rejected. Notes in the possession of Cabot, regarding a conversation with AVX after the rejection, suggested that the AVX chief executive officer wanted the most favored customer provision included in the two-year contract extension period for flake powder, and was "gambling" on Cabot's not being able to fulfil its first year's obligation under the supply contract. An internal AVX memorandum prepared in May, 2001, regarding its tantalum powder inventories, marked "confidential," recommended that contract renegotiation be deferred until after Cabot made its "September shipments," when AVX could "be comfortable in our inventory position."

*635 Nevertheless, AVX and Cabot continued to negotiate these and other modifications from August through December, **510 2001.[FN11] AVX sought additional concessions, as a worldwide decline in demand for computer and telephone products began, reducing the demand for tantalum capacitors. Cabot agreed to some of these concessions, and on December 21, 2001, the vice-president in charge of the tantalum division of AVX recommended to the president and chief executive officer that the negotiated revisions be accepted. In his analysis, the vice-president cited the significant savings that would accrue to AVX in the short term, the advantages it would give AVX over its competitors, and the reality that a long-term relationship with Cabot would be necessary "when the market recovers." The "main downside" he advised was, "will it hinder any future legal position?" The AVX executive group took no action on the recommendation.[FN12]

> FN11. During the latter half of 2001, both Cabot and AVX sought and agreed to relief from some of the contract provisions that made little sense in a declining market.
> For example, in November, 2001, AVX was excused from a requirement that it purchase additional tantalum powder worth $2.5 million by the end of the year, for which it had "absolutely no use," and which would result in "further degradation of our financial health."

> FN12. In an e-mail dated December 21, 2001, the president and chief executive officer responded to the vice-president's recommendation, advising that the concessions were not sufficient over the long term, and that, "[i]f we now renegotiate and revalidate this contract then we have no possible relief ... and the clauses in the new contract would further tie our hands ... we were in a better condition than we thought we were then ... we need to listen to the lawyer ... and other avenues for redress before we sell our soul again to this devil."

Throughout the supply contract's five-year term, both AVX and Cabot performed under its terms. Between January, 2001, and July, 2002, AVX purchased tantalum products worth more than $173 million from Cabot in 469 separate transactions, at the prices and in the amounts specified in the supply contract. By October, 2003, AVX had purchased tantalum products worth more than $342,809,000 in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503                                                                                   Page 10

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

739 separate transactions under the *636 supply contract.[FN13] AVX also took advantage of the "most favored customer" provision and availed itself of price reductions aggregating over $6 million.

> FN13. During the same period, AVX also sold tantalum scrap worth more than $5 million to Cabot at the prices stated in the supply contract.

On July 26, 2002, more than twenty months after the supply contract was negotiated, and more than eighteen months after it was executed, AVX commenced an action against Cabot in Federal court. AVX alleged that the 2000 letters of intent were binding contracts and that the supply contract was void because it had been executed by AVX under economic duress. The action was dismissed for lack of diversity jurisdiction.

Cabot commenced this action in March, 2003, seeking a declaration that the supply contract was a valid and binding contract, and that the 2000 letters of intent were not binding contracts, and were, in any event, superseded by the supply contract, which expressly settled and released all claims relating to them. In its answer, AVX asserted economic duress with regard to the supply contract, and filed various counterclaims, seeking declarations that (1) the 2000 letters of intent were binding contracts; (2) Cabot committed a breach of the 2000 letters of intent; (3) Cabot's knowing disregard of the 2000 letters of intent violated G.L. c. 93A; and (4) Cabot violated the covenant of good faith and fair dealing implied in the 2000 letters of intent when it took "advantage of its market position in the face of a tantalum **511 shortage which it knew was only temporary to coerce AVX into executing" the supply contract. In its answer to the counterclaims, Cabot asserted that AVX had ratified the supply agreement and had released its claims under the letters of intent. Cabot filed a motion for partial summary judgment, which was allowed.[FN14]

> FN14. The motion related to five of six counts; and thus, the decision did not dispose of all claims and counterclaims.

