# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10467-RGS

```
***************************
AVX CORPORATION             *
and AVX LIMITED,            *
            Plaintiffs,     *
                            *
                            *
v.                          *
                            *
                            *
CABOT CORPORATION,          *
            Defendant.      *
***************************
```

DEPOSITION OF WILLIAM J. YOUNG, taken
before Kristin M. Stedman, a Registered Professional
Reporter and Notary Public in and for the Commonwealth
of Massachusetts, at the offices of Bodoff &
Associates, 225 Friend Street, Boston, Massachusetts,
on Wednesday, November 28, 2007, at 10:00 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MA  02116
(617) 426-6060

```
 1                    P R O C E E D I N G S

 2                      -   -   -   -   -

 3                   WILLIAM J. YOUNG,

 4        having first been satisfactorily identified and

 5               duly sworn by the Notary Public,

 6             was examined and testified as follows:

 7                      -   -   -   -   -

 8   EXAMINATION BY MR. GOREN:

 9         Q.   State your full name, Mr. Young.

10         A.   William J. Young.

11         Q.   And are you employed?

12         A.   Employed by the Cabot Corporation for the

13   Cabot Supermetals division.

14         Q.   You are the general manager, is that a

15   fair title?

16         A.   No.

17         Q.   What is your title?

18         A.   I am the director of major accounts.  I

19   don't know if that is what the card says there or not,

20   key accounts.

21         Q.   Key accounts?

22         A.   Right.  Sales.

23         Q.   Did you not sign an affidavit in one of

24   the related cases describing yourself somewhat
```

1    pursue that, but I may at some point in time have to

2    call off additional questioning because he is not

3    being produced on that topic, and discovery on that

4    point has been, AVX's discovery on that topic has been

5    barred by the Court.

6         Q.   Mr. Young, do you understand that the

7    terms and provisions of the relationship between Cabot

8    Corporation on the one hand and Showa Cabot out of

9    Japan on the other from the period from 1996 through

10   February 2002 to be governed by the joint venture

11   agreement, deposition Exhibit No. 2?

12            MR. DAVIS:  Objection.  If you know.

13        A.   Yes, I understand the agreement that

14   existed.  I have never seen this agreement, let's be

15   clear on that, first time.

16        Q.   Have you seen --

17        A.   I have never seen this agreement.

18        Q.   What agreement have you seen?

19        A.   I haven't seen any agreements, I have

20   never seen any formal agreements relative to the joint

21   venture.

22        Q.   But you understand, just to be clear, that

23   the relationship between Cabot and Showa Cabot joint

24   venture in this period 1996 to February 2002 to be

1    governed by the operative agreement, namely,

2    deposition Exhibit 2?

3              MR. DAVIS:  Objection.  I think that calls

4    for him to speculate.  He says he has never seen the

5    agreement, so you are asking to him to verify this

6    agreement, which he says he has never seen, is the

7    operative document, so I object on that basis.  You

8    may respond.

9         A.    I understand in principal the agreement

10   that existed between '96 and 2002 in principal.

11        Q.    In each year from 1996 to February 2002,

12   what tantalum products or rights did Cabot sell or

13   transfer to Showa Cabot?

14             MR. DAVIS:  Objection.  I am going to

15   instruct you not to answer.  He is not being produced

16   for category number eighteen.  I don't believe, if you

17   can point out other categories of the notice of

18   deposition for which Mr. Young has been produced today

19   that you believe these questions are relevant to, I

20   will consider that, but again, Richard, I think that

21   you're seeking to question him on a category for which

22   he has not been produced, and on which the Court has

23   previously barred AVX from conducting discovery.

