# Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 04-10467-RGS


```
***************************
AVX CORPORATION             *
And AVX LIMITED,            *
            Plaintiffs,    *
                           *
                           *
v.                         *
                           *
                           *
CABOT CORPORATION,         *
            Defendant.     *
***************************
```


DEPOSITION OF EDUARDO E. CORDEIRO, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Kristin M. Stedman, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Bodoff & Associates, 225 Friend Street, Boston, Massachusetts, on Thursday, November 29, 2007, at 2:00 p.m.


KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MA  02116
(617) 426-6060

1        A.    Less than four, probably.

2        Q.    Is that the extent of the preparation you

3    made for this deposition?

4        A.    Specifically, yes.

5        Q.    In the year 2000, what was your title with

6    Cabot?

7        A.    I was director of investor relations.

8        Q.    And you had held that post just for, I am

9    trying to remember the prior deposition, just for a

10    couple of years?

11        A.    I held the post from, I want to say late

12    1999 for about three years, so until about 2002.

13        Q.    What part of 2002?

14        A.    I would say March of 2002.

15        Q.    And your title as of March 2002 is?

16        A.    I was a corporate controller.

17        Q.    And prior to being the -- what did you

18    call it, the director of investment relations?

19        A.    Yes.

20        Q.    You were?

21        A.    I was manager of corporate planning.

22        Q.    For what period of time?

23        A.    From when I joined the company in July

24    of 1998 until sometime towards the middle or end of

1    1999.

2          Q.    In that capacity, did you participate in

3    decision making concerning strategy and direction for

4    Cabot Performance Materials?

5          A.    In which capacity specifically?

6          Q.    What was the title again, from the mid

7    '90s to '99?

8          A.    Manager of corporate planning?

9          Q.    Yes.

10         A.    No.

11         Q.    What was the manager of corporate

12   planning?

13         A.    I worked for the corporation on a number

14   of projects in many different businesses, and my job

15   was not to really make any decisions but to basically

16   do project work.

17         Q.    Any projects involving the tantalum

18   business?

19         A.    I do not recall specifically if I did any

20   work for tantalum.  It's possible I did, but it's not

21   something that comes to mind now.

22         Q.    Any involvement with analysis or

23   examination of the tantalum capacitor market?

24         A.    I do not recall.

1    quote, as are necessary for the manufacture of

2    tantalum products, do you see that?

3              MR. DAVIS:  Objection.  You are asking if

4    that is what it says?

5              MR. GOREN:  Yes, no tricks here.

6         A.    Where are you exactly?

7         Q.    Certainly.  Right at the top of the page,

8    gentlemen, this will confirm the terms on which we

9    will purchase from you --

10        A.    Okay.

11        Q.    -- and you will sell to us ore and

12   potassium, tantalum fluoride as are necessary for the

13   manufacture of tantalum products, correct?

14        A.    Okay.

15        Q.    And for its part, Showa Cabot says we will

16   order all of our requirements of raw materials from

17   you, do you see that?

18        A.    Yes.

19              MR. DAVIS:  Objection.  You can respond.

20        A.    I see that.

21        Q.    In the year 2000, Cabot learned that Showa

22   Cabot was purchasing KTaF from China, correct?

23              MR. DAVIS:  Objection.

24        A.    I do not know for sure the year, but yes,

1    we were aware of that.

2        Q.    And isn't it true that Cabot took steps to

3    see that that ceased?

4        A.    I am not aware of that.

5        Q.    Do you have reason to believe that Showa

6    Cabot complained to Cabot about you're cutting us off

7    from KTaF?

8            MR. DAVIS:  Objection.

9        Q.    In or about the year 2000?

10           MR. DAVIS:  Objection.  Calls for

11    speculation.  If you know.

12        A.    I have no reason to believe, but it would

13    be speculation on my behalf if I were to answer.

14        Q.    You have reason to believe --

15        A.    I have no reason to believe, but it would

16    be speculation on my behalf if I were to answer

17    affirmatively one way or another.

18        Q.    Did you ever have any discussions with Mr.

19    Odle or Mr. Burns on this subject, sir?

20        A.    I did not.

21        Q.    So you have no basis for knowing, do you?

22           MR. DAVIS:  Objection.

23        A.    That is why I said it was speculation,

24    didn't I?

1      Q.    Isn't it true that in the year 2000, Showa

2    Cabot sold nodular products that were comparable to

3    Cabot's Boyertown products at a lower price?

4      A.    I do not know.

5      Q.    Do I need to show you an exhibit to ask

6    you, Mr. Cordeiro -- let me just ask the question,

7    isn't it true that in the fall of 2000, Cabot told

8    AVX, no powder, no wire for 2001 unless you enter into

9    a long-term fixed-price contract?

10         MR. DAVIS:  Objection.  You can respond.

11     A.    It would be helpful if you would show me

12   the exhibit.

13     Q.    Try 14, please.

14     A.    Here we go.  This one?

15     Q.    Yes.

16     A.    Okay.

17     Q.    Is Exhibit 14 one of the documents that

18   you have reviewed in preparing for this deposition?

19     A.    It is.

20     Q.    Did you review, as you understand it, the

21   prior deposition exhibits in recent examinations by

22   me, is that your understanding?

23         MR. DAVIS:  Objection.

24     Q.    Do you understand that you -- did you

1    review these exhibits?

2            A.    I reviewed this one specifically.  It is

3    possible I reviewed some of these, but I would have to

4    go through each one and let you know which one I

5    reviewed, but I did review this one.

6            Q.    Isn't it true that in the fall of 2000 --

7    actually earlier, isn't it true that in August

8    of 2000, Cabot told AVX, no powder, no wire in 2001

9    unless you sign up to a long-term supply agreement for

10   both flake and nodular?

11           MR. DAVIS:  Objection.  You may respond.

12           A.    It says that we would not be able to

13   supply tantalum powder or wire to AVX in 2001 and

14   beyond.

15           Q.    Right.  My question was a little broader.

16   Isn't it true that Cabot demanded a long-term -- let's

17   break it down --

18           A.    Long-term contract.

19           Q.    A long-term contract?

20           A.    Yes.

21           Q.    And the contract that was proposed was

22   five years, correct?  Do you need to look at a

23   document to --

24           A.    I see that it was proposed a multiyear

1    contract.

