UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION and AVX LIMITED, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CABOT CORPORATION, )<br><br>Defendant. ) | CIVIL ACTION NO. 04-10467-RGS |

## DEFENDANT CABOT CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Cabot Corporation ("Cabot") respectfully submits this Memorandum in Support of its Motion for Summary Judgment on the Complaint and Jury Demand of plaintiffs AVX Corporation and AVX Limited (collectively, "AVX"). This case is one of a series of actions commenced by AVX against Cabot arising out a written, multi-year Supply Agreement that the parties entered into in January 2001 (the "2001 Supply Agreement"). In the 2001 Supply Agreement, AVX committed to purchase certain minimum quantities of various tantalum products -- including "flake" and "non-flake" or "nodular" tantalum powders -- from Cabot over a five-year period. The only claim asserted by AVX in its Complaint in this case is that flake tantalum powder and non-flake tantalum powder purportedly constitute "separate products," and that, in negotiating the 2001 Supply Agreement, Cabot allegedly tied or "conditioned plaintiff's purchase of flake [tantalum] powders on its purchase of non-flake

[tantalum] powders" in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 14. Complaint, ¶¶ 1, 33-41.  No other wrongdoing or misconduct by Cabot is alleged.

Discovery between the parties has established, however, that AVX's tying claim against Cabot is fatally flawed both factually and legally.  The undisputed evidence, obtained primarily from AVX's own witnesses and contemporaneous documents, establishes that:

(1)     Contrary to the allegations of its Complaint, AVX's claim in this case *is not* that Cabot conditioned AVX's purchases of Cabot's flake tantalum powder to its purchase of Cabot's non-flake or nodular powder.  When questioned at length on this topic at their depositions, AVX's designated corporate representatives made no such assertion.  Rather, according to the sworn testimony of AVX's designated representatives, AVX's true claim in this case is that Cabot allegedly "coerced" AVX into signing a binding, multi-year contract for the purchase of *any* tantalum products, whether flake or non-flake, in years extending beyond the parties' pre-existing "letters of intent" (*i.e.*, effectively beyond 2001).  As is clear from controlling authority and as admitted by AVX's own economic expert, however, such conduct on Cabot's part, even if true (which it is not), simply does not constitute the tying of "separate" or "distinct" products in violation of Section 1 of the Sherman Act (*see* Section II, *infra*);

(2)     AVX's claim that it was improperly coerced by Cabot into signing a multi-year contract for the sale of tantalum products in years extending beyond the parties' pre-existing letters of intent also is barred by the doctrine of claim preclusion or *res judicata* because it is *exactly the same claim* that AVX previously litigated against Cabot, and lost, in the Massachusetts state courts (*see* Cabot Corp. v.

AVX Corp., 448 Mass. 629 (2007) ("*Cabot/AVX I*"); *see also* Section III, *infra*);

(3)     Regardless of the true nature of its claim in this action, AVX cannot prove that Cabot in fact tied or conditioned AVX's purchase of flake tantalum powder to its purchase of non-flake or nodular powder. To the contrary, AVX's President and Chief Executive Officer, who was directly involved in the negotiation of the Supply Agreement in the summer and fall of 2000, has testified under oath that AVX actually desired to purchase *more*, not less, nodular powder from Cabot at the time the parties entered into that Agreement, and AVX's desire for more nodular powder is confirmed in the Agreement itself (*see* Section IV, *infra*); and

(4)     Regardless of the true nature of its claim in this action, AVX cannot prove that it suffered actual injury as a result of Cabot's purported violation of federal antitrust laws. In fact, AVX has produced no evidence that it suffered *any* harm whatsoever on account of Cabot's alleged misconduct (*see* Section V, *infra*).

For the foregoing reasons, each of which is discussed more fully below, Cabot's Motion for Summary Judgment should be allowed.

## Statement Of Undisputed Material Facts

Cabot incorporates by reference its accompanying Statement of Material Facts, filed pursuant to Fed. R. Civ. P. 56 and L.R. 56.1.

## Argument

I.     THE RELEVANT STANDARD.

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Borschow

Hosp. and Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 14 (1st Cir. 1996)

(affirming district court's granting of summary judgment for defendant in tying action).

