UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION and AVX LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>CABOT CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-10467-RGS<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT CABOT CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Cabot Corporation ("Cabot") hereby submits this Statement of Material Facts, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, in support of its Motion for Summary Judgment on the Complaint of plaintiffs AVX Corporation and AVX Limited (collectively "AVX"). Cabot respectfully asserts that all of the facts stated herein are undisputed for summary judgment purposes.

### *The Parties*

1.      Defendant Cabot Corporation is a Delaware corporation that maintains its corporate headquarters at Two Seaport Lane, Boston, Suffolk County, Massachusetts. Cabot is a specialty chemicals company. Cabot also is a supplier of tantalum, a rare metal used in the production of high performance electronic capacitors. Complaint, ¶ 3; Affidavit of William P.

Young, dated March 29, 2008 ("Young Aff."), ¶ 2.[1]  Cabot's stock is publicly traded on the New York Stock Exchange under the symbol "CBT."  *See* Cabot Corp. Website, http://www.cabot-corp.com/.

2.     Plaintiff AVX Corporation ("AVX Corp.") is a Delaware corporation that maintains its principal place of business at 801 17th Avenue South, Myrtle Beach, South Carolina.  Complaint, ¶ 2.  AVX is one of the world's largest manufacturers and suppliers of tantalum capacitors, passive components that are used in a variety of electronic devices.  *Id.* at ¶ 7; *see* AVX Website at http://www.avx.com/ (last visited March 24, 2008).  (Relevant excerpts taken from AVX's website are appended to the accompanying Affidavit of Julie C. Rising, Esq., dated March 31, 2008 (the "Rising Aff.") at <u>Tab 1</u>.)  AVX Corp.'s total revenue in 2007 was almost $1.5 billion.  *Id.*  Its stock is publicly traded on the New York Stock Exchange under the symbol "AVX."  *Id.*

3.     The majority of AVX's outstanding shares are owned by Kyocera Corporation, a multi-national electronics, imaging and chemicals conglomerate based in Kyoto, Japan. *See* http://www.avx.com. (Rising Aff., <u>Tab 1</u>.)  AVX has numerous production facilities worldwide, including manufacturing operations located in Biddeford, Maine, in Paignton, England, and in Lanskroun, The Czech Republic.  *Id.*

4.     Plaintiff AVX Limited ("AVX Ltd." or, collectively with AVX Corp., "AVX") is a United Kingdom corporation that maintains its principal place of business at Admiral House, Harlington Way, Fleet, Hampshire, United Kingdom.  AVX Ltd. is a wholly owned subsidiary of

---

[1] Prior to his recent retirement, Mr. Young was employed as Director of Major Accounts for Cabot's Supermetals Division.  Young Aff. at ¶ 1.  Mr. Young worked for Cabot or its predecessors in various positions in the tantalum production business for over 40 years.  *Id.*  As a longtime Cabot employee, Mr. Young had periodic direct contact with representatives of AVX, and acquired substantial knowledge regarding tantalum and the electronic components industry as a whole.

AVX Corp. that also is engaged in the manufacture and supply of passive electronic components and related products.  Complaint, ¶ 3.

### *Tantalum*

5.    Tantalum is an elemental metal (chemical symbol "Ta", atomic number 73) that is approximately as rare in nature as uranium.  Young Aff., ¶ 2.  Tantalum has unique properties that make it essential to certain applications and highly desirable for others.  *Id.*  For example, tantalum is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures.  *Id.*  These characteristics, among others, make tantalum the preferred raw material for high performance electronic capacitors that are, in turn, components of a wide range of modern electronic devices, including cellular telephones and personal computers.  *Id.*

6.    Historically, the market for tantalum has been highly volatile.  Young Aff., ¶ 3. Periods of high demand, intermittent supply shortages, inventory hoarding, and sharply-rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly-falling prices.  *Id.*  Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in the price of tantalum to be much more pronounced than those of other industrial metals.  *Id.*

### *AVX and Cabot*

7.    Prior to 2008, AVX and Cabot had a long-standing business relationship. Complaint, ¶ 9.  As various points in time, AVX purchased tantalum from Cabot for use in the manufacture of tantalum capacitors in the forms of "flake" tantalum powder, "non-flake" or "nodular" tantalum powder, tantalum wire and semi-refined tantalum ore (also known as

"K2TaF7" or simply "KTaF") (collectively, "Tantalum Products" or "Products"). Complaint, ¶¶ 9, 18; Young Aff., ¶¶ 4-6.

