TAB #4



## SUPPLY AGREEMENT

This Supply Agreement made effective as of the first day of January 2001 by and between Cabot Corporation, Cabot Performance Materials Division ("CPM") and AVX Limited and AVX Corporation (individually and collectively "Buyer"). In consideration of the mutual promises herein contained and other good and valuable consideration, Buyer and CPM hereby agree as follows:

1. **PERIOD OF AGREEMENT**

   This agreement shall be effective as of the date set forth above. This Agreement shall govern sales of the tantalum powder, wire and K2TaF7 described on Appendix A (individually and collectively "Product" or "Products"), all of which shall be delivered between the date hereof and December 31, 2005.

2. **QUANTITIES; RIGHT OF FIRST REFUSAL FOR ADDITIONAL QUANTITIES; SCHEDULING**

   Buyer shall purchase and CPM shall sell the "minimum purchase quantity" ("Minimum Purchase Quantity") of each Product described on Appendix A. In calendar year ("CY") 2001, Buyer shall purchase and CPM shall sell such portion of the "as available purchase quantity" of K2TaF7 and nodular tantalum powder described on Appendix A ("As Available Products") as CPM may have available for purchase. In CY 2002 and each calendar year thereafter, if mutually agreed, Buyer may elect to substitute nodular tantalum powder for up to 20,000 lbs of the flake tantalum powder required to be purchased under this Agreement.

   In addition, if CPM increases the actual manufacturing capacity of its Boyertown, PA tantalum powder production facilities to more than its Base Capacity, as defined in Section 3, CPM shall offer to Buyer first such portion of the capacity for CY 2003, 2004 and 2005 in excess of its tantalum powder Base Capacity as is equal to (i) the total number of pounds of tantalum powder purchased by Buyer during CY 2002, divided by (ii) the total number of pounds of tantalum powder shipped by CPM from the Boyertown Facility during CY 2002. If Buyer declines or CPM and Buyer do not reach an agreement with respect to such capacity within thirty (30) days after CPM gives Buyer written notice of its capacity expansion, CPM shall be free to enter into negotiations and conclude transactions with third parties ("Third Party Expansion Sales"), provided that the terms of such third party transactions are not more favorable than the last terms offered by CPM and rejected by Buyer.

   Prior to the beginning of calendar year CY 2002 and each calendar year thereafter, CPM and Buyer shall agree on the mix and volume of Products comprising the Minimum Purchase Quantities of tantalum powder and wire. No grade of flake tantalum powder with a cv/gm greater than that of C255 shall account for more than 50% of the total tantalum Minimum Purchase Quantity of flake tantalum powder in CY 2002 and no grade of flake tantalum powder with a cv/gm in excess of that of C255 shall account for more than 64% of the total tantalum Minimum Purchase Quantity of flake tantalum powder in CY 2003 through 2005.

   The Products to be purchased and sold under this Agreement in each calendar year shall be delivered throughout the year in approximately equal monthly shipments, except that shipments under the AVX purchase orders listed on Appendix A shall be made at the times specified on Appendix A. Prior to the beginning of each calendar year during the term of this Agreement, Buyer and CPM shall agree for capacity planning purposes on a non-binding, 12 month estimated shipping forecast of the specific products to be delivered hereunder by type, grade, volume and delivery date. In addition, each month during the term of this Agreement, Buyer and CPM shall agree on a detailed six (6) month rolling forecast of the specific Products to be delivered hereunder by type, grade, volume and delivery date ("Six Month Forecast"). The first twelve (12) weeks of each Six Month Forecast shall be binding on Buyer and CPM.

Exhibit 42
3|8

Buyer shall in all events pay CPM each year for (i) the full Minimum Purchase Quantity of all Products, provided that CPM has made such products available for delivery to Buyer, and (ii) all Product that Buyer agrees to purchase pursuant to the paragraph immediately above, regardless of whether Buyer takes delivery of such products.

In CY 2001 (i) all K2TaF7 sales shall be FCA Boyertown, PA, (ii) all tantalum powder and wire sales designated "Biddeford" on Appendix A shall be CIP Biddeford, ME and (iii) all tantalum powder and wire sales designated "Europe" on Appendix A shall be CIP Heathrow Airport. All other sales shall be FCA Boyertown, PA.

