# TAB #5

CONFIDENTIAL

```
                                                           Page 1
 1            COMMONWEALTH OF MASSACHUSETTS

 2     SUFFOLK, SS                    SUPERIOR COURT

 3          CIVIL ACTION NO. 05-03816-BLS

 4

 5   AVX CORPORATION and AVX LIMITED,    )

 6          Plaintiffs And Defendants    )

 7          in Counterclaim,             )

 8     vs.                               )

 9   CABOT CORPORATION,                  )

10          Defendant and Plaintiff      )

11          In Counterclaim.             )

12                                              CONFIDENTIAL

13

14             **CONFIDENTIAL**          ORIGINAL

15

16       The deposition of JOHN STERLING

17   GILBERTSON, called for examination, taken before

18   ANNETTE M. MONTALVO, a Notary Public within and

19   for the Commonwealth of Massachusetts, and a

20   Registered Merit Reporter of said state, at Suite

21   3400, Two International Place, Boston,

22   Massachusetts, on the 22nd day of August, A.D.

23   2006, at 9:30 a.m.

24
```

CONFIDENTIAL

Page 86

```
 1      A.    Yes.
 2   BY MR. FRANK:
 3      Q.    In the second paragraph of Exhibit 172,
 4   you refer to a company called Starck.  Do you see
 5   that?
 6      A.    Yes.
 7      Q.    And is it correct that Starck -- that
 8   HC Starck was AVX's primary supplier of tantalum
 9   powders and wires?
10      A.    Yes.
11      Q.    Immediately under that you set forth
12   your understanding of AVX's needs, is that
13   correct, and priorities?
14      A.    From Cabot, yes.
15      Q.    Okay.  The first priority was the
16   Biddeford product, and you said 10 to 15 tons, do
17   you see that?
18      A.    Yes I do.
19      Q.    That would be 20 to 30,000 pounds of
20   the product that was used in Biddeford, correct?
21      A.    Yes.
22      Q.    Okay.  The second priority was "54 tons
23   of raw that we will get processed elsewhere," and
24   that you say "which he is apparently stuck with."
```

CONFIDENTIAL

Page 87

```
 1   That's a reference to KTaF; is that correct?
 2       A.    Yes.
 3       Q.    And the third is "the flake that he
 4   only sells to us for" -- the third priority was
 5   "the flake that he only sells to us for high
 6   voltage."  The "he" there is a reference to
 7   Cabot, correct?
 8       A.    Yes.
 9       Q.    About two or three lines down in the
10   memorandum you say, "Vishay is telling the story
11   in the field that they have bought all his
12   capacity to process material and this may be
13   true."
14             What had you been -- what had been
15   reported to you about what Vishay was saying in
16   the field?
17       A.    That they were telling in the field
18   that they had a contract with Cabot for all their
19   material, which turned out not to be true.
20       Q.    But -- withdrawn.
21             You informed Mr. Rosen, did you not,
22   that Cabot had verbally agreed to supply the
23   material that sometime prior to September 28 --
24   withdrawn.
```

CONFIDENTIAL

Page 146

```
 1   material available, and if it were to become
 2   available later, we would like to get an
 3   opportunity for it.
 4        Q.   Okay.  Item 3 proposes to purchase
 5   50,000 pounds of flake material at $500 a pound
 6   in year 1, and 80,000 pounds of flake at that
 7   price in year 2; do you see that?
 8        A.   Yes, I see that.
 9        Q.   And you also proposed to purchase
10   80,000 pounds in years 3 and 4 at the most
11   favored customer price, correct?
12        A.   Yes.
13        Q.   Okay.  And you made a similar offer at
14   $550 a pounds for wire, correct?
15        A.   Yes.
16        Q.   Okay.  And in item 7 you proposed that
17   if other powders were available in years 2 and
18   thereafter beyond the material needed for
19   Biddeford or for flake, you proposed to purchase
20   that material -- you proposed to purchase 60,000
21   pounds of that material at $500 per pound?
22        A.   Yes.
23        Q.   Okay.  Why did you make that proposal?
24        A.   I think that this was, again, the
```

Page 147

1    concern that we just did not have enough flake or
2    Biddeford material available, and I was trying to
3    leave it open that if there were subsequent
4    materials available, because these were so
5    critical to us, that we would like to purchase
6    them further.
7        Q.    At the top of the second page you say
8    in the second sentence:  "It is critical that AVX
9    operates its business on a level playing field in
10   terms of competitive price and that Cabot would
11   do this in an efficient manner;" do you see that?
12       A.    Yes, I see that.
13       Q.    And is it correct that what you were
14   asking for was the same treatment as was being
15   received by Cabot's most favored customer?
16       A.    No.
17       Q.    Okay.  So you thought -- was it your
18   opinion that "level playing field" meant that you
19   would get better treatment than Cabot's most
20   favored customer?
21       MR. SLAVITT:  Objection.  You can answer.
22   BY THE WITNESS:
23       A.    My impression --
24   BY MR. FRANK:

