# TAB #12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| AVX CORPORATION, | : |
| Plaintiff, | : |
| | : Civil Action No._____ |
| v. | : |
| CABOT CORPORATION and<br>CABOT PERFORMANCE<br>MATERIALS, INC., | : **02 - 11524 RGS** |
| Defendant. | : |

## COMPLAINT

### INTRODUCTION

Plaintiff and defendant had a contract for the supply of tantalum. Despite that agreement, when the market for tantalum went from relatively stable to extremely volatile, defendant, one of the largest players in the market, took advantage of its strong position and plaintiff's weakened position to force plaintiff into agreeing to a new, highly unfavorable set of terms for supply of the tantalum defendant had already contracted to supply. Without those new terms, despite the parties' previous agreement, defendant said it would be "simply unable" to supply plaintiff with the tantalum it needed. Plaintiff, to its significant detriment, had no choice but to enter into a new long-term agreement. Further, as time has passed, defendant has not even lived up to the terms of the new agreement.

## PARTIES

1. Plaintiff, AVX Corporation ("AVX") is a South Carolina corporation with its principal place of business at 801 17th Avenue, South, Myrtle Beach, South Carolina. In addition to its South Carolina office, AVX has plants in Biddeford, ME, and Paignton, England, as well as other plants and affiliated companies worldwide.

2. Defendant, Cabot Corporation ("Cabot") is a Delaware Corporation with its principal place of business at Two Seaport Lane, Suite 1300, Boston, MA 02109. Cabot also has divisions and affiliated companies worldwide, including its incorporated division, Cabot Performance Materials ("CPM") located in Boyertown, PA.

## JURISDICTION AND VENUE

3. Diversity jurisdiction is based on 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. AVX is a South Carolina corporation and Cabot is a Delaware corporation with its principal place of business in Boston, MA.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## FACTS

### AVX Manufactures Passive Electronic Components and Uses Tantalum in that Process.

5. AVX is a manufacturer and supplier of passive electronic components and related products that are used in a variety of electronic devices. Passive components are not those "smart" parts of the numerous computerized devices available today, but rather those components that facilitate the passing of electrical charges by which those computers work.

6. Tantalum, a naturally occurring element, is used by AVX and others in its industry to create capacitors, devices that store electrical charges. Because tantalum forms a

dense, stable, tightly adhering, electrically insulating oxide, tantalum capacitors have a much higher ability to store electricity in a much smaller space than those made out of other materials. Tantalum is available in several forms, including wire and several different grades of powder, including flake.

7. Capacitors are made from the powder form of tantalum. Different grades of powder are used to make different kinds of capacitors. Smaller grades are used to make those capacitors that go in smaller devices, such as cell phones and personal digital assistants. The bulkier, higher voltage powders are used in capacitors for bigger instruments, such as personal computers.

8. AVX has numerous customers for its tantalum capacitors, including original electronic equipment manufacturers, medical device companies and military contractors. AVX's relationships with its customers and clients depend on its being able to supply them with capacitors, which, in turn depends on AVX's ability to procure a high enough grade of tantalum.

**The Tantalum Market is Controlled by a Few Key Players and Can Be Volatile.**

9. Commercially mined tantalum ores containing the mineral tantalite are the primary source of tantalum. Australia has the biggest confirmed ore reserves, approximately 42% of the global total. Thailand, Nigeria, the Congo, Canada, Brazil and Malaysia are potential other sources of tantalum, but there are various difficulties in accessing the stores in those countries. The recycling/scrap market also provides some tantalum.

10. Cabot is one of four companies worldwide that processes tantalum for sale to companies like AVX. Tantalum represents 14% of Cabot's sales, but a substantially higher percentage of its profits. Two of the other tantalum processing companies are H.C. Starck

("Starck") and NEICC. The last of the four is Showa Cabot, a 50% joint venture between Cabot and the Japanese company Showa Denko.

11. The Australian tantalum mines are controlled by the Sons of Gwalia. Cabot owns 8% of the Sons of Gwalia and takes 75% of the output from its mines. Cabot also has its own tantalum mining facility at Lac du Bonnet, Manitoba. Cabot's operation processes 50% of the world's tantalum and Cabot is the dominant company in high voltage powder processing.

