TAB #17

Volume _____

Pages ___1___ ~~166~~

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * *
                                 *
AVX CORPORATION                  *
and AVX LIMITED                  *
                                 *
                                 *
              Plaintiffs,        *
                                 *
   - vs. -                       *  C. A.# 04-10467-RGS
                                 *
CABOT CORPORATION                *
                                 *
                                 *
              Defendant.         *
                                 *
* * * * * * * * * * * * * * * * *
```

DEPOSITION of AVX CORPORATION and AVX LIMITED, (Peter William Collis), a witness called by and on behalf of the Defendant, pursuant to the provisions of Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Charles E. Janey, Jr., CVR, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Choate, Hall & Stewart, Two International Place, Boston, MA 02110, on Wednesday, December 5, 2007, commencing at 12:15 p.m.

JANEY ASSOCIATES

P. O. Box 365355
Boston, MA 02136-0003
(617) 364-5555
Fax (617) 364-5550

1       have seen it before?
2              (Pause.)
3  A.   Yes.
4  Q.   This is a copy of a Notice of Deposition that was served in this case, Mr. Collis. A nearly identical one was served on AVX Limited. And again, it's my understanding that you're appearing here today to testify to certain categories in this Notice of Deposition. Is that your understanding?
10 A.   Yes.
11         MR. DAVIS: Richard, I understand that he's being designated with respect to both AVX Corporation and AVX Limited. Is that correct?
14         MR. GOREN: Correct.
15         MR. DAVIS: With respect to the same categories for both?
17         MR. GOREN: Yes.
18         BY MR. DAVIS:
19 Q.   And the specific categories for which you've designated are -- and just confirm this that is consistent with your understanding please Mr. Collis. Categories No. 7,8,9,11,13,15 and 17. I can go through again if you'd like.
24 A.   11 and 13.

JANEY ASSOCIATES

1  Q.         Also 7,8 and 9?

2  A.         Sorry.  7,8,9,11 and 13.

3  Q.         And how about 15 and 17?

4  A.         Yes.

5              MR. DAVIS: Let's mark this as the next

6  exhibit.  Exhibit No. 2

7                    (The document above-referred to

8                    was marked Deposition Exhibit No.

9                    2 for identification.)

10             BY MR. DAVIS:

11  Q.        Mr. Collis, I'll hand you a copy of a document

12  that's been marked as Exhibit 2.  I think you've

13  seen this one before?

14  A.        I believe so.

15  Q.        This is a copy of the 2001 Supply Agreement

16  between Cabot and AVX Corporation and AVX Limited.

17  Do you agree with that?

18  A.        Yes.

19  Q.        And if I refer to AVX Corporation and AVX

20  Limited jointly as AVX, is that acceptable to you?

21  A.        Yes.

22  Q.        Mr. Collis, this Supply Agreement between

23  Cabot and AVX has attached to it as Appendix A, a

24  list of products that AVX agreed to purchase from

| | | |
|---|---|---|
| 1 | | Cabot pursuant to this contract. Do you see that? |
| 2 | A. | I do. |
| 3 | Q. | Which of the products that are listed here Mr. |
| 4 | | Collis, are the products that AVX claims in this |
| 5 | | litigation it did not wish to purchase from Cabot, |
| 6 | | but was forced to do so? |
| 7 | | MR. GOREN: Objection. You may answer. |
| 8 | | THE WITNESS: The -- the basic premise |
| 9 | | was we were coerced into a five year agreement which |
| 10 | | we didn't want to get into. |
| 11 | | MR. DAVIS: Let's mark as the next |
| 12 | | exhibit this document please? Thank you. |
| 13 | | (The document above-referred to |
| 14 | | was marked Deposition Exhibit No. |
| 15 | | 3 for identification.) |
| 16 | | BY MR. DAVIS: |
| 17 | Q. | Mr. Collis you have what's been marked as |
| 18 | | Exhibit 3 which I'll represent is a copy of the |
| 19 | | Complaint and Jury Demand in this case. Have you |
| 20 | | seen this document before? |
| 21 | A. | I'm not sure. |
| 22 | Q. | On the very first page of this document, |
| 23 | | Paragraph 1, would you actually read all of |
| 24 | | Paragraph 1 to yourself for a moment, Mr. Collis |

1                    MR. DAVIS:  You can respond.

2                    THE WITNESS:  There is the nodular on

3      Biddeford, the nodular under Europe.  There's wire

4      under Biddeford, wire under Europe and KTAF for the

5      extent of the five year contract.

6              BY MR. DAVIS:

7      Q.       So I want to understand this correctly.  Are

8      you saying that AVX did not wish to purchase, as of

9      the time that it entered into this supply agreement

10     with Cabot, it did not wish to purchase any nodular

11     powder from Cabot?

12     A.       We didn't wish to purchase -- enter into an

13     agreement to purchase materials for five years.

14     Q.       Putting that to one side, the five year

15     agreement.  Were there any nodular powders that are

16     listed on this exhibit that AVX actually wished to

17     purchase from Cabot as of the time that Exhibit 2

18     was signed?

19     A.       Sorry.  Could you repeat the question?

20     Q.       Certainly.

21              Putting aside the five year length of the

22     contract, were there any nodular products that are

23     listed on Appendix A to your Exhibit No. 2, the

24     Supply Agreement, that AVX actually wished to

                        JANEY ASSOCIATES

1    purchase from Cabot as of the time that this supply

2    agreement was actually signed?

3             MR. GOREN: Independent of the other

4    terms of the contract?

5        BY MR. DAVIS:

6    Q.   Independent of the five year length of the

7    contract.

8    A.   Yes. Yes.

9    Q.   Which ones did AVX actually wish to purchase?

10   A.   We wished to purchase the ones that we had in

11   the Letter of Intent at the time that we had the

12   original agreement.

13        And we also entered in the KTAF Agreement to

14   protect our supply chain from Showa Cabot -- because

15   of the situation we were being told where Showa was

16   going to be short of material.

17   Q.   I can try to short circuit some of this Mr.

18   Collis to see if I understand AVX's position. Is it

19   fair to say that it's AVX's position that its

20   complaint in this case is that it was forced by

21   Cabot to sign a contract for years beyond 2001?

22             MR. GOREN: Objection. You may answer.

23             THE WITNESS: Yes.

24        BY MR. DAVIS:

1  Q.         Is there more to AVX's complaint in this
2       action other than it was forced by Cabot, allegedly,
3       to sign a contract or a binding contract for
4       delivery of products beyond the calendar year 2001?
5  A.         No.
6  Q.         Is it fair to say that the products that are
7       listed on Appendix A to the 2001 Supply Agreement
8       under calendar year 2001 -- do you see that?
9  A.         Yes.
10 Q.         Was AVX willing, as of the time this agreement
11      was signed, to purchase those products from Cabot?
12 A.         We did not want to enter into an agreement to
13      purchase those materials.
14 Q.         We're going to sort through this again. Is it
15      fair to say that as of 2001, AVX did not wish to
16      enter into any binding agreement with Cabot to
17      purchase any products be they nodular, flake, KTAF,
18      anything else, from Cabot?
19            MR. GOREN: Objection.
20            THE WITNESS: No. We'd already entered
21      into a short term contract which we knew as the
22      Letter of Intent. So we were willing to enter into
23      a short term contract.
24            BY MR. DAVIS:

JANEY ASSOCIATES

