UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AVX CORPORATION<br>and AVX LIMITED,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>CABOT CORPORATION,<br><br>　　　　　Defendant. | CIVIL ACTION NO. 04-10467-RGS |

## AFFIDAVIT OF WILLIAM J. YOUNG

I, William J. Young, hereby state under oath that:

1. I recently retired from my position as Director of Major Accounts for the Supermetals Division of defendant Cabot Corporation ("Cabot"). Cabot is a Delaware corporation that maintains its corporate headquarters at Two Seaport Lane, Boston, Suffolk County, Massachusetts. I was employed by Cabot or its predecessors in various positions for over 40 years. As a Cabot employee, I had periodic, direct contact with representatives of plaintiffs AVX Corporation and AVX Limited ("AVX"), and acquired substantial knowledge regarding tantalum and the electronics industry as a whole.

2. Cabot is a global specialty chemical and materials company. One of the materials that Cabot supplies through its Supermetals Division is tantalum. Tantalum is an elemental metal (chemical symbol "Ta", atomic number 73) that is approximately as rare in nature as uranium. Cabot sells tantalum in a variety of forms, including flake and non-flake or

nodular tantalum powder, tantalum wire and, on occasion, in the form of semi-refined ore known as "K2TaF7" (collectively "Tantalum Products" or "Products"). Because tantalum is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures, tantalum is a favored material for use in certain types of high performance electronic capacitors. Capacitors are passive components that are used in a wide range of electronic devices, including personal computers and mobile telephones.

3. Historically, the market for Tantalum Products has been highly volatile. Periods of high demand, supply shortages, inventory hoarding, and sharply-rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly-falling prices. Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in the prices of Tantalum Products to be much more pronounced than those of other industrial metals.

4. In the years prior to 2001, AVX purchased substantial quantities of Tantalum Products from Cabot through a series of one or two page "Letters of Intent," which described, in general terms, the quantities of Tantalum Products that AVX then anticipated buying from Cabot, and the prices that AVX then was willing to pay Cabot for those products.

5. Although it did so in the years prior to 2001, Cabot strongly preferred not to sell Tantalum Products to AVX pursuant to "Letters of Intent" because AVX did not regard those letters as binding on AVX. AVX often purchased more or less Tantalum Products than were called for under the parties' then existing Letters of Intent depending on its needs, and periodically insisted upon price reductions from Cabot when AVX believed that changes in market conditions justified its demands. As a result, Cabot experienced significant fluctuations

in overall demand for its Tantalum Products, and had great difficulty generating a stable revenue stream that would protect Cabot against market downturns and support an expansion of its productive capacity. AVX nonetheless resisted Cabot's efforts to negotiate and execute a binding, long-term supply contract for Cabot's Tantalum Products because AVX understood and appreciated the operational flexibility and financial security that the parties' non-binding Letters of Intent afforded AVX in times of slack demand for its own products.

6.  In the late 1990s and continuing into the year 2000, demand for Tantalum Products experienced a period of unprecedented growth that led to a severe product shortage and sharply rising prices. Vastly increased demand for tantalum capacitors by manufacturers of wireless telephone equipment in particular, and electronic equipment in general, created great concern among tantalum purchasers, including AVX, that the worldwide demand for tantalum had, or would soon, exceed the existing productive capacity of the principal suppliers of Tantalum Products, including Cabot.

7.  After years of bearing the brunt of the cyclical periods of low demand for Tantalum Products and being denied the benefits of the occasional periods of high demand, Cabot's management made the decision in approximately mid-2000, that Cabot thereafter would sell its Tantalum Products only to those customers who were willing to enter into binding, long-term supply agreements at increased prices. Cabot distributed letters announcing its decision in this regard to all of Cabot's major customers, including AVX, in early August 2000. In those letters, Cabot invited its customers, including AVX, to begin immediate contract negotiations with Cabot if they wished to continue purchasing Tantalum Products from Cabot in the future.

8.  Between August and January 2001, Cabot engaged in extended negotiations with AVX concerning a contract that would govern the parties' future relationship. Although I was

not a direct participant in those negotiations, I was aware that they were ongoing, I kept myself informed of their progress while they were underway, and I provided input about the negotiations within Cabot. The contract negotiations between Cabot and AVX ultimately led to the execution of a written, multi-year "Supply Agreement" for Tantalum Products in January 2001 (the "2001 Supply Agreement" or the "Agreement"). That Agreement remained in effect until the end of its prescribed five-year term on December 31, 2005.

9. The basic terms of the 2001 Supply Agreement were hammered out in a series of meetings, letters and e-mail exchanges primarily between Thomas Odle (then General Manager of Cabot's Performance Materials Division), and Ernest Chilton (then Senior Vice President of AVX's Tantalum Division) and John Gilbertson (AVX's President and Chief Executive Officer) from August 2000 into November 2000. After the principal terms had been agreed-upon by the parties, responsibility for finalizing the written Agreement was delegated primarily to my co-worker, Earl "Hugh" Tyler (then Strategic Business Unit Manager in Cabot's Performance Materials Division), and John Chapple (AVX's Materials Manager) and Kurt Cummings (AVX's Chief Financial Officer). I worked with Mr. Tyler in reviewing and helping to finalize the terms of the 2001 Supply Agreement.

10. To my knowledge, at no time during the negotiation of the 2001 Supply Agreement in 2000-2001 did Cabot ever tie or condition AVX purchases of Cabot's flake tantalum powder on AVX purchases of non-flake or nodular tantalum powder. To the contrary, throughout the negotiation of the 2001 Supply Agreement, it was my understanding that AVX wanted to purchase *more* of both Cabot's flake tantalum powder and its non-flake or nodular tantalum powder than Cabot was then willing or able to sell to AVX.

11.  Similarly, to my knowledge, at no time prior to the commencement of this federal court action in September 2005 did AVX assert in its communications with Cabot that Cabot had improperly tied or conditioned AVX purchases of Cabot's flake tantalum powder on AVX purchases of non-flake or nodular tantalum powder in the 2001 Supply Agreement.

Signed under the pains and penalties of perjury, this ___ day of March, 2008.

*William J. Young*  3/29/08
William J. Young

4315558.1

p.5    973-361-8198    William Young    Mar 29 08 09:54a