**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| AVX CORPORATION<br>and AVX LIMITED, | )<br>)<br>) |  |
| Plaintiffs, | )<br>) | Civil Action No.: 04-10467-RGS |
| v. | )<br>)<br>) |  |
| CABOT CORPORATION, | )<br>) |  |
| Defendant. | )<br>) |  |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF AVX CORPORATION AND AVX LIMITED**
**FOR PARTIAL SUMMARY JUDGMENT**

**I. INTRODUCTION**

Cabot Corporation ("Cabot") holds patents on the manufacture of a form of tantalum known as flake powder, which AVX Corporation and AVX Limited (together "AVX") in turn use in the manufacture of capacitors. In order to develop the market for flake tantalum, Cabot encouraged AVX to develop products using its patented flake powder. AVX responded. Its customers, in turn, designed many of their products to use capacitors that could only be made with flake tantalum powder.

AVX also manufactures capacitors using nodular tantalum powder. It bought nodular powder from a number of sources, including Cabot. In the fall of 2000, Cabot, knowing that AVX had developed products around its patented flake tantalum and knowing further that AVX had other, preferred sources from which to buy nodular tantalum powder, told AVX that it would not sell AVX flake tantalum unless it entered into a long-term take or pay contract, which included both flake and nodular tantalum. Because AVX needed flake tantalum to produce the

1

capacitors developed for its customers under existing commitments to those customers and because Cabot was the only source of flake tantalum, AVX acceded to Cabot's demands and committed to purchase nodular tantalum as well as flake over a five-year period beginning January 1, 2001.  It is because of this tying of the purchase of nodular to flake where Cabot, because of its monopoly in flake, had market power in flake, that AVX has brought the instant lawsuit.

This Court must find that Cabot violated the antitrust law's prohibition against tying if AVX establishes the four elements of a *per se* tying case.  AVX seeks by this summary judgment motion for the Court to enter an order finding that three of those elements – namely, that flake and nodular are separate products, that the two products were tied, and that a substantial amount of commerce has been affected – have been met.  AVX reserves for trial the fourth element – namely, whether Cabot has market power in the tying product.

## II.  FACTS

### A.  *Tantalum and Its Uses*

Cabot, through its Supermetals Division, manufactures and sells electronic-grade tantalum, which is used primarily for the manufacture of capacitors, passive components that store electricity and are used in a variety of electronic devices.  Plaintiffs' Concise Statement of Material Facts ("SOF") ¶ 2.[1]  It sells tantalum in both wire and powder forms.  SOF ¶ 3.  Within the powder category, there are two kinds that are relevant to this case – flake and nodular.  *Id.*  Cabot has patents on flake.  SOF ¶ 4.  According to Cabot, flake has unique characteristics that set it apart from nodular powder.  SOF ¶ 3.  As touted on its website:

---

[1] These capacitors store electrical charge in electronic devices used in both specialized and commodity applications, such as cell phones, computer processors, medical devices, military equipment, automotive control devices, computer servers and networks, and manufacturing controls.  SOF ¶ 2.

> Flake capacitor powders have the inherent potential to achieve higher CV/g at a given formation voltage as compared to nodular powders … [and] offer inherent advantages over nodular products in high voltage applications. Specifically, the optimal CV/g and lower DC leakage provide the capacitor manufacturers unique capabilities in their anode designs.

SOF ¶ 4. Cabot markets its flake tantalum product as unique in the industry. *Id*. Because of its patents, Cabot at all relevant times has been the sole worldwide source of flake tantalum powder. SOF ¶ 5.

From the mid 1990's until February 2002 Cabot was one of four principal suppliers of non-flake electronic-grade tantalum products in the world; the other three were H.C. Starck of Germany ("Starck"), Ningxia Non-Ferrous Metals of China ("Ningxia") and Showa-Cabot of Aizu, Japan, a 50-50 joint venture between Cabot and Showa Denko KK of Japan ("Showa"). SOF ¶ 6. In February 2002, Cabot acquired the other half interest in Showa, which as a wholly owned subsidiary continued to sell electronic-grade tantalum products. *Id.* As of 2000, according to industry reports, the respective market shares of the four dominant players were Starck 32.09%, Cabot 27.6%, Showa 25.03% and Ningxia 14.76%. SOF ¶ 7.

