# Exhibit 12

## JOINT VENTURE AGREEMENT

### (FOR APPLICATION)

THIS AGREEMENT, made and entered into this 15th day of October, 1971, by and between SHOWA DENKO K.K. ("SDK"), a corporation duly organized and existing under the laws of Japan, with its head office at 34, Shiba-Miyamoto-cho, Minato-ku, Tokyo, Japan, and KAWECKI BERYLCO INDUSTRIES, INC. ("KBI"), a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania, U.S.A., with its head office at Tuckerton Road, Reading, Pennsylvania (the "Parties"):

### W I T N E S S E T H :

WHEREAS, KBI possesses valuable industrial property rights and knowhow (including knowhow relating to ore and tin slag treatment) pertaining to the manufacture and sale of tantalum powder and tantalum products (the "Products") and the construction and operation of production facilities and equipment therefor (the "Technology"); and

WHEREAS, SDK is in the business of producing and selling tantalum powder in Japan and owns a facility at its Higashinagahara Works for the production of tantalum powder and owns certain equipment, and inventories and Technology relating to such production and sale; and

WHEREAS, SDK and KBI have decided to establish

**CONFIDENTIAL**

C(FED)095338

SKBI 8

a joint company under the laws of Japan and to contribute to such joint company the aforesaid assets and Technology; such joint company to be organized for the manufacture and sale of the Products as hereinafter provided;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, SDK and KBI hereby agree as follows:

Section 1.00    FORMATION OF NEWCO

1.01    Organization and Registration

Promptly after receipt of the Authorizations (as hereinafter defined) SDK shall take all action necessary to cause a new stock corporation (kabushiki kaisha) to be organized and registered under the laws of Japan in accordance with the provisions of this Section 1.00.  Such stock corporation shall be known in the Japanese language as "Showa-KBI Kabushiki Kaisha" and shall be called in the English language "Showa-KBI Co., Ltd." ("Newco").  The registered head office of Newco shall be located at Minato-ku, Tokyo, Japan.

1.02    Initial Business Activities of Newco

The initial business activities of Newco shall

-2-

CONFIDENTIAL

C(FED)095339

consist of the manufacture in Japan of the Products and the sale thereof in Japan and elsewhere.

### 1.03  Articles of Incorporation of Newco

SDK shall cause Newco to adopt as its articles of incorporation a fully accurate Japanese language translation of the English language version of the form of articles of incorporation annexed hereto as "Exhibit I."

### 1.04  Initial Total Paid-in Capital of Newco

Newco shall have an authorized capital of Four Hundred Thirty Million Yen (¥430,000,000) consisting of 860,000 shares of par value of 500 Yen per share and a total initial paid-in capital of Two Hundred Fifteen Million Yen (¥215,000,000) consisting of 430,000 shares of such par value.

### 1.05  Capital Contribution by SDK

SDK will contribute ¥215,000,000 (Two Hundred Fifteen Million Yen) in cash to Newco as its initial paid-in capital in exchange for the issuance to it by Newco of 430,000 (Four Hundred Thirty Thousand) shares of Newco's stock.

### 1.06  Corporate Action

-3-

CONFIDENTIAL

C(FED)095340

1.06.1   SDK shall cause the Board of Directors of Newco to adopt resolutions:

(a)   authorizing Newco at the Closing to execute and deliver an exclusive licensing agreement with KBI (the "Exclusive License Agreement") provided for in Section 2 hereof.

(b)   authorizing Newco at the Closing to issue 430,000 (Four Hundred Thirty Thousand) Shares to KBI in exchange for the payment by KBI of ¥215,000,000 (Two Hundred Fifteen Million Yen).

(c)   authorizing Newco at the Closing to execute and deliver a contract (the "Plant Purchase Agreement") for, among other things, the purchase by Newco of SDK's tantalum powder-producing plant and related equipment and inventories (the "Plant") provided for in Section 2 hereof.

(d)   authorizing Newco to execute and deliver at the Closing this Agreement and the several other Associated Agreements to which Newco is to become a party pursuant to Section 2 hereof.

1.06.2   KBI shall adopt resolutions:

(a)   authorizing execution and delivery at the Closing of the Exclusive License Agreement and the other Associated Agreements to which KBI is to become a party

-4-

CONFIDENTIAL

C(FED)095341

pursuant to Section 2 hereof.

(b)  authorizing the contribution of KBI at the Closing of ¥215,000,000 (Two Hundred Fifteen Million Yen) to the capital of Newco in exchange for 430,000 (Four Hundred Thirty Thousand) shares of Newco's stock.

1.06.3  SDK shall adopt resolutions:

(a)  waiving its pre-emptive right in connection with the shares or any part thereof to be issued to KBI pursuant to Section 1.06.1 hereof.

(b)  authorizing execution and delivery at the Closing of the Plant Purchase Agreement and the other Associated Agreements to which SDK is to become a party pursuant to Section 2 hereof.

1.07  <u>Capital Contribution by KBI</u>

At the Closing, after execution of the Exclusive License Agreement by Newco and receipt by KBI of the net amount of the royalty payable under the Exclusive License Agreement, KBI will contribute ¥215,000,000 (Two Hundred Fifteen Million Yen) in cash to Newco as its contribution to the capital thereof in exchange for the issuance to it by Newco of 430,000,000 (Four Hundred Thirty Thousand) shares.

-6-

CONFIDENTIAL

C(FED)095342

Section 2.00  <u>AGREEMENTS TO BE EXECUTED AT THE CLOSING</u>

2.01  Exclusive License Agreement
<u>Between KBI and Newco</u>

At the Closing, KBI and Newco shall enter into
the "Exclusive License Agreement" annexed hereto as Exhibit
II, providing for a license of KBI's Technology in exchange
for a prepaid royalty of US$650,000.

2.02  Technical Assistance Agreements
<u>Between Newco and KBI and Newco and SDK</u>

At the Closing, Newco and KBI shall enter into the
"Technical Assistance Agreement" annexed hereto as Exhibit
III and providing for the exchange by such parties of future
Technology and assistance in connection with the Products; and
SDK will inform Newco of the occurrence of any developments in
SDK's business which might have value to Newco and negotiate
with Newco licenses for such developments on mutually agreeable
terms and conditions.

2.03  The Other Associated Agreements
<u>Between SDK,KBI and/or Newco</u>

At the Closing, SDK, KBI and/or Newco shall enter into
and consummate the other associated agreements.

-6-

CONFIDENTIAL

C(FED)095343

Section 3.00  MANAGEMENT OF NEWCO

3.01  Corporate Action after Closing

Promptly after the Closing, SDK and KBI, duly convened in an extraordinary meeting of the shareholders of Newco, will do the following acts and things:

(a)  accept upon delivery thereof the resignations of one-half of the members of the Board of Directors of Newco.

(b)  elect persons designated by KBI to fill the resulting vacancies.

3.02  Election of Directors

SDK and KBI shall at all times enjoy equal representation on the board of directors of Newco. Accordingly, one-half (1/2) of the directors of Newco shall be persons nominated by SDK and the other one-half (1/2) of the directors of Newco shall be individuals nominated by KBI, and the Parties hereby undertake to vote their shares of Newco so as to cause the election as directors of the persons so nominated. In the case of the death, resignation or removal of a director prior to the end of his term, each of the Parties agrees to vote its shares so as to appoint as his replacement a director nominated by the Party who has

-7-

CONFIDENTIAL

nominated the director whose death, resignation or removal
was the cause of such vacancy.

