SOFUNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
AVX CORPORATION                )
and AVX LIMITED,               )
                               )
        Plaintiffs,            )        Civil Action No.: 04-10467-RGS
                               )
v.                             )
                               )
CABOT CORPORATION,             )
                               )
        Defendant.             )
_____)
```

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION OF CABOT CORPORATION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Cabot continues to press the erroneous position that AVX must prove it was coerced into buying product that it did not want in order to establish a *per se* illegal tying case[1] under the Sherman Antitrust Act.  It made the same argument in connection with its motion for judgment on the pleadings in this case.  This Court rejected the argument then.  It should reject the argument now.

### II.  FACTS

AVX incorporates herein its recitation of facts set forth in its Memorandum of Law in Support of its Motion for Partial Summary Judgment

---

[1] Cabot does not appear to meaningfully address the issue of a rule of reason violation of the Sherman Act in its motion.  As a result, this opposition only addresses the issues of the elements of a *per se* violation.  It should be noted, however, that even if Cabot's motion were granted, AVX would still be entitled to a trial as to whether Cabot's actions were an unreasonable restraint of trade.

## III. ARGUMENT

### A.  *Summary Judgment Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  All inferences must be made in favor of the non-moving party.  *Teragram Corporation v. Marketwatch.com, Inc.*, 444 F.3d 1 (1st Cir. 2006); *Del Gallo v. Parent*, 2008 U.S. Dist. LEXIS 25353 (D. Mass. March 28, 2008); *Atlantech Inc. v. American Panel Corp.*, 2008 U.S. Dist. LEXIS 22612 (D. Mass. March 24, 2008).

### B.  *Cabot's Argument*

Before turning to the legal discussion, it is worth reviewing Cabot's argument.  Its arguments essentially fall into two categories – that AVX has not demonstrated that it was coerced into purchasing products that it would not have purchased[2] and that AVX has not shown any damage.

### C.  *Cabot's Legal Premises Are Incorrect*

Central to Cabot's argument in its summary judgment motion (indeed, central to the whole way it has conducted this case) are the following incorrect premises – that AVX must show that it was coerced into buying product and that AVX cannot have a tying claim if it wanted the product.  These positions are two sides of the same coin and will be addressed together.

---

[2] Cabot presents this argument as three separate arguments.  First, it argues that the depositions of AVX's Rule 30(b)(6) witnesses demonstrate that Cabot did not tie the purchase of flake tantalum to the purchase of non-flake tantalum.  Second, it argues that because the Supreme Judicial Court has affirmed the dismissal of AVX's common law coercion case AVX is precluded from pursuing a coercion case here.  Third, it argues that because AVX wanted to purchase non-flake tantalum AVX is precluded from bringing a tying claim.

According to the Supreme Court, a tying arrangement, pure and simple, is one in which the availability of one item (the "tying" item) is conditioned upon the purchase of another item (the "tied" item) or an agreement not to purchase the tied item from the seller's competitor. *Illinois Tool Works, Inc, v. Independent Ink, Inc.*, 547 U.S. 28, 32 (2006); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). Such an arrangement, when coupled with market power in the market for the tying product, is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *International Salt Co. Inc., v. United States*, 332 U.S. 392 (1947); *Lee v. The Life Insurance Company of North America*, 23 F. 3d 14 (1st Cir. 1994).

As Cabot recognizes, the rules for determining a *per se* tying violation are well established in the First Circuit and involve the establishment of four elements:

1. the tying and tied products are actually two distinct products;

2. there is an agreement or condition, express or implied, that establishes a tie;

3. the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and

4. the tie forecloses a substantial amount of commerce in the market for the tied product.

*Borschow Hosp. & Med. Supplies, Inc., v. Cesar Castillo, Inc.,* 96 F.3d 10, 17 (1st Cir. 1996); *Data General Corporation, et al., v. Grumman Systems Support Corporation,* 36 F. 3d 1147 (1st Cir. 1994); *Grappone, Inc., v. Subaru of New England, Inc.,* 858 F. 2d 792 (1st Cir. 1988). Nowhere in the governing law of this Circuit is there any requirement, or even mention, of "coercion." The First Circuit has articulated the binding elements of a *per se* tying case and has made clear that such a concept is not part of a plaintiff's case.

While giving lip service to the law in this Circuit, Cabot nevertheless persists in trying to contort this case into a coercion case – one in which AVX must prove that Cabot forced AVX to

buy product that it does not want. It devotes a considerable portion of its brief arguing that AVX is precluded from bringing a coercion claim because the issue has already been decided by the Massachusetts Supreme Judicial Court. If this case alleged common law coercion – rather than violation of the federal antitrust laws – that would be a relevant argument. But, as this Court has already recognized in denying Cabot's motion for judgment on the pleadings, it does not. Cabot makes the same error in a different way when it argues that there cannot be any tie because AVX wanted the tied product.[3] Nowhere is this factor listed in the four elements stated above and, as discussed in more detail hereafter, the desire for a product does not detract from a tying claim and, indeed may be a necessary element of it.[4]

Under the governing law, all AVX must demonstrate is an act of conditioning the purchase of one product on the purchase of another, not whether the plaintiff is coerced into buying the product or whether it wanted the product. The focus of an illegal tie is on actions of the defendant and the consequent harm to competition, ***not*** the harm to the plaintiff itself. As this Court so aptly stated in its earlier decision in this case:

> A "victim" of an illegal tying arrangement might well be a perfectly willing participant in the transaction, either because it prizes the tying product highly, or because it has a concomitant desire to acquire the tied product. It is the harm to competition that the antitrust laws seek to avert – not harms to individual market participants.

---

[3] For purposes of this case, the product over which Cabot is alleged to have market power is "flake" tantalum powder which is designated as the "tying product." The products that are associated with that product are the "tied products," in this case, non-flake products, nodular powder and KTaF.

[4] Cabot's misperception of the law also distorted the manner in which it conducted discovery. For example, when it designated topics for testimony by AVX's Rule 30(b)(6) witnesses, it included in the topics "coercive strategies" but excluded as a topic the tying – in the First Circuit's words, "conditioning" – of any products. Cabot then carries this error over into its brief by reasoning that AVX's failure to testify in this case as to coercion implies a failure in its proof. Of course, if coercion is not an element, then such absence of testimony has the same impact on AVX's failure to provide testimony concerning the weather during the relevant period – that is, no impact whatsoever.

*AVX Corporation, et al. v. Cabot Corporation*, 2006 U.S. Dist. LEXIS 49857 at *8 (D. Mass. July 21, 2006). Judge Garrity made a similar observation in *Anderson Foreign Motors, Inc. v. New England Toyota Distributors, Inc.*, 475 F. Supp. 973 (D. Mass. 1979):

> It is the nature of the test that it focuses not on the buyer's state of mind ***but rather on the seller's actions***; tying doctrine seeks to deter ***a seller's conduct*** in unnecessarily conditioning the sale of one product on the purchase of another.

*Id.* at 988 (emphasis added). The rationale for focusing on the tie rather than on the purchaser's desire to purchase the product was aptly explained by Professors Areeda and Turner:

> [A]ll purchases covered by the tie should be counted as foreclosed to rivals even when many of the defendant's customers had voluntarily purchased the same volume of the second product from him before there was any tie-in. Although the tie has not increased the defendant's sales of the tied product to those customers or the market share represented by them, it has suppressed their previous freedom to transfer their business to competing suppliers during the life of the tying agreement.

3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 1709d (2006).

Indeed, because the evil addressed by the antitrust laws' prohibition against tying is to prevent the limiting of competition through the ***diversion*** of product sales to a particular seller, there is authority that there is no antitrust injury at all if the purchaser does not want the tied product and would not have purchased it but for the tying activity. *See Bafus/Dudley v. Aspen Realty, Inc.*, 2007 U.S. Dist. LEXIS 88228 at *10 (D. Idaho Nov. 30, 2007) ("The not insubstantial volume of commerce requirement is not met if the plaintiff would not have bought the tied product at all in the absence of the tying arrangement."); *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 890 F. 2d 803, 814 (1st Cir. 1988) ("The Supreme Court has written that 'when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on

competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.'").

This point is only confirmed by the cases that hold that even if the buyer is totally indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, a tying agreement may work significant restraints on competition in the tied product. *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S. Ct. 1551, 1558 n. 19, 80 L. Ed. 2d 2 (1984); *Key Enterprises of Delaware, Inc. v. Venice Hosp.*, 919 F.2d 1550, 1560 (11th Cir. 1990). Again, the focus is on the impact on the market from the illegal tie, not on the attitude of the putative customer. Accordingly, AVX could have been reluctant, neutral, or willing to buy nodular from Cabot; if Cabot conditioned the purchase of nodular on the purchase of flake, this element would be satisfied.

The ineluctable conclusion from the clear law is that because the buyer's state of mind is irrelevant, a plaintiff need not establish coercion to succeed with its *per se* tying claim. "[C]oercion has no relevance to a determination of antitrust liability; it is relevant, if at all, only to determining whether a tie-in exists, that is, whether the seller has conditioned the sale of one product on the purchase of another." *Anderson Foreign Motors, Inc., v. New England Toyota Distributors, Inc.*, supra at 988. Other courts agree. According to the Third Circuit:

> Relying upon *Ungar*, defendants appear to argue that coercion is a requirement of proof in all tying cases. Neither *Ungar* nor any other case has so held. Rather, *Ungar* affirmed that under a long line of Supreme Court precedents a tying claim consists solely of the three elements quoted above. Assuming economic power over the tying product and a not insubstantial amount of commerce, the plaintiff need only show that a seller conditioned the sale of one product (the tying product) on the purchase of another product (the tied product). It has never been an element of plaintiff's case to disprove, nor even a permitted defense, that the tied product is superior to others available on the market, or that even without the tie requirement plaintiff would have purchased the tied product.

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977). The Eleventh Circuit agrees:

6

> Appellants, on the other hand, appear to argue that "coercion" is a distinct and separate element of a tying violation.  Although the cases treat proof of coercion in a variety of ways, it generally appears to be part and parcel of two other requisite elements of proof rather than a separate element: 1) that the products are actually "tied" as a matter of antitrust law and 2) that the seller has the market power to force the buyer to purchase the tied product.

*Tic-X-Press, Inc. v. Omni Promotions Co.,* 815 F.2d 1407, 1416 (11th Cir. 1987).  And, according to Professors Areeda and Turner:

> Unfortunately, some erroneous dicta have required proof of "coercion" – apparently in the sense of a purchase that would not otherwise have been made – even though an announced or understood condition has been established… This is mostly dicta, either because the existence of an announced or understood condition was either unclear or not at issue.  These cases should be understood merely to require the necessary condition and some proof that without that condition the buyer *might* have wanted another product.

3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 1754e (2006) (emphasis in original).

### D. *AVX's Rule 30(b)(6) Testimony Does Not Preclude a Tie*

Turning to the specific arguments, Cabot's first line of attack is that AVX is not claiming that Cabot conditioned the purchase of flake tantalum on the purchase of non-flake tantalum.  It then points to deposition testimony of AVX's Rule 30(b)(6) deposition witnesses to support that contention.  Its argument is based on a number of flawed premises.  First, it cannot escape the fact that the Supply Agreement itself conditions AVX's ability to purchase flake tantalum on AVX's commitment to purchase non-flake products over a five-year period.  Second, because of its already-rejected position that this case is about coercion, the topics it designated in the Rule 30(b)(6) deposition notice focused on coercion and did not at all mention conditioning.  Third, it ignores the uncontradicted evidence that Cabot did, in fact, condition the purchase of flake on the commitment to purchase non-flake products.

7

1.  <u>The Agreement Establishes the Tie</u>

In trying to focus this Court on AVX's willingness to purchase non-flake tantalum, Cabot ignores the fact that the Supply Agreement itself ties the flake and non-flake products.  Without more, a formal agreement will establish the tie, but there need not be one.  *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3rd Cir. 1976); *Summerwood Corporation v. Cado Systems Corporation*, 1986 U.S. Dist. LEXIS 27683 (E.D. Pa. 1986).  Put another way, if there is a written agreement the tie is established.  According to *Ungar*, a leading case on the subject, "a formal agreement is not necessary, ***although it is sufficient***."  531 F.2d at 1224 (emphasis added).

In the numerous cases that address the issue of whether there is a tie, the contract normally provides for the purchase of only the tying product or services.  The arguments made in those cases are that despite the lack of formal obligation the plaintiff was required to purchase both products or services.  *See, e.g., Bogosian v. Gulf Oil Corporation*, 561 F. 2d 434 (3rd Cir. 1977) (lease did not include specific provision requiring lessor of gas station to purchase gasoline from lessee/gasoline supplier, requiring court to find a tie using extrinsic evidence); *Tic-X-Press*, *Inc., v. Omni Promotions Co., et al.,* 815 F.2d 1407, 1416 (11th Cir. 1987) (lease agreement for coliseum did not mandate that lessee  use a specific ticket agency, requiring the court to find a tie based on extrinsic evidence).

In the present case, however, the Supply Agreement did, in fact, require AVX to purchase both flake and non-flake products.  Plaintiffs' Concise Statement of Material Facts in Support of Motion for Partial Summary Judgment ("SOF") ¶ 27.  Section 2 of the Supply Agreement states that "Buyer shall purchase … the 'minimum purchase quantity' … of each Product described on Appendix A."  *Id.*  Appendix A, in turn, contains separate line items for flake, nodular and

KTaF. *Id.* That AVX would be in material breach of the Supply Agreement if it did not honor its obligations to purchase nodular – relieving Cabot of its obligations to ship flake thereunder – is without question. Even more striking, the Supply Agreement is a multi-year agreement. Thus, for AVX to get flake in 2001, it was not just obliged to buy nodular in 2001, it was obliged to buy nodular in **each** of the following four years. Nowhere does Cabot point to even a scintilla of proof that AVX independently wanted **all** of such nodular in **each** of the years at that fixed price. Indeed, the actual evidence is all to the contrary.

The fact that the agreement does not expressly state that AVX needed to purchase nodular if it wanted flake is of no moment. The obligation to do so is inherent in the agreement. Any language expressly conditioning the purchase of flake on the purchase of nodular would be mere surplusage.

The undisputed history leading up to the signing of the Supply Agreement merely serves to confirm the tie. SOF ¶¶ 22-28. Statements from Cabot to the effect that by denying AVX flake, AVX "[was] left … in an intolerable position" (SOF ¶ 25) or that AVX's need for flake tantalum was a "really a big stick in [Cabot's] 'negotiations' with [AVX]" (*id.*) underscore that fact. Further demonstrative of the pre-contract conditioning is that Cabot never offered to sell AVX flake for 2001 either without any condition or separately without the commitment to purchase nodular products. SOF ¶ 28.

Turning to the issue of the multi-year contract, there appears to be no doubt that AVX did not want to enter into a multi-year take or pay contract. SOF ¶ 32; Chapple Aff. ¶¶ 20, 26. That means that Cabot simply cannot argue that conditioning did not exist. The purchase of nodular in the out years was an express condition of purchasing flake for 2001. The requirement of a long-term contract came from Cabot and Cabot alone.

2.  <u>Cabot Entirely Ignores the Established Law Concerning Unwanted Terms</u>

An entirely independent failure of Cabot's argument arises from its failure to deal with the explicit law concerning unwanted terms.  The cases are clear that conditioning exists even if a buyer would buy both products, but would have preferred to buy the tied product on different terms.  *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 814 (1st Cir. 1988) (*quoting Jefferson Parish Hospital Dist. No. 2*, 466 U.S. at 12)).  Accordingly, Cabot's proof, even taken on its own terms, is insufficient.  Even if one accepted that some form of resistance is necessary as an element of proof, Cabot would have to demonstrate ***not only*** that AVX wanted all of the nodular in each of the years covered by the Supply Agreement, ***but also*** that AVX did not prefer other terms.

Cabot has entirely failed to address this component of the issue even framed as it desires.  Its failure to do so, standing on its own, is fatal.  The clear record that AVX did not want a multi-year contract, did not want take or pay provisions, and did not want a five-year fixed price establishes that Cabot could not meet its burden even if it had chosen to try.

3.  <u>AVX's Rule 30(b)(6) Witnesses Do Not Bind AVX on the Topic of Conditioning</u>

One need look only at the designated topics for the Rule 30(b)(6) depositions[5] to understand that the witnesses that AVX produced in response to the Rule 30(b)(6) deposition notice were not designated on the topic of conditioning.  The two designated topics upon which Cabot bases its summary judgment argument are:

> 10.  The "coercive strategies" referenced in Paragraph 30 of the Complaint, including but not limited to AVX's awareness of such strategies.

> 11.  All products or terms that AVX was forced to accept on account of "Cabot's coercive strategies" as referenced in Paragraph 30 of the Complaint.

---

[5] A copy of the Rule 30(b)(6) deposition notice can be found at Tab 16, Rising Aff.

Cabot could have, but did not, designate as topics allegations made in paragraphs 1 and 38 of the Complaint, which specifically refer to conditioning.  Among other things, paragraph 1 alleges:

> Specifically, knowing that plaintiff made certain products that could only be manufactured with the "flake" form of tantalum made by defendant, designated as C275 and C255, defendant conditioned plaintiff's purchase of flake powders on its purchase of non-flake powders.

Paragraph 38 of the Complaint alleges:

> When Cabot engaged in the conduct set forth in ¶¶ 23-32 above, it conditioned AVX's purchase of flake powders on its purchase of non-flake powders.

Ignoring this Court's warnings in its decision on the motion for judgment on the pleadings that a tying case does not require proof of coercion, Cabot nevertheless persisted in fashioning its discovery around that topic.

Because Cabot did not designate conditioning as a topic it cannot now claim that whatever testimony AVX's witnesses gave on that topic is binding.  *See Payless Shoesource Worldwide, Inc. v. Target Corporation*, 2008 U.S. Dist. LEXIS 28878 at *31 (D. Kan. April 8, 2008) ("Rule 30(b)(6) sets a high burden of knowledge, but only regarding the noticed topics, no more and no less."); *T&H Landscaping, LLC v. Colorado Structures Inc.*, 2007 U.S. Dist LEXIS 63495 at *6 (D. Colo. August 28, 2007) ("Plaintiff has a duty to designate with specificity the issues to be addressed so that Defendant can adequately prepare its Rule 30(b)(6) designee.")

### 4. AVX's Witnesses Confirmed Cabot's Conditioning of Flake on Non-flake Purchases

Even if one were to conclude that AVX is bound on the topic of "conditioning" despite Cabot's failure to designate that topic in its Rule 30(b)(6) deposition notices, the depositions themselves do not establish the absence of conditioning.  To the contrary, they confirm that

Cabot did, in fact, condition the purchase of flake on the commitment by AVX to purchase non-flake products over a long term.

Kurt Cummings, who testified on topic 10 ("coercive strategies"), among others, was not even asked a question about conditioning.  Peter Collis, who testified on topic 11 (products and terms AVX was forced to accept as a result of the coercive strategies), testified as follows in response to questions about conditioning:

Q:      Okay.  Going back to [the Complaint] and Jury Demand at Paragraph 1 Mr. Collis, what are the non-flake powders that AVX claims that Cabot conditioned AVX's purchase of flake powders upon?

A.      Actually the nodular powders and the fact that we had to take a five year contract for these materials.

Q.      Looking back please at Exhibit 2 which is the contract and Appendix A for Exhibit 2, which are the nodular powders that AVX did not wish to purchase from Cabot as of the time that this contract was executed?

MR. GOREN:  Objection.

MR. DAVIS:  You can respond.

THE WITNESS:  There is the nodular on Biddeford, the nodular under Europe.  There's wire under Biddeford, wire under Europe and KTAF for the extent of the five year contract.

Even though Cabot had never designated conditioning as a topic, Mr. Collis answered the questions fully and completely.  As it turns out, these were the only questions that Cabot asked about conditioning.  Instead, it turned to questions about the products that AVX wished to purchase.  In response to those questions, he made it clear that while AVX may have wished to purchase certain products in 2001 *it did not necessarily want to purchase – or at least commit to purchasing – those products in years* 2002, 2003, 2004 and 2005.

In other words, Cabot used its market power in flake tantalum to get AVX to enter into a long-term contract for non-flake tantalum.  The result, as more fully set forth in AVX's

Memorandum of Law in Support of its Motion for Partial Summary Judgment, is that there was a dramatic shift in AVX's purchases of non-flake tantalum from Cabot's competitors to Cabot. The result to AVX is that it overpaid by millions of dollars on the tantalum that it purchased from Cabot, all as more fully set forth in the last section of this brief.

5.    The Affidavit of AVX's Former Purchasing Manager Confirms the Tie

If Mr. Collis's testimony does not present sufficient evidence to raise a material fact concerning Cabot's conditioning of its sale of flake on AVX's purchase of non-flake products, the affidavit of John Chapple puts that issue to rest.  Mr. Chapple was at all times relevant to this case the person in charge of purchasing tantalum at AVX.[6]  His affidavit unequivocally states that Cabot told him that if AVX did not enter into a five-year supply contract for both flake and non-flake products, that AVX would not get any flake for 2001.  Chapple Aff. ¶ 22.

The short answer is that, contrary to Cabot's assertion, AVX is claiming loudly and clearly that Cabot was using its monopoly in flake tantalum to force it to purchase over a five-year period non-flake products that it was otherwise not prepare to commit to purchasing.

E.  **The Supreme Judicial Court Decision Does Not Bar AVX's Claims**

Cabot next asserts that AVX's claims of coercion are barred by the decision in the state court where its claim of economic duress was dismissed.  That is an interesting argument but is irrelevant to this case.  While claims of common law coercion are barred, this Court has already held that coercion in the sense of antitrust tying is not.

F.  **That AVX Desired to Buy Tantalum Does Not Preclude a Tie**

AVX finally argues that because AVX wanted to purchase tantalum its claim is barred. As discussed on pages 5-6 of this Memorandum of Law, it is irrelevant to the inquiry whether

---

[6] Mr. Chapple retired in 2007.

AVX wanted to purchase any of the product. Indeed, with the focus being on whether Cabot's conduct resulted in a diversion of sales from Cabot's competitors to it, there can be no question that AVX's desire to purchase nodular tantalum powder is essential to the claim, not a detraction from it.

### G. AVX Has Suffered Substantial Damage as a Result of Cabot's Anti-competitive Conduct

In response to Cabot's interrogatory requesting that AVX state the damages sustained, AVX initially responded that it had not yet calculated those damages. That statement was true then and has remained true until very recently.[7] Having now calculated its damages, AVX has now served on Cabot Supplemental Answers to Cabot's Interrogatories, as permitted by F.R. Civ. P. 26(e). Those damages are substantial, amounting to as much as $14.5 million for nodular purchases[8] and $107 million for KTaF,[9] before trebling.

---

[7] At his deposition, Peter Collis described generally the damages suffered by AVX and stated that the calculation was being performed by AVX's experts. As a result of issues arising out of the timing of the submission of AVX's expert's report in connection with delays in the conclusion of fact discovery, AVX's expert was not able to make the damage calculation in sufficient time to include it in the report. (The Court is aware of the discovery disputes in this case and AVX will not rehearse them here.) As a result, AVX subsequently performed its own calculation of damages. Because the evidence of the amounts by which AVX overpaid is not based on scientific, technical or other specialized knowledge, but is instead based on the business records and purchasing experience of AVX employees, expert testimony is not necessary. Fed. R. Evid. 702.

[8] It is undisputed that under the Supply Agreement AVX purchased more than 180,000 pounds of nodular products, including 40,000 pounds of nodular products for AVX's European plants. *See* Rising Aff. Tab 4 (Supply Agreement); SOF ¶ 34. But for the Supply Agreement over the five years AVX could have purchased Cabot's nodular products earmarked under the Supply Agreement for Biddeford at the lower prices that Cabot charged in each of 2001 through 2005. SOF ¶ 34; Exhibit B, AVX Supplemental Answers. But for the Supply Agreement over the five years AVX would not have purchased any nodular products from Cabot for Europe for any of the years 2001 through 2005 and would have purchased better quality available alternatives at lower prices. SOF ¶ 34. If AVX had purchased the Biddeford nodular products at Cabot's pricing in effect in each year from 2001 through 2005 and used the highest quality available alternatives AVX would have saved over $11 million. Exhibit B, AVX Supplemental Answers. Under the same scenario but using lower priced available alternatives, AVX would have save over $14.5 Million. *Id.* Hypothetically removing the Biddeford purchases, the damages associated with just the "forced" European nodular purchases would be about $2.5 million assuming use of best quality available alternatives and over $3.25 Million assuming use of lower priced available alternatives. Exhibit C, AVX Supplemental Answers.

[9] It is undisputed under the Supply Agreement AVX purchased over 950,000 pounds of KTaF. *See* Rising Aff. Tab 4 (Supply Agreement); SOF ¶ 34. But for the Supply Agreement, during the five year period of 2001 through 2005 AVX would not have purchased any KTaF from Cabot and would have purchased finished nodular products from

# IV. CONCLUSION

Because at a minimum there are genuine issues of material facts as it relates to the

elements of an antitrust tying claim Cabot's motion for summary judgment should be denied.

Respectfully submitted,

AVX CORPORATION
and AVX LIMITED,

By their attorneys,


_/s/ Joseph S.U. Bodoff_____
Joseph S.U. Bodoff (BBO No. 549116)
Richard A. Goren (BBO No. 203700)
Ryan D. Sullivan (BBO No. 660696)
Bodoff & Associates, P.C.
225 Friend Street
Boston, MA 02114
(617) 742-7300

Dated: April 14, 2008

---

Showa, Starck and/or Ningxia at substantially less cost.  SOF ¶ 34.  In doing so, AVX would not have incurred both the $185 per pound acquisition cost and the additional costs to toll or further convert the KTaF into finished nodular products.  *See* Exhibit A to AVX Supplemental Answers.  If AVX had used the best quality available alternatives it would have saved over $81.8 million.  *Id.*  If AVX had used lower priced available alternatives, AVX would have saved over $107.3 million.  *Id.*