## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 04-10467-RGS |
| CABOT CORPORATION, | ) ) |
| Defendant. | ) ) ) |

## PLAINTIFFS' RESPONSE TO DEFENDANT CABOT CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, in opposition of the Motion of Defendant Cabot Corporation ("Cabot") for Summary Judgment, the plaintiffs AVX CORPORATION and AVX LIMITED (collectively "AVX"). hereby submit their responses to Cabot's concise statement of the material facts of record. AVX sets forth each of Cabot's statements followed by AVX's response to each numbered paragraph.

1.     Defendant Cabot Corporation is a Delaware corporation that maintains its corporate headquarters at Two Seaport Lane, Boston, Suffolk County, Massachusetts. Cabot is a specialty chemicals company. Cabot also is a supplier of tantalum, a rare metal used in the production of high performance electronic capacitors. Complaint, ¶ 3;

Affidavit of William P. Young, dated March 29, 2008 ("Young Aff."), ¶ 2.[1] Cabot's

---

[1] Prior to his recent retirement, Mr. Young was employed as Director of Major Accounts for Cabot's Supermetals Division. Young Aff. at ¶ 1. Mr. Young worked for Cabot or its predecessors in various positions in the tantalum production business for over 40 years. *Id.* As a longtime Cabot employee, Mr.

stock is publicly traded on the New York Stock Exchange under the symbol "CBT." *See* Cabot Corp. Website, http://www.cabotcorp.com/.

**AVX RESPONSE.**  Admitted except that the last sentence of footnote 1 is denied as unsupported by the record**.**

2.      Plaintiff AVX Corporation ("AVX Corp.") is a Delaware corporation that maintains its principal place of business at 801 17th Avenue South, Myrtle Beach, South Carolina. Complaint, ¶ 2.  AVX is one of the world's largest manufacturers and suppliers of tantalum capacitors, passive components that are used in a variety of electronic devices.  *Id.* at ¶ 7; *see* AVX Website at http://www.avx.com/ (last visited March 24, 2008).  (Relevant excerpts taken from AVX's website are appended to the accompanying Affidavit of Julie C. Rising, Esq., dated March 31, 2008 (the "Rising Aff.") at Tab 1.) AVX Corp.'s total revenue in 2007 was almost $1.5 billion. *Id.* Its stock is publicly traded on the New York Stock Exchange under the symbol "AVX." *Id.*

**AVX RESPONSE.**  Admitted**.**

3.      The majority of AVX's outstanding shares are owned by Kyocera Corporation, a multi-national electronics, imaging and chemicals conglomerate based in Kyoto, Japan. *See* http://www.avx.com. (Rising Aff., Tab 1.) AVX has numerous production facilities worldwide, including manufacturing operations located in Biddeford, Maine, in Paignton, England, and in Lanskroun, The Czech Republic. *Id.*

**AVX RESPONSE.**  Admitted.

4.      Plaintiff AVX Limited ("AVX Ltd." or, collectively with AVX Corp., "AVX") is a United Kingdom corporation that maintains its principal place of business at Admiral

---

Young had periodic direct contact with representatives of AVX, and acquired substantial knowledge regarding tantalum and the electronic components industry as a whole.

House, Harlington Way, Fleet, Hampshire, United Kingdom. AVX Ltd. is a wholly owned subsidiary of AVX Corp. that also is engaged in the manufacture and supply of passive electronic components and related products. Complaint, ¶ 3.

**AVX RESPONSE.**  Admitted**.**

5.      Tantalum is an elemental metal (chemical symbol "Ta", atomic number 73) that is approximately as rare in nature as uranium. Young Aff., ¶ 2.  Tantalum has unique properties that make it essential to certain applications and highly desirable for others.  *Id.* For example, tantalum is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures.  *Id.* These characteristics, among others, make tantalum the preferred raw material for high performance electronic capacitors that are, in turn, components of a wide range of modern electronic devices, including cellular telephones and personal computers. *Id.*

> **AVX RESPONSE** AVX admits tantalum is an elemental metal (chemical symbol "Ta",
> atomic number 73) that is approximately as rare in nature as uranium. The second
> sentence is not supported by the citation proffered; AVX agrees with Young's statement
> that "tantalum is a favored material for use in certain types of high performance
> electronic capacitors." AVX agrees that tantalum is extremely resistant to corrosion, is
> highly ductile, and has a high dielectric constant across a broad range of temperatures and
> that these characteristics, among others, make tantalum the preferred raw material for
> high performance electronic capacitors that are, in turn, components of a wide range of
> modern electronic devices, including cellular telephones and personal computers.

6.      Historically, the market for tantalum has been highly volatile.  Young Aff., ¶ 3. Periods of high demand, intermittent supply shortages, inventory hoarding, and sharply-

rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly-falling prices. *Id.* Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in the price of tantalum to be much more pronounced than those of other industrial metals. *Id.*

> **AVX RESPONSE**. AVX disputes ¶ 6 and also objects because the statements are not supported by the cited material as the statements are properly the subject of expert opinion. disputes ¶ 3 of the Young affidavit as the inadmissible opinions of the fact witness Mr. Young.

7.    Prior to 2008, AVX and Cabot had a long-standing business relationship. Complaint, ¶ 9. As various points in time, AVX purchased tantalum from Cabot for use in the manufacture of tantalum capacitors in the forms of "flake" tantalum powder, "non-flake" or "nodular" tantalum powder, tantalum wire and semi-refined tantalum ore (also known as "K2TaF7" or simply "KTaF") (collectively, "Tantalum Products" or "Products"). Complaint, ¶¶ 9, 18; Young Aff., ¶¶ 4-6.

> **AVX RESPONSE**  AVX admits that AVX and Cabot have had, and continue to have, a long-standing business relationship, that for many years up to and including the present, AVX has purchased from Cabot substantial quantities of Cabot's flake products, nodular products and tantalum wire for use in the manufacture of tantalum capacitors, and that in 2001 -2003 AVX purchased over 950,000 pounds of KTaf. AVX's April 9, 2008 Concise Statement of Material Facts in support of AVX's Motion for Partial Summary Judgment ("SOF") ¶¶ 11, 27. *See* April 8, 2008 Affidavit of John Chapple ("Chapple Aff.").

8.    Prior to 2001, AVX purchased Tantalum Products from Cabot pursuant to a series of one or two page "Letters of Intent," which described, in general terms, the quantities of Tantalum Products that AVX then anticipated buying from Cabot, and the prices that AVX then was willing to pay Cabot for those products.  Young Aff., ¶ 4.  (True copies of the Letters of Intent that AVX and Cabot executed in 2000 are appended to the Rising Aff. at collective Tab 2.)

> **AVX RESPONSE.**  Admitted except as to "the prices that AVX then was willing to pay Cabot for those products."  AVX asserts the Letters of Intent reflected the prices quoted by Cabot. Chapple Aff. ¶ 17.

9.    Although it did so in the years prior to 2001, Cabot strongly preferred not to sell Tantalum Products to AVX pursuant to "Letters of Intent" because AVX did not regard those letters as binding on AVX. Young Aff., ¶ 5.  AVX often purchased more or less Tantalum Products than were called for under the parties' Letters of Intent depending on its needs, and periodically insisted upon price reductions from Cabot when AVX believed that changes in market conditions justified its demands.  *Id.*  As a result, Cabot experienced significant fluctuations in overall demand for its Tantalum Products, and had great difficulty generating a stable revenue stream that would protect Cabot against market downturns and support an expansion of its productive capacity. *Id.*

> **AVX RESPONSE**   AVX disputes ¶ 9 as unsupported by the record proffered by Cabot. AVX admits that in the mid to late 1990's it declined Cabot's request to enter into a long term so-called take or pay contract under which AVX would bind itself to purchase specified amounts of Cabot's flake and other tantalum products for several years. Chapple Aff. ¶ 18.  The affidavit relied on by Cabot improperly purports to state the

belief, intentions and state of mind of AVX; the third sentence states inadmissible

opinion; and the fourth sentence is inadmissible hearsay and opinion purporting to state

AVX's understanding and appreciation of certain alleged facts.

10.     AVX nonetheless resisted Cabot's efforts prior to 2000 to negotiate and execute a

binding, long-term supply contract for Cabot's Tantalum Products because AVX wanted the

operational flexibility and financial security that the parties' non-binding Letters of Intent

afforded AVX in times of slack demand for its own products.  Young Aff., ¶ 5.

**AVX RESPONSE**   AVX admits it declined Cabot's request to enter into a long term so-

called take or pay contract under which AVX would bind itself to purchase specified

amounts of Cabot's flake and other tantalum products for several years**.** Chapple Aff. ¶

18.  AVX disputes the improper and inadmissible statement of opinion as to AVX's

motives and desires as unsupported by the record. AVX further objects as its state of

mind is not relevant to this case.  Further responding AVX states its general practice was

not to commit to purchases based on sales forecasts of more than 12 months. Chapple

Aff. ¶ 20.

11.     In the late 1990s and continuing into the year 2000, demand for Tantalum Products

experienced a period of unprecedented growth that led to a severe product shortage and

sharply rising prices. Complaint, ¶ 23; Young Aff., ¶ 6.  Vastly increased demand for

tantalum capacitors by manufacturers of wireless telephone equipment in particular, and

electronic equipment in general, created great concern among tantalum purchasers, including

AVX, that the worldwide demand for tantalum had, or would soon, exceed the existing

productive capacity of the principal suppliers of Tantalum Products, including Cabot.  Young

Aff., ¶ 6.

**AVX RESPONSE**  AVX admits that toward the end of 2000 a tantalum shortage became evident.  AVX disputes the balance of ¶ 11 as unsupported by the record proffered by Cabot because the statements are properly the subject of expert opinion and because supported by the inadmissible opinions of the fact witness Mr. Young**.**

12.    After years of bearing the brunt of the cyclical periods of low demand for Tantalum Products and being denied the benefits of the occasional periods of high demand, Cabot's management made the decision in approximately mid-2000 that Cabot henceforth would sell its Tantalum Products only to those customers who were willing to enter into binding, long-term supply agreements at increased prices.  Young Aff., ¶ 7.  Cabot distributed letters announcing its decision in this regard to all of Cabot's major customers, including AVX, in early August 2000. *Id.*  (A true copy of the letter that Cabot sent to AVX in August 2000 is appended to the Rising Aff. at <u>Tab 3</u>.) In those letters, Cabot invited its customers, including AVX, to begin immediate contract negotiations with Cabot if they wished to continue purchasing Tantalum Products from Cabot in the future.  *Id.*

**AVX RESPONSE**   AVX disputes the portion of the first sentence of ¶ 12 as to Cabot "bearing the brunt of the cyclical periods of low demand for Tantalum Products and being denied the benefits of the occasional periods of high demand "as unsupported by the record proffered by Cabot and objects as the motives of Cabot are immaterial. AVX admits that in August 2000 Cabot informed AVX that "without a long term supply contract, Cabot would not be able to supply tantalum powder or wire to AVX in 2001 and beyond." SOF ¶ 22.  AVX admits that in August 2000 it received from Cabot the documents in Rising Aff. at Tab 3 bate stamp numbers C(A) 031740 and C(A) 031741.  AVX disputes Cabot's characterization of the communications as the two

documents speak for themselves.  Further responding AVX states that on August 11,

2000 Cabot predicated discussions with AVX on AVX's entry into a five year take or

pay contract for both flake products and nodular products with the quantities and prices

to be negotiated.  SOF ¶ 23.  In late August or early September 2000 Hugh Tyler of

Cabot again informed AVX that Cabot would not provide any product to AVX in 2001

unless AVX entered into a five year take or pay agreement to purchase minimum

quantities of both flake and nodular products at fixed prices.  Chapple Aff. ¶ 22. On or

about September 1, 2000 and later in September AVX informed Cabot that AVX's

European plants had to have Cabot's flake products and that without flake AVX would

be mortally injured.  *Id.*  On more than one occasion in September 2000 Hugh Tyler of

Cabot informed AVX that it would get no flake in 2001 unless AVX entered into five

year take or pay contract. *Id.* In late September 2000 Hugh Tyler of Cabot informed

AVX it was non-negotiable that there would be no flake for AVX for 2001 unless AVX

entered into a five year take or pay contract.  *Id.*

13.    Between August and January 2001, Cabot personnel engaged in extended

negotiations with AVX representatives concerning a contract that would govern the parties'

future relationship. Young Aff., ¶ 8.  The contract negotiations between Cabot and AVX

ultimately led to the execution of a written, multi-year "Supply Agreement" for Tantalum

Products in January 2001 (the "2001 Supply Agreement" or the "Agreement").  *Id.* (A true

copy of the 2001 Supply Agreement is appended to the Rising Aff. at <u>Tab 4</u>.)

**AVX RESPONSE**    AVX disputes the first sentence of ¶ 13 as unsupported by the

record proffered by Cabot as Mr. Young testified he had no involvement from July 2000

to January 2001 in negotiations with AVX.  Young Depo. 11-27-08 at 190:

Q.   And just so that I get the hierarchy

correct, Mr. Odle was the general manager of the

tantalum business in the year 2000, correct?

    A.   Yes.

    Q.   The way you explained it, I think, I

regret I didn't read the whole thing, is that you in

the year 2000, you reported to Mr. Fisher, correct?

    A.   Yes.

    Q.   And he reported to Mr. Odle, correct?

    A.   Yes.

    Q.   And Mr. Odle to Mr. Burns?

    A.   Yes.

    Q.   And you testified, I believe that you had

no involvement with the negotiation of the contract

with AVX in the last six months of 2000?

       MR. DAVIS:  Objection.  Contrary, but you

can respond.

    Q.   Correct me, please.

    A.   That's correct.

Further answering AVX admits that a true copy of the January 2001 Supply Agreement at

issue is appended to the Rising Aff. at <u>Tab 4.</u>  Further responding AVX states that

desperate for flake AVX agreed to negotiate terms of a five year take or pay contract.

Chapple Aff. ¶ 22.  In October 2000 AVX commenced negotiations with Cabot as to the

quantities of flake products, nodular products and KTaf and the prices to be paid over five years under a five year contract as required by Cabot. Chapple Aff. ¶ 23.

14.    The basic terms of the 2001 Supply Agreement were hammered out in a series of meetings, letters and e-mail exchanges primarily between Thomas Odle (then General Manager of Cabot's Performance Materials Division), and Ernest Chilton (then Senior Vice President of AVX's Tantalum Division) and John Gilbertson (AVX's President and Chief Executive Officer) from August 2000 into November 2000.  Young Aff., ¶ 9.  After the principal terms had been agreed-upon by the parties, responsibility for finalizing the written 2001 Supply Agreement was delegated primarily to Earl "Hugh" Tyler (then Strategic Business Unit Manager in Cabot's Performance Materials Division), and John Chapple (AVX's Materials Manager) and Kurt Cummings (AVX's Chief Financial Officer).  *Id.*

**AVX RESPONSE**   AVX disputes ¶ 14 as unsupported by the record proffered by Cabot.  *See* response to ¶ 13.  AVX further states that in October 2000 AVX commenced negotiations with Cabot as to the quantities of flake products, nodular products and KTaf and the prices to be paid over five years under a five year contract as required by Cabot. Chapple Aff. ¶ 23. In January 2001 the five year Supply Agreement was signed by Cabot and AVX. *Id.*

15.    At the time AVX was negotiating the 2001 Supply Agreement with Cabot, AVX wished to purchase both Cabot's flake tantalum powder and Cabot's non-flake or nodular tantalum powder.  Deposition of John Gilbertson, dated August 22, 2006 ("Gilbertson Depo."), p. 86. (Relevant excerpts of the Gilbertson Depo. are appended to the Rising Aff. at Tab 5.) In an internal e-mail message that he sent to other top AVX executives in September 2000, John Gilbertson, AVX's President and Chief Executive Officer, identified AVX's

number "1" priority in its contract negotiations with Cabot as procuring "10 to 15 [metric] tons" of Cabot's nodular tantalum powder for AVX's Biddeford, Maine production facility. *Id.*, p. 86; E-mail message from John Gilbertson to Benjamin Rosen, dated September 28, 2000 (a true copy of which is appended to the Rising Aff. at <u>Tab 6</u>).

> **<u>AVX RESPONSE</u>**   AVX admits that as of 2000 and January 2001 when the Supply Agreement was signed it did want to purchase from Cabot its flake products, its nodular products for its Biddeford operation and KTaf. Chapple Aff. ¶¶ 15, 17, 21, 26. Further answering AVX states as of 2000 and January 2001 AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each of 2002, 2003, 2004 and 2005 at fixed prices. SOF ¶ 32. AVX disputes Cabot's characterization of the two John Gilbertson emails which speak for themselves. Further answering AVX states that its state of mind is not relevant. AVX further responds that the quantity of nodular and other products for Biddeford that AVX desired for 2001 is not relevant.

16.     In or about late October 2000, AVX made a written contract proposal to Cabot in which AVX affirmatively offered to purchase from Cabot, *inter alia*: (a) 30,000 pounds of Cabot's non-flake or nodular tantalum powder annually from 2001 through 2003, and a minimum of a further 25,000 pounds annually in 2004 and 2005; (b) 300,000 pounds of KTaF in 2001, a further 325,000 pounds in 2002, and a further 300,000 pounds in 2003; and (c) 50,000 pounds of Cabot's flake tantalum powder in 2001, and a minimum of a further 80,000 pounds annually in 2002 through 2005. Gilbertson Depo., pp. 151-152 (Rising Aff., <u>Tab 5</u>); E-mail message from John Gilbertson to Evan Slavitt, Esq., dated October 30, 2000, with attachment titled "Proposal [10-30-2000]" (a true copy of which is appended to the Rising Aff. at <u>Tab 7</u>). AVX's October 2000 proposal further stated that, "[i]f other Powders

are available in years [sic] two, beyond the Biddeford and Flake agreement, AVX would purchase 60k pounds at 500 dollars per pound." *Id.*

**AVX RESPONSE**   In its Statement of Material Facts ¶ 12 in support of its cross motion for summary judgment in *AVX v. Cabot Corp*, Suffolk Superior Court CA . 05-3816-Cabot admits that on October 17, 2000 "Cabot prepared and circulated a first draft of the 2001 Supply Agreement early on in the negotiations process."  Further answering AVX states that there is no "written proposal" in the record proffered by Cabot which consists of deposition testimony concerning internal discussions and internal memoranda (Rising Tab 5) and AVX internal notes (Rising Tab 7). The so-called 10-30-00 proposal at Tab 7 is an internal AVX memorandum concerning what AVX might do. Further answering AVX states that its state of mind is not relevant. Further answering AVX states that to the extent its state of mind is relevant once as a condition of getting the flake products AVX accepted Cabot's requirement of a five year take or pay contract for both flake and non-flake products the negotiation were limited to the quantities to be purchased over the five years and the prices to be paid (*See* SOF ¶¶ 22-25) and those subsequent negotiations over quantities and pricing over the five years are irrelevant.

17.    Cabot did not agree to AVX's October 2000 proposal.  *See* E-mail message from Thomas Odle to John Gilbertson, dated November 2, 2000 (a true copy of which is appended to the Rising Aff. at Tab 8). In subsequent negotiations between the parties, Cabot actually *reduced* the amount of additional non-flake or nodular tantalum powder that it was prepared to sell to AVX in 2002 through 2005 for use at AVX's other facilities from 60,000 pounds per year, as requested by AVX, to 10,000 pounds per year.  *Id.*; *see also* Gilbertson Depo., pp. 146, 165-66 (Rising Aff., Tab 5).

**AVX RESPONSE**   AVX disputes ¶ 17 as unsupported by the citations proffered by Cabot.  Further answering AVX states as of 2000 and January 2001 AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each of 2002, 2003, 2004 and 2005 at fixed prices.  SOF ¶ 32. Further answering AVX states that but for the Supply Agreement AVX would not have purchased any nodular products from Cabot for Europe for the years 2001 through 2005. SOF ¶ 34. Further answering AVX states that its state of mind is not relevant. Further answering AVX states that to the extent its state of mind is relevant once as a condition of getting the flake products AVX accepted Cabot's requirement of a five year take or pay contract for both flake and non-flake products the negotiation were limited to the quantities to be purchased over the five years and the prices to be paid (*See* SOF ¶¶ 22-25) and those subsequent negotiations over quantities and pricing over the five years are irrelevant.

18.     Cabot's reduction in the amount of additional non-flake or nodular tantalum powder that it was prepared to sell to AVX in 2002 through 2005 made AVX's management "very uncomfortable." Gilbertson Depo., pp. 165-166 (Rising Aff., Tab 5). When questioned about Cabot's reduction at his deposition, Mr. Gilbertson testified,

> Q.     Okay. Now if you will look just above the chart, and you will see it says, "change the nodular to 10,000 pounds, which our side is very uncomfortable with as a good faith from our side." Do you see that? Just above the chart.
>
> A.     I see that, yes.
>
> Q.     Is it correct that you were uncomfortable with the reduction from 60,000 pounds of nodular powder as shown on [Cabot's] e-mail, Exhibit 181, to the 10,000 pounds as shown on Exhibit 2?
>
> A.     Yes.

Q. Because you wanted more if you could get it?

A. Right.

Q. I'm sorry?

A. Yes, correct.

*Id.*

**AVX RESPONSE**     AVX disputes the first sentence of ¶ 18 as unsupported by the record proffered by Cabot. Further answering AVX states that the amount of tied products it desired is irrelevant. Further answering AVX states that Peter Collis when examined concerning this 60,000 pounds explained that he, Peter Collis, had informed Mr. Gilbertson he was mistaken:

> The second one was along similar lines. And
>> he outlined some objectives. The next one I saw was
>> a forward from him of a Tom Odle outline of the
>> first five year contract that I saw which had KTAF
>> in for five years, nodular powder from Boyertown of
>> 60,000 pounds. And I think the Biddeford material
>> was 30,000 pounds at that time. I don t recall the
>> wire.
>> My inputs to him were we don t want the
>> nodular powder from Boyertown.
>
> Q.       You didn t want any nodular powder from
> Boyertown?
> A.       If we could got out of the nodular powder from
> Boyertown, my inputs are we would have lived without
> them. On the  - let me rephrase that.
>> The 60,000 pounds for the European Operation.
> We clearly needed the Biddeford operation nodular
> materials. The Biddeford wire was necessary.
> Because again, they had only accrued Cabot Wire.
> And wire would mean a major change in the supplier
> to the military and medical market.
>> The  - and the KTAF for five years. I believe
> I said to him  - you know  - we were going to have a
> difficult time selling these prices in to the market
> place. And we should reduce these numbers as much
> as possible.

> Q.      Were AVX s European facilities using Cabot
>         nodular powder for any purpose back in 2000?
> A.      We were working with  - with Cabot on nodular
>         materials.  But we were  - we were struggling to get
>         what we considered to be consistent nodular material
>         from the Boyertown operation.

Collis 11-27-07 Depo. at 57-58. AVX's long time purchasing manager John Chapple

explains that AVX only agreed to try out Cabot's C-606 subject to that nodular powder

meeting AVX Raw Materials Specifications but that Cabot product never met those

specifications.  Chapple Aff ¶ 16.  But for the Supply Agreement AVX would not have

purchased nodular powders for its European plants for any part of the five year term of

the Supply Agreement.  SOF ¶ 34.  Further answering AVX states that its state of mind is

not relevant. Further answering AVX states that to the extent its state of mind is relevant

once as a condition of getting the flake products AVX accepted Cabot's requirement of a

five year take or pay contract for both flake and non-flake products the negotiation were

limited to the quantities to be purchased over the five years and the prices to be paid (*See*

SOF ¶¶ 22-25) and those subsequent negotiations over quantities and pricing over the

five years are irrelevant.

19.      AVX later requested, and Cabot later agreed, to supply an additional 5,000 pounds

of non-flake or nodular powder to AVX in 2001 "if those pounds were available." Gilbertson

Depo., pp. 165-166 (Rising Aff., <u>Tab 5</u>); 2001 Supply Agreement, Appendix A (Rising Aff.,

<u>Tab 4</u>).

**<u>AVX RESPONSE</u>**   AVX disputes the first sentence of ¶ 19 as unsupported by the

record proffered by Cabot.  The Supply Agreement speaks for itself. Further answering

AVX states that its state of mind is not relevant. Further answering AVX states that to the

extent its state of mind is relevant once as a condition of getting the flake products AVX

accepted Cabot's requirement of a five year take or pay contract for both flake and non-flake products the negotiation were limited to the quantities to be purchased over the five years and the prices to be paid (*See* SOF ¶¶ 22-25) and those subsequent negotiations over quantities and pricing over the five years are irrelevant.

20.    By early November 2000, Cabot and AVX had reached agreement in principal on the prices and the minimum quantities of the Tantalum Products that AVX was willing to purchase from Cabot over the ensuing five years, including the minimum quantities of nodular tantalum powder and KTaF.  E-mail message from John Gilbertson to Kurt Cummings, *et al.*, dated November 8, 2000, with attached e-mail message from Thomas Odle to John Gilbertson (a true copy of which is appended to the Rising Aff. at <u>Tab 9</u>). On November 7, 2000, Mr. Gilbertson sent a summary of the agreed-upon terms to Mr. Odle with a cover message stating: "TOM … I think we have a fair agreement for both parties … hope you agree." Gilbertson Depo., p. 176 (Rising Aff., <u>Tab 5</u>); E-mail message from John Gilbertson to Thomas Odle, dated November 7, 2000  (a true copy of which is appended to the Rising Aff. at <u>Tab 10</u>).

**<u>AVX RESPONSE</u>**   AVX disputes ¶ 20 as unsupported by the record proffered by Cabot.  Further answering AVX states as of 2000 and January 2001 AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each of 2002, 2003, 2004 and 2005 at fixed prices. SOF 32.  Further answering AVX states that to the extent its state of mind is relevant once as a condition of getting the flake products AVX accepted Cabot's requirement of a five year take or pay contract for both flake and non-flake products the negotiation were limited to the quantities to be purchased over the five years and the prices to be paid (*See* SOF ¶¶ 22-25) and those subsequent negotiations

over quantities and pricing over the five years are irrelevant. The November 7, 2000 email speaks for itself; and the third through the fifth pages of Tab 9 are not authenticated. Similarly the "rough talking points" appended to the Tab 9 email are also not authenticated.

21.    The final version of the 2001 Supply Agreement was signed by Cabot and AVX in January 2001. Complaint, ¶ 29; Young Aff., ¶ 9. The specific quantities of Tantalum Products that AVX agreed to purchase and Cabot agreed to sell are described in "Appendix A" to the 2001 Supply Agreement. Complaint, ¶ 29. They include more than 325,000 pounds of flake tantalum powder, more than 180,000 pounds of non-flake or nodular tantalum powder, and more than 950,000 pounds of KTaF. 2001 Supply Agreement, Appendix A (Rising Aff., Tab 4).

**AVX RESPONSE**   AVX admits that the Supply Agreement was signed by Cabot and AVX in January 2001 and that the specific quantities of flake products, nodular products, KTaf and wire AVX was required to purchase over the five year term are specified in "Appendix A" to the 2001 Supply Agreement.

22.    Not long after Cabot and AVX executed the 2001 Supply Agreement, worldwide demand for various types of electronic devices – and, hence, worldwide demand for electronic capacitors and tantalum -- experienced a rapid and steep decline. *See* Amended Complaint, Case No. 02-cv-11524, Doc. No. 7 at Exhibit D, ¶33.

**AVX RESPONSE**   AVX states that events after January 2001 when the Supply Agreement was signed are immaterial as to liability. AVX admits that prices for tantalum products declined sometime after early to mid 2001. Further answering AVX states that whether or not worldwide demand for electronic capacitors and tantalum --

17

experienced a rapid and steep decline is irrelevant.  Further answering AVX disputes

Cabot's characterization of ¶ 33 of that prior complaint which in *haec verbae*:

> As the worldwide economy softened in 2001, the demand for passive components
> dropped off dramatically.  Reduced selling prices for tantalum capacitors coupled
> with increased raw material costs and low production volumes have adversely
> impacted profits for capacitor manufacturers such as AVX.

In its answer to that Amended Complaint, Cabot admitted the allegations of ¶ 33.

23.    In July 2002, AVX commenced litigation against Cabot in federal court seeking,

*inter alia*, to undo the 2001 Supply Agreement on the ground that the parties' prior "Letters

of Intent" constituted binding agreements, and alleging that,

> when the market for tantalum went from relatively stable to
> extremely volatile, [Cabot], one of the largest players in the
> market, took advantage of its strong position and [AVX's]
> weakened position to force [AVX] into agreeing to a new,
> highly unfavorable set of terms for supply of the tantalum
> [Cabot] already had contracted to supply. Without those
> new terms … [Cabot] said it would be "simply unable" to
> supply [AVX] with the tantalum it needed. [AVX], to its
> significant detriment, had no choice but to enter into a new
> long-term agreement.

AVX Complaint in <u>AVX Corp. and AVX Ltd. v. Cabot Corp.</u>, U.S.D.C. Civil Action No.

0211524 (RGS), dated July 26, 2002 (a true copy of which is appended to Rising Aff. at

<u>Tab 12</u>).

**<u>AVX RESPONSE</u>**   AVX states that the prior litigation dealt with an entirely different

subject and the quoted passage was in the introduction to the said complaint and that

Cabot chose not to treat the introduction as allegations and did not to respond thereto.

24.    After partially-dispositive motion practice in federal court, AVX's various claims

against Cabot, including AVX's claim that it was economically coerced by Cabot's

"commercial threats" to enter into a "binding, five-year contract, under which AVX would

purchase specified quantities of tantalum powder and wire at stated prices" notwithstanding the parties' pre-existing "Letters of Intent," were litigated in Massachusetts state court. AVX Answer, Counter-Claim and Jury Demand in <u>Cabot Corp. v. AVX Corp. and AVX Ltd.</u>, Suffolk Superior Court Civil Action No. 03-1235 ("*Cabot/AVX I*"), dated April 17, 2003 (a true copy of which is appended to Rising Aff. at <u>Tab 13</u>).

**AVX RESPONSE**    AVX admits there was prior litigation in the Massachusetts Superior Court concerning the Supply Agreement. AVX further states that common law coercion is not an element of proof in this case and that the prior litigation is not relevant.

25.    All of AVX's claims, counterclaims and defenses in *Cabot/AVX I*, including AVX's claim of economic duress, were resolved against AVX or dismissed. The Massachusetts Superior Court entered judgment in Cabot's favor on October 6, 2005 (a true copy of which is appended to Rising Aff. at <u>Tab 14</u>).

**AVX RESPONSE**    AVX admits that judgment was entered in favor of Cabot in the form attached at Tab 14. AVX further states that common law coercion is not an element of proof in this case and that the prior litigation is not relevant.

26.    AVX's subsequent appeal of the Superior Court's judgment in *Cabot/AVX I* was considered and rejected by the Massachusetts Supreme Judicial in an opinion issued on March 28, 2007 (Rising Aff., <u>Tab 10</u>). As stated by the SJC,

> [a] Superior Court judge granted summary judgment for Cabot, concluding that there was no economic duress where the [Supply Agreement] was the product of hard bargaining and not any unlawful or wrongful act, and where the values exchanges between the parties were not disproportionate. The judge also concluded that AVX had, in any event, ratified the [Supply Agreement] by its conduct, and we transferred the case from the Appeals

Court on our own motion.  We affirm.

Cabot v. AVX, 448 Mass. at 630 (Rising Aff., Tab 10.)

**AVX RESPONSE**   AVX admits that the Superior Court's judgment was affirmed.  The opinion of the SJC speaks for itself. AVX further states that common law coercion is not an element of proof in this case and that the prior litigation is not relevant.

27.    The SJC further held that, with one minor exception not relevant here (*i.e.*, a relatively small amount of C606, a non-flake tantalum powder that AVX admittedly wanted), that the pre-existing "letters of intent" between Cabot and AVX "were not binding."  448 Mass. at 641 (Rising Aff., Tab 10). It said,

> [j]ust as there was no binding commitment on AVX to
> purchase products other than C606, Cabot was not bound
> by the letters [of intent] to supply any other product in
> any specific amount.  This interpretation is in line with
> the long-established principle that a "contract" to
> purchase an unspecified amount of goods is not a
> contract at all.

*Id.* at 640 (citation omitted).

**AVX RESPONSE**   AVX admits that the Superior Court's judgment was affirmed.  The opinion of the SJC speaks for itself. AVX further states that common law coercion is not an element of proof in this case and that the prior litigation is not relevant.

28.    The Massachusetts Superior Court entered final judgment, after rescript, on all counts asserted in *Cabot/AVX I* in Cabot's favor on April 27, 2007. Final Judgment, dated April 27, 2007 (a true copy of which is appended to the Rising Aff. at Tab 15).

**AVX RESPONSE**   Admitted.

29.    AVX commenced this federal court action against Cabot in March 2004.  *See* Complaint.  The only claim asserted by AVX in its Complaint in this case is that flake

tantalum powder and non-flake tantalum powder purportedly constitute "separate products," and that, in negotiating the 2001 Supply Agreement, Cabot allegedly tied or "conditioned plaintiff's purchase of flake [tantalum] powders on its purchase of non-flake [tantalum] powders" in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 14. Complaint, ¶¶ 1, 33-41. No other wrongdoing or misconduct by Cabot is alleged.

**AVX RESPONSE**   AVX admits the first sentence of ¶ 30 and further answering states that the Complaint speaks for itself.

30.    On December 5, 2007, AVX produced Peter Collis, Vice President of AVX's worldwide tantalum operations, to testify on AVX's behalf under Fed. R. Civ. P. 30(b)(6) with respect to, *inter alia*, the particular "products or terms that AVX alleges it was forced to accept on account of 'Cabot's coercive strategies' as referenced in Paragraph 30 of [its] Complaint" in this action. (True copies of Cabot's Notice of Deposition of AVX Corp. and essentially identical Notice of Deposition of AVX Ltd., dated October 17, 2007, are appended to the Rising Aff. at collectively Tab 16. Relevant excerpts from the transcript of the December 5, 2007 Collis deposition (the "Collis Depo.") are appended to the Rising Aff. at Tab 17.)

**AVX RESPONSE**   AVX admits that Peter Collis, Vice President of AVX's worldwide tantalum operations, testified on behalf of AVX on December 5, 2007 and that excerpts from the transcript of the December 5, 2007 Collis deposition are appended to the Rising Aff. at Tab 17.

31.    In the course of his December 5, 2007 deposition, Mr. Collis was shown a copy of the 2001 Supply Agreement, including "Appendix A." When asked to identify the particular tantalum products that AVX claims it was "coerced" by Cabot into buying, Mr. Collis

testified, in part, as follows:

> Q.   Which of the products that are listed [in Appendix A] Mr. Collis, are the products that AVX claims in this litigation it did not wish to purchase from Cabot, but was forced to do so?
>
> MR. GOREN: Objection.  You may answer.
>
> THE WITNESS:  The – the basic premise was we were coerced into a five year agreement which we didn't want to get into.

Collis Depo., p. 10 (Rising Aff., Tab 17).

***********

> Q.   So I want to understand this correctly.  Are you saying that AVX did not wish to purchase, as of the time that it entered into the Supply Agreement with Cabot, it did not wish to purchase any nodular powder from Cabot?
>
> A.   We didn't wish to purchase – enter into an agreement to purchase materials for five years.

*Id.*, p. 13.

***********

> Q.   Putting aside the five year length of the contract, were there any nodular products that are listed on Appendix A to … the Supply Agreement, that AVX actually wished from Cabot as of the time that this Supply Agreement was actually signed?
>
> MR. GOREN: Independent of the other terms of the contract.
>
> A.   Yes. Yes.
>
> Q.   Which ones did AVX actually wish to purchase?
>
> A.   We wished to purchase the ones that we had in the Letter of Intent at the time we had the original agreement.  And we also entered into the KTAF agreement to protect our supply chain from Showa Cabot – because of the situation we were being told where Showa was going to be short of material.

Q.    I can try to short circuit some of this Mr. Collis to see if I understand AVX's position. Is it fair to say that it's AVX's position that its complaint in this case is that it was forced by Cabot to sign a contract for years beyond 2001?

MR. GOREN: Objection.  You may answer.

THE WITNESS:  Yes.

BY MR. DAVIS:

Q.    Is there more to AVX's complaint in this action other than it was forced by Cabot, allegedly, to sign a contract or a binding contract for delivery of products beyond the calendar year 2001?

A.    No.

*Id.*, pp. 13-15.

*************

Q.    So it's AVX's position that every product that is encompassed by the 2001 Supply Agreement was a product that it believes it was forced to accept on account of Cabot's coercive strategies. Is that right?

MR. GOREN: Objection.

THE WITNESS:  Yes. We did not want to enter into a five year agreement.

*Id.*

*************

Q.    Are there any additional products that AVX claims it was forced to accept on account of Cabot's coercive strategies other than what you've identified?

A.    I – I'm sorry.  I'm a bit confused. Can I perhaps clarify the –

Q.    Yes.

A.    I mean – basically we're saying all of the materials in years 2 through 5. What other materials would you be referring to?

Q.    So when you say, "all of the materials in years 2 through 5", you're looking at Appendix A to Exhibit 2. Are you not?

A.    Yes.

Q.    And do I have it correct that it is AVX's position that all of the materials that you see listed under calendar year 2002, CY 2002, are products that AVX alleges it was forced to accept on account on [sic] Cabot's coercive strategies?

A.    We did not want to enter into a contract longer than 12 months.

Q.    So what I said is correct?

A.    Yes.

Q.    And the same would be true for calendar year 2003?

A.    Yes.

Q.    AVX did not wish to purchase any of those products from Cabot. Correct?

A.    We didn't wish to enter into a long term contract for the purchase of those materials.

*Id.*, pp. 18-19.

*************

Q.    Is it fair to say that as of January 2001, AVX did not wish to enter into a contract with Cabot, a binding contract, to purchase any of the products that are listed [in Schedule A to the Supply Agreement] under calendar year – let's start with calendar year 2002 for delivery in 2002? Is that right?

MR. GOREN: Objection.

THE WITNESS:  Yes.

Q.    I'm not trying to confuse you.  The complaint that AVX has is that in 2001 it was being required by Cabot to enter into a contract that would call for products and it would bind AVX to buy products from Cabot in the year 2002? Correct?

A.    Correct.

Q.    And the same is true for the year 2003. Correct?

24

Q.      Correct.

Q.      And the same is true for 2004 and 2005. Correct?

A.      Correct.

***********

Q.      Is it fair to say that the crux of AVX's complaint in this case is that in 2001, AVX was forced by Cabot to sign an agreement that required AVX to purchase in the years 2002, 2003, 2004 [and] 2005 the products listed in those years on Appendix A?

MR. GOREN: Objection.  You may answer.

THE WITNESS:  Correct.

BY MR. DAVIS:

Q.      Is there more to AVX's complaint in this case other than what I have stated? To your knowledge?

A.      To my knowledge, no.

*Id.*, pp. 20-22.

**AVX RESPONSE**  AVX admits that that ¶ 31 sets forth portions of the deposition testimony of Peter Collis.

32.    When questioned at his December 5, 2007 deposition about AVX's willingness to purchase the nodular tantalum powder listed on Appendix A to the 2001 Supply Agreement, Mr. Collis further testified, in part, as follows:

Q.      Alright. And under nodular, you see that there is 25,000 pounds minimum that AVX agreed to buy under this contract. Correct?

A.      Correct.

Q.      Alright. Is it correct to say that AVX did in fact

25

wish to purchase that nodular powder from Cabot
as of calendar year 2001?

MR. GOREN: Wait a minute. Does your question
deal with the quantity or the specific product?

MR. DAVIS: Right now I'm dealing with that term
of this agreement.    25,000 pounds of nodular
powder.

MR. GOREN: Okay.

BY MR. DAVIS:

Q.    Do you know?

A.    Yes.

\*\*\*\*\*\*\*\*\*\*

Q.    And Mr. Collis, drawing your attention to that 5,000
pound entry on [Appendix A] under calendar year
2001, is it fair to say that AVX did in fact wish to
purchase from Cabot in calendar year 2001 an
additional 5,000 pounds of nodular powder for
AVX's Biddeford, Maine facility if Cabot could
make that product available to AVX?

A.    Yes. We would have bought the extra 5,000 pounds
if it was available.

Collis Depo., pp. 24-26 (Rising Aff., Tab 17).

**AVX RESPONSE**  AVX disputes Cabot's characterization of the transcript which

speaks for itself.  AVX admits that ¶ 32 sets forth portions of the deposition testimony of

Peter Collis.

33.    When questioned at his December 5, 2007 deposition about the specific tantalum

products that AVX actually wished to purchase from Cabot when it entered into the 2001

Supply Agreement, Mr. Collis further testified, in part, as follows:

Q.    Which ones did AVX actually wish to purchase?

26

> A.    We wished to purchase the ones that we had in the
>        Letter of Intent at the time that we had the original
>        agreement.

Collis Depo., p. 14 (Rising Aff., <u>Tab 17</u>).

**AVX RESPONSE**  AVX disputes Cabot's characterization of the transcript which speaks for itself.  AVX admits that that ¶ 33 sets forth portions of the deposition testimony of Peter Collis.

34.    Cabot deposed Kurt Cummings, AVX's Vice President and Chief Financial Officer, on December 12, 2007.  (Relevant excerpts from the transcript of the December 12, 2007 Cummings deposition (the "Cummings Depo.") are appended to the Rising Aff. at <u>Tab 18</u>.)  AVX designated Mr. Cummings under Fed. R. Civ. P. 30(b)(6) to testify on its behalf concerning "Cabot's coercive strategies" as alleged in Paragraph 30 of AVX's Complaint in this action.  *See* Depo. Notice (Rising Aff., <u>Tab 16</u>), topic no. 11. When questioned on this topic at his deposition, Mr. Cummings testified, in relevant part, as follows:

> Q.    And what were Cabot's coercive strategies, to your
>        understanding?
>
> A.    I believe they surrounded the conditions under
>        which the Supply Agreement was negotiated.
>
> Q.    They surrounded?  Is that the word you just used?
>
> A.    Um-hum.
>
> Q.    Surrounded with what?
>
> A.    Two issues.  One, we had an existing supply
>        agreement which Cabot indicated they would not
>        honor.
>
> Q.    You are referring to the letter of intent?

27

> A.  Yes. And we were told that we would not get material unless we entered into a long-term supply agreement.
>
> Q.  And that is the coercive strategies you believe this is referring to?
>
> A.  Yes.
>
> Q.  What other coercive strategies are you aware of that Cabot engaged in during the negotiation of the 2001 Supply Agreement?
>
> A.  I think that covers it.

Cummings Depo., pp. 17-18 (Rising Aff., <u>Tab 18</u>).

**<u>AVX RESPONSE</u>** AVX admits that that ¶ 34 sets forth portions of the deposition testimony of Kurt Cummings.

35.     Cabot deposed AVX's economic expert in this action, Dr. Steven Schwartz, on February 19, 2008.  (Relevant excerpts from the transcript of the February 19, 2008 Schwartz deposition (the "Schwartz Depo.") are appended to the Rising Aff. at <u>Tab 19</u>.) In the course of his deposition, Dr. Schwartz testified, in part, as follows:

> Q.  You know enough about antitrust law and antitrust law involving tying to recognize that, in order to have a tie for antitrust purposes, that you need to have separate products, correct?
>
> A.  Yes.
>
> Q.  That's part of the reason why, in your analysis, you analyze whether flake tantalum powder and nodular tantalum powder are separate products, correct?
>
> A.  Yes.
>
> Q.  And you came to the conclusion that they are?
>
> A.  Yes.
>
> Q.  You would agree with me, however, that if AVX's

claim in this case is that it agreed to buy certain products in 2001 from Cabot, but then Cabot forced AVX to buy the same products in 2002, 2003, 2004 and 2005, that those would not, by definition, be separate products, correct?

A.     Okay. Again, just to be sure I understand, you are talking about conditioning the availability of products in years two, three – of a product in year[s] two, three, four and five on the purchase of the same product in year one.

Q.     Yes. I'm talking about conditioning purchases of products in subsequent years on AVX's purchase of products in year one.

A.     My understanding of the law and my understanding of economics is that would not be a tie….

Schwartz Depo., pp. 168-169 (Rising Aff., Tab 19).

**AVX RESPONSE**   AVX admits that Cabot deposed AVX's economic expert in this action, Dr. Steven Schwartz, on February 19, 2008.  AVX admits that ¶ 35 sets forth portions of the deposition testimony of Dr. Steven Schwartz.  Further answering AVX states that Dr. Schwartz is not offering any opinions in this case as to the legal elements of AVX's claims.

36.     On December 29, 2006, Cabot served AVX with its First Set of Interrogatories in this action (a true copy of which is appended to the Rising Aff. at Tab 20). AVX served its Answers to Cabot's First Set of Interrogatories on February 28, 2007 (a true copy of which is appended to the Rising Aff. at Tab 21). In response to Interrogatory No. 20, which asked AVX to "[p]lease state all of the damages that AVX claims to have sustained" as a result of Cabot's alleged misconduct, AVX answered that it "ha[d] not yet calculated its damages." *Id.*, Response to Int. No. 20.

**AVX RESPONSE**   Admitted.

29

37.    Cabot subsequently moved to compel further, more substantive responses to its

First Set of Interrogatories from AVX on April 13, 2007.  (*See* Docket Nos. 56 and 57.) AVX

submitted its Opposition to Cabot's Motion to Compel on April 27, 2007.  (*See* Docket No.

59.) In response to Cabot's request that AVX be ordered to provide a more substantive

response to Cabot's Interrogatory No. 20 seeking information concerning AVX's alleged

damages, AVX stated:

> AVX stands by its response that it has not yet calculated its
> damages.  It is premature for AVX to assert "all" of its
> damages. AVX has been damaged by the excess of the
> amounts paid under the January 2001 Supply Agreement
> over the term of that agreement over the fair market prices
> of those products over the term of that agreement.  AVX
> intends to prove it damages at trial. These calculations
> cannot be made at this preliminary stage of this litigation.
> AVX is mindful of its obligations under FRCP 26(e)
> regarding supplementation of answers to interrogatories.

*Id.*, pp. 9-10.

**AVX RESPONSE**    AVX admits that Cabot filed a motion to compel discovery and that

Cabot's has accurately excerpted a portion of AVX's brief.

38.    AVX never supplemented its answer to Interrogatory No. 20 from Cabot's First

Set of Interrogatories. Rising Aff., ¶ 20.

**AVX RESPONSE**    AVX admits that as of March 31, 2008 it had not served a

supplemental response to Interrogatory No. 20.  AVX has served its Further

Supplemental Response to Cabot's First Set of Interrogatories including Interrogatory

No. 20 on April 14, 2008.   A copy of that Further Supplemental Response is attached as

Exhibit A.

39.    On December 5, 2007, AVX produced Peter Collis, Vice President of AVX's

worldwide tantalum operations, to testify on AVX's behalf under Rule 30(b)(6) with respect

to, *inter alia*:

> [a]ny damages that AVX claims to have sustained on
> account of the conduct alleged in the Complaint, including
> but not limited to the complete nature and amount of such
> damages, and the precise means by which AVX calculated
> such damages.

Cabot Notices of Deposition (Rising Aff., <u>Tab 16</u>); Collis Depo., pp. 8-9, 120 (Rising

Aff., <u>Tab 17</u>).

**<u>AVX RESPONSE</u>**    AVX admits that Peter Collis, Vice President of AVX's worldwide

tantalum operations, testified on behalf of AVX on December 5, 2007 and that excerpts

from the transcript of the December 5, 2007 Collis deposition are appended to the Rising

Aff. at <u>Tab 17.</u>

40.    When questioned on the topic of AVX's alleged damages at his December 5, 2007

deposition, Mr. Collis testified, in relevant part, as follows:

> Q.    What damages has AVX sustained as a result of the
> conduct of Cabot that is alleged in the Complaint in
> this matter?
>
> A.    That is being calculated by our outside expert.
>
> Q.    Has AVX sustained damages?
>
> A.    Yes.
>
> Q.    Do you have any understanding right now of the
> monetary value of those damages?
>
> A.    We have monitored the market price of material and
> compared that with what we ended up paying in the
> contract when we used the material as against what
> the market price was at the time, and passed that to
> our expert.
>
> Q.    How would you go about calculating AVX's

damages in this matter?

A.    How would I go about calculating.

MR. GOREN: Objection.  You may answer.

THE WITNESS:  Basically, we've left that with our
expert to come up with that calculation.

Collis Depo., pp. 117-18 (Rising Aff., <u>Tab 17</u>).

**AVX RESPONSE**    AVX admits that Peter Collis, Vice President of AVX's worldwide

tantalum operations, testified on behalf of AVX on December 5, 2007 and that excerpts

from the transcript of the December 5, 2007 Collis deposition are appended to the Rising

Aff. at <u>Tab 17.</u>

41.    On December 15, 2007, AVX served Cabot with the report of AVX's economic

expert, Dr. Steven Schwartz, describing Dr. Schwartz's opinions and anticipated trial

testimony in this action pursuant to Fed. R. Civ. P. 26(a).  (A true copy of Dr. Schwartz's

expert report, which was designated "Privileged and Highly Confidential" by AVX,

previously was filed under seal in conjunction with Cabot's Opposition to AVX's Motion for

Leave to File Substitute Expert Report, dated February 19, 2008 (Docket No. 102)).

However, Dr. Schwartz's report contains no information, opinions, or description of any

anticipated expert testimony concerning the nature or amount of AVX's alleged damages.

*Id.*

**AVX RESPONSE**    AVX admits that the December 15, 2007 report of Dr. Steven

Schwartz was served on Cabot and that Cabot filed that report in this Court.  AVX

disputes Cabot's characterization of that report which speaks for itself.

42.    Cabot deposed Dr. Schwartz on February 19, 2008.  In the course of his

deposition, Dr. Schwartz testified, in part, that his expert report in this action does not

address AVX's alleged damages because he "hadn't been asked" by AVX to render an opinion on that topic prior to issuing that report. Schwartz Depo., pp. 201-202 (Rising Aff., Tab 19).

**AVX RESPONSE**   AVX admits that Cabot deposed AVX's economic expert in this action, Dr. Steven Schwartz, on February 19, 2008.  AVX admits that ¶ 42 sets forth portions of the deposition testimony of Dr. Steven Schwartz.  Further answering AVX states that Dr. Schwartz is not offering any opinions in this case as to the amounts of damages suffered by AVX in this case.

AVX CORPORATION and
AVX LIMITED

By their attorneys,


*/s/ Richard .A. Goren*
Joseph S.U. Bodoff (BBO #549116)
Richard A. Goren (BBO #203700)
Bodoff & Associates P.C.
225 Friend Street
Boston, MA  02114
(617) 742-7300

Dated: April 14, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document dated April 14, 2008  filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent to those non-registered participants (if any) on  April 14, 2008.

*/s/ Richard .A. Goren*