UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| AVX CORPORATION ) | |
| and AVX LIMITED, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION NO. 04-10467-RGS |
| v. ) | |
| ) | |
| CABOT CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

## CABOT CORPORATION'S MEMORANDUM IN OPPOSITION TO AVX CORPORATION'S AND AVX LIMITED'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Cabot Corporation ("Cabot") respectfully submits this memorandum in opposition to the Motion For Partial Summary Judgment of plaintiffs AVX Corporation and AVX Limited (collectively, "AVX") (Docket No. 114).

Cabot sells tantalum products. For many years, Cabot attempted, unsuccessfully, to persuade AVX to enter into a long-term, binding contract to purchase Cabot's tantalum products. In 2000, a severe shortage of tantalum products gave Cabot a bargaining advantage. Cabot had tantalum powders of various types that its customers, the manufacturers of tantalum capacitors, badly wanted to purchase. Cabot again insisted on long-term contracts for the sale of its tantalum products. This time, it prevailed in the bargaining process. AVX's complaint in this action, as repeatedly articulated by its own witnesses, is that Cabot violated antitrust laws by using its advantageous bargaining position to get AVX finally to commit to a binding, long-term supply agreement for various tantalum products in early 2001 (the "2001 Supply Agreement").

The 2001 Supply Agreement does not violate federal antitrust laws as a matter of law. Although AVX's lawyers insist that Cabot tied the sale of one type of tantalum powder -- called "flake" -- to another type of tantalum powder -- called "nodular," in that Agreement, the undisputed evidence does not support AVX's claim. Indeed, AVX's own President, who negotiated the disputed agreement with Cabot, has testified that, far from forcing AVX to purchase nodular powder as a condition of purchasing flake powder, Cabot actually turned down AVX's requests to purchase *additional quantities* of nodular powder that AVX wished to buy.

For these reasons and others, which are addressed more fully below, AVX's Motion for Partial Summary Judgment is wholly without merit. Accordingly, AVX's Motion should be denied, and Cabot's Motion for Summary Judgment (Docket Nos. 109 to 113) should be granted.

## The Facts

1.    Tantalum is an elemental metal mined at various locations around the world. Tantalum ore can be refined into tantalum powder and wire and then used in the manufacture of capacitors. Capacitors are electrical components that are, in turn, used in personal computers, cell phones and other electronic equipment. Cabot's Statement of Material Facts in Support of Its Motion for Summary Judgment, dated Mar. 31, 2008 ("Cabot SOF" (Docket No. 111)) at ¶ 5.

2.    Cabot was and is in the business, *inter alia*, of purchasing tantalum ore, converting it into tantalum powder and wire, and selling those products to capacitor manufacturers. Affidavit of William P. Young, dated Mar. 29, 2008 ("Young Aff." (Docket No. 113)), ¶ 2. AVX is in the business, *inter alia*, of purchasing tantalum products, using them in the manufacture of capacitors, and selling capacitors to firms that make electronic equipment. Complaint, ¶¶ 7-9.

3.    Both Cabot and AVX are public companies whose stock is traded on the New York Stock Exchange. AVX is controlled by Kyocera, an enormous Japanese conglomerate. AVX is, in its own right, a large and extremely profitable company. During the fiscal year ending March 1,

2001, it had sales of $2.6 billion (a 60% increase over its prior fiscal year) and net profits of $824 million (a 370% increase over its prior fiscal year). Deposition of Peter Collis, dated Dec. 5, 2007 ("2007 Collis Depo.") at 156-160 (relevant excerpts are appended to the Affidavit of Julie C. Rising, dated May 9, 2008 ("Rising Aff. II") at Ex. 1).

4.    Historically, the price of tantalum products has been highly volatile. The manufacturing capacity of tantalum producers is limited in the short run. Rapid increases in demand for products that use tantalum have resulted in shortages of tantalum products, and thus in dramatic increases in tantalum prices. In times of relatively slack demand for end-products that contain tantalum, prices have fallen. Complaint, ¶ 16; Young Aff., ¶ 3; Deposition of Ernest Chilton, dated Sept. 11, 2006 ("Chilton Depo.") at 28 (relevant excerpts are appended to Rising Aff. II at Ex. 2).

5.    Prior to the events at issue in this case, Cabot was one of four suppliers of tantalum powders to AVX. AVX purchased about 15% of its total tantalum powder needs from Cabot. AVX Concise Statement of Material Facts ("AVX SOF" (Docket No. 116)), ¶¶ 6, 33.

6.    For many years prior to 2001, Cabot sold tantalum powder and wire to AVX under non-binding Letters of Intent. During the 1990's, Cabot attempted to persuade AVX to enter into purchase agreements that would obligate AVX to purchase defined quantities of tantalum products at specified prices for an agreed period of time. Cabot Corp. v. AVX Corp., 448 Mass. 629, 631-632 (2007) (attached as Tab 11 to the Affidavit of Julie C. Rising, dated Mar. 31, 2008 ("Rising Aff. I" (Docket No. 112)), submitted in conjunction with Cabot's Motion for Summary Judgment). Cabot's objective was to introduce predictability into the parties' business relationship. During this period, AVX chose not to enter such an agreement, and thus to leave Cabot with the risks of market volatility. Young Aff., ¶ 5. Chilton Depo. at 28-29 (Rising Aff. II, Ex. 2).

7.    In 2000, there was: (a) an extraordinary growth in demand for end-products that use capacitors, especially cell phones and personal computers; (b) a resulting increase in demand for tantalum capacitors; and (c) not enough tantalum powder and wire to meet this demand.  By the middle of 2000, powder and wire were in very short supply and prices of tantalum products were rising rapidly.  Cabot found itself in an advantageous bargaining position.  It had products that its tantalum capacitor customers strongly wanted to buy.  Complaint, ¶ 23; Young Aff., ¶ 6.

8.    Cabot sells numerous types of tantalum powders.  Each has somewhat different electrical properties.  Certain powders are called "flake" because they are shaped like flakes, others are called "nodular" because they are nodular in appearance.  Affidavit of Joseph S. U. Bodoff, dated April 9, 2008 ("Bodoff Aff." (Docket No. 118)), Ex. 6.  Prior to the events at issue in this case, flake products did not command a premium price.  Letters of Intent (Rising Aff. I, Tab 2); Affidavit of John Chapple, dated Apr. 8, 2008  ("Chapple Aff." (Docket No. 117)), ¶ 13.

9.    AVX attempts to have its capacitors designed into its customer's products.  Certain of these capacitors incorporate a particular flake powder; others require a particular nodular powder; still others use ceramics or other metals rather than tantalum powders.  Complaint, ¶ 9. At his deposition, AVX's antitrust expert, Dr. Steven Schwartz, testified that when manufacturers of electronic end-products (*e.g.*, a cell phone) choose a capacitor to design into new models, there is competition among capacitor manufacturers who offer a variety of capacitors, some containing nodular powder, some containing flake powder, and some containing other non-tantalum materials.  Deposition of Dr. Steven Schwartz, dated Feb. 19, 2008 ("Schwartz Depo.") at 77-78, 100-103, 209-212 (relevant excerpts are appended to Rising Aff. II at Ex. 3).

10.    Various types of tantalum powders can serve as substitutes for various other types of tantalum powders.  Ernest Chilton, the Vice-President of AVX's tantalum operations in 2000, has estimated that, "depending upon priorities," AVX could replace the flake tantalum powders

used in AVX's capacitors with nodular powders in the space of "three to six months."  Chilton

Depo. at 12, 52-54 (Rising Aff. II, <u>Ex. 2</u>).  Moreover, other non-flake tantalum powders have

electrical properties that make them direct substitutes for most flake powders.  *See* E-mail from P.

Collis to J. Gilbertson, dated Sept. 23, 2000 (a true copy of which is appended to Rising Aff. II

at <u>Ex. 4</u>); Deposition of Peter Collis, dated Aug. 8, 2006 ("2006 Collis Depo.") at 67-68 (relevant

excerpts are appended to Rising Aff. II at <u>Ex. 5</u>).[1]

      11.    In August 2000, AVX informed Cabot that its "requirements" for 2001 were

36,000 kg. (79,200 lbs.) of Cabot's flake powders, and 54,000 kg. (118,800 lbs.) of Cabot's

nodular powders.  AVX also requested that Cabot sell AVX 200,000 lbs. of KTaF (a partially-

manufactured, intermediate tantalum product that can be refined into finished powder).  AVX

Notes of Cabot/AVX Meetings, dated Aug. 18, 2000 and Sept. 1, 2000 (true copies of which are

appended to Rising Aff. II at <u>Ex. 6</u>); Deposition of John Chapple, dated Aug. 4, 2006 ("Chapple

Depo.") at 18-19 (relevant excerpts are appended to Rising Aff. II at <u>Ex. 7</u>).

      12.    Cabot responded that it could supply only 20,000 lbs. of nodular powder to AVX

for use at its Biddeford, Maine facility, plus approximately 240,000 lbs. of KTaF, but otherwise

was sold out for 2001.  Cabot further stated that it had additional quantities of tantalum powders

available for sale beginning in 2002, but would only sell to AVX if AVX was prepared to enter

into a binding, long-term purchase and sale agreement of the type that Cabot had long requested.

Chapple Depo. at 22-25, 38 (Rising Aff. II, <u>Ex. 7</u>).

      13.    A lengthy negotiation ensued.  The primary negotiators were Thomas Odle (then

General Manager of Cabot's Performance Materials Division), Ernest Chilton (then Senior Vice

---

[1] EPCOS is an AVX competitor in the capacitor business.  AVX states that EPCOS had "developed products that could only be made with flake."  AVX SOF, ¶ 10.  However, AVX admits that EPCOS entered into a binding long-term sales agreement with Cabot at about the same time as AVX entered the 2001 Supply Agreement, and which did not require the sale of *any* flake powders.  *Id.*, ¶ 12.

President of AVX's Tantalum Division), and John Gilbertson (AVX's President). Young Aff.,
¶ 9. The principal issues in the negotiation were: (a) the quantity of tantalum products that AVX
could purchase; (b) the length of the contract; and (c) the price to be paid by AVX.

14.    AVX identified its objectives internally. Its highest priority was the purchase of
20,000 to 30,000 pounds per year of *nodular powder* for use at its Biddeford, Maine facility. Its
next highest priority was the purchase of KTaF, which AVX intended to have tolled (refined) into
nodular powder by a third party. AVX's last priority was the purchase of flake powder. E-mail
from J. Gilbertson to B. Rosen, dated Sept. 28, 2000 (Rising Aff. I, Tab 6); Deposition of John
Gilbertson, dated Aug. 22, 2006 ("Gilbertson Depo.") at 86-87 (relevant excerpts are appended to
Rising Aff. II at Ex. 8).

15.    In the negotiations that ensued, AVX consistently pressed for the opportunity to
purchase *more* nodular powder, *more* flake powder, and *more* KTaF than Cabot could provide.
Eventually, AVX proposed to purchase (a) 30,000 pounds per year of nodular powder for its
Biddeford plant; (b) 50,000 pounds per year of flake powder; (c) 300,000 pounds per year of
KTaF; and, (d) if available in the years after 2001, an additional 60,000 pounds of nodular powder
per year for its European operations. E-mail from J. Gilbertson to E. Slavitt, dated Oct. 30, 2000
(Rising Aff. I, Tab 7); Gilbertson Depo. at 151-152, 159 (Rising Aff. II, Ex. 8); Long Term
Settlement, dated Oct. 31, 2000 (a true copy of which is appended to Rising Aff. II at Ex. 9); 2007
Collis Depo. at 57-58, 88-89 (Rising Aff. II, Ex. 1); E-mail from T. Odle to J. Gilbertson, dated
Nov. 2, 2000 (Rising Aff. I, Tab 8); AVX Term Sheet, dated Oct. 30, 2000 (a true copy of which
is appended to Rising Aff. II at Ex. 10).

16.    Due to capacity constraints, Cabot actually *reduced* the amount of nodular powder
that it would agree to sell to AVX for use at AVX's Biddeford plant in 2001 from 30,000 to
25,000 pounds. Cabot also *reduced* the amount of nodular powder that it would sell to AVX's

European plants from 60,000 pounds of nodular powder per year to 10,000 pounds per year beginning in 2002.  AVX President Gilbertson, AVX's negotiator, said contemporaneously, and testified at his deposition, that AVX was "very uncomfortable" with the reduction in nodular powder sales for use at AVX's European plants because AVX "wanted more if [AVX] could get it."  Rough Talking Points, dated Nov. 3, 2000 (a true copy of which is appended to Rising Aff. II at Ex. 11); Gilbertson Depo. at 164-166 (Rising Aff. II, Ex. 8).

17.    The primary contract negotiations between Cabot and AVX concluded in early November 2000.  AVX agreed to purchase specified amounts of tantalum flake and nodular powders (as well as tantalum wire) in each of five years (2001 through 2005) and specified amounts of KTaF in each of three years (2001-2003).  The price for the powders and wire was to be $500/lb.  However, AVX was protected against a future decline in market prices.  Cabot agreed, subject to certain conditions and limitations, that if it were to sell the same or equivalent tantalum powder or wire products at lower prices in the years 2003, 2004 or 2005, AVX would only pay the lower price.  2001 Supply Agreement, § 3 (Rising Aff. I, Tab 4).

18.    When an agreement in principle was achieved, AVX President Gilbertson e-mailed the final term sheet to Cabot's Thomas Odle, with a cover note that said, "Tom . . . I think we have a fair agreement for both parties . . . hope you agree."  E-mail from J. Gilbertson to T. Odle, dated Nov. 7, 2000 (Rising Aff. I, Tab 10); Gilbertson Depo. at 175-176 (Rising Aff. II, Ex. 8).

19.    The final version of the 2001 Supply Agreement was executed in January 2001.  A few months later, capacitor demand began to soften, the price of tantalum powders fell, and AVX found itself obligated to buy more tantalum powder than it thought it needed.  *See* Amended Complaint, Case No. 02-11524, ¶ 33 (Rising Aff. I, Tab 12).  Further negotiations, prompted by AVX, ensued.  At various points during those negotiations, Cabot and AVX's mid-level personnel agreed, in principle, to make various modifications to the 2001 Supply Agreement.  Chapple

Depo. at 120-137 (Rising Aff. II, <u>Ex. 7</u>); Letter from H. Tyler to J. Chapple, dated June 29, 2001 (a true copy of which is appended to Rising Aff. II at <u>Ex. 12</u>); Letter from J. Chapple to H. Tyler, dated August 14, 2001 (a true copy of which is appended to Rising Aff. II at <u>Ex. 13</u>); E-mail from H. Tyler to J. Chapple, dated August 14, 2001 (a true copy of which is appended to Rising Aff. II at <u>Ex. 14</u>).   However, the proposed contract amendments consistently were rejected by AVX's senior management.   Chapple Depo. at 120-137 (Rising Aff. II, <u>Ex. 7</u>).

20.     Beginning in July 2002, AVX began a series of legal maneuvers that were designed to avoid the 2001 Supply Agreement.   First, it sued (unsuccessfully) in this court alleging, *inter alia*, that Cabot had violated the Robinson-Patman Act in entering into the 2001 Supply Agreement.   Complaint, dated July 26, 2002 (Rising Aff. I, Tab 12.)   After that case was dismissed, AVX alleged (unsuccessfully) in a state court action that it was coerced into signing the 2001 Supply Agreement under economic duress.   *See* <u>Cabot Corp.</u>, 448 Mass. at 630 (Rising Aff. I, Tab 11).   Still later, in 2004, more than three years after it executed the 2001 Supply Agreement, AVX's lawyers hit upon the theory that Cabot purportedly violated the Sherman Act by tying the sale of flake powder to the sale of nodular powder.   AVX thereupon commenced this action.

21.     AVX's antitrust expert in this action, Dr. Steven Schwartz, has acknowledged that he had found no evidence -- no testimony and no document -- that Cabot representatives ever said, in words or in substance, that Cabot only would sell AVX flake tantalum powder if AVX also agreed to purchase nodular tantalum powder from Cabot.   Schwartz Depo. at 134 (Rising Aff. II, <u>Ex. 3</u>).   To the contrary, the undisputed evidence is that while its business was booming, AVX pressed Cabot to sell it *more* nodular powder than Cabot had capacity to make, or would commit to sell.   Rough Talking Points (Rising Aff. II, <u>Ex. 11</u>); Gilbertson Depo. at 164-166 (Rising Aff. II, <u>Ex. 8</u>).

22.    Dr. Schwartz further testified at his deposition that Cabot *did not* condition the sale of its flake powder on AVX's commitment to purchase KTaF. Schwartz Depo. at 132 (Rising Aff. II, Ex. 3).

23.    Mr. Peter Collis, now the General Manager of AVX's Tantalum Division and AVX's corporate designee under Rule 30(b)(6), repeatedly testified at his deposition in this action that AVX's only complaint in this case is that Cabot insisted in 2000 that AVX enter into a binding, five-year contract to purchase *both* flake *and* nodular tantalum powders in years beyond 2001. 2007 Collis Depo. at 10, 13, 17 (Rising Aff. II, Ex. 1). Mr. Collis further acknowledged that AVX "wished to purchase the [tantalum powders] that we had in the [pre-existing] Letters of Intent." *Id.* at 10-23 (Rising Aff. II, Ex. 1). The Cabot/AVX Letter of Intent called for, *inter alia*, the purchase of 112,000 pounds of nodular powder in 2001 -- four and one-half times the amount of nodular powder that Cabot agreed to sell to AVX that year under the 2001 Supply Agreement, and almost three times the amount of nodular powder that Cabot agreed to sell to AVX in any subsequent year of that Agreement. Letters of Intent (Rising Aff. I, Tab 2).

## **Argument**

I.    THE SUMMARY JUDGMENT STANDARD.

Summary judgment should be only granted if "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 14 (1st Cir. 1996). To succeed in its motion, the moving party "must show that there is an absence of evidence to support the nonmoving party's position." *Id.* at 14 (*quoting* Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990)). Facts are to be viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn in that party's favor. Barbour v. Dynamics Research Corp., 63 F.3d

32, 36 (1st Cir. 1995). As demonstrated below, AVX cannot prove the essential elements of its

tying claim and, therefore, AVX's Motion for Partial Summary Judgment should be denied.

II.    AVX'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED
       BECAUSE AVX'S TYING CLAIM FAILS ON THE UNDISPUTED FACTS AS A
       MATTER OF LAW.

       A.    The Law Of Tying.

       The law governing tying agreements is stated in the First Circuit's two most recent

decisions involving alleged ties: Data General Corp. v. Grumman Systems Support Corp., 36 F.3d

1147 (1st Cir. 1994), and Borschow, supra. The first step in the analysis is to determine whether

there has been a tie. The mere fact that a sale (or a purchase and sale agreement) involves more

than one product does not establish that there was "tying." See, e.g., Tic-X-Press, Inc. v. Omni

Promotions Co., 815 F.2d 1407, 1415 (11th Cir. 1987) ("To establish that two products are in fact

'tied,' a plaintiff must show something more than just that two products were sold together in the

same package."). Rather, the plaintiff must establish that the seller actually conditioned the sale of

one product (the "tying" product) on the purchase of another (the "tied" product). As the First

Circuit explained in Borschow, "[f]or a tie to be shown, a seller must withhold product A unless

the buyer also selects product B. Only after the existence of a tie is shown is it necessary to

determine whether an alleged tying arrangement exists." 96 F.3d at 17 (quoting T. Harris Young

& Assoc. Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 822-823 (11th Cir. 1991)).

       The demonstration of an unlawful tying arrangement also requires proof that the alleged

"conditioning" was accomplished through the use of force or coercion. As the First Circuit stated

in Data General:

            [p]roof of a tying arrangement generally requires evidence that the
            supplier's sale of the tying product is conditioned upon the
            unwilling purchase of the tied product from the supplier or an
            unwilling promise not to purchase the tied product from any other
            supplier. See, e.g., Jefferson Parish, 466 U.S. at 12, 104 S. Ct. at

1558 ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); Wells Real Estate, 850 F.2d at 814 ("Tying arrangements involve the use of leverage over the market for one product . . . to coerce purchases of a second product ...."). In the absence of an explicit tying agreement, conditioning may be inferred from evidence indicating that the supplier has actually coerced the purchase or non-purchase of another product.

36 F.3d at 1180; see also Borschow, 96 F.3d at 17 ("Coercion is an *essential element* of any tying arrangement, *i.e.*, forcing the purchaser or lessor to take the unwanted tied product along with the tied product.") (emphasis added) (*quoting* Cia Petrolera Caribe, Inc. v. Avis Rent-A-Car Corp., 576 F. Supp. 1011, 1016 (D.P.R. 1983), aff'd, 735 F.2d 636 (1st Cir. 1984)).

Notwithstanding the First Circuit's holdings in Data General and Borschow, AVX argues that "coercion" is not an element of a tying claim, relying on carefully selected language from Wells Real Estate v. Greater Lowell Board of Realtors, 850 F.2d 803 (1st Cir. 1988). AVX's Memorandum in Support of its Motion for Partial Summary Judgment ("AVX Memo" (Docket No. 115)) at 9-10. AVX omits, however, the First Circuit's explanation of the language that AVX quotes, which rejects precisely the position that AVX asserts in this case. The Court said (italicized language omitted by AVX):

The Supreme Court has written that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." Hyde, 466 U.S. at 16, 104 S. Ct. at 1560.… *But we read the passage in question not as relevant to the issue of plaintiffs' injury and standing to sue, but as regarding the plaintiffs' showing as to the "not insubstantial" volume of commerce that is foreclosed by the tie.… Otherwise, it would be impossible to reconcile the Supreme Court's language with the clear statement earlier in the same case that invalid tying exists where the buyer is forced "into the purchase of a tied product that the buyer either did not want at*

> *all, **or** might have preferred to purchase elsewhere on different terms.*"  466 U.S. at 12, 104 S. Ct. at 1558 (emphasis added).

<u>Wells Real Estate</u>, 850 F.2d at 814-815.

To the extent that any doubt remains, the Supreme Court explicitly reaffirmed that the use of "force" is an essential characteristic of a tying claim in its recent decision in <u>Illinois Tool Works, Inc. v. Independent Ink, Inc.</u>, 547 U.S. 28 (2006).  It said:

> [o]ur cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Id.* at 34-35 (*quoting* <u>Jefferson Parish Hospital Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12 (1984)).

B.    <u>AVX's Contentions In This Case</u>.

AVX's Complaint alleges that, beginning in August 2000, Cabot told AVX that it would not sell flake tantalum powder or nodular tantalum powder to AVX unless AVX entered a binding long-term contract for the purchase of those products.  Complaint, ¶¶ 23-32, 38.  The Complaint asserts that, in 2000, AVX had pre-existing supply contracts with Cabot (the "Letters of Intent"), but that Cabot nonetheless insisted upon a longer term agreement at higher prices and for smaller quantities than were stated in the prior "contract[s]."[2]  Complaint, ¶¶ 1, 19, 22, 29 and Exhibit A.

When Cabot questioned AVX's Rule 30(b)(6) witness, Mr. Peter Collis, about AVX's tying claim in December 2007, however, Mr. Collis testified that AVX's actual complaint in this case is that AVX was forced by Cabot to enter a binding long-term contract for *any tantalum products*, not that AVX was compelled to buy one product in order to obtain access to another. He said:

---

[2] In <u>Cabot Corp. v. AVX Corp.</u>, the Massachusetts Supreme Judicial Court held, with one exception not relevant here, that the pre-existing Letters of Intent between Cabot and AVX did not constitute binding contracts.  448 Mass. at 640-41 (Rising Aff. I, Tab 11).

Q:  Which of the products that are listed here [in Appendix A to the 2001 Supply Agreement], Mr. Collis, are the products that AVX claims in this litigation it did not wish to purchase from Cabot, but was forced to do so?

[. . . .]

THE WITNESS:  The **-** the basic premise was we were coerced into a five year agreement which we didn't want to get into.

* * *

Q:  So I want to understand this correctly.  Are you saying that AVX did not wish to purchase, as of the time that it entered into this supply agreement with Cabot, it did not wish to purchase any nodular powder from Cabot?

A:  We didn't wish to purchase **-** enter into an agreement to purchase materials for five years.

* * *

Q:  So it [i]s AVX's position that every product that is encompassed by the 2001 Supply Agreement was a product that it believes it was forced to accept on account of Cabot's coercive strategies.  Is that right?

[. . . .]

THE WITNESS:  Yes.  We did not want to enter into a five year agreement.

2007 Collis Depo. at 10, 13, 17 (Rising Aff. II, Ex. 1).

When further questioned at his December 2007 deposition whether there is "more to AVX's complaint in this action other than it was forced by Cabot, allegedly, to sign a contract or a binding contract for delivery of products beyond the calendar year 2001?", Mr. Collis answered "No." 2007 Collis Depo. at 15 (Rising Aff. II, Ex. 1).

C.  Cabot's Insistence On A Binding, Multi-Year Supply Contract Is Not A Tying Violation As A Matter Of Law.

One of the required elements of a tying claim is that there must be two separate products; a tying product and a tied product.  *See* Jefferson Parish, 466 U.S. at 19 (holding that prior Supreme

Court decisions "make it clear that a tying arrangement cannot exist unless two separate product markets have been linked."); *see also* <u>Wells Real Estate</u>, 850 F.2d at 814 ("Tying arrangements involve the use of leverage over the market for one product ... to coerce purchases of a second product."). A product cannot be tied to itself. Thus, it is not a tying violation for a seller to enter a contract that requires a purchaser to buy two units, rather than one unit, of the same thing. Moreover, it is not a tying violation for a seller to require the purchase of one unit of a product in one time period (*e.g.*, a day, a month, or a year), and the purchase of a second unit of the same product in a later time period. Virtually every purchase and sale agreement between businesses involves the sale of multiple units of a product, and many involve the sale of multiple units over extended periods of time. Such agreements are not subject to antitrust tying analysis because they simply do not involve "separate products." As the Supreme Court confirmed in <u>Jefferson Parish</u>:

> The requirement that two distinguishable product markets be involved follows from the underlying rationale of the rule against tying. The definitional question depends on whether the arrangement may have the type of competitive consequences addressed by the rule. The answer to the question whether petitioners have utilized a tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying -- that petitioners have foreclosed competition on the merits *in a product market distinct from the market for the tying item.*

466 U.S. at 20-21 (emphasis added).

In the face of this controlling case law, there is no legal or logical support for the assertion made by AVX, through its Rule 30(b)(6) witness, that it was a "tying" violation for Cabot to insist in 2000 that, in order to purchase the flake and nodular powders that AVX admittedly wished to purchase from Cabot in 2001, that AVX enter into a long-term contract to purchase the *very same* products from Cabot over a five-year period. *See* 2007 Collis Depo. at 10, 13, 17 (Rising Aff. II, <u>Ex. 1</u>). Insistence by the seller on a multi-year contract when the purchaser only wants a one-year contract simply does not implicate the policy underlying the law of tying as articulated by the

Supreme Court in <u>Jefferson Parish</u> because it does not "foreclose[] competition on the merits in a product market *distinct* from the market for the tying item[s]." 466 U.S. at 20-21 (emphasis added). AVX cites no contrary authority because there is none.

In the absence of evidence that Cabot actually conditioned the sale of flake powder on AVX's agreement to also purchase nodular powder (which point is addressed below), the fact that various powder types are encompassed by the 2001 Supply Agreement does not change the result. Cabot's rivals in the tantalum business were free to compete for AVX's nodular powder business when the parties were negotiating that contract in 2000. They also were free to attempt to get AVX to enter a long-term contract for the purchase of tantalum powders from them, rather than from Cabot. A supply contract does not unlawfully "foreclose competition" merely because it binds the purchaser for a defined period of time.

   D.   <u>There Is No Admissible Evidence That Cabot Actually Conditioned The Sale Of Flake Powder On AVX's Agreement To Purchase Nodular Powder.</u>

AVX's tying claim fails for the further reasons that there is no evidence -- let alone any *undisputed* evidence -- that Cabot actually conditioned the sale of flake powder in the 2001 Supply Agreement on AVX's agreement also to purchase nodular powder. To the contrary, the documentary evidence and the testimony of AVX's own witnesses proves exactly the opposite. It is undisputed that tantalum products of all types were in short supply in 2000. Cabot had limited manufacturing capacity. By AVX's own admission, its highest priority in its negotiations with Cabot in late 2000 was the purchase of *nodular* powders for AVX's Biddeford, Maine manufacturing facility. E-mail from J. Gilbertson to B. Rosen, dated Sept. 28, 2000 (Rising Aff. I, Tab 6); Gilbertson Depo. at 86-87 (Rising Aff. II, <u>Ex. 8</u>).

AVX wished to buy more nodular powder for its Biddeford plant than Cabot would agree to sell in 2001, and AVX confirmed that desire by committing in the 2001 Supply Agreement to

purchase an additional 5,000 pounds of nodular powder for Biddeford in 2001 on an "as available" basis.  2001 Supply Agreement, Appendix A (Rising Aff. I, Tab 4).  AVX simultaneously requested tens of thousands of pounds of additional nodular powder for its European operations that Cabot could not, and would not, commit to supply.  Rough Talking Points (Rising Aff. II, Ex. 11); Gilbertson Depo. at 164-166 (Rising Aff. II, Ex. 8).  According to Mr. Gilbertson, AVX's President, AVX "wanted more" nodular powder from Cabot "if [AVX] could get it."  Gilbertson Depo. at 166 (Rising Aff. II, Ex. 8).

In an effort to avoid the entry of summary judgment in Cabot's favor on this issue, AVX recently has submitted the Affidavit of John Chapple, AVX's retired purchasing/materials manager.  *See generally* Chapple Aff. (Docket No. 117).  AVX relies on one sentence in the Chapple Affidavit as its sole "evidence" of Cabot's alleged conditioning.  *See id.*, ¶ 22 ("In the summer of 2000 Hugh Tyler informed me that Cabot would not provide any product to AVX in 2001 unless AVX entered into a five year take or pay agreement to purchase minimum quantities of both flake and nodular products at fixed prices.").  Mr. Chapple's Affidavit does not and cannot support AVX's position, however, for at least two reasons.

First, on August 4, 20006, Mr. Chapple was deposed at length regarding the complete substance of his communications with Mr. Tyler in the summer of 2000, and he made no mention of any alleged threat by Mr. Tyler or Cabot to tie sales of Cabot's flake powder to AVX's agreement also to purchase Cabot's nodular powder.  *See* Chapple Depo. at 14-33 (Rising Aff. II, Ex. 7).  As a matter of law, a party may not rely on the affidavit of a witness to obtain or avoid summary judgment where that affidavit is inconsistent with the testimony of the same witness at his deposition.  *See, e.g.*, Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).

Second, AVX fails to mention that Mr. Tyler's alleged statement -- to the extent that it was made at all -- came in conjunction with Mr. Chapple's pronouncement in the summer of 2000 that AVX badly "wanted" to purchase *both* flake powders *and* nodular powders from Cabot.  Meeting Notes (Rising Aff. II, <u>Ex. 6</u>); Chapple Depo. at 17-21 (Rising Aff. II, <u>Ex. 7</u>).  In this context, Mr. Tyler's statement that, in the future, Cabot only would sell flake powder and nodular powder to AVX under a "five year take or pay agreement" for "minimum quantities" simply does not support AVX's contention that Cabot's sales of those products were conditioned on one another.  To the contrary, as admitted by Mr. Chapple and Mr. Gilbertson at deposition, AVX's greater concern in the summer of 2000 was that Cabot did not have, and would not commit to sell, sufficient nodular powder to fulfill AVX's anticipated needs.  Chapple Depo. at 22-25 (Rising Aff. II, <u>Ex. 7</u>); Gilbertson Depo. at 164-166 (Rising Aff. II, <u>Ex. 8</u>).  Simply put, Cabot did not tie, or even have any need to tie, sales of its flake and nodular powders together.

Similarly, the undisputed evidence establishes that AVX wanted to purchase KTaF from Cabot.  AVX described the purchase of KTaF (which AVX intended to convert into nodular powder) as its second highest priority in late 2000.  E-mail from J. Gilbertson to B. Rosen, dated Sept. 28, 2000 (Rising Aff. I, Tab 6); Gilbertson Depo. at 86-87 (Rising Aff. II, <u>Ex. 8</u>).  It was AVX, not Cabot, that first proposed Cabot sell KTaF to AVX.  E-mail from J. Gilbertson to B. Rosen, dated Sept. 28, 2000 (Rising Aff. I, Tab 6); E-mail from J. Gilbertson to E. Slavitt, dated October 30, 2000 (Rising Aff. I, Tab 7).  Once again, AVX wanted to purchase more KTaF than Cabot would promise to sell in 2001.  As a result, the parties agreed that Cabot would sell at least 246,500 pounds of KTaF to AVX in 2001, and that Cabot would sell an additional 105,500 pounds of KTaF to AVX on an "as available" basis.  2001 Supply Agreement, App. A (Rising Aff. I, Tab 4).  In light of evidence such as this, even AVX's antitrust expert, Dr. Schwartz, admits that

Cabot did not tie sales of its flake tantalum powder to AVX's purchases of KTaF. Schwartz Depo. at 57-59, 134, 154 (Rising Aff. II, Ex. 3).

> E.    Flake And Nodular Tantalum Powders Are Not "Separate Products" For Antitrust Purposes.

AVX makes the erroneous assumption that flake tantalum powder and nodular tantalum powder are "separate products" for antitrust purposes. They are not. Each of Cabot's flake powders and each of Cabot's nodular powders have slightly different electrical properties. However, they are not separate products because they do not compete in separate markets. *See* Jefferson Parish, 466 U.S. at 18-22. Flake and nodular powders are sold to the same customers; *i.e.*, capacitor manufacturers. They are all used in the same products, capacitors. According to Ernest Chilton, the former head of AVX's tantalum operations, AVX had the ability in 2000 to replace Cabot's flake tantalum powder in AVX's capacitor products with nodular powders in "three to six months" if AVX had wished to do so. Chilton Depo. at 54 (Rising Aff. II, Ex. 2). Furthermore, when AVX and other capacitor manufacturers attempt to sell their products to the manufacturers of electronic equipment, different capacitors with different characteristics -- some containing flake powders, some using nodular powders, and some using other materials – also compete with each other. Schwartz Depo. at 77-78, 100-103, 209-212 (Rising Aff. II, Ex. 3). The fact that nodular and flake products can and do serve as substitutes for one another at various levels in the marketplace is strong evidence that they are not "separate products" for antitrust purposes. *See* Jefferson Parish, 466 U.S. at 19. They are, rather, alternative choices in the same market.[3]

---

[3] AVX quotes Cabot's website as stating that "[b]oth the Nodular and Flake type products are produced via a sodium reduction process. These products have high surface area and excellent handling and flow characteristics, which allow capacitor manufacturers to produce small anodes with good weight and capacitance control." AVX Memo at p. 14. These facts do not suggest the flake and nodular powders are separate products. Further, the fact that only Cabot sells flake powder does not mean that flake competes in a market that is separate from the market in which nodular powders compete.

F.     Cabot Does Not Possess "Market Power" For Antitrust Purposes.

Contrary to AVX's assertions, Cabot also does not possess "market power" with respect to its flake tantalum powders.  AVX admits that Cabot's flake powders do not command a higher price in the marketplace than nodular powders.  Chapple Aff., ¶ 13.  Furthermore, the fact that an individual customer -- here, AVX -- prefers or "needs" a particular product does not mean that the seller has market power in that product.  *See, e.g.,*  Grappone, Inc. v. Subaru of New England Inc., 858 F.2d 792, 796-797 (1st Cir. 1988) ("[A] seller who has the power to raise prices only in respect to [a] special handful [of buyers] is a seller who cannot easily cause harm in *tied* product markets…. Of course, virtually every seller of a branded product has *some* customers who especially prefer its product.  But to permit that fact alone to show market power is to condemn ties that are bound to be harmless ….").  For example, AVX's Biddeford, Maine plant sold capacitors to particular medical and military equipment manufacturers for use in specific end products.  The Biddeford capacitors incorporated nodular powders.  Yet, AVX does not (and could not) assert that Cabot has market power in nodular powders.

The fact that Cabot holds certain patents on the manufacture of flake powder does not mandate a different result.  As a matter of law, Cabot's patents on methods of producing flake powder do not mean that it has "market power" in any market.  *See* Illinois Tool, 547 U.S. at 45-46.

G.     Cabot's Conduct Did Not Foreclose A Substantial Amount Of Commerce In The Market For Tantalum Powders.

Lastly, AVX argues that Cabot's alleged conduct foreclosed a substantial amount of commerce in the "market" for nodular powder.  Any such foreclosure must, of course, be a result of an unlawful tying arrangement, and not due merely to the existence of a binding supply contract extending for a period of years.  AVX's argument, however, is that a substantial amount of

commerce was foreclosed simply because AVX entered into the 2001 Supply Agreement, thereby foreclosing Cabot's competitors from selling their tantalum products to AVX in place of Cabot's. AVX Memorandum of Law filed in Support of its Motion for Partial Summary Judgment (Doc. No. 115) at 16-19.   AVX cites no case in support of the proposition that a "foreclosure" of commerce of this type is sufficient to establish an unlawful tying agreement.   AVX does not because there is none.

## <u>Conclusion</u>

For the foregoing reasons, Cabot respectfully submits that AVX's Motion For Partial Summary Judgment should be denied in its entirety.

CABOT CORPORATION

By its attorneys,

*/s/ Brian A. Davis*
Robert S. Frank, Jr. (BBO No. 177240)
    (rfrank@choate.com)
Brian A. Davis (BBO No. 546462)
    (bad@choate.com)
Julie C. Rising (BBO No. 666950)
    (jrising@choate.com)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

Date:   May 9, 2008

4329128.1

-20-

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on May 9, 2008.

*/s/ Julie C. Rising*
Julie C. Rising

4329128v1