UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AVX CORPORATION and AVX LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-10467-RGS |
| CABOT CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT CABOT CORPORATION'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendant Cabot Corporation ("Cabot") hereby submits the following responses to plaintiffs AVX Corporation and AVX Ltd.'s (collectively, "AVX") Concise Statement of the Material Facts filed in Support of their Motion for Partial Summary Judgment ("AVX SOF") (Doc. No. 116) for purposes of this proceeding only.

Specific Facts And Responses

1.      Plaintiff AVX CORPORATION is a Delaware corporation with a principal place of business in South Carolina. Plaintiff AVX LIMITED is a wholly owned subsidiary of AVX CORPORATION incorporated under the laws of the United Kingdom with its principal place of business in the United Kingdom (AVX CORPORATION and AVX LIMITED are collectively referred to as "AVX"). AVX is one of the world's largest manufacturers and suppliers of

tantalum capacitors, passive components that store electricity and are used in a variety of electronic devices.    AVX has numerous production facilities worldwide, including manufacturing operations located in Biddeford, Maine, in Paignton, England, in Lanskroun, the Czech Republic and in El Salvador.  Cabot's March 31, 2008 Statement of purported material facts, docket entry 111,¶¶ 1-4.

     **Response:**    Cabot does not dispute the statements contained in Paragraph 1.

     2.     Defendant Cabot Corporation is a Delaware corporation headquartered in Boston, Massachusetts ("Cabot").  *Id.*  Cabot manufactures and supplies chemicals and engineered materials to a range of industries.  *Id.*  Cabot's Supermetals Division manufactures and sells electronic-grade tantalum which is used primarily for manufacturing capacitors that store electrical charge in electronic devices used in both specialized and commodity applications, such as among others, cell phones, computer processors, medical devices, military equipment including jets and missiles, automotive control devices, computer servers and networks, and manufacturing controls.  *See* Cabot website at www.cabot-corp.com/ (last visited April 8, 2008). (Relevant excerpts taken from Cabot's website are appended to the accompanying Affidavit of Joseph S.U. Bodoff, Esq., dated April 9, 2008 (the "Bodoff Aff.").  Bodoff Aff. Exh. 1.  Because tantalum forms a dense, stable, tightly adhering, electrically insulating oxide, tantalum capacitors have a much higher ability to store electricity in a much smaller space than those made from other materials.  Bodoff Aff. Exh. 2 at ¶ 4.  According to Cabot, tantalum accounts for "substantially all" of its Supermetals Division sales.  Bodoff Aff. Exh. 3, pp. 7-8.  In 2005, Cabot's Supermetals business accounted for approximately 25% of Cabot's overall gross profits. Bodoff Aff. Exh. 4, p. 32.

     **Response:**    Cabot does not dispute the statements contained in Paragraph 2.

4328423v1

3.     Cabot sells electronic-grade tantalum in wire and powder forms.  Bodoff Aff.

Exh. 1.  Cabot sells tantalum powder in three forms, angular or electron beam, flake and nodular

varieties.  *Id.*  Cabot's website describes its three capacitor-grade tantalum powder products as

follows:

> Capacitor-grade tantalum powders from Cabot are used to make
> high reliability capacitors for cellular phones, computers and
> numerous other electronic devices.
>
> Featuring capacitance up to 200,000 CV/g, our powders have
> enabled tantalum capacitor manufacturers to yield better
> performance in the same size parts and pack more performance
> into smaller packages.
>
> Cabot produces three types of capacitor-grade tantalum powder:
> Angular (EB), Nodular and Flake.
>
> The Angular or EB type powders are manufactured using an
> electron beam melting process.  These powders contain both
> angular and flake shaped particles which have been agglomerated
> to a specified surface area and capacitance range.
>
> Both the Nodular and Flake type products are produced via a
> sodium reduction process.  These products have high surface area
> and excellent handling and flow characteristics, which allow
> capacitor manufacturers to produce small anodes with good weight
> and capacitance control.
>
> The Flake product is unique to Cabot.  This powder type is
> manufactured using our patented process to generate a flake
> shaped product which extends the capability range into mid-
> voltage applications.

Bodoff Aff. Exh. 1.

**Response:**     Cabot does not dispute the statements contained in Paragraph 3.

4.     Cabot has patents on flake. Bodoff Aff. Exh. 5.  According to Cabot,

> Flake capacitor powders have the inherent potential to achieve
> higher CV/g at a given formation voltage as compared to nodular
> powders ... [and] offer inherent advantages over nodular products
> in high voltage applications.  Specifically, the optimal CV/g and

3

> lower DC leakage provide the capacitor manufacturers unique
> capabilities in their anode designs.

Bodoff Aff. Exh. 6.

Cabot markets its tantalum flake product as unique in the industry. *Id.*; Bodoff Aff. Exh. 7, AVX

Counterclaim ¶ 12, Cabot Reply ¶ 12, *Cabot Corp. v. AVX CORP.*, Suffolk Superior Court CA

03-1235- BLS; *See also* Bodoff Aff. Exh. 8, p. 44 ("Cabot's flake powders [are] unique...

[because they] able to achieve a high CV at high voltage and ... [their] ability to provide low

ESR and high surge resistance.").

**Response:**     Cabot does not dispute the statements contained in Paragraph 4 (not

including any purported facts contained in the quoted language, which Cabot admits is accurately

quoted).

5.     At all relevant times Cabot has been the sole worldwide source of flake powder

products. Bodoff Aff. Exh. 9, pp. 34-36; Chapple Aff ¶ 8.

**Response:**     Cabot disputes the statements contained in Paragraph 5 as unsupported by

the record citations provided. Cabot states that the testimony of Mr. William Young cited in

Paragraph 5 actually reflects Mr. Young's testimony that in 2000, "the only place in the world

AVX could get C255 or 275 was Cabot." Bodoff Aff., Ex. 9, p. 35. Cabot does not dispute that

the flake form of tantalum powder is unique to Cabot. Bodoff Aff., Ex. 1.

6.     From the mid 1990's until February 2002 Cabot was one of four principal

suppliers of electronic-grade tantalum products in the world; the other three were H.C. Starck of

Germany ("Starck"), Ningxia Non-Ferrous Metals of China ("Ningxia") and Showa-Cabot of

Aizu, Japan, a 50-50 joint venture between Cabot and Showa Denko KK of Japan ("Showa").

Chapple Aff. ¶ 3; Bodoff Aff. Exh. 10, p. 24. In February 2002 Cabot acquired the other half

interest in Showa which as a wholly owned subsidiary then continued to sell electronic-grade tantalum products. Bodoff Aff. Exh. 9, p. 20.

**Response:**    Cabot does not dispute the statements contained in Paragraph 6.

7.    As of 2000 according to industry reports, the respective market shares of the four dominant players were Starck 32.09 %, Cabot 27.6%, Showa 25.03% and Ningxia 14.76%. Bodoff Aff. Exh. 11.    Each of Cabot, Starck and Ningxia produce their respective tantalum products from ore by initially producing or purchasing a semi-refined material called KTaF which is then further processed into manufactured products.    *See* Cabot's Statement of Purported Material Facts, ¶ 7, docket entry 111.    At all material times Cabot was obligated by contract to provide Showa with the KTaf Showa required to manufacture Showa's nodular tantalum products.    Bodoff Aff. Exh. 12, pp. C(FED) 095338-63, 095379- 99,095410-423 at C(FED) 095422 (Cabot "will sell to us [Showa] ore and potassium tantalum fluoride as are necessary for the manufacture of tantalum products by us ...".).

**Response:**    Cabot disputes the statements contained in Paragraph 7 to the extent they are unsupported by the record citations provided.    Cabot further states that the market shares described in the first sentence of Paragraph 7 are derived from the report of AVX's antitrust expert in this matter, and therefore are opinion and not fact.    According to the referenced source, in 2000, the percentage of market shares were estimated from the respective companies' reported sales of tantalum powder only.    Bodoff Aff., Ex. 10.    Cabot does not dispute that the percentages listed in Paragraph 7 appear in a third-party report cited by AVX's expert.    Bodoff Aff., Exs. 10 and 11.    In the last sentence of Paragraph 7, the phrase "all material times" is not defined and therefore Cabot cannot admit or deny the statements made regarding its supply of KTaF to Showa.    Cabot does not dispute that it agreed to supply certain quantities of KTaF to Showa

pursuant to the terms and conditions set forth in the Joint Venture Agreement, attached to the Bodoff Aff. as Exhibit 12, and further states that the document speaks for itself.

8.     At all material times the principal buyers of electronic-grade tantalum products have been the world's four largest tantalum capacitor manufacturers, AVX, Vishay Sprague, Inc. and affiliates ("Vishay"), Kemet Electronics ("Kemet") and EPCOS ("Epcos").  Chapple Aff ¶ 4; Bodoff Aff. Exh. 13.   In 2000 Cabot considered AVX to be the "world's largest tantalum capacitor manufacturer."  Bodoff Aff. Exh. 14.

**Response:**     Cabot disputes the statements contained in Paragraph 8 to the extent they are unsupported by the record citations provided.  Cabot does not dispute that AVX, Kemet, Vishay and Epcos were four of the largest tantalum capacitor manufacturers and buyers of capacitor-grade tantalum products, but cannot admit or dispute whether it was "at all material times" since that term is not defined.  Cabot does not dispute that in 2000, Thomas Odle, Vice President and General Manager of Cabot Performance Materials (now part of Cabot Supermetals), wrote a letter in which he referred to AVX as "the world's largest tantalum capacitor manufacturer."  Bodoff Aff., Ex. 14.

9.     Prior to 2001 AVX purchased tantalum products from Showa, Starck, Ningxia and Cabot under so-called letters of intent in which the supplier quoted a price usually for one year for each of its products and AVX estimated its need for the desired products of each supplier.  Chapple Aff. ¶ 17.  Prior to 2001 Cabot would offer and sell its flake products to AVX regardless of how much of Cabot's nodular products AVX purchased.  *Id.*

**Response:**     Cabot disputes the statements contained in Paragraph 9 to the extent they are unsupported by the record citations provided.   Cabot further states that AVX's characterization of the letters of intent is unsupported by the record.  Cabot disputes the assertion

in the last sentence of Paragraph 9 to the extent it implies that Cabot ever tied or conditioned AVX's purchases of Cabot's flake powder on AVX's purchases of Cabot's nodular powder, which assertion is not supported by the record.

10.    Beginning in the 1990's at Cabot's encouragement AVX designed, developed and secured end user approvals for capacitors that because of size constraints, high reliability requirements and unique performance characteristics AVX could only make with flake.  *Id.* ¶ 5. It was generally known that Vishay, Kemet and Epcos had also developed products that could only be made with Cabot's flake.  *Id.* ¶ 6.

**Response:**    Cabot disputes the statements contained in Paragraph 10 because they reflect the opinion of Mr. Chapple without any evidence of his personal knowledge and are unsupported by any documentary or testimonial evidence.  Cabot further states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of the capacitor products that use flake.  *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000, attached to the May 9, 2008 affidavit of Julie C. Rising ("Rising Aff. II"), filed contemporaneously herewith, as Ex. 4; Deposition of Peter Collis, dated August 8, 2006 ("2006 Collis Depo.") at pp. 67-68 (Rising Aff. II, Ex. 5).  *See also* Deposition of Robert J. Fairey, dated July 11, 2003 ("Fairey Depo."), at pp. 45-48 (relevant excerpts are appended to the Rising Aff. II at Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Deposition of William A. Millman, dated November 19, 2007 ("Millman Depo."), at pp. 47-49 (relevant excerpts are appended to the Rising Aff. II at Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Responses to AVX's Interrogatories 12 and 13, Exhibit A, dated October 30, 2007 ("Cabot's Supplemental Interrogatories") (a true copy of

which is appended to Rising Aff. II at Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products).  Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so.  Deposition of Ernest Chilton, dated Sept. 11, 2006 ("Chilton Depo.") at pp. 53-54 (Rising Aff. II, Ex. 2).

11.    From the late 1990's through 2000 AVX purchased both flake and nodular products from Cabot.  *Id.* ¶ 15.  Most of the nodular products were for AVX's Biddeford facility and the flake products with minor exception were for AVX's European plants.  *Id.*  In the mid to late 1990's AVX turned down Cabot's request that AVX enter into a long term contract committing to purchase specific amounts of specific products.  *Id.* ¶ 18.  Cabot always charged AVX separate prices for its flake products and its nodular products.  *Id.* ¶ 17.  Both AVX purchase orders and Cabot invoices always featured separate line items for each flake product at a stated price and each nodular powder product or a tantalum wire product, at a separately stated price.  *Id.*

**Response:**    Cabot does not dispute the statements contained in Paragraph 11.

12.    Under its 2000 contract with Epcos Cabot sold nodular products but no flake products.  Bodoff Aff. Exh. 15.

**Response:**    Cabot does not dispute the statements contained in Paragraph 12.

13.    AVX always sought to secure more than one source for all the materials required to make AVX's capacitors.  Chapple Aff. ¶ 9.  For example AVX's European operations used non-flake or nodular products for most of the capacitors they manufactured.  *Id.*  For a number of these needs AVX purchased comparable powders from Showa, Starck and/or Ningxia.  *Id.*  AVX

purchased three specific flake products from Cabot, C-250, C-255 and C-275, with C-255 and C-275 being the principal ones from the late 1990's to 2007. *Id.*

    **Response:**    Cabot does not dispute the statements contained in Paragraph 13.

14.    As of 2000 for approximately half of the C-255 applications AVX had no commercially reasonable nodular substitutes that could be used and were or might be accepted by end users. Chapple Aff. ¶ 9; *See* Bodoff Aff. Exh. 8, pp. 47, 161-62 ("There are specific codes, there are specific part numbers, that it's impossible to make the same product performance, the capacitance, ESR, physical size, surge resistance, surge robustness, without flake.") ("there were cases where a flake-based technology will be competing with a nodular-based technology. But then there are other circumstances, such as down-sized components where, for example, traditionally, it's available only in a D case and we'll make it available in a C case or a smaller case. Or we will put capacitance into that same larger case size and make that available. In those cases, for periods of time, there were no alternatives in terms of nodular-based solutions.").

    **Response:**    Cabot disputes the statements contained in Paragraph 14 as unsupported by the record citations provided. Cabot further states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of AVX's capacitor products that use flake. *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, Ex. 5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories

(Rising Aff. II, <u>Ex. 17</u>) (chart showing alternatives to Cabot's flake and nodular powder products). Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so. Chilton Depo. at pp. 53-54 (Rising Aff. II, <u>Ex. 2</u>).

15.    For some AVX capacitors made with flake such as for example for military applications such as F-22 jet planes, missiles and medical applications such as pacemakers, even if a potential substitute might be technically feasible, securing design change approval from the end user would be most unlikely or at best problematic for lack of a proven history of reliability. *See* Bodoff Aff. Exh. 8, pp. 25, 88-89 (flake used for automotive applications "to provide extra reliability"), (AVX had "obligations under those contracts to supply that product. They can't suddenly decide... [to] do a complete redesign. You can't make a change to an F-22 in a short period of time. And we also used flight materials to supply products for the military, the U.S. military and the British military, as well as medical devices, and these require an act of Congress to change designs."), ( flake used for military applications as "alternative[s are] ...not proven, and that's the problem. With the military and the medical guys, what they totally rely upon is proven history. So they establish field life component reliability and they then really hate change. They really don't want any change at all.").

**Response:**    Cabot disputes the statements contained in Paragraph 15 as unsupported by the record citations provided. Cabot states that whether a "potential substitute might be technically feasible" is a matter of opinion and not fact. Cabot further states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of the capacitor products that use flake. *See, e.g.,*

E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, Ex. 5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products).  Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so.  Chilton Depo. at pp. 53-54 (Rising Aff. II, Ex. 2).

16.    As of 2000 AVX had no substitutes for Cabot's C-275 flake product.  Chapple Aff. ¶ 10.  By 2007 AVX has been able to develop some alternatives to Cabot's C-275 but only "in limited, small number of circumstances."  Bodoff Aff. 8, p. 171.  ("Even today, ... [AVX does] not have alternates that we would consider appropriate for our customers in some areas where flake is the only product that we can rely upon.  Even today, after seven years.").  Bodoff Aff. Exh. 8, p. 180.

**Response:**    Cabot disputes the statements contained in Paragraph 16 as contrary to the record.  Cabot states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of the capacitor products that use flake.  *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, Ex. 5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-

11

49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products). Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so. Chilton Depo. at pp. 53-54 (Rising Aff. II, Ex. 2).

17. By the mid to late 1990's and as of 2000 AVX had developed designs for capacitors made with flake that were approved for use in a number of high voltage applications by end users. Chapple Aff. ¶ 7. Cabot's flake products were at all times utilized by AVX for specific purposes that were different in relevant performance degrees, capabilities and reliability from all nodular products produced by Cabot and all other tantalum product suppliers. *Id.* AVX has never used flake and nodular products in an integrated manner, in the same capacitor or to complement one another. *Id.* ¶ 12. As of 2000 AVX had commitments to deliver capacitors and approved capacitor designs that could only be met with Cabot's flake products. Chapple Aff. ¶¶ 9, 22; Bodoff Aff. Exh. 23, p. 31 ("our immediate concern was getting material to satisfy the commitments we had made to our customers."); ¶ 26 *infra*. Upon information and belief as of 2000, Vishay, Kemet and some other tantalum capacitor manufacturers also had capacitor designs that could only be made with Cabot's flake products. Chapple Aff ¶ 11.

**Response:** Cabot disputes the statements contained in Paragraph 17 as contrary to the record. Cabot states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of the capacitor products that use flake. *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, Ex.

4328423v1

5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products). Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so. Chilton Depo. at pp. 53-54 (Rising Aff. II, Ex. 2).

18.    The letters of intent between Cabot and AVX always separately listed Cabot's flake products at stated prices and separately listed Cabot's other tantalum products, including Cabot's nodular products at stated prices. *See, e.g.*, Bodoff Aff. Exh. 16; Chapple Aff. ¶ 17. At all times material hereto AVX's purchase orders and Cabot's invoices to AVX separately listed Cabot's flake products, the quantities and stated prices and Cabot's nodular products, the quantities and stated prices. *Id.*

**Response:**    Cabot disputes the statements contained in Paragraph 18 to the extent they purport to establish that the products, quantities and prices set forth in the letters of intent between Cabot and AVX were binding on the parties. Cabot states that the Massachusetts Supreme Judicial Court has held in prior related litigation between the parties that those letters of intent, with one exception not relevant to this action, did not constitute binding contracts. Cabot Corp. v. AVX Corp., 448 Mass. 629, 640 (2007) (attached as Tab 11 to the Affidavit of Julie Rising, dated March 31, 2008 ("Rising Aff. I" (Docket No. 112)). Cabot otherwise does not dispute the statements contained in Paragraph 18.

19.    Cabot's flake products are separate and distinct products in the marketplace of manufacturers of electronic capacitors.  *See* Chapple Aff. ¶ 7.  Cabot's flake products C-255 and C-275 are manufactured to precise raw material specifications with limited acceptable ranges of Physical characteristics, Electrical characteristics, Sintering profiles, Wet DCL, CV/gram, BDV, and Chemical characteristics (e.g., HIGHLY CONFIDENTIAL C(A 056541-42-Not filed).  *See* Chapple Aff. ¶¶ 5, 7.

**Response:**    Cabot disputes the statements contained in Paragraph 19 as contrary to the record.  Cabot states that the established record shows that the "market" for tantalum powders generally is viewed as including both flake tantalum powder and nodular tantalum powder.  *See e.g.*, Bodoff Aff., Ex. 16 (Letter of Intent categorizing products as "Tantalum Powder" and "Tantalum Wire"); Bodoff Aff., Ex. 10 (Paumanok Report titled "Tantalum Ore, Powder & Wire Markets Worldwide: 2005-2010").  Cabot further states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of the capacitor products that use flake.  *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, <u>Ex. 4</u>); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, <u>Ex. 5</u>); Fairey Depo. at pp. 45-48 (Rising Aff. II, <u>Ex. 15</u>) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-49 (Rising Aff. II, <u>Ex. 16</u>) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, <u>Ex. 17</u>) (chart showing alternatives to Cabot's flake and nodular powder products).  Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so.  Chilton Depo. at pp. 53-54 (Rising Aff. II, <u>Ex. 2</u>).  AVX's expert, Dr.

Steven Schwartz, also has testified that capacitors made with flake, nodular, and other materials all compete with one another in the marketplace. Schwartz Depo. at pp. 77-78, 100-103, 209-212 (Rising Aff. II, Ex. 3).

20.    From the late 1990's through 2000 AVX purchased for its European plants substantial quantities of nodular products from Showa, including particularly S-506 a 50,000 CV/GRM nodular powder product and S300 a 40,000 CV/GRM nodular powder product. Chapple Aff. ¶ 16; Bodoff Aff. Exh. 17. These two Showa products were considered best in class. Bodoff Aff. Exh. 9, p. 39 ("The [Showa] S506 was a world-class 50,000 CV per gram powder, the [Cabot] 606 was not a world-class 50,000 CV per gram powder."); Bodoff Aff. Exh. 8, pp. 21-22 ("Showa Cabot ... best in class, ...and ... a preferred supplier. If I look at Cabot and Cabot materials, then they would typically be middle of the road ranking and not ... a preferred supplier ..."); *See* Chapple Aff. ¶ 16. In 2000 Cabot encouraged AVX to purchase its C-606, a 50,000 CV/GRM nodular power product, intended according to Cabot to compete with Showa's S-506 nodular product. *Id.* AVX agreed to give the C-606 nodular product a try subject to the product meeting AVX's specified Raw Materials Specifications (the "RMS"). *Id.* Cabot's C-606 was somewhat more expensive than Showa's S-506. *Id.* But the C-606 never met AVX's RMS. *Id.*

**Response:**    Cabot does not dispute the statements contained in Paragraph 20.

21.    Prior to 2001 AVX had never purchased KTaf from Cabot or any other supplier and had always purchased finished products. Chapple Aff. ¶ 21. In 2000 Showa informed AVX while it had sufficient capacity because Cabot was limiting its supply of KTaf, Showa was unsure it could meet AVX's needs going forward. *Id.* The quantity of finished product resulting from tolling or further processing the KTaf is approximately 40 percent. Bodoff Aff. Exh. 18.

4328423v1

**Response:**    Cabot does not dispute the statements contained in the first sentence of Paragraph 21.  Cabot disputes the statements contained in the second sentence of Paragraph 21 as contrary to the record.  Cabot's designated representative under Rule 30(b)(6) has testified that Showa's concern in approximately 2000 regarding its future supply of KTaF was due to a general industry shortage of KTaF, and not because Cabot was arbitrarily limiting Showa's supply of KTaF.  *See* Deposition of Marlin Spotts, dated April 3, 2008 ("Spotts Depo."), at pp. 65-66 (relevant excerpts are appended to the Rising Aff. II at Ex. 18).  Cabot disputes the fact set forth in the last sentence of Paragraph 21 because, according to AVX's designated representative under Rule 30(b)(6), KTaF converts to finished nodular powder at a ratio of approximately three pounds of KTaF to one pound of nodular powder.  2006 Collis Depo. at pp. 24-25 (Rising Aff. II, Ex. 5).

22.    In August 2000 Cabot informed AVX that "without a long term supply contract, Cabot would not be able to supply tantalum powder or wire to AVX in 2001 and beyond." Bodoff Aff. Exh. 19.

**Response:**    Cabot disputes the quotation set forth in Paragraph 22 as inaccurate. Cabot does not dispute that, on August 7, 2000, Mr. Thomas Odle of Cabot wrote to Mr. John Gilbertson of AVX and informed him that "without a contract, I do not believe [Cabot] will be able to meet [AVX's] needs in [2001 and beyond]."  Letter of T. Odle to J. Gilbertson, dated August 7, 2000 (Rising Aff. I, Tab 3).  Mr. Odle further stated in the same letter that Cabot was "seek[ing] partners that will sign long term agreements and share the risks of mining, exploration, and the high cost of inventory management as well as R&D in this business."  *Id*.

23.    On August 11, 2000 Cabot predicated discussions with AVX on AVX's entry into a five year take or pay contract for both flake products and nodular products with the quantities and prices to be negotiated.  *See* Bodoff Aff. Exh. 20.

**Response:**    Cabot disputes the statements contained in Paragraph 23 to the extent that they are intended to establish that Cabot conditioned its contract discussions with AVX in 2000 on AVX's commitment to purchase both flake tantalum powder and nodular tantalum powder from Cabot in the future.   Cabot's designated representative under Rule 30(b)(6) has testified that no such conditioning occurred.  *See* Spotts Depo. at pp. 8-10 (Rising Aff. II, Ex. 18).  Cabot does not dispute that, on August 7, 2000, Mr. Thomas Odle of Cabot wrote to Mr. John Gilbertson of AVX and invited AVX to engage in negotiations for a binding, long-term contract for the supply of tantalum products.  Letter of T. Odle to J. Gilbertson, dated August 7, 2000 (Rising Aff. I, Tab 3).  Mr. Odle further stated in the same letter that, "without a contract, I do not believe [Cabot] will be able to meet [AVX's] needs in [2001 and beyond]," and that Cabot was "seek[ing] partners that will sign long term agreements and share the risks of mining, exploration, and the high cost of inventory management as well as R&D in this business."  *Id*.

24.    In late August or early September 2000 Hugh Tyler of Cabot again informed AVX that Cabot would not provide any product to AVX in 2001 unless AVX entered into a five year take or pay agreement to purchase minimum quantities of both flake and nodular products at fixed prices.  Chapple Aff. ¶ 22.  On or about September 1, 2000 and later in September AVX informed Cabot that AVX's European plants had to have Cabot's flake products and that without flake AVX would be mortally injured.  *Id*.  On more than one occasion in September 2000 Hugh Tyler of Cabot informed AVX that it would get no flake in 2001 unless AVX entered into five year take or pay contract.  *Id*.  In late September 2000 Hugh Tyler of Cabot informed AVX it

4328423v1

was non-negotiable that there would be no flake for AVX for 2001 unless AVX entered into a

five year take or pay contract.  *Id.*

>    **Response:**    Cabot disputes the statements contained in Paragraph 24 to the extent that

they are intended to establish that Cabot conditioned its contract discussions with AVX in 2000

on AVX's commitment to purchase both flake tantalum powder and nodular tantalum powder

from Cabot in the future.   Cabot's designated representative under Rule 30(b)(6) has testified

that no such conditioning occurred.  *See* Spotts Depo. at pp. 8-10 (Rising Aff. II, Ex. 18).  Cabot

does not dispute that on various occasions in the summer and fall of 2000, Mr. Earl "Hugh"

Tyler of Cabot informed AVX personnel that AVX's purchases of tantalum products from Cabot

in 2001 and subsequent years would have to be made pursuant to a long-term, binding contract

for minimum, agreed-upon quantities.


>    25.    Cabot understood that by denying Paignton the flake, AVX "[was] left ... in an

intolerable position."  Bodoff Aff. Exh. 21.  According to Cabot that AVX was "frantic for C-

275 and C-255 ... [was a] really a big stick in [Cabot's] "negotiations" with [AVX]...". Bodoff

Aff. Exh. 22.

>    **Response:**    Cabot disputes the statements contained in Paragraph 25 as contrary to the

record.  Cabot states that the established record shows there are various nodular powders that

have a high capacitance that could serve as substitutes for flake powder in many, if not all, of

AVX's capacitor products that use flake.  *See, e.g.,* E-mail from Peter Collis to John Gilbertson,

dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II,

Ex. 5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic

capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-

49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in

less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products). Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so. Chilton Depo. at pp. 53-54 (Rising Aff. II, Ex. 2).

26.    In 2000 AVX had some contracts that could only be satisfied with capacitors made with Cabot's flake products. Bodoff Aff. Exh. 8, pp. 176-77.

**Response:**    Cabot disputes the statements contained in Paragraph 25 as contrary to the record. Cabot states that the established record shows there are various nodular powders that have a high capacitance that could serve as substitutes for flake powder in many, if not all, of AVX's capacitor products that use flake. *See, e.g.,* E-mail from Peter Collis to John Gilbertson, dated September 23, 2000 (Rising Aff. II, Ex. 4); 2006 Collis Depo. at pp. 67-68 (Rising Aff. II, Ex. 5); Fairey Depo. at pp. 45-48 (Rising Aff. II, Ex. 15) (testifying that high voltage ceramic capacitors compete with and could be substituted for flake capacitors); Millman Depo. at pp. 47-49 (Rising Aff. II, Ex. 16) (AVX customers could design out AVX's flake-based capacitors in less than a year); Cabot's Supplemental Interrogatories (Rising Aff. II, Ex. 17) (chart showing alternatives to Cabot's flake and nodular powder products). Indeed, Mr. Ernest Chilton, the former head of AVX's Tantalum Division, has testified that, "depending on priorities," AVX could replace Cabot's flake powders in its products in "three to six months" if AVX wished to do so. Chilton Depo. at pp. 53-54 (Rising Aff. II, Ex. 2).

27.    Desperate for flake AVX agreed to negotiate terms of a five year take or pay contract. Chapple Aff. ¶ 22. In October 2000 AVX commenced negotiations with Cabot as to the quantities of flake products, nodular products and KTaf and the prices to be paid over five

years under a five year contract as required by Cabot.  Chapple Aff. ¶ 23.  In January 2001 the

five year Supply Agreement was signed by Cabot and AVX.  *Id.*  Bodoff Aff. Exh. 23.

     **Response:**     Cabot disputes the statements contained in Paragraph 27 to the extent that

they are intended to establish that AVX only entered into contract negotiations with Cabot in

2000 in order to acquire Cabot's flake tantalum powder.  Mr. John Gilbertson, AVX's President

and primary negotiator of the 2001 Supply Agreement, has testified that AVX's highest priority

in its negotiations with Cabot was the purchase of 20,000 to 30,000 pounds per year of nodular

powder for use at AVX's Biddeford, Maine facility.  Deposition of John Gilbertson, dated

August 22, 2006 ("Gilbertson Depo.") at pp. 86-87 (Rising Aff. II, <u>Ex. 8</u>); *see also* E-mail from

J. Gilbertson to B. Rosen, dated Sept. 28, 2000 (Rising Aff. I, Tab 6).  Cabot does not dispute

that formal negotiations between Cabot and AVX commenced in October 2000, and that the final

2001 Supply Agreement was executed by the parties in January 2001.

     28.     At no time in the period from commencement of negotiations of the terms as to

how much and at what prices for both flake and non-flake products did Cabot ever offer to sell

AVX flake for 2001 either without any condition or separately without the commitment to

purchase nodular products.  *Id.*

     **Response:**     Cabot disputes the statements contained in Paragraph 28 to the extent that

they are intended to establish that Cabot conditioned its contract discussions with AVX in 2000

on AVX's commitment to purchase both flake tantalum powder and nodular tantalum powder

from Cabot in the future.   Cabot's designated representative under Rule 30(b)(6) has testified

that no such conditioning occurred.  *See* Spotts Depo. at pp. 8-10 (Rising Aff. II, <u>Ex. 18</u>).

29.    The Supply Agreement entered into in January 2001 required AVX to purchase nodular products for Europe which AVX would have preferred to have purchased from Showa, Starck or Ningxia.  Chapple Aff. ¶ 26.

**Response:**    Cabot disputes the facts in Paragraph 29 because they are only supported by the opinion of Mr. Chapple and describe events for which Mr. Chapple has no personal knowledge.  Cabot further responds that Cabot reduced the amount of nodular powder that AVX wanted to purchase from Cabot under the 2001 Supply Agreement, and could not commit to provide the amounts that AVX was seeking.  Cabot SOF at ¶¶ 17-19; Gilbertson Depo. at pp. 151-152, 165-66 (Rising Aff. I, Tab 5); 11/2/2000 Odle e-mail (Rising Aff. I, Tab 8).

30.    As it did with AVX, upon information and belief, Cabot also required each of Vishay, Kemet and Epcos to enter into a long term take or pay contract as a condition of obtaining any product in 2001.  Chapple Aff. ¶ 24.

**Response:**    Cabot does not dispute the facts in Paragraph 30 except to the extent they are only supported by the opinion of Mr. Chapple and describe events for which Mr. Chapple has no personal knowledge.  Responding further, Cabot asserts that it had made the decision to enter into contracts for Tantalum Products only with those customers who were willing to enter into binding, long-term supply agreements at increased prices.  Cabot SOF, ¶ 12; Young Aff., ¶7. Cabot does not dispute that it entered into long term take or pay contracts with Vishay, Kemet and Epcos.

31.    Of the total supply market for all tantalum powder and wire products in 2000, Cabot (27.6%), Showa (25.03%), Starck (32.09%) and Ningxia (14.76%) constituted all but 1%. Bodoff Aff. Exh. 11.  By 2004 Cabot (including then wholly owned Showa) had 66% of the market, with Starck down to 23% and Ningxia to 10%.  *Id.*  According to the 2005 Paumanok

report "[t]antalum powder and wire sales to the capacitor industry declined at ... Starck between 2000 and 2004 as a direct result of the 'take or pay' contracts initialized by their chief rival-Cabot Corporation."   Bodoff Aff. Exh. 10, p. 28.   Cabot's actions in tying up the major purchasers of tantalum products for several years limited competition in the market for nodular products.   Bodoff Aff. Exh. 24, pp. 21-22 ("when Cabot entered into long-term supply agreements with the three major players in the market, that being AVX, Vishay and Kemet, there was a tremendous lock on the available material in order to make tantalum capacitors, so it lessened competition in those three parties' ability to get market-based material for a long period of time.").   Because of the requirements of the Supply Agreement AVX one of the largest buyers in the world of nodular products was prevented from purchasing nodular products for its European operations from its preferred suppliers.   Chapple Aff. ¶ 26.

 **Response:**    Cabot disputes the first two sentences of Paragraph 31 because they are based on exhibits from the report of AVX's expert and are therefore opinion and not fact.   Cabot does not dispute that the Paumanok report referenced in sentence 3 is accurately quoted.   Cabot disputes the fourth sentence of Paragraph 31 because whether any of Cabot's actions "limited competition" is a question of law, and therefore not a fact.   Cabot disputes the final sentence of Paragraph 31 because it is only supported by the opinion of Mr. Chapple and is unsupported by any documentary or testimonial evidence.   Responding further, during the negotiations of the 2001 Supply Agreement and after its execution, AVX actively sought additional supply of nodular powder from Ningxia and Starck, and was willing to pay prices much higher than that being charged by Cabot in the 2001 Supply Agreement.   E-mail from Peter Collis to John Gilbertson, dated December 5, 2000 and e-mail from Peter Collis to John Gilbertson, dated February 7, 2001 (true copies of which are appended to Rising Aff. II collectively at Ex. 19);

Schwartz Depo. at pp. 172-173 (Rising Aff. II, Ex. 3). There is no evidence in the record that AVX was ever "prevented" from purchasing any nodular products.

32.    As of 2000 and January 2001 AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each of 2002, 2003, 2004 and 2005 at fixed prices. Bodoff Aff. Exh. 24, pp. 31, 20 ("when we started the process of requesting material, it was for a relatively short period of time, six months to one year. It was at Cabot's insistence that it be a longer term supply agreement" for flake products, nodular products and KTaf) ("Our understanding was that we would get nothing without a long-term supply agreement."). AVX's general practice was not to commit to purchases based on sales forecasts of more than 12 months. Chapple Aff. ¶ 20. "One of the reasons we didn't want to sign a five-year contract, the tantalum industry or the electronics industry is a very variable industry and we couldn't accurately go more than twelve months forward on material we really wanted." Bodoff Aff. Exh. 25 at 111.

**Response:**    Cabot disputes the facts in Paragraph 32 that are supported only by the opinion of Mr. Chapple and describe events for which Mr. Chapple has no personal knowledge. Cabot does not dispute that AVX originally did not want to enter into a five-year agreement for the supply of tantalum products. Cabot SOF, ¶ 10. Cabot further responds that AVX forecasted out further than 6 to twelve months as evidenced by the letters of intent which showed AVX's desired supply of tantalum powder over the course of a two year period. Bodoff Aff., Ex. 16.

33.    A comparison of AVX's purchasing history for tantalum powders including KTaF from 1995 through 2000 with that following the effect of the 2001 Supply Agreement through 2003, demonstrates a large decline in AVX's percentage of purchasers from suppliers other than

Cabot and an increase by more than 500% in AVX's purchases from Cabot (approximately 15% for 1995-2000 to 78% in 2003). Bodoff Aff. Exh. 17.

**Response:**    Cabot disputes the facts in Paragraph 31 because they are based on exhibits from the report of AVX's expert and are therefore opinion and not fact.  Cabot does not dispute that the percentage of AVX's purchases of tantalum powder from Cabot increased from 2001-2003.  Cabot disputes that any particular portion of the increase can be attributed to the 2001 Supply Agreement, which is a matter of opinion or law and not fact.  Cabot asserts that the change in overall percentage is due, at least in part, to the fact that in 2001 the worldwide demand for tantalum capacitors experienced a rapid and steep decline.  Cabot SOF, ¶ 22.

34.    The Supply Agreement required AVX to purchase specified quantities of flake products, specified quantities of nodular products and specified quantities of KTaf at fixed prices for the five year term.  Bodoff Aff. Exh. 23.  AVX purchased the KTaf to provide to Showa to manufacture nodular products for AVX.  Bodoff Aff. Exh. 25, p. 27 ("KTAF was not a normal purchase for us.  We were willing to step in and buy KTAF because we were being told that Cabot were not going to supply Showa Cabot with sufficient KTAF to meet our needs, but were willing to sell the KTAF directly to us. So that's why we stepped in and took that too.").  *See* Chapple Aff ¶ 21.  Section 2 of the Supply Agreement states that "Buyer shall purchase ... the 'minimum purchase quantity' ... of each Product described on Appendix A."  Appendix A, in turn, contains separate line items for flake products and nodular products.  But for the Supply Agreement AVX would not have purchased any nodular products from Cabot for Europe for the years 2001 through 2005.  Instead AVX would have purchased lesser amounts at lower prices of higher quality nodular products from Showa, Starck and/or Ningxia.  But for the Supply Agreement over the five years AVX would have purchased less of Cabot's nodular products for

Biddeford and at lower prices.  But for the Supply Agreement during the five year period of 2001 through 2005 AVX would not have purchased any KTaf from Cabot and would have purchased finished nodular products from Showa, Starck and/or Ningxia at substantially less cost.  But for the Supply Agreement during the five year period of 2001 through 2005 based on its actual consumption and historic purchasing and stocking practices AVX would have purchased less flake from Cabot and, upon information and belief, at lower prices. Chapple Aff. ¶ 26.

**Response:**      Cabot does not dispute the first three sentences of Paragraph 34 regarding the purchase requirements and quantities specified in the 2001 Supply Agreement.  Cabot disputes that AVX bought KTaF under the 2001 Supply Agreement "because [it was] being told that Cabot [was] not going to supply Showa Cabot with sufficient KTAF to meet [AVX's] needs" because there is no admissible evidence to support that assertion, and because Cabot never told Showa that it was not going to supply Showa with sufficient KTaF to meet its needs. Spotts Depo. at pp. 65-66 (Rising Aff. II, Ex. 18) (stating that Showa was never in a position where they were materially short on KTaF and stating that Showa's concern regarding getting enough KTaF from Cabot was due to the industry shortage at that time).  Cabot disputes the remainder of Paragraph 34 because it contains speculation about events that never occurred and are only supported by the opinion of Mr. Chapple, and not by any documentary or testimonial evidence.  Cabot further disputes the asserted facts supported by Mr. Chapple's affidavit because it references facts for which Mr. Chapple has no personal knowledge.  Cabot further asserts that during the negotiations of the 2001 Supply Agreement and after its execution, AVX actively sought additional supply of nodular powder from Ningxia and Starck, and was willing to pay prices much higher than that being charged by Cabot in the 2001 Supply Agreement.  12/5/2000 and 2/7/2001 Collis e-mails (Rising Aff. II, Ex. 19); Schwartz Depo. at pp. 172-173 (Rising Aff.

II, Ex. 3).   Additionally, AVX was protected from being locked in to the prices in the 2001 Supply Agreement if the market changed and Cabot lowered its prices by the Most Favored Customer provision in the contract.   Bodoff Aff., Ex. 23, Sec. 3.   Finally, as evidenced by the letters of intent, AVX forecasted purchasing much higher volumes of tantalum powder from Cabot than it ultimately negotiated to purchase in the 2001 Supply Agreement.   Bodoff Aff., Ex. 16 (showing forecasted needs of flake and nodular powder at over 180,000 pounds for 2001 compared with the minimum purchase requirement of 75,000 pounds for that year in the 2001 Supply Agreement).   And, it is undisputed that Cabot engaged in discussions with AVX in 2001 about amending the 2001 Supply Agreement which were rejected by AVX's senior management. Chapple Depo. at pp. 136-137 (Rising Aff. II, Ex. 7).

Respectfully Submitted,

CABOT CORPORATION

By its attorneys,


*/s/ Brian A. Davis*
Robert S. Frank, Jr. (BBO No. 177240)
    (rfrank@choate.com)
Brian A. Davis (BBO No. 546462)
    (bad@choate.com)
Julie C. Rising (BBO No. 666950)
    (jrising@choate.com)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5000

Date:   May 9, 2008

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on May 9, 2008.

*/s/ Julie C. Rising*
Julie C. Rising

4328423v1