# Exhibit #3



# Digital Court Reporting & Video

## Transcript of the Testimony of
# Dr. Stephen Schwartz

**Date:** February 19, 2008

**Caption:** AVX Corporation and AVX Limited v. Cabot Corporation

## CONDENSED
## TRANSCRIPT

Digital Court Reporting and Video, LLC
866.721.0972 Toll-free
713.683.0401 Local
713.683.8935 Fax
depos@digitalreporting.com
www.digitalreporting.com

**Job Number: 3194**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
-------------------------------------x
AVX CORPORATION and AVX LIMITED,
      Plaintiffs,
  - against -    Civil Action
          No. 04-10467-RGS

CABOT CORPORATION,

      Defendant.

-------------------------------------x
      February 19, 2008
      10:50 a.m.

Videotaped Deposition of DR. STEVEN SCHWARTZ, an
expert witness on behalf of the Plaintiffs herein,
and held at the offices of Robinson & Cole, 120
Bloomingdale Road, White Plains, New York, before
April Pearl Schirm, a Court Reporter and Notary
Public of the State of New York.

Page 2

1
2  A P P E A R A N C E S :
3     BODOFF & ASSOCIATES, LLP
      Attorneys for the Plaintiffs
4       225 Friend Street
      Seventh Floor
5       Boston, Massachusetts 02114-1812
   BY:  RICHARD A. GOREN, ESQ.
6
7
   CHOATE, HALL & STEWART, LLP
8     Attorneys for the Defendant
     Two International Place
9       Boston, Massachusetts 02110
   BY:  BRIAN A. DAVIS, ESQ.
10
11
   ALSO PRESENT:
12      JOE BARRION - VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2       IT IS HEREBY STIPULATED AND
3  AGREED by and between the attorneys for the
4  respective parties herein, that filing and sealing
5  be and the same are hereby waived.
6
7       IT IS FURTHER STIPULATED AND
8  AGREED that all objections, except as to the form
9  of the question, shall be reserved to the time of
10  the trial.
11
12       IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be signed
14  and sworn to before any officer authorized to
15  administer an oath, with the same force and effect
16  as if signed and sworn to before the Court.
17
18
19
20
21
22
23
24
25

Page 4

1       DR. STEVEN SCHWARTZ
2
3       THE VIDEOGRAPHER:  This is the
4  video operator speaking, Joe Barrion, of
5  Digital Court Reporting and Video, of 225
6  Lenox Avenue, Westfield, New Jersey.
7       Today's date is February 19,
8  2008.  The time on the video monitor is
9  10:50.  We are here at the offices of
10  Robinson & Cole located at 120 Bloomingdale
11  Road, White Plains, New York, to take the
12  videotaped deposition of Dr. Steven
13  Schwartz in the matter of AVX Corporation
14  and AVX Limited versus Cabot Corporation in
15  the United States District Court, for the
16  District of Massachusetts, civil action
17  number 04-10467-RGS.
18       Will counsel please identify
19  yourselves, and state whom you represent.
20       MR. GOREN:  My name is Richard
21  Goren of Bodoff & Associates, and I
22  represent the plaintiffs, AVX Corporation
23  and AVX Limited.
24       MR. DAVIS:  My name is Brian
25  Davis.  I'm from the law firm of Choate,

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 5

1           DR. STEVEN SCHWARTZ
2      Hall & Stewart in Boston, and I represent
3      the defendant, Cabot Corporation.
4           THE VIDEOGRAPHER: Will the court
5      reporter please swear in the witness.
6
7           (The witness was duly sworn.)
8
9
10    EXAMINATION BY
11    MR. DAVIS:
12
13      Q.       Good morning.
14      A.  Good morning.
15      Q.       Dr. Schwartz, will you state your full
16    name for the record, please?
17      A.  Steven Schwartz.
18      Q.       Dr. Schwartz, I took a quick look at
19    your CV. I see you have been deposed before; is
20    that right?
21      A.  That is correct.
22      Q.       On multiple occasions?
23      A.  Yes.
24      Q.       So you know pretty much the drill
25    here.

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 6

1           DR. STEVEN SCHWARTZ
2      A.  I do.
3      Q.       I'm going to ask you a series of
4      questions here today. If at any point in time,
5      you don't understand any of my questions, please
6      speak up and I'll try to clarify my question for
7      you. Do you understand that?
8      A.  I do.
9      Q.       And if you do respond to my question,
10    I'm going to assume that you understood it; is
11    that fair?
12      A.  That is fair.
13      Q.       In addition, you've probably received
14    these instructions before as well, but please wait
15    until I finish my question before you begin to
16    answer. That will keep the stenographer sane and
17    make for a much cleaner transcript. Do you
18    understand that?
19      A.  I do.
20      Q.       And again, we're starting a little bit
21    late today, but I hope that we'll still be able to
22    finish on time. If at any point in time you wish
23    to take a break, please let me know, and I'll try
24    to accommodate you as soon as possible. Do you
25    understand that?

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 7

1           DR. STEVEN SCHWARTZ
2      A.  I appreciate that.
3      Q.       Where do you work, Dr. Schwartz?
4      A.  I work for a company called NERA
5      Economic Consulting.
6      Q.       Where is your office?
7      A.  In White Plains.
8      Q.       What's the business of NERA?
9      A.  NERA is an economic consulting firm
10    that specializes in the application of modern
11    microeconomics to complex problems of business and
12    public policy, oftentimes but not always in the
13    context of litigation or a regulatory proceeding.
14      Q.       How long have you been with NERA?
15      A.  It will be 24 years in July.
16      Q.       What is your current position?
17      A.  I'm a senior vice president.
18      Q.       And generally, what do you do at NERA?
19      A.  Well, that is a good question. I do
20    lots of things. I'm obviously responsible for
21    developing and managing business, supervising
22    projects such as this one, oftentimes being the
23    person responsible for writing a report and, if
24    requested, testifying as to the results of our
25    analysis.

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 8

1           DR. STEVEN SCHWARTZ
2           I am responsible for managing a group
3      of people and keeping them gainfully occupied with
4      work that hopefully is interesting and energizing
5      and responsible for making sure they get the
6      training that they need. I have responsibility
7      for the monitoring and management of the career of
8      a senior person.
9           I am the head of the White Plains
10    office. I am responsible for the management of
11    NERA's antitrust and trade regulation conference
12    that we put on annually in Santa Fe. I'm a member
13    of various committees of NERA's partners group. I
14    think that is it.
15      Q.       How many people work at NERA's White
16    Plains office?
17      A.  It's probably — counting the admin
18    staff that is based there, it's probably 80.
19      Q.       And how many consulting professionals?
20      A.  Let me go around the office. There
21    are four senior vice presidents, and if you want
22    to include the research staff, there are probably
23    another 50 people who are on the economic research
24    staff.
25      Q.       You were retained at some point in

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

2  (Pages 5 to 8)

Dr. Stephen Schwartz                              AVX Corporation and AVX Limited v. Cabot Corporation

Page 33

1            DR. STEVEN SCHWARTZ
2    reverse order here for one moment. If you look at
3    Exhibit 4 for a moment, have you seen this
4    document before?
5        A. Yes.
6        Q.       This is a copy of the 2001 supply
7    agreement that Cabot and AVX signed, correct?
8        A. Yes.
9        Q.       This is the supply agreement that is
10   at the heart of AVX's claims in this case,
11   correct?
12       A. That is my understanding.
13       Q.       If you take a look at appendix A to
14   the supply agreement, have you seen that
15   particular appendix before?
16       A. Yes.
17       Q.  .     Dr. Schwartz, what are the
18   particular — let me take a step back. We'll keep
19   the record clear.
20           Appendix A identifies the minimum
21   quantities of products that AVX agreed to purchase
22   under this 2001 supply agreement from Cabot,
23   correct?
24       A. That is my understanding.
25       Q.       Now, Dr. Schwartz, what is your

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                              AVX Corporation and AVX Limited v. Cabot Corporation

Page 34

1            DR. STEVEN SCHWARTZ
2    understanding as to which of the products listed
3    on appendix A are products that AVX did not wish
4    to purchase from Cabot —
5        MR. GOREN:  Objection.
6        Q.       — but was forced to do so on account
7    of Cabot's anti-competitive conduct?
8        MR. GOREN:  Objection. You may
9    answer.
10       A. Let me restate slightly. The items
11   that I understand that Cabot — that AVX did not
12   wish to be contractually obligated to purchase
13   from Cabot over an extended period of time is the
14   European nodular product.
15       Q.       Just the European nodular product?
16       A. That is my conclusion as of this
17   point.
18       Q.       Where did you obtain that information,
19   that AVX did not wish to purchase the European
20   nodular product from Cabot?
21       A. Okay. I'm going to stick with my
22   characterization that AVX did not wish to be
23   contractually obligated to purchase the nodular
24   powder specified in appendix A to this supply
25   agreement for Europe. I drew that conclusion from

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                              AVX Corporation and AVX Limited v. Cabot Corporation

Page 35

1            DR. STEVEN SCHWARTZ
2    a variety of documents in this case, deposition
3    testimony that I read prior to the report and
4    certainly subsequent to the report.
5        Q.       Which ones? This is a critical issue
6    in this case. Which ones?
7        MR. GOREN:  Objection.
8        A. Which ones, meaning which depositions?
9        Q. Yeah. What did you rely upon?
10       A. Well, I identified several depositions
11   that I had not reviewed as of the time of this
12   report, several deponents, and that is what I had
13   in mind.
14       Q.       Who?
15       A. Gilbertson, Chapple, Odle.
16       Q.       Anything else?
17       A. That is what I recall as I sit here.
18       Q.       Go back, please, to Exhibit 3, which
19   is Mr. Collis's deposition. Do you know who Mr.
20   Collis is?
21       A. I do.
22       Q.       In fact, you spoke with Mr. Collis in
23   the course of your work, did you not?
24       A. I did.
25       Q.       Mr. Collis is currently the head of

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                              AVX Corporation and AVX Limited v. Cabot Corporation

Page 36

1            DR. STEVEN SCHWARTZ
2    AVX's tantalum division or business, correct?
3        A. I don't know his formal title, but
4    that was my understanding of his functional role.
5        Q.       And do you see Mr. Collis was deposed
6    in this matter on December 5, 2007; is that right?
7        A. Yes.
8        MR. GOREN:  I would interject and
9    point to the last page of Schwartz Exhibit
10   Number 3 and ask the witness to look at the
11   date indicated by the reporter.
12       MR. DAVIS:  Richard, do not
13   interject, please. You are not permitted
14   to instruct the witness.
15       MR. GOREN:  I am not instructing
16   the witness. You may conduct your
17   examination, but you should do so fairly.
18       MR. DAVIS:  I am doing so fairly.
19   I simply referenced Mr. Collis.
20       MR. GOREN:  Please continue.
21       MR. DAVIS:  Please do not
22   interrupt my questioning.
23       MR. GOREN:  Please continue.
24
25   BY MR. DAVIS:

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 49

DR. STEVEN SCHWARTZ

1
2    **Q.**    Certainly.
3    A.  I'm sorry.  You are back to page 3?
4    **Q.**    Page 3 of your expert report.
5    A.  Okay.
6    **Q.**    And looking under your summary of
7    opinions, the first opinion, again, it states
8    that, in part, that Cabot has sold tantalum powder
9    pursuant to a long-term contract under which AVX's
10   ability to purchase patented flake tantalum has
11   been conditioned on purchases of processed
12   tantalum ore, KTaF, capital K, capital T, small A,
13   capital F, or K-salt, and non-patented nodular
14   tantalum.
15        We talked a moment ago about the
16   non-patented nodular tantalum.  Now, where did you
17   come to an understanding that Cabot conditioned
18   AVX's ability to purchase flake powder on AVX's
19   purchases of KTaF?
20       A.  Actually, as of the time that I wrote
21   this report, that was a conclusion based on --
22   largely on conversations with Mr. Collis and a few
23   documents.  Since that point, I've reviewed other
24   documents that lead me to modify that conclusion.
25       **Q.**    Modify it in what way?

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 50

DR. STEVEN SCHWARTZ

1
2    A.  Well, I understand there is a legal
3    theory of a per se liability under tying that has
4    been or may be advanced by AVX that would still
5    argue that there has been conditioning.  However,
6    under the rule of reason theory, where there is
7    the explicit coercive element and the explicit
8    conditioning of purchases of flake on purchases of
9    tantalum ore, the subsequent evidence that I have
10   seen no longer supports that conclusion.
11       **Q.**    Meaning that you have seen evidence
12   since you wrote this report that causes you to
13   believe that Cabot did not condition AVX's
14   purchases of KTaF on -- I'm sorry.  Let me repeat
15   that.
16        You have seen evidence since you wrote
17   your report that causes you to believe that Cabot
18   did not condition AVX's purchases on flake -- of
19   flake on its purchases of KTaF?
20        MR. GOREN:  I'm going to object.
21   You may answer.
22       A.  I'll say it slightly differently.
23        I have seen evidence that leads me no
24   longer to make the assertion that purchases of
25   flake were conditioned on purchases of KTaF.

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 51

DR. STEVEN SCHWARTZ

1
2    **Q.**    What evidence was that?
3    A.  There are materials that I have
4    reviewed subsequent to the preparation of this
5    report that discuss in more detail or in great
6    detail, rather, the issue surrounding the
7    purchases of KTaF, the reasons why AVX had to
8    purchase KTaF.
9        There may have been a coercive element
10   to those purchases but not a coercive element that
11   is linked to purchases of flake.  Rather, it has
12   to do with Cabot's inability to supply or
13   unwillingness to supply Showa Cabot with the KTaF
14   that was necessary for Showa to meet the needs of
15   AVX with respect to certain tantalum products.
16       **Q.**    Is your understanding as of 2000,
17   2001 when AVX negotiated this supply agreement
18   with Cabot, that AVX, in fact, wished to purchase
19   KTaF from Cabot?
20       A.  My understanding is that Cabot took
21   the position that in order to protect its supply
22   chain, that it would be necessary for it to
23   purchase KTaF.  It did not wish to, in a business
24   sense, but felt that it was compelled to in order
25   to preserve the supply chain.  Although, it was

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 52

DR. STEVEN SCHWARTZ

1
2    also my understanding that they had no desire to
3    purchase KTaF pursuant to a long-term agreement
4    setting forth take-or-pay requirements and
5    established prices.
6        **Q.**    As you sit here today, do you believe
7    that Cabot engaged in any unlawful
8    anti-competitive contact -- conduct with respect
9    to its sales of KTaF to AVX under the 2001 supply
10   agreement?
11        MR. GOREN:  Objection.
12       A.  I don't think I can answer with
13   respect to unlawful.  That is outside of my
14   purview.  I'm not testifying to any
15   anti-competitive behavior by Cabot with respect to
16   KTaF.
17       **Q.**    And any opinions that are contained in
18   your December 15, 2007, report to that effect, you
19   are effectively withdrawing; is that fair to say?
20       A.  Yes, based on the information that I
21   have available to me.  Obviously, I understand
22   that the court has ordered additional discovery
23   that may bear on the issue of KTaF.  Obviously,
24   I'm going to review that.  If I see anything that
25   causes me to change my mind or to alter my

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 53

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    conclusions, I will inform counsel, and then
3    counsel will do what is appropriate.
4        Q.    When did you first see this additional
5    information that causes you to change your opinion
6    with respect to KTaF?
7        A.    Subsequent to the issuance of my
8    report.
9        Q.    Did any of those materials predate the
10    issuance of your report?
11        A.    Well, certainly there are documents
12    that I reviewed that were produced in the course
13    of this case that predated the issuance of this
14    report, but they were not documents that I had
15    reviewed at that point to lead me to
16    the conclusions that I have testified to today.
17        There were, I believe, depositions
18    that were taken prior to the issuance of this
19    report that I had not received prior to December
20    15th that I was able to review subsequently that
21    would cause me to give the opinion that I just
22    testified to.
23        Q.    But the materials that caused you to
24    change your opinion with respect to KTaF, did any
25    of those written materials predate your December

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 54

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    15, 2007, report?
3        MR. GOREN:  Objection.
4        A.    I think I already answered that.  The
5    answer is yes.
6        Q.    Why is it that you didn't review those
7    materials before issuing your December 15, 2007,
8    report?
9        A.    Some of them I didn't have, I had not
10    received.  Some of them I had reviewed, but in
11    light of additional deposition testimony that was
12    provided to me subsequent to December 15th caused
13    me to view those documents in a different light
14    and led me to the conclusions -- to amend the
15    conclusions, as I have done so this morning.
16        Q.    The documents that you hadn't received
17    that you just referred to a moment ago, when did
18    you first receive those after you issued your
19    December 15, 2007, report?
20        MR. GOREN:  Him personally?
21        MR. DAVIS:  Yes.
22        A.    I don't know that I can put a date on
23    it.
24        Q.    Who did you receive them from?
25        A.    Well, I received them from my staff.

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 55

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    I presume my staff received them in some way,
3    shape or form from AVX or counsel.
4        Q.    In working on this matter, who among
5    AVX's counsel have you interacted with most
6    frequently?
7        A.    I don't know if I can characterize
8    more or less frequently.  I interacted with
9    different people.
10        Q.    Then who are the people that you've
11    interacted with?
12        A.    Mr. Goren, Mr. Bodoff, Mr. Slavitt.
13        Q.    And you interacted with them all about
14    equally on this matter?
15        A.    Mr. Slavitt probably less than
16    Mr. Goren and Mr. Bodoff.
17        Q.    But Mr. Goren and Mr. Bodoff, you
18    interacted with them roughly equally?
19        A.    Again, I haven't tried to sit down and
20    characterize the extent of my contacts with them.
21    I probably had more conversations with Mr. Goren
22    than Mr. Bodoff.  If you were to total the length
23    of time that I have been on the phone with both of
24    them, I would guess it would be roughly equal,
25    probably more minutes with Mr. Goren than

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 56

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    Mr. Bodoff.  But again, I haven't attempted to do
3    that calculation.
4        Q.    Okay.  I want to show you some
5    documents and ask you if you have seen them
6    before.
7        MR. DAVIS:  Would you mark this,
8        please, as the next exhibit.
9
10        (Schwartz Exhibit 5, ONE-PAGE
11        EMAIL FROM J. GILBERTSON DATED
12        9/28/00, BATES STAMPED AVX 0072,
13        marked for identification.)
14
15        Q.    Mr. Schwartz, would you take a look
16    for a moment at what has been marked as Exhibit 5
17    and ask if you have seen this particular document
18    before.
19        A.    I may have.  It doesn't ring a bell,
20    but I may have seen it.
21        Q.    You know who Mr. Gilbertson is?
22        A.    Yes.
23        Q.    He is the head of AVX, correct?
24        A.    Yes.
25        Q.    And this is an email from Mr.

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

14 (Pages 53 to 56)

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 57

1           DR. STEVEN SCHWARTZ
2    Gilbertson to a Mr. Rosen and Mr. Jackson at AVX
3    dated September 28 of 2000.  Do you see that?
4        A.  I do.
5        Q.        Is it your understanding that at that
6    point in time that AVX's needs included 10 to 15
7    metric tons of nodular powder for its Biddeford
8    facility?
9           MR. GOREN:  Objection.
10       A.  I see that is what is written here.  I
11   don't have an independent opinion on Biddeford's
12   needs as of that particular date.
13       Q.        Did AVX want or need nodular powder
14   from Cabot at the time it entered into the 2001
15   supply agreement?
16       A.  For Biddeford, yes.
17       Q.        But only for Biddeford?
18          MR. GOREN:  Objection.
19       A.  It had a particular need for nodular
20   powder for Biddeford from Cabot, because those
21   powders were uniquely positioned for the products
22   that Biddeford was manufacturing.  So the
23   situation at Biddeford was different than the
24   situation at Paignton, P-A-I-G-N-T-O-N.
25       Q.        You mentioned earlier that you

Page 58

1           DR. STEVEN SCHWARTZ
2    understood that AVX did not wish to purchase
3    long-term contract nodular powder for its European
4    operations from Cabot; is that right?
5        A.  It's not quite the way I said it, but
6    substantially, that is correct.
7        Q.        Sorry.  I can't remember precisely how
8    you put it.
9        A.  I think the way I put it was, they did
10   not want to be contractually obligated to buy
11   non-patented nodular powder over a long period of
12   time at specified quantities and at predetermined
13   prices.
14       Q.        What is your understanding as to who,
15   in the course of negotiations between Cabot and
16   AVX, first raised the possibility of AVX
17   purchasing nodular powder for its European
18   operations under that agreement?
19          MR. GOREN:  Objection.
20       A.  I don't think the documents that I
21   have seen have led me to conclude who had
22   first -- who first raised it.
23       Q.        Did you see, in the course of your
24   work, any documents from AVX that were generated
25   in the course of contract negotiations in which

Page 59

1           DR. STEVEN SCHWARTZ
2    AVX expressed disinterest or a desire not to
3    purchase nodular powder for its European
4    operations from Cabot?
5        A.  Yes.
6        Q.        What did you see?
7        A.  I recall at least one email, and there
8    may have been more, from Mr. Collis, and there may
9    have been others, but the one that I have in mind
10   is from Mr. Collis, indicating that it would be
11   his preference that there be no requirement to
12   purchase nodular for Europe.
13       Q.        Not that he didn't want nodular for
14   Europe, but his preference was that AVX not be
15   contractually bound to purchase nodular for
16   Europe; is that right?
17       A.  That they not be bound contractually
18   to purchase, under -- pursuant to a long-term
19   contract on preset terms and conditions, et
20   cetera, et cetera, yes.
21       Q.        Would you look, please, back at your
22   expert report, Dr. Schwartz, on page 4 looking at
23   some of your other -- summaries of your other
24   opinions here.
25          So in your opinion number 4, it

Page 60

1           DR. STEVEN SCHWARTZ
2    states: Cabot has used its control of tantalum
3    ore supplies to limit the ability of rival
4    suppliers of tantalum powder, in particular, Showa
5    Denko, to compete effectively in the market for
6    nodular tantalum powder.  Stop.
7           Do you still hold that opinion?
8        A.  I would amend that, I guess, to say
9    Cabot has used its control of KTaF supplies to
10   limit the ability of rival suppliers of tantalum
11   powder, in particular, Showa Cabot, to compete
12   effectively in the market for nodular tantalum
13   powder.  I still think that is a correct
14   statement.
15       Q.        Now, to your knowledge, is that a
16   claim that AVX has made in this case?
17          MR. GOREN:  Objection.
18       A.  I don't recall that -- specifically
19   that it was made in the complaint.
20          MR. DAVIS:  Let's mark the
21   complaint, please, as the next exhibit.
22
23          (Schwartz Exhibit 6, DOCUMENT
24          ENTITLED COMPLAINT AND JURY
25          DEMAND, marked for

```
1           DR. STEVEN SCHWARTZ
2        Can you reread my question,
3     please.
4
5           (The court reporter read back
6           requested portion of the
7           transcript.)
8
9        A.  I recall that there were claims that I
10    understood to be common law claims as opposed to
11    antitrust claims brought in federal court pursuant
12    to specific antitrust statutes involving or that
13    stated certain claims that AVX had against Cabot
14    in connection with the contract at issue, and I
15    understood that those claims had been dismissed
16    summarily and that that dismissal had been
17    affirmed.
18        Q.       You recall reviewing the decision in
19    which the courts affirmed that dismissal?
20        A.  Again, I cannot say with certainty.  I
21    would have to -- if this is the affirming
22    decision, I would have to go back and read it to
23    see if I recall reading this decision
24    specifically.
25        Q.       Let me direct your attention to some
```

```
1           DR. STEVEN SCHWARTZ
2     specific portions of the decision for a moment.
3     It's on page 7 of the copy that you have,
4     Dr. Schwartz, in the second column.  Do you see
5     there is a paragraph that begins, on November
6     7, --
7        A.  I do.
8        Q.       -- 2000?
9           It says -- I'll just read a portion of
10    it.  It says:  On November 7, 2000, Cabot and AVX
11    memorialized the terms of a basic agreement to a
12    binding, five-year contract under which AVX would
13    purchase specified quantities of tantalum powder
14    and wire at stated prices.  In an electronic mail
15    message, email, sent to a Cabot executive
16    regarding the agreed terms, the president and
17    chief executive officer of AVX wrote, "I think we
18    have a fair agreement for both parties.  Hope you
19    agree."  The prices agreed to were no higher than
20    the then-current market prices for tantalum
21    products.  Do you see that?
22        A.  I do.
23        Q.       Is the statement in this opinion by
24    the Massachusetts Supreme Judicial Court, that the
25    prices agreed to in the 2001 supply agreement were
```

```
1           DR. STEVEN SCHWARTZ
2     no higher than the then-current market prices for
3     tantalum products; is that accurate?
4           MR. GOREN:  Objection.
5        A.  I think the prices for 2001 that were
6     specified in the contract were in line with the
7     market prices that prevailed for a portion of 2001
8     but not for the entire period.
9        Q.       You understand, Dr. Schwartz, that
10    when these parties entered into these contract,
11    they did so at a point in time, correct?
12        A.  Yes.
13        Q.       Would you agree with me that the
14    prices that are contained in the 2001 supply
15    agreement, as of the time that the parties entered
16    into that agreement, were in line with or were no
17    higher than the then-current market prices for
18    tantalum products?
19           MR. GOREN:  Objection.  You may
20           answer.
21        A.  I'll stand by my answer.  I think that
22    answers your question.
23        Q.       I don't think it does.  I think you --
24    I don't think you did, Dr. Schwartz.  So let's
25    explore it.
```

```
1           DR. STEVEN SCHWARTZ
2        A.  Okay.
3        Q.       At the time that Cabot and AVX entered
4     into the 2001 supply agreement, there were current
5     market prices for the products that were
6     encompassed by that agreement, correct?
7        A.  Sure.
8        Q.       And is it your understanding that the
9     prices that are encompassed, contained within the
10    2001 supply agreement, which is Exhibit 4, that
11    those prices were no higher than the then-current
12    market prices for tantalum products at the time
13    that agreement was signed?
14        A.  Again, I'll try and answer it again
15    and see if I can convince you that I'm being
16    responsive to your question.
17           I think that the prices that were set
18    forth in the supply agreement were consistent with
19    the market prices that were prevailing as of the
20    time of the contract and consistent with the
21    market prices that prevailed for a portion of
22    2001.  They were not consistent with the market
23    prices that prevailed in the latter part of 2001
24    and for the remaining periods of the contract.
25           I hope that answers your question.
```

60361027-8cc5-4bfb-835c-d7ea37f5441a

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 73

```
 1          DR. STEVEN SCHWARTZ
 2      Q.      When the parties entered into -- when
 3   Cabot and AVX entered into the 2001 supply
 4   agreement, you would agree with me that the prices
 5   that were included in that contract were
 6   consistent with the prices that then existed,
 7   correct?
 8          MR. GOREN: Objection. You may
 9   answer.
10      A.   Yes.
11      Q.      And subsequent to the contract being
12   signed, market prices for tantalum products,
13   including those encompassed by the 2001 supply
14   agreement, decreased, correct?
15      A.   Yes.
16      Q.      So that's what you are referring to in
17   your testimony, is that when you state that the
18   prices that were contained in the contract were
19   not necessarily consistent with subsequent
20   pricing, that is because after the contract was
21   signed, market prices for some of these products
22   declined, correct?
23      A.   That's correct.
24      Q.      But AVX already had signed a binding
25   contract to pay these particular prices that are
```

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 74

```
 1          DR. STEVEN SCHWARTZ
 2   listed on appendix A to the 2001 supply agreement
 3   to Cabot, correct?
 4      A.   Well, you said already. They did sign
 5   the contract.
 6      Q.      And the contract specified the prices
 7   that AVX would pay over time, correct?
 8      A.   Prices and quantities.
 9      Q.      And that's the reason why the prices
10   that AVX paid to Cabot over the course of the
11   contract didn't go down, because they were
12   specified in the contract, correct?
13          MR. GOREN: Objection.
14      A.   I think the question you asked is
15   tautological. The contract covered five years,
16   and it was a take-or-pay agreement specifying
17   specific amounts at specific prices. So I think
18   the -- the answer to your question is yes, but I
19   think it's tautological.
20      Q.      Would you turn to page 6 of your
21   expert report, please. In paragraph 8, you state
22   that, among other things: In 2003, AVX made 22
23   percent of worldwide tantalum capacitor sales; do
24   you see that?
25      A.   Yes.
```

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 75

```
 1          DR. STEVEN SCHWARTZ
 2      Q.      What was AVX's share in -- of
 3   worldwide tantalum capacitor sales in 2005?
 4      A.   I don't recall as I sit here.
 5      Q.      Did it go -- did AVX's share of
 6   worldwide tantalum capacitor sales go up or down
 7   from 2003 to 2005?
 8      A.   I don't recall.
 9      Q.      Did AVX's share of worldwide tantalum
10   capacitor sales go up or down from 2001 to 2003?
11      A.   Again, I don't recall specifically.
12      Q.      Have you formed any opinions regarding
13   how the 2001 supply agreement affected AVX's
14   competitiveness in the market -- worldwide market
15   for tantalum capacitors?
16          MR. GOREN: Objection.
17      A.   I'm sorry. Can you read that back,
18   please.
19      Q.      I can repeat it.
20          Have you formed any opinions in this
21   matter regarding how, if at all, the 2001 supply
22   agreement affected AVX's competitiveness in the
23   worldwide market for tantalum capacitors?
24      A.   I have not formed an opinion on that.
25      Q.      Would you turn, please, to page 8 of
```

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 76

```
 1          DR. STEVEN SCHWARTZ
 2   your expert report. Under section 2, supply of
 3   electronic-grade tantalum, paragraph 13 begins:
 4   As a result of its patent, and that is a patent on
 5   flake powder, correct?
 6      A.   Correct.
 7      Q.      It says: Cabot was the sole supplier
 8   of flake tantalum powder until February 2002, when
 9   it acquired its then joint venture partner, Showa
10   Denko. Do you see that?
11      A.   Yes.
12      Q.      Now, have AVX's purchases of flake
13   powder increased or decreased since this contract
14   was -- the 2001 supply agreement ended?
15      A.   I've seen information about that, but
16   I don't recall as I sit here.
17      Q.      Does AVX currently buy any flake
18   tantalum powder from Cabot?
19          MR. GOREN: Objection.
20      A.   My understanding is that it -- my
21   understanding is that it does.
22      Q.      Where did you obtain that
23   understanding?
24      A.   In the course of my conversation with
25   Mr. Collis, my understanding was there had been a
```

713-683-0401  Digital Court Reporting and Video  713-683-8935

Page 77

DR. STEVEN SCHWARTZ

1  period of time when there were inventories but
2  that they were continuing to purchase -- my
3  understanding is that they were continuing to
4  purchase from Cabot.
5     Q.       Do you know if AVX currently buys any
6  tantalum products from Cabot?
7     A. I do not know their current purchases.
8     Q.       To your knowledge, is AVX still
9  dependent on Cabot to supply flake product?
10        MR. GOREN:  Objection.
11     A.  My understanding is that, to the
12  extent that AVX doesn't have inventories of flake
13  that it can use to produce its tantalum capacitors
14  that are made with flake, that it needs to acquire
15  that flake powder from Cabot.
16     Q.       Have sales of flake powder increased
17  or decreased in the past five years?
18     A.  I have not studied that specifically.
19  I don't know.
20     Q.       Wouldn't that information tell you
21  something about the market for flake tantalum
22  powder, how competitive it is?
23        MR. GOREN:  Objection.
24     A.  It would depend on the question that

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 78

DR. STEVEN SCHWARTZ

1  you are asking. I think for purposes of this
2  analysis, and given my understanding of the way
3  the market worked, the answer is no, it wasn't
4  necessary for me to do that.
5     Q.       Well, would you regard a decrease in
6  sales of flake powder over time, say over the past
7  five years, as an indication that flake powder
8  competes with other products, other tantalum
9  powder products in the market?
10     A.  Well, it depends on which stage of
11  competition you are talking.  If you are talking
12  about a pre-design stage, before an end user has
13  established and fully engineered a product, I
14  would agree that there is competition across
15  materials that are used to manufacture capacitors.
16     Q.       Including tantalum?
17     A.  Including tantalum, but that once
18  those designs are established, that the
19  opportunities for competition of cross materials
20  is essentially gone. I would not agree that there
21  is competition between tantalum and other
22  materials, however, for every application. I
23  think that is an important qualification.
24     Q.       Let me follow up your testimony for a

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 79

DR. STEVEN SCHWARTZ

1  moment.
2        If I understand you correctly, it's
3  your opinion that once an electronic component
4  design has been set, and the materials to be used
5  in that design have been specified, that that
6  reduces competition for the components that are
7  included in that device; is that right?
8     A.  I would say it differently.
9     Q.       What I said, is that correct in
10  substance? I know I'm having great difficulty
11  sort of repeating what you said word for word.
12  But was my statement correct in substance?
13     A.  If by your statement you mean that the
14  opportunity -- the opportunities for competition
15  of cross materials are severely limited once a
16  design is set, I would certainly agree with that.
17  In some instances, the opportunities for
18  competition for cross materials may be effectively
19  eliminated. But in any event, they are surely
20  severely limited.
21     Q.       That is not a phenomenon that is
22  unique to tantalum, let's say, for example,
23  correct?
24     A.  I'm not sure I understand your

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 80

DR. STEVEN SCHWARTZ

1  question.
2     Q.       For example, if an automotive
3  manufacturer decides to use a particular type of
4  materials for purposes of manufacturing a
5  dashboard in a particular car, once that decision
6  has been made and that product has been specified,
7  it's difficult for that manufacturer then to turn
8  around and substitute a completely different
9  product without changing the design, right?
10     A.  I think it's a little bit different,
11  maybe a lot different.  There are certainly other
12  products or other situations where you have
13  lock-in once a design is set.  You certainly have
14  situations in which there are stages of
15  competition, and the results of one competitive
16  scrimmage affects the extent to which there is
17  competition at a subsequent stage of production or
18  at a subsequent point in time. So in that regard,
19  the market for capacitors is not unique.
20     Q.       You understand that some of the big
21  markets for tantalum capacitors are cell phones?
22     A.  I understand that is one of them.
23     Q.       Personal computers?
24     A.  Yes.

713-683-0401   Digital Court Reporting and Video   713-683-8935

20 (Pages 77 to 80)

Page 85

DR. STEVEN SCHWARTZ

2 Q. Where are the notes?
3 A. My practice is not to keep them.
4 Q. So they were destroyed?
5 A. They were thrown out.
6 Q. Thrown out in a place where we can't
7 retrieve them right now; is that right?
8 MR. GOREN: Objection.
9 A. I presume not.
10 Q. When were they thrown out?
11 A. Probably early November.
12 Q. Before your report was prepared?
13 A. Yes.
14 Q. So you reduced to memory what was
15 contained in the notes and then used it for
16 purposes of drafting your report?
17 A. I reduced some of it to memory. Most
18 of what was in those conversations I was
19 subsequently able to identify another source for
20 that information. And the citations in the
21 document report would be to those other sources of
22 information, rather than relying on the interviews
23 themselves.
24 Q. Okay.
25 MR. DAVIS: Why don't we take a

Page 86

DR. STEVEN SCHWARTZ

2 break here for lunch.
3 MR. GOREN: Okay.
4 THE VIDEOGRAPHER: We're going
5 off the record. The time is 12:35.
6
7
8
9 (Lunch Recess taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

DR. STEVEN SCHWARTZ

2
3 THE VIDEOGRAPHER: We're now back
4 on the record. The time is 1:24.
5
6 BY MR. DAVIS:
7
8 Q. Dr. Schwartz, welcome back.
9 A. Thank you.
10 Q. Before we broke for lunch, actually, I
11 think earlier in the day today, you were
12 testifying about the nodular powder that AVX
13 actually wanted or needed from Cabot back in the
14 2001 time frame when they entered into the 2001
15 supply agreement. Again, I won't get it exactly
16 right, but in substance, is it your understanding
17 that AVX did wish to purchase nodular tantalum
18 powder for its Biddeford operation but did not
19 wish to purchase nodular tantalum powder from
20 Cabot for AVX's European operations?
21 A. I think that is not quite what I said.
22 Q. Please correct me.
23 A. As of the 2000, 2001 time frame, AVX
24 did want to buy nodular powder for Biddeford.
25 Q. I'm sorry. You said —

Page 88

DR. STEVEN SCHWARTZ

2 A. Did want to buy nodular powder,
3 specific nodular powders for Biddeford, but that
4 it did not want to be contractually obligated to
5 buy nodular powder for Biddeford over a long
6 period of time, and that it did not want to be
7 contractually obligated to buy any nodular powder
8 for Europe over an extended period of time at
9 fixed prices and quantities.
10 Q. Okay.
11 MR. DAVIS: Let's mark this,
12 please, as the next exhibit. I believe
13 we're up to 8.
14
15 (Schwartz Exhibit 8, DEPOSITION
16 TRANSCRIPT OF JOHN GILBERTSON
17 DATED 8/22/06, marked for
18 identification.)
19
20 MR. DAVIS: I'd like to mark
21 another one, please. Mark that, please, as
22 Exhibit 9.
23
24 (Schwartz Exhibit 9, FIVE-PAGE
25 DOCUMENT BATE'S STAMPED

Page 89

DR. STEVEN SCHWARTZ

1      C(AII)087098, marked for
2      identification.)
3
4
5      Q.      Dr. Schwartz, first, directing your
6   attention to Exhibit 9, have you seen that
7   document before?
8      A.   I'm hesitating only because there are
9   several documents that I recall that look like
10  this.  And I have reviewed a number of them.  I
11  don't recall this one specifically.  It wouldn't
12  surprise me if I've read it, but I don't recall it
13  specifically.
14     Q.      Now, you see that on the bottom of the
15  first page of Exhibit 9 onto the top of the second
16  page of Exhibit 9 is a matrix that is similar to
17  appendix A to the 2001 supply agreement; do you
18  see that?
19     A.   If by similar you mean the numbers are
20  the same, I would have to check.  If you mean
21  similar in that it looks the same, I would agree
22  it looks —
23     Q.      Similar in general layout.
24     A.   I will agree with that.
25     Q.      Do you see the top of page 2 to

Page 90

DR. STEVEN SCHWARTZ

1      DR. STEVEN SCHWARTZ
2   Exhibit 9, there is a reference to nodular.  And
3   you can see, if you look at the bottom of page 1
4   and then the top of page 2, you see that that is
5   nodular for Europe.  Do you see that?
6      A.   Yes.
7      Q.      And you see there is a reference to 0
8   in — 0 nodular in 2001 for Europe and then 10,000
9   pounds for each year from 2002 through 2005.  Do
10  you agree with that?
11     A.   Yes.
12     Q.      And back on page 1 of Exhibit 9, do
13  you see the paragraph before the matrix begins
14  says:  I lowered the commitment to 25,000 pounds
15  in Biddeford, bracket, how about a statement you
16  will try to add 5,000 pounds, question mark, close
17  bracket, change the nodular to 10,000 pounds which
18  our side is very uncomfortable with.  Stop there.
19  Have you seen that language before?
20     A.   Yes.
21     Q.      Is it your understanding that these
22  are communications between Mr. Gilbertson and
23  Mr. Odle at Cabot in the course of negotiation of
24  the 2001 supply agreement?
25     A.   Yes.

Page 91

DR. STEVEN SCHWARTZ

1      DR. STEVEN SCHWARTZ
2      MR. GOREN:  Objection.
3      Q.      Is it your understanding that AVX was
4   uncomfortable with the fact that the amount of
5   nodular powder for Europe had been reduced to
6   10,000 pounds per year?
7      A.   My understanding is that they were
8   uncomfortable that it was 10,000 pounds and not 0.
9      Q.      Okay.  Would you look please at
10  Exhibit 8, which is Mr. Gilbertson's deposition
11  dated August 22, 2006.  Do you see that?
12     A.   I do.
13     Q.      Now, if you'll look, please, on
14  page — this is a minuscript version.  You have
15  seen these before?
16     A.   Yes.
17     Q.   .   If you look, it's on page 42 of
18  Exhibit 8, but it's page 165 of the deposition
19  transcript itself.  Please tell me when you have
20  found that page.
21     A.   I have it.
22     Q.      You see there are some questions and
23  answers, Mr. Gilbertson at his deposition, and
24  about halfway down on the page — well, actually,
25  if you look at the prior page on 164 up above, do

Page 92

DR. STEVEN SCHWARTZ

1      DR. STEVEN SCHWARTZ
2   you see there is a reference to Exhibit 2?  Do you
3   see that?
4      A.   I do.
5      Q.      And you'll see that Exhibit 9 of your
6   deposition has an Exhibit 2 sticker down in the
7   lower right-hand corner.  Do you see that?
8      A.   I do see that.
9      Q.      And I'll represent to you, Dr.
10  Schwartz, we're mixing and matching here.  This is
11  Exhibit 2 that was referenced at Mr. Gilbertson's
12  deposition.  All right?
13     A.   All right.  I'll accept that.
14     Q.      You'll see there was a discussion at
15  Mr. Gilbertson's deposition about Exhibit 2, now
16  Exhibit 9 at your deposition.  And Mr. Gilbertson
17  was asked and he answered as follows:
18         "Question:  Okay.  And is it —
19      directing your attention to the
20      continuation of the chart, the second page,
21      the very top of that chart, there is a
22      listing of 10,000 pounds of nodular powder
23      under the heading Europe in the years 2002
24      through 2005.  Do you see that?
25         "Answer:  Yes — I see that, yes.

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 93

1           DR. STEVEN SCHWARTZ
2       This was basically Tom's chart, you know.
3           "Question: Okay. Now, if you
4       will look just above the chart, and you
5       will see it says, quote, change the nodular
6       to 10,000 pounds, which from our side --
7       which our side is very uncomfortable with
8       as a good faith from our side, close quote.
9       Do you see that, just above the chart?
10          "Answer: I see that, yes.
11          "Question: Is it correct that
12      you were uncomfortable with the reduction
13      from 60,000 pounds of nodular powder, as
14      shown in Mr. Odle's email, Exhibit 181, to
15      the 10,000 pounds as shown on Exhibit 2.
16          "Answer: Yes.
17          "Question: Because you wanted
18      more if you could get it?
19          "Answer: Right.
20          "Question: I'm sorry?
21          "Answer: Yes. Correct."
22      Do you see that?
23      A.  I do.
24      Q.      Now, that testimony by Mr. Gilbertson
25  is contrary to your understanding, as you just

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 94

1           DR. STEVEN SCHWARTZ
2       related, correct?
3       A.  The words are contrary. I think his
4       testimony makes no sense.
5       Q.      It makes -- sorry?
6       A.  I think it makes no sense.
7       Q.      The testimony of Mr. Gilbertson, the
8       CEO of AVX, in this case makes no sense. That is
9       your opinion?
10      A.  I think that this particular --
11          MR. GOREN: Objection.
12      A.  This particular piece of testimony
13      makes no sense and is inconsistent with other
14      documents. And certainly, in light of this
15      testimony, but I think it is inconsistent with
16      enough other information.
17      Q.      So you were aware of this testimony at
18      the time you issued your report in this case?
19      A.  I don't recall whether I became aware
20      of it -- I was -- well, let me be clear. I don't
21      know that I read it until after. I was aware,
22      generally, of the testimony of Mr. Gilbertson.
23      Q.      Have you dismissed the testimony of
24      Mr. Gilbertson that I just read to you for
25      purposes of reaching your conclusions in this

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 95

1           DR. STEVEN SCHWARTZ
2       case?
3       A.  No, I haven't dismissed it. I've
4       considered it in light of other documents and
5       other testimony.
6       Q.      Do you believe that Mr. Gilbertson's
7       testimony, as I just read to you, is accurate?
8           MR. GOREN: Objection.
9       A.  Do I believe that it was transcribed
10      accurately?
11      Q.      Let's start there.
12      A.  I have no way of knowing.
13      Q.      Do you believe it actually states
14      Mr. Gilbertson's understanding at the time that he
15      was having his discussions with Mr. Odle back in
16      2000?
17      A.  That I'm not sure of, because even the
18      limited bit of testimony here really makes no
19      sense, especially in light of other documents. So
20      I'm wondering if Mr. Gilbertson may have misspoken
21      or may not have understood your questions
22      completely.
23      Q.      Do you know whether Mr. Gilbertson
24      changed any of that testimony in his errata sheet
25      for his deposition?

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 96

1           DR. STEVEN SCHWARTZ
2       A.  I don't know.
3       Q.      When you were over at AVX's facilities
4       in England -- or strike that.
5           At any point in time, did you ever ask
6       to talk to Mr. Gilbertson or anyone at AVX to try
7       to clarify Mr. Gilbertson's testimony that I just
8       read to you?
9       A.  I did not.
10      Q.      Did you ever talk to anyone at AVX for
11      purposes of understanding AVX's position regarding
12      the 10,000 pounds of nodular powder for Europe
13      that is referenced in Exhibit 9 and in
14      Mr. Gilbertson's deposition?
15      A.  I don't recall conversations with
16      Mr. Collis that specifically referenced 10,000
17      pounds but there were -- as part of our
18      conversation there were discussions about the
19      desirability of having a commitment to purchase a
20      specified volume of nodular powder for Europe
21      pursuant to the terms of the contract.
22      Q.      Did anyone from AVX ever tell you at
23      the time AVX entered into this agreement back in
24      2000, 2001, that AVX actually wanted more nodular
25      powder from Cabot, not less?

713-683-0401   Digital Court Reporting and Video   713-683-8935

24 (Pages 93 to 96)

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 97

DR. STEVEN SCHWARTZ

1
2    A. I have seen some documents that talk
3    about volumes of powder that AVX wanted for 2001
4    but not necessarily on a going forward basis.
5        Q.        Now, looking back for a moment at your
6    report in this case on page 11, there is a
7    discussion of the relative market.
8        A. Just give me a moment to get back
9    there.
10        Q.        Certainly.
11        A. Okay.
12        Q.        Now, again, there is a discussion here
13    of the relevant market, by which you mean the
14    market for antitrust analysis purposes in which
15    flake would exist; is that right?
16        A. The market that is relevant for
17    purposes of analyzing the antitrust claims that
18    are in the complaint.
19        Q.        By the relevant market, would the
20    relevant market include flake?
21        A. Well, are you talking about the
22    conclusion or the question. The question is, what
23    are the boundaries of the relevant market. The
24    conclusion is that there is a relevant market for
25    flake that is separate and distinct than the

Page 99

DR. STEVEN SCHWARTZ

1
2        MR. GOREN:  Let me help.  When?
3        MR. DAVIS:  At any point in time.
4        A. Well, again, I think you need to talk
5    about various levels and stages of competition.
6    And you need to understand what it is that end
7    users are buying when they purchase a capacitor.
8    They are buying functionality.  My understanding
9    is that they are requiring a capacitor that has
10    certain capabilities and certain performance
11    characteristics much more than they are requiring
12    a particular material, although, they may be at
13    the margin concerned with a particular material.
14        It may be that technically there are
15    products that -- capacitors, let me be more
16    specific, made with a variety of materials that
17    can perform the same function as a capacitor made
18    from tantalum, whether it's nodular powder or
19    flake.
20        Whether those are economic substitutes
21    depends on the terms and conditions on which those
22    capacitors made with the different materials are
23    sold and what other costs and functional
24    limitations are imposed on the end user as a
25    result of using one type of capacitor or another.

Page 98

DR. STEVEN SCHWARTZ

1
2    relevant market for nodular, but that includes
3    nodular.
4        Q.        If you take a look at the top of page
5    12, as part of your report you state:  Thus, all
6    products that are economically interchangeable
7    with those of Cabot are included in the relevant
8    product market.  Did I read that correctly?
9        A. You did, although I would suggest that
10    understanding that sentence requires that you read
11    the preceding sentences.
12        Q.        All right.  Now, but would you agree
13    with me that any products that are economically
14    interchangeable with flake powder would be in the
15    same relevant product market as flake powder?
16        A. Again, in the context of the prior
17    discussion in paragraph 19, yes, because that
18    concluding statement makes sense in light of what
19    precedes it.
20        Q.        So for example, are there any ceramic
21    tantalum -- strike that.
22        Are there any ceramic products,
23    capacitor products that would be in the same
24    relevant product market as tantalum -- flake
25    tantalum based capacitors?

Page 100

DR. STEVEN SCHWARTZ

1
2        Q.        Are tantalum capacitors generally more
3    expensive than ceramic capacitors?
4        A. My understanding is that like to like,
5    yes.
6        Q.        Are tantalum capacitors generally more
7    expensive than aluminum capacitors?
8        A. Again, with the same qualification as
9    before, yes.
10        Q.        Are tantalum capacitors generally more
11    expensive than film or multi-level or multi-layer
12    film capacitors, to your knowledge?
13        A. That I don't know.
14        Q.        Are there products that compete
15    with -- actually, go back to the 2000, 2001 time
16    frame.  Were there products that competed with
17    Cabot's flake tantalum powder in that time frame?
18        A. Again, if we're talking at the
19    predesign stage when the focus is on obtaining a
20    particular set of performance characteristics and
21    functional characteristics from a capacitor, at
22    that stage there may, for certain customers and
23    certain applications, have been materials that
24    competed with flake powder.
25        Q.        Were there other tantalum powders that

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 101

1         DR. STEVEN SCHWARTZ
2    competed with Cabot's flake powder in the 2000,
3    2001 time frame?
4         A.   Again, with the same qualification,
5    depending on the particular functionality and
6    particular performance characteristics that were
7    desired.  There may have been nodular powder based
8    capacitors that could have -- that could have
9    theoretically performed the same function.
10        Q.   Is it your understanding that the
11   desirability of any particular product in the
12   market is a function of lots of factors, including
13   sort of its reliability and the case size that can
14   be produced and the cost and the availability and
15   other factors?
16        A.   I wouldn't have stated it that way.
17        Q.   Is the way I stated it reasonably
18   accurate?
19        A.   Yes and no.
20        Q.   How is it accurate?  Let's start
21   there.  Go ahead, pat me on the back.
22        A.   Well, it's -- it is accurate in the
23   sense that the choice of a particular capacitor is
24   not made, as I understand it, is not ordinarily
25   made, as I understand it, based on any one single

Page 102

1         DR. STEVEN SCHWARTZ
2    characteristic of the capacitor, that there are an
3    array of characteristics that end users want from
4    capacitors for particular pieces of equipment,
5    devices, functions, whatever, and that they will
6    make their choices based on a variety of
7    performance and other features, including things
8    like the size of the capacitor, like the
9    reliability of the manufacturer's products
10   historically, how the product tests, things of
11   that sort.
12        So at that stage, the breadth of
13   competition is the cross of a variety of
14   dimensions.  Both the cost of materials and cost
15   of suppliers.
16        Q.   How was my statement inaccurate?  Go
17   ahead.  Whack me.
18        A.   I don't mean to whack you.  It was
19   inaccurate because -- and I don't -- I -- please
20   don't take offense.  It was -- lawyers are
21   often -- well, not lawyers.  Non-economists are a
22   bit too imprecise in their language.  And I think
23   your statement was a perfectly reasonable layman's
24   statement, but it was not sufficiently precise as
25   to the nature of the competition, as I would

Page 103

1         DR. STEVEN SCHWARTZ
2    prefer as an economist.
3         Q.   In a few occasions in the course of
4    today's deposition, you've used the phrase,
5    predesign phase.  What is that?
6         A.   My understanding is that, for any
7    given piece of equipment, there is a -- in the
8    life of that product, there is a period that I
9    have called, for lack of a better term, the
10   predesign phase, which to me means prior to the
11   time the design is locked in and the product is
12   fully engineered, where designs can be changed,
13   re-engineering can be done, and there are options
14   available to the manufacturer to make changes
15   subject to whatever the performance requirements
16   are for the product.
17        Q.   When you say the product, what are you
18   referring to?
19        A.   Whatever the end product is that this
20   particular capacitor is going to be a part of,
21   whether we're talking about a personal computer or
22   an iPod or a cell phone or a digital camera or
23   whatever it might be.
24        Q.   For example, an electronic device?
25        A.   That's fair.  Or again, to be fair, it

Page 104

1         DR. STEVEN SCHWARTZ
2    may be an electronic component that is used within
3    a larger devise, for example, some electronic
4    component that is part of an automobile.
5         Q.   Once a manufacturer -- strike that.
6         You've described what you understand
7    to be the predesign phase.  I take it -- what do
8    you call the phase that comes after the predesign
9    phase?  Is that the locked in phase?
10        A.   I hadn't really labeled it, but I
11   think the way I've characterized that phase in the
12   report is the period -- the phase, once the
13   product, the design is locked in or the design is
14   set or the product is fully engineered.
15        Q.   Can we call that the locked in phase
16   for purposes of your deposition here today?
17   You'll understand the phase I'm referring to?
18        A.   I'll understand what that means.
19        Q.   In the locked in phase, as I
20   understand your testimony, the manufacturer then
21   is constrained in its ability to replace tantalum
22   capacitors that have been designed into that
23   product at that point in time, specifically
24   because the design has been finalized and locked
25   in; is that right?

60361027-8cc5-4bfb-835c-d7ea37f5441a

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 129

1           DR. STEVEN SCHWARTZ
2    availability of flake on the purchase of some
3    other product and could they use the market power
4    that they had with respect to this particular
5    product, flake, that they had by virtue of the
6    patents that they had governing the production of
7    the flake and use that as a lever to extend their
8    power into other non-patented products. That is
9    what I object to as an economic matter.
10          I'm certainly not suggesting that as
11   an economic matter -- again, there may be a legal
12   issue. I'm not saying one way or another. As an
13   economic matter, if Cabot had decided at the end
14   of 2000 that it was going out of the flake
15   business altogether, surely it could have done
16   that. If it had decided that it doesn't want to
17   sell flake to AVX because it doesn't like dealing
18   with AVX, as an economic matter, I don't have a
19   problem with that. It's the conditioning through
20   economic coercion that I find problematic as an
21   economic matter.
22          Q.      And the conditioning in this case is
23   the conditioning of purchases of nodular on flake?
24          A.  Conditioning the purchases of flake on
25   the purchases of nodular.

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 130

1           DR. STEVEN SCHWARTZ
2          Q.      Okay.
3          A.  I think maybe you should -- you can't
4    buy the flake unless you buy the nodular as well.
5          Q.      Okay. Again, your basis for believing
6    that was the case is AVX's complaint in this case;
7    is that right?
8          A.  Well, I think there is economic
9    evidence to support the allegation in the
10   complaint.
11         Q.      But when you say economic evidence,
12   what do you mean?
13         A.  The discussion about the nature of the
14   contract and the negotiations, I think, says to me
15   that -- says to me two things. One is that AVX
16   would have preferred a contract without any
17   requirement to buy nodular, not that it didn't
18   want to buy nodular, not that it didn't want to
19   necessarily buy nodular from Cabot, but it did not
20   want to have a contractual, long-term take-or-pay
21   obligation to Cabot.
22         Q.      Are you aware of anything in any of
23   the evidence in this case in which anyone from
24   Cabot told AVX that AVX had to buy Cabot's nodular
25   powder if AVX wanted to purchase Cabot's flake

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 131

1           DR. STEVEN SCHWARTZ
2    powder?
3          A.  I'm not aware that those specific
4    words were used, but the economics of the
5    transaction says to me that that is, in effect,
6    what happened.
7          Q.      Are you aware of any evidence that
8    Cabot said that, in words or in substance, not
9    necessarily those exact words, but in substance to
10   AVX in the course of the negotiation of this
11   contract?
12         A.  As I interpret the evidence, the fact
13   that there could not be an agreement without the
14   inclusion of nodular says to me that, in
15   substance, Cabot was saying to AVX, if you don't
16   buy the nodular, you don't get the flake.
17         Q.      What evidence do you point to for the
18   proposition that Cabot told AVX in the course of
19   this negotiation that there could be no agreement
20   unless AVX agreed to buy nodular?
21         A.  My recollection is that there were --
22   that the inclusion of the nodular was at the
23   behest of Cabot and that the -- there were those
24   within AVX who wanted the nodular requirement set
25   to zero and that Cabot would not consider -- my

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 132

1           DR. STEVEN SCHWARTZ
2    understanding is that Cabot would not consider the
3    possibility of taking nodular out of the
4    agreement.
5          Q.      It's more accurate to say, actually,
6    Dr. Schwartz, that Cabot wouldn't consider selling
7    nodular powder to AVX unless AVX agreed to sign a
8    binding, long-term contract for the provision of
9    nodular powder; is that right?
10                 MR. GOREN:  Objection.
11         A.  I would not agree with that.
12         Q.      What is wrong with that statement?
13         A.  I think, the way I interpret the
14   evidence is that Cabot would not sell flake powder
15   to AVX, except pursuant to a contract that
16   specified amounts to be purchased and prices to be
17   paid over time with respect to some quantity of
18   products, most important to our discussion,
19   nodular powder.
20         Q.      Were those other products products
21   that AVX wished to purchase from Cabot?
22         A.  I'm taking the KTaF out of it. I'm
23   taking the Biddeford nodular out of it and
24   focusing on the European nodular.
25         Q.      And we've already seen -- we saw

713-683-0401   Digital Court Reporting and Video   713-683-8935

DR. STEVEN SCHWARTZ

1       DR. STEVEN SCHWARTZ
2    Mr. Gilbertson's testimony on that point, that
3    actually, AVX wanted more nodular powder from
4    Cabot, not less?
5       A. That is what Mr. Gilbertson said, but
6    I—
7       Q.      You respectfully disagree with him?
8       A. I respectfully disagree with — I
9    respectfully disagree with his reasoning, and I
10   don't think the language in his testimony is
11   internally consistent.
12      Q.      You recognize that Mr. Gilbertson was
13   one of the prime negotiators of this contract on
14   behalf of AVX, don't you?
15      A. I do.
16      Q.      So as you sit here, Dr. Schwartz, you
17   truthfully think that you know better than
18   Mr. Gilbertson as to what AVX wanted from Cabot at
19   the time that it entered into this contract?
20         MR. GOREN: Objection.
21      A. I'm not suggesting that. I am
22   suggesting that, taken in its entirety, the
23   testimony to which you referred me earlier that we
24   discussed is inconsistent — that testimony is
25   inconsistent with the conclusion that you took

1       DR. STEVEN SCHWARTZ
2    Mr. Gilbertson to through your questioning.
3       Q.      Just going back to my earlier
4    question, because I'm not sure we actually covered
5    it. As you sit here today, can you point to any
6    evidence in this case that Cabot, at any point in
7    time, said to AVX that Cabot only would sell flake
8    nodular powder to AVX if AVX agreed to purchase
9    nodular powder from Cabot at the same time?
10      A. In words, no. In substance, yes.
11      Q.      In substance, you are referring to the
12   economic evidence, correct?
13      A. Yes.
14      Q.      Which we've already discussed?
15      A. Correct.
16      Q.      You are not aware of any testimony
17   from any witnesses to that effect, correct?
18      A. I am not.
19      Q.      You are not aware of any documents in
20   which Cabot said that to AVX, in words or in
21   substance?
22      A. Nothing that I recall.
23      Q.      Looking, sir, at your report, page 14,
24   there is a reference in paragraph 26 to design
25   out, do you see that?

1       DR. STEVEN SCHWARTZ
2       A. Yes.
3       Q.      What does design out mean?
4       A. My understanding is that design out
5    refers to the process of taking an existing design
6    and for a particular piece of electrical equipment
7    or component and changing some of the underlying
8    electrical components to achieve the same
9    function, replacing something that, for example,
10   is no longer available.
11      Q.      So for example, you are familiar with
12   the fact that Intel, over the course of the years,
13   has largely, not exclusively, but largely designed
14   tantalum out of its semi-conductors?
15      A. I'm aware of that.
16      Q.      That is an example of the design out
17   phenomenon, correct?
18      A. Yes and no, although it's — it is
19   part of the design out phenomenon. I guess what I
20   want to be clear about is that there are, as I
21   understand it, at least two broad kinds of design
22   out, one is the short term design out because
23   something is unavailable immediately, and the
24   other is a longer term design out issue where in
25   order to embody a new technology or to move in a

1       DR. STEVEN SCHWARTZ
2    different direction for whatever reason, you may
3    move away from one particular type of product or
4    one particular type of capacitor to another.
5       Q.      Have any flake based capacitor
6    products been designed out over time?
7          MR. GOREN: AVX's?
8          MR. DAVIS: Sure. Let's take
9    AVX's.
10      A. It wouldn't surprise me if there were
11   some instances that over an extended period of
12   time designs would change that would take away a
13   flake tantalum — flake tantalum powder product
14   and replace it with something else. I don't have
15   anything specific in mind, but I wouldn't be
16   surprised if that had occurred.
17      Q.      On those occasions in which flake
18   based products have been designed out by
19   manufacturers, what have they been replaced with?
20      A. I don't know.
21      Q.      Did you investigate that in the course
22   of your work?
23      A. Only in the most general sense of what
24   the alternatives could have been, which would, in
25   part, as I understand it, depend on why they were

60361027-8cc5-4bfb-835c-d7ea37f5441a

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 153

```
 1        DR. STEVEN SCHWARTZ
 2     A.  That may be true.  I don't -- I don't
 3  have a recollection of that as I sit here.
 4     Q.      Well, you stated in your report that
 5  the 2001 supply agreement required AVX to buy much
 6  more nodular powder from Cabot than it needed.  I
 7  guess what I'm trying to get at is, how did you go
 8  about determining what AVX needed?
 9     A.  As you go through each year of the
10  contract, you go through and you look and say,
11  well, how much did they actually have to buy and
12  how much did they buy.  We know, for example, from
13  the documents that there were periods of time in
14  which powder that was purchased from Cabot was
15  stockpiled.  When you inventory, that says you're
16  buying more than you need.
17     Q.      You would agree with me, Dr. Schwartz,
18  really the relevant question is, what did AVX
19  think -- as of the time it entered into the 2001
20  supply agreement with Cabot, what did AVX think it
21  was going to need in those subsequent years?
22        MR. GOREN:  Objection.
23     A.      Because that's the time that AVX
24  agreed to buy those minimum quantities from Cabot,
25  right?
```

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 154

```
 1        DR. STEVEN SCHWARTZ
 2        MR. GOREN:  Objection.
 3     A.  Well, that is certainly something
 4  that -- that is a piece of information, but when
 5  one talks about the effects of this contract, and
 6  when one considers that the linchpin to this
 7  contract was the gun figuratively held to AVX's
 8  head by Cabot, with respect to the availability of
 9  flake, those amounts represent minimum amounts to
10  be -- you know, under a take-or-pay sort of an
11  agreement, the adverse effect comes when that gun
12  requires you to accept amounts that turn out not
13  to be economically viable and require you to incur
14  costs that you would otherwise not have incurred.
15     Q.      Again, the gun you are referring to is
16  flake and only flake?
17     A.  Yes.
18     Q.      Are you aware of any testimony in this
19  case that AVX desperately needed nodular powder
20  for its Biddeford operations from Cabot in the
21  2000, 2001 time frame?
22     A.  Yes, it needed it for Biddeford.  And
23  again, I've made that very clear.  The focus for
24  me is with respect to European nodular.
25     Q.      So did the nodular powder that Cabot
```

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 155

```
 1        DR. STEVEN SCHWARTZ
 2  had that Biddeford wanted, did that give Cabot a
 3  gun to AVX's head as well?
 4        MR. GOREN:  Objection.
 5     A.  Repeat that, please.
 6     Q.      I can rephrase it.
 7     A.  Okay.
 8     Q.      You've referenced several times the
 9  flake that Cabot sold was the equivalent of a gun
10  to AVX's head.  Maybe not the exact words, but
11  I've got that in essence, do I not?
12     A.  You do.
13     Q.      And you are aware that there is
14  testimony in this case to the effect that AVX also
15  desperately wanted Cabot's nodular powder for
16  AVX's Biddeford operations back in the mid to late
17  2000 time frame?  You are aware of that, are you
18  not?
19     A.  It did want powder for Biddeford, yes.
20     Q.      That it desperately wanted powder for
21  Biddeford?
22     A.  I don't recall the word desperately.
23     Q.      Did you recall seeing Mr. Collis's
24  testimony that AVX wanted tantalum nodular powder
25  for its Biddeford operations just as badly as it
```

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                AVX Corporation and AVX Limited v. Cabot Corporation

Page 156

```
 1        DR. STEVEN SCHWARTZ
 2  wanted flake?
 3     A.  Again, I don't recall the just as
 4  badly as it wanted flake, but I do know that it
 5  had a need for and wanted the nodular powder for
 6  Biddeford.
 7     Q.      So you would agree with me that, in
 8  that respect, the nodular powder was the same as
 9  the flake powder; they both gave Cabot an economic
10  power, in your view, over AVX at that point in
11  time, right?
12        MR. GOREN:  Objection.
13     A.  I don't think the extent of the
14  economic power that Cabot had with respect to the
15  Biddeford powder was any more equivalent to the
16  power that it had with respect to flake for
17  purposes of the European nodular, which is really,
18  for purposes of my analysis, the tied product that
19  I am focused on.
20     Q.      Did AVX want the Biddeford nodular any
21  less than it wanted the flake from Cabot in the
22  2000 time frame?
23     A.  I haven't formed a judgment on that
24  one way or the other.
25     Q.      You would agree with me that AVX's
```

713-683-0401   Digital Court Reporting and Video   713-683-8935

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 165

1          DR. STEVEN SCHWARTZ
2    question.
3          MR. GOREN: Yeah.
4        Q.       You would agree with me, Dr. Schwartz,
5    that if what AVX was complaining of in this case
6    was that it was forced to purchase by Cabot any
7    kind of tantalum product for years beyond the time
8    period encompassed by those letters of intent --
9    strike that. Let me start again.
10          You saw Mr. Collis's testimony earlier
11    today, correct?
12        A.   Yep. We looked at it, as I recall.
13        Q.       And actually, why don't you pull it
14    out, and we'll go back.
15        A.   What number was Collis?
16        Q.       Collis is Exhibit 3.
17    A. ·Okay.
18        Q.       If you take a look at page 17 of
19    Mr. Collis's deposition again, on the bottom of
20    page 17, beginning on line 17, Mr. Collis was
21    asked, just a little more than two months ago:
22          "Question: So it's AVX's
23    position that every product that is
24    encompassed by the 2001 supply agreement
25    was a product that it believes it was

Page 166

1          DR. STEVEN SCHWARTZ
2    forced to accept on account of Cabot's
3    coercive strategies. Is that right?"
4          There was an objection.
5          Mr. Collis answered: Yes. We
6    did not want to enter into a five-year
7    agreement.
8          Then if you look on page 18,
9    beginning on line 2, then line 4 is where
10    the question begins: Are there any
11    additional products that AVX claims it was
12    forced to accept on account of Cabot's
13    coercive strategies other than what you've
14    identified?
15          "Answer: I -- I'm sorry. I'm a
16    bit confused. Can I perhaps clarify the --
17          "Question: Yes.
18          "Answer: I mean -- basically,
19    we're saying all of the materials in years
20    2 through 5. What other materials are you
21    referring to?
22          "Question: So when you say, all
23    of the materials in years 2 through 5,
24    you're looking at appendix A to Exhibit 2.
25    Are you not?

Page 167

1          DR. STEVEN SCHWARTZ
2          "Answer: Yes."
3          Appendix A is the appendix A to
4    the supply agreement.
5          So you would agree with me,
6    Dr. Schwartz, that what Mr. Collis testifies to
7    here is that AVX believes that it was forced to
8    buy -- that it was coerced into buying any
9    products at all in the years 2 through 5; do you
10    see that?
11        A.   I see that is what Mr. Collis says.
12        Q.       You would agree with me that if Cabot
13    purportedly used its market power in flake, as you
14    have testified to, to force AVX to buy more flake
15    and nodular and maybe even KTaF in years 2 through
16    5 of this contract, that's not a tying claim?
17          MR. GOREN: Objection.
18        A.   Okay. I'm confused by your question,
19    and let me tell you why, and maybe we can help
20    each other figure out what you are asking so I can
21    answer the question.
22          I'm not asserting that based on my
23    analysis I have concluded that there was a tie
24    with any -- with respect to any product other than
25    the European nodular. I'm not offering an opinion

Page 168

1          DR. STEVEN SCHWARTZ
2    on that. AVX can certainly try and, you know, put
3    evidence on those issues. I have nothing to
4    say about them. My focus is on the European
5    nodular.
6          If -- can I imagine a set of facts
7    that would create the tie that is alleged by
8    Mr. Collis, yes. But I haven't done an analysis
9    to determine if that set of facts exist. My focus
10    has been on looking at the conditions surrounding
11    the market power attendant to the flake products
12    and whether there was evidence of economic
13    conditioning with respect to European nodular.
14    And that is the extent of the opinion that I have.
15          Now, I don't know if that answers your
16    question. If it doesn't, I apologize. It means I
17    just really don't understand what you are asking.
18        Q.       You know enough about antitrust law
19    and antitrust law involving tying to recognize
20    that in order to have a tie for antitrust purposes
21    that you need to have separate products, correct?
22        A.   Yes.
23        Q.       That's part of the reason why, in your
24    analysis, you analyze whether flake tantalum
25    powder and nodular tantalum powder are separate

42 (Pages 165 to 168)

Page 169

1          DR. STEVEN SCHWARTZ
2    products, correct?
3          A. Yes.
4          Q.      And you came to the conclusion that
5    they are?
6          A. Yes.
7          Q.      You would agree with me, however, that
8    if AVX's claim in this case is that it agreed to
9    buy certain products in 2001 from Cabot but then
10   Cabot forced AVX to buy the same products in 2002,
11   2003, 2004 and 2005, that those would not, by
12   definition, be separate products, correct?
13         A. Okay. Again, just to be sure I
14   understand, you are talking about conditioning the
15   availability of products in years two, three -- of
16   a product in year two, three, four and five on the
17   purchase of that same product in year one?
18         A.      Yes. I'm talking about conditioning
19   purchases of products in subsequent years on AVX's
20   purchase of products in year one.
21         A. My understanding of the law and my
22   understanding of the economics is that would not
23   be a tie. I would note that I'm an expert in
24   economics, and whatever I say about the law is
25   certainly not dispositive on anybody.

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 170

1          DR. STEVEN SCHWARTZ
2          Q.      And it won't be dispositive on the
3    judge either, but he might want to consider it.
4          On the top of page 21 of your report,
5    you state: Furthermore, although Cabot did
6    require AVX to purchase a mix of nodular and flake
7    powder in the 2001 supply agreement, it did not
8    incorporate a, quote, required grade mix, close
9    quote, of nodular and flake powders in its
10   purchasing agreements with other capacitor
11   manufacturers such as Kemet, which is, K-E-M-E-T,
12   and Vishay, V-I-S-H-A-Y.  What do you mean by
13   that?
14         A. If you don't mind, I'd like to read
15   the whole paragraph.
16         Q.      No. Go right ahead.
17         A. I think the point I was making here
18   was the fairly narrow point that because flake
19   capacitors was a relatively larger percentage of
20   AVX's business than other manufacturers, I infer
21   that Cabot was able to extract more favorable
22   terms and conditions with respect to flake and
23   nodular in the supply agreement than it was able
24   to obtain from other manufacturers. I think that
25   is the only point that I'm making.

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 171

1          DR. STEVEN SCHWARTZ
2          Q.      Did any other manufacturers buy
3    flake -- Cabot's flake product from Cabot in the
4    2000, 2001 time frame?
5          A. My understanding is that they did.
6          Q.      Did Cabot tie sales of nodular
7    tantalum products to those customers as well?
8          MR. GOREN:  Objection.
9          A. I've not formed a judgment about the
10   circumstances surrounding the contracts between
11   Cabot and other capacitor manufacturers.
12         Q.      Did you look at that issue in the
13   course of your work?
14         A. I did not analyze the circumstances
15   surrounding those contracts.
16         Q.      If you turn to page 23 of your report,
17   paragraph 43. Paragraph 43 states:  The increase
18   in price for Cabot's nodular powders between 2000
19   and 2001 was also much greater than corresponding
20   increases from other suppliers.  Do you see that?
21         A. I do.
22         Q.      Are you aware that in the 2000 time
23   frame, that AVX paid almost twice what it paid to
24   Cabot for nodular powder from H.C. Starck?
25         A. I'm sorry. Say that again.

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 172

1          DR. STEVEN SCHWARTZ
2          MR. GOREN:  Twice the price or
3    twice the quantity?
4          MR. DAVIS:  Twice the price.
5          A. Okay. Can you repeat the whole
6    question?
7          Q.      Certainly. Are you aware that in the
8    2000 time frame that AVX actually purchased
9    nodular tantalum powder from Starck at
10   approximately $1,000 a pound?
11         A. Prior to the supply agreement?
12         Q.      Yes.
13         A. That is the time frame we're talking
14   about?
15         Q.      Yes, in 2000.
16         A. I'm aware that there are prices --
17   there were instances where for nodular powder, AVX
18   paid substantially higher prices to Starck than
19   they did Cabot.
20         Q.      Including the prices that they paid to
21   Cabot under the 2001 supply agreement, correct?
22         A. My understanding is that there were
23   prices in the 2000 -- in the supply agreement that
24   were lower than the prices that Starck charged for
25   some products in the 2000 time frame for certain

713-683-0401   Digital Court Reporting and Video   713-683-8935

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 173

1          DR. STEVEN SCHWARTZ
2    products that it sold.
3        Q.        In fact, other suppliers were
4    charging, including Starck, were charging more
5    than Cabot in that time frame for nodular powder,
6    right?
7          MR. GOREN:  What time frame?
8          MR. DAVIS:  In the 2000 time
9        frame, leading up to the signing of the
10       2001 supply agreement.
11       A.  My understanding is that there were
12   some products for which Cabot's prices were lower
13   and some for which they were not for nodular
14   powders.
15       Q.        Now, on page 24 of your report, you
16   talk about changes in prices over time.  In
17   particular, if you look at paragraph 45, would you
18   read that to yourself and tell me, please, when
19   you are done.
20       A.  Okay.
21       Q.        Now, Exhibit 45 -- I'm sorry.
22       Paragraph 45 of your report makes
23   reference to Exhibit 7.  And Exhibit 7 is titled
24   tantalum powder purchases from Cabot.  Do you see
25   that?

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 174

1          DR. STEVEN SCHWARTZ
2    A.  Let me get to it.  Yes.
3        Q.        If I understand the import of this
4    chart, it shows that the prices that AVX paid, on
5    average, from Cabot in the 19 -- certainly in the
6    2001 through 2005 time frame were higher than the
7    prices that Kemet and Vishay paid from Cabot; is
8    that right?
9        A.  Yes.
10       Q.        You are aware that Kemet and Vishay
11   signed contracts with Cabot in the 2000 time
12   frame that required them to buy tantalum products from
13   Cabot at prices of up to $500 per pound?
14       A.  Yes.
15       Q.        Which is the same or approximately the
16   same price that AVX was being charged under its
17   agreement, correct?
18       A.  Well, let me go back.  I know that
19   they signed agreements that were similar in nature
20   to the agreement with AVX and that they were
21   long-term take-and-pay.  I don't recall the
22   specific prices that were included in the Kemet
23   and Vishay contracts.
24       Q.        Well, are you aware that while those
25   contracts were enforced that Cabot and Kemet and

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 175

1          DR. STEVEN SCHWARTZ
2    Vishay agreed to settlements of pending litigation
3    that resulted in price reductions to those
4    particular entities?
5        A.  Price reductions and extensions in the
6    length of the term, yes.
7        Q.        So you would expect to see the results
8    of those price reductions in the data that you
9    have included in Exhibit 7, right?
10       A.  For the years after the settlements
11   but not for the years before.
12       Q.        And you are also aware that Cabot and
13   AVX attempted, on a number of occasions, to
14   resolve their disputes about this particular
15   contract while the contract was still enforced?
16   Are you familiar with that?
17         MR. GOREN:  Objection.
18       A.  I understand that there were
19   discussions between the parties about ways to
20   resolve their disagreements.
21       Q.        Are you aware that agreements were
22   reached between Cabot and some of the people
23   within AVX that were then rejected by AVX's top
24   management?  Are you aware of that fact?
25         MR. GOREN:  Objection.

713-683-0401  Digital Court Reporting and Video  713-683-8935

---

Dr. Stephen Schwartz                    AVX Corporation and AVX Limited v. Cabot Corporation

Page 176

1          DR. STEVEN SCHWARTZ
2    A.  I am aware that there was no
3    resolution.  It would not surprise me if there
4    were some people within both Cabot and AVX that
5    would have been happy to agree to something that
6    the top management would not have been happy to
7    agree to.
8        Q.        So what we really see on Exhibit 7,
9    Dr. Schwartz, is that Kemet and Vishay were able
10   to reach agreements and enter into settlements
11   with Cabot that reduced the prices that they paid
12   in -- certainly in the latter parts of their
13   contracts from what AVX was paying under its
14   unmodified contract with Cabot; is that right?
15       A.  Certainly in the out years of -- as
16   reflected on this exhibit, the prices paid by
17   Kemet and Vishay do reflect the results of the
18   settlement.  But the early years do show the
19   pricing differences under the agreements that
20   were -- initial agreements that were signed by
21   AVX, Kemet and Vishay.
22       Q.        Looking on paragraph 47 of your report
23   on page 25, about a third of the way into the
24   paragraph you state:  Looking at Exhibits 8A and
25   8B, Cabot's product level costs for flake and

713-683-0401  Digital Court Reporting and Video  713-683-8935

60361027-8cc5-4bfb-835c-d7ea37f5441a

Dr. Stephen Schwartz                          AVX Corporation and AVX Limited v. Cabot Corporation

Page 205

1              DR. STEVEN SCHWARTZ
2              MR. DAVIS:  Well, the rule -- the
3       scheduling order in this case doesn't
4       permit him to submit a rebuttal report.
5       There isn't any provision in the scheduling
6       order for him doing so.  So if you expect
7       Dr. Schwartz to testify at trial in any
8       manner, shape or form regarding the content
9       of Dr. Kalt's report, I'm entitled to
10      inquire about that here today at
11      Dr. Schwartz's one and only deposition in
12      this matter.
13             MR. GOREN:  If and to the extent
14      that Dr. Schwartz issues a rebuttal report,
15      we intend to provide you with that
16      opportunity to further examine him on that
17      prior to trial.
18             MR. DAVIS:  Expert discovery,
19      Richard, in this case closes on March 1,
20      2008.  So I don't -- you keep referring to
21      a rebuttal report and further expert
22      depositions.  That is not permitted under
23      the court's order.
24             So again, my position is --
25      Cabot's position is that if you intend to

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                          AVX Corporation and AVX Limited v. Cabot Corporation

Page 206

1              DR. STEVEN SCHWARTZ
2       have Dr. Schwartz testify at all with
3       respect to the content of Dr. Kalt's
4       report, I'm entitled to ask those questions
5       now.  He says he read the report.  I'm
6       here.  I wish to explore any criticisms,
7       thoughts, anticipated testimony that he may
8       have with respect to that report here
9       today.  If you don't allow me to do so,
10      then he is going to be precluded from
11      offering that testimony at trial.
12             MR. GOREN:  I disagree.  I think
13      you can ask the witness some general
14      questions about his observations of the
15      Kalt report.  If he issues a rebuttal
16      report with opinions in there, we will give
17      you the opportunity to conduct a further
18      deposition.
19             I hear you loud and clear.  I
20      have no answer, but the witness has not
21      been engaged as of yet, if at all, to
22      provide an expert rebuttal opinion to Kalt,
23      to the Kalt report.
24
25      BY MR. DAVIS:

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                          AVX Corporation and AVX Limited v. Cabot Corporation

Page 207

1              DR. STEVEN SCHWARTZ
2
3       Q.       Dr. Schwartz, do you expect to testify
4       at trial in this matter?
5       A.    If I'm asked, yes.
6       Q.       Have you been asked to testify at
7       trial in this matter yet?
8       A.    No.
9       Q.       Have you formed any opinions at this
10      point in time regarding any of the content of
11      Dr. Kalt's report?
12      A.    I have impressions.  I haven't formed
13      final opinions.
14      Q.       Would you share with me now your
15      impressions of Dr. Kalt's report, please?
16      A.    You ask so nicely.
17      Q.       It's late.
18      A.    The easiest way for me to do that is
19      to allow me to, since I have not committed his
20      report to memory, allow me to flip through, if I
21      may.
22             I don't agree with Dr. Kalt's
23      discussion about the lack of an incentive for
24      tying.
25      Q.       What page are you on, please?

713-683-0401   Digital Court Reporting and Video   713-683-8935

---

Dr. Stephen Schwartz                          AVX Corporation and AVX Limited v. Cabot Corporation

Page 208

1              DR. STEVEN SCHWARTZ
2       A.    Page 13 of his report.
3       Q.       And how do you think that his analysis
4       or his opinions in that respect are incorrect?
5       A.    Because I don't think -- I don't think
6       they go far enough.  It is clearly true that one
7       approach that Cabot could have taken in this
8       marketplace is simply to have done whatever it
9       wanted to do with respect to the price of flake.
10      It had a patent with respect to flake, and it
11      could have used that patent with respect to flake
12      however it wished.
13             Dr. Kalt seems to preclude any
14      rationale for trying to leverage market power
15      associated with the patent into some other market.
16      In fact, I believe he goes further, seemingly to
17      suggest -- again, maybe I'm misinterpreting him.
18      He will certainly speak for himself.  But he seems
19      to suggest that he can't conceive of an instance
20      in which a patent holder would engage in a tie
21      where the patent holder tries to leverage the
22      patent and the market power associated with that
23      patent into another market where there is another
24      product being sold.  He seems to preclude that as
25      a reasonable possibility.  Respectfully, I

713-683-0401   Digital Court Reporting and Video   713-683-8935

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 209

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    disagree with him on that.
3        Q.        What else?
4        A.    Quite clearly, I disagree with him
5    that there is no basis for inferring actual tying.
6    I've gone through in perhaps painful detail my
7    rationale for believing that there was
8    conditioning and the nature of the economic
9    coercion that I believe exists.
10       Q.        Anything else?
11       A.    I disagree with his conclusion that
12   all tantalum powder competes in one market.
13       Q.        What page are you on?
14       A.    He may discuss it in other places, but
15   he certainly does in paragraph 58 carrying over
16   from 19 to 20.
17       Q.        And how do you think he is incorrect
18   in that respect?
19       A.    Well, again, I think there are
20   separate markets for flake and nodular, as we have
21   discussed.
22       Q.        Separate markets you think would exist
23   in the context of the locked in?
24       A.    Yes.
25       Q.        You don't believe that products exist

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 210

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    in separate markets in the predesign phase; is
3    that right?
4        A.    As I've said before, I believe that
5    there are alternatives -- that different materials
6    can represent alternatives for one another in
7    certain -- in different applications in the
8    predesign phase.
9        Q.        Including flake and nodular?
10       A.    Potentially, yes.
11       Q.        But I want to make my question a bit
12   more pointed. Do you believe that flake and
13   nodular constitute separate products in the
14   predesign phase market?
15       A.    Well, okay. Separate products, yes.
16   Is there one -- I think what you are meaning to
17   ask is do they compete in the same market?
18       Q.        Do they compete in the predesign phase
19   market?
20       A.    Excuse me. That question I
21   understood. With respect to some applications in
22   the predesign stage, nodular and tantalum --
23   nodular and flake do compete. It's only in the
24   lockin phase.
25       Q.        In what applications do nodular and

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 211

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    tantalum not compete in the predesign phase?
3        A.    My understanding is a particular -- is
4    that in particular, in the high voltage
5    applications, in the applications that require a
6    high degree of redundancy, I think automotive is a
7    prime example of that. While as a technical
8    matter, nodular could substitute for flake. As a
9    practical, economic matter, nodular is not a
10   realistic alternative.
11       Q.        Does flake compete with other --
12   strike that.
13       Do products other than nodular powder
14   compete with flake in high voltage application in
15   the predesign phase, for example, ceramics?
16       A.    My understanding is that in some
17   applications there will be competition in the
18   predesign stage, or there can be competition in
19   the predesign stage between flake and ceramic.
20       Q.        Including high voltage applications?
21       A.    Including some high voltage
22   application.
23       Q.        Are you aware, as you sit here today,
24   can you identify for me any specific high voltage
25   applications in which flake and ceramics do not

713-683-0401   Digital Court Reporting and Video   713-683-8935

Page 212

DR. STEVEN SCHWARTZ

1    DR. STEVEN SCHWARTZ
2    compete in the predesign stage?
3        A.    No. I couldn't do that one way or the
4    other.
5        Q.        Anything else? Any other criticisms
6    that you have regarding Dr. Kalt's report?
7        A.    Well, as we discussed, I disagree with
8    his characterization of AVX suffering buyer's
9    remorse. I think his statement in paragraph 62 is
10   unnecessarily glib and off point, but that may be
11   a matter of style. I obviously disagree, as I
12   said, with his conclusions with respect to
13   conditioning.
14       Q.        Meaning going back to the tie?
15       A.    Yes. I disagree with his conclusions
16   about market power as it respects -- with respect
17   to flake because I think he misses the two phases
18   of competition. There is the significance of the
19   lockin phase and the ability to exercise market
20   power vis-a-vis customers who have their own
21   customers who are locked into a particular
22   product.
23       Q.        Anything else?
24       A.    I think as a general matter, Dr. Kalt
25   blurs the lines between different tantalum

713-683-0401   Digital Court Reporting and Video   713-683-8935

60361027-8cc5-4bfb-835c-d7ea37f5441a

Page 213

DR. STEVEN SCHWARTZ

1
2    products and makes a number of statements about
3    the tantalum market and Cabot's behavior with
4    respect to tantalum that would be arguably correct
5    or correct if you were limiting his
6    characterization to nodular but are not correct
7    when they relate to flake.
8        Q.      Can you cite an example, please?
9        A.    Well, he has got some discussion
10   beginning at about — well, I guess it may just be
11   paragraph 79 that I think would have elements of
12   truth in them or would have elements of accuracy
13   in them if the discussion was limited to nodular
14   but not necessarily to flake.
15       Q.      Specifically, what do you believe to
16   be facts that would apply to nodular but not
17   necessarily to flake that are stated in paragraph
18   79?
19       A.    Investing in customer service to
20   encourage customer loyalty has value in highly
21   competitive marketplaces where consumers can
22   easily seek to have their commercial needs met by
23   other competitors.  I think that is a statement
24   that applies to the sale of nodular.
25       If Cabot had the monopolistic power

Page 214

DR. STEVEN SCHWARTZ

1
2    that plaintiffs allege, and that term, by the way,
3    is not mine, monopolistic power, then Cabot would
4    find investing in customer loyalty less valuable.
5    Again, that is, the investments that Cabot makes
6    with respect to customer loyalty, I believe, you
7    can attribute, as I understand it, to nodular, not
8    to flake.
9        Q.      Is it your understanding that Cabot's
10   research staff did not work with AVX to try to
11   solve production problems regarding flake powder?
12       A.    Oh, I think they did.  I don't regard
13   that as something to engender customer loyalty.
14       Q.      Anything else?
15       A.    I think his discussion of design out
16   mischaracterizes what I have done and
17   mischaracterizes the record.
18       Q.      And where are you, specifically?
19       A.    Paragraph 81.
20       Q.      And how does it mischaracterize, A,
21   the record?
22       A.    Well, because I think the record is
23   replete with discussion of problems in design out
24   and distinguishes between what is technically
25   possible and what is economically reasonable.  And

Page 215

DR. STEVEN SCHWARTZ

1
2    that is a distinction that I think Dr. Kalt
3    ignores.
4        Q.      How does it mischaracterize what you
5    have stated?
6        A.    Well, I think in my report, I state
7    pretty clearly that I'm focusing on the extent to
8    which design out is possible in what we've called,
9    for purposes of this deposition, the lockin phase.
10   I'm not talking about the extent to which there
11   are alternatives in the predesign phase.  And I
12   think that Dr. Kalt is a bit disingenuous in his
13   characterization of what he has done.
14       Q.      Your report does say that once the
15   design of the electronic device is set, end users
16   of capacitors would typically switch to a
17   different type of capacitor if their existing
18   capacitor needs are not met, correct?
19       A.    Yes, but that statement is, in this —
20   as Dr. Kalt has used it, that statement is, I
21   think, grossly out of context.  The point is, if I
22   am making iPods, and I'm using capacitors used
23   from flake and flake is no longer available, I
24   have no option.  It may take me a while.  I may
25   not be able — I may have to re-engineer the iPod.

Page 216

DR. STEVEN SCHWARTZ

1
2    I may have to do things in a way that are less
3    efficient.  I will have to incur costs.  And it
4    will surely sour my relationship with the supplier
5    of flake capacitors.
6        So the suggestion that — to suggest
7    that if they can't get flake capacitors, customers
8    will sit there and do nothing would be silly.  To
9    suggest that that means that the design out option
10   is a viable economic option and that there is no
11   market power attendant to Cabot's patents as a
12   consequence, I think, is absurd.
13       Q.      Anything else?
14       A.    Obviously, I disagree with his
15   discussion on the separate product market for tied
16   goods.  Although I'm not sure that it's relevant
17   any longer.
18       Q.      Because of the — your change in
19   opinion regarding KTaF?
20       A.    Correct.
21       Q.      Anything else?
22       A.    I do believe there is antitrust
23   injury.
24       Q.      But you have not opined in that,
25   correct?

60361027-8cc5-4bfb-835c-d7ea37f5441a