The parties then entered into a stipulation of dismissal without prejudice with respect to the unresolved claims and counterclaims, thereby permitting the entry of a final judgment in Cabot's favor. See Mass. R. Civ. P. 58(a), as amended, 371 Mass. 908 (1977); Mass. R. Civ. P. 54(b), 365 Mass. 820 (1974).

[1][2][3] 2. *Standard of review.* We review a grant of summary judgment to determine whether, viewing the evidence in the light *637 most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. *Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 120, 571 N.E.2d 357 (1991), citing Mass. R. Civ. P. 56(c), 365 Mass. 824 (1974). We may consider any ground supporting the judgment. *Id.,* citing *Champagne v. Commissioner of Correction,* 395 Mass. 382, 386, 480 N.E.2d 609 (1985). Where the party opposing the motion bears the burden of proof at trial, the moving party will prevail only if it demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of the case. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716, 575 N.E.2d 734 (1991).

[4][5][6] 3. *Economic duress.* It is well established that a contract entered into under duress is voidable. *Barnette v. Wells Fargo Nev. Nat'l Bank,* 270 U.S. 438, 444, 46 S.Ct. 326, 70 L.Ed. 669 (1926). *Coveney v. President & Trustees of the College of the Holy Cross,* 388 Mass. 16, 22, 445 N.E.2d 136 (1983), citing *Avallone v. Elizabeth Arden Sales Corp.,* 344 Mass. 556, 561, 183 N.E.2d 496 (1962). *Cappy's, Inc. v. Dorgan,* 313 Mass. 170, 174, 46 N.E.2d 538 (1943). *Freeman v. Teeling,* 290 Mass. 93, 95, 194 N.E. 677 (1935). Restatement (Second) of Contracts § 175 (1981). See 7 A. Corbin, Contracts § 28.1 (rev. ed.2002); 28 S. Williston, Contracts § 71:3 at 431 (4th ed. 2003) (Williston). Such duress need not be physical; it may be economic in nature. *International Underwater Contrs., Inc. v. New England Tel. & Tel. Co.,* 8 Mass.App.Ct. 340, 342, 393 N.E.2d 968 (1979) (*International Underwater Contrs.*), citing *Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 220,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1942 WL 4411 (1942). "To show economic duress (1) a party 'must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will,'" *International Underwater Contrs., supra,* quoting 13 S. Williston, Contracts § 1617, at 704 (3d ed.1970), resulting in the threatened party being "compelled to make a disproportionate exchange of values." *International Underwater Contrs., supra,* quoting 13 S. Williston, Contracts, *supra.*

[7][8][9] "The elements of economic duress have also been described as follows: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts *638 of the opposite party.'" *International Underwater Contrs., supra,* quoting *Urban Plumbing & Heating Co. v. United States,* 187 Ct.Cl. 15, 408 F.2d 382, 389 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). To show duress, a victim "must go beyond the mere showing of a reluctance to accept [and] financial embarrassment" and show **512 that acts of the other party produced these factors. Williston, *supra* at § 71:7 at 449. Thus, "[i]n order to substantiate the allegation of economic duress or business compulsion ... [t]here must be a showing of acts on the part of the defendant which produced [the financial embarrassment]. The assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *International Underwater Contrs., supra,* quoting *W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir.1957).

[10] AVX bears the burden of proving that the supply contract it entered into with Cabot was executed under economic duress. *Willett v. Herrick,* 258 Mass. 585, 607-608, 155 N.E. 589,cert. denied, 275 U.S. 545, 48 S.Ct. 83, 72 L.Ed. 417 (1927). Williston, *supra* at § 71.10 at 460. We agree with the motion judge that AVX has no reasonable expectation of proving the elements necessary to this claim.

[11][12] AVX and Cabot are sophisticated and substantial commercial parties. They were represented by highly competent counsel in their negotiations of a contract that was to govern their commercial relationship over the long term, and to settle their differences over the validity of prior agreements, purchase orders, and letters of intent. In these circumstances, we will strictly construe the requirements of economic duress against the party asserting it, so as not to undercut the well-established public policy favoring the private settlement of disputes. *Ismert & Assocs. Inc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 550 (1st Cir.1986). As the motion judge concluded, "[w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document, negotiated over several months, they are entitled to and should be held to the language they chose."

[13] There is no dispute that the strength of Cabot's bargaining position in negotiating the supply contract, as well as AVX's weakened position, were the result of a worldwide shortage of *639 the rare tantalum product, at a time when AVX was facing a rapidly growing demand from its customers for the type of capacitors it manufactured. Cabot did not create the situation-it merely took advantage of it.

[14][15] The parties also acknowledge, as they must, that it is not infrequent that "when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other," and that "[t]he weaker party often must often enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two." *VKK Corp. v. National Football League,* 244 F.3d 114, 123 (2d Cir.2001). "Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases." *Id.* Hard bargaining is not unlawful; it is "not only acceptable, but indeed, desirable, in our economic system, and should not be discouraged by the courts." S. Williston, *supra* at § 71.7, at 450.

Absent any legally cognizable restraint, Cabot was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

free to drive whatever bargain the market would bear. AVX contends, however, that Cabot did not just engage in hard bargaining, it acted wrongfully in threatening to withhold tantalum deliveries to AVX in violation of the terms of the letters of intent, in order to coerce AVX into signing the supply contract. *David Nassif Assocs. v. United States*, 226 Ct.Cl. 372, 644 F.2d 4, 12 (1981) (threats that would constitute breach of duty of good **513 faith under contract may constitute economic duress). *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 448 N.E.2d 445 (1983) (economic duress may be shown if one party has threatened to commit breach of agreement by withholding performance unless other party agrees to further demand). Restatement (Second) of Contracts § 176(1)(d) & comment e (1981) (threat not to perform under contract may be improper if it amounts to breach of duty of good faith and fair dealing). Of course, if the letters of intent were not binding contracts, it would not have been wrongful for Cabot to have declined to abide by them. Nor would it have been wrongful (in the sense of economic duress) if "there [was] a good faith belief by [Cabot] that its position represent[ed] a plausible one" under *640 the letters of intent. *Happ v. Corning, Inc.*, 466 F.3d 41, 45 (1st Cir.2006).

[16][17][18][19] The letters of intent are unambiguous and where language is unambiguous, its interpretation is a question of law that may be resolved on a motion for summary judgment. *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779, 761 N.E.2d 946 (2002), and cases cited. The language in the letters of intent that "[i]t is AVX's intention to purchase the following materials" is not a binding commitment by AVX to make any purchases at all. See *Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 706-707, 592 N.E.2d 1289 (1992). With one exception, no other language in the letters alters their nonbinding nature. In the tantalum powder letter of intent, one of the ten products covered by its terms is dealt with separately from the others. Specifically, as to product C606, "AVX agrees to take or pay for a minimum of 26,494 [kilograms] of C606" (at a set price). This was a binding commitment. There is, however, no evidence in the record that Cabot threatened to withhold this product in the fall of 2000 in an attempt to coerce AVX into signing the supply contract. Just as there was no binding commitment on AVX to purchase products other than C606, Cabot was not bound by the letters to supply any other product in any specific amount. This interpretation is in line with the long-established principle that a "contract" to purchase an unspecified amount of goods is not a contract at all. See, e.g., *Gill v. Richmond Coop. Ass'n*, 309 Mass. 73, 79-80, 34 N.E.2d 509 (1941) (no contract where buyers "promised nothing except to buy such milk as they might order" because buyers did not bind themselves to any actual purchase). Cf. *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995), quoting *Schwanbeck v. Federal-Mogul Corp.*, supra at 706, 592 N.E.2d 1289 ("promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract"); *Schwanbeck v. Federal-Mogul Corp.*, supra at 706-707, 592 N.E.2d 1289 (parties not bound to further negotiations where letter of intent included certain contractual commitments and separate statement of "[i]ntention to proceed to negotiate"); *Stewart v. Johnson*, 252 Mass. 287, 290, 147 N.E. 850 (1925) (statements that "it is my expectation to take advantage of the panic prices" and "when the proper time comes, will buy for you" did not constitute *641 binding obligation to make purchases for party to whom statements made). AVX points to no authority for its contention that the letters of intent, as drafted and executed, are binding contracts. It merely asserts that they are.

The deposition testimony of AVX employees as to their understanding and use of the letters of intent is consistent with the conclusion that they were not binding. One AVX employee who routinely submitted**514 purchase orders to Cabot testified that his understanding of the agreements was that they were flexible so that if AVX's tantalum needs changed, it "was not required to actually purchase the specific products or the specific quantities set forth" in the letters and that the quantities set forth in the agreements were "listed for reference for planning purposes [and were] not binding." The AVX materials manager similarly testified that, while he understood the prices set forth were

863 N.E.2d 503

Page 13

448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

binding, the quantities were not. He further understood that nothing was binding on AVX until it gave a specific order and that order was confirmed by Cabot.[FN15,FN16]

> FN15. Even if the language of the letters of intent could be viewed as ambiguous, the history of their use as evidenced in the record makes it far from unreasonable for Cabot to take the position, in good faith, that they were not binding. See *Happ v. Corning, Inc.*, 466 F.3d 41, 44-45 (1st Cir.2006). By June of 2000, Cabot officials had also sought and obtained a legal opinion that based on the history of their past use the letters of intent were not binding contracts.

> FN16. AVX also claims that Cabot engaged in a "pattern and practice that violated commercial norms of conduct" and points to deposition testimony by a representative of another tantalum products purchaser, to the effect that Cabot had forced it to accept a new contract to avoid suffering disastrous commercial consequences. But merely arguing that Cabot "intentionally gained market power with the purpose and intent of exercising leverage against its customers" does not show that Cabot's conduct went beyond hard bargaining in a market that had turned favorable to Cabot. See *Strickland Tower Maintenance, Inc. v. AT & T Communications, Inc.*, 128 F.3d 1422, 1426 (10th Cir.1997) (party cannot establish claim of economic duress "by alleging merely that the opposing party took advantage of [a] weak negotiating position").

[20][21] In addition to establishing that Cabot acted wrongfully in order to coerce AVX into signing the supply contract, AVX must also prove that it had no feasible alternative in the face of this wrongful conduct but to enter into the supply contract. Leaving aside the question whether AVX could have bought tantalum product from other suppliers, "[c]ourts have consistently *642 held that the presence of an adequate legal remedy undermines claims of economic duress." *Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 549 (1st Cir.1986) (Breyer, J., concurring), and cases cited. If AVX believed that Cabot was threatening to commit a breach of a binding contract by withholding a scarce product critical to its business in order to coerce a disproportionate bargain, AVX could have gone immediately to court and sought preliminary injunctive relief followed by declaratory relief on the merits of its claim. While "recourse to courts of law" may not be an adequate remedy if it is "not quick enough to save the victim's business or property interests," *International Underwater Contrs.*, supra at 346, 393 N.E.2d 968, quoting 13 S. Williston, Contracts § 1617 at 709 (3d ed.1970), that is not the case here. As the motion judge found, such relief is ordinarily granted, if meritorious, within ten days of the filing of a complaint in State or Federal court. In contrast, the negotiations prompted by Cabot's threats took almost four months to complete.[FN17]

> FN17. While we do not base our conclusion that AVX cannot reasonably expect to establish economic duress on the motion judge's finding that there was no disproportionate exchange of value, that finding finds strong support in the record. Even though AVX may have preferred to order and buy tantalum products on a year-to-year basis, the supply contract provided it with a long-term supply of an exceedingly rare product (in an admittedly volatile market) necessary to its manufacturing business, at then market prices, with a most favored customer clause to protect it against its competitors.

4. *Ratification.* Even if we were to conclude that, for purposes of summary **515 judgment, material facts regarding the existence of economic duress remain in dispute, Cabot nonetheless would be entitled to summary judgment because the undisputed material facts establish that AVX ratified the contract by its actions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503

Page 14

448 Mass. 629, 863 N.E.2d 503
(Cite as: 448 Mass. 629, 863 N.E.2d 503)

[22][23][24] A contract that is voidable for duress may be ratified and affirmed. *Ford v. Retirement Bd. of Lawrence*, 315 Mass. 492, 496, 53 N.E.2d 81 (1944), and cases cited. 7 A. Corbin, Contracts § 28.8 at 59 (rev. ed.2002). "The subsequent conduct of one who seeks to set aside a transaction voidable on account of fraud or duress bars him from relief if such conduct amounts to a waiver or affirmance of the transaction." *Ford v. Retirement Bd. of Lawrence, supra* at 496, 53 N.E.2d 81. A party must complain promptly of coercive acts that allegedly forced it into the contract or the *643 defense of duress is waived, and the contract ratified. *Beaconsfield Townhouse Condominium Trust v. Zussman*, 49 Mass.App.Ct. 757, 763, 733 N.E.2d 141 (2000). "The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the 'heads I win, tails you lose' option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release, the rights and duties under it become free of the doubt engendered by possible assertions of duress." *VKK Corp. v. National Football League*, 244 F.3d 114, 123 (2d Cir.2001). FN18

FN18. The requirement of prompt disavowal is not unfair to the disadvantaged party who will ordinarily know (as AVX claims to have known) that it was forced to execute the contract under economic duress. With such knowledge, the party "will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect." *VKK Corp. v. National Football League*, 244 F.3d 114, 124 (2d Cir.2001).

[25] As ratification is an affirmative defense to AVX's claim of economic duress, Cabot bears the burden to show that AVX ratified the contract. *Rydman v. Dennison Mfg. Co.*, 373 Mass. 855, 366 N.E.2d 763 (1977). See *Abbadessa v. Moore Business Forms, Inc.*, 987 F.2d 18, 24 (1st Cir.1993) (alleged coercing party having provided evidence of ratification, issue is whether alleged victims of economic duress "raised genuine issues of material fact that the claimed duress had not been removed between the time they signed the agreements and the time they brought this action").

[26] "A party may ratify an agreement entered into under duress in a number of different ways: 'first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity ... by acting upon it, performing under it, or by affirmatively acknowledging it.'" *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989), quoting *United States v. McBride*, 571 F.Supp. 596, 613 (S.D.Tex.1983). See *Beaconsfield Townhouse Condominium Trust, supra*, and cases cited; *644 *Deren v. Digital Equip. Corp.*, 61 F.3d 1, 2-3 (1st Cir.1995), and cases cited.

[27] The supply agreement was executed in January, 2001, and the first time AVX asserted duress was in July, 2002. The "burden of avoiding a contractual obligation on the ground of duress ' necessarily increases proportionately with the delay in initiating suit.'" **516*Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 550 (1st Cir.1986) (Breyer, J., concurring), quoting *International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir.1976). Eighteen months is an exceptionally long time for a sophisticated party such as AVX, represented by counsel, to wait before voicing a claim of duress. See *Abbadessa v. Moore Business Forms, Inc., supra* at 24 (summary judgment appropriate where allegedly coerced individuals waited four and seven months to assert claim of duress and accepted benefits under the agreement); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) (allegation of duress eighteen months after signing modification agreement not reasonable time where purported victim worked with pressuring party for nearly three months); *Dorn v. Astra USA*, 975 F.Supp. 388, 393-394 (D.Mass.1997) (duress defense waived where party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503

Page 15

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

to contract waited eleven months to allege duress and accepted benefits under contract). AVX claims, however, that it was subject to Cabot's coercive tactics until the negotiations to modify the contract failed at the end of 2001, and that it could not risk alleging duress while still subject to that coercion. Thus, it argues, when it filed suit alleging duress in July, 2002, the delay was six or seven months, and not eighteen months.

The record viewed in its light most favorable to AVX leaves little doubt that whatever coercion AVX believed it was subject to during the last half of 2000, and the first half of 2001, it was fully capable of exercising its "free will and judgment" with regard to the contract by July, 2001, when it rejected modifications negotiated by its management and agreed to by Cabot. *Coveney v. President & Trustees of the College of the Holy Cross,* 388 Mass. 16, 22, 445 N.E.2d 136 (1983), quoting *Avallone v. Elizabeth Arden Sales Corp.,* 344 Mass. 556, 561, 183 N.E.2d 496 (1962) (duress is such fear as precludes exercise of "free will and judgment"). Yet *645 another twelve months elapsed before AVX raised its claim of duress. This lengthy period of silence is powerful (if not conclusive) evidence of ratification.

Ratification is further evidenced by AVX's performance under the contract. During 2001, while the market for electronic capacitors remained strong, AVX accepted the benefits afforded it under the terms of the supply contract, purchased Cabot's tantalum products necessary to its manufacture of capacitors, and demanded that Cabot deliver those products in the quantities and in the time frames specified therein.

AVX contends, however, that the purchases it made in 2001 were pursuant to the preexisting letters of intent and not the supply contract. There is no evidence in the record to support this contention. [FN19] It is uncontested that AVX paid for tantalum products during 2001 at the rates established in the supply contract, and not in the letters of intent. In addition, of course, AVX continued to purchase tantalum under the supply contract after the letters of intent would have expired, in January, 2001 (wire), and January, 2002 (powder), and for the remainder of its term.

> FN19. To the contrary, for example, in a May, 2001, letter, one division of AVX complained of "accumulating tantalum powder inventory" because of reduced demand and the "take or pay" contract with Cabot. The 2000 letters of intent, however, included a take or pay provision for only one type of powder (C606), not the type identified in the May, 2001, letter.

[28] AVX finally argues that ratification of the supply contract was only possible once it formed an **517 intent to ratify, an intent it claims it never formed. While an intention to ratify is "an essential element and is at the foundation of the doctrine of waiver or ratification," it may be shown by "conduct inconsistent with any other hypothesis than that of approval." Annot., Ratification of Contract Voidable for Duress, 77 A.L.R.2d 426, 434 (1961). AVX's continued purchase of tantalum products worth hundreds of millions of dollars and its sale of scrap under the terms of the supply contract, its assertion of its right to the full and timely delivery of the products under the contract beginning early in its term, and its subsequent assertion of the most favored customer protections of the contract later on is conduct inconsistent with any conclusion other than an intention to *646 ratify. *Rosenbloom v. Kaplan,* 273 Mass. 411, 417, 173 N.E. 522 (1930) ("must be assumed" payments made pursuant to mortgage " were made with an intention to affirm the contracts and obligations thereunder").

AVX cannot simply accept the terms of a supply contract favorable to it, obtain the supply it needs, and claim it did not intend to ratify the contract because some terms were unfavorable to it. Stated otherwise, it cannot "wait [ ] to see how the arrangement works out and then decid[e] whether to seek to undo it." *VKK Corp. v. National Football League,* 244 F.3d 114, 123 (2d Cir.2001). See *Deren v. Digital Equip. Corp.,* 61 F.3d 1, 3 (1st Cir.1995) (former employees ratified agreement by accepting payments under terms of contract for three and one-half years before alleging duress).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 N.E.2d 503                                                                                                                    Page 16

448 Mass. 629, 863 N.E.2d 503
**(Cite as: 448 Mass. 629, 863 N.E.2d 503)**

See *Ford v. Retirement Bd. of Lawrence,* 315 Mass. 492, 53 N.E.2d 81 (1944) (following alleged coercion, employees assented to continued payroll deductions by failing to contest after threats expired, waiving defense of duress); *Rosenbloom v. Kaplan, supra* (mortgage note allegedly executed under duress not voidable where mortgagor made payments of interest on note after alleged acts causing duress had ceased). See also *In re Boston Shipyard Corp., supra* at 455 (purported duress victim who signed modification in exchange for payment, worked for nearly three months with coercing party, and waited over eighteen months after signing modification to allege duress ratified modification and waived duress defense).

5. *Conclusion.* Summary judgment was properly granted for Cabot. The supply agreement is not voidable for economic duress. Consequently, the release it contains is enforceable. Cabot and AVX have released each other from "any and all claims and causes of action relating to, or arising under, the Prior Agreements." Cabot is entitled to judgment as a matter of law.

*Judgment affirmed.*

Mass.,2007.
Cabot Corp. v. AVX Corp.
448 Mass. 629, 863 N.E.2d 503

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.