24             MR. GOREN:  Your conclusions are

```
 1        is outside the scope of permissible discovery, I will
 2        not permit him to testify on those topics here today.
 3                  MR. GOREN:  All of these questions are
 4        designed to elicit responses that are geared in large
 5        part but not solely to the area you have just
 6        identified.  I intend to examine the witness on these
 7        areas, and I want some answers, and I am frustrated
 8        that it is now 10:15 in the morning, and we haven't
 9        even scratched the surface, and you object on a basis
10        that is impermissible under the rules, and second, the
11        questions that are posed are within the predicate that
12        you insist upon, namely, the economic controls de
13        facto or otherwise that Cabot exerted over Showa
14        Cabot.
15             Q.   Mr. Young --
16                  MR. DAVIS:  Let me just say, I am
17        frustrated that we're here, we produced Mr. Young as a
18        designee on a series of categories in a 30(b)(6)
19        notice, and you are beginning the deposition with
20        questions on a category for which he has not been
21        designated.
22             Q.   Mr. Young, to your knowledge, in the
23        period from 1996 through February 2002, isn't it true
24        that Showa Cabot sold tantalum products to AVX?
```

```
1              MR. DAVIS:  You can answer that.

2         Q.   You know that?

3         A.   Yes.

4         Q.   With respect to each year from 1996

5    through February 2002, did Showa Cabot sell or ship

6    tantalum to any customers of Cabot to satisfy an

7    obligation of Cabot or a purchase order issue to

8    Cabot?

9              MR. DAVIS:  I am sorry, will you reread

10   the question for me?

11             (Reporter read the record as requested.)

12             MR. DAVIS:  Objection.  I will let you

13   respond to that.

14        A.   I want to make sure I understand the

15   question.  Are we referring to tantalum powder, or are

16   we referring to all products tantalum?

17        Q.   All tantalum products.

18        A.   All tantalum products.  Between the period

19   of 1996 and February of 2002, what I call the Aizu

20   facility or the venture you are talking about --

21        Q.   Fair.

22        A.   -- sold product to Kemet, they sold

23   product to AVX, and I don't know if they sold products

24   to Vishay or not, but I know for certain they sold
```

1    products to customers that were customers of ours,

2    yes, if that is your question.

3              MR. DAVIS:  I think that was his prior

4    question.

5         A.   I am confused on that question.

6         Q.   I will get there.  In this period of time

7    prior to -- February 2002, Cabot acquired the other

8    half interest it had not owned in the joint venture,

9    correct?

10        A.   Yes, sir.

11        Q.   So I want to focus on the period

12   six years, 1996 through that period.  In that period

13   of time, Cabot had purchase orders and obligations to

14   sell tantalum products to AVX, Vishay, Kemet and other

15   buyers, correct?

16             MR. DAVIS:  Objection.  You can respond.

17        A.   Cabot had obligations during that six-year

18   period to sell the products, yes.

19        Q.   And the question is in that period of

20   time, did Showa Cabot ship or sell any of those

21   products in satisfaction of a purchase order or an

22   obligation that Cabot had?

23             MR. DAVIS:  Objection.  You can respond.

24        A.   The problem I am having with the question,

1    rather than give a simple yes or no answer is you have

2    bridged six very significant years here.  You have

3    bridged '96, '7, '8, '9 and 2000 with the period, we

4    had annualized arrangements set up starting in 2001

5    and 2002, so I have to ask you to please be specific

6    in the time period that you want me to answer.

7        Q.    Please explain what you mean the

8    annualized arrangements for 2001 and 2002?

9        A.    Well, you have those.  Those are the

10   annual contracts arrangements we set up that were from

11   the period of 2000 on, you have those.

12       Q.    Explain what the annualized arrangement is

13   for the year 2001 between Showa Cabot and Cabot

14   Corporation?

15            MR. DAVIS:  Objection.  I think you

16   misinterpret what he is saying.  You may respond.

17       A.    There was no annualized arrangement

18   between Showa and us.  There was annualized

19   arrangement between us and customers, is what I said,

20   not Showa and us.

21       Q.    Okay.  In the year 2000, Cabot had an

22   annualized arrangement with a number of its customers

23   then, is that correct?

24            MR. DAVIS:  Objection.

1      Q.   For certain quantities of tantalum

2    products?

3              MR. DAVIS:   Objection.   You can respond.

4      A.   Yes.

5      Q.   Did Showa Cabot sell or ship any of those

6    products to satisfy those annualized arrangements in

7    that year?

8              MR. DAVIS:   Objection.

9      A.   I don't remember.

10     Q.   Was it a practice or were there occasions

11   on which Showa Cabot in the year 2000 would sell or

12   ship a tantalum product to satisfy an obligation of

13   Cabot?

14             MR. DAVIS:   Objection.

15     Q.   Did that ever happen?

16             MR. DAVIS:   Objection.

17     A.   To my memory, no.

18     Q.   After February 2002, isn't it true that

19   what you call the Aizu operation, which is now part of

20   the Supermetals division, let me stop there, that is

21   correct?

22     A.   Yes, it is.

23     Q.   After February 2002, Boyertown and Aizu

24   were operated as a single unitary division, correct?

1           MR. DAVIS:  Objection.

2       A.   Yes.

3       Q.   Now, after February 2002, isn't it true

4   that the Aizu operation sold or shipped tantalum

5   products to some customers of Cabot to satisfy either

6   an obligation of Cabot or a purchase order issued to

7   Cabot?

8           MR. DAVIS:  Objection.

9       A.   I believe that is true.

10      Q.   Yes, in fact, there were some contracts

11  with Kemet and Vishay that specified that the Cabot

12  Supermetals K.K. subsidiary, the Aizu operation, would

13  satisfy some of the obligations that had been

14  specified from the Boyertown facility, correct?

15          MR. DAVIS:  Objection.  You can respond.

16      A.   Yes, sir, that is correct.

17      Q.   Now, this case is all about flake,

18  correct?

19          MR. DAVIS:  Objection.

20      Q.   That is what you understand?

21          MR. DAVIS:  Objection.

22      A.   That is what I understand.

23      Q.   At any time in the period from 1996

24  through February 2002, did the Showa Cabot joint

1    venture have the right or permission to develop,

2    manufacture or sell flake tantalum?

3              MR. DAVIS:  Objection.  You may respond,

4    to the extent that you know.

5         A.    I want to understand -- the question is

6    broad.  You said manufacture, right and sell?

7         Q.    Develop, manufacture and/or sell, yes,

8    sir.

9         A.    I cannot speak with any knowledge or

10   authority about the rights to develop or manufacture.

11   My area of competency was sales, so I don't know

12   whether they had the rights to sell our flake anywhere

13   else, I don't know that.  They did not make flake, if

14   that is your question.  I am trying to understand

15   where you are getting with the question here because

16   it's broad.

17        Q.    In the period from 1996 through

18   February 2002, did Showa Cabot manufacture flake?

19        A.    No, sir.

20        Q.    Now, take a look at deposition Exhibit

21   No. 2, please, and turn to --

22        A.    I would like to restate my answer on the

23   last question.

24        Q.    Sure.

1       A.    Since my knowledge is limited to the

2    customers I serviced and not the total global

3    community that the Japanese service, I am going to

4    answer that with, to my knowledge, they did not make

5    flake, to my knowledge.

6       Q.    Who, if you don't know, would know at

7    Cabot?

8             MR. DAVIS:  Objection.

9       A.    Who is left but me?  I would say probably

10   not many people but me, okay.

11      Q.    And how is it that --

12      A.    Well, the records would show, of course.

13   I don't want to answer the question before you ask it

14   again.  You have access to the records of sales of the

15   Japanese facility during that period, they would show

16   if they made and sold flake, I would believe.

17      Q.    Your counsel has refused to deliver those

18   records.  They are subject of a pending motion

19   before --

20             MR. DAVIS:  For reconsideration.

21      Q.    -- the Court.

22             MR. DAVIS:  The Court has ordered those

23   documents need not be produced, so the record is

24   clear, and AVX is seeking reconsideration of that

1    order.

2        A.    So I will stand on my statement, to my

3    knowledge, they did not produce flake.

4        Q.    You were involved in period of time '96

5    through February 2002 in sales, correct?

6        A.    Yes, sir.

7        Q.    And you were familiar with the sales that

8    were conducted by Showa Cabot, correct?

9            MR. DAVIS:  Objection.  He didn't work for

10   Showa, are you saying he was aware that Showa Cabot

11   was making sales?

12       Q.    Do you want to try my question?

13       A.    Please ask it again.

14       Q.    Certainly.  Were you aware as a general

15   matter of the products that Showa Cabot was selling in

16   this period of time?

17       A.    No, sir, I was not totally aware.

18       Q.    You were aware that they were selling

19   certain nodular products, correct?

20       A.    Yes.

21       Q.    And you were aware that they were not

22   selling flake, correct?

23           MR. DAVIS:  Objection.

24       A.    Yes.

1    Q.   You knew, did you not, that the only place

2    in the entire world to purchase flake in the period

3    from 1996, actually today, or let me step back, let's

4    go back to February 2002, is from Cabot Corporation,

5    correct?

6    A.   Yes, sir.

7    Q.   Do you have any reason to believe that

8    prior to February 2002 Showa Cabot was selling flake?

9    MR. DAVIS:  Objection.  Asked and

10   answered.  You can respond.

11   A.   I have no reason to believe prior to that

12   they were selling flake.

13   Q.   After February 2002?

14   MR. DAVIS:  Objection.  You can respond.

15   A.   The reason I am hesitating to answer the

16   question is I need to understand what you mean by

17   selling, please, selling one pound, selling samples, I

18   mean, what do you mean by the question selling?

19   Q.   Someone asks for a certain number of

20   pounds of flake material, however denominated by the

21   Aizu operations, they might have had different letters

22   in front of 255, 275 or experimental products, after

23   that period of time, did the Aizu operations sell

24   flake?

```
 1              A.    I believe --
 2                    MR. DAVIS:  You can respond.
 3              A.    I believe they did.
 4              Q.    Which products?
 5              A.    I don't remember specifically whether they
 6        were C255 or C275, which are the primary flake
 7        products.
 8              Q.    After February 2002, could the Aizu
 9        operation have offered flake to AVX and others?
10                    MR. DAVIS:  Objection.
11              Q.    Answer.
12                    MR. DAVIS:  Calls for speculation.  You
13        can respond.
14              A.    I believe they could have.
15              Q.    Now, prior to February 2002, isn't it true
16        that Cabot had obligated itself under its joint
17        venture agreement with Showa Denko, that is the
18        so-called Showa Cabot joint venture, to share all its
19        technology with Showa Cabot, isn't that true?
20                    MR. DAVIS:  Objection.
21              Q.    Isn't that what you understood the deal to
22        be?
23                    MR. DAVIS:  Objection, and I am going to
24        instruct you not to answer that.  I think that goes
```

1     the obligations or the dealings between Cabot and the

2     Showa joint venture prior to February of '02.

3               Again, his understanding, I think it's

4     irrelevant in any respect.  You have the agreement,

5     you can make your arguments off the agreement.

6               MR. GOREN:  Just for the record let me

7     restate the question.

8          Q.   Mr. Young, you testified earlier that you

9     did have an understanding of what the deal or the

10    arrangement was between Cabot and Showa Cabot,

11    correct, that is what you testified at the outset?

12              MR. DAVIS:  Objection.  The record will

13    speak for itself.  You can respond.

14         A.   Yes.

15         Q.   Isn't it true that your understanding was

16    that prior to February 2002, Cabot would share with

17    the joint venture all of its technology, including

18    flake?

19              MR. DAVIS:  Objection.  You can respond,

20    talking about your understanding.

21         A.   That's correct, yes, that is my

22    understanding.

23         Q.   Now, let's look at Exhibit 2, please.  And

24    turn to, let's start with Bates number 095379, and

```
 1    actually, I would like to identify for the record

 2    because the document is broken up, that Exhibit 2

 3    consists of the following --

 4         A.   095379?

 5         Q.   Yes, sir.

 6              MR. GOREN:  And I am just going to recite

 7    a little legal gibberish, miss.  Deposition Exhibit 2

 8    --

 9         A.   I don't have that page.

10              MR. DAVIS:  I don't have that page either.

11    In fact, it looks like there are pages missing.

12              MR. GOREN:  Do you have what is Exhibit 2,

13    exclusive license agreement?  Is that not 09 --

14              THE WITNESS:  It's shaved off the bottom.

15              MR. GOREN:  I beg your pardon.

16              MR. DAVIS:  I would note for the record

17    that the prior page is 095363.

18              MR. GOREN:  That is exactly what I intend

19    to put into the record.  Deposition Exhibit 2 is what

20    was produced by Cabot Corporation as representative of

21    the joint venture agreement extant between Showa Cabot

22    on the one hand, the joint venture and Cabot

23    Corporation for the period 1996 through February 2002.

24    It consists of Bates number, and I will leave off the
```

1    letters 095338 through 363, picking up again at 095379

2    through 399, picking up again at 095412 through 4112,

3    then jumping ahead to 095422-423, that is what was

4    produced and that is deposition Exhibit 2.

5         Q.    Now, sir, if you turn to Exhibit 2, the

6    exclusive license agreement, it recites that the U.S.

7    entity is transferring its then secret processes and

8    what have you to the joint venture, do you see that,

9    on the second page of Exhibit 2?

10              MR. DAVIS:   I object.  Again, he has not

11   seen this agreement before, so are you asking him to

12   say what the agreement, what the words state on the

13   agreement?

14              MR. GOREN:   I am calling the witness's

15   attention to, it recites, this is consistent with the

16   witness's understanding.

17        Q.    Exhibit 2 is an exclusive license

18   agreement, and the U.S. entity is granting to Showa a

19   license of all of the industrial property rights,

20   secret processes pertaining to the manufacture and

21   sales of tantalum powder, and they're more

22   particularly described on Schedule A, the technology,

23   do you see that, sir?

24              MR. DAVIS:   Objection.

1          Q.   Do you see that, Mr. Young?

2               MR. DAVIS:  Objection.  You can tell him

3    whether that is what you read the words to say.

4          Q.   And I also apologize for my impatience,

5    sir.

6          A.   It's the first time I saw this, but we all

7    know that.

8          Q.   Yes, sir.

9          A.   Looking at this, there's a lot on that

10   page you are referring to.  It does refer to a

11   licensing technology exchange agreement, yes.

12         Q.   And then if we turn to Exhibit 3, which I

13   hope the Bates number show up, but I have it beginning

14   at 095391.

15         A.   Got it.

16         Q.   And it doesn't bear a date, but do you see

17   on the second page paragraph one, the words, this

18   agreement pertains to any rights, secret processes,

19   know-how relating to the manufacture and use of the

20   products which, the acronym is KBI, but that's the

21   U.S. entity, or Showa develops or acquires during the

22   term of this agreement, correct, do you see that?

23              MR. DAVIS:  Objection.  You can tell him

24   that is what it is.

1        A.   Yes, that is what it says.

2        Q.   In this period of time, 1996 through

3   February 2002, Cabot had, Cabot manufactured and sold

4   flake products, specifically C255 and 275, correct?

5        A.   Yes, that is correct.

6        Q.   And to your knowledge, Showa Cabot also

7   sold nodular products to AVX among others, correct?

8        A.   Yes.

9        Q.   But the only place in the entire world AVX

10   could get flake was from Cabot Corporation in this

11   period of time from 1996 through February 2002,

12   correct?

13            MR. DAVIS:  Objection.  Asked and

14   answered.  You can respond.

15        A.   During that period of time, AVX purchased

16   powder from us, which was called flake, that was

17   available as nodular through other producers, yes,

18   that is correct.

19        Q.   Mr. Young, this is a small point, and I

20   think we each know what we're doing, but I just need

21   to lock you in, that there are, in this period of

22   time, 1996 through February 2002, there were two

23   products that Cabot marketed and sold as flake,

24   correct?

1          MR. DAVIS:  Objection.  You can respond.

2      A.    There were two main products that we sold

3    as flake that you are referring to, C255 and 275.

4    There was also a C200 which was an older flake

5    product.  Yes, there were a few different variations

6    of flake, yeah.

7      Q.    And isn't it true that year 2000, that the

8    only place in the world AVX could go to get C255 or

9    275 was Cabot?

10         MR. DAVIS:  Objection.  Asked and

11   answered.  You can respond.

12     A.    Yes, sir, that is correct.

13     Q.    Now, for what reason or reasons in this

14   period 1996 through February 2002 did Cabot not

15   provide Showa Cabot with the flake technology?

16         MR. DAVIS:  Objection.  I instruct you not

17   to answer.

18         MR. GOREN:  Mr. Davis?

19         MR. DAVIS:  Yes, Mr. Goren.

20         MR. GOREN:  Do you acknowledge that if

21   there were another source, whether or not there was

22   another source for flake prior to entry into the

23   long-term supply agreement is relevant to this case?

24         MR. DAVIS:  Richard, I acknowledge that

1    you sought discovery on Cabot's dealings with Showa

2    Denko, and you were denied that discovery by

3    Magistrate Judge Bowler.  You currently have a motion

4    for reconsideration pending on that point which

5    acknowledges the fact that you were denied this

6    discovery, so my position is that unless and until you

7    obtain the Court's revocation of Magistrate Judge

8    Bowler's order which prohibits you from conducting

9    discovery on that point, that you are not permitted to

10   do so.

11            MR. GOREN:  You misrepresent both what was

12   before the Court and its ruling, and you also failed

13   to move for a protective order as you are required

14   under the rules.

15            MR. DAVIS:  My instruction stands.

16       Q.   Let's try this one, in the year 2000 or

17   thereabouts, isn't it true that Showa Cabot produced

18   and sold tantalum powders at prices that were lower

19   than what Cabot offered for comparable products, sir?

20            MR. DAVIS:  Objection.

21       Q.   You knew that?

22            MR. DAVIS:  Objection.

23       A.   I did not know that, because during that

24   period, they were a competitor.

1        Q.    They were a competitor?

2        A.    Sure.

3        Q.    Didn't you as a salesperson keep up with

4    the prices of what competitors charged?

5        A.    I specifically had no knowledge of what

6    the Aizu plant was selling powder at to specific

7    customers.  I had general feelings, but I had no

8    specific knowledge of what that was, no.

9        Q.    You had no reason to believe based on what

10   other people told you or what you read other people to

11   have said as to the pricing of the Aizu operation

12   prior to February 2002, Mr. Young?

13            MR. DAVIS:  Objection.  I think that

14   misstates his prior testimony.  You can respond.

15       A.    I did not have any specific knowledge of

16   that.

17       Q.    Did you have any reason to believe or to

18   understand that the prices that Showa Cabot charged

19   for some nodular products was less than the prices

20   charged by Cabot for comparable products?

21            MR. DAVIS:  Objection.

22       A.    I believe I answered that.  I had no

23   specific knowledge of their pricing structure.

24       Q.    Sir, I asked a different question.  I

1    asked, isn't it true that you had reason to believe or

2    reason to understand, which would include that which

3    was beyond which you perceived, saw or heard, but

4    reason to believe or to understand based on what

5    somebody else told you or based on something that you

6    read somebody else said or any reason in the world,

7    isn't it true that you had reason to understand that

8    prior to February 2002, Showa Cabot sold nodular

9    products at a price that was less than what Cabot

10   Boyertown sold a comparable product?

11                MR. DAVIS:  Objection.  Asked and

12   answered.  You can try again.

13        A.   I have no specific knowledge that the Aizu

14   facility sold nodular products less than us because

15   they made nodular products that we did not make.

16        Q.   They made, for example, something called

17   S506, correct?

18        A.   Yes.

19        Q.   And that was comparable, was it not, with

20   the Cabot 606, correct?

21                MR. DAVIS:  Objection.  Please don't yell

22   at him.

23                MR. GOREN:  I beg your pardon.  I am

24   sorry.  It's part of my personality.  Off the record a

1    second.

2            (Discussion off the record.)

3            MR. GOREN:  On the record, please.

4        A.    I am going to answer the question in

5    somewhat detail because there is a technical

6    difference, there was between the S506 and C606.  The

7    S506 was a world-class 50,000 CV per gram powder, the

8    606 was not a world-class 50,000 CV per gram powder.

9        Q.    Isn't it true that the -- Strike that.

10            Were they, the Cabot 606 and the Showa

11    506, did they compete for segments of the same market?

12        A.    Yes, they did, they competed for the

13    50,000 CV window.

14        Q.    And isn't it true that Cabot knew that a

15    number of its customers were unhappy with the

16    performance of Cabot's 606 in the period of, let's

17    say, the year 2000?

18            MR. DAVIS:  Objection.  You can respond.

19        A.    Yes.

20        Q.    And isn't it true that Cabot knew in the

21    year 2000 that some of its buyers who were not pleased

22    with the performance of C606 looked to the Showa

23    product S506?

24            MR. DAVIS:  Objection.  You say looked to

1    the product, what do you mean?

2         A.   When you say buyers are you referring to

3    customers purchasing?

4         Q.   Yes, sir.

5         A.   I want to understand the question.

6              MR. DAVIS:   Same objection.

7         A.   I thought we just covered this in the

8    previous question, but yes, that is to my knowledge,

9    yes.

10        Q.   Now, we know that Cabot did acquire the

11   other half interest of the Showa Cabot joint venture

12   and closed on that in February 2002, correct?

13             MR. DAVIS:   Objection.  Asked and

14   answered.  You can respond.

15        A.   Yes, sir.

16        Q.   For what reasons did Cabot acquire the

17   other half interest of the Showa Cabot joint venture?

18             MR. DAVIS:   Objection.  And I am going to

19   instruct you not to answer this.  It goes beyond the

20   scope of permissible discovery, and he's not being

21   produced as a witness to testify on Cabot's behalf

22   with respect to that joint venture.

23        Q.   Let's try this, focusing on the year 2000,

24   Mr. Young, isn't it true that in the year 2000, Cabot

1    commenced discussions to acquire the other half

2    interest of the Showa Cabot joint venture?

3                  MR. DAVIS:  Objection.  And if you know.

4          A.    I don't know.

5                  MR. GOREN:  Please mark as Exhibit 3 that

6    is a Cabot document bearing Bates number 028968.

7                  (Marked Exhibit 3; E-Mail, 3/9/02.)

8          Q.    Would you take a moment to look at that,

9    and you will note that it's dated March 9, 2000, and

10   it indicates that you received a copy of this.

11                 (Witness reviewing document.)

12         Q.    Do you note in the first paragraph there's

13   a reference to, from Mr. Tyler, the entree into Japan

14   creates a dramatic potential for Cabot, do you see

15   that?

16         A.    Yes, I do.

17         Q.    And then the fourth paragraph down, the

18   Showa opportunity is golden, do you see that

19   reference?

20         A.    Yes, I do.

21         Q.    So isn't it true that as of March 2000

22   Cabot had started to consider or undertake in some

23   process that led to the acquisition of the other half

24   interest, the closing of which occurred in

1    February 2002, sir?

2              MR. DAVIS:  Objection.  I caution you not

3    to speculate.  If you know.

4         A.   I have no idea when Cabot started

5    negotiations, sir, with Showa Denko to buy the other

6    50 percent.

7         Q.   That is fair.  But in March of 2000, were

8    there not internal discussions about acquiring some or

9    all of that other half interest?

10             MR. DAVIS:  Objection.  Internal

11   discussions among whom?

12             MR. GOREN:  At Cabot.

13             MR. DAVIS:  Objection.  If you know.

14        A.   I don't know.

15        Q.   And Mr. Tyler's reference is entree into

16   Japan creates dramatic commercial potential for the

17   Showa opportunity, don't you understand that to refer

18   to acquiring the other half interest?

19             MR. DAVIS:  Objection.

20        Q.   Isn't that what you understand --

21             MR. DAVIS:  Objection.

22        Q.   -- looking at it?

23        A.   I don't know what Hugh Tyler's reference

24   here or intention is.  I see it, and I have no idea

1    what his intention was and why he said that.  I don't.

2         Q.    Now, you go down, please, to the paragraph

3    that starts, having said all this, we should

4    accelerate the development of capacity, expansion

5    plans, et cetera, et cetera, do you see that

6    paragraph, sir?

7         A.    Yes, I do.

8         Q.    And then do you see in the eighth line

9    down a reference to, quote, old contract language

10   which still plagues CPM, et cetera?

11             MR. DAVIS:  Is there a question pending?

12        A.    Which paragraph are we on?

13        Q.    Let me restart.  The paragraph that

14   starts, having said all this we should, and then come

15   down, among the other things Mr. Tyler says, we should

16   immediately begin an intense business discussion with

17   Showa to establish our contractual needs and

18   expectations for a, quote, deal, closed quote, to be

19   attractive to us.  Put everything on the table, power

20   supply, technology exchange, financial commitments,

21   old contract language which still plagues CPM, do you

22   see that?

23        A.    Uh-huh.  Yes, I do.

24        Q.    Does that refresh your memory, sir, that

1    as of March 2000, internally Cabot was considering

2    revising the arrangement with the Aizu operation?

3            MR. DAVIS:  Objection.  Caution you not to

4    speculate.  If you know.

5        A.   I was not involved in any discussions.

6        Q.   You were copied on this e-mail?

7            MR. DAVIS:  You can answer that question

8    yes or no.

9        A.   I was copied on the e-mail, but I was not

10   involved in any discussions relative to Cabot's

11   intentions at this particular time period to purchase

12   the other 50 percent.

13       Q.   Were you involved at any later time, sir?

14           MR. DAVIS:  Objection.

15       A.   No, not that I remember.

16       Q.   Why did you say at this time?

17           MR. DAVIS:  Objection.  You can respond.

18       A.   We're going back here seven years.  Any

19   situation relative to the acquisition would have been

20   handled by corporate, not at the divisional functional

21   level and certainly not at my commercial level.

22       Q.   Who at Cabot would have knowledge about

23   the dealings and the considerations leading up to the

24   acquisition of that half interest, the closing of

1    which occurred in February 2002?

2              MR. DAVIS:  Objection.

3        Q.    Who?

4              MR. DAVIS:  If you know.

5        Q.    Mr. Burns?

6              MR. DAVIS:  Objection.  I caution you not

7    to speculate.  If you know.

8        A.    Since I wasn't involved, I can't answer

9    that.

10       Q.    Who do you have reason to believe would

11   know?

12             MR. DAVIS:  Objection.  I caution, if what

13   Mr. Goren is looking for by reason to believe is

14   asking you to speculate, then I caution you not to

15   speculate.  Tell him, if you know, who was involved in

16   those negotiations.

17       Q.    You can also tell me having a reason to

18   believe based on the corporate structure and decision

19   making in place at that time who would have dealt with

20   such matters?

21             MR. DAVIS:  Objection.  If you know.

22       A.    I don't know specifically who was involved

23   in these discussions.

24       Q.    Who at the time would be appropriate to

1    have dealt with this, that is to say the strategic

2    decisions as to alter the relationship with the Aizu

3    operations, which some twenty months later ended up in

4    a closing?

5              MR. DAVIS:  Objection.

6         Q.    Who?

7              MR. DAVIS:  Objection.  Asked and

8    answered.

9         A.    I believe I have answered it.

10        Q.    Who do you believe --

11             MR. DAVIS:  Objection.

12        Q.    -- as you sit here today, would know about

13   that?

14             MR. DAVIS:  Objection.  I caution you not

15   to speculate.  If you know, you can tell him one more

16   time.

17        A.    I don't know and I would have to

18   speculate, so I can't answer that question.

19        Q.    Now, isn't it true that in the period of

20   1996 through February 2002, Cabot was obliged to

21   supply the material for Showa Cabot in order for it to

22   produce and sell tantalum products?

23             MR. DAVIS:  Objection.  I instruct you not

24   to answer that question.  You're asking him to comment

1    on what Cabot's obligations were to the Showa Cabot

2    joint venture.  He's already testified he never saw

3    the agreements, and I think that goes beyond the scope

4    of permissible discovery.

5         Q.   Let's turn back to Exhibit 2, exhibit

6    Roman numeral VI thereof, beginning at Bates

7    stamped page 095422, it's the second page from the

8    end, Mr. Young.

9         A.   Got it.

10        Q.   And do you see that the first paragraph

11   sets out that this will confirm the terms upon which

12   we will purchase from you KBI, and that is Cabot,

13   correct?

14             MR. DAVIS:  Objection.

15        Q.   Well, forget that, you don't know that KBI

16   is Cabot, but this will confirm the terms upon which

17   we will purchase from you and you will sell to us ore

18   and potassium tantalum fluoride as are necessary for

19   the manufacture of tantalum products by us, and it's

20   defined term raw materials, you see that?

21        A.   That is what it says, yes, sir.

22        Q.   And in paragraph two says, we will order

23   all our requirements of raw materials from you,

24   correct?

1            MR. DAVIS:  Objection.  That is part what

2      it states.

3            A.    That is what it says.

4            Q.    And you testified at the outset of this

5      deposition, sir, that you were familiar with as a

6      general matter the basic terms between Showa Cabot and

7      Cabot Corporation in the period prior to

8      February 2002, correct?

9            MR. DAVIS:  Objection.  The record will

10     speak for itself.

11           Q.    But you recall testifying that way, Mr.

12     Young, right?

13           MR. DAVIS:  Objection.  Same objection.

14     The record will speak for itself.  You can respond.

15           Q.    I am entitled to an answer, sir?

16           A.    Yes.

17           Q.    Thank you.  And isn't it true that in the

18     period prior to February 2002 and in particular in the

19     year 2000, Cabot was obliged to supply the

20     requirements of Showa Cabot for raw material?

21           MR. DAVIS:  Objection.  I instruct you not

22     to answer.

23           Q.    That is what you understood it, is it not?

24           MR. DAVIS:  The same instruction, same

1    objection.

2            MR. GOREN:  Brian, it goes, if nothing

3    else, to the issue of economic control.

4            MR. DAVIS:  Richard, you are not permitted

5    discovery on these topics.

6            MR. GOREN:  You are contradicting

7    yourself.  Let's move on.

8            MR. DAVIS:  I am trying to work with you,

9    but I think that you are going well beyond what the

10    Court has permitted you to discover.

11        Q.    If we go back to deposition Exhibit No. 3,

12    Mr. Young, the paragraph that I was referring to

13    earlier, old contract language which still plagues CPM

14    Cabot, isn't it true that in the year 2000, some of

15    the old contract language that plagued Cabot was its

16    obligation to furnish all raw material to Showa?

17            MR. DAVIS:  Objection.

18        Q.    Isn't that true?

19            MR. DAVIS:  Objection.  I caution you not

20    to speculate.

21        A.    I have no idea.

22        Q.    Who would know, whom do you believe would

23    know?

24        A.    Whom do I believe would know specifically

1    what?  Can you rephrase the question?

2         Q.   Sure.

3         A.   Please.

4         Q.   What issues, if any, or concerns that

5    Cabot had with its agreement with Showa Cabot in the

6    year 2000 that led eventually to the acquisition that

7    closed in February of 2002?

8              MR. DAVIS:  Who would know that, or are

9    you asking him the substance of those concerns?

10        Q.   Who would know?

11             MR. DAVIS:  Objection.  Caution you not to

12   speculate.

13        A.   Clarification, are we referring to

14   products we sell or products that Aizu purchases from

15   us as a raw material?  I don't know where you are

16   going with the question.

17        Q.   The products that Aizu purchases as raw

18   material, that's KTaF, right?

19        A.   Right.

20             THE WITNESS:  Can I answer that?

21             MR. DAVIS:  Would you reread the question,

22   please?

23        Q.   The question is who do you have reason to

24   believe would know about these issues, which you have