2        Q.   Mr. Cordeiro, I have been up every morning

3    at five a.m., and I am little tired --

4            MR. GOREN:  This is off.

5            (Discussion off the record.)

6        Q.   Mr. Cordeiro, I put in front of you

7    deposition Exhibit 32, is this one of the documents

8    that you reviewed to prepare for this deposition?

9        A.   No, I did not review this.

10       Q.   Now, if you need a minute or two, just let

11   me know, but my question is, isn't it true that

12   initially in August, then again later in October 2000,

13   that Cabot said to AVX, no powder, no wire in 2001

14   unless you agree to a long-term supply agreement for

15   five years, fixed quantities of nodular, fixed

16   quantities of flake at fixed prices?

17           MR. DAVIS:  Objection.

18       Q.   Take what time you need.

19           MR. DAVIS:  Are you asking him if that is

20   what this document says?

21           MR. GOREN:  I am asking him isn't it true

22   that that is what Cabot demanded.

23           MR. DAVIS:  Objection.

24       A.   Okay.  I am sorry, I read this first page.

1    I understand this to be a draft of a supply agreement

2    that was presented to AVX on October 17, 2000 to John

3    Gilbertson, and that what this represents is an offer,

4    not a demand, from Cabot to supply a certain amount of

5    powder and wire as designated in the back for fixed

6    prices for a term of five years.

7                Q.    Thank you.

8                A.    That is what I understand this to be, and

9    what I understand what Cabot was intending at that

10   point in time.

11               Q.    So maybe I should use the word requesting

12   rather than demanding, does that make you more

13   comfortable?

14               A.    Offering to, offering to purchase.

15               Q.    And the powder was both nodular and flake,

16   correct?

17               MR. DAVIS:  Objection.

18               A.    So I have not read the whole document, but

19   what appears to be in the schedule Appendix A is

20   powder, wire and KTaF, there is no mention of flake.

21               Q.    Mr. Cordeiro, isn't it true that Cabot

22   said to AVX if you want to get some flake, you are

23   going to have to commit to buy both flake and nodular

24   for five years, isn't that true?

1          MR. DAVIS:  Objection.

2          THE WITNESS:  I can answer?

3          MR. DAVIS:  Certainly.

4     A.    No, that is not true.

5     Q.    What is not true?

6     A.    As far as I understand.  The statement

7  that you just said, you asked me if it was true or

8  not, I said, no, it is not true.

9     Q.    And what is your basis for saying it's not

10  true?

11     A.    My basis for saying it's not true is that

12  I don't have any documentation that would tell me it's

13  true.

14     Q.    Did you review any of the depositions that

15  were taken in the first or second rounds of this

16  litigation?

17     A.    Without pointing to specific ones, I would

18  say that, yes, I have reviewed some depositions.

19     Q.    Did you review Mr. Odle's depositions?

20     A.    I have reviewed portions of Mr. Odle's

21  depositions, yes.

22     Q.    Your deposition?

23     A.    Yes, I have reviewed my deposition.

24     Q.    Was that subsumed within the approximate

1    four hours that you spent with Mr. Davis?

2         A.    Was that subsumed?  Did that take place

3    in, is that what you mean?

4         Q.    Yes.

5         A.    Yes.  I was at my deposition.

6         Q.    Isn't it true, Mr. Cordeiro, that in this

7    time period, 1999, 2000, Cabot knew that AVX relied on

8    Cabot for flake?

9              MR. DAVIS:  Objection.  You may respond.

10        A.    I can certainly say that AVX purchased

11   flake from Cabot, so if that is what you mean by

12   relied on.  I guess I am a little confused about the

13   term what does relied on mean.

14        Q.    Isn't it true that Cabot understood that

15   Cabot's flake material was the sole source for some of

16   AVX's tantalum capacitors?

17              MR. DAVIS:  Objection.

18        A.    I guess that wouldn't be any different

19   from any other capacitor that AVX would buy from, that

20   AVX would buy powder from with a specific designation.

21              MR. GOREN:  Mark this, please.

22              (Marked Exhibit 33; Minutes.)

23        Q.    Mr. Cordeiro, I put in front of you

24   Exhibit 33.

1        A.    Okay.

2        Q.    Page two, take a peek at.

3        A.    Okay.

4        Q.    These are minutes, the document recites

5    Exhibit 33 from Cabot's files, correct?

6        A.    Yes.

7        Q.    Have you seen this before?

8        A.    I have not seen this before.

9        Q.    Now, you will see on page one that Cabot

10   is aware that AVX has a partial substitute for some of

11   Cabot's 255, do you see that, that Ningxia FTW170?

12             MR. DAVIS:   Objection.

13        A.    I see that.

14        Q.    And do you see that it's priced at $150 a

15   kilogram lower than Cabot's flake?

16             MR. DAVIS:   Objection.  You are asking him

17   if that is what it says?

18             MR. GOREN:   Yes.

19        A.    Yes, that is what it says.

20        Q.    And Cabot was aware then at late 1999 that

21   AVX had a partial alternative for C255 that was

22   cheaper than Cabot's, correct?

23             MR. DAVIS:   Objection.  I think you are

24   mischaracterizing the document because you keep saying

1    partial.

2         A.   Yeah, why do you say partial?

3         Q.   It says it's been approved as an alternate

4    supplier for 25 and 35 volt parts, that doesn't

5    include all of the parts that are fabricated with

6    C255, does it, Mr. Cordeiro?

7              MR. DAVIS:  Objection.  You are still

8    mischaracterizing the document.

9         A.   I do not know.

10        Q.   If you look at the second page, Mr.

11   Cordeiro?

12        A.   Yes.

13        Q.   Do you see there that the notation AVX

14   produces parts from C275 for customers that cannot be

15   told, and this is a quote, we no longer make these

16   parts, closed quote, therefore, we'll have to make

17   C275 work?

18             MR. DAVIS:  Objection.  Please read the

19   rest.

20        Q.   And/or suffer lower yields.  My point, I

21   am trying to go back to the initial point, in 1999 and

22   2000, Cabot was aware, was it not, that AVX needed its

23   flake products?

24             MR. DAVIS:  Objection.  You can answer.

1          A.    I thought I answered this clearly last

2    time, but just to try to be more clear, I guess, I

3    would say that we were aware that flake was a product

4    that AVX was interested in buying, along with many

5    other products that we made, but I still don't

6    understand the terminology they relied on us, which is

7    how you characterized it.

8          Q.    Mr. Cordeiro, we have a couple of areas to

9    quickly go through on this point.  Cabot has patents

10   on both its C255 and 275, correct?

11         A.    Yes, it does.

12         Q.    It is the, unless it licenses that, it is

13   the sole supplier in the entire world of those

14   products, correct?

15         A.    I believe so.

16         Q.    And AVX told Cabot in 1999 and 2000 that

17   it needed Cabot's 255 and 275, correct?

18              MR. DAVIS:  Objection.  You can respond.

19         A.    That, among other products that it also

20   needed.

21              MR. GOREN:  Mark, please.

22              (Marked Exhibit 34; Document, 9/1/00.)

23         Q.    Mr. Cordeiro, I put in front of you

24   Exhibit 34.  You will note the date September 1, 2000?

1        A.    Yes.

2              MR. DAVIS:  Do you want him to read it,

3    Richard?

4        Q.    I want you to take particular note of the

5    last five lines of the second paragraph of Exhibit 34,

6    please.

7              MR. DAVIS:  Take a minute and just read

8    it.  I don't want to him to take anything out of

9    context.

10             MR. GOREN:  That's fine.  I have as much

11   time as needed to complete this examination.

12       A.    Is there a reason there's no from on this?

13       Q.    I have no idea, Mr. Cordeiro.  It's

14   Cabot's document, sir.

15       A.    I don't know either so I am just wondering

16   if there's a reason.

17             (Witness reviewing document.)

18       A.    Okay.

19       Q.    So isn't it true that at least as of

20   September 1, 2000, AVX had informed Cabot, this is

21   apparently a quote, you must find a way to get me C255

22   and 275, no is -- I believe deleted is not acceptable

23   -- this will kill us, I can do without the other

24   powders but I have to have flake.  So AVX informed

1    Cabot as of at least September 1, 2000 that it needed

2    flake, correct?

3                MR. DAVIS:  Objection.

4        Q.    That is what the document says?

5                MR. DAVIS:  You can answer that.

6        A.    That is what the document says.

7        Q.    But isn't that what you understood --

8    Strike that.

9                Isn't that what Cabot understood in

10   September 2000, this is one of the reasons that

11   underlie why Cabot asked for a five-year supply

12   agreement, isn't that true?

13               MR. DAVIS:  Objection.  Richard, could you

14   clarify the question?

15               MR. GOREN:  Sure.

16       Q.    Isn't it true that one of the reasons

17   underlying Cabot's request to AVX that it enter into a

18   long-term supply agreement is that it knew it was the

19   sole source of flake and that AVX needed the flake?

20               MR. DAVIS:  Objection.  You can respond.

21       A.    I don't believe that is true.

22       Q.    What is your basis for saying you don't

23   believe that is true?

24               MR. DAVIS:  Objection.

1    A.    I don't believe it's true because the

2    customers, including AVX, were scrambling for all

3    kinds of powder, as stated earlier in this document,

4    the 20,000 pounds going to Biddeford, and that it was

5    unrelated to the type of tantalum, but that any and

6    all tantalum would be required, needed, and customers

7    would sign up for long-term deals for any type of

8    tantalum.

9        Q.    Mr. Chapple told Cabot, I can do without

10   the other powders, but I have to have flake, that is

11   apparently a quote?

12           MR. DAVIS:    Is there a question pending?

13       Q.    Sure.  So you want to stand by your

14   answer?  Isn't it true that -- let's backtrack.  Cabot

15   was the sole source in the entire world for C255 and

16   275, correct?

17           MR. DAVIS:    Objection.  Asked and

18   answered.  You can respond.

19       A.    Yes, among other powders, that is true.

20       Q.    Just 255 and 275, correct?

21           MR. DAVIS:    Objection.  Asked and

22   answered.  You can respond.

23       A.    Yes, among other powders, that is correct.

24       Q.    I am not asking about other powders, Mr.

1    Cordeiro.  Please don't fight with me.

2                    MR. DAVIS:  Objection.

3         Q.    Sole source for those two powders,

4    correct?

5         A.    Yes.

6                    MR. DAVIS:  Objection.  Asked and

7    answered.

8         Q.    Now, if Showa Cabot were able to sell

9    flake, the circumstances in the fall of 2000 would

10   have been different, would they not?

11                   MR. DAVIS:  Objection.  I caution you not

12   to speculate.

13        A.    So let me just -- can you just repeat the

14   question, please?

15        Q.    Let's interject, what is your educational

16   background again?

17        A.    I have an M.B.A.

18        Q.    From?

19        A.    Harvard.

20        Q.    That's what I thought.  Did you ever have

21   Professor Hawkins?

22        A.    No.

23        Q.    Roy Shapiro?

24        A.    I know Shapiro, but I never had him.

```
1              Q.    He's a childhood friend.
2                    This case, you know, is about an alleged
3       tie between the flake products and the nodular
4       products, you understand that, correct?
5              A.    Yes.
6                    MR. DAVIS:  Objection.  You can respond.
7              Q.    And the flake products we're talking about
8       are C255 and C275, correct?
9              A.    Yes.
10             Q.    So isn't it true that if AVX had another
11      source for the flake, the negotiating positions of the
12      parties in the fall of 2000 would have been a little
13      different?
14                   MR. DAVIS:  Objection.  I caution you not
15      to speculate.
16             A.    It would be hard for me to say
17      definitively whether the negotiating positions of
18      parties would be different.
19             Q.    It may not be definitively, but you are an
20      M.B.A. from Harvard, if there's a second source for a
21      material, don't you think that alters the landscape
22      for the negotiations, sir?
23                   MR. DAVIS:  Objection.  You may respond.
24             A.    No, it does not.
```

1      Q.   Showa Cabot was entitled, was it not,

2   access to the flake technology under its agreements

3   with Cabot, correct?

4           MR. DAVIS:  Objection.  It calls for a

5   legal opinion.

6           MR. GOREN:  It calls for his

7   understanding.

8           MR. DAVIS:  But he's not here to testify

9   and he hasn't been produced to testify on Cabot's

10  behalf with respect to any agreements between Cabot

11  and Showa Denko.

12          MR. GOREN:  He's here to testify, by your

13  limitation, to the reasons underlying the request by

14  Cabot that AVX enter into this five-year agreement.

15  This is one of the reasons that I want to probe.

16          MR. DAVIS:  You are trying to make it one

17  of the reasons, Richard.  It's not one of the reasons,

18  and if you want to ask him whether that had anything

19  to do with Cabot's position back in that time frame, I

20  am sure he would be happy to tell you.

21          MR. GOREN:  I would like to go through it

22  my way, and I would like an answer to my question.

23      Q.   Isn't it true that Cabot understood in the

24  year 2000, that Showa Cabot had a right to the flake

1    technology?

2             MR. DAVIS:  Objection.  Caution you not to

3    speculate.

4        A.    Could I ask you to phrase the questions in

5    the affirmative and not the negative?  It's very

6    difficult for me in my mind to translate what you are

7    saying, so could I ask you to restate or rephrase that

8    question?

9        Q.    Sure.  Isn't it true that Cabot understood

10   that Showa Cabot had a right to the flake technology

11   as of the year 2000?

12            MR. DAVIS:  Objection.  I caution you not

13   to speculate.  If you know.

14       A.    I have not read the agreement, and I don't

15   know what the legal opinion is of that agreement, so

16   it would be very difficult for me to answer.

17       Q.    Did you review Mr. Fisher's deposition?

18       A.    I did not.

19       Q.    Cabot understood in the year 2000 that

20   Showa Cabot had access to its technology, correct, it

21   had a technology-exchange agreement?

22            MR. DAVIS:  Objection.  Caution you not to

23   speculate.

24       Q.    Correct?

1          MR. DAVIS:  Same objection.  Same

2     instruction.

3          A.  I am not familiar with the agreement.  I

4     guess the agreement that you refer to, which I guess

5     would be the initial agreement between Showa Cabot and

6     Cabot?

7          Q.  The operative agreement.

8          A.  This one?

9          Q.  Yes.

10         A.  Exhibit 2?

11         Q.  Yes.

12         A.  So I have not read nor am I familiar with

13    the details of this agreement.

14         Q.  But you are here to testify about the

15    reasons in the year 2000 underlying Cabot's request

16    that AVX enter into this five-year agreement, isn't

17    that true?

18         A.  Yes, I am.

19         Q.  Isn't it true, sir, that one of the

20    reasons is that --

21         MR. GOREN:  Excuse me.

22         (Short break taken.)

23         Q.  Now, isn't it true that in 2000, Cabot

24    knew or understood that Showa Cabot was selling

1    nodular products at a lower price than Cabot?

2            MR. DAVIS:  Objection.  You may respond.

3        A.    I do not know if that would be true or

4    whether we knew that.

5        Q.    In the year 2000, Cabot adopted a new

6    strategy for dealing with buyers, correct, called it

7    the new paradigm or something like that?  Maybe I

8    should rephrase.

9            Prior to the fall of 2000, Cabot did not

10   have any -- prior to 2000, Cabot did not have any

11   long-term agreements with Kemet, Vishay or AVX?

12       A.    That is true.

13       Q.    And in the year 2000, Cabot determined

14   that it wanted to secure long-term contracts from its

15   major purchasers, correct?

16           MR. DAVIS:  Objection.  Are you saying

17   that is the first time that they had that intention,

18   or they had that intention in 2000?

19           MR. GOREN:  They had that intention.

20       A.    Yes, that is true.

21       Q.    And Cabot had a strategy that it

22   implemented to try to get these major purchasers to

23   enter into long-term supply contracts, a game plan,

24   correct?

1          MR. DAVIS:  Objection.  You can respond.

2     A.    Yes.

3     Q.    And isn't it true that Cabot limited Showa

4  Cabot's supply of KTaF in 2000 as part of that

5  strategy?

6          MR. DAVIS:  Objection.  You can respond.

7     A.    Haven't you asked this question already,

8  or are you asking this in connection with a specific

9  strategy?

10    Q.    The latter, a specific strategy, wasn't

11 that part of --

12    A.    I don't believe that's true.

13    Q.    What is your basis for saying you don't

14 believe that's true?

15         MR. DAVIS:  Objection.  You can respond.

16    A.    It's the same answer that I gave before,

17 which is that tantalum itself was becoming short in

18 the industry, demand was far outstripping supply,

19 customers were asking for more and more product, and

20 Showa Cabot was getting its share.  We had to restrict

21 output to customers.  They may have had to do that.

22 Our competitors may have had to do that.

23    Q.    Isn't it true that in or about the year

24 2000, Cabot took steps to prevent or to limit Showa

1    Cabot's purchase of KTaF from China?

2              MR. DAVIS:  Objection.  Asked and

3    answered.  You may respond.

4         A.   I am not aware of that.

5         Q.   So it's hard to ask the follow-up

6    question, wasn't dealings, its dealings with Showa

7    Cabot part of Cabot's strategy for getting AVX to

8    enter into a long-term fixed-price supply agreement?

9              MR. DAVIS:  Objection.  You can respond.

10        A.   I don't believe so.

11        Q.   Why don't we interject at this point and

12   have you tell us your version of the reasons

13   underlying Cabot's request that AVX enter into a

14   long-term supply agreement?

15        A.   Okay.

16             MR. DAVIS:  Objection.  You can respond.

17        Q.   This is your chance now, so you tell us

18   the whole shebang.

19        A.   So I guess what happened in 2000 with

20   regards to the development of these long-term

21   contracts with all of Cabot's customers at the time

22   really started earlier than 2000, it started in mid

23   1990s, when Cabot very carefully went through and

24   identified that there would likely be at some point in

1    the future a shortage of tantalum, and that capital

2    was needed, and there needed to be an incentive to go

3    and develop more mines and more raw material, and

4    Cabot did this, probably in the mid 1990s, 1995 or

5    1996, we took this to our customers, including AVX

6    then, we asked our customers if they would be

7    interested in partnering with us and helping to try to

8    bring some stability to what has been sort of a rocky

9    industry, and the customers said they weren't terribly

10   interested.

11            Cabot went out and secured raw material

12   supply for itself, invested its own capital in a very

13   significant mining operation in Australia, and in

14   2000, when, as I said earlier, demand was clearly

15   outstripping the supply for tantalum, Cabot was in the

16   position to go back to its customers and say, you

17   know, we have been to you before, in order for us to

18   continue to be able to do this and to be able to meet

19   the needs of the future, we need to have some

20   stability, we need to have long-term off-take

21   agreements so that we can continue to invest in the

22   industry, and that is what the whole purpose was of

23   the 2000 long-term supply agreements.

24            Q.   Is that Cabot's complete answer and

1    statement of the reasons in this period for

2    considering and then requesting AVX to enter into a

3    long-term five-year supply agreement?

4              MR. DAVIS:  Objection.  Are you saying --

5         Q.    Is there anything else you want to add?

6              MR. DAVIS:  You can respond.

7         A.    That is all I can think of right now.  I

8    believe that's my complete answer.

9         Q.    Let's go back to Showa.  Mr. Odle in the

10   year 2000 and until when was the manager of the

11   tantalum business?

12        A.    I believe it was 2003.

13        Q.    And did you succeed him?

14        A.    No, there was one person between Tom and

15   myself.

16        Q.    But prior to that time, Mr. Odle ran the

17   business and reported to Mr. Burns, correct?

18        A.    Yes.

19        Q.    And do you remember I asked you whether

20   Showa Cabot had a right to the flake technology, do

21   you remember I asked you that question?

22        A.    Yes.

23              (Marked Exhibit 35; Odle Deposition

24              Excerpt.)

1    Q.   Now, I represent to you, Mr. Cordeiro,

2   that this is just an excerpt from Mr. Odle's

3   deposition in July of 2003, and do you see, sir, that

4   Mr. Odle says that under their joint venture

5   agreement, and you have to turn to the next page, they

6   had a right to the flake powder patent?

7              MR. DAVIS:  Objection.  You may respond.

8         A.   What is your question?

9         Q.   I am asking you whether you see that in

10   July of 2003, Mr. Odle testified that Showa Cabot had

11   a right to the flake powder patent technology under

12   the technology-exchange agreement, which is deposition

13   Exhibit 2, that is what he said?

14              MR. DAVIS:  Objection.  I think it is

15   improper to ask this witness to comment on the

16   testimony.

17              MR. GOREN:  I am not asking him to

18   comment.

19         Q.   Mr. Odle was the manager of this business,

20   and in 2003 he testified, did he not, that under the

21   technology-exchange agreement, Showa Cabot had a right

22   to the flake technology?  That is all, I am just

23   pointing that out to you, that is what he said.

24              MR. DAVIS:  Objection.

1    A.    Okay.  I am reading what you have handed

2   me, which is a short excerpt of what he said, and that

3   is, I guess what you are saying.

4        Q.    Does that refresh your recollection, sir,

5   that Cabot understood in the year 2000 that Showa

6   Cabot had a right under the technology-exchange

7   agreement with Showa Cabot to the flake technology?

8            MR. DAVIS:  Objection.  You can respond.

9        A.    I can't comment on what Tom thought or

10  understood, but you know, I can only say that this is

11  what the transcript said.

12       Q.    He was the manager of the business,

13  correct?

14       A.    Yes, he was.

15           MR. GOREN:  Mark, please.

16           (Marked Exhibit 36; Fisher Deposition

17           Excerpt.)

18       Q.    Mr. Cordeiro, I put in front of you

19  Exhibit 36, which is an excerpt from Mr. Fisher's

20  July 2003 deposition.  Mr. Fisher was -- what was his

21  role at Cabot, Michael Fisher?

22       A.    I think Michael Fisher had a commercial

23  role, but I don't recall exactly what his title was.

24  I think he was a commercial director of sales and

1    marketing.  I don't know if he was marketing sales.

2        Q.    But do you see where Mr. Fisher testified

3    in 2003 that prior to Cabot purchasing the balance of

4    Showa Cabot, it didn't make flake products, that is

5    what he testified, correct?

6            MR. DAVIS:  Objection.  You are asking if

7        that is what this document says.  You may respond.

8        A.    And your question was did he --

9        Q.    You are here to speak for Cabot?

10       A.    Yes.

11       Q.    And in 2003, Michael Fisher testified that

12   Showa Cabot, while it had a right to the flake

13   technology, in fact didn't -- actually, he didn't

14   testify to that.

15           Mr. Fisher testified that Showa Cabot

16   didn't make, obviously didn't sell any flake products,

17   that is what he said, correct?

18           MR. DAVIS:  Objection.

19       A.    According to his testimony, yes.

20       Q.    And that is what Cabot understood, did it

21   not, Mr. Cordeiro, that while Showa Cabot had a right

22   to the flake technology, Cabot didn't allow it access

23   to it, it didn't actually provide it?

24           MR. DAVIS:  Objection.  Caution you not to

1    speculate.

2         A.    I think you just drew a conclusion there

3    between those two comments that I can't necessarily

4    agree to.

5         Q.    Well, Cabot understood that Showa Cabot

6    didn't make flake, correct?

7         A.    Yes.

8         Q.    And Cabot also understood that Showa Cabot

9    had a right to produce flake, correct?

10             MR. DAVIS:  Objection.  Asked and

11    answered.  Calls for a legal opinion.

12         A.    According to Tom Odle's testimony, yes.

13         Q.    Now, you testified that one of the reasons

14    underlying Cabot's request for a long-term supply

15    agreement was that demand in 2000 was in excess of

16    supply, correct?

17         A.    Yes.

18         Q.    And we're talking about, you are talking

19    about demand for tantalum capacitors, demand for

20    tantalum, exactly what demand, or both?

21         A.    Demand for tantalum capacitors and

22    subsequently demand for tantalum powder.

23         Q.    From which they were made?

24         A.    From which they were made, yes.

1          Q.    And Cabot made periodic assessments of

2     those markets and made projections based on its

3     understanding of those markets and demands, correct?

4          A.    Yes.

5               MR. DAVIS:  Objection.

6          Q.    And Mr. Odle was, one of his duties was to

7     undertake market analyses of the tantalum capacitor

8     market, correct?

9          A.    Yes.

10         Q.    And Mr. Odle at the time was director of

11    marketing and sales, does that sound correct?

12         A.    What time is this?

13         Q.    In the year 2000.

14         A.    No, he was the general manager.

15         Q.    Didn't he also serve as director of

16    marketing and sales at the same time?

17         A.    I don't think so.

18         Q.    But as general manager, he did oversee

19    analyses of the tantalum capacitor market, correct?

20         A.    That's more accurate.

21               MR. DAVIS:  Objection.  Please pause.

22         Q.    In making its plans, Cabot relied on these

23    projections of tantalum capacitor demand, correct?

24               MR. DAVIS:  Objection.

```
 1              MR. DAVIS:  Objection.

 2         A.   Yes.

 3         Q.   The demand for tantalum capacitors,

 4    correct?

 5         A.   Yes.

 6         Q.   Why do you look at Mr. Davis?

 7         A.   Because he told me to slow down, so I am

 8    just taking a pause, if that's okay.

 9         Q.   Yes, it is.

10              MR. DAVIS:  Good man.

11         A.   I too would be happy to wrap this up.

12         Q.   And isn't it true that Cabot told AVX in

13    the fall of 2000 that it, namely, Cabot continued to

14    project continued strong growth in the tantalum

15    capacitor market?

16         A.   I believe that is true.

17         Q.   And isn't it true that Cabot knew or had

18    reason to believe that that was correct?

19              MR. DAVIS:  Objection.  You can respond.

20         A.   I do not have any information or

21    understanding for that.

22         Q.   And didn't you look at an e-mail yesterday

23    about Mr. Odle?

24         A.   Can you show me this e-mail?
```

1        Q.    Sure.  Exhibit 16, please.

2        A.    Okay.

3        Q.    You see that this is a February 24, 2000

4    e-mail from Mr. Odle to Mr. Young and copied to a

5    whole bunch of folks at Cabot?

6        A.    Yes.

7        Q.    And in February of 2000, Cabot, or at

8    least the manager who was in charge of analyses of

9    market demand --

10       A.    I am sorry, say that again.  He was not in

11   charge of that.

12       Q.    He oversaw is what you said?

13             Mr. Davis:  Objection.  You may respond.

14       A.    Yes, that is correct.

15       Q.    And Mr. Odle in February, he said we all

16   know that an electronics industry downturn is coming,

17   it may not come this year or even next year, but it

18   has come three times in the last decade, I think we

19   all know the cycle?

20       A.    Yes.

21       Q.    So Cabot knew as best it could, its

22   analyses of the tantalum capacitor market was that the

23   bubble would burst, correct?

24             MR. DAVIS:  Objection.  You can respond.

1          MR. DAVIS:  Objection.  If you know.

2      A.   That's correct.

3      Q.   And it was the capital needed for the

4  expansion for those option amounts that you're

5  referencing as part of this strategy, is that correct?

6          MR. DAVIS:  Objection.  You can respond.

7      A.   That would be some of the capital that

8  Cabot believed it would need to invest in the future,

9  yes.

10     Q.   So if the demand for tantalum capacitors

11 did not continue to grow as it had from '99 to 2000,

12 then Cabot would not need money for expansion for

13 mining, would it?

14         MR. DAVIS:  Objection.  I caution you not

15 to speculate.  You can respond.

16     A.   I do not know specifically that answer.

17     Q.   But predicated --

18     A.   Can you say the question again?

19         (Reporter read the record as requested.)

20     A.   I cannot say for sure.

21     Q.   But it's reasonable to assume that,

22 correct?

23         MR. DAVIS:  Objection.  I caution you not

24 to speculate.

1          Q.    Let's strike that.

2                Approximately how much ore did Cabot

3     purchase in the year 1999, approximately?

4          A.    I do not know.

5          Q.    More than a million tons?

6          A.    No.  This is done in pounds, not tons.

7          Q.    It is done in pounds?

8          A.    Yeah.

9          Q.    I may have this mixed up between millions

10    of pounds and tons, but isn't it true that the

11    capacity, annual capacity of the Gwalia mines in this

12    period of time was about, I thought it was two million

13    tons.

14         A.    I do not remember because expansion took

15    place over the years, so I just don't know in 1999 how

16    much we bought and how much Gwalia had.

17         Q.    In or about 1999 or 2000, what percentage

18    of Gwalia's annual capacity did Cabot take up?

19               MR. DAVIS:  Objection.

20         A.    I would only know a very rough number.  I

21    could be off by 50 percent.

22         Q.    What is it?

23         A.    So I think it's in the order of

24    75 percent, but it could be significantly lower.

1      MR. DAVIS:  Objection.  You can respond.

2  Caution you not to speculate.

3      A.   I can't say that for sure.

4      Q.   Was what you have described as the growth

5  and demand for tantalum capacitors a factor that Cabot

6  considered when it asked AVX to enter into this

7  agreement?  I think you said yes --

8      MR. DAVIS:  Objection.  Asked and

9  answered, but you may respond.

10      A.   Yes.

11      MR. GOREN:  Mark, please.

12      (Marked Exhibit 37; E-Mail.)

13      A.   Okay.

14      Q.   Isn't it true, Mr. Cordeiro, that a key

15  element of Cabot's position in its request that AVX

16  enter into a long-term supply agreement was that it

17  knew the flake was highly valuable and needed by AVX?

18      MR. DAVIS:  Objection.  Asked and

19  answered.  You can respond.

20      A.   Are you referencing this exhibit or are

21  you asking an open-ended question again, because I

22  think I have been asked that question a number of

23  times, so can you specifically --

24      Q.   In here, Mr. Tyler references that Mr.

1    Burns wants to, quote, hear the flake value position

2    statement, do you see that?

3         A.    I see that.

4         Q.    Isn't that a reference to the value --

5         A.    I don't know --

6         Q.    Cabot knew that it had -- that it was the

7    sole source of flake to AVX?

8              MR. DAVIS:  Objection.  Asked and answered

9    several times over now.

10         Q.    Correct?

11         A.    So your question is what?

12              MR. GOREN:  Read it, please.

13              (Reporter read the record as requested.)

14         A.    That is what you said, Cabot knew that it

15    was the sole source of flake?

16         Q.    Yes.

17              MR. DAVIS:  Objection.  Asked and

18    answered.  You can respond.

19         A.    I believe that is true.

20         Q.    And that as the sole source, that was a

21    key bargaining chip in its request that AVX enter into

22    a five-year long-term agreement, correct?

23              MR. DAVIS:  Objection.  Vague.  You can

24    respond.

1      A.    I do not believe that is true.

2      Q.    Where else was AVX going to get flake?

3            MR. DAVIS:  Objection.  You can respond.

4      A.    As I think I have said before, flake was

5    one of many products, and the main issue taking place

6    at the time was a shortage of tantalum, not

7    necessarily of a specific product, and that is why

8    these customers were willing and eager to enter into

9    long-term contracts.

10     Q.    My question was where else was AVX going

11   to get flake?

12           MR. DAVIS:  Objection.  I caution you not

13   to speculate.  You can respond.

14     Q.    You know, you don't have to speculate?

15           MR. DAVIS:  Please don't speculate.  If

16   you know.

17     A.    I don't know where else they might have

18   sought to go get flake.

19           MR. GOREN:  Mark, please.

20           (Marked Exhibit 38; E-Mail.)

21     Q.    Mr. Cordeiro, Exhibit 38.

22           MR. DAVIS:  Is there a question?

23     Q.    Do you see -- first, does this refresh

24   your memory that the ore price in 2000 was about $70 a

1    pound?

2                   MR. DAVIS:  Objection.  You can respond.

3           A.    I don't know.

4           Q.    That is what Mr. Odle said anyway, right?

5                   MR. DAVIS:  Objection.  That is not quite

6    accurate.

7           A.    It's one data point.  You know, it is

8    filled with, you know, next year may exceed $70 per

9    pound.  I don't know what he means, does he mean the

10   average pound, I don't know what he means.

11          Q.    Does this refresh your memory that in the

12   year 2000, in early 2000 the price of ore was around

13   $70?

14                  MR. DAVIS:  Objection.  You can respond.

15          A.    I do not know that for sure.

16          Q.    Cabot in 2000 wanted to sell more of the

17   C606, correct?

18          A.    Well, according to this e-mail from Tom,

19   it appears that could be true, yes, but I don't know

20   relative to what, more of relative to what, I don't

21   know.

22          Q.    And C606 had higher margins than some of

23   the other powders, correct?

24          A.    That is correct.

1    tantalum capacitors would grow, it would make sense

2    for Cabot to lock AVX into buying fixed amounts of

3    nodular for five years, correct?

4              MR. DAVIS:  Objection.  I caution you not

5    to speculate.

6              THE WITNESS:  Can you read the question

7    back?

8              (Reporter read the record as requested.)

9         A.   Well, I am trying to put that question

10   into -- I am not sure I can just answer yes or no to

11   the question because it requires me to, I think make

12   some assumptions about, you know, so many things.

13        Q.   Let me try this, Mr. Cordeiro --

14        A.   You are trying to put two things together,

15   the economic value of a long-term contract and whether

16   or not we thought that the market was going to go up

17   or down.

18        Q.   Let me try this, the pricing for the five

19   years was fixed, correct?

20        A.   Correct.

21        Q.   It was around, subject to adjustment, $500

22   a pound?

23        A.   For the powder.

24        Q.   550 for the wire actually, right?

1          A.    Uh-huh.   There was KTaF.

2          Q.    KTaF at 185?

3          A.    Correct.

4          Q.    And these were prices much higher than,

5     let's say, 1998 and 1999, correct?

6          A.    That's correct.

7          Q.    And unless the market continued to grow,

8     the demand for tantalum capacitors continued to grow

9     as it had in 2000 -- Strike that.

10              If the market didn't continue to grow at

11    the rate it had from '99 to 2000, Cabot would have had

12    an ample supply to satisfy the market, correct?

13              MR. DAVIS:  Objection.

14         A.    I can't speculate on that.

15         Q.    Cabot had a contract with Sons of Gwalia,

16    among other sources, that would satisfy the tantalum

17    capacitor market at the 1999 rate, is that fair?

18              MR. DAVIS:  Objection.

19         A.    I do not know.

20         Q.    You said, I thought that the request for a

21    five-year fixed contract was predicated on the need to

22    expand the supply of tantalum ore, and that required

23    funds and a commitment, correct?

24              MR. DAVIS:  Objection.

1        A.   I think what I said was it was required to

2 assure supply going into the future, and I was pretty

3 clear not to make a comment about whether it was

4 one year, two years, five years or ten years, and I

5 think this gets back to why Cabot in 1995 came to our

6 customers to try to partner with them, because we have

7 to do things long in advance of when the electronics

8 industry would like, and so for us to make the

9 commitment for us to be able to be there as a supplier

10 with the assuredness of supply required us to get into

11 some type of agreement with our customers that they

12 would take the material.

13        Q.   The customers did not do that, correct?

14        A.   In the mid 1990s, they did not do that.

15        Q.   And in the mid 1990s, Cabot entered into a

16 long-term supply agreement with, among others, Sons of

17 Gwalia, correct?

18        A.   With Sons of Gwalia.

19        Q.   And that contract provided enough material

20 for Cabot to satisfy the tantalum market right

21 through 1999, correct?

22        MR. DAVIS:  Objection.  Asked and

23 answered.  You can respond.

24        MR. GOREN:  It wasn't asked and answered.

1          MR. DAVIS:  In fact, it was.  We can go

2    back through the transcript.

3          MR. GOREN:  And that is not a proper

4    objection, asked and answered.

5          MR. DAVIS:  It absolutely is.  You are not

6    entitled to ask the witness the same question over and

7    over again until you get the answer that you like, but

8    my objection is stated.  Mr. Cordeiro, you may respond

9    again, if you wish.

10         A.    The question was did we enter into an

11   agreement with the Sons of Gwalia in the mid 1990s to

12   have sufficient ore through 1999, was that your

13   question?

14         Q.    No, but why don't you answer that?

15         A.    I would prefer to answer your question.

16              THE WITNESS:  Please read it back.

17              (Reporter read the record as requested.)

18         A.    That contract provided us enough material

19   to supply at least as much as we were able to supply,

20   but as I mentioned to you already, tantalum was

21   becoming short in 1999, so I don't know if it supplied

22   the whole market or not, and let's not forget that we

23   are still a small portion of the tantalum market.

24   We're not, it's not like we're the only player.

1    Q.   Sir, between you and Showa Cabot in this

2    period, you were more than half the marketplace,

3    correct?

4              MR. DAVIS:  Objection.

5    A.   I don't think that's correct.

6    Q.   You don't think that Cabot had

7    approximately 20 to 25 percent of the market in this

8    period, and that Showa had 25 to 30 percent in this

9    period?

10             MR. DAVIS:  Objection.

11   A.   It's possible those numbers are close, but

12   it's not more than half, that is for sure.

13   Q.   About half?

14   A.   That's not what you said.

15   Q.   Let's take it about half, and I will even

16   apologize.  About half of the market?

17   A.   Possibly.

18   Q.   Cabot had enough supply assured to it

19   under its existing agreements with Sons of Gwalia in

20   the year 2000 to satisfy demand if it stayed at the

21   1999 level, correct?

22             MR. DAVIS:  Objection.  Asked and

23   answered.

24             MR. GOREN:  I don't think it has been.

1    A.    I don't know, I don't know.

2    Q.    In this time frame of 2000, who were

3    Cabot's principal competitors other than Showa Cabot?

4    A.    For powder, HC Starck and Ningxia.

5    Q.    The latter for China and Starck out of

6    Germany and other places, correct?

7    A.    Correct.

8    Q.    Did either of Starck or Ningxia enter into

9    long-term fixed agreements with its customers?

10    A.    I do not know.

11         MR. DAVIS:  Can we take a break for a

12    minute?

13         MR. GOREN:  I am going to ask the witness

14    to look at Exhibit 18.

15         (Short break taken.)

16    Q.    Mr. Cordeiro, I have put in front of you

17    what has been marked as deposition Exhibit 18, and it

18    is page thirty from the Cabot 2006 10-K.

19    A.    Okay.

20    Q.    And about 60 percent down the second

21    paragraph there's a statement, since 2004 sales in the

22    Supermetals business have been transitioning from

23    principally those under fixed-price fixed-volume

24    contracts to market-based arrangements, do you see

1    that?

2         A.    Yes.

3         Q.    And pardon me, I forget the timing, at the

4    time of this 10-K, I think it was December 2006, were

5    you in charge of the Supermetals business at this

6    point?

7         A.    Yes.

8         Q.    You testified earlier that when you

9    requested AVX and the other principal players to enter

10   into the long-term fixed-price fixed-volume contracts,

11   it was to obtain stability in the marketplace, was

12   your phrase?

13        A.    Yes.  Assuredness of supply is what I

14   think I said, and stability, and create stability in

15   the marketplace.

16        Q.    For what reason did Cabot transition from

17   fixed-price fixed-volume contracts to market-based

18   arrangements?

19        A.    Because the contracts were expiring.

20        Q.    And the customers wouldn't renew?

21             MR. DAVIS:  Objection.  You can answer.

22        A.    I haven't actually thought of asking them.

23        Q.    Mr. Young said almost verbatim the exact

24   thing, because he knew what the answer would be.  Is

1    that what you would say too?

2            MR. DAVIS:  Objection.

3        Q.   You wouldn't ask because you knew what the

4    answer would be?

5            MR. DAVIS:  Objection.

6        A.   Yeah, I don't think that they would be

7    interested again.

8        Q.   In 2006, let's go back a second, tell us,

9    please, your understanding of the number of tantalum

10   capacitors -- no, let's leave it in your universe, the

11   tantalum products in pounds that were sold in 2000,

12   2001 and in each of the years worldwide?

13           MR. DAVIS:  By who?

14       Q.   Worldwide, the whole marketplace?

15       A.   You want me to recite to you what I think

16   the market numbers of sold powder was in those years?

17       Q.   Yes.

18       A.   I don't have that information.

19       Q.   What about Cabot's sales?

20           MR. DAVIS:  Caution you not to speculate.

21       A.   I don't think I have -- I couldn't give

22   you a good answer off the top of my head.

23       Q.   Did in fact the --

24           MR. GOREN:  By the way --

1                MR. DAVIS:  Thank you.  I appreciate that.

2                MR. GOREN:  My personal stash.

3                THE WITNESS:  They're cheaper if you buy

4       bigger bottles.

5                MR. GOREN:  Personal experience.

6           Q.   Did the market for tantalum capacitors

7       continue to grow after 2000?

8           A.   To be clear, it's my understanding there

9       was a decline in 2001, and then at some point

10      thereafter it had started to grow again quite

11      significantly.

12          Q.   2002 --

13          A.   I don't know exactly when, but there was

14      essentially a dip and then started to grow again.

15          Q.   As of the end of the AVX agreement, which

16      was December 31, 2005, is that correct?

17          A.   I think that is correct.

18          Q.   As of that year, 2005, had demand gone

19      back to the level it was in 2000?

20               MR. DAVIS:  Objection.  You can respond.

21          A.   I don't know for sure whether the demand

22      for tantalum capacitors was at, above or below 2000.

23          Q.   Was it close, do you think?

24               MR. DAVIS:  Objection.