Though the facts are to be viewed in the light most favorable to the nonmoving party, in

antitrust cases, the nonmoving party must present specific facts to show there is a genuine issue

for trial and "may not rest on mere allegations" to defeat a properly-supported motion for

summary judgment. *See, e.g.,* Borschow, 96 F.3d at 14.

Where the nonmoving party fails to establish an essential element of its case, "there can

be no genuine issue as to any material fact, since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Subsolutions, Inc. v. Doctor's Assocs., Inc., 436 F. Supp. 2d 348, 351 (D. Conn. 2006)

(granting summary judgment for defendant in tying action); *see also* Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986) (summary judgment required "against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case").

As demonstrated below, there is no genuine issue of material fact in this action.  AVX

cannot prove essential elements of its tying claim as a matter of law.  Accordingly, Cabot's

Motion for Summary Judgment should be allowed.

II.    CABOT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE ALLOWED
       BECAUSE AVX'S ACTUAL CLAIM THAT CABOT COERCED AVX INTO
       SIGNING A MULTI-YEAR CONTRACT THAT REQUIRED AVX TO PURCHASE
       *ANY* TANTALUM PRODUCTS, WHETHER FLAKE OR NON-FLAKE, IN YEARS
       BEYOND 2001 DOES NOT CONSTITUTE AN UNLAWFUL TYING
       ARRANGEMENT UNDER SECTION 1 OF THE SHERMAN ACT.

The only claim asserted in AVX's Complaint in this action is that Cabot allegedly tied

or "conditioned AVX's purchase of flake [tantalum] powders on its purchase of non-flake

[tantalum] powders" in violation of Section 1 of the Sherman Act.  Complaint, ¶¶ 33-41.  In

order to establish a *per se* tying violation, a plaintiff must satisfy the following four elements: (1) the tying and tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product. Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1178-1179 (1st Cir. 1994). As stated by the United States Supreme Court in Jefferson Parish Hospital Dist. No. 2 v. Hyde:

> the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

466 U.S. 2, 12 (1984).

If a plaintiff cannot prove that the defendant possessed sufficient economic power in the market for the tying product to establish a *per se* tying violation, he or she still can prevail under a "rule of reason" analysis by demonstrating that the defendant's conduct constitutes an "unreasonable restraint on competition in the relevant market." Jefferson Parish, 466 U.S. at 18. All other elements of proof under both a *per se* and a "rule of reason" analysis remain the same. *See, e.g.,* State of Illinois v. Panhandle Eastern Pipe Line Co., 730 F. Supp. 826, 929 (C.D. Ill. 1990) (listing elements of proof for a tying violation applying the "rule of reason").

Discovery by Cabot, however, has established that AVX's actual claim in this action is unrelated to any unlawful tying arrangement within the meaning of Section 1 of the Sherman Act. More specifically, on December 5, 2007, AVX produced Peter Collis, Vice President of

AVX's worldwide tantalum operations, to testify on AVX's behalf under Fed. R. Civ. P. 30(b)(6) with respect to, *inter alia*, the particular "products or terms that AVX alleges it was forced to accept on account of 'Cabot's coercive strategies' as referenced in Paragraph 30 of [its] Complaint." Defendant Cabot Corporation's State of Material Facts In Support of its Motion for Summary Judgment, dated March 31, 2008 ("SOF"), ¶ 30. In the course of his deposition, Mr. Collis was shown a copy of the 2001 Supply Agreement, including "Appendix A," which specifies the minimum quantities of flake and non-flake tantalum products that AVX committed to purchase in each year of the five-year term of the Agreement (*i.e.*, 2001-2005). When asked to identify the particular tantalum products on Appendix A that AVX claims it was "coerced" by Cabot into buying, Mr. Collis testified *not* that Cabot had tied AVX's purchases of flake tantalum powder to its purchases of non-flake or nodular tantalum powder, but rather that Cabot purportedly had coerced AVX into purchasing *both* flake *and* non-flake powders in years beyond 2001. AVX, speaking through Mr. Collis, testified:

> Q.    Which of the products that are listed [in Appendix A] Mr. Collis, are the products that AVX claims in this litigation it did not wish to purchase from Cabot, but was forced to do so?
>
> MR. GOREN: Objection. You may answer.
>
> THE WITNESS: The - the basic premise was we were coerced into a five year agreement which we didn't want to get into.
>
> **********
>
> Q.    So I want to understand this correctly. Are you saying that AVX did not wish to purchase, as of the time that it entered into the Supply Agreement with Cabot, it did not wish to purchase any nodular powder from Cabot?
>
> A.    We didn't wish to purchase – enter into an agreement to purchase materials for five years.

\*\*\*\*\*\*\*\*\*\*\*

Q.    Putting aside the five year length of the contract, were there any nodular products that are listed on Appendix A to ... the Supply Agreement, that AVX actually wished from Cabot as of the time that this Supply Agreement was actually signed?

MR. GOREN:  Independent of the other terms of the contract.

A.    Yes.  Yes.

Q.    Which ones did AVX actually wish to purchase?

A.    We wished to purchase the ones that we had in the Letter of Intent at the time we had the original agreement [*i.e.*, both flake and non-flake tantalum powders]....

\*\*\*\*\*\*\*\*\*\*\*

Q.    I can try to short circuit some of this Mr. Collis to see if I understand AVX's position.  Is it fair to say that it's AVX's position that its complaint in this case is that it was forced by Cabot to sign a contract for years beyond 2001?

MR. GOREN:  Objection.  You may answer.

THE WITNESS:  Yes.

BY MR. DAVIS:

Q.    Is there more to AVX's complaint in this action other than it was forced by Cabot, allegedly, to sign a contract or a binding contract for delivery of products beyond the calendar year 2001?

A.    No.

SOF, ¶ 31.

When questioned at greater length about the particular tantalum products that AVX allegedly was coerced into buying by Cabot, Mr. Collis further testified, in part, as follows:

Q.    Is it fair to say that as of January 2001, AVX did not wish to enter into a contract with Cabot, a binding contract, to purchase any of the products that are listed [in Appendix A] under calendar year – let's start with calendar year 2002 for delivery in 2002?  Is that right?

MR. GOREN:  Objection.

THE WITNESS:  Yes.

Q.    I'm not trying to confuse you.  The complaint that AVX has is that in
      2001 it was being required by Cabot to enter into a contract that would
      call for products and it would bind AVX to buy products from Cabot in
      the year 2002?  Correct?

A.    Correct.

Q.    And the same is true for the year 2003.  Correct?

A.    Correct.

Q.    And the same is true for 2004 and 2005.  Correct?

A.    Correct.

                              ***********

Q.    Is it fair to say that the crux of AVX's complaint in this case is that in
      2001, AVX was forced by Cabot to sign an agreement that required
      AVX to purchase in the years 2002, 2003, 2004 [and] 2005 the products
      listed in those years on Appendix A?

MR. GOREN:  Objection.  You may answer.

THE WITNESS:  Correct.

BY MR. DAVIS:

Q.    Is there more to AVX's complaint in this case other than what I have
      stated?  To your knowledge?

A.    To my knowledge, no.

SOF, ¶ 31.

Mr. Collis' testimony concerning the true nature of AVX's claim in this action was

confirmed by Kurt Cummings, AVX's Chief Financial Officer, at his deposition on

December 12, 2007.  AVX designated Mr. Cummings under Rule 30(b)(6) to testify on its

behalf concerning "Cabot's coercive strategies" as alleged in Paragraph 30 of AVX's

Complaint.  SOF, ¶ 34.  When questioned on this topic at his deposition, Mr. Cummings

testified, in relevant part, as follows,

> Q.    And what were Cabot's coercive strategies, to your understanding?
>
> A.    I believe they surrounded the conditions under which the Supply
>       Agreement was negotiated.
>
> Q.    They surrounded?  Is that the word you just used?
>
> A.    Um-hum.
>
> Q.    Surrounded with what?
>
> A.    Two issues.  One, we had an existing supply agreement which Cabot
>       indicated they would not honor.
>
> Q.    You are referring to the letter of intent?
>
> A.    Yes.  And we were told that we would not get material unless we entered
>       into a long-term supply agreement.
>
> Q.    And that is the coercive strategies you believe this is referring to?
>
> A.    Yes.
>
> Q.    What other coercive strategies are you aware of that Cabot engaged in
>       during the negotiation of the 2001 Supply Agreement?
>
> A.    I think that covers it.

SOF, ¶ 34.

AVX is bound by the deposition testimony of Mr. Collis and Mr. Cummings appearing

in their capacity as AVX's corporate designees under Fed. R. Civ. P. 30(b)(6).  *See, e.g.,*

Berwind Prop. Group Inc. v. Envtl. Mgmt. Group, Inc., 233 F.R.D. 62, 65 (D. Mass. 2005)

(a corporate designee under Rule 30(b)(6) "speaks for (and binds) the corporation"); *see also*

In re P.R. Elec. Power Auth., 687 F.2d 501, 503-504 (1st Cir. 1982) ("To the extent a

designated official having authority may make a binding admission [while testifying under

Rule 30(b)(6)], this is part of the normal risk of litigation."). Their testimony establishes that AVX's actual claim in this case *is not* that Cabot allegedly conditioned AVX's purchases of flake tantalum powder on its purchases of non-flake or nodular tantalum powder, but rather that Cabot purportedly conditioned AVX's purchases of flake *and* non-flake tantalum products in the year 2001 on AVX's commitment to purchase *more* flake *and* non-flake tantalum products in the years 2002-2005. This difference is fatal to AVX's claim under Section 1 of the Sherman Act.

The law is clear that "Section 1 of the Sherman Act prohibits a seller from 'tying' the sale of *one product* to the purchase of a *second product* if the seller thereby avoids competition on the merits of the 'tied' product." *See, e.g.,* Data General, 36 F.3d at 1178 (emphasis added); *see also* Borschow, 96 F.3d at 17 ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product ..."). Thus, in order to prove an unlawful tying arrangement, AVX must prove, *inter alia*, that the "tying and the tied products are actually two distinct products." Data General, 36 F.3d at 1178.

AVX cannot meet this burden. What AVX now claims is not that Cabot tied AVX's purchase of "one product" to its purchase of a separate and distinct "second product" as required by Section 1 of the Sherman Act, but rather that Cabot allegedly tied AVX's purchases of various tantalum products to its purchases of *the same products* in subsequent years. *See, e.g.,* Data General, 36 F.3d at 1178; SOF, ¶¶ 29-35. It is not a tying violation, however, for a seller to insist that a buyer purchase more of a product than the buyer might otherwise wish to purchase. *Id.*; *see also* Borschow, 96 F.3d at 17. Because the sale of a

product or group of products cannot be improperly "tied" to sales of more of the same product

or group of products, AVX's tying claim necessarily fails as a matter of law.[1]

III.    CABOT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE ALLOWED
        BECAUSE AVX'S ACTUAL CLAIM THAT CABOT COERCED AVX INTO
        SIGNING A MULTI-YEAR CONTRACT THAT REQUIRED AVX TO PURCHASE
        *ANY* TANTALUM PRODUCTS, WHETHER FLAKE OR NON-FLAKE, IN 2002-
        2005 PREVIOUSLY WAS FULLY LITIGATED AND LOST BY AVX IN THE
        MASSACHUSETTS STATE COURTS AND, THEREFORE, IS BARRED BY THE
        DOCTRINE OF CLAIM PRECLUSION OR *RES JUDICATA*.

As discussed in Section II, *supra*, AVX's actual claim in this action does not comport

with the allegations of AVX's Complaint.  AVX's true claim is that it was unlawfully coerced

by Cabot into signing a binding, multi-year contract for the purchase of tantalum products for

years extending beyond the parties' pre-existing Letters of Intent.  SOF, ¶¶ 29-35.  That claim

---

[1] The fact that the same products cannot be unlawfully "tied" to one another for antitrust purposes was confirmed by AVX's own economic expert, Dr. Steven Schwartz, at his deposition in this action on February 19, 2008.  Dr. Schwartz testified, in relevant part,

Q.    You know enough about antitrust law and antitrust law involving tying to recognize that, in order to have a tie for antitrust purposes, that you need to have separate products, correct?

A.    Yes.

Q.    That's part of the reason why, in your analysis, you analyze whether flake tantalum powder and nodular tantalum powder are separate products, correct?

A.    Yes.

Q.    And you came to the conclusion that they are?

A.    Yes.

Q.    You would agree with me, however, that if AVX's claim in this case is that it agreed to buy certain products in 2001 from Cabot, but then Cabot forced AVX to buy the same products in 2002, 2003, 2004 and 2005, that those would not, by definition, be separate products, correct?

A.    Okay.  Again, just to be sure I understand, you are talking about conditioning the availability of products in years two, three – of a product in year[s] two, three, four and five on the purchase of the same product in year one.

Q.    Yes.  I'm talking about conditioning purchases of products in subsequent years on AVX's purchase of products in year one.

A.    My understanding of the law and my understanding of economics is that would not be a tie....

SOF, ¶ 35.

fails as a matter of law, however, not only because Cabot's conduct, as alleged by AVX, does not constitute a violation of Section 1 of the Sherman Act, but also because AVX previously asserted and lost *exactly the same claim* against Cabot in the Massachusetts state courts.

As recognized by the Massachusetts Supreme Judicial Court in *Cabot/AVX I*, AVX's claims and defenses in that case included the claim that Cabot wrongfully subjected AVX to "economic duress" and "coerced AVX into signing" the 2001 Supply Agreement by taking "advantage of what was then a seller's market to negotiate aggressively a multi-year deal" for tantalum products for years beyond those encompassed by the parties' pre-existing Letters of Intent (*i.e.*, effectively beyond 2001), which AVX argued were "binding contracts." Cabot Corp., 448 Mass. at 640-641. The Supreme Judicial Court's opinion in *Cabot/AVX I* also establishes that AVX's claim was fully considered, and flatly rejected, by both the Superior Court and the Supreme Judicial Court. As stated by the Supreme Judicial Court:

> [a] Superior Court judge granted summary judgment for Cabot, concluding that there was no economic duress where the [Supply Agreement] was the product of hard bargaining and not any unlawful or wrongful act, and where the values exchanges between the parties were not disproportionate. The judge also concluded that AVX had, in any event, ratified the [Supply Agreement] by its conduct, and we transferred the case from the Appeals Court on our own motion. We affirm.

*Id.* at 630.

The Supreme Judicial Court held that, with one minor exception not relevant here (*i.e.*, a relatively small amount of C606, a non-flake tantalum powder that AVX admittedly wanted), the pre-existing Letters of Intent between Cabot and AVX "were not binding." *Id.* at 641. It said,

> [j]ust as there was no binding commitment on AVX to purchase products other than C606, Cabot was not bound by the letters [of intent] to supply any other product in any specific amount. This

> interpretation is in line with the long-established principle that a
> "contract" to purchase an unspecified amount of goods is not a
> contract at all.

*Id.* at 640 (citation omitted). The Superior Court entered final judgment, after rescript, on all

counts asserted in *Cabot/AVX I* in Cabot's favor on April 27, 2007. SOF, ¶ 28.

Having litigated and indisputably lost its claim that Cabot wrongfully coerced AVX into

signing a binding, multi-year contract for the purchase of tantalum products for years

extending beyond the parties' pre-existing Letters of Intent in *Cabot/AVX I*, AVX is barred by

the doctrine of claim preclusion or *res judicata* from asserting the same claim again in this

action. "Under the full faith and credit statute, 28 U.S.C. § 1738, a judgment rendered in a

state court is entitled to the same preclusive effect in federal court as it would be given within

the state in which it was rendered." In re Sonus Networks, Inc., Shareholder Derivative

Litig., 499 F.3d 47, 56 (1st Cir. 2007). Massachusetts law, in turn, holds that the doctrine of

claim preclusion "prohibits the maintenance of an action based on the same claim that was the

subject of an earlier action between the same parties or their privies." McDonough v. City of

Quincy, 452 F.3d 8, 16 (1st Cir. 2006) (*quoting* Bagley v. Moxley, 407 Mass. 633, 636

(1990)). As stated by the First Circuit in McDonough,

> "There are three essential elements to the doctrine of claim
> preclusion: (1) the identity or privity of the parties to the present
> and prior actions; (2) identity of the cause[s] of action; and (3) a
> prior final judgment on the merits." Bui v. Ma, 62 Mass. App.
> Ct. 553, 818 N.E.2d 572, 579 (2004). Causes of action are
> identical if they "derive [] from the same transaction or series of
> transactions." TLT Const. Corp. v. A. Anthony Tappe, 48
> Mass. App. Ct. 1, 716 N.E.2d 1044, 1052 (1999). "What
> factual grouping constitutes a transaction is to be determined
> pragmatically, giving weight to such factors as whether the facts
> are related in time, space and origin or motivation, whether they
> form a convenient trial unit, and whether their treatment as a unit

> conforms to the parties' expectations." Mancuso v. Kinchla, 60
> Mass. App. Ct. 558, 806 N.E.2d 427, 438 (2004).

Id.

Massachusetts law further holds that the "statement of a different form of liability is not

a different cause of action, provided it grows out of the same transaction, act, agreement, and

seeks redress for the same wrong." TLT Const. Corp., 48 Mass. App. Ct. at 8 (quoting

Mackintosh v. Chambers, 285 Mass. 594, 596 (1934)); see also Charlette v. Charlette Bros.

Foundry, Inc., 59 Mass. App. Ct. 34, 44 (2003) ("[C]laim preclusion will apply even though a

party is prepared in a second action to present different evidence or legal theories to support

his claim or seeks different remedies."). Where the "fundamental cause of action remains the

same," the second action is barred "[a]lthough some of the claims ... are 'cloaked' with

different theories of liability." Andrews-Clarke v. Lucent Techs., Inc., 157 F. Supp. 2d 93,

102 (D. Mass. 2001) (applying same preclusion standard under federal common law).

In this case, all of the elements for the application of the doctrine of claim preclusion or

res judicata to AVX's claim against Cabot on account of the prior judgment entered in

Cabot/AVX I are satisfied. The parties to the two actions are identical. SOF, ¶¶ 23, 29. The

claims asserted by AVX in the two actions also are identical in that they seek redress for the

same alleged wrong arising from the same transaction in the same timeframe (i.e., Cabot's

alleged coercion in forcing AVX in 2000-2001 to sign a multi-year supply contract for

tantalum products in contravention of the parties' pre-existing, purportedly binding Letters of

Intent). Id., ¶¶ 29-35. Lastly, Cabot previously obtained a final judgment in its favor in

Cabot/AVX I. Id., ¶¶ 25-28. Thus, in addition to being insufficient as a matter of federal

antitrust law, AVX's purported tying claim against Cabot is barred by the doctrine of claim

preclusion or res judicata.

IV.   CABOT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE ALLOWED
      BECAUSE AVX CANNOT PROVE THAT CABOT ACTUALLY TIED AVX'S
      PURCHASES OF FLAKE TANTALUM POWDER TO ITS PURCHASE OF NON-
      FLAKE TANTALUM POWDER.

As noted above, AVX also must prove that "there was an agreement or condition,

express or implied, that establishes a tie" in order to prevail on its tying claim against Cabot

under Section 1 of the Sherman Act.  *See, e.g.,* Data General, 36 F.3d at 1178-1179.  Again,

AVX cannot meet this burden.  Nothing in the 2001 Supply Agreement explicitly conditions

AVX's purchases of Cabot's allegedly highly-desirable flake tantalum powder on AVX's

purchases of Cabot's allegedly undesirable non-flake tantalum powder, and AVX has adduced

absolutely no admissible evidence tending to prove the existence of an implicit requirement to

that effect.

To the contrary, John Gilbertson, AVX's President and Chief Executive Officer, as

well as one of the principal negotiators of the 2001 Supply Agreement on AVX's behalf,

informed other AVX top executives in September 2000 -- and confirmed at his deposition by

Cabot -- that AVX's number "1" priority in its negotiations with Cabot in mid-to-late 2000

was obtaining at least "10 to 15 [metric] tons" of non-flake or nodular tantalum powder from

Cabot for AVX's Biddeford, Maine manufacturing facility.  SOF, ¶ 15.  Mr. Gilbertson

further testified at his deposition that, at the time AVX was bargaining over the proposed

Supply Agreement with Cabot, AVX actually wanted to purchase *more*, not less, non-flake or

nodular tantalum powder than Cabot was able to sell.  *Id.*, ¶ 18.  When questioned about a

50,000 pound reduction in the amount of nodular tantalum powder that Cabot told AVX,

during negotiations, that it was prepared to sell, Mr. Gilbertson testified,

> Q.    Okay.  Now if you will look just above the chart, and you will see it
>       says, "change the nodular to 10,000 pounds, which our side [*i.e.*, AVX]

is very uncomfortable with as a good faith from our side." Do you see that? Just above the chart.

A.    I see that, yes.

Q.    Is it correct that you were uncomfortable with the reduction from 60,000 pounds of nodular powder as shown on [Cabot's] e-mail, Exhibit 181, to the 10,000 pounds as shown on Exhibit 2?

A.    Yes.

Q.    Because you wanted more if you could get it?

A.    Right.

Q.    I'm sorry?

A.    Yes, correct.

*Id.*

AVX's desire to purchase more, not less, non-flake or nodular tantalum powder from Cabot during the negotiation of the 2001 Supply Agreement also is confirmed by the terms of the Agreement itself, which provide, among other things, that AVX would purchase an *additional* 5,000 pounds of "nodular" tantalum powder from Cabot in 2001 on an "[a]s [a]vailable" basis. *See* SOF, ¶ 19.

The undisputed evidence that AVX actually wished to purchase additional non-flake or nodular tantalum from Cabot when it entered into the 2001 Supply Agreement directly undercuts any assertion by AVX in this action that Cabot forcibly "tied" AVX's purchases of flake powder to its purchase of non-flake powder in that Agreement. Rather, it proves that AVX actually wanted to purchase *both* flake and non-flake products from Cabot. There was, accordingly, no "tie" or "conditioning" of any kind, and Cabot can have no liability to AVX under Section 1 of the Sherman Act as a matter of law. *See, e.g.,* Borschow, 96 F.3d at 18 ("There is no tie for any antitrust purpose unless the defendant improperly imposes conditions

that explicitly or practically require buyers to take the second product if they want the first one.") (*quoting* 10 Phillip E. Areeda, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1752b, at 280 (1996)); *see also* Cía Petrolera Caribe, Inc. v. Avis Rental Car Corp., 576 F. Supp. 1011, 1016 (D.P.R. 1983) (a valid tying claim requires proof that the seller "forc[ed] the purchaser or lessor to take the unwanted tied product along with the tying product."), *aff'd*, 735 F.2d 636 (1st Cir. 1984).

V.     CABOT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE ALLOWED BECAUSE AVX CANNOT PROVE THAT IT SUFFERED ANY INJURY ON ACCOUNT OF CABOT'S ALLEGED MISCONDUCT.

In order to prevail on its tying claim against Cabot under Section 1 of the Sherman Act, AVX also must prove that it has suffered "injury in [its] business or property by reason of anything forbidden in the antitrust laws." Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 815 (1st Cir. 1988); *see also* Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir. 1984) ("To have standing to bring an antitrust action a plaintiff must have suffered antitrust injury, which is injury of the type the antitrust laws were intended to prevent and which flows from that which makes a defendant's acts unlawful.").

AVX cannot meet this burden either. AVX has produced no evidence in this action of *any* injury, let alone any injury resulting from Cabot's purported antitrust violations. When asked by Cabot in written discovery to "[p]lease state all of the damages that AVX claims to have sustained" as a result of Cabot's alleged misconduct, AVX stated in February 2007 that it "ha[d] not yet calculated its damages." SOF, ¶ 36. When Cabot subsequently sought to compel a further, more substantive response to its discovery request concerning AVX's alleged damages, AVX stated in April 2007,

> AVX stands by its response that it has not yet calculated its damages. It is premature for AVX to assert "all" of its damages. AVX has been damages by the excess of the amounts paid under the January 2001 Supply Agreement over the term of that agreement over the fair market prices of those products over the term of that agreement. AVX intends to prove it damages at trial. These calculations cannot be made at this preliminary stage of this litigation. AVX is mindful of its obligations under FRCP 26(e) regarding supplementation of answers to interrogatories.

*Id.*, ¶ 37.

Despite its pledge to do so, AVX never supplemented its responses to Cabot's interrogatories relating to damages. SOF, ¶ 38. As a result, no written discovery responses describing AVX's alleged damages ever have been provided to Cabot.

Cabot's efforts to learn AVX's claimed damages through oral discovery were no more successful. On December 5, 2007, AVX also produced Mr. Collis as its designated witness under Rule 30(b)(6) to testify on AVX's behalf with respect to, *inter alia*,

> [a]ny damages that AVX claims to have sustained on account of the conduct alleged in the Complaint, including but not limited to the complete nature and amount of such damages, and the precise means by which AVX calculated such damages.

SOF, ¶ 39. When questioned on the topic of AVX's alleged damages at this Rule 30(b)(6) deposition, Mr. Collis testified, in relevant part, as follows,

Q.  What damages has AVX sustained as a result of the conduct of Cabot that is alleged in the Complaint in this matter?

A.  That is being calculated by our outside expert.

Q.  Has AVX sustained damages?

A.  Yes.

Q.  Do you have any understanding right now of the monetary value of those damages?

A.    We have monitored the market price of material and compared that with what we ended up paying in the contract when we used the material as against what the market price was at the time, and passed that to our expert.

Q.    How would you go about calculating AVX's damages in this matter?

A.    How would I go about calculating.

MR. GOREN:  Objection.  You may answer.

THE WITNESS:  Basically, we've left that with our expert to come up with that calculation.

SOF, ¶ 40.

However, when AVX's economic expert, Dr. Steven Schwartz, issued his expert report in this action on December 15, 2007, Dr. Schwartz's report contained no information, opinions, or description of any anticipated testimony concerning the nature or amount of AVX's alleged damages.  SOF, ¶ 41.  Dr. Schwartz later acknowledged at his deposition that his expert report says nothing about AVX's alleged damages, a deficiency that he attributed to the fact that he simply "hadn't been asked" by AVX to render an opinion on damages prior to issuing the report.  *Id.*, ¶ 42.

If AVX possessed any evidence that it actually has suffered "injury in [its] business or property" by reason of Cabot's alleged antitrust violations, AVX was required to disclose that evidence to Cabot in discovery.  *See, e.g.,* U.S. v. Miracle Recreation Equip. Co., 118 F.R.D. 100, 104 (S.D. Iowa 1987) (discovery "relating to the amount of damages recoverable is certainly relevant and therefore permissible under Rule 26 so long as none of the material sought to be discovered is privileged."); Wells Real Estate, 850 F.2d at 815.  AVX, however, has produced no evidence of any such injury.  Without proof of actual harm, AVX cannot succeed on its claim against Cabot as a matter of law, and the entry of judgment in Cabot's

favor, once again, is appropriate. *Id.*; *see also* <u>Borschow</u>, 96 F.3d at 17 (affirming summary judgment for defendant in tying case, in part, on the ground that plaintiff "was never injured" by defendant's alleged misconduct).

## Conclusion

AVX cannot prove that Cabot violated Section 1 of the Sherman Act in the negotiation of the Supply Agreement by allegedly tying or "condition[ing] plaintiff's purchase of flake [tantalum] powders on its purchase of non-flake [tantalum] powders" as alleged in its Complaint. That claim is inconsistent with the testimony of AVX's own Rule 30(b)(6) witnesses, and AVX has adduced no other admissible evidence that would tend to prove the existence of such a requirement by Cabot. AVX also has produced no evidence that it suffered any actual harm as a result of Cabot's alleged misconduct. AVX's true claim that Cabot allegedly coerced AVX into signing a binding, multi-year contract for the purchase of tantalum products, whether flake or non-flake, for years extending beyond the parties' pre-existing Letters of Intent, simply does not qualify as an antitrust violation, and is barred under the doctrine of claim preclusion or *res judicata* by the final judgment entered on the exact same claim in *Cabot/AVX I*. For these reasons, Cabot respectfully requests that the Court grant its Motion for Summary Judgment on AVX's Complaint in this action.

Respectfully Submitted,

CABOT CORPORATION

By its attorneys,


/s/ Brian A. Davis
Robert S. Frank, Jr. (BBO No. 177240)
      (rfrank@choate.com)
Brian A. Davis (BBO No. 546462)
      (bad@choate.com)
Julie C. Rising (BBO No. 666950)
      (jrising@choate.com)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

Date:   March 31, 2008

4314511.1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on March 31, 2008.

*/s/ Julie C. Rising*

4314511.1
4314511v1