8.     Prior to 2001, AVX purchased Tantalum Products from Cabot pursuant to a series of one or two page "Letters of Intent," which described, in general terms, the quantities of Tantalum Products that AVX then anticipated buying from Cabot, and the prices that AVX then was willing to pay Cabot for those products. Young Aff., ¶ 4. (True copies of the Letters of Intent that AVX and Cabot executed in 2000 are appended to the Rising Aff. at collective <u>Tab 2</u>.)

9.     Although it did so in the years prior to 2001, Cabot strongly preferred not to sell Tantalum Products to AVX pursuant to "Letters of Intent" because AVX did not regard those letters as binding on AVX. Young Aff., ¶ 5. AVX often purchased more or less Tantalum Products than were called for under the parties' Letters of Intent depending on its needs, and periodically insisted upon price reductions from Cabot when AVX believed that changes in market conditions justified its demands. *Id.* As a result, Cabot experienced significant fluctuations in overall demand for its Tantalum Products, and had great difficulty generating a stable revenue stream that would protect Cabot against market downturns and support an expansion of its productive capacity. *Id.*

10.     AVX nonetheless resisted Cabot's efforts prior to 2000 to negotiate and execute a binding, long-term supply contract for Cabot's Tantalum Products because AVX wanted the operational flexibility and financial security that the parties' non-binding Letters of Intent afforded AVX in times of slack demand for its own products. Young Aff., ¶ 5.

11.     In the late 1990s and continuing into the year 2000, demand for Tantalum Products experienced a period of unprecedented growth that led to a severe product shortage and sharply rising prices. Complaint, ¶ 23; Young Aff., ¶ 6. Vastly increased demand for tantalum

capacitors by manufacturers of wireless telephone equipment in particular, and electronic equipment in general, created great concern among tantalum purchasers, including AVX, that the worldwide demand for tantalum had, or would soon, exceed the existing productive capacity of the principal suppliers of Tantalum Products, including Cabot.  Young Aff., ¶ 6.

12.     After years of bearing the brunt of the cyclical periods of low demand for Tantalum Products and being denied the benefits of the occasional periods of high demand, Cabot's management made the decision in approximately mid-2000 that Cabot henceforth would sell its Tantalum Products only to those customers who were willing to enter into binding, long-term supply agreements at increased prices.   Young Aff., ¶ 7.   Cabot distributed letters announcing its decision in this regard to all of Cabot's major customers, including AVX, in early August 2000.  *Id.*  (A true copy of the letter that Cabot sent to AVX in August 2000 is appended to the Rising Aff. at Tab 3.)   In those letters, Cabot invited its customers, including AVX, to begin immediate contract negotiations with Cabot if they wished to continue purchasing Tantalum Products from Cabot in the future.  *Id.*

13.     Between August and January 2001, Cabot personnel engaged in extended negotiations with AVX representatives concerning a contract that would govern the parties' future relationship.   Young Aff., ¶ 8.   The contract negotiations between Cabot and AVX ultimately led to the execution of a written, multi-year "Supply Agreement" for Tantalum Products in January 2001 (the "2001 Supply Agreement" or the "Agreement").  *Id.*  (A true copy of the 2001 Supply Agreement is appended to the Rising Aff. at Tab 4.)

14.     The basic terms of the 2001 Supply Agreement were hammered out in a series of meetings, letters and e-mail exchanges primarily between Thomas Odle (then General Manager of Cabot's Performance Materials Division), and Ernest Chilton (then Senior Vice President of

AVX's Tantalum Division) and John Gilbertson (AVX's President and Chief Executive Officer) from August 2000 into November 2000. Young Aff., ¶ 9. After the principal terms had been agreed-upon by the parties, responsibility for finalizing the written 2001 Supply Agreement was delegated primarily to Earl "Hugh" Tyler (then Strategic Business Unit Manager in Cabot's Performance Materials Division), and John Chapple (AVX's Materials Manager) and Kurt Cummings (AVX's Chief Financial Officer). *Id.*

15.    At the time AVX was negotiating the 2001 Supply Agreement with Cabot, AVX wished to purchase both Cabot's flake tantalum powder and Cabot's non-flake or nodular tantalum powder. Deposition of John Gilbertson, dated August 22, 2006 ("Gilbertson Depo."), p. 86. (Relevant excerpts of the Gilbertson Depo. are appended to the Rising Aff. at Tab 5.)  In an internal e-mail message that he sent to other top AVX executives in September 2000, John Gilbertson, AVX's President and Chief Executive Officer, identified AVX's number "1" priority in its contract negotiations with Cabot as procuring "10 to 15 [metric] tons" of Cabot's nodular tantalum powder for AVX's Biddeford, Maine production facility. *Id.*, p. 86; E-mail message from John Gilbertson to Benjamin Rosen, dated September 28, 2000 (a true copy of which is appended to the Rising Aff. at Tab 6).

16.    In or about late October 2000, AVX made a written contract proposal to Cabot in which AVX affirmatively offered to purchase from Cabot, *inter alia*: (a) 30,000 pounds of Cabot's non-flake or nodular tantalum powder annually from 2001 through 2003, and a minimum of a further 25,000 pounds annually in 2004 and 2005; (b) 300,000 pounds of KTaF in 2001, a further 325,000 pounds in 2002, and a further 300,000 pounds in 2003; and (c) 50,000 pounds of Cabot's flake tantalum powder in 2001, and a minimum of a further 80,000 pounds annually in 2002 through 2005. Gilbertson Depo., pp. 151-152 (Rising Aff., Tab 5); E-mail

message from John Gilbertson to Evan Slavitt, Esq., dated October 30, 2000, with attachment titled "Proposal [10-30-2000]" (a true copy of which is appended to the Rising Aff. at Tab 7). AVX's October 2000 proposal further stated that, "[i]f other Powders are available in years [sic] two, beyond the Biddeford and Flake agreement, AVX would purchase 60k pounds at 500 dollars per pound." *Id.*

17.    Cabot did not agree to AVX's October 2000 proposal. *See* E-mail message from Thomas Odle to John Gilbertson, dated November 2, 2000 (a true copy of which is appended to the Rising Aff. at Tab 8). In subsequent negotiations between the parties, Cabot actually *reduced* the amount of additional non-flake or nodular tantalum powder that it was prepared to sell to AVX in 2002 through 2005 for use at AVX's other facilities from 60,000 pounds per year, as requested by AVX, to 10,000 pounds per year. *Id.*; *see also* Gilbertson Depo., pp. 146, 165-66 (Rising Aff., Tab 5).

18.    Cabot's reduction in the amount of additional non-flake or nodular tantalum powder that it was prepared to sell to AVX in 2002 through 2005 made AVX's management "very uncomfortable." Gilbertson Depo., pp. 165-166 (Rising Aff., Tab 5). When questioned about Cabot's reduction at his deposition, Mr. Gilbertson testified,

> Q.    Okay. Now if you will look just above the chart, and you will see it says, "change the nodular to 10,000 pounds, which our side is very uncomfortable with as a good faith from our side." Do you see that? Just above the chart.
>
> A.    I see that, yes.
>
> Q.    Is it correct that you were uncomfortable with the reduction from 60,000 pounds of nodular powder as shown on [Cabot's] e-mail, Exhibit 181, to the 10,000 pounds as shown on Exhibit 2?
>
> A.    Yes.

Q.    Because you wanted more if you could get it?

A.    Right.

Q.    I'm sorry?

A.    Yes, correct.

*Id.*

19.    AVX later requested, and Cabot later agreed, to supply an additional 5,000 pounds of non-flake or nodular powder to AVX in 2001 "if those pounds were available." Gilbertson Depo., pp. 165-166 (Rising Aff., Tab 5); 2001 Supply Agreement, Appendix A (Rising Aff., Tab 4).

20.    By early November 2000, Cabot and AVX had reached agreement in principal on the prices and the minimum quantities of the Tantalum Products that AVX was willing to purchase from Cabot over the ensuing five years, including the minimum quantities of nodular tantalum powder and KTaF.  E-mail message from John Gilbertson to Kurt Cummings, *et al.*, dated November 8, 2000, with attached e-mail message from Thomas Odle to John Gilbertson (a true copy of which is appended to the Rising Aff. at Tab 9).   On November 7, 2000, Mr. Gilbertson sent a summary of the agreed-upon terms to Mr. Odle with a cover message stating: "TOM … I think we have a fair agreement for both parties … hope you agree." Gilbertson Depo., p. 176 (Rising Aff., Tab 5); E-mail message from John Gilbertson to Thomas Odle, dated November 7, 2000  (a true copy of which is appended to the Rising Aff. at Tab 10).

21.    The final version of the 2001 Supply Agreement was signed by Cabot and AVX in January 2001.   Complaint, ¶ 29; Young Aff., ¶ 9.   The specific quantities of Tantalum Products that AVX agreed to purchase and Cabot agreed to sell are described in "Appendix A" to the 2001 Supply Agreement.  Complaint, ¶ 29.  They include more than 325,000 pounds of flake

tantalum powder, more than 180,000 pounds of non-flake or nodular tantalum powder, and more than 950,000 pounds of KTaF. 2001 Supply Agreement, Appendix A (Rising Aff., Tab 4).

### *AVX's Subsequent Efforts to Avoid the 2001 Supply Agreement*

22.    Not long after Cabot and AVX executed the 2001 Supply Agreement, worldwide demand for various types of electronic devices – and, hence, worldwide demand for electronic capacitors and tantalum -- experienced a rapid and steep decline. *See* Amended Complaint, Case No. 02-cv-11524, Doc. No. 7 at Exhibit D, ¶33.

23.    In July 2002, AVX commenced litigation against Cabot in federal court seeking, *inter alia*, to undo the 2001 Supply Agreement on the ground that the parties' prior "Letters of Intent" constituted binding agreements, and alleging that,

> when the market for tantalum went from relatively stable to extremely volatile, [Cabot], one of the largest players in the market, took advantage of its strong position and [AVX's] weakened position to force [AVX] into agreeing to a new, highly unfavorable set of terms for supply of the tantalum [Cabot] already had contracted to supply. Without those new terms … [Cabot] said it would be "simply unable" to supply [AVX] with the tantalum it needed. [AVX], to its significant detriment, had no choice but to enter into a new long-term agreement.

AVX Complaint in AVX Corp. and AVX Ltd. v. Cabot Corp., U.S.D.C. Civil Action No. 02-11524 (RGS), dated July 26, 2002 (a true copy of which is appended to Rising Aff. at Tab 12).

24.    After partially-dispositive motion practice in federal court, AVX's various claims against Cabot, including AVX's claim that it was economically coerced by Cabot's "commercial threats" to enter into a "binding, five-year contract, under which AVX would purchase specified quantities of tantalum powder and wire at stated prices" notwithstanding the parties' pre-existing "Letters of Intent," were litigated in Massachusetts state court. AVX Answer, Counter-Claim and Jury Demand in Cabot Corp. v. AVX Corp. and AVX Ltd., Suffolk Superior Court Civil

Action No. 03-1235 ("*Cabot/AVX I*"), dated April 17, 2003 (a true copy of which is appended to Rising Aff. at <u>Tab 13</u>).

25.     All of AVX's claims, counterclaims and defenses in *Cabot/AVX I*, including AVX's claim of economic duress, were resolved against AVX or dismissed.  The Massachusetts Superior Court entered judgment in Cabot's favor on October 6, 2005 (a true copy of which is appended to Rising Aff. at <u>Tab 14</u>).

26.     AVX's subsequent appeal of the Superior Court's judgment in *Cabot/AVX I* was considered and rejected by the Massachusetts Supreme Judicial in an opinion issued on March 28, 2007 (Rising Aff., <u>Tab 10</u>).  As stated by the SJC,

> [a] Superior Court judge granted summary judgment for Cabot, concluding that there was no economic duress where the [Supply Agreement] was the product of hard bargaining and not any unlawful or wrongful act, and where the values exchanges between the parties were not disproportionate.  The judge also concluded that AVX had, in any event, ratified the [Supply Agreement] by its conduct, and we transferred the case from the Appeals Court on our own motion.  We affirm.

<u>Cabot v. AVX</u>, 448 Mass. at 630 (Rising Aff., <u>Tab 10</u>.)

27.     The SJC further held that, with one minor exception not relevant here (*i.e.*, a relatively small amount of C606, a non-flake tantalum powder that AVX admittedly wanted), that the pre-existing "letters of intent" between Cabot and AVX "were not binding."  448 Mass. at 641 (Rising Aff., <u>Tab 10</u>).  It said,

> [j]ust as there was no binding commitment on AVX to purchase products other than C606, Cabot was not bound by the letters [of intent] to supply any other product in any specific amount.  This interpretation is in line with the long-established principle that a "contract" to purchase an unspecified amount of goods is not a contract at all.

*Id.* at 640 (citation omitted).

28.     The Massachusetts Superior Court entered final judgment, after rescript, on all counts asserted in *Cabot/AVX I* in Cabot's favor on April 27, 2007.  Final Judgment, dated April 27, 2007 (a true copy of which is appended to the Rising Aff. at <u>Tab 15</u>).

***AVX's Claims Against Cabot in this Action***

29.     AVX commenced this federal court action against Cabot in March 2004.  *See* Complaint.  The only claim asserted by AVX in its Complaint in this case is that flake tantalum powder and non-flake tantalum powder purportedly constitute "separate products," and that, in negotiating the 2001 Supply Agreement, Cabot allegedly tied or "conditioned plaintiff's purchase of flake [tantalum] powders on its purchase of non-flake [tantalum] powders" in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 14.  Complaint, ¶¶ 1, 33-41.  No other wrongdoing or misconduct by Cabot is alleged.

30.     On December 5, 2007, AVX produced Peter Collis, Vice President of AVX's worldwide tantalum operations, to testify on AVX's behalf under Fed. R. Civ. P. 30(b)(6) with respect to, *inter alia*, the particular "products or terms that AVX alleges it was forced to accept on account of 'Cabot's coercive strategies' as referenced in Paragraph 30 of [its] Complaint" in this action.  (True copies of Cabot's Notice of Deposition of AVX Corp. and essentially identical Notice of Deposition of AVX Ltd., dated October 17, 2007, are appended to the Rising Aff. at collectively <u>Tab 16</u>.  Relevant excerpts from the transcript of the December 5, 2007 Collis deposition (the "Collis Depo.") are appended to the Rising Aff. at <u>Tab 17</u>.)

31.     In the course of his December 5, 2007 deposition, Mr. Collis was shown a copy of the 2001 Supply Agreement, including "Appendix A."  When asked to identify the particular tantalum products that AVX claims it was "coerced" by Cabot into buying, Mr. Collis testified, in part, as follows:

> Q.     Which of the products that are listed [in Appendix A] Mr. Collis, are the products that AVX claims in this litigation it did not wish to purchase from Cabot, but was forced to do so?
>
> MR. GOREN:  Objection.  You may answer.
>
> THE WITNESS:  The – the basic premise was we were coerced into a five year agreement which we didn't want to get into.

Collis Depo., p. 10 (Rising Aff., <u>Tab 17</u>).

***********

> Q.     So I want to understand this correctly.  Are you saying that AVX did not wish to purchase, as of the time that it entered into the Supply Agreement with Cabot, it did not wish to purchase any nodular powder from Cabot?
>
> A.     We didn't wish to purchase – enter into an agreement to purchase materials for five years.

*Id.*, p. 13.

***********

> Q.     Putting aside the five year length of the contract, were there any nodular products that are listed on Appendix A to … the Supply Agreement, that AVX actually wished from Cabot as of the time that this Supply Agreement was actually signed?
>
> MR. GOREN:     Independent of the other terms of the contract.
>
> A.     Yes.  Yes.
>
> Q.     Which ones did AVX actually wish to purchase?
>
> A.     We wished to purchase the ones that we had in the Letter of Intent at the time we had the original agreement.  And we also entered into the KTAF agreement to protect our supply chain from Showa Cabot – because of the situation we were being told where Showa was going to be short of material.

Q.    I can try to short circuit some of this Mr. Collis to see if I understand AVX's position. Is it fair to say that it's AVX's position that its complaint in this case is that it was forced by Cabot to sign a contract for years beyond 2001?

MR. GOREN: Objection. You may answer.

THE WITNESS: Yes.

BY MR. DAVIS:

Q.    Is there more to AVX's complaint in this action other than it was forced by Cabot, allegedly, to sign a contract or a binding contract for delivery of products beyond the calendar year 2001?

A.    No.

*Id.*, pp. 13-15.

*************

Q.    So it's AVX's position that every product that is encompassed by the 2001 Supply Agreement was a product that it believes it was forced to accept on account of Cabot's coercive strategies. Is that right?

MR. GOREN: Objection.

THE WITNESS: Yes. We did not want to enter into a five year agreement.

*Id.*

*************

Q.    Are there any additional products that AVX claims it was forced to accept on account of Cabot's coercive strategies other than what you've identified?

A.    I – I'm sorry. I'm a bit confused. Can I perhaps clarify the –

Q.    Yes.

A.      I mean – basically we're saying all of the materials in years 2 through 5.  What other materials would you be referring to?

Q.      So when you say, "all of the materials in years 2 through 5", you're looking at Appendix A to Exhibit 2. Are you not?

A.      Yes.

Q.      And do I have it correct that it is AVX's position that all of the materials that you see listed under calendar year 2002, CY 2002, are products that AVX alleges it was forced to accept on account on [sic] Cabot's coercive strategies?

A.      We did not want to enter into a contract longer than 12 months.

Q.      So what I said is correct?

A.      Yes.

Q.      And the same would be true for calendar year 2003?

A.      Yes.

Q.      AVX did not wish to purchase any of those products from Cabot.  Correct?

A.      We didn't wish to enter into a long term contract for the purchase of those materials.

*Id*., pp. 18-19.

*************

Q.      Is it fair to say that as of January 2001, AVX did not wish to enter into a contract with Cabot, a binding contract, to purchase any of the products that are listed [in Schedule A to the Supply Agreement] under calendar year – let's start with calendar year 2002 for delivery in 2002?  Is that right?

MR. GOREN:  Objection.

THE WITNESS:  Yes.

Q.    I'm not trying to confuse you. The complaint that AVX has is that in 2001 it was being required by Cabot to enter into a contract that would call for products and it would bind AVX to buy products from Cabot in the year 2002? Correct?

A.    Correct.

Q.    And the same is true for the year 2003. Correct?

A.    Correct.

Q.    And the same is true for 2004 and 2005. Correct?

A.    Correct.

\*\*\*\*\*\*\*\*\*\*

Q.    Is it fair to say that the crux of AVX's complaint in this case is that in 2001, AVX was forced by Cabot to sign an agreement that required AVX to purchase in the years 2002, 2003, 2004 [and] 2005 the products listed in those years on Appendix A?

MR. GOREN: Objection. You may answer.

THE WITNESS: Correct.

BY MR. DAVIS:

Q.    Is there more to AVX's complaint in this case other than what I have stated? To your knowledge?

A.    To my knowledge, no.

*Id.*, pp. 20-22.

32.    When questioned at his December 5, 2007 deposition about AVX's willingness to

purchase the nodular tantalum powder listed on Appendix A to the 2001 Supply Agreement, Mr.

Collis further testified, in part, as follows:

Q.    Alright. And under nodular, you see that there is 25,000 pounds minimum that AVX agreed to buy under this contract. Correct?

A.    Correct.

Q.      Alright.  Is it correct to say that AVX did in fact wish to purchase that nodular powder from Cabot as of calendar year 2001?

MR. GOREN:  Wait a minute.  Does your question deal with the quantity or the specific product?

MR. DAVIS:  Right now I'm dealing with that term of this agreement.  25,000 pounds of nodular powder.

MR. GOREN:  Okay.

BY MR. DAVIS:

Q.      Do you know?

A.      Yes.

*************

Q.      And Mr. Collis, drawing your attention to that 5,000 pound entry on [Appendix A] under calendar year 2001, is it fair to say that AVX did in fact wish to purchase from Cabot in calendar year 2001 an additional 5,000 pounds of nodular powder for AVX's Biddeford, Maine facility if Cabot could make that product available to AVX?

A.      Yes.  We would have bought the extra 5,000 pounds if it was available.

Collis Depo., pp. 24-26 (Rising Aff., Tab 17).

33.     When questioned at his December 5, 2007 deposition about the specific tantalum products that AVX actually wished to purchase from Cabot when it entered into the 2001 Supply Agreement, Mr. Collis further testified, in part, as follows:

Q.      Which ones did AVX actually wish to purchase?

A.      We wished to purchase the ones that we had in the Letter of Intent at the time that we had the original agreement.

Collis Depo., p. 14 (Rising Aff., Tab 17).

34.     Cabot deposed Kurt Cummings, AVX's Vice President and Chief Financial Officer, on December 12, 2007.  (Relevant excerpts from the transcript of the December 12, 2007 Cummings deposition (the "Cummings Depo.") are appended to the Rising Aff. at Tab 18.) AVX designated Mr. Cummings under Fed. R. Civ. P. 30(b)(6) to testify on its behalf concerning "Cabot's coercive strategies" as alleged in Paragraph 30 of AVX's Complaint in this action.  *See* Depo. Notice (Rising Aff., Tab 16), topic no. 11.   When questioned on this topic at his deposition, Mr. Cummings testified, in relevant part, as follows:

> Q.     And what were Cabot's coercive strategies, to your understanding?
>
> A.     I believe they surrounded the conditions under which the Supply Agreement was negotiated.
>
> Q.     They surrounded?  Is that the word you just used?
>
> A.     Um-hum.
>
> Q.     Surrounded with what?
>
> A.     Two issues.  One, we had an existing supply agreement which Cabot indicated they would not honor.
>
> Q.     You are referring to the letter of intent?
>
> A.     Yes.  And we were told that we would not get material unless we entered into a long-term supply agreement.
>
> Q.     And that is the coercive strategies you believe this is referring to?
>
> A.     Yes.
>
> Q.     What other coercive strategies are you aware of that Cabot engaged in during the negotiation of the 2001 Supply Agreement?
>
> A.     I think that covers it.

Cummings Depo., pp. 17-18 (Rising Aff., Tab 18).

35.    Cabot deposed AVX's economic expert in this action, Dr. Steven Schwartz, on February 19, 2008.  (Relevant excerpts from the transcript of the February 19, 2008 Schwartz deposition (the "Schwartz Depo.") are appended to the Rising Aff. at <u>Tab 19</u>.)  In the course of his deposition, Dr. Schwartz testified, in part, as follows:

> Q.    You know enough about antitrust law and antitrust law involving tying to recognize that, in order to have a tie for antitrust purposes, that you need to have separate products, correct?
>
> A.    Yes.
>
> Q.    That's part of the reason why, in your analysis, you analyze whether flake tantalum powder and nodular tantalum powder are separate products, correct?
>
> A.    Yes.
>
> Q.    And you came to the conclusion that they are?
>
> A.    Yes.
>
> Q.    You would agree with me, however, that if AVX's claim in this case is that it agreed to buy certain products in 2001 from Cabot, but then Cabot forced AVX to buy the same products in 2002, 2003, 2004 and 2005, that those would not, by definition, be separate products, correct?
>
> A.    Okay.  Again, just to be sure I understand, you are talking about conditioning the availability of products in years two, three – of a product in year[s] two, three, four and five on the purchase of the same product in year one.
>
> Q.    Yes.  I'm talking about conditioning purchases of products in subsequent years on AVX's purchase of products in year one.
>
> A.    My understanding of the law and my understanding of economics is that would not be a tie….

Schwartz Depo., pp. 168-169 (Rising Aff., <u>Tab 19</u>).

### *AVX's Lack of Evidence Concerning Damages*

36.     On December 29, 2006, Cabot served AVX with its First Set of Interrogatories in this action (a true copy of which is appended to the Rising Aff. at <u>Tab 20</u>).  AVX served its Answers to Cabot's First Set of Interrogatories on February 28, 2007 (a true copy of which is appended to the Rising Aff. at <u>Tab 21</u>).  In response to Interrogatory No. 20, which asked AVX to "[p]lease state all of the damages that AVX claims to have sustained" as a result of Cabot's alleged misconduct, AVX answered that it "ha[d] not yet calculated its damages."  *Id.*, Response to Int. No. 20.

37.     Cabot subsequently moved to compel further, more substantive responses to its First Set of Interrogatories from AVX on April 13, 2007.  (*See* Docket Nos. 56 and 57.)  AVX submitted its Opposition to Cabot's Motion to Compel on April 27, 2007.  (*See* Docket No. 59.)  In response to Cabot's request that AVX be ordered to provide a more substantive response to Cabot's Interrogatory No. 20 seeking information concerning AVX's alleged damages, AVX stated:

> AVX stands by its response that it has not yet calculated its damages.  It is premature for AVX to assert "all" of its damages.  AVX has been damages by the excess of the amounts paid under the January 2001 Supply Agreement over the term of that agreement over the fair market prices of those products over the term of that agreement.  AVX intends to prove it damages at trial.  These calculations cannot be made at this preliminary stage of this litigation.  AVX is mindful of its obligations under FRCP 26(e) regarding supplementation of answers to interrogatories.

*Id.*, pp. 9-10.

38.     AVX never supplemented its answer to Interrogatory No. 20 from Cabot's First Set of Interrogatories.  Rising Aff., ¶ 20.

39.    On December 5, 2007, AVX produced Peter Collis, Vice President of AVX's

worldwide tantalum operations, to testify on AVX's behalf under Rule 30(b)(6) with respect to,

*inter alia*:

> [a]ny damages that AVX claims to have sustained on account of
> the conduct alleged in the Complaint, including but not limited to
> the complete nature and amount of such damages, and the precise
> means by which AVX calculated such damages.

Cabot Notices of Deposition (Rising Aff., Tab 16); Collis Depo., pp. 8-9, 120 (Rising Aff.,

Tab 17).

40.    When questioned on the topic of AVX's alleged damages at his December 5,

2007 deposition, Mr. Collis testified, in relevant part, as follows:

> Q.    What damages has AVX sustained as a result of the
> conduct of Cabot that is alleged in the Complaint in this
> matter?
>
> A.    That is being calculated by our outside expert.
>
> Q.    Has AVX sustained damages?
>
> A.    Yes.
>
> Q.    Do you have any understanding right now of the monetary
> value of those damages?
>
> A.    We have monitored the market price of material and
> compared that with what we ended up paying in the
> contract when we used the material as against what the
> market price was at the time, and passed that to our expert.
>
> Q.    How would you go about calculating AVX's damages in
> this matter?
>
> A.    How would I go about calculating.
>
> MR. GOREN:  Objection.  You may answer.
>
> THE WITNESS:  Basically, we've left that with our expert
> to come up with that calculation.

Collis Depo., pp. 117-18 (Rising Aff., <u>Tab 17</u>).

41.     On December 15, 2007, AVX served Cabot with the report of AVX's economic expert, Dr. Steven Schwartz, describing Dr. Schwartz's opinions and anticipated trial testimony in this action pursuant to Fed. R. Civ. P. 26(a).  (A true copy of Dr. Schwartz's expert report, which was designated "Privileged and Highly Confidential" by AVX, previously was filed under seal in conjunction with Cabot's Opposition to AVX's Motion for Leave to File Substitute Expert Report, dated February 19, 2008 (Docket No. 102)).   However, Dr. Schwartz's report contains no information, opinions, or description of any anticipated expert testimony concerning the nature or amount of AVX's alleged damages.  *Id.*

42.     Cabot deposed Dr. Schwartz on February 19, 2008.   In the course of his deposition, Dr. Schwartz testified, in part, that his expert report in this action does not address AVX's alleged damages because he "hadn't been asked" by AVX to render an opinion on that topic prior to issuing that report.  Schwartz Depo., pp. 201-202 (Rising Aff., <u>Tab 19</u>).

CABOT CORPORATION

By its attorneys,


/s/ Brian A. Davis
Robert S. Frank, Jr. (BBO No. 177240)
       (rfrank@choate.com)
Brian A. Davis (BBO No. 546462)
       (bad@choate.com)
Julie C. Rising (BBO No. 666950)
       (jrising@choate.com)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:   March 31, 2008




## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on March 31, 2008.



/s/ Julie C. Rising




4316070.1