3.  PRICE

    The prices for Products to be purchased and sold during the term of this agreement are listed on Appendix A.

    If CPM sells any grade of tantalum powder or wire from its "Base Capacity" (which shall mean as to tantalum powder the total number of pounds of tantalum powder shipped by CPM in CY 2002 to all parties and shall mean as to tantalum wire the total pounds of tantalum wire shipped to all parties by CPM in CY 2002) to a third party for delivery in CY 2003, 2004 or 2005 at a price (FCA Boyertown) that, regardless of any special terms, conditions, rebates or allowances, is less than Buyer's price under this Agreement for an equivalent grade of tantalum powder (which shall be defined as the same CV/gram +/- 5%) or wire (defined by grade and diameter) then Buyer's price for a subsequent purchase of the same quantity and grade of tantalum powder or wire shall be reduced to the lower third party price. (In no event, however, shall the quantity of any Product as to which Buyer's price is reduced under this Section exceed, in any one case or in all cases taken together, the number of pounds of such Product to be purchased by Buyer under this Agreement.) If Buyer is not then obligated under this Agreement to purchase at least the same quantity and grade of the applicable tantalum powder or wire during the remainder of this Agreement, CPM shall issue Buyer a credit in the amount of the unusable portion of the price reduction that may be applied against any other purchase required to made under this Agreement. CPM shall issue Buyer a cash refund in the amount of any credit remaining after all purchases required under this Agreement have been made.

    The preceding paragraph shall not, however, apply with respect to (i) sales of tantalum powder or wire as a result of the expansion of CPM's Base Capacity (ii) Third Party Expansion Sales, (iii) K2TaF7 and (iv) contracts entered into by CPM prior to the date of this Agreement.

    Buyer shall have the right, upon reasonable prior notice, to have an independent certified public accounting firm audit, during normal business hours, CPM's compliance with this Section 3.

4.  CONSIGNMENT OF POWDER AND WIRE; INVOICES AND PAYMENT FOR PRODUCTS

    All tantalum powder and wire shall be initially delivered to Buyer on consignment. Buyer shall bear the risk of loss of consigned Products and Buyer shall keep all consigned Products in a safe, secure, segregated location at Buyer's expense. Buyer shall be required to purchase all Products delivered on consignment, but consigned Products shall remain the property of CPM until they are paid for in full. CPM shall have the right to inspect all consigned Products and to audit Buyer's records respecting consigned Product at any time.

    With respect to all tantalum powder and wire delivered to Buyer on consignment between the date hereof and December 31, 2001 ("2001 Product"), Buyer shall (i) notify CPM in writing at least every fifteen (15) days of all changes in the Products held on consignment and (ii) purchase all 2001 Product no later than ninety (90) days after the first day of the first full calendar month beginning

2

*Exhibit 42* [handwritten]
*4/8* [handwritten]

after the date of delivery ("2001 Mandatory Purchase Date"). CPM shall invoice Buyer for 2001 Product upon the earlier of (i) notice of use and (ii) the 2001 Mandatory Purchase Date.

With respect to all tantalum powder and wire delivered to Buyer on consignment after December 31, 2001 ("Post 2001 Product"), Buyer shall (i) notify CPM in writing within seven (7) business days of any change in the Products held on consignment and (ii) purchase all Post 2001 Product no later than forty-five (45) days after the date of delivery ("Post 2001 Mandatory Purchase Date"). CPM shall invoice Buyer for Post 2001 Product upon the earlier of (i) notice of use and (ii) the Post 2001 Mandatory Purchase Date.

CPM shall invoice Buyer for all K2TaF7 upon delivery to Buyer. Buyer shall pay all invoices with immediately available funds within thirty (30) days of invoice date.

5. FORCE MAJEURE

Neither party hereto shall be liable to the other for default or delay in performing its obligations hereunder if caused by fire, explosion, strike, lockout, labour conflict, riot, war, acts of God, delay of carriers, governmental order or regulation or shortage of electrical or other power, so long as such Force Majeure is in effect; provided, however, that no party shall be excused by reason of Force Majeure from any obligation to pay money when due.

6. CONFIDENTIALITY

During the period of this Agreement and for a period of two years thereafter, Buyer and CPM shall not disclose the terms of this Agreement. The provisions of this Section 6 shall survive the termination of this Agreement.

7. WARRANTY; LIMITATION OF LIABILITY

All Products delivered by CPM shall conform at the time of delivery to the specifications mutually agreed upon by Buyer and CPM as of the date of release for shipment. CPM shall replace or refund the purchase price of any Product that does not so conform at the time of delivery. CPM MAKES NO OTHER WARRANTY OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL CPM BE RESPONSIBLE OR LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

8. SCRAP SALE BY BUYER

Each calendar quarter during the term of this Agreement, Buyer shall sell and CPM shall purchase such quantity of tantalum contained in scrap materials ("Scrap") of the grades and at the prices set forth on Appendix B as is equal to fourteen percent (14%) by total weight, contained tantalum, of the tantalum powder and wire (but not K2TaF7) shipped to Buyer by CPM. Scrap prices are FCA Buyer's plant, i.e. freight paid by CPM. It is expected that Scrap will be supplied in approximately equal quarterly shipments.

If Buyer sells any grade of Scrap to a third party for delivery in CY 2003, 2004 or 2005 at a price (FCA Buyer's plant) that, regardless of any special terms, conditions, rebates or allowances, is less than CPM's price under this Agreement for an equivalent grade of Scrap then CPM's price for a subsequent purchase of the same quantity and grade Scrap shall be reduced to the lower third party price. (In no event, however, shall the quantity of Scrap as to which CPM's price is reduced under this Section exceed, in any one case or in all cases taken together, the number of pounds of Scrap to

Exhibit 4.
578

be purchased by CPM as calculated pursuant to the paragraph immediately above.) If CPM is not then obligated under this Agreement to purchase at least the same quantity and grade of Scrap during the remainder of the CY in which such third party sale is made, Buyer shall issue CPM a credit in the amount of the unusable portion of the price reduction that may be applied against any other purchase required to made under this Agreement. Buyer shall issue CPM a cash refund in the amount of any credit remaining after all purchases required under this Agreement have been made.

CPM shall have the right, upon reasonable prior notice, to have an independent certified public accounting firm audit, during normal business hours, Buyer's compliance with this Section.

9. GOVERNING LAW

This Agreement shall be governed by and construed under the laws of The Commonwealth of Massachusetts, Incoterms 2000 and the federal laws of the United States. The United Nations Convention for International Sales and Purchases of Goods shall not apply.

10. COMPLETE AGREEMENT; RELEASE

This Agreement constitutes the entire understanding of the parties and supersede all prior purchases orders (except to the extent expressly incorporated herein by reference) discussions, agreements and letters of intent between the parties, including, without limitation, AVX purchase orders listed on Appendix A and the existing Letters of Intent between CPM and AVX respecting tantalum wire and tantalum (individually and collectively the "Prior Agreements") all of which shall have no force and effect and shall create no liabilities or obligations for either party or any affiliate of either party. This Agreement also constitutes full accord and satisfaction between Buyer and CPM with respect to the Prior Agreements. Buyer and CPM hereby release each other from any and all claims and causes of action relating to, or arising under, the Prior Agreements that Buyer and CPM may now or hereafter have.

11. MISCELLANEOUS

No modification of this Agreement or waiver of the terms and conditions hereof shall be effective unless made in writing and signed by authorized representatives of both parties and no such modification or waiver shall be affected by the acknowledgement of acceptance of purchase order forms or order acknowledgement forms containing other or different terms and conditions unless such forms expressly state (other than in pre-printed language) that they are intended to be a modification or waiver of the terms of this Agreement and are signed by an authorized representative of CPM and Buyer. No waiver by either party of any breach of any of the terms and conditions herein contained to be performed by the other party, shall be construed as a waiver of any subsequent breach, whether of the same or of any other term or condition hereof.

This Agreement may not be transferred or assigned by either party without the written consent of the other party, except as a part of the transfer of substantially all of such party's capital stock, assets or business unit to which this Agreement pertains. This Agreement shall benefit and bind the parties and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day, month and year above written.

Exhibit 42
6/8

Cabot Corporation
Cabot Performance Materials Division

By : _____
Title : _____President_____

AVX Limited

By : _____
Title : _____Director_____

AVX Corporation

By : _____
Title : _____VP CFO_____

5

Exhibit 42
7/8

Appendix A
Product Quantities and Prices

| | Shipments per AVX PO | | | | CY 2001 | | | CY 2002 | | CY 2003 | | CY 2004 | | CY 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Purchase Order Number | Minimum Purchase Quantity/Lb. | Shipment Date | $/Lb | Minimum Purchase Quantity/Lbs | As Available Purchase Quantity /Lbs | $/Lbs | Minimum Purchase Quantity/Lbs | $/Lbs | Minimum Purchase Quantity/Lbs | $/Lbs | Minimum Purchase Quantity/Lbs | $/Lbs | Minimum Purchase Quantity/Lbs | $/Lbs |
| **TA POWDER** | | | | | | | | | | | | | | | |
| **Biddeford** | | | | | | | | | | | | | | | |
| Nodular | GL01052 | unshipped balance | To be agreed | per PO | 25,000 | 5,000 | $500 | 30,000 | $500 | 30,000 | $500* | 30,000 | $500* | 30,000 | $500* |
| Flake | GL01053 | 50<br>50 | 1/18/01<br>2/15/01 | per PO | | | | | | | | | | | |
| **Europe** | | | | | | | | | | | | | | | |
| Nodular | PCON001956<br>PCON001287 | unshipped balance<br><br>330<br>331 | To be agreed<br><br>1/25/01<br>3/26/01 | per PO<br><br>per PO<br>per PO | 0 | 0 | n/a | 10,000 | $500 | 10,000 | $500* | 10,000 | $500* | 10,000 | $500* |
| Flake | PCON000927<br><br>PCON001965 | unshipped balance<br><br>unshipped balance | 1/18/01<br><br>1/11/01 | per PO<br><br>per PO | 50,000 | 0 | $500 | 70,000 | $500 | 70,000 | $500* | 70,000 | $500* | 70,000 | $500 |
| **TA WIRE** | | | | | | | | | | | | | | | |
| **Biddeford** | | | | | 4,400 | 0 | $550 | 5,400 | $550 | 6,600 | $550* | 6,600 | $550* | 6,600 | $550 |
| Europe | LCON002459 | 1102<br><br>441<br>441 | To be agreed<br><br>1/19/01<br>2/16/01 | per PO | 11,000 | 0 | $550 | 10,500 | $550 | 10,000 | $550* | 10,000 | $550* | 10,000 | $550 |
| **K2TaF7** | | | | | | | | | | | | | | | |
| | | 0 | | n/a | 246,500 | 105,500 | $185 | 352,000 | $185 | 352,000 | $185 | 0 | n/a | 0 | n/ |

*Subject to adjustment as set forth in Section 3.

Exhibit 42
8|8

Appendix B

Scrap Buy-Back Schedule
$/lb of Contained Tantalum**

|  | CY01-CY05** |
|---|---|
| **Type of Scrap*** |  |
| Grey Anodes | $141/lb |
| Grey Anodes on S/S bars | $101/lb |
| Pellets with binder removed | $133/lb |
| Ta Wire & Pins | $143/lb |
| Ta Wire Pins on S/S bars | $101/lb |
| Colored Anodes | $119/lb |
| Colored Anodes on S/S bars | $85/lb |
| Black & White Anodes | $111/lb |
| Black & White Anodes (on S/S bars) | $84/lb |
| Used Furnace Parts | $137/lb |
| Capacitors | $99/lb |
| Powder Floor Sweeps | $96/lb |
| Powder with binder | $114/lb |
| Powder with binder removed | $132/lb |

\* Actual classification of scrap is subject to CPM final inspection and approval.

\*\* The prices for all Scrap purchased for delivery in each calendar quarter are subject to further adjustment as set forth in Section 8

2