CONFIDENTIAL

Page 151

1    Q.    Okay. Do you -- did you discuss -- did
2    you receive a response by Mr. Slavitt to your
3    e-mail, which is the Exhibit 98?
4    A.    I asked for his thoughts. I must have.
5    I do not remember.
6    Q.    Okay. Did you talk to Mr. Slavitt?
7    A.    I don't remember, but I probably did.
8    Q.    Do you have notes of that conversation?
9    A.    No, I don't.
10   Q.    Did you in this period of time speak to
11   Mr. Slavitt about your -- about a most favored
12   customer contract provision or your objectives
13   with respect to such a provision?
14   A.    I don't remember specifically doing
15   that.
16   Q.    Okay. I judge from the body language
17   that you are not saying you didn't --
18   A.    I am definitely not saying I didn't, I
19   just don't remember.
20   Q.    Okay. Turning to the second page of
21   Exhibit 98, had you discussed the substance of
22   what appears on the third, fourth, and fifth
23   pages of Exhibit 98 with Mr. Odle to determine
24   whether the principles stated on those pages were

CONFIDENTIAL

Page 152

1  something that he would recommend to his boss,
2  Mr. Burns?
3      A.    My impression is the answer would be
4  yes because we had several phone conversations
5  around these talking points, and there were
6  several talking points exchanged back and forth.
7      Q.    Do you believe that you said to
8  Mr. Odle in the course of those several telephone
9  calls substantially what appears on pages 3, 4,
10 and 5 of Exhibit 98?
11     A.    Yes.
12     Q.    Turn, if you would, to the third
13 page -- I'm sorry, to what is the fourth page of
14 the document. And I just want to call your
15 attention to one thing that is on that page.
16 Towards the bottom there's a reference to AVX's
17 capital expansion plans, perhaps four or five
18 paragraphs up from the very end?
19     A.    Right.
20     Q.    Would you just read that sentence to
21 yourself, and then my question is, what were the
22 capital expansion plans to which you made
23 reference?
24     A.    My point was that at that time there

Page 165

1    A.    Yes, I do.

2    Q.    And then you say in the text above the
3 chart: "I lowered the commitment to 25,000 pounds
4 in Biddeford. How about a statement that you
5 will try to add 5,000 pounds"?

6    A.    Yes.

7    Q.    Do you see that?

8    A.    Yes.

9    Q.    Is it fair to say that your objective
10 was, if you could, to purchase additional nodular
11 powder?

12    A.    Yes.

13    Q.    Okay. And is it -- directing your
14 attention to the continuation of the chart, the
15 second page, the very top of that chart there's a
16 listing of 10,000 pounds of nodular powder under
17 the heading Europe in the years 2002 through
18 2005, do you see that?

19    A.    I see that, yes. This was basically
20 Tom's chart, you know.

21    Q.    Okay. Now if you will look just above
22 the chart, and you will see it says, "change the
23 nodular to 10,000 pounds, which our side is very
24 uncomfortable with as a good faith from our

Page 166

1  side." Do you see that? Just above the chart.

2    A.    I see that, yes.

3    Q.    Is it correct that you were
4  uncomfortable with the reduction from 60,000
5  pounds of nodular powder as shown on Mr. Odle's
6  e-mail, Exhibit 181, to the 10,000 pounds as
7  shown on Exhibit 2?

8    A.    Yes.

9    Q.    Because you wanted more if you could
10 get it?

11    A.    Right.

12    Q.    I'm sorry?

13    A.    Yes, correct.

14    Q.    Directing your attention Exhibit 2 to
15 the first full paragraph under the second "Tom,"
16 it says, "the most favored nation/customer in
17 some term in year 3 to 5 of the agreement is the
18 only way we have of ensuring that level playing
19 field."

20    Did you communicate to Mr. Odle that
21 the most favored customer provision that you were
22 suggesting was designed to create a level playing
23 field among AVX's -- between AVX and Cabot's
24 otherwise most favored customer?

CONFIDENTIAL

Page 176

1   BY MR. FRANK:
2       Q.   Is Exhibit 184 an e-mail and
3   essentially final proposal that you forwarded to
4   Mr. Odle on or about November 7, excluding only
5   the material which begins -- which appears at the
6   very top of the first page of Exhibit 184.
7       A.   Yes, it appears to be that.
8       Q.   Now, addressing -- looking at the first
9   page of Exhibit 184, you see the message beside
10  the word "Tom," first page of the document?
11      A.   Right.
12      Q.   Did that accurately reflect your view
13  at the time?
14      A.   My statement here means --
15      Q.   Did that accurately reflect your view
16  at the time?
17      A.   No.
18      Q.   Did you tell Mr. Odle that it did not
19  accurately reflect your view at the time?
20      A.   Mr. Odle was --
21      Q.   Did you tell Mr. Odle that it did not
22  accurately reflect your view at the time?
23      A.   No.
24      Q.   Was it your understanding that this