12. Cabot markets its "flake" tantalum powder product as unique in the industry.

13. The demand for tantalum is largely tied to the electronics market. For example, as the demand for electronic devices has grown, so has the demand for tantalum. Tantalum is also used in the aerospace industry; specialty alloys containing tantalum were used in the International Space Station.

14. In the past several years, the tantalum market has exhibited some instability. Despite what appears to be the general availability of tantalum, in part because there is a long lead time in developing new sources of the element, short term increases in marginal demand can drive the price up dramatically. In the last two years, the market has seen occasions when spot prices have increased by multiples.

15. A great deal of the tantalum supply is locked up in long term contracts, and the parties to those contracts can and do exert substantial control over the market. Half of the Sons of Gwalia's world-wide production is committed to long-term contracts with Cabot and Starck, giving those two companies substantial control over the tantalum prices and supplies.

### Cabot and AVX Signed an Enforceable Agreement

16. AVX and Cabot have had a long-standing business relationship. Generally, AVX has bought 50% of its high voltage powder from Cabot because Cabot's processing of the powder prepares it more readily for AVX's use. AVX also buys 10% of all of its other tantalum sources, including wire, from Cabot. Cabot is aware of AVX's reliance on reliable supplies of tantalum from Cabot.

17. In November 1999, Cabot approached AVX to negotiate a two year contract for the pricing and supply of tantalum powder. See letter dated November 30, 1999 from Kurt Habecker of CPM to John Chapple at AVX, attached hereto as Exhibit A. The parties' relationship had been governed by similar agreements in the past.

18. Exhibit A reads as follows, "Our Proposal #1 (Attachment 1) encompasses the essence of the challenged and opportunities: a multi-year _**contract**_, assured supply for AVX, and technical development. We strongly endorse this proposal, versus proposals #2 and 3 as the most beneficial to AVX." (emphasis added)

19. Exhibit A further states, "We hope to agree on Proposal #1 at this week's meeting . . . ."

20. AVX and Cabot entered into a two-year Letter of Intent ("2000 Letter of Intent") containing terms substantially similar to those in Exhibit A. See 2000 Letter of Intent, a true and correct copy of which is attached hereto as Exhibit B.

21. The 2000 Letter of Intent contains the prices at which AVX would purchase each different kind of tantalum powder, as well as the amounts of those powders AVX would buy and conditions for the powders' delivery.

22. In addition, the 2000 Letter of Intent contains the following Terms and Conditions:

1. Orders to be released quarterly.
2. Minimum notice for delivery 4/5 weeks.
3. Specification covered by RMS 489 latest issue.
4. All prices are CIF Heathrow Airport or CIF Prague or F.O.B. delivered to Biddeford, ME. Prices include 90 days (maximum) c consignment in either Paignton, Lanskroun or Biddeford.
5. The two-year contract period will be for orders from 1st February 2000, through 31st January 2002, and for shipments through 28 February 2002. Year 2 prices will be effective for orders received beginning 1st February 2001 and for shipments scheduled on or after 28th February 2001.
6. AVX agrees to take or pay for a minimum of 26,494 kg or C606 no later than 18 months after the commencement of Year 1 of this contract provided the material conforms to the AVX requirements.
7. Consignment terms as currently agreed.

23. The 2000 Letter of Intent is signed by Earl H. Tyler ("Tyler"), Strategic Business Unit Manager, for Cabot and by John Chapple ("Chapple") for AVX. Tyler and Chapple had negotiated such agreements in the past.

24. For most of the year 2000, the parties operated under the 2000 Letter of Intent without incident.

**Despite the Existing Agreement, Cabot Took Advantage of a
Tantalum Shortage to Coerce AVX into Negotiating a
<u>New Agreement on Terms Far More Advantageous to Cabot.</u>**

25. Towards the end of 2000, a tantalum shortage became evident. Because of its industry expertise, Cabot understood that shortage to be transitory.

26. Cabot approached AVX, claiming that the 2000 Letter of Intent was invalid. Cabot was aware that it was the only source of the high voltage tantalum powders that AVX used. Cabot was also aware that failure to secure sufficient tantalum would be devastating

to AVX's business, both in its short-term profits and in its reputation among its customers and in the industry generally.

27. On August 7, 2000, Thomas Odle, Vice President and General Manager of CPM ("Odle") wrote to John Gilbertson, President of AVX ("August 7 Letter"). A true and correct copy of that letter is attached hereto as Exhibit C.

28. In the August 7 Letter, Odle states that, "I want to make it clear that without a contract, I do not believe we will be able to meet your needs in those years."

29. AVX believed that the 2000 Letter of Intent was valid, but believed it had no choice other than to bargain with Cabot. Upon information and belief, had AVX chosen to litigate to enforce the 2000 Letter of Intent, Cabot would have ceased the delivery of tantalum that AVX desperately needed.

30. On August 18, 2000, Tyler and Chapple met to discuss tantalum supplies and prices going forward. Tyler sent an e-mail Chapple on September 5, 2000 ("September 5 e-mail"), confirming the terms of Cabot's offer. A true and correct copy of the September 5 e-mail is attached hereto as Exhibit D. Chapple responded, sending along AVX's powder requirements.

31. AVX was convinced the parties had reached some common ground until Tyler telephoned Chapple to tell him that Cabot had sold all its tantalum powder for 2001, reserving only a small quantity for AVX. See Letter dated September 6, 2000, from Chapple to Tyler, a true and correct copy of which is attached hereto as Exhibit E.

32. AVX continued to negotiate in good faith. Cabot, knowing AVX could not fulfill its customers' needs without Cabot's tantalum, continued to insist upon a long-term contract for lesser quantities of tantalum at substantially higher prices than those in the 2000

Letter of Intent. Cabot also threatened to halt negotiations entirely and cease delivery of tantalum should AVX take any steps to have the 2000 Letter of Intent enforced.

33. In October of 2000, Ernie Chilton ("Chilton") Senior Vice President of AVX wrote to Odle. A true and correct copy of that letter is attached hereto as Exhibit F. In that letter, a Chilton informed Odle that "Cabot has been a critical supplier to AVX and is a sole source on many of its products." AVX, through Chilton, offered to pay as much as 60-70 % "over the calendar 2000 price" for certain amounts of material that only Cabot supplies. In addition, AVX agreed to commit to a long term, five-year proposal.

34. AVX, still at Cabot's mercy, continued to negotiate and attempt to secure the best possible arrangement under the circumstances. Cabot continued to insist on a long-term contract for lesser supplies of tantalum at much higher prices. Finally, because AVX needed to be able to assure its clients that it would have sufficient tantalum to meet their demands, AVX agreed to Cabot's offer and signed the 2001 Supply Agreement. A true and correct copy of the contract is attached hereto as Exhibit G.

35. Certain of AVX's competitors have found themselves subject to identical treatment at Cabot's hands and have filed suit to recover their damages.

### Cabot Touted its New Favorable Contracts in Its Annual Report and in Industry Publications.

36. Cabot was featured in the May 2, 2001 issue of Chemical Week in an article called "Investing in Itself." A true and correct copy of that article is attached hereto as Exhibit H.

37. In part, that article reads as follows:

> The big story in Cabot's performance materials business is the renegotiation of tantalum contracts with customers in the electronics industry, which use tantalum to

make capacitors. Tantalum prices skyrocketed as the traditional source, a byproduct of tin mining in Asia, began drying up. The tantalum business earned $40 million in fiscal 2000, but it lost money in the fiscal first quarter of this year as prices for tantalum raw material continued to climb.

"We took advantage of the shortage to enter into long term contracts with our customers," says [Ken Burnes, President of Cabot]. "They were pure margin improvement contracts." Earnings will as a result be three times higher in fiscal 2002 than in 2000, an earnings power equal to that of [Cabot's main product]. The effect is so significant that Cabot had advised analysts to increase earnings estimates for the second fiscal quarter. Earnings in the performance materials business more than tripled in the second fiscal quarter, to $26 million, on a near doubling of sales, driven by a 26% increase in volumes and 56% increase in price.

38. Cabot's published an Annual Report for Fiscal Year ending September 30, 2001. A true and correct copy of that annual report is attached hereto as Exhibit I.

39. With respect to the Outlook for 2002 in Performance Materials, Cabot's Annual Report reads as follows:

Cabot's long term contracts with its customers call for specified volumes and prices for the coming year; however, Cabot continues to work with its customers to look for ways to help them in these difficult market conditions while preserving the long-term value of the contracts.

### The Market Conditions that Precipitated Cabot's Actions Have Changed Considerably.

40. As the worldwide economy softened in 2001, the demand for passive components dropped off dramatically. Reduced selling prices for tantalum capacitors, coupled with increased raw material costs and low production volumes have evaporated profits.

41. Cabot management has disclosed publicly that they recognize that the committed quantities under these contracts are problematic for the capacitor manufacturers.

Cabot has indicated that they have made long term purchase commitments to the miners for ore and that they are willing to discuss extending deliveries with their customers, but Cabot is unwilling to reduce selling prices.

42. Cabot has indicated that, in return for an extension of deliveries over addition years, Cabot will seek an increased purchase commitment from AVX.

### To The Extent the 2001 Supply Agreement is an Enforceable Contract Cabot Has Breached It.

43. Having had no choice, AVX entered into the 2001 Supply Agreement with Cabot. Under the 2001 Supply Agreement, Cabot agreed to provide AVX with certain levels of C275 and C255 tantalum flake that met a commercially reasonable grade. Cabot has not abided by the terms of that agreement.

44. The 2001 Supply Agreement provides that Cabot is to supply AVX with roughly 10.3 tons of acceptable C255 and 4.2 tons of acceptable C275. To date, AVX has received only 9.1 tons of acceptable C255 and only 2.1 tons of acceptable C275. AVX has reasonably rejected a substantial amount of C255 because it was of inferior quality. Because Cabot's C275 has recently been of such poor quality, Cabot sends AVX samples of C275. Even though it needs the flake, AVX has been forced to reject those samples.

45. Thus, Cabot has not provided AVX with the amounts of tantalum, in the quality grade, that Cabot agreed to provide in the 2001 Supply Agreement. As a result of Cabot's failure to provide AVX with the proper grade and amount of tantalum required under the 2001 Supply Agreement, AVX has encountered substantial difficulties in meeting its obligations to those its clients and customers whose products rely on C275 or C255.

### AVX Suffered and Continues to Suffer Considerable Injury As a Direct and Proximate Result of Cabot's Actions.

46. Because Cabot's actions and AVX's clients' demands left AVX with no choice but to enter the 2001 contract, AVX has incurred substantially greater costs. As of the close of the first quarter of calendar year 2002, those costs totaled nearly 80 million dollars and are rising.

47. As a result of Cabot's failure to provide AVX with the proper grade and amount of tantalum required under the 2001 Supply Agreement, AVX has encountered substantial difficulties in meeting its obligations to its clients and customers. The poor grade of tantalum provided by Cabot to AVX, that AVX has been forced to make use of in its products has resulted in AVX's customers refusing to accept some of AVX's capacitors, to AVX's cost and professional detriment.

### COUNT I
### (Declaratory Judgment)

48. AVX repeats and realleges the preceding paragraphs as though the same were set forth herein.

49. Cabot and AVX negotiated the 2000 Letter of Intent. It contains necessary and specific terms of price, quantity and delivery.

50. AVX hereby requests a judgment that the 2000 Supply Agreement is a valid and enforceable contract.

## COUNT II
### (Violation of M.G.L. c. 93A- Unfair Trade Practices)

51. AVX incorporates the foregoing paragraphs by reference.

52. Cabot is engaged in trade or commerce within the Commonwealth of Massachusetts.

53. Cabot's unfair and deceptive practices and acts occurred primarily and substantially in the Commonwealth of Massachusetts, in that: Cabot is located in Massachusetts, the negotiations for the 2001 Contract took place in part Massachusetts, the coercive documents were generated from Cabot's headquarters in Boston; substantial meetings took place in the Commonwealth; correspondence originated within the Commonwealth; telephone calls were placed to the Commonwealth from outside the Commonwealth; telephone calls originating within the Commonwealth were placed to telephone numbers outside; and false representations were explicitly made or implicitly incorporated into the meetings, correspondence and telephone calls within the Commonwealth.

54. Cabot's conduct was in disregard of known contractual arrangements and was intended to secure greater benefit to Cabot and constitutes an unfair practice or act.

55. As a result, AVX has suffered damage and is entitled to treble damages under M.G.L. c. 93A.

## COUNT III
### (Violation of 15 U.S.C.§ 13 – Robinson Patman Act)

56. AVX incorporates the foregoing paragraphs by reference.

57. Cabot us engaged in commerce, selling tantalum, which is a commodity. AVX and other purchasers of Cabot's tantalum are also engaged in commerce.

58.  Cabot sold tantalum of like grade and quality contemporaneously to AVX and other purchasers. Cabot discriminated in price between AVX and other purchasers in the sale of that tantalum. The tantalum Cabot sold to AVX was for use and consumption in the United States and other locations.

59.  Cabot's discriminatory pricing has the possibility of a substantial lessening of competition in the injury destruction or prevention of competition with Cabot.

60.  AVX's has suffered and continues to suffer harm as a direct and proximate result of Cabot's control of the tantalum market and resultant discriminatory pricing.

## COUNT IV
### (Breach of Contract)

61.  AVX incorporates the foregoing paragraphs by reference.

62.  The 2000 Letter of Intent is an enforceable agreement. The parties performed under it as such for much of 2000.

63.  Cabot's failure to honor any of the terms of that contract constitutes a material breach of the 2000 Letter of Intent.

64.  AVX has suffered and continues to suffer substantial harm as a result of Cabot's breach of the 2000 Letter of Intent.

## COUNT V
### (Breach of the Covenant of Good Faith and Fair Dealing)

65.  AVX incorporates the foregoing paragraphs by reference.

66.  Cabot and AVX had a contract. In the Commonwealth, all contracts contain an implied covenant of good faith and fair dealing.

67. Cabot acted in bad faith in taking advantage of its position in the face of a tantalum shortage it knew was only temporary to coerce AVX into negotiating a new and, for Cabot substantially more favorable agreement.

68. AVX has suffered and continues to suffer harm as a result of Cabot's actions.

## COUNT VI
### (Breach of Contract)

69. AVX incorporates the foregoing paragraphs by reference.

70. If the 2001 Supply Agreement is a valid contract, then Cabot was obligated to provide AVX with the proper grade and amount of tantalum required under the 2001 Supply Agreement.

71. Cabot has failed to abide by its obligations under the 2001 Agreement.

72. As a direct and proximate result of Cabot's actions as detailed above, AVX has suffered and continues to suffer damages.

## COUNT VII
### (Tortious Interference with Advantageous Business Relationships)

73. AVX incorporates the foregoing paragraphs by reference.

74. AVX developed business relations and goodwill with its clients. That good will is based in part on AVX's ability to provide high quality tantalum capacitors within certain time constraints.

75. Cabot knew that AVX's goodwill and relationships with its customers depended on AVX receiving the right quantity and grade of tantalum powder. By failing to provide the correct amounts and grades of C275 and C255, Cabot intended to and did interfere with AVX's advantageous business relationships with its clients.

76.   As a direct result of Cabot's intentional and wrongful interference with AVX's advantageous business relationships with its clients, AVX has suffered and continues to suffer actual damages.

WHEREFORE, plaintiff, AVX Corporation, hereby respectfully requests that the Court:

1.   Enter a declaratory judgment that the 2000 Letter of Intent is valid, enforceable and binding;

2.   Enter judgment in favor of AVX for damages to be proven at trial;

3.   Multiply damages and award attorneys' fees pursuant to M.G.L. c. 93A; and

4.   Enter such other orders and relief as may be appropriate under the circumstances.

### JURY DEMAND

Plaintiff requests a jury trial on all counts so triable.

AVX CORPORATION

By its Attorneys,

Evan Slavitt, Esq. (BBO #466510)
C. Alexa Abowitz (BBO# 652945)
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  02110
Tel: (617) 345-7000

Dated: 7/26/02