```
 1              BY MR. DAVIS:
 2    Q.        What are the terms -- let me go back for a
 3    minute.
 4              Are there any additional products that AVX
 5    claims it was forced to accept on account of Cabot's
 6    coercive strategies other than what you've
 7    identified?
 8    A.        I -- I'm sorry.  I'm a bit confused.  Can I
 9    perhaps clarify the --
10    Q.        Yes.
11    A.        I mean -- basically we're saying all of the
12    materials in years 2 through 5.  What other
13    materials would you be referring to?
14    Q.        So when you say, "all of the materials in
15    years 2 through 5", you're looking at Appendix A to
16    Exhibit 2.  Are you not?
17    A.        Yes.
18    Q.        And do I have it correct that it is AVX's
19    position that all of the materials that you see
20    listed under calendar year 2002, CY 2002, are
21    products that AVX alleges it was forced to accept on
22    account on Cabot's coercive strategies?
23    A.        We did not want to enter into a contract
24    longer than 12 months.
```

JANEY ASSOCIATES

1  Q.          So what I said is correct?

2  A.          Yes.

3  Q.          And the same would be true for calendar year
4     2003?

5  A.          Yes.

6  Q.          AVX did not wish to purchase any of those
7     products from Cabot. Correct?

8  A.          We didn't wish to enter into a long term
9     contract for the purchase of those materials.

10 Q.          So what I said was correct?

11             MR. GOREN: Objection.

12             THE WITNESS: In 2003, we may have
13    wanted to purchase some of those materials, same as
14    in 2002. What we didn't want to do was enter into a
15    long term agreement to purchase those materials.

16             BY MR. DAVIS:

17 Q.          It's fair to say that as of 2001, AVX did not
18    wish to enter into a contract with Cabot to buy any
19    of the products listed under calendar year 2003. Is
20    that right?

21             MR. GOREN: Objection.

22             THE WITNESS: We didn't wish to enter
23    into a five year agreement to buy those materials.
24    But by the time 2003 came, we may well have wanted

```
 1            to have bought some of those materials.
 2                 BY MR. DAVIS:
 3     Q.          Actually, I think I dealt with that in my
 4            question, but let me go back.  I don't want to
 5            confuse you.
 6                 The agreement that is marked as Exhibit 2 was
 7            signed back in January of 2001.  Correct?
 8     A.          Yes.
 9     Q.          Is it fair to say that as of January 2001, AVX
10            did not wish to enter into a contract with Cabot, a
11            binding contract, to purchase any of the products
12            that are listed under calendar year -- let's start
13            with calendar year 2002 for delivery in 2002.  Is
14            that right?
15                 MR. GOREN:  Objection.
16                 THE WITNESS:  Yes.
17                 BY MR. DAVIS:
18     Q.          I'm not trying to confuse you.  The complaint
19            that AVX has is that in 2001 it was being required
20            by Cabot to enter into a contract that would call
21            for products and it would bind AVX to buy products
22            from Cabot in the year 2002.  Correct?
23     A.          Correct.
24     Q.          And the same is true for the year 2003.
```

```
 1            Correct?
 2   A.       Correct.
 3   Q.       And the same is true for 2004 and 2005.
 4            Correct?
 5   A.       Correct.
 6   Q.       That's AVX's compliant in this case.  Correct?
 7                 MR. GOREN:  Objection.  That's not what
 8   the witness is here to testify to.  He's here on
 9   this subject to identify the products or the terms
10   in the contract that were -- AVX was forced to
11   accept.
12            BY MR. DAVIS:
13   Q.       I think the question is fairly encompassed by
14   that category.  Can you respond Mr. Collis?  Do you
15   have the question in mind?
16   A.       No.
17                 MR. DAVIS:  Would you re-read the
18   question please?
19            (Question was read back as requested.)
20                 MR. GOREN:  Objection.
21                 MR. DAVIS:  Your objection is noted.
22            BY MR. DAVIS:
23   Q.       Is that true Mr. Collis?
24   A.       Sorry.  Which part of the question are you
```

JANEY ASSOCIATES

1          asking me is that true to?
2  Q.     Have I fairly summarized -- I'll go back and
3          ask you the question again.
4               Is it fair to say that the crux of AVX's
5          compliant in this case is that it was forced in 2002
6          to sign a contract for delivery of the products
7          listed on Appendix A to the 2001 Supply Agreement in
8          calendar years 2002, 2003, 2004 and 2005?
9  A.     Wasn't it the year 2000, not 2002 we were
10         forced to?
11 Q.     I'm sorry.  Could you repeat question?
12 A.     I think you asked that if in 2002 we were
13         forced to sign.
14 Q.     Then I will repeat the question.
15              Is it fair to say that the crux of AVX's
16         complaint in this case is that in 2001, AVX was
17         forced by Cabot to sign an agreement that required
18         AVX to purchase in the years 2002, 2003, 2004, 2005
19         the products listed in those years on Appendix A?
20              MR. GOREN:  Objection.  You may answer.
21              THE WITNESS:  Correct.
22         BY MR. DAVIS:
23 Q.     Is there more to AVX's compliant in this case
24         other than what I have stated?  To your knowledge.

1  A.         Yes.

2  Q.         Sorry. I think we understand some of this, but I've got to make the record clear for anyone who ultimately reads this.

           So TA Powder refers to Tantalum Powder and there's a reference there to Biddeford. That's a reference to AVX's Biddeford, Maine plant. Correct?

8  A.         That's correct.

9  Q.         Alright. And under nodular, you see that there is 25,000 pounds minimum purchase that AVX agreed to buy under this contract. Correct?

12 A.         Correct.

13 Q.         Alright. Is it correct to say that AVX did in fact wish to purchase that nodular powder from Cabot as of calendar year 2001?

           MR. GOREN: Wait a minute. Does your question deal with the quantity or the specific product?

           MR. DAVIS: Right now I'm dealing with that term of this agreement. 25,000 pounds of nodular powder.

           MR. GOREN: Okay.

           BY MR. DAVIS:

24 Q.         Do you know?

                    JANEY ASSOCIATES

1  A.        Yes.

2  Q.        Okay. If you see just to the right of that
3           entry, Mr. Collis, there's a column labeled "As
4           Available Purchase Quantity/Pounds". Do you see
5           that?

6  A.        I do.

7  Q.        And do you understand that to denote or
8           memorialize AVX's desire or interest in purchasing
9           additional Tantalum product from Cabot in that time
10          frame if Cabot could make those products available
11          to AVX?

12 A.        That's how I understand it. Yes.

13 Q.        Was AVX in fact interested in purchasing an
14          additional 5,000 pounds of nodular powder for it's
15          Biddeford Facility from Cabot in calendar year 2001?

16              MR. GOREN:  Wait a minute. In addition
17          to what's stated in this column as available
18          purchase?

19              MR. DAVIS:  No. I'm referring to that
20          entry.

21              MR. GOREN:  Okay.

22              MR. DAVIS:  There's an entry there that
23          says 5,000 pounds of as available product. Let me
24          go back --

1              MR. GOREN: I'm sorry. I thought you
2      had already asked that. That's why.
3              BY MR. DAVIS:
4    Q.        No. I think I was referring earlier to the
5      25,000 pounds. But I'm going to now move onto the
6      next entry.
7              And Mr. Collis, drawing your attention to that
8      5,000 pound entry on Exhibit 2 under calendar year
9      2001, is it fair to say that AVX did in fact wish to
10     purchase from Cabot in calendar year 2001 an
11     additional 5,000 pounds of nodular powder for AVX's
12     Biddeford, Maine Facility if Cabot could make that
13     product available to AVX?
14   A.        Yes. We would have bought the extra 5,000
15     pounds if it was available.
16   Q.        And moving further down under the column under
17     calendar year 2001. Was AVX in fact interested in
18     purchasing a 50,000 pounds of flake powder for
19     Europe from Cabot in 2001?
20   A.        Yes we were.
21   Q.        Was AVX also interested in purchasing 4,400
22     pounds of Tantalum Wire from Cabot for it's
23     Biddeford, Maine Facility in 2001?
24   A.        Yes we were.

```
 1        time, Daewoo, Ninxia, Matsuo, Hitachi, and several
 2        other small companies.
 3   Q.   What damages has AVX sustained as a result of
 4        the conduct of Cabot that is alleged in the
 5        complaint in this matter?
 6   A.   That is being calculated by our outside
 7        expert.
 8   Q.   Has AVX sustained damages?
 9   A.   Yes.
10   Q.   Do you have any understanding right now of the
11        monetary value of those damages?
12   A.   We have monitored the market price of material
13        and compared that with what we ended up paying in
14        the contract when we used the material as against
15        what the market price was at that time, and passed
16        that to our expert.
17   Q.   How would you go about calculating AVX's
18        damages in this matter?
19   A.   How would I go about calculating.
20             MR. GOREN: Objection. You may answer.
21             THE WITNESS: Basically, we've left that
22        with our expert to come up with that calculation.
23             BY MR. DAVIS:
24   Q.   A moment ago, you said that AVX monitored
```

1    market prices for materials --

2  A.    Yes.

3  Q.    -- and compared those against what AVX paid to Cabot
4    under the 2001 supply agreement; was that accurate?

5  A.    That is accurate.

6  Q.    What materials?

7  A.    For all of the materials. For flake, because
8    we could tell from the MFN agreement that Cabot was
9    selling flake at lower prices, which we assumed was
10    then the market price, outside of the contract. For
11    nodular that we were buying from Starck or Showa
12    Cabot or Ninxia that we were doing as part of the
13    tolling agreement, so the cost of their raw material
14    that we had to take as part of us getting our raw
15    material tolled.

16  Q.    Are there any other elements to AVX's damages
17    that you are aware of, as you sit here today?

18  A.    The biggest damage that has happened is the
19    impact that it's had on the total tantalum market,
20    which has been greatly reduced in the electronics
21    industry. Because of the inability of the main
22    suppliers in the market, AVX, KEMET and Vishay, to
23    bring capacitor prices down, our customers moved
24    away to alternative products. It took --

1         damage to the total capacitor business.

2   Q.    When you reference MLCCs, you are referencing

3         multi-layer ceramic capacitors, is that right?

4   A.    That is right.

5   Q.    Is AVX, in fact, seeking damages from Cabot

6         for harm done to the tantalum capacitor industry?

7               MR. GOREN:  Objection.  You may answer.

8               THE WITNESS:  Our external expert is

9         working on the damages number.

10              BY MR. DAVIS:

11  Q.    Do you know whether AVX is seeking damages for

12        harm done to the tantalum capacitor industry?

13  A.    We're waiting for the inputs from our external

14        expert.

15  Q.    I take it you do not know yet?

16  A.    I don't know yet.

17  Q.    The phenomenon that you are referring to,

18        where the number of tantalum capacitors in

19        comparison to MLCCs that are used, is that referred

20        to sometimes as "design out?"

21  A.    It could be referred to as "design out," yes.

22

23  Q.    The phenomenon that you are referring to is a

24        phenomenon of customers of AVX's components choosing