AVX is one of the world's largest manufacturers and suppliers of tantalum capacitors. SOF ¶ 1. In addition to AVX, at all material times the principal buyers of electronic-grade tantalum products were Vishay Sprague, Inc. and affiliates ("Vishay"), Kemet Electronics ("Kemet") and Epcos AG ("Epcos"). SOF ¶ 8. In 2000, Cabot considered AVX to be the "world's largest tantalum capacitor manufacturer." *Id.*

### B. AVX's Purchases of Tantalum from Cabot

Cabot obtained its first patent for flake tantalum in 1993. SOF ¶ 4. In order to develop a market for this new product, Cabot encouraged AVX to develop products that used flake tantalum. SOF ¶ 10. AVX responded and developed and created a market for its customers of

3

capacitors that used flake tantalum powder. *Id.*[2]  There were good reasons for AVX to offer its customers capacitors made out of flake tantalum. *See* SOF ¶¶ 3, 4.  Principally, the use of flake tantalum in capacitors allows for high voltage capacitance in a smaller case size, with a high degree of reliability and a greater ability to store electric charges with minimal loss of charge. *See, e.g.,* SOF ¶¶ 14, 15.  The result of AVX's investment in Cabot's new technology was that as of 2000 AVX had commitments to deliver capacitors and approved capacitor designs that could only be met with Cabot's flake products.  SOF ¶¶ 14, 15, 17, 26.[3]

From the late 1990's through 2000 AVX purchased both flake and nodular products from Cabot under one-year letters of intent.  SOF ¶¶ 9, 11.  Most of the nodular products were for AVX's Biddeford facility and the flake products with minor exception were for AVX's European plants. *Id.*  Prior to 2001 Cabot would offer and sell its flake products to AVX regardless of how much of Cabot's nodular products AVX purchased. *Id.*  AVX also purchased nodular products for its European plants from its preferred suppliers Showa, Starck and Ningxia.  SOF ¶¶ 13, 20, 29, 34.

The letters of intent between Cabot and AVX always separately listed Cabot's flake products at stated prices and separately listed Cabot's other tantalum products, including Cabot's nodular products at stated prices.  SOF ¶ 18.  AVX's purchase orders and Cabot's invoices to AVX separately listed Cabot's flake products, the quantities and stated prices and Cabot's nodular products, the quantities and stated prices. *Id.*

---

[2] AVX was not the only manufacturer to take Cabot's bait.  It is generally known that Vishay, Kemet and Epcos had also developed products that could only be made with Cabot's flake. *Id.*

[3] By the mid to late 1990's and as of 2000 AVX had developed designs for capacitors made with flake that were approved for use in a number of high voltage applications by end users.  SOF ¶ 17.  Cabot's flake products were at all times utilized by AVX for specific purposes that were different in relevant performance degrees, capabilities and reliability from all nodular products produced by Cabot and all other tantalum product suppliers. *Id.*  AVX has never used flake and nodular products in an integrated manner, in the same capacitor or to complement one another. *Id.*  Upon information and belief as of 2000, Vishay, Kemet and some other tantalum capacitor manufacturers also had capacitor designs that could only be made with Cabot's flake products. *Id.*

### C. The 2001 Supply Agreement

Despite the long-standing practice of AVX purchasing tantalum from Cabot under one-year letters of intent, Cabot made it clear by August 2000 that it would not sell any tantalum to AVX unless it entered into a five-year take or pay agreement. SOF ¶ 22. Thus, AVX no longer had the option to purchase just flake from Cabot in any of the years from 2001 to 2005. Instead, in each of those years, the purchase of nodular was a prerequisite to the purchase of flake. Cabot knew that flake was critical to AVX's capacitor business. SOF ¶¶ 24, 25. In late August or early September 2000 Hugh Tyler of Cabot informed AVX that Cabot would not provide any product to AVX in 2001 unless AVX entered into a five-year take or pay agreement to purchase minimum quantities of both flake and nodular products at fixed prices. *Id.* On or about September 1, 2000 and later in September AVX informed Cabot that AVX's European plants had to have Cabot's flake products and that without flake AVX would be mortally injured. *Id.* On more than one occasion in September 2000 Hugh Tyler of Cabot informed AVX that it would get no flake in 2001 unless AVX entered into a five-year contract. *Id.* In late September 2000 he informed AVX it was non-negotiable and that there would be no flake for AVX for 2001 unless AVX entered into a five-year take or pay contract that required (i) mandatory purchases of both flake and nodular (ii) in each of five years (iii) at fixed prices. *Id.*

Cabot understood that by denying AVX flake, AVX "[was] left … in an intolerable position." *Id.* According to Cabot, that AVX was "frantic for C-275 and C-255 [grades of flake tantalum] … [was] really a big stick in [Cabot's] "negotiations" with [AVX]…" *Id.*

AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each of 2002, 2003, 2004 and 2005 at fixed prices. SOF ¶ 32.

The Supply Agreement required AVX to purchase specified quantities of flake products, specified quantities of nodular products and specified quantities of KTaF, all at fixed prices for the five-year term. SOF ¶ 27.[4] By doing that, it not only committed AVX to purchase the products at higher prices, but also to divert to Cabot purchases that normally would have been made from Showa, Starck and/or Ningxia. SOF ¶¶ 13, 20, 29, 34.[5] The result was that not only did Cabot require that AVX purchase nodular tantalum from it that it otherwise would not have purchased, but even for those products that AVX may have wanted, it forced AVX to commit to purchases over a five-year period. SOF ¶ 32. The effect, as demonstrated by the following graph, was dramatic:[6]



**AVX Percentage of Purchases by Supplier 1995-2003**

---

[4] Section 2 of the Supply Agreement states that "Buyer shall purchase … the 'minimum purchase quantity' … of each Product described on Appendix A." Appendix A, in turn, contains separate line items for flake products and nodular products.

[5] But for the Supply Agreement, AVX would not have purchased any nodular products from Cabot for its European operations for the years 2001 through 2005. SOF ¶ 34. Instead, AVX would have purchased lesser amounts from Cabot and would have purchased higher quality nodular products at lower prices from Showa, Starck and/or Ningxia. *Id*. But for the Supply Agreement, over the five years AVX would have purchased less nodular products from Cabot for its Biddeford operations and at prices lower than charged by Cabot. *Id*. But for the Supply Agreement, during the five-year period of 2001 through 2005 AVX would not have purchased any KTaF from Cabot and would have purchased finished nodular products from Showa, Starck and/or Ningxia at substantially less cost. *Id*.

[6] As the graph (derived from data from Exhibit 5 to Schwartz Report (SOF ¶ 34)) demonstrates, purchases from Cabot on the one hand and AVX's other suppliers on the other hand were relatively flat through 2000, with a dramatic increase of purchases from Cabot and a corresponding decrease in purchases from the other suppliers beginning in 2001.

6

## III. ARGUMENT

### A. *Summary Judgment Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." This means that the party opposing a summary judgment motion has the burden of demonstrating the existence of a triable issue that is both genuine and material to its claim or defense. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The non-moving party must submit more than a mere scintilla of evidence supporting its opposition to summary judgment. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Industrial Co., LTD, et al., v. Zenith Radio Corp. et al.,* 475 U.S. 574, 586 (1986).

### B. *The Sherman Act's Prohibition Against Tying*

Before turning to the specifics of AVX's summary judgment motion, it is helpful to review the elements of an illegal tying claim and what is and is not relevant to the analysis. Specifically, as discussed below, there are four discrete elements that a plaintiff must show to support a *per se* tying violation. Factors beyond those four elements are irrelevant if those elements are established.

According to the Supreme Court, a tying arrangement, pure and simple, is one in which the availability of one item (the "tying item") is conditioned upon the purchase of another item (the "tied" item) or an agreement not to purchase the tied item from the seller's competitor. *Illinois Tool Works, Inc, v. Independent Ink, Inc.*, 547 U.S. 28, 32 (2006); *Eastman Kodak Co. v.*

7

*Image Technical Services, Inc.*, 504 U.S. 451 (1992).  Such an arrangement, when coupled with market power in the market for the tying product, is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  *International Salt Co. Inc., v. United States*, 332 U.S. 392 (1947); *Lee v. The Life Insurance Company of North America*, 23 F. 3d 14 (1st Cir. 1994).

The rules for determining a *per se* tying violation are well established in the First Circuit.  In order to establish a *per se* tying violation,[7] and thus a violation of Section 1 of the Sherman Act, the plaintiff need only show:

1. the tying and tied products are actually two distinct products;

2. there is an agreement or condition, express or implied, that establishes a tie;

3. the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and

4. the tie forecloses a substantial amount of commerce in the market for the tied product.

*Borschow Hosp. & Med. Supplies, Inc., v. Cesar Castillo, Inc.,* 96 F.3d 10, 17 (1st Cir. 1996); *Data General Corporation, et al., v. Grumman Systems Support Corporation,* 36 F. 3d 1147 (1st Cir. 1994); *Grappone, Inc., v. Subaru of New England, Inc.,* 858 F. 2d 792 (1st Cir. 1988).

It is irrelevant to the inquiry whether the plaintiff desired to purchase the tied product; the important fact is merely that the products are tied.  As this Court so aptly stated in its earlier decision in this case:

> A "victim" of an illegal tying arrangement might well be a perfectly willing participant in the transaction, either because it prizes the tying product highly, or because it has a concomitant desire to acquire the tied product.  It is the harm to competition that the antitrust laws seek to avert – not harms to individual market participants.

---

[7] The Supreme Court has articulated several practices to be *per se* violations.  The plaintiff need show NOTHING other than the elements of the violation.  It is important to note that even a practice that is not shown to be a *per se* violation may still violate the rule of reason.  Because that is rarely amenable to summary judgment, AVX moves solely on the *per se* violation and reserves its rights if its motion is denied to prove a rule of reason violation at trial.

*AVX Corporation, et al. v. Cabot Corporation*, 2006 U.S. Dist. LEXIS 49857 at *8 (D. Mass. July 21, 2006). The focus, as this Court noted, is not on what products the plaintiff wanted to purchase but on the "harm to the competition." *Id.* Judge Garrity made a similar observation in *Anderson Foreign Motors, Inc., v. New England Toyota Distributors, Inc.*, 475 F. Supp. 973 (D. Mass. 1979):

> It is the nature of the test that it focuses not on the buyer's state of mind but rather on the seller's actions; tying doctrine seeks to deter a seller's conduct in unnecessarily conditioning the sale of one product on the purchase of another.

*Id.* at 988. The rationale for focusing on the tie rather than on the purchaser's desire to purchase the product was aptly explained by Professors Areeda and Turner:

> [A]ll purchases covered by the tie should be counted as foreclosed to rivals even when many of the defendant's customers had voluntarily purchased the same volume of the second product from him before there was any tie-in. Although the tie has not increased the defendant's sales of the tied product to those customers or the market share represented by them, it has suppressed their previous freedom to transfer their business to competing suppliers during the life of the tying agreement.

3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 1709d (2006).

Indeed, because the evil addressed by the antitrust laws' prohibition against tying is to prevent the limiting of competition through the ***diversion*** of product sales to a particular seller, there is authority that there is no antitrust injury at all if the purchaser does not want the product and would not have purchased but for the tying activity. *See Bafus/Dudley v. Aspen Realty, Inc.*, 2007 U.S. Dist. LEXIS 88228 at *10 (D. Idaho Nov. 30, 2007) ("The not insubstantial volume of commerce requirement is not met if the plaintiff would not have bought the tied product at all in the absence of the tying arrangement."); *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 890 F. 2d 803, 814 (1st Cir. 1988) ("The Supreme Court has written that 'when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another

9

seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.'").

Further, as the buyer's state of mind is irrelevant, a plaintiff need not establish coercion to succeed with its per se tying claim. "[C]oercion has no relevance to a determination of antitrust liability; it is relevant, if at all, only to determining whether a tie-in exists, that is, whether the seller has conditioned the sale of one product on the purchase of another." *Anderson Foreign Motors, Inc., v. New England Toyota Distributors, Inc.*, supra at 988. Other courts agree. According to the Third Circuit:

> Relying upon *Ungar*, defendants appear to argue that coercion is a requirement of proof in all tying cases. Neither *Ungar* nor any other case has so held. Rather, *Ungar* affirmed that under a long line of Supreme Court precedents a tying claim consists solely of the three elements quoted above. Assuming economic power over the tying product and a not insubstantial amount of commerce, the plaintiff need only show that a seller conditioned the sale of one product (the tying product) on the purchase of another product (the tied product). It has never been an element of plaintiff's case to disprove, nor even a permitted defense, that the tied product is superior to others available on the market, or that even without the tie requirement plaintiff would have purchased the tied product.

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977). The Eleventh Circuit agrees:

> Appellants, on the other hand, appear to argue that "coercion" is a distinct and separate element of a tying violation. Although the cases treat proof of coercion in a variety of away, it generally appears to be part and parcel of two other requisite elements of proof rather than a separate element: 1) that the products are actually "tied" as a matter of antitrust law and 2) that the seller has the market power to force the buyer to purchase the tied product.

*Tic-X-Press, Inc. v. Omni Promotions Co.,* 815 F.2d 1407, 1416 (11th Cir. 1987). And, according to Professors Areeda and Turner:

> Unfortunately, some erroneous dicta have required proof of "coercion" – apparently in the sense of a purchase that would not otherwise have been made – even though an announced or understood condition has been established… This is mostly dicta, either because the existence of an announced or understood

10

> condition was either unclear or not at issue. These cases should be understood merely to require the necessary condition and some proof that without that condition the buyer *might* have wanted another product.

3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 1754e (2006) (emphasis in original).

### C. Elements of Sherman Act Tying Claim

As stated previously, the First Circuit has established four elements to establish a *per se* tying claim:

1. the tying and tied products are actually two distinct products;

2. there is an agreement or condition, express or implied, that establishes a tie;

3. the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and

4. the tie forecloses a substantial amount of commerce in the market for the tied product.

*Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.,* supra; *Data General Corporation, et al., v. Grumman Systems Support Corporation,* supra; *Grappone, Inc., v. Subaru of New England, Inc.,* supra. *See also Wells Real Estate, Inc. v. Greater Lowell Board of Realtors,* 850 F. 2d 803 (1st Cir. 1988) (identifies three elements, essentially combining the first two).

Because there are no material facts in dispute as to elements 1, 2 and 4, partial summary judgment should be entered in AVX's favor, leaving the only issues for trial whether Cabot has sufficient economic power in the tying product and the amount of damages that should be awarded to AVX.

### D. The Tying and Tied Products Are Distinct and Separate Products.

That the tying product – flake tantalum powders – and the tied product – nodular tantalum powders – are separate products cannot be subject to serious contest.

11

According to the Supreme Court, "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the *character of the demand for the two items*." *Jefferson Parish Hospital District No. 2 et al., v. Hyde*, 466 U.S. 2, 19 (1984) (emphasis added). *See also, Eastman Kodak Company v. Image Technical Services, Inc., et al.,* 504 U.S. 451, 463 (1992). Courts have examined a panoply of specific indicia in their efforts to determine the separateness issue. Such indicia have included, but are not limited to:

- Whether the purportedly tied and tying items will perform properly if they are separated. *See United States of America v. Microsoft Corporation,* 253 F.3d 34, 89-90 (D.C. Cir. 2001);

- Whether the tying party or its competitors offer the items individually or only as a single overall package. *See SMS Systems Maintenance Services, Inc., v. Digital Equipment Corporation*, 188 F.3d 11, 15 (1st Cir. 1999); *United States of America v. Jerrold Electronics Corporation*, 187 F. Supp. 545, 559 (E.D. Pa 1960);

- Whether each of the items is available from other sources. *See N.W. Controls, Inc. v. Outboard Marine Corp.,* 333 F. Supp. 493, 503 (D. Del. 1971);

- Whether the products are marketed separately. *See Outboard Marine* at 502; and

- Whether prices are set for the items individually or as a lump sum as packaged. *See United States of America v. Jerrold Electronics Corporation*, supra at 559.

Applying these factors to the ***uncontested*** facts in the case at bar leads to only one conclusion – that flake tantalum (the tying product) and nodular tantalum (the tied product) are, in fact, separate products.

12

The starting point for understanding the separateness of the two products is that Cabot, by virtue of its patent, is the only company to manufacture and sell flake tantalum, while at the relevant time there were three[8] other suppliers of tantalum products that sold nodular, but not flake. Clearly, customers of those manufacturers were buying nodular separate from flake. Indeed, AVX purchased nodular tantalum (but not flake) on a regular basis for its European plants from Cabot's major competitors for nodular – Showa, Starck and Ningxia.

Cabot itself has sold nodular separately from flake. In this regard, one only need look at the fact that prior to AVX and Cabot entering into the Supply Agreement that is at the heart of this dispute, AVX on a regular basis bought flake tantalum separately from its purchase of nodular tantalum. SOF ¶ 11. The fact that flake and nodular are sold separately is also demonstrated by Cabot's contracts with its other customers. For example, in a contract dated December 21, 2000 between Cabot and Epcos, Cabot sold only nodular to Epcos. SOF ¶ 12.

Flake and nodular are, in fact, used separately by AVX in the manufacture of its capacitors. SOF ¶ 17. A capacitor designed to use flake uses only flake and a capacitor designed to use nodular uses only nodular. *Id.* There is never a need to use both.

Cabot's own website confirms that the products are different:

Capacitor-grade tantalum powders from Cabot are used to make high reliability for cellular phones, computers and numerous other electronic devices.

Featuring capacitance up to 200,000 CV/g, our powders have enabled tantalum capacitor manufacturers to yield better performance in the same size parts and pack more performance into smaller packages.

Cabot produces three types of capacitor-grade tantalum powder: Angular (EB), Nodular and Flake.

The Angular or EB type powders are manufactured using an electron beam melting process. These powders contain both angular and flake shaped particles which have been agglomerated to a specified surface area and capacitance range.

---

[8] After February 2002 Showa a former competitor of Cabot became a wholly owned subsidiary of Cabot. SOF ¶ 6.

> Both the Nodular and Flake type products are produced via a sodium reduction process. These products have high surface area and excellent handling and flow characteristics, which allow capacitor manufacturers to produce small anodes with good weight and capacitance control.
>
> ***The Flake product is unique to Cabot.*** This powder type is manufactured using our patented process to generate a flake shaped product which extends the capability range into mid-voltage applications.[9]

(Emphasis added). SOF ¶ 3. The website goes on to highlight the different characteristics of each of the tantalum products that Cabot manufactures. *Id.*

For these reasons, the Court must conclude that the products are separate and that the first prong of a *per se* tying claim has been established.

### E.  The Products Are Tied

The second element of a tying case is that there must be an agreement or condition, express or implied that establishes a tie. *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.,* supra; *Data General Corporation, et al., v. Grumman Systems Support Corporation,* supra; *Grappone, Inc., v. Subaru of New England, Inc.*, supra. A formal agreement will establish the tie, but there need not be one. *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3rd Cir. 1976); *Summerwood Corporation v. Cado Systems Corporation*, 1986 U.S. Dist. LEXIS 27683 (E.D. Pa. 1986). But, if there is an agreement the tie is conclusively established. According to *Ungar*, a leading case on the subject, "a formal agreement is not necessary, ***although it is sufficient***." 531 F.2d at 1224 (emphasis added).

In the numerous cases that address the issue of whether there is a tie, the contract normally provides for the purchase of only the tying product or services. The arguments made in those cases are that despite the lack of formal obligation the plaintiff was required to purchase

---

[9] A copy of this web page is attached as Exhibit 1 to the Statement of Facts and can be found at www.cabot-corp.com/cws/businesses.nsf/CWSID/cwsBUS01302001045900PM8426?OpenDocument&bc=Products+%26+Markets/Tantalum/Product+Information&bcn=23/4294967265/3186&entry=product.

14

both products or services. *See, e.g., Bogosian v. Gulf Oil Corporation*, 561 F. 2d 434 (3rd Cir. 1977) (lease did not include specific provision requiring lessor of gas station to purchase gasoline from lessee/gasoline supplier, requiring court to find a tie using extrinsic evidence); *Tic-X-Press*, *Inc., v. Omni Promotions Co., et al.,* 815 F.2d 1407, 1416 (11th Cir. 1987) (lease agreement for coliseum did not mandate that lessee use a specific ticket agency, requiring the court to find a tie based on extrinsic evidence).

In the present case, the Supply Agreement does, in fact, require AVX to purchase both flake and nodular tantalum. SOF ¶ 27. Section 2 of the Supply Agreement states that "Buyer shall purchase … the 'minimum purchase quantity' … of each Product described on Appendix A." *Id.* Appendix A, in turn, contains separate line items for flake and nodular. *Id.* That AVX would be in material breach of the Supply Agreement if it did not honor its obligations to purchase nodular – relieving Cabot of its obligations to ship flake thereunder – is without question.

The fact that the agreement does not expressly state that AVX needed to purchase nodular if it wanted flake is of no moment. The obligation to do so is inherent in the agreement. Any language expressly conditioning the purchase of flake on the purchase of nodular would be mere surplusage.

The undisputed history leading up to the signing of the supply agreement merely serves to confirm the tie. SOF ¶¶ 22-28. Statements from Cabot to the effect that by denying AVX flake, AVX "[was] left … in an intolerable position" (SOF ¶ 25) or that AVX's need for flake tantalum was a "really a big stick in [Cabot's] 'negotiations' with [AVX]" (*id.*) underscore that fact.

Further demonstrative of the pre-contract conditioning is that Cabot never offered to sell AVX flake for 2001 either without any condition or separately without the commitment to purchase nodular products.  SOF ¶ 28.

### F.  *Foreclosure of Substantial Amount of Commerce in Tied Product Market*

The fourth and final element of a *per se* tying claim in the First Circuit requires a plaintiff to demonstrate that "the tie forecloses a substantial amount of commerce in the market for the tied product."  *E.g.*, *Data General Corporation, et al., v. Grumman Systems Support Corporation*, supra at 1179.  "[T]he controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie[.]"  *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 500 (1969).  "The amount of commerce foreclosed must be not insubstantial, or merely de minimis."  *Storage Tech. Corporation v. Custom Hardware Engineering & Consulting, LTD*, 2006 U.S. Dist. LEXIS 43690 (D. Mass. June 28, 2006).

In a *per se* case, the plaintiff need "not prove the actual scope of anti-competitive effects in the market … [b]ut … must make some minimal showing of real or potential foreclosed commerce caused by the tie, if only as a matter of practical inferential common sense."  *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, supra at 815 n. 11.  A necessary element of a showing of impact on competition in the market for nodular tantalum products is that AVX wanted or desired some of the tied product on different terms and the rest from different suppliers.

> [W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

16

*Jefferson Parish Hospital District No. 2 et al., v. Hyde*, supra at 16. *See Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, supra at 814-15.

The uncontested facts here clearly show that while AVX wanted to purchase tantalum nodular powders to meet its needs during the years covered by the 2001 Supply Agreement, but for Cabot's conditioning of the purchase of flake tantalum on the purchase of nodular tantalum, AVX would have purchased a large portion of its nodular tantalum requirements from other suppliers because others offered higher quality nodular at cheaper prices. SOF ¶ 34. Further, even Cabot does not seriously contest that AVX resisted the mandatory purchase of nodular in the out years of the contract but Cabot insisted that the contract not only require purchases of both types of powder, but also that such purchases take place over five years. In this case, AVX wanted to purchase nodular products for its European operations and its preferred suppliers were Showa, Starck and Ningxia. SOF ¶¶ 13, 20, 34. AVX also wanted to purchase Cabot's specialty nodular products for its Biddeford operation but not be bound to purchase specified minimum quantities at prices fixed at a time when supply was tight and demand was high. SOF ¶ 32.

Under the Supply Agreement, AVX was bound over five years to purchase 185,000 pounds of nodular products at a cost of $500 per pound – a total of $9,250,000.[10] This alone should be sufficient to demonstrate that Cabot's actions had more than a de minimis effect on commerce.

A comparison of AVX's purchasing history for tantalum powders, including KTaF, from 1995 through 2000 with that following the effect of the 2001 Supply Agreement through 2003,

---

[10] In addition, Showa – AVX's preferred supplier for European nodular products – had been unable to meet AVX's anticipated purchases in 2001 because Cabot had reportedly limited Showa's supply of KTaF, the semi-refined material from which Showa's nodular products were made. SOF ¶ 21. While AVX had never purchased KTaF before, under the Supply Agreement Cabot sold AVX more than 950,000 pounds of KTaF in the three year period 2001 through 2003. *Id.* Utilizing a 40-percent yield, the 950,000 pounds of KTaF represents another 380,000 pounds of nodular products removed from the market. (A 40-percent yield is a fair estimate of the amount of nodular product that would be produced from the KTaF.). *See* SOF ¶ 21.

demonstrates a remarkable decline in AVX's percentage of purchasers from suppliers other than Cabot and an increase by more than 500% in AVX's purchases from Cabot (approximately 15% for 1995-2000 to 78% in 2003). SOF ¶ 33. The graphic representation of the dramatic changes in AVX's purchases from the date of the Supply Agreement forward contained on page 6 of this brief is worth reproducing again:



A review of the change in AVX's purchasing trends following the execution of the 2001 Supply Agreement alone is enough to demonstrate that more than a de minimis amount of commerce was foreclosed as a result of Cabot's improper conditioning of the purchase of flake on the purchase of nodular over an extended period of time. Moreover, a review of Cabot's market share relative to its competitors from 2001 to the 2005 shows clearly that following the execution of the 2001 Supply Agreement and other agreements with Kemet, Vishay and Epcos, Cabot's total worldwide market share for tantalum powders and wires increased substantially while its competitor's share fell. SOF ¶ 31.

According to a 2005 Paumanok Report, of the total supply market for all tantalum powder and wire products in 2000, Cabot (27.6%), Showa (25.03%), Starck (32.09%) and Ningxia (14.76%) constituted all but 1%. *Id.* By 2004 Cabot (including then wholly-owned

18

Showa) had 66% of the market, with Starck down to 23% and Ningxia to 10%. *Id.* According the 2005 Paumanok report "[t]antalum powder and wire sales to the capacitor industry declined at … Starck between 2000 and 2004 as a direct result of the 'take or pay' contracts initialized by their chief rival – Cabot Corporation." *Id.*

Clearly the impact on competition in the market for nodular products was more than de minimis. *See, e.g., Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 501-03 (1969) (total market wide foreclosed sales $ 4 million, $2.8 million and $2.3 million in three years of which the plaintiff's total purchases of the tied product were $190,000).

## IV. CONCLUSION

In sum, there are no issues of material fact as to whether (1) flake tantalum is a separate product from nodular tantalum, (2) the purchase of nodular tantalum was tied to AVX's ability to purchase flake tantalum, and (3) the effect of the tie was to foreclose a substantial amount of competition in nodular tantalum. For these reasons, this Court should enter summary judgment

on these three aspects of AVX's tying case and set the matter for trial on the issue of whether Cabot had market power on flake tantalum and on damages.

                                                  Respectfully submitted,

                                                  AVX CORPORATION
                                                  and AVX LIMITED,

                                                  By their attorneys,


                                                  */s/ Joseph S.U. Bodoff*_____
                                                  Joseph S.U. Bodoff (BBO No. 549116)
                                                  Richard A. Goren (BBO No. 203700)
                                                  Ryan D. Sullivan (BBO No. 660696)
                                                  Bodoff & Associates, P.C.
                                                  225 Friend Street
                                                  Boston, MA 02114
                                                  (617) 742-7300

Dated: April 9, 2008