### 3.03  Representative Directors

Newco shall have two (2) representative directors
who shall be elected by the board of directors of Newco from
among the members thereof.  One of the representative
directors shall be an individual nominated by SDK and accept-
able to KBI and the other representative director shall be
an individual nominated by KBI and acceptable to SDK.

Subject to the powers of the board of directors
of Newco set forth in the articles of incorporation thereof,
the representative directors shall have full authority, act-
ing jointly, in respect of purchases of raw materials, pro-
duction and sales policies.  Each representative director
may delegate authority to the other in respect of specific
matters.

### 3.04  Officers

Newco shall have the following officers:

3.04.1  A President who shall be the representa-
tive director nominated by SDK and acceptable to KBI.

3.04.2  A Vice President who shall be nominated
by KBI and acceptable to SDK.

-8-

CONFIDENTIAL

C(FED)095345

3.04.3   Such other officers as the Parties shall agree upon.

The Parties hereto hereby covenant and agree to cause the directors of Newco respectively nominated by them to cast their votes so as to appoint as officers and as representative directors those individuals nominated and approved as provided in this Section.  Further, in the case of the death, resignation or removal of an officer or representative director prior to the end of his term, the Parties agree in similar manner to cause the directors of Newco to cast their votes so as to appoint a replacement.

3.05   Statutory Auditors

Newco shall have two (2) statutory auditors, one of whom shall be nominated by SDK and the other of whom shall be nominated by KBI.  The Parties agree to vote their respective shares so as to appoint such nominees.  In the case of the death, resignation or removal of an auditor prior to the end of his term, the Parties agree to cast their votes so as to appoint a replacement who is a nominee of the Party who has nominated the auditor whose death, resignation or removal was the cause of such vacancy.

-9-

CONFIDENTIAL

C(FED)095346

3.06  Books of Account

Newco shall keep true and accurate books of account
and records, employing standards, procedures and forms in
conformity with the mandatory requirements of Japanese law
and in conformity with generally accepted accounting prin-
ciples in Japan consistently applied as determined by the
firm of accountants to be designated pursuant to Section 3.07
hereof.

3.07  Independent Public Accountants

There shall be an annual calendar year-end audit
of Newco and, if KBI or SDK so requests, a similar audit as
of the end of any semi-annual accounting period, both conducted
at the expense of Newco by a firm of independent public account-
ants and auditors.  The Parties hereto hereby designate and
appoint the firm of Tomatsu Aoki and Company as such independ-
ent public accountants and auditors, such designation and
appointment to remain effective until terminated by resolu-
tion of the shareholders of Newco.

3.08  Monthly Reports to Parties;
      Inspection of Newco Records

Newco shall prepare and distribute to the Parties,
promptly after the close of each month, a profit and loss

-10-

CONFIDENTIAL

C(FED)095347

estimate for such month, a profit and loss estimate for
the period from the beginning of the current fiscal year to
the end of such month, and such other data (a profit and loss
statement and a balance sheet for each half-year etc.) as
shall keep the Parties well advised of the operations and
condition of Newco.  The books of account and records of Newco
shall be available to the Parties and their representatives
for inspection at all reasonable times.

Section 4.00   GENERAL ADMINISTRATION OF NEWCO:
               PERSONNEL AND OPERATIONS

4.01  Plant and Administrative Facilities

SDK will, under the direction of Newco's board
of directors or of the representative directors acting
jointly, use its best efforts to supervise the operations
of Newco and to assure that Newco's production and admini-
strative facilities are adequately maintained and developed
and are functioning effectively in the commercial produc-
tion and sale of the Products.

4.02  Personnel of Newco

SDK will make available to Newco (by seconding
from its own organization or otherwise) qualified personnel
for the general administration of Newco and will also furnish

-11-

CONFIDENTIAL

and/or recruit qualified management, technical and sales
personnel for Newco, including the Plant Manager who will be
in charge of manufacturing operations and related services;
provided, however, that the Parties understand that Newco
will conduct operations with the minimum management personnel
of its own, compatible with the efficient and economical
operation of Newco.  SDK agrees to cause its personnel
assigned to work for Newco to perform the functions and dis-
charge the duties of employees of a metallurgical company in
a diligent, loyal and skillful manner.  The services which
SDK will perform for Newco, under the direction of the board
of directors of Newco or of the representative directors
acting jointly, in addition to general advice, guidance and
assistance in connection with business conditions in Japan,
include (but are not limited to):

     (a)  Negotiations with the Japanese central and
local government and their administrations.

     (b)  Relations with customers, suppliers, etc.
and with the public.

     (c)  Recruitment and administration of personnel.

     (d)  Labor relations, labor and wage policy and
administration.

     (e)  General administration and bookkeeping of
Newco.

CONFIDENTIAL

C(FED)095349

(f)  Legal, patent and tax advice.

(g)  Accounting services and preparation of financial statements of Newco.

(h)  Matters relating to meetings of the board of directors and shareholders of Newco.

(i)  Purchase of equipment and raw materials.

SDK will be compensated for the foregoing services at the rates set forth in the Plant Management Agreement,

## 4.03  United States Export Controls

Anything to the contrary elsewhere in this Agreement notwithstanding, Newco agrees that it will in no way obligate itself to furnish and that it will not in fact furnish to any other person, firm or corporation, any goods or services which laws or regulations of the United States government prohibit or restrain KBI, its affiliates or subsidiaries from exporting or furnishing thereto, unless KBI shall have received authorization or license from the competent agency of the United States government permitting acts or transactions otherwise forbidden under such laws or regulations as aforesaid, and then, only to the extent permitted by the terms and conditions of any such authorization or license,

-13-

CONFIDENTIAL

C(FED)095350

Section 5.00  ADDITIONAL UNDERTAKINGS AND COVENANTS

5.01  Non-Contestability

Neither Newco nor the Parties shall directly or indirectly contest or aid others in contesting or do anything which may impair the value or validity of any Technology licensed or disclosed by either Party or Newco pursuant to this Agreement or any of the Associated Agreements.

5.02  Activities of the Parties

After the Closing and until the termination of this Agreement:

(a)  KBI will sell the Products in Japan through Newco in accordance with the sales agreement to be concluded between KBI and Newco under the Section 2.03; and

(b)  Without the prior written consent of KBI, which consent shall not unreasonably be withheld, SDK will not (i) manufacture or sell any of the Products (except for finished goods inventory not purchased by Newco, all of which shall be sold through Newco as provided in the Plant Purchase Agreement) or (ii) license to any person or organization (other than Newco pursuant to the Plant Purchase Agreement) any Technology relating to the Products.  The term "Products" as used in this paragraph 5.02 shall have the meanings ~~in~~ set forth ~~particular~~ in Paragraph 1-1 of SCHEDULE A attached to the Exclusive License Agreement.

-14-

CONFIDENTIAL

C(FED)095351

5.03  <u>Future Financing for Newco</u>

If, in the course of Newco's future operations, the Parties mutually decide that Newco requires additional funds for its operations:

(a)  The Parties will use their best efforts to cause such additional funds to be loaned to Newco by lending institutions on reasonable terms and conditions; and if in such case Newco cannot obtain a loan on its own credit, the Parties will, if they each approve the lending institution providing the funds, each guarantee one-half of the amount borrowed and take other reasonable action to cause the loan to be made.

(b)  If borrowings as aforesaid are not available to Newco, the Parties will provide such funds to Newco in equal amounts by loan, equity or otherwise on equal terms and conditions.

(c)  Notwithstanding the above, KBI will not be required to guarantee or provide any such additional funds to Newco unless and until it shall first obtain such authorizations, licenses, and approvals as may be necessary under Japanese and/or U.S. laws or regulations in connection with such funding, or with the receipt by KBI of

-15-

CONFIDENTIAL

C(FED)095352

dividends or interest, or with the repayment and repatria-
tion of the principal amount of such funds in United
States dollar currency on terms at least as favorable as
those validated pursuant to Section 9.01 hereof.

(d)  Indebtedness owed to the Parties pursuant to
this Agreement or any Associated Agreement will be repaid
to them in equal amounts and at the same times.

### 5.04  Right of First Refusal

Neither Party will sell, transfer, or otherwise
dispose of all or any part of its shares of Newco to a third
party, until it has first offered to sell such shares to the
other Party as follows.  Upon receipt of a third party's
offer, the Party wishing to sell any of its shares of Newco
(the "Offeror") will make a written offer to sell such shares
upon the same terms and conditions to the other Party (the
"Offeree").  The Offeree will have thirty (30) days to pur-
chase all such shares subject to the offer by written
acceptance thereof, failing which the offeror will be entitled,
for a period of six (6) months after the expiration of such
thirty day period, to sell or otherwise dispose of such
shares to any third party but only upon the same terms as
were stated in its offer to the Offeree.

-16-

CONFIDENTIAL

C(FED)095353

Section 6.00  <u>CONFIDENTIALITY OF INFORMATION</u>

    6.01  Secret and Confidential Information
         <u>Not to be Disclosed</u>

       Except to the extent the disclosure thereof may be required or permitted by this Agreement or any Associated Agreements, each Party agrees that it will keep strictly secret and confidential and will not itself disclose to any third party any secret or confidential information acquired from the other Party.  Without limiting the scope of the foregoing obligation, the Parties agree to cause all written materials relating to or containing such information, including all sketches, drawings, reports and notes, and all copies, reproductions, reprints and translations, to be plainly marked to indicate the secret and confidential nature thereof and to prevent unauthorized use or reproduction thereof.

    6.02  <u>Secrecy Arrangements</u>

       Each Party will take all reasonable action to compel compliance by its employees with the provisions of this Section 6.00.  SDK agrees that its employees and those of Newco are and shall be subject to the employee regulations previously delivered by SDK to KBI.

-17-

CONFIDENTIAL

C(FED)095354

6.03  <u>Survival of Obligations</u>

The obligations undertaken by the Parties pursuant to this Section 6.00 shall survive termination of this Agreement.

6.04  <u>Information Available to the Public</u>

The obligations undertaken pursuant to this Section shall not apply to any such information as is or becomes published or otherwise generally available to the public, or which is, at the time of disclosure, in the possession of the Party to which such information is disclosed, provided such publication, availability or possession has not been effected in violation of any rights of the Parties hereto.

Section 7.00  <u>PAYMENTS AND TAXES</u>

7.01  <u>Manner and Place of Payments by Newco</u>

Except as otherwise provided herein or therein, all payments to KBI by Newco in relation to this Agreement and the Associated Agreements shall be made by cable in United States dollar currency at Chase Manhattan Bank, N.A., 410 Park Avenue, New York, New York, U.S.A., for the account of KBI, or to such other bank or address in the United States of America as KBI may from time to time designate in writing.

-18-

CONFIDENTIAL

C(FED)095355

### 7.02  Withholding Taxes Resulting From Exclusive License

KBI understands that, pursuant to applicable laws, including the Convention between Japan and the United States of America for The Avoidance of Double Taxation, Newco will be  required to withhold ten percent (10%) (i.e., Sixty-Five Thousand U.S. Dollars) of the consideration to be paid to KBI by Newco pursuant to the Exclusive License Agreement. Newco shall withhold and promptly pay such amount to the competent tax authorities of Japan, and furnish KBI with official tax receipts or other official evidence of such payment.

## Section 8.00  TERM AND TERMINATION

### 8.01  Term

This Agreement shall come into force on the date hereof subject to the obtaining of all Authorizations and shall continue in force and effect for an indefinite term hereafter until this Agreement is sooner terminated pursuant to the provisions of this Agreement.

-19-

CONFIDENTIAL

C(FED)095356

8.02   <u>Bankruptcy, Etc., of a Party</u>

Either Party may terminate this Agreement by written notice to the other Party hereto in the event that the other Party shall be declared insolvent or bankrupt, be dissolved or liquidated, or have all or any substantial portion of its capital stock or assets expropriated by any government.

8.03   <u>Bankruptcy, Etc., of Newco</u>

Either Party may terminate this Agreement by written notice to the other Party in the event that Newco shall be declared insolvent or bankrupt, be dissolved or liquidated or have all or any substantial portion of its capital stock or assets expropriated by any government.

Section 9.00   <u>AUTHORIZATIONS TO BE OBTAINED</u>

9.01   Validation of Acquisition of
<u>Shares by KBI and Other Transactions</u>

As soon as practicable after the execution of this Agreement, SDK will permit representatives appointed by KBI to have access to the Plant and such books, records and other

-20-

CONFIDENTIAL

C(FED)095357

financial data as SDK deems necessary for achieving the pur-
pose of such access insofar as they do not unreasonably
obstruct SDK's ordinary business activities. The Parties
understand that the purpose of such access is to examine the
technical feasibility of the Plant and to confirm whether or
not the valuation of the Plant conforms to generally ac-
cepted accounting principles in Japan. The costs and expenses
for such access shall be borne by KBI. If KBI approves the
Plant and its valuation on its books by SDK it will so advise
SDK, whereupon the Parties will promptly proceed as follows:

9.01.1 SDK shall cause to be filed with the competent
authorities of the Government of Japan appropriate applications
for validation or approval under the Law Concerning Foreign
Investment (Law No. 1963 of 1950, as amended) of:

(a)  the acquisition by KBI of the shares of
Newco to be acquired by KBI hereunder, and

(b)  the conclusion between KBI and Newco of
the Exclusive License and Technical Assistance Agreements.

Such validations or approvals shall include assur-
ances by the Japanese Government of the convertibility and
repatriability in United States Dollars to KBI, or its
nominee of any and all dividends, royalties, interest, re-
imbursement costs, capital investment and any other payment

-21-

CONFIDENTIAL

C(FED)095358

to KBI contemplated by this Agreement or the Associated Agreements.

9.01.2  KBI will file applications for:

(a)  such licenses, waivers or other approvals as it deems necessary or desirable to obtain pursuant to the United States Export Control Act of 1949 in connection with the disclosure to and use by New co of KBI Technology in accordance with this Agreement or any of the Associated Agreements; and

(b)  a ruling by the United States Treasury under Section 367 and 351 of the United States Internal Revenue Code that the investment in Newco by KBI and the grant by KBI to Newco of the Technology are not in pursuance of a plan one of whose purposes is the avoidance of United States income taxes and that the transactions between KBI and Newco contemplated by this Agreement will not result in the recognition of taxable gain or loss to KBI; and

(c)  a specific authorization, pursuant to the Code of Federal Regulations, Title 14, Part 1000 and the regulations pertaining thereto (if KBI decides that it is necessary or advisable to obtain such an authorization), to perform any and all the acts or transactions contemplated in this Agreement, including the contributions to Newco pursuant hereto.

-22-

CONFIDENTIAL

C(FED)095359

9.01.3  The Parties will also cause to be made such other applications for such other governmental authorization as shall be necessary or advisable to conclude and perform the transactions contemplated by this Agreement.

9.02  Failure to Obtain Authorizations

In the event that by November 1, 1971 the authorizations, validations, approvals, rulings, waivers and licenses contemplated by this Section 9.00 (the "Authorizations") shall not have been obtained in form and substance satisfactory to the Parties, this Agreement may be terminated by KBI or SDK upon thirty days prior written notice and thereafter shall be deemed null and void ab initio without any obligation of either Party to the other.

Section 10.00  INTERPRETATION

10.01  Governing Language

This Agreement is in the English language only, which language shall be controlling in all respects. No translation, if any, of this Agreement into the Japanese or any other language shall be of any force or effect in the interpretation of this Agreement or in a determination of the intent of either of the Parties or of Newco.

-23-

CONFIDENTIAL

C(FED)095360

### 10.02  Modification, Etc., of Agreement

No amendment or change hereof or addition hereto shall be effective or binding on either of the Parties or Newco unless reduced in writing and executed by the respective duly authorized representatives of each of the Parties and Newco.

### Section 11.00  ARBITRATION

All disputes arising in connection with this Agreement shall be submitted to and finally determined by arbitration. Any such arbitration shall be conducted in the English language in New York, N. Y. when it is requested by SDK or Newco or in Japan when requested by KBI, and in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. Judgment upon an award rendered may be entered in any court having jurisdiction or application may be made to any such court for a judicial acceptance of such award and an order of enforcement thereof, as the case may be.

### Section 12.00  THE CLOSING

The Closing hereunder will be held at a place to be agreed upon by the Parties on the sixtieth (60th) business

-24-

CONFIDENTIAL

*Mm. WL*

C(FED)095361

day following the date of written notice by KBI to SDK that all of the Authorizations which are required or permitted to be obtained have been obtained in form and substance satisfactory to KBI.

Section 13.00   MISCELLANEOUS

13.01   Assignment

This Agreement, and all rights and obligations hereunder, shall be binding upon and inure to the benefit of the respective successors or assigns of the Parties; provided that no assignment shall be made without prior written consent of the other Party.

13.02   Notices

Except as otherwise provided in this Agreement, all notices required or permitted to be given hereunder shall be in writing in English and shall be valid and sufficient if sent by registered air mail, postage prepaid, addressed as first above written.  Either Party may change its address by a notice given to the other Party in the manner set forth above.

13.03   Governing Law

This Agreement shall be construed according to the

-25-

CONFIDENTIAL

C(FED)095362

laws of Japan.

IN WITNESS WHEREOF, the Parties have executed this Agreement this 15th day of October , 1971.

SHOWA DENKO K.K.

Witness:

By _Kaneo Sugiura_

~~Sato Osajima~~

KAWECKI BERYLCO INDUSTRIES, INC.

Witness:

By _Walter R. Lowry_
President

_Gordon C. Osmund_

Showa-KBI Co., Ltd. hereby accepts the terms and provisions of this Agreement and agrees to be bound thereby.

Dated:          , 1971

SHOWA-KBI CO., LTD.

Witness:

By ~~Kaneo Sugiura~~ H.S.
President

_____

CONFIDENTIAL

EXHIBIT II

EXCLUSIVE LICENSE AGREEMENT

AGREEMENT dated                , 197 , between
KAWECKI BERYLCO INDUSTRIES, INC., a corporation organized
under the laws of the Commonwealth of Pennsylvania and having
its principal office at Tuckerton Road, Reading, Pennsylvania,
U.S.A. ("KBI"), and SHOWA-KBI CO., LTD., a corporation organ-
ized under the laws of Japan and having its principal office
at Minato-ku, Tokyo, Japan ("Showa-KBI"),

W I T N E S S E T H :

WHEREAS, the Joint Venture Agreement dated *October* ,
1971 between KBI and Showa Denko K.K. (the "Venture Agree-
ment), provides that KBI and Showa-KBI shall enter into an
exclusive license agreement upon the terms and conditions set
forth below:

NOW, THEREFORE, for and in consideration of the
premises and the mutual covenants and undertakings herein
contained, the parties hereto hereby agree as follows:

1.  Subject to the issuance of all appropriate auth-
orizations by the governments of Japan and the United States
of America and to the limitations of applicable laws, KBI

**CONFIDENTIAL**

C(FED)095379

hereby grants to Showa-KBI a license of all of KBI's industrial property rights, secret processes, technical information and know-how (including know-how relating to ore and tin slag treatment) pertaining to the manufacture and sales of tantalum powder and tantalum products (the "Products") and to the construction and operation of production facilities and equipment therefor, all as more particularly described in Schedule A annexed hereto (the "Technology"). Except for the sublicensing permitted under Section 4 of this Agreement the foregoing license shall be utilized by Showa-KBI exclusively in connection with its manufacture of the Products in Japan and its sales of the Products in Japan and elsewhere; and during the term of this Agreement KBI will not except as permitted or required by Showa-KBI utilize the Technology to manufacture and sell the Products in Japan and will not license the Technology to any person or organization in countries outside of North or South America, Europe, Australia or Africa. In connection with such license, KBI shall furnish or make available to Showa-KBI descriptions of know-how, copies of patents and related applications, notebooks, formulae, sketches, records and other technical documents and data relating thereto. Upon request by Showa-KBI, KBI shall cooperate with Showa-KBI in registering or filing application, as the case may be, with the Japanese Patent Bureau in connection with the granting of the exclusive license of the rights included in the Technology. To the foregoing end, KBI agrees that it will execute, acknowledge and deliver, at the expense of KBI, any and all such instruments, and other written materials as Showa-KBI deem

**CONFIDENTIAL**    C(FED)095380

necessary or proper in order to complete and perfect said granting of the exclusive license.

      2.  In consideration of the foregoing license, Showa-KBI will simultaneously with the execution of this Agreement pay to KBI a lump-sum royalty of Six Hundred Fifty Thousand U.S. Dollars (U.S.$650,000), less applicable Japanese withholding tax of Sixty-Five Thousand U.S. Dollars (U.S.$65,000), or a balance of Five Hundred Eighty-Five Thousand U.S. Dollars (U.S.$585,000). The amount of payment due hereabove (U.S.$650,000) shall be calculated in the Yen currency adopting the rate of exchange prevailing at an authorized foreign exchange bank in Japan on the date such payment is made, [provided, however, that the rate shall be fixed at the bottom limit of 315 Yen to one U.S. Dollar even when the Yen currency be upvalued beyond such limit.] Showa-KBI will assist KBI in obtaining an official tax receipt or other evidence sufficient to enable KBI to claim as a credit against United States income tax the amount withheld pursuant to this paragraph.

      3.  So long as this Agreement is in effect Showa-KBI will use its best efforts to maintain the validity and good standing in Japan of the patents included in the Technology. Showa-KBI will defend all elements of the Technology against infringement, conversion or unauthorized use by third parties in Japan and will defend all claims of

CONFIDENTIAL

C(FED)095381

infringement, conversion or unauthorized use brought by third parties in Japan against Showa-KBI and/or KBI. KBI will co-operate and assist in any reasonable manner in this connec-tion. In addition, KBI may at its option, but shall not be obligated to, take all action in Japan to protect and defend the Technology against infringement, conversion or unauthor-ized use. The costs and expenses of all such action shall be borne by Showa-KBI.

4. Except to the extent the disclosure thereof may be required or permitted by this Agreement, Showa-KBI will not, at any time during the term of this Agreement or thereafter, directly or indirectly sublicense or divulge to any third party and will keep strictly secret any rights, trade secrets, know-how or other confidential information included in the Technology, provided, however, that Showa-KBI shall have the non-exclusive right to sublicense the Technology to any person or organization in any country of South America and Africa and in West Germany, Belgium, France and Australia, and have the exclusive right (as to any other party including SDK and KBI) to sublicense the Technology to any person or organization in any country other than those in North America, Europe, South America and Africa and Australia. The obligations undertaken pursuant to this Section shall not apply to any such information as is or becomes published or otherwise

CONFIDENTIAL

-4-

C(FED)095382

generally available to the public, or which is, at the time of disclosure, in the possession of Showa-KBI, provided such publication, availability or possession has not been effected in violation of any of the rights of the parties hereto.

5.  To implement paragraph 4, Showa-KBI will (i) cause all written or printed documents or data relating to the Technology, and all reproductions and translations thereof, to be plainly marked to indicate the secret and confidential nature thereof, (ii) assure compliance by its employees who are to have access to the Technology or any portion thereof, with applicable employee regulations, (iii) take all necessary action, including the institution and prosecution of appropriate judicial proceedings, to compel compliance with the provisions of this paragraph.

6.  This Agreement and the rights granted hereunder will become effective upon payment of the consideration provided for herein (subject to the Authorizations provided for in the Venture Agreement) and will continue thereafter in perpetuity (except that rights under KBI patents will terminate at the expiration of such patents), unless cancelled by KBI or Showa-KBI upon written notice at any time in the event of the occurrence of any of the following conditions subsequent:

(a)  Showa-KBI or KBI shall fail to comply with any of the provisions hereof.

**CONFIDENTIAL**

-5-

C(FED)095383

(b)  Showa-KBI shall be dissolved or liquidated, be declared insolvent or bankrupt, make an assignment for the benefit of creditors or have all or any substantial portion of its assets expropriated by any government.

7.  Cancellation of this Agreement for any reason shall not release either party from any liability to the other party which has accrued prior to the date of such cancellation.

8.  All disputes arising in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International chamber of commerce by a sole arbitrator appointed in accordance with the Rules. The Arbitration shall be held in the English language at New York, N. Y. when it is requested by Showa-KBI or in Tokyo when requested by KBI.  Judgment upon the award rendered may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be.

9.  This Agreement is in the English language which alone shall be controlling in all respects.

10.  All notices to be given hereunder shall be in writing and sent by mail to such party at the address first given above or to such other address as to which either party shall have been duly notified by the other.

CONFIDENTIAL

-6-

C(FED)095384

11.  No amendment hereof or supplement hereto shall be binding upon either party unless contained in a written instrument signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

KAWECKI BERYLCO INDUSTRIES, INC.

Attest:

_____

By_____

SHOWA-KBI CO., LTD.

Attest:

_____

By_____

**CONFIDENTIAL**

-7-

**C(FED)095385**

SCHEDULE A

The Design Package (including raw materials receiving, storage of products and shipping facilities) to be furnished to Showa-KBI from KBI based on Section 1. Basis of Design will be indicated in Section 2 and the subsequent Sections.

1. Basis of Design

   1-1 Kinds of products

      1-1-1 Chemical compounds

         a) $Ta_2O_5$ (Optical and crystal grade)
         b) $K_2TaF_7$
         c) TaC
         d) TaN
         e) $TaCl_5$

      1-1-2 Powders and anode

         a) Capacitor grade powder (High voltage, high capacitance and normal grade)

         b) Metallurgical grade powder

         c) Anode (Diameter: 1 mm⌀ or more)

      1-1-3 Mill products

         a) Wire (Stable grain size and normal grade, Diameter: 0.1 mm⌀ or more)

         b) Pipe (Diameter: 3 mm⌀ or more, Thickness: 0.2 mm t or more)

         c) Sheet (Thickness: 0.05 mm t or more, Width: 1,000 mm or less)

         d) Foil (Thickness: 0.05 mm t or less, Width: 200 mm or less)

      1-1-4 Alloys

**CONFIDENTIAL**

C(FED)095386

1-2 Plant capacity

    1-2-1 Chemical products

        a). $Ta_2O_5$

        b) TaC          30 t/y

        c) $K_2TaF_7$    100, 200, 300 t/y

        d) TaN          5 t/y

        e) $TaCl_5$       5 t/y

    1-2-2 Powder and anode

        a) Powder    30, 50, 70 t/y

        b) Anode     10 t/y

    1-2-3 Mill products

        a) Wire      5 t/y

        b) Pipe

        c) Sheet     20 t/y

        d) Foil

    1-2-4 Alloys     10 t/y

2. Process design

  2-1 Process description

  2-2 Process flow sheets with control system

  2-3 Engineering flow diagram

  2-4 Material balance

  2-5 Quantity and components of effluents and emissions

  2-6 Conditions and specifications of utilities

3. Specifications

  3-1 Raw materials specification

  3-2 Chemicals specification

  3-3 Intermediate products specification

  3-4 Products specification

CONFIDENTIAL

C(FED)095387

4. Design of facilities

　4-1 Equipment list

　4-2 Equipment engineering specifications and drawings
　　　for fabrication work

　4-3 Special design information including piping, conveyor
　　　and handling equipment, etc.

　4-4 Instrument data sheet

　4-5 Proposed equipment arrangement

　4-6 Other general design information

　　　4-6-1 Standard specification for materials of
　　　　　　equipment, piping, valve, etc.

　　　4-6-2 Standard and code


5. Manuals

　5-1 Operation manuals

　5-2 Quality control manuals

　5-3 Analytical method manuals

　5-4 Maintenance service manuals

　5-5 Safety manuals

　5-6 Technical manuals


6. Unit consumption and yield


7. Information

　7-1 Physical properties

　7-2 Pollution control

　7-3 Special information on control system, electrical,
　　　civil and architectural facilities

　7-4 Information on facilities currently in use by KBI

**CONFIDENTIAL**

- 3 -

C(FED)095388

7-5 Information on laboratory apparatus

7-6 Information on secondary and tertiary processing of
tantalum for such applications as welding, explosive
clad, etc.

CONFIDENTIAL

C(FED)095389

CONFIDENTIAL

C(FED)095390

EXHIBIT III

TECHNICAL ASSISTANCE AGREEMENT

AGREEMENT dated                    , 197 , between KAWECKI BERYLCO INDUSTRIES, INC., a corporation organized under the laws of the Commonwealth of Pennsylvania, and having its principal office at Tuckerton Road, Reading, Pennsylvania, U.S.A. ("KBI"), and SHOWA-KBI CO., LTD., a corporation organized under the laws of Japan and having its principal office at Minato-ku, Tokyo, Japan ("Showa-KBI"),

W I T N E S S E T H :

WHEREAS, pursuant to the terms of the Joint Venture Agreement dated October , 1971 between KBI and Showa Denko K.K., KBI is simultaneously herewith granting to Showa-KBI a license of KBI's present rights, secret processes and know-how relating to the manufacture and use in Japan of tantalum powder and tantalum products (the "Products"); and

WHEREAS, KBI and Showa-KBI wish to provide for the exchange of technical assistance services in connection with the manufacture and use of the Products and for the exchange of licenses of rights, secret processes and know-how relating to the Products which they each may develop or acquire here-after.

**CONFIDENTIAL**

C(FED)095391

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. This Agreement pertains to any rights (registered or unregistered), secret processes, technical information or know-how (including know-how relating to ore and tin slag treatment) relating to the manufacture and use of the Products and to the construction and operation of production facilities and equipment therefor which KBI or Showa-KBI develops or ac-quires during the term of this Agreement (the "Technology").

2. KBI licenses its Technology to Showa-KBI for use in the manufacture of the Products in Japan and the sale thereof in Japan and elsewhere and Showa-KBI licenses its Technology to KBI for use in the manufacture and sale of the Products in the United States and elsewhere.  The foregoing licenses shall be granted by each party to the other on a royalty-free basis. KBI agrees that during the term of this Agreement it will not license its Technology or sublicense the Technology licensed to it by Showa-KBI to any person or organization in countries outside of North or South America, Europe, Australia or Africa; and Showa-KBI agrees that during the term of this Agreement it will not license its Technology or sublicense the Technology licensed to it by KBI to any person or organization in Japan, North America and Europe (excluding West Germany, Belgium and France).

**CONFIDENTIAL**

- 2 -

C(FED)095392

3.  KBI agrees on the following terms to permit qualified personnel in the employ of Showa-KBI to inspect and have access to those portions of the plants or other facilities of KBI in the United States where the Products are manufactured or under study for the purpose of training such personnel.  The number of such personnel of Showa-KBI to be sent to the United States who shall be directly engaged in the manufacture of the Products and the schedules and particular purposes of such visits shall be mutually decided upon from time to time by the parties.  Showa-KBI agrees to give reasonable notice to KBI of all proposed visits and to comply with all reasonable requests by KBI for modification or postponement thereof to minimize interference with KBI's research and production schedules.  Showa-KBI will bear the entire expense of all salaries, travel, living and other expenses of its personnel while in the United States pursuant to this paragraph.  Showa-KBI assumes full responsibility for any loss or damage resulting from injury to or death of any of such personnel during or as a result of any visit to the plant and facilities of KBI hereunder and agrees to hold harmless or indemnify KBI for any such loss or damage except one which results from the willful or grossly negligent acts of KBI, its employees or agents.  Showa-KBI agrees not to send any person who does not execute a secrecy agreement satisfactory to KBI to the United States on a training

-3-

**CONFIDENTIAL**

**C(FED)095393**

visit to KBI's plant or other facilities.  The foregoing provi-
sions of paragraph 3 will be applicable _mutatis_ _mutandis_ to
visits of KBI personnel to the plant and facilities of Showa-
KBI.

4.  Subject to the provisions of this paragraph KBI
will from time to time, at Showa-KBI's request, send qualified
personnel in its employ to Japan for the purpose of consulting
with and assisting Showa-KBI in connection with the manufac-
ture, use or sale of the Products.  The parties will mutually
determine in each case the number and timing of such tech-
nicians or sales personnel to be sent to Japan in the light
of KBI's production and research schedules, it being understood
that KBI will not be required to furnish technical assistance
in Japan in a manner which might unduly interfere with its
own operations.  Showa-KBI agrees to pay in United States dollars
to KBI as compensation for the technical assistance furnished
hereunder an amount equal to Eighty U.S. Dollars ($80) per
day for the services of each KBI engineer and Fifty U.S. Dollars
($50) per day for the services of each KBI technician on a
technical assistance assignment pursuant hereto.  The fore-
going charges will be reviewed and adjusted by mutual agreement
from time to time.  Showa-KBI will be responsible for
providing each employee of KBI assigned to furnish
technical assistance hereunder with round-trip, first-class
air transportation between his usual place of employment

CONFIDENTIAL

- 4 -

C(FED)095394

in the United States and Japan and for bearing the cost of his
living and maintenance expenses in Japan.  KBI assumes full
responsibility for any loss or damage resulting from injury
to or death of any such personnel during or as a result of
such visit and agrees to hold harmless or indemnify Showa-KBI
from any such loss or damage except one which results from
the willful or grossly negligent acts of Showa-KBI, its
employees or agents.  The foregoing provisions of paragraph 4
will be applicable mutatis mutandis to visits of Showa-KBI
personnel to the plant and facilities of KBI.

    5.  Each party will have the right in any country
of the world to file applications for and to hold, in its own
name and at its own expense, patents and industrial property
rights for the Technology developed by it after the date hereof.

    6.  Showa-KBI and KBI will not, at any time during
the term of this Agreement or thereafter, directly or indi-
rectly divulge to any third party the Technology or any
portion thereof, except to the extent the divulgement thereof
may be required or permitted by any agreement between the
parties hereto.  The obligations undertaken pursuant to this
Section shall not apply to any such information as is or be-
comes published or otherwise generally available to the public,
or which is, at the time of disclosure, in the possession of
the Party to which such information is disclosed or furnished,
provided such publication, availability or possession has not

CONFIDENTIAL

-5-

C(FED)095395

been effected in violation of any of the rights of the parties hereto.

7.  To implement paragraph 6, each party will (i) cause all written or printed documents or data relating to the other party's Technology, and all reproductions and translations thereof, to be plainly marked to indicate the secret and confidential nature thereof, (ii) assure compliance by its employees who are to have access to the Technology or a portion thereof with either a secrecy agreement or employee regulations satisfactory in form and substance to the other party, and (iii) take all necessary action, including the institution and prosecution of appropriate judicial proceedings, to compel compliance with the provisions of this paragraph.

8.  Other than as provided in Sections 3 and 4, KBI shall perform, without receiving any further compensation from Showa-KBI, the following services at the request of Showa-KBI:

(1)  Offering of written comments and explanations on the materials supplied to Showa-KBI under Section 1 of the Exclusive License Agreement, and comments on other documents as prepared by Showa-KBI on the basis of said materials for the practice of Technology.

(2)  Offering of advice in writing on questions that may arise on the part of Showa-KBI in the course of design,

C(FED)095396

construction and operation of the plant insofar as such
questions are related to Technology.

Technology as used in this Section shall mean such as is dis-
closed to Showa-KBI under this agreement and the Exclusive
License Agreement.

9.  Showa-KBI and KBI will use their best efforts to
maintain the validity and good standing of their respective
patents included in the Technology.

10.  This Agreement shall become effective as of
the date of execution hereof by the parties subject to the
authorizations hereof, and the licenses granted hereunder
shall continue thereafter in perpetuity (except that rights
under patents will terminate at the expiration of such
patents) unless or until terminated upon the happening of
one of the following events:

(a)  Either Showa-KBI or KBI complains by written
notice to the other of a breach of this Agreement and such
breach continues for a period of not less than sixty (60)
days after receipt of such notice, in which event this Agree-
ment may be terminated by the party not in breach upon
written notice to the other.

(b)  Either party terminates the aforesaid Joint
Venture Agreement according to the provisions thereof.

**CONFIDENTIAL**

C(FED)095397

-7-

(c) KBI disposes of its stockholdings in Showa-KBI pursuant to provisions of the aforesaid Joint Venture Agreement; provided, however, that termination pursuant to this subparagraph (c) shall not affect either party's right to continue to utilize the Technology licensed to such party prior to such termination.

11. All disputes arising in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by a sole arbitrator appointed in accordance with the Rules. The arbitration shall be held in the English language at New York, N. Y. when it is requested by Showa-KBI or in Tokyo when requested by KBI. Judgment upon the award rendered may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award and an order of enforcement, as the case may be.

12. This Agreement is in the English language, which alone shall be controlling in all respects.

13. The rights and obligations herein provided for shall be subject to the issuance, in form and substance satisfactory to KBI and Showa-KBI, of all licenses, waivers, approvals or authorizations that may be deemed necessary or desirable by either of them in connection with this Agreement, including but not limited to those expressly set forth in Section 9 of the aforesaid Joint Venture Agreement.

**CONFIDENTIAL**

C(FED)095398

14.  All notices to be given hereunder shall be in writing and sent by mail to such party at the address first given or such other address as to which either party shall have been duly notified by the other.

15.  No amendment hereof or supplement hereto shall be binding upon either party unless contained in a written instrument signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first mentioned.

KAWECKI BERYLCO INDUSTRIES, INC.


By _____

Attest:


_____

SHOWA-KBI CO., LTD.


By _____

Attest:


_____

CONFIDENTIAL

C(FED)095399

EXHIBIT V

[Letterhead of]

KAWECKI BERYLCO INDUSTRIES, INC.

, 1971

Showa-KBI Kabushiki Kaisha

Minato-Ku
Tokyo, Japan

Gentlemen:

This will confirm the terms upon which you are to
act as our independent contractor with respect to sales in
Japan of tantalum powder and tantalum products manufactured
by us ("KBI") in the United States of America.

1.  You shall act as KBI's exclusive independent
contractor for sales with respect to sales in Japan of tanta-
lum powder and tantalum products manufactured by KBI in the
United States of America (the "Products").  You will perform
such services directly, through your own sales organization,
or indirectly, through agents appointed by you for such pur-
pose.  You agree to appoint Sumitomo Shoji K.K. as one such
agent.

2.  (a)  You will be entitled to a commission, pay-
able as hereinafter provided, at the rate of 6.5% of KBI's
Net Sales of Products in Japan.  With respect to Net Sales of
Products to customers pursuant to orders solicited by Sumitomo
Shoji K.K., you shall pay a commission of 3% of such Net Sales
to Sumitomo Shoji K.K. and the balance of 3 1/2% shall be re-
tained by you.  For the purposes hereof, Net Sales shall mean
our invoice price excluding freight, packaging, taxes, insur-
ance or similar charges.

(b)  Commissions will be due to you upon KBI's
receipt of payment in full from its customers.  Invoices not
paid by such customers according to KBI's credit terms as in
effect from time to time will, at KBI's request, be paid to
KBI by you (net of your commission) and thereafter you will be
entitled to collect such unpaid invoices from such customers
for your own account.  You will use your best efforts to
ensure that all exchange control licenses and approvals

**CONFIDENTIAL**

C(FED)095410

Showa-KBI Kabushiki Kaisha                                2.

necessary for the remittance to KBI of the total amount of
each invoice are obtained from the Japanese government so
as to allow such remittances to be made to KBI:  c/o Chase
Manhattan Bank, N.A., 410 Park Avenue, New York, New York
10017, U.S.A.

        (c)  The agents appointed by you under Para-
graph 1 and also the sales commission to be paid to you and
your agents under Paragraph 2(a) shall be reviewed and ad-
justed by mutual agreement from time to time.

        3.   All orders solicited by you and your agents
will be subject to acceptance by KBI as to price and other
terms and conditions of sale.  We will supply you with
price lists in effect from time to time and with the speci-
fications of the Products and other descriptive matter
printed in English.  You and your agents will not, in any
way, assume or create any obligations on our behalf nor
make any representation or warranty except such representa-
tions and warranties as are specifically authorized by us
in writing.  You shall not be authorized to accumulate inven-
tories of the Products or to execute on our behalf any
contracts for the sale thereof.

        4.   This agreement shall begin on the date first
above written, shall remain in effect during the term of
the Joint Venture Agreement between us dated _October_ , 1971
and shall terminate automatically upon the termination of
such Joint Venture Agreement.

        5.   So long as this Agreement is in effect you
agree not to act as independent contractor, agent, distributor
or in any other similar capacity for any other manufacturer
of products similar to or competitive with the Products; pro-
vided, however, that nothing contained herein shall in any way
limit your right to sell in Japan or elsewhere tantalum or
any other products manufactured by you.

        6.   Notices to be given hereunder by either party
shall be deemed sufficient if given in writing and sent by
prepaid registered airmail to the parties at the addresses
set forth above, or at such other addresses as to which
either party may notify the other in accordance with this
paragraph.

        7.   This Agreement may be amended or modified only
by a writing signed by both parties, and shall be construed
in accordance with the laws of the State of New York, U.S.A.

**CONFIDENTIAL**

**C(FED)095411**

Showa-KBI Kabushiki Kaisha                                    3.

       8.  Any dispute or difference as to the interpre-
tation, construction or performance of this Agreement will
be referred to and finally settled by arbitration conducted
by a sole arbitrator in New York, New York, U.S.A., in the
English language pursuant to the Rules of Arbitration of
the International Chamber of Commerce.

                              Very truly yours,

                              KAWECKI BERYLCO INDUSTRIES, INC.

                          By_____

Agreed and Confirmed:

SHOWA-KBI KAUBSHIKI KAISHA


By_____

CONFIDENTIAL

C(FED)095412

CONFIDENTIAL

C(FED)095413

EXHIBIT VII

PLANT MANAGEMENT AGREEMENT

AGREEMENT made this        day of          , 197 , BETWEEN:

Showa Denko K.K., a Japanese corporation having its head
office at 34, Shiba Miyamoto-cho, Minato-ku, Tokyo, Japan
(hereinafter called "SDK"), and

Showa-KBI Co., Ltd., a Japanese corporation having its
head office at Minato-ku, Tokyo, Japan (hereinafter called
"Newco")

WHEREAS

A.  SDK and Kawecki Berylco Industries, Inc. (hereinafter
called "KBI") have agreed to establish Newco for the purpose
of manufacturing and selling tantalum powder and tantalum
products; and

B.  SDK and KBI have further agreed that SDK will furnish
Newco with the services of its head office and its
Higashinagahara Works for the general administration of Newco
on the terms and conditions set forth herein.

NOW, IT IS HEREBY AGREED as follows:

CONFIDENTIAL

C(FED)095414

Article 1.  <u>DEFINITIONS</u>

1.1 In this Agreement:

"Products shall mean tantalum powder and tantalum products and any other products which SDK and KBI agree should be manufactured, used and/or sold by Newco in the future.

"Pre-operating Period" shall mean the period beginning with the preparations for formation of Newco (but in no event prior to the signing of the Venture Agreement) and ending at the commencement of sales and/or import of Products by Newco.

"Operating Period" shall mean the period beginning with the sales and/or import of Products by Newco.

"Venture Agreement" shall mean the agreement titled the Joint Venture Agreement concluded between SDK and KBI on        day of *October*, 1971 in relation to the formation of Newco by SDK and KBI to which this Agreement shall be attached and of which it is made a part.

CONFIDENTIAL

-2-

C(FED)095415

Article 2. <u>SERVICES</u>

2.1   SDK shall furnish Newco with the services required for the general administration of Newco including the following:

(a)   Negotiations with the Japanese central and local government agencies.

(b)   Relations with customers, suppliers, etc. and with the public.

(c)   Recruitment and administration of personnel.

(d)   Labor relations, labor and wage policy and administration.

(e)   General administration and bookkeeping.

(f)   Legal, patent and tax matters.

(g)   Accounting and preparation of financial statements.

(h)   Matters relating to meetings of the board of directors and of the shareholders.

(i)   Purchase of equipment and raw materials.

**CONFIDENTIAL**

**C(FED)095416**

2.2   The services set forth in Article 2.1 shall be furnished
      by both the head office and the Higashinagahara Works
      of SDK.  The relationship between such services and the
      organization and functions available therefor in SDK
      are outlined in Annex I attached hereto and made a
      part hereof.

2.3   SDK shall at all times act honestly and faithfully in
      the interests of Newco and shall diligently perform the
      services set forth in  this Article under the authority
      and direction of the board of directors of Newce and/or
      the representative directors of Newco acting jointly.

Article 3.   ACCOUNTING RECORDS

3.1   SDK agrees to prepare and maintain all the accounting
      books and records relating to the operations of Newco in
      accordance with generally accepted accounting principles
      in Japan consistently applied.

3.2   SDK shall prepare and distribute to Newco, promptly after
      the close of each month, a profit and loss estimate for
      such month, a profit and loss estimate for the period from
      the beginning of the then current fiscal year to the end
      of such month, and such other data (aprofit and loss statemen
      and a balance sheet for each half year, etc.) as shall keep
      the parent companies well advised of the operations and
      conditions of Newco.

**CONFIDENTIAL**          C(FED)095417

Article 4.  COMPENSATION

For all the services rendered to Newco by SDK under this
Agreement, SDK shall be compensated as follows:

a)   Pre-operating Period:  Newco shall compensate SDK for
     all the costs and expenses incurred by SDK during Pre-
     operating Period in providing such services including
     filing and registration fees, organizational expenses
     and all other payments made to third parties in this
     connection.

b)   Operating Period:  For services furnished by SDK's head
     office during the Operating Period, Newco shall pay SDK
     an amount equal to the actual costs and expenses incurred
     in SDK's head office in providing such services.  For
     services furnished by SDK Higashinagahara Works during
     the Operating Period, Newco shall pay SDK an amount
     equal to the actual costs and expenses incurred by
     Higashinagahara Works in providing such services.

     Within ten (10) days after the end of each month SDK
     shall furnish Newco with an invoice for such services.
     The amount invoiced shall be paid in cash or by cheque
     to SDK within ten (10) days after the receipt of such
     invoice by Newco.

**CONFIDENTIAL**

-5-

**C(FED)095418**

Article 5. MISCELLANEOUS

5.1  This Agreement shall become effective on the date of execution hereof and shall continue for an indefinite term subject to Newco's right to terminate this Agreement upon written notice to SDK if and when such termination is authorized by a majority of the directors of Newco.

5.2  All disputes arising in connection with this Agreement shall be finally settled in accordance with the laws of Japan under the rules of conciliation and arbitration of the International Chamber of Commerce by a sole arbitrator appointed in accordance with said rules. The arbitration shall be held in Tokyo.

5.3  The original copies of this Agreement have been written in duplicate.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first hereinabove set forth.

SHOWA DENKO K. K.

SHOWA-KBI CO., LTD.

**CONFIDENTIAL**

C(FED)095419

(Annex I)   RELATIONSHIP BETWEEN COMMISSIONED WORK AND SDK ORGANIZATION CONCERNED

**COMMISSIONED WORK**

(1) Negotiations with the Japanese central and local government agencies

(2) Relations with customers, suppliers, etc. and with the public

(3) Recruitment and administration of personnel

(4) Labor relations, labor and wage policy and administration

(5) General administration and bookkeeping

(6) Legal, patent and tax matters

(7) Accounting and preparation of financial statements

(8) Matters relating to meetings of the board of directors and of the shareholders

(9) Purchase of equipment and raw materials

| | ORGANIZATION CONCERNED | CONTENTS |
|---|---|---|
| Principal Office | Secretariat | (1)(4) |
| | Foreign Relations Office | (3)(6) |
| | General Affairs Dept. | (1)(6) |
| | Personnel Dept. | (8) |
| | Planning Dept. | (1)(2)(5) |
| | Affiliated Organizations Dept. | |
| | Fertilizer & Chemical Div. | |
| | Administration & Planning Dept. | |
| | Research & Development Dept. | (6) |
| | Environmental Measures Dept. | (2) |
| | Systems Engineering Dept. | (7) |
| | Finance Dept. | (7) |
| SHOWA KBI SDK | Accounting Dept. | (9) |
| | Purchasing Dept. | (9) |
| | Electricity Dept. | |
| | Engineering Div. | |
| Higashinagahara Works | Administration Sec. | (1)(2)(3)(5)(7)(9) |
| | Technical Sec. | (2) |
| | Electric & Engineering Sec. | (9) |

CONFIDENTIAL

C(FED)095420

**CONFIDENTIAL**

**C(FED)095421**

<u>EXHIBIT VI</u>

Letterhead of Showa-KBI Co., Ltd.

, 197

Kawecki Berylco Industries, Inc.
220 East 42nd Street
New York, N.Y. 10017

Gentlemen:

        This will confirm the terms upon which we will
purchase from you ("KBI") and you will sell to us ore and potassium
tantalum fluoride as are necessary for the manufacture
of tantalum products by us ("Raw Materials").

        1. We agree to purchase and you agree to sell
Raw Materials in accordance with the following provisions.

        2. We will order all our requirements of Raw
Materials from you on written forms stating therein the
quantities, specifications, date of delivery and other
terms of sale of the Raw Materials.

        3. You will sell to us Raw Materials ordered
pursuant to paragraph 2 at a price and on other terms of
sale substantially competitive with those obtainable from
a third party or with those generally available to a pur-
chaser of Raw Materials, provided, however, that notwith-
standing the foregoing if during the term of this agreement
a party other than you offers to supply Raw Materials at a
lower price, or at the same price but with more favorable
payment terms, than you are willing to extend to us
hereunder, then you may, at your option, either (i) meet
such lower price or more favorable terms for such Raw
Materials or (ii) permit us to purchase Raw Materials from
such third party at such lower price or on such more favor-
able terms. In the event of (ii), your obligations to sell
such Raw Materials to us and our obligations to purchase
such Raw Materials from you shall be suspended during the
period during which you are unwilling to meet such lower
price or more favorable terms and in addition shall be
suspended if and to the extent that pursuant to the afore-
said option (ii) we become contractually committed to pur-
chase Raw Materials from such third party.

**CONFIDENTIAL**

C(FED)095422

Kawecki Berylco Industries, Inc.                                    2.

4.   All requests for quotations, offers and acceptances hereunder will be made by telex and will be deemed sufficient if sent to the parties at the following telex addresses:

     To KBI:

     To us:

or to such other telex address as either party may designate by notice given by telex and confirmed by registered airmail.

5.   This agreement shall begin on the date first above written, shall remain in effect during the term of two years from said date, and shall be automatically extended for additional periods of two years each, unless either party shall serve written notice of termination of this agreement upon the other party not later than one hundred and eighty days prior to the original termination date or other termination date if the agreement shall have been extended.

6.   This agreement may be amended or modified only by a writing signed by both parties and shall be construed in accordance with the laws of the State of New York, U.S.A.

7.   All disputes arising in connection with this agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by a sole arbitrator appointed in accordance with the Rules.  The Arbitration shall be held in the English language at New York, N. Y. when it is requested by us or in Tokyo when requested by you.

                              Very truly yours,

                              SHOWA-KBI CO., LTD.


                              By_____

AGREED AND CONFIRMED:

KAWECKI BERYLCO INDUSTRIES, INC.


By_____                    **CONFIDENTIAL**

                                                       **C(FED)095423**