# Exhibit #7

1        COMMONWEALTH OF MASSACHUSETTS

2   SUFFOLK, SS               SUPERIOR COURT

3        CIVIL ACTION NO. 05-03816-BLS

4

5  AVX CORPORATION and AVX LIMITED,    )

6           Plaintiffs And Defendants  )

7           in Counterclaim,        )

8     vs.                      )

9  CABOT CORPORATION,           )

10         Defendant and Plaintiff    )

11         In Counterclaim.        )

12

13

CONFIDENTIAL

14          **CONFIDENTIAL**

15

16      The deposition of JOHN COLIN CHAPPLE,

17  called for examination, taken before ANNETTE M.

18  MONTALVO, a Notary Public within and for the

19  Commonwealth of Massachusetts, and a Registered

20  Merit Reporter of said state, at Suite 3400, Two

21  International Place, Boston, Massachusetts, on

22  the 4th day of August, A.D. 2006, at 9:30 a.m.

23

24

Page 2

1 PRESENT:

2

3    BODOFF & SLAVITT, LLP,

4    (225 Friend Street, 7th Floor,

5    Boston, Massachusetts  02114,

6    617-742-7300), by:

7    MR. EVAN SLAVITT,

8        appeared on behalf of the Plaintiffs

9        and Defendants in Counterclaim;

10

11    CHOATE, HALL & STEWART,

12    (Two International Place,

13    Boston, Massachusetts  02110,

14    617-248-5000), by:

15    MR. ROBERT S. FRANK, JR.,

16        appeared on behalf of the Defendant

17        and Plaintiff In Counterclaim.

18

19

20

21

22 REPORTED BY:  ANNETTE M. MONTALVO, CSR, RMR,

23        RMR CERTIFICATE NO. 833506.

24

---

Page 4

1 INDEX  (Continued)

2

3        E X H I B I T S

4 NUMBER                              PAGE

5 Deposition Exhibit

6

7 No. 61                              61

8 No. 62                              68

9 No. 62-A                            70

10 No. 63                             73

11 No. 64                             74

12 No. 65                             77

13 No. 66                             102

14 No. 67                             104

15 No. 68                             104

16 No. 69                             106

17 No. 70                             108

18 No. 71                             109

19 No. 72                             111

20 No. 73                             114

21 Nos. 74 and 75                     115

22 No. 76                             116

23 No. 77                             119

24 No. 78                             120

---

Page 3

1            I N D E X

2 WITNESS                    EXAMINATION

3 JOHN COLIN CHAPPLE

4    By Mr. Frank                7

5

6        E X H I B I T S

7 NUMBER                              PAGE

8 Deposition Exhibit

9 No. 45                              12

10 No. 46                             14

11 No. 47                             16

12 No. 48                             24

13 No. 49                             28

14 No. 50                             30

15 No. 51                             32

16 No. 52                             34

17 No. 53                             38

18 No. 54                             39

19 No. 55                             43

20 No. 56                             51

21 No. 57                             55

22 No. 58                             55

23 No. 59                             57

24 No. 60                             60

---

Page 5

1 INDEX  (Continued)

2

3        E X H I B I T S

4 NUMBER                              PAGE

5 Deposition Exhibit

6 No. 79                              122

7 No. 80                              132

8 No. 81                              133

9 No. 82                              135

10 No. 83                             138

11 No. 84                             140

12 No. 85                             145

13 No. 86                             150

14 No. 87                             152

15 No. 88                             155

16 No. 89                             159

17 No. 90 and 90-A                    172

18 No. 91                             179

19 No. 92 and 93                      180

20

21

22

23

24

---

2 (Pages 2 to 5)

Page 6

1  MR. FRANK: Stipulations?
2  MR. SLAVITT: The one we had last time was
3  all objections except as to form and motions to
4  strike are preserved until trial. The witness
5  shall have 30 days to read and sign the
6  deposition, starting from date of receipt.
7  Failure to sign within that period of time is
8  deemed signature for all purposes. The witness
9  can sign in front of a notary public or whatever
10  the relevant equivalent is.
11  MR. FRANK: I am prepared to -- as long as
12  the witness signs --
13  MR. SLAVITT: Then that's fine. I'm just
14  telling you what we did last time.
15  MR. FRANK: Waive notarization.
16  MR. SLAVITT: Also, we are up to 44.
17  MR. FRANK: 44.
18
19  (WHEREUPON, the witness was duly
20  sworn.)
21
22  JOHN COLIN CHAPPLE,
23  called as a witness herein, having been first
24  satisfactorily identified and duly sworn, was

Page 7

1  examined and testified as follows:
2  EXAMINATION
3  BY MR. FRANK:
4  Q.  Good morning, sir. Would you state
5  your name, please.
6  A.  John Colin Chapple.
7  Q.  Where do you live, Mr. Chapple?
8  A.  I live at 5 Albany Road, Paignton, in
9  the UK.
10  Q.  Are you presently employed?
11  A.  I am.
12  Q.  By whom are you employed?
13  A.  AVX Limited.
14  Q.  And what is your position with AVX
15  Limited?
16  A.  Materials manager.
17  Q.  And is it correct that in that
18  position, among other things, you have day-to-day
19  responsibility for the purchasing of tantalum
20  materials for AVX?
21  A.  That's correct.
22  Q.  Because I have had the opportunity to
23  take your deposition before, I am simply going to
24  ask you a few questions about your background,

Page 8

1  and I suspect I know the answers.
2  You attended South Devon Technical
3  College; is that correct?
4  A.  That's correct.
5  Q.  And did you obtain a degree from South
6  Devon Technical College?
7  A.  No, not a degree. We did an ordinary
8  national certificate in electrical engineering.
9  We then left South Devon Technical College and
10  went to a company called Sifam.
11  Q.  Okay. And the "we" in that response is
12  yourself?
13  A.  It is myself.
14  Q.  Okay. And am I correct that you were
15  first employed by AVX beginning in 1987 when AVX
16  purchased a company then called Standard
17  Telephone and Cables?
18  A.  That's correct.
19  Q.  Okay. Is it also correct that in 1989
20  you became a senior buyer in the purchasing
21  group, purchasing certain products for AVX's
22  Paignton, England, facility?
23  A.  That's correct.
24  Q.  Okay. Is it also correct that in 1993

Page 9

1  you were promoted to the position of purchasing
2  manager, and from that point forward were
3  responsible for purchasing all products for the
4  Paignton facility?
5  A.  I believe that's correct.
6  Q.  Okay. And is it correct that in
7  addition, beginning in 1995, you had the
8  responsibility for purchasing tantalum products
9  for all of the members of the AVX group?
10  A.  That's correct.
11  Q.  And am I also correct that in 1997 you
12  were again promoted to the position of materials
13  manager?
14  A.  I believe that was the date, yes.
15  Q.  Okay. And in your capacity as
16  materials manager, you have, as I understand it,
17  responsibilities beyond simply purchasing
18  materials; is that correct?
19  A.  The responsibility would be for the
20  main materials for the group.
21  Q.  For the?
22  A.  For the group.
23  Q.  For the main materials.
24  And main materials include tantalum

3 (Pages 6 to 9)

1 powder, wire, and other tantalum product?
2    A.    That's correct.
3    Q.    And am I correct that up to a date in
4 early 2001, you reported to Mr. Ernest Chilton?
5    A.    No. I didn't report to Mr. Chilton, I
6 reported to Mr. Peter Collis.
7    Q.    Okay. And at that time, that is up to
8 January, February, 2001, what was Mr. Collis'
9 position?
10    A.    Mr. Collis, as far as I can recall, was
11 the plant manager of Paignton.
12    Q.    Okay. And is it correct that in
13 January or February of 2001, Mr. Collis became
14 the head of AVX's tantalum capacitor division?
15    A.    That's correct.
16    Q.    In place of his -- the man who had been
17 his superior, Mr. Chilton?
18    A.    That's correct.
19    Q.    And is it correct that when Mr. Collis
20 became the head of AVX's tantalum capacitor
21 division, you continued to report directly to
22 Mr. Collis?
23    A.    Correct.
24    Q.    Okay. Now, I should ask you this

1 question, although the questions I have asked up
2 to now relate to information I learned from
3 rereading your prior deposition.
4        Since the time of your prior
5 deposition, which is September of 2003, is it
6 correct that you have been the materials manager
7 for AVX and have continually had the primary
8 responsibility within AVX for the purchase of
9 what you have called main materials, including
10 tantalum powder, wire, and other tantalum
11 products?
12    A.    That's correct.
13    Q.    In preparation for your deposition
14 today, did you reread the dep -- the transcript
15 of the deposition that I took in London of you in
16 September of 2003?
17    A.    Yes, I did.
18    Q.    Okay. And in the course of rereading
19 that deposition, did you find anything in it that
20 you thought was mistaken or incorrect, or that
21 you would otherwise want to change?
22    A.    Not that I can recall, no.
23    MR. FRANK: Off the record.
24        (WHEREUPON, discussion was had off

1        the record.)
2    MR. SLAVITT: While we were off the record,
3 we were talking about the treatment of the
4 deposition under the confidentiality order. The
5 way we are going to do it is this: This
6 deposition will be identified as confidential,
7 within the meaning of the confidentiality order.
8 Nonetheless, because there is a period of time
9 after receipt of the deposition that both sides
10 have to designate any portion as highly
11 confidential, the counsel will treat it as highly
12 confidential until that period elapses and such
13 designations are either made or not made.
14        So for the court reporter's purpose, in
15 this case all she has to do is identify the
16 transcript as confidential and we will deal with
17 it from that point on.
18 BY MR. FRANK:
19    Q.    It's correct, is it not, sir, that in
20 the period prior to the year 2000, Cabot and AVX
21 did business under a series of documents that
22 were titled "Letter of Intent"?
23    A.    That's correct.
24    Q.    And it's correct, is it not, that at

1 least in the year 2000, Cabot approached AVX and
2 said that it wanted to enter a long-term
3 agreement with AVX?
4    A.    That's correct.
5    Q.    Okay. And is it correct -- I will put
6 in front of you, just so we are confident we are
7 talking about the same thing, a composite
8 document consisting of two things entitled Letter
9 of Intent, one relating to tantalum powder and
10 the other relating to tantalum wire.
11    MR. FRANK: And I will ask the reporter to
12 mark that as Exhibit 45 for identification.
13        (WHEREUPON, a certain document was
14        marked Deposition Exhibit No. 45,
15        for identification, as of 8/4/06.)
16 BY MR. FRANK:
17    Q.    And my question for you, sir, is
18 whether the letters of intent, which are in
19 Exhibit 45, were the letters of intent that
20 were -- that applied during the year 2000, at
21 least during the year 2000?
22    A.    I believe they are.
23    Q.    Okay. And is it correct that in the
24 discussions between Cabot and AVX in 2000, AVX

4 (Pages 10 to 13)

1 took the position that the letters of intent
2 marked Exhibit 45 were binding agreements and
3 Cabot took the position that the letters of
4 intent marked Exhibit 45 were not binding upon
5 either party?
6    A.   That's correct.
7    Q.   Am I further correct that when Cabot
8 informed AVX that it wished to enter a binding
9 long-term agreement, this being in 2000, that AVX
10 responded, in effect, that it already had a
11 binding agreement with respect to the years 2000
12 and 2001 under the letters of -- under the
13 documents titled Letters of Intent, marked
14 Exhibit 45?
15    A.   That's correct.
16    Q.   And is it correct that you and a man
17 named Hugh Tyler of Cabot agreed to meet at
18 Heathrow Airport in the summer of 2000 to further
19 discuss the subject?
20    A.   As far as I can recall, yes. It is a
21 long time ago now.
22    MR. FRANK: Let me ask the reporter to mark
23 as Exhibit 46 a document which bears the Bates
24 numbers C(AII) 089163 through 167.

1       (WHEREUPON, a certain document was
2        marked Deposition Exhibit No. 46,
3        for identification, as of 8/4/06.)
4 BY MR. FRANK:
5    Q.   Do you recognize Exhibit 46, sir, as an
6 e-mail essentially arranging a meeting between
7 you and Mr. Tyler at Heathrow in August of 2000?
8    A.   In 46 there are four pages here. Are
9 we talking about the first page only?
10    Q.   That's a fair -- let me reframe the
11 question.
12       And is it correct that the first page
13 of Exhibit 46 is an e-mail exchange arranging a
14 meeting at Heathrow Airport in August of 2000 and
15 attaching a draft of a long-term agreement then
16 proposed by Cabot?
17    A.   Page 1, I can recall, I think. The
18 other three pages I don't recall.
19    Q.   Okay. Do you have any reason to
20 believe that -- well, first, did you receive the
21 e-mail from Mr. Tyler to you that appears on the
22 first page of Exhibit 46?
23    A.   As far as I can recall, yes.
24    Q.   Okay. Do you have any reason to

1 believe that there was not attached to it the
2 draft agreement that is a part of Exhibit 46?
3    A.   I don't believe it was. I don't see a
4 note or an attachment here. You normally see an
5 attachment there. I don't recall this document
6 being forward with it.
7    Q.   Let me direct your attention, if I
8 could, to the text of Mr. Tyler's e-mail. About
9 halfway down it says: "As you requested, I am
10 attaching a Word file copy of the supply
11 agreement we want to use."
12       Do you see that?
13    A.   Uh-huh. I do.
14    Q.   Having now observed that, do you have
15 any reason to believe that the supply agreement
16 that's the last three pages of Exhibit 46 is not
17 the draft supply agreement that was provided to
18 you with the first page of Exhibit 46?
19    A.   I can't recall.
20    Q.   Okay. Did you meet with Mr. Tyler at
21 Heathrow Airport on or about August 18, 2000?
22    A.   As far as I can recall, I think we did.
23    Q.   Okay. In a minute I am going to show
24 you a couple of documents to see if I can refresh

1 your memory, but without looking at any
2 documents, what do you now recall was said by
3 Mr. Tyler to you and by you to Mr. Tyler in the
4 course of that e-mail?
5    A.   As far as I can recall, and it's a long
6 time ago now, we had a discussion, and I believe
7 we made headway towards some kind of agreement.
8    Q.   Apart from that, or in addition that,
9 do you recall anything else that you said or he
10 said in the course of that meeting, or the
11 substance of what was said?
12    A.   I don't recall.
13    Q.   I'm going to show you a document, a
14 three-page document, which bears Bates numbers
15 AVX 0372 through 74. In a minute I will ask you
16 to tell me what it is.
17    MR. FRANK: And at the moment, I will ask the
18 reporter to mark it as Exhibit 47.
19       (WHEREUPON, a certain document was
20        marked Deposition Exhibit No. 47,
21        for identification, as of 8/4/06.)
22 BY MR. FRANK:
23    Q.   I am going to ask you, sir, first,
24 about the first two pages of Exhibit 47. Did you

5 (Pages 14 to 17)

Page 18

1  prepare those pages?

2  A.  I believe I did.

3  Q.  Okay.  And were those your -- was that

4  your memorandum of what had been said at the

5  Heathrow meeting, made shortly after that

6  meeting?

7  A.  As far as I can recall, it was.

8  Q.  Okay.  And the subject addressed under

9  the number 2 was what Mr. Tyler said at that

10  meeting that Cabot wanted by way of a new

11  agreement; is that fair?

12  A.  As far as I can recall, yes.

13  Q.  Okay.  And directing your attention now

14  to -- well, first, in context, tantalum products

15  were at the time in short supply; is that

16  correct?

17  MR. SLAVITT:  Objection.  You can answer.

18  BY THE WITNESS:

19  A.  We didn't have a particular problem in

20  getting tantalum products.  I think some of the

21  products that were available from Cabot were in

22  short supply, as far as I can recall.

23  BY MR. FRANK:

24  Q.  Directing your attention to item noted

Page 19

1  beside 3, it refers to KTaF.  KTaF is an

2  intermediate between ore and the finished powder

3  and wire, correct?

4  A.  That's correct.

5  Q.  And is it correct that at the Heathrow

6  meeting you told Mr. Tyler that AVX wanted to

7  purchase 200,000 pounds of KTaF?

8  A.  That's correct.

9  Q.  Okay.  And is it correct that the

10  reason why you wanted to purchase that KTaF was

11  because you could have it manufactured from KTaF

12  into finished powder and wire by people other

13  than Cabot?

14  A.  That's correct.

15  Q.  Okay.  And now, item 4 speaks of

16  something called new wire prices.  Was that AVX's

17  proposal or Cabot's request at the time?

18  A.  I can't recall.

19  Q.  Okay.  I will ask the same question

20  with respect to item 5.  I believe listed there

21  are someone's statements with respect to the

22  prices for particular types of powder, tantalum

23  powder.  Do you recall whether that was AVX's

24  proposal or Cabot's request?

Page 20

1  A.  As far as I can recall, that was a

2  Cabot offering.

3  Q.  Okay.  In connection -- and calling

4  your attention to item 6, that says AVX initial

5  requirement for 2001.  Am I correct in

6  understanding that that is what AVX -- or what

7  you told Mr. Tyler AVX wanted to purchase in

8  2001?

9  A.  I believe it was, but I don't totally

10  recall it.

11  Q.  Okay.  And then it says in parentheses,

12  "Cabot thought we would want more," question

13  mark.

14  Do you recall what that refers to?

15  A.  I don't recall.

16  Q.  Now having looked at the first two

17  pages of Exhibit 47, do you now recall anything

18  about the August 18, 2000 meeting at Heathrow

19  Airport to which you have not already testified?

20  A.  I can't recall anything else, no.

21  Q.  All right.  At that meeting, was there

22  any discussion of most favored customer treatment

23  for AVX at that meeting?

24  A.  I don't believe there was.

Page 21

1  Q.  Okay.  Just going back a second to

2  item 6, when that says "AVX initial requirements

3  for 2001," I take it that's what AVX wanted to

4  purchase in 2001 from Cabot?

5  A.  I believe it would have been.

6  Q.  Okay.  Now, turning to the third page

7  of Exhibit 47, when next after the Heathrow

8  meeting do you believe you spoke to Mr. Tyler?

9  A.  I don't recall exactly, but it must

10  have been after this telephone conversation in

11  page 4 of 3.

12  Q.  And is it correct that the third page

13  of Exhibit 47 are a memorandum that you made of a

14  telephone call with Mr. Tyler, which telephone

15  call took place on September 1, 2000?

16  A.  I believe it is.

17  Q.  And is it correct that the memorandum

18  was made -- actually, if you look at the very

19  bottom of the memorandum, is it correct that the

20  memo -- that you made this memorandum on

21  September 5, 2000, lower left-hand corner?

22  A.  I don't recall the dates.

23  Q.  Directing your attention to the very

24  small print in the lower left-hand corner of the

6 (Pages 18 to 21)

Page 22

1 third page of Exhibit 47, it appears to say
2 created on 5 September 2000. Does that -- was it
3 your practice when you made a memo like this to
4 note the date on which you made the memorandum,
5 particularly where it was referring to an event
6 that had happened on another day?
7    A.   I can't recall.
8    Q.   Okay. Now, first, do you have an
9 independent memory of the phone call that you had
10 with Mr. Tyler on or about September 1, 2000?
11    A.   It is a long time ago. I have a vague
12 memory.
13    Q.   Okay. You're perfectly free to refer
14 to the third page of Exhibit 47 in responding to
15 the next question, which is, would you tell me
16 what you recall you said to Mr. Tyler and
17 Mr. Tyler said to you on the occasion of the
18 September 1, 2000 conversation.
19    A.   I believe Mr. Tyler phoned me and said,
20 "I have some bad news," and then we went through,
21 basically, the four items which are specified in
22 page 3 here.
23    Q.   Okay. He told you first that Cabot had
24 made a deal for the sale of tantalum powder and

Page 23

1 wire; is that correct?
2    A.   I believe so.
3    Q.   Okay. Did he tell you with whom Cabot
4 had made that deal?
5    A.   I don't recall.
6    Q.   Did you have an understanding as to who
7 Cabot had made that deal with?
8    A.   No, they had a number of customers.
9    Q.   Did he tell you that Cabot had reserved
10 and was willing to sell to AVX's facility in
11 Biddeford, Maine, 20,000 pounds of powder?
12    A.   That's correct.
13    Q.   And did he tell you that there was
14 240,000 pounds of KTaF available for purchase?
15    A.   I believe so.
16    Q.   And did he tell you in that
17 conversation that there was no other powder or
18 wire that was available for purchase by AVX?
19    A.   As far as I can recall, yes.
20    Q.   And did he tell you that there would,
21 however, be powder available beginning in 2002,
22 but that if AVX wanted to purchase it, it was
23 going to have to sign a five-year contract with
24 Cabot?

Page 24

1    A.   As far as I can recall, yes.
2    Q.   Have you told me all that you -- let me
3 withdraw that.
4         Have you told me now all that you
5 recall of your conversation with Mr. Tyler by
6 telephone on September 1, 2000?
7    A.   With that telephone conversation, I
8 asked Mr. Tyler to hold in other people
9 to witness that telephone conversation.
10    Q.   And I take it Mr. Tyler did hold and
11 you did bring in others; is that correct?
12    A.   That's correct.
13    Q.   Okay. Who did you bring in?
14    A.   As far as I recall, Mr. Ernie Chilton
15 and Mr. Peter Collis.
16    Q.   And is what you have described up to
17 this point what had been the exchange that had
18 taken place between you and Mr. Tyler before you
19 brought Mr. Chilton and Mr. Collis into the
20 conversation?
21    A.   Yes.
22    Q.   Okay. Now that we have got them in the
23 conversation, would you tell us what you recall
24 was said in that portion of the telephone

Page 25

1 conversation?
2    A.   As far as I can recall, I asked
3 Mr. Tyler to repeat exactly what he had told me,
4 which I believe he did so.
5    Q.   Okay. Was there any response from the
6 trio now present in the conversation on the AVX
7 side, in that conversation, that you can recall?
8    A.   I believe it was quite a heated
9 conversation, but I don't recall exactly what was
10 said.
11    Q.   Do you recall the substance of what was
12 said beyond what you have already testified to?
13    A.   I can't recall anything further.
14    Q.   Was there any discussion in either half
15 of the conversation about most favored customer
16 treatment?
17    A.   Not that I can recall.
18    MR. FRANK: Please mark as Exhibit 48, a
19 document which bears Bates numbers C(A) 032113
20 and 14.
21         (WHEREUPON, a certain document was
22         marked Deposition Exhibit No. 48,
23         for identification, as of 8/4/06.)
24 BY MR. FRANK:

7 (Pages 22 to 25)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 26

1    Q.   Now, directing your attention to
2  Exhibit 48, first, do you recognize Exhibit 48 as
3  a combination of an e-mail that Mr. Tyler sent to
4  you sometime prior to September 6, 2000 at 5:13
5  a.m. U.S. time, and your response to that
6  e-mail? I confess to not seeing a date on
7  Mr. Tyler's e-mail to you.
8    A.   As far as I can recall, yes.
9    Q.   Okay. And in the course of the
10 September 1 conversation, did you ask Mr. Tyler
11 to confirm Cabot's position with respect to what
12 it would sell to AVX's European facilities?
13   A.   I can't recall.
14   Q.   Okay. But in any event, is it correct
15 that Mr. Tyler did -- actually, I now see it. I
16 apologize.
17      Is it correct that on September 5,
18 2000, Mr. Tyler sent you an e-mail that set forth
19 the fact that Cabot had approximately between
20 200,000 and 240,000 pounds of KTaF available for
21 purchase during the period 2001 through 2005,
22 and -- but said that a five-year agreement would
23 be needed if AVX wanted to buy that material?
24   A.   As far as I can recall, yes.

Page 27

1    Q.   Okay. Now, in the bottom portion of
2  Mr. Tyler's e-mail he refers to your wanting to
3  resolve the wording of a contract. Do you see
4  that?
5    A.   Yes, I do.
6    Q.   Do you recall any conversation with --
7  between you and Mr. Tyler on that subject?
8    A.   I really can't recall.
9    Q.   Okay. In any event, it is correct, is
10 it not, that you responded on the morning of
11 September 6 that AVX wanted to purchase 240,000
12 pounds of KTaF and wanted to purchase 10 tons of
13 wire under a binding contract?
14   A.   I believe so.
15   Q.   Okay. And then you go on to say that
16 regarding powder, that that was a more difficult
17 subject because Cabot was saying that apart from
18 the 20,000 pounds of powder that Cabot had said
19 it would sell to AVX's Biddeford facility, that
20 Cabot was otherwise saying it didn't have powder
21 available for sale in 2001; is that right?
22   MR. SLAVITT: Objection. You can answer.
23 BY THE WITNESS:
24   A.   That is right.

Page 28

1  BY MR. FRANK:
2    Q.   And you repeated to Mr. Tyler what you
3  had said at Heathrow, at the Heathrow meeting,
4  which were that AVX's requirements for 2001 were
5  the 2,000 kilograms of a powder called C255 per
6  month, 1,000 kilograms of a powder called C275
7  per month, 2,500 kilograms of a powder called
8  C606 per month, 1,000 kilograms of a powder
9  called C706 per month, and 1,000 kilograms of a
10 powder called C420 per month; is that correct?
11   A.   That's correct.
12   Q.   What response, if any, did Mr. Tyler
13 make to your e-mail, which is the top half of
14 Exhibit 48?
15   A.   I can't recall.
16   Q.   Okay. Now, what do you recall happened
17 next in the -- what do you recall happened next
18 that you were involved in relating to the
19 negotiation of an agreement between AVX and Cabot
20 after September 6, 2000?
21   A.   As far as I can recall, I wrote a
22 letter to Mr. Tyler expressing our displeasure of
23 this treatment.
24   MR. FRANK: Mark, please, as Exhibit 49, a

Page 29

1  document dated September 6, 2000.
2         (WHEREUPON, a certain document was
3         marked Deposition Exhibit No. 49,
4         for identification, as of 8/4/06.)
5  BY MR. FRANK:
6    Q.   Mr. Chapple, is Exhibit 49 the letter
7  to which you just made reference?
8    A.   It is, but there is a marking on the
9  top there. It says "1st price discussion."
10   Q.   Okay. And is it correct that that
11 marking is in your handwriting?
12   A.   It is.
13   Q.   And is it correct that the letter that
14 you sent to AVX would not have had that -- did
15 not have that handwritten note on it?
16   MR. SLAVITT: Did you mean to ask that
17 question?
18   MR. FRANK: I didn't mean to ask that
19 question. Thank you. I misspoke.
20 BY MR. FRANK:
21   Q.   Is it correct that the letter that you
22 sent to Cabot did not have that handwritten note
23 on it?
24   A.   That's correct.

8 (Pages 26 to 29)

Page 30

1    Q.   And is that a file note that you made
2 to yourself so that you could remember what this
3 was?
4    A.   I believe it is.
5    Q.   And in the second paragraph of the
6 letter you refer to "our requirement that was
7 discussed at length at our meeting."  Do you see
8 that?
9    A.   I do.
10    Q.   Okay.  And that meeting was the
11 Heathrow meeting?
12    A.   I believe it was.
13    Q.   And the requirement was AVX's need for
14 the products that were -- that are listed on
15 Exhibit 48 in the amounts set forth on
16 Exhibit 48, correct?
17    A.   I believe it was.
18    Q.   What happened next?
19    A.   I can't quite recall the course of
20 events.
21    Q.   Let me see if I can help.
22    MR. FRANK:  Mark, please, as Exhibit 50, a
23 document bearing Bates numbers AVX 1452 and 53.
24        (WHEREUPON, a certain document was

Page 31

1        marked Deposition Exhibit No. 50,
2        for identification, as of 8/4/06.)
3 BY MR. FRANK:
4    Q.   I direct your attention, if I could, to
5 the second page of Exhibit 50 and ask you if that
6 is a memorandum that you made?
7    A.   I believe it was.
8    Q.   And is that a memorandum of a
9 conversation that you had with Mr. Tyler at
10 Cabot?
11    A.   As far as I can recall, yes.
12    Q.   Okay.  Now, either based upon your
13 independent memory or based upon your memory
14 having reviewed the second page of Exhibit 50,
15 what do you recall -- well, first, tell me when
16 that phone call was and then please tell me what
17 you recall of the phone call.
18    MR. SLAVITT:  Objection.  You can answer.
19 BY MR. FRANK:
20    Q.   First tell me when the phone call was.
21    A.   I can't recall.
22    Q.   Do you have any reason -- the
23 memorandum states at the top that it is a phone
24 call on 20 September 2000.  Do you have any

Page 32

1 reason to believe that that's not accurate?
2    A.   I don't really.
3    Q.   Is it correct that that is a record
4 that this -- that this memorandum was a record
5 that you made of a telephone conversation with
6 Mr. Tyler in September 2000, which memorandum you
7 made shortly after the conclusion of that phone
8 call?
9    A.   As far as I can recall, yes.
10    Q.   Okay.  Now having examined the second
11 page of Exhibit 50, what do you recall of your
12 conversation with Mr. Tyler in or about
13 September 20, 2000?
14    A.   I don't recall the telephone
15 conversation at all.
16    Q.   Okay.  Does the memorandum -- well, is
17 it your memory that after September -- after
18 sometime in September of 2000, that for a period
19 of time the negotiations between Cabot and AVX
20 with respect to a contractual arrangement passed
21 from your hands into the hands of others at AVX?
22    A.   I believe that's correct.
23    Q.   Okay.  And what do you recall as your
24 next participation in those -- in the negotiation

Page 33

1 or formation of a five-year agreement with Cabot?
2    A.   I don't recall.
3    Q.   Okay.  Let me show you, if I could, a
4 document I will ask the reporter to mark as
5 Exhibit 51, Bates numbers AVX 1456 through 1458.
6        (WHEREUPON, a certain document was
7        marked Deposition Exhibit No. 51,
8        for identification, as of 8/4/06.)
9 BY MR. FRANK:
10    Q.   Exhibit 51, sir, appears in its second,
11 third, and fourth pages to be a memorandum
12 prepared by Mr. Chilton of a meeting that he
13 and --
14    A.   Can I just finish reading it.
15    Q.   I'm sorry.
16    MR. FRANK:  Off the record.
17        (WHEREUPON, discussion was had off
18        the record.)
19 BY MR. FRANK:
20    Q.   First, do you recognize Exhibit 51 as a
21 copy of a memorandum which you received on or
22 about October 4, 2000?
23    A.   That's correct.
24    Q.   Okay.  And it would appear that this is

9 (Pages 30 to 33)

Page 34

1 a memorandum prepared by Mr. Chilton of a meeting
2 involving Mr. Chilton, Mr. Burns of Cabot,
3 Mr. Rosen of AVX, and perhaps others. Did you
4 attend that meeting?
5    A.    No, I did not.
6    Q.    Okay. Did you discuss that meeting or
7 what had happened at that meeting with anyone at
8 AVX that you can now recall?
9    A.    As far as I recall, Mr. Chilton and I
10 discussed it.
11   Q.    Okay. And was that discussion shortly
12 after Mr. Chilton's cover memorandum? The first
13 page of Exhibit 51 is dated October 4, 2000. His
14 memorandum of the meeting involving Messrs. Rosen
15 and Burns is dated October 2. Do you recall when
16 you spoke to Mr. Chilton?
17   A.    I don't recall.
18   Q.    What did Mr. Chilton say to you and
19 what did you say to Mr. Chilton with respect to
20 the Burns, Rosen, Chilton meeting in late
21 September, early October 2000?
22   A.    I don't recall.
23   Q.    Do you remember the substance of
24 anything that was said?

Page 35

1    A.    I don't recall.
2    Q.    Were you having conversations with
3 Mr. Tyler of Cabot in parallel with the
4 conversations that were being held at what I will
5 call a higher level in the two companies?
6    A.    I believe I was.
7    Q.    Okay. What do you recall of your
8 conversations with Mr. Tyler in the late -- in
9 the September, October 2000 period, except as you
10 have already testified?
11   A.    I can't recall.
12   Q.    Let me show you a document which I will
13 ask the reporter to mark as Exhibit 52, bearing
14 Bates numbers AVX 1499 through 1501.
15         (WHEREUPON, a certain document was
16         marked Deposition Exhibit No. 52,
17         for identification, as of 8/4/06.)
18 BY MR. FRANK:
19   Q.    Now I want to divide my questions
20 relating to Exhibit 52 because the pages may be
21 different things.
22         Let me direct your attention first to
23 the page that has Bates number 1501, the last
24 page of the exhibit. Did you prepare this page?

Page 36

1    A.    As far as I can recall, yes, I did.
2    Q.    Okay. And is it correct that the top
3 half of this page was your suggestion for AVX's
4 opening proposal to Cabot in the negotiation that
5 was about -- that had just begun?
6    A.    I believe it was.
7    Q.    Okay. And is it correct that you were
8 proposing that AVX ask Cabot to sell 30,000
9 pounds of tantalum powder to AVX's Biddeford,
10 Maine, facility, 70,000 pounds of flake powder to
11 AVX's European facilities, and 240,000 pounds of
12 KTaF?
13   A.    I believe it was.
14   Q.    And was it your -- and where it says
15 current prices plus 60 percent, and in the case
16 of KTaF, $150 a pound, was that the price opener
17 or the opening proposal that you thought that AVX
18 should make to Cabot with respect to its proposal
19 that AVX would purchase those quantities?
20   A.    I believe it was.
21   Q.    Of those products?
22   A.    Yes.
23   Q.    And then you're proposing that AVX
24 would buy the same quantity of the same products

Page 37

1 in each of years 2 through 5 at the prices
2 indicated, or prices that could be calculated
3 from the percentages that appear on the third
4 page of Exhibit 52?
5    A.    I believe so.
6    Q.    Am I correct that the last part, the
7 lower half of the third page of Exhibit 52 is
8 information that you were providing to others at
9 AVX that was designed to allow them to convert
10 the price for KTaF to an estimated price for
11 finished powder?
12   A.    That is correct.
13   Q.    Did you then have an understanding who
14 would toll the KTaF into finished powder? I use
15 the word "understanding." You may choose some
16 other word.
17   A.    I believe there was a requirement for
18 KTaF from a number of tantalum producers, yes.
19   Q.    Okay. So that you thought you could --
20 that any one of several tantalum producers could
21 take the KTaF and toll it into finished powder?
22   A.    Yes.
23   Q.    And I have used the word "toll." Is it
24 a fair lay translation of that word that you take

10 (Pages 34 to 37)

Page 38

1 the KTaF and perform manufacturing processes on
2 it such that it comes out the other end as usable
3 by AVX as tantalum powder?
4    A.   That's right.
5    Q.   Okay.  Now, did you try out AVX's
6 opening proposal on Mr. Tyler?  And I want to
7 direct your attention, if it is helpful, to the
8 second page of Exhibit 52.
9    A.   I can't recall.
10   Q.   Okay.  Is the second page of Exhibit 52
11 a memo that you sent to Mr. Chilton on or about
12 October 4, 2000?
13   A.   It is.
14   Q.   And do you recognize it today as your
15 report to Mr. Chilton of Mr. Tyler's off-line
16 reaction to the AVX opener?
17   A.   I can't recall.
18   Q.   Okay.  Do you have any reason to
19 believe that the memo does not -- well, first, do
20 you believe that you had a conversation with
21 Mr. Tyler on or about October 4, 2000, having
22 reviewed the second page of Exhibit 52?
23   A.   Yes.
24   Q.   Okay.  Do you have any reason to --

Page 39

1 well, withdrawn.
2      Can you now recall that conversation at
3 all?
4    A.   I am afraid I can't.
5    Q.   Okay.  And, finally, do you recognize
6 the first page of Exhibit 52 as a copy of a
7 memorandum that you received on or shortly after
8 October 4, 2000 from Mr. Chilton to his
9 superiors, Messrs. Gilbertson and Rosen?
10   A.   I see I was copied, but I don't recall
11 it.
12   MR. FRANK:  Mark, please, as Exhibit 53 a
13 document bearing Bates numbers AVX 1434 through
14 1436.
15      (WHEREUPON, a certain document was
16      marked Deposition Exhibit No. 53,
17      for identification, as of 8/4/06.)
18 BY MR. FRANK:
19   Q.   Tell me when you are ready.
20   A.   Okay.
21   Q.   Okay.  Do you recognize Exhibit 53 as
22 consisting in part of an e-mail to Thomas Odle of
23 Cabot from Mr. Chilton, which was sent on
24 October 5, 2000?

Page 40

1    A.   As far as I can recall, this was a
2 letter which Mr. Gilbertson proposed to send to
3 Mr. Thomas Odle.
4    Q.   I see.
5    MR. FRANK:  And I will ask the reporter to
6 mark as Exhibit 54, AVX 1480 and 1481.  So we
7 have all the relevant pieces of paper in front of
8 us.
9      (WHEREUPON, a certain document was
10     marked Deposition Exhibit No. 54,
11     for identification, as of 8/4/06.)
12 BY MR. FRANK:
13   Q.   Let's go to 53 first.
14   A.   Okay.
15   Q.   You corrected me moment ago by pointing
16 out that the document that appears to be from
17 Mr. Chilton to Mr. Odle, that is the bottom of
18 the first page and the top of the second page of
19 Exhibit 53, is a draft of a proposed letter to be
20 sent by Mr. Chilton to Mr. Odle, correct?
21   A.   This is a suggestion by Mr. Gilbertson
22 that this letter should be in Mr. Chilton's name,
23 yes.
24   Q.   Okay.  And is it fair to say that the

Page 41

1 letter was to be the implementation of the
2 opening proposal by AVX that you had suggested in
3 Exhibit 52, the third page?
4    A.   I believe so.
5    Q.   And the handwritten material that
6 appears on Exhibit 53, that is your handwriting,
7 is it not, sir?
8    A.   It is.
9    Q.   Can you read it?  And if you can, would
10 you read it into the record.
11   A.   "The materials requested are only
12 supplied by Cabot.  AVX uses it to make unique
13 products, which in most cases is the only
14 supplier, and in small cases" --
15   Q.   "And in all cases"?
16   A.   "And in all cases is the primary
17 supplier."
18   Q.   Is it fair to say that you were
19 suggesting -- that was a note to yourself that
20 you should suggest that those words be added to
21 the --
22   A.   It was.
23   Q.   -- to the letter?
24   A.   It was.

11 (Pages 38 to 41)

Page 42

1 Q. Okay. Now, directing your attention to
2 the -- well, at the very bottom of the first page
3 of Exhibit 53, point 1 in the proposal is that
4 "AVX proposes to pay an additional 80 percent for
5 30,000 pounds of material for our products at the
6 Biddeford operation. Cabot is the sole source of
7 this material." Do you see that?
8 A. I do.
9 Q. And item 2 is "AVX proposes to pay an
10 additional 100 percent for 70,000 pounds of flake
11 material for AVX's European plants." Do you see
12 that?
13 A. I do.
14 Q. Now, underneath that, about three or
15 four lines further down it says "AVX further
16 agrees in calendar year 2003, 2004, 2005, to take
17 the agreed amount at the lowest price that the
18 subject material is sold to a competitor by
19 Cabot. This is commonly referred to as the most
20 favored customer price in the industry." Do you
21 see that?
22 A. I do.
23 Q. Up to that point, this being October 5,
24 2000, had there been any discussion, to your

Page 43

1 knowledge, of a most favored customer or most
2 favored nation provision in an agreement between
3 Cabot and AVX?
4 A. Not that I recall.
5 Q. Okay. Now, in your capacity as
6 materials manager at AVX, do you have most
7 favored customer or most favored nation
8 provisions in other agreements with other
9 suppliers?
10 A. Not that I recall, no.
11 Q. Okay. Now directing your attention to
12 Exhibit 54, is that the letter that Mr. Chilton
13 did, in fact, send to Mr. Odle of CPM on
14 October 6, 2000?
15 A. I don't recall.
16 Q. Do you have any reason to think that
17 this wasn't sent by Mr. Chilton to Mr. Odle on
18 about October 6, 2000?
19 A. I wasn't copied so I can't recall.
20 Q. Okay. Going back to -- withdrawn.
21 What do you recall was your next
22 involvement in the negotiation of what turned out
23 to be the five-year supply agreement between AVX
24 and CPM?

Page 44

1 A. As far as I can recall, I don't think I
2 had any further involvement.
3 Q. Let me show you some documents and see
4 if they stimulate a memory.
5 MR. FRANK: Mark, please, as Exhibit 55 a
6 document bearing Bates number C(AII) 087122
7 through 28.
8 (WHEREUPON, a certain document was
9 marked Deposition Exhibit No. 55,
10 for identification, as of 8/4/06.)
11 BY MR. FRANK:
12 Q. Have you seen Exhibit 55 before?
13 A. I believe I did, yes.
14 Q. Did you discuss it -- did you see it
15 sometime on or shortly after October 17, 2000?
16 A. I believe so.
17 Q. Did you discuss it with anyone at AVX?
18 A. I can't recall.
19 Q. Did you discuss it with anyone at CPM?
20 A. I can't recall.
21 Q. Let me direct your attention to the
22 draft of a supply agreement that is attached.
23 First, I want to ask you about the first
24 paragraph that appears under the heading "two

Page 45

1 quantity scheduling of liquidated damages." And
2 I just ask you to read that to yourself for a
3 moment, and then I am going to ask you a question
4 about it.
5 You will see in that paragraph that a
6 distinction is made between -- that it was
7 proposed that a distinction be made between
8 products that CPM would sell and AVX would
9 purchase, and products that might be purchased if
10 they were available?
11 A. Right.
12 Q. Okay. Do you recall discussions in
13 this general period, September, October,
14 November, 2000, about as-available material?
15 A. Mr. Chilton and myself attended the TIC
16 conference in San Francisco, I think it was,
17 where further negotiations regarding this
18 contract took place.
19 Q. And on the subject of as-available
20 materials, is it correct that -- well, withdrawn.
21 At the Tantalum Industry Conference,
22 who was present on the AVX side?
23 A. At the conference in general was
24 myself, Mr. Chilton, Mr. Billman, and another

12 (Pages 42 to 45)

Page 62

1  BY MR. FRANK:
2  Q.  Let's start with 60. Have you seen 60
3  before?
4  A.  I have.
5  Q.  Is it a fair characterization to say
6  that Exhibit 60 was negotiated by persons other
7  than yourself and given to you as the outcome of
8  that negotiation?
9  MR. SLAVITT: Objection. You can answer.
10 BY THE WITNESS:
11 A.  I believe that to be correct, yes.
12 BY MR. FRANK:
13 Q.  And is it your -- that's your
14 handwriting on the document?
15 A.  On the bottom?
16 Q.  Well, first at the top of page 60 --
17 A.  It is.
18 Q.  -- of Exhibit 60.
19     And that is -- the word there is
20 "final"?
21 A.  Correct.
22 Q.  And was that your note made at the time
23 to remind yourself that this was the last of a
24 series of similar lists points that had been

Page 63

1  agreed upon?
2  A.  It was.
3  Q.  Okay. Would you read the handwriting
4  at the bottom of the first page of Exhibit 60.
5  A.  "Wire 5 tons at $1212.53 a kilo."
6  Q.  And is it correct that after the
7  principles upon which the parties had agreed were
8  determined by others than yourself, the business
9  of preparing a formal contract was passed off --
10 passed along to yourself and others at AVX and
11 Mr. Tyler and others at CPM to take the general
12 points of agreement and reduce them to a formal
13 contract?
14 A.  Mr. Tyler and myself finalized the
15 smaller points. The contract then was formed by
16 Cabot and presented to us.
17 Q.  Okay. Do you recall your discussions
18 with Mr. Tyler on the subject of finalizing the
19 smaller points? Let's start with -- let me start
20 in a different place.
21     Do you remember what the smaller points
22 were that you and Mr. Tyler finalized?
23 A.  I believe we discussed the price of
24 scrap.

Page 64

1  Q.  Anything else?
2  A.  I believe we discussed the quantity and
3  type of open orders which were on the books.
4  Q.  Anything else?
5  A.  Not that I can recall.
6  Q.  Okay. Directing your attention, if I
7  could, to Exhibit 61, do you recognize this as a
8  letter from Mr. Chilton to Mr. Odle, which was
9  intended to set forth the principles on which
10 Mr. Odle and Mr. Gilbertson had agreed in their
11 discussions?
12 A.  I don't remember seeing this letter.
13 Q.  Okay. Directing your attention back,
14 then, to Exhibit 60, was it your understanding --
15 let me direct your attention to the second page
16 and to the section that has the number 3 beside
17 it.
18     Was it your understanding that for the
19 years 2003, 2004, and 2005, AVX was to be treated
20 from a price and quantity point of view, as well
21 as Cabot's most favored customer for tantalum
22 powder and tantalum wire?
23 MR. SLAVITT: Objection. You can answer.
24 BY THE WITNESS:

Page 65

1  A.  Item 3 does bring an MFN clause into
2  operation from 2003 to 2005.
3  BY MR. FRANK:
4  Q.  Was it your understanding that the
5  principle upon which the negotiators agreed was
6  that in those years, AVX was to receive the same
7  treatment from a price and quantity point of view
8  as the CPM customer for tantalum powder and
9  tantalum wire that received the best prices,
10 lowest prices, from CPM?
11 MR. SLAVITT: Objection. You can answer.
12 BY THE WITNESS:
13 A.  We were to have a level playing field,
14 yes, in those years.
15 BY MR. FRANK:
16 Q.  And did a level playing field mean that
17 AVX would get the same -- would get the lowest
18 price, whatever that was, in the same quantity
19 that was provided to CPM's most favored customer?
20 A.  Yes.
21 Q.  Now, you testified that Cabot was to
22 prepare a draft agreement?
23 A.  Correct.
24 Q.  Do you recall that there was a delay in

17 (Pages 62 to 65)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

1 the preparation of that agreement?
2    A.   I believe there was.
3    Q.   Okay.  And let me -- and do you recall
4 that a reason for the delay was that in order to
5 have -- to free up capacity to sell certain
6 materials to AVX, Cabot had to make arrangements
7 to have certain of its KTaF tolled for other
8 customers at Showa Cabot?
9    MR. SLAVITT:  Objection.  You can answer.
10 BY THE WITNESS:
11    A.   I believe there was something along
12 those lines, but I don't recall the detail.
13 BY MR. FRANK:
14    Q.   And during the same period of time, did
15 you have discussions with others about the
16 tolling of the KTaF that AVX proposed to purchase
17 from Cabot under the five-year contract that was
18 then under discussion?
19    A.   I did.
20    Q.   With whom did you have those
21 discussions?
22    A.   Principally with Showa Cabot.
23    Q.   I beg pardon?
24    A.   Principally with Showa Cabot.

1    MR. FRANK:  Off the record.
2         (WHEREUPON, discussion was had off
3         the record.)
4 BY MR. FRANK:
5    Q.   And what was it that you wanted to have
6 that KTaF tolled into?
7    A.   I was to have it tolled into tantalum
8 powder, which could be used by AVX.
9    Q.   Okay.  What kind of tantalum powder?
10    A.   It would be per our raw materials
11 specifications.
12    Q.   I didn't ask a very good question.
13         A distinction has been made between
14 flake powder and nodular powder.  Do you recall
15 whether you asked Showa to toll the CPM KTaF into
16 flake, nodular, or both?
17    A.   I asked them to turn it into nodular
18 powder because Showa was not able to manufacture
19 flake powder.
20    Q.   Do you recall what -- do you recall
21 what type of nodular powder or powders you asked
22 Showa to toll the Cabot KTaF into?
23    A.   As far as I can recall, it was a powder
24 called S506.

1    MR. FRANK:  Please mark as Exhibit 62 a
2 document bearing Bates numbers AVX 7712 through
3 7717.
4         (WHEREUPON, a certain document was
5         marked Deposition Exhibit No. 62,
6         for identification, as of 8/4/06.)
7 BY MR. FRANK:
8    Q.   Have you seen Exhibit 62 before?
9    A.   I believe I have.
10    Q.   Do you recognize this as the first
11 draft of a proposed supply agreement after the --
12 after the matter was turned over to people other
13 than Gilbertson and Odle to finalize?
14    A.   I do.
15    Q.   And is it correct that this was -- how
16 was this handled within AVX, that is, was this
17 sent to you and you sent it to others for
18 comments, or did it work some other way?
19    A.   I don't remember replying to this
20 letter.
21    Q.   Let me -- Exhibit 62 looks like a draft
22 of a proposed supply agreement with some
23 handwritten comments on it, and then a memo from
24 Mr. Cummings to you and Mr. Collis commenting.

1 First, is that a fair description?
2    A.   It is.
3    Q.   Okay.  Is it correct that the draft was
4 sent to you, passed along by you, to Mr. Cummings
5 and others for comment and this is Mr. Cummings
6 getting back to you with his comments?
7    MR. SLAVITT:  Objection.  You can answer.
8 BY THE WITNESS:
9    A.   No.  I believe this was coming from
10 Mr. Cummings to Mr. Collis and myself for our
11 comments.
12 BY MR. FRANK:
13    Q.   To him?
14    A.   To him.
15    Q.   Okay.  And so am I correct -- did you
16 discuss this draft with Mr. Cummings?
17    A.   I can't recall doing so.
18    Q.   Okay.  Did you review the draft
19 yourself?
20    A.   I can't recall doing so.
21    Q.   Did you -- do you recall discussing
22 anything about the draft with anyone on the AVX
23 side?
24    A.   The only people I would have discussed

18 (Pages 66 to 69)

Page 102

1    MR. FRANK: Back on the record. Please mark
2 as Exhibit 66 a document bearing Bates number
3 C(A) 040439 and 40.
4        (WHEREUPON, a certain document was
5        marked Deposition Exhibit No. 66,
6        for identification, as of 8/4/06.)
7        JOHN COLIN CHAPPLE,
8 called as a witness herein, having been
9 previously satisfactorily identified and duly
10 sworn and having testified, was examined and
11 testified further as follows:
12        EXAMINATION (Resumed)
13 BY MR. FRANK:
14    Q.    Is it correct, sir, that beginning in
15 April of 2001 you initiated discussions with
16 representatives of CPM about a possible
17 modification to the 2001 supply agreement?
18    A.    Correct.
19    Q.    And directing your attention to the
20 second page of Exhibit 66 -- well, is the second
21 page the vehicle that you used to open up those
22 discussions?
23    A.    I believe it was.
24    Q.    Okay.  To whom did you transmit the

Page 103

1 second page?
2    A.    I believe it was Mr. Hugh Tyler.
3    Q.    Okay.  Now directing your attention to
4 the first page, this would appear to be an e-mail
5 that you sent to Mr. Tyler in May of 2001, and I
6 will ask you whether -- between April 6 of 2001,
7 the date of the second page, and May 10, 2001,
8 the date of the first page, you had any
9 discussions with Mr. Tyler that you can now
10 recall regarding a contract modification?
11    A.    I can't recall.
12    Q.    Is it correct that at the time you --
13 or AVX wanted to purchase more flake powder and
14 less KTaF?
15    A.    I believe so.
16    Q.    And is it correct that Mr. Tyler's
17 response on behalf of CPM was that CPM would
18 entertain such a discussion, but only if the net
19 effect on revenue flowing to CPM was neutral?
20    A.    I believe that was correct, yes.
21    Q.    Okay.  And did you prepare a -- I will
22 withdraw that and ask the reporter to mark as 67
23 C(A) 041074 through 1076.
24        (WHEREUPON, a certain document was

Page 104

1        marked Deposition Exhibit No. 67,
2        for identification, as of 8/4/06.)
3 BY MR. FRANK:
4    Q.    Is it correct, sir, that Exhibit 67 --
5 well, first, did you prepare Exhibit 67 and send
6 it to Mr. Tyler in June 2001?
7    A.    I believe Ms. Jana Walker prepared it
8 and I forwarded it on to Mr. Tyler.
9    Q.    Thank you.
10        And Ms. Walker works for you at --
11    A.    She did.  Yes, she did.
12    Q.    And am I correct that what we see here
13 is the listing of what it was that AVX was to
14 purchase for its European facilities under the
15 existing 2001 supply agreement with aggregate
16 dollar values applied to each of the categories
17 so that you and Mr. Tyler could discuss -- could
18 use this as a basis for discussing shifting of
19 those values?
20    A.    That's correct.
21    MR. FRANK:  Please mark as Exhibit 68 C(A)
22 041156 through 57.
23        (WHEREUPON, a certain document was
24        marked Deposition Exhibit No. 68,

Page 105

1        for identification, as of 8/4/06.)
2 BY MR. FRANK:
3    Q.    Is Exhibit 68 an e-mail that you
4 received from Mr. Tyler on or about June 19,
5 2001?
6    A.    It was.
7    Q.    And does it reflect a proposal by
8 Mr. Tyler that would have done two things, first,
9 it would have increased the amount of flake that
10 AVX was to purchase, and, second, it would
11 decrease the price applicable to purchases of
12 KTaF?
13    A.    Correct.
14    Q.    And was it Mr. Tyler's submission that
15 the combination of those two factors resulted in
16 a shifting of values within the contract without
17 changing the total value in the contract to CPM?
18    MR. SLAVITT:  Objection.  You can answer.
19 BY THE WITNESS:
20    A.    Correct.
21 BY MR. FRANK:
22    Q.    Okay.  And is it correct that that
23 particular proposal was not acceptable to you?
24    A.    It was not.

27 (Pages 102 to 105)

Page 106

1     MR. FRANK: Mark, please, as Exhibit 69 a
2 document bearing Bates number C(AII) 088843
3 through 846.
4         (WHEREUPON, a certain document was
5         marked Deposition Exhibit No. 69,
6         for identification, as of 8/4/06.)
7 BY MR. FRANK:
8     Q.   Do you recognize Exhibit 69 as, first,
9 an e-mail that you sent to Mr. Tyler dated
10 June 19, 2001, and then a response that you got
11 back from Mr. Tyler on the same day?
12    A.   I do.
13    Q.   Okay. Do you remember this exchange?
14    A.   Not in detail, no.
15    Q.   Is it fair to say that your reaction to
16 Mr. Tyler's proposal, Exhibit 68, was that it was
17 too rich from -- gave CPM too much?
18    A.   Yes.
19    Q.   Okay. Did you have a discussion with
20 Mr. Tyler on or around June 19, 2001 about
21 substituting -- removing the nodular powder that
22 AVX Europe was to purchase and replacing it with
23 flake?
24    A.   I don't recall.

Page 107

1     Q.   Okay. Let me direct your attention to
2 Exhibit 69. In the text of Mr. Tyler's e-mail to
3 you at the end of the fourth line it says, "to
4 increase flake output even to accommodate your
5 current model," and by "you" I believe it means
6 AVX," I have to build a new line a major
7 investment here, but one we are willing to make
8 with the volumes and extension of 2007 as
9 specified in my scenario 1." Do you see that?
10    A.   I do.
11    Q.   Did you understand that to provide --
12 that it was CPM's position that to provide the
13 additional volume that AVX was asking for it
14 would have to build another production line to
15 provide that incremental volume?
16    A.   Yes.
17    Q.   Okay. And then Mr. Tyler goes on to
18 say, "regarding your desire to have flake v
19 nodular flexibility, this is a workable
20 modification with conditions based on the rest of
21 the changes." Do you see that?
22    A.   I do.
23    Q.   And if you look at the chart that's
24 attached, you'll see that it shows -- it reduces

Page 108

1 the nodular purchases to zero and leaves just
2 flake wire and KTaF to be purchased. Do you see
3 that?
4     A.   I do.
5     Q.   Do you recall discussing with Mr. Tyler
6 in this period of time AVX's desire to take flake
7 in lieu of nodular powder?
8     A.   I don't recall, I'm afraid.
9     Q.   Do you recall Mr. Tyler telling you
10 that that was okay with CPM?
11    A.   I don't recall, I'm afraid.
12    Q.   Do you have any reason to believe that
13 you didn't ask and that Mr. Tyler didn't say that
14 it was all right to do away with purchases of
15 nodular and replace them with purchases of flake
16 powder?
17    A.   No reason.
18    Q.   Let me show you a document that I'm
19 going to mark as Exhibit 70, Bates C(A) 041159
20 through 61.
21        (WHEREUPON, a certain document was
22        marked Deposition Exhibit No. 70,
23        for identification, as of 8/4/06.)
24 BY MR. FRANK:

Page 109

1     Q.   Is it fair to describe Exhibit 70, sir,
2 as your counterproposal to Mr. Tyler's proposal
3 as reflected in Exhibit 69?
4     A.   Right.
5     Q.   And your counterproposal would have had
6 a zero requirement with respect to the purchases
7 of nodular powder and flake requirements set
8 forth in the attachment, correct?
9     A.   Correct.
10    MR. FRANK: Please mark as Exhibit 71, AVX
11 2825 and 26.
12        (WHEREUPON, a certain document was
13        marked Deposition Exhibit No. 71,
14        for identification, as of 8/4/06.)
15 BY MR. FRANK:
16    Q.   Do you recognize Exhibit 71 as a letter
17 to you from Mr. Tyler which you received on or
18 shortly after June 29, 2001?
19    A.   I do.
20    Q.   The letter starts out by saying: "The
21 following points reflect the supply agreement
22 modifications on which you and I have agreement,
23 pending approval by your management." Do you see
24 that?

28 (Pages 106 to 109)

1   A.  I do.
2   Q.  Okay.  That's, of course, Mr. Tyler's
3  statement to you.  Did you think that it was a
4  correct statement insofar as it reflected your
5  discussions with Mr. Tyler up to that point?
6   A.  It was.
7   Q.  Okay.  Directing your attention to the
8  second page now, it is correct, is it not, that
9  point 5, that Cabot was willing to -- that in
10  consideration of the increased purchase of flake,
11  Cabot was prepared to forego sales of nodular
12  powder -- of European nodular powder, that is,
13  10,000 pounds of nodular powder?
14   A.  Yes.
15   Q.  Is it also correct, point 4, that Cabot
16  was allowed prepared to allow AVX to substitute
17  up to 30,000 pounds of flake with nodular
18  tantalum powder in any contract year?
19   A.  Correct.
20   Q.  And the purpose of that, was it not,
21  was to give AVX flexibility in the event that it
22  turned out that it didn't actually need as much
23  flake as it was proposing to agree to purchase?
24   A.  Correct.

1   Q.  Now let me call your attention to
2  paragraph -- point 3, sub (D).
3        One of the points of agreement at the
4  Tyler-Chapple level was that certain purchases of
5  flake would be made in years 2006 and 2007, that
6  is beyond the end date of the then existing
7  supply agreement, correct?
8   A.  Correct.
9   Q.  Okay.  And the last sentence of point 3
10  sub (D) says "most favored nation pricing will
11  not apply to the 2006, 2007 volumes"?
12   A.  Correct.
13   Q.  That sentence was to become a point of
14  discussion between the two sides?
15   A.  It would have been.
16   MR. FRANK:  Mark, please, as Exhibit 72 a
17  document bearing Bates number AVX 2827 through
18  29.
19        (WHEREUPON, a certain document was
20        marked Deposition Exhibit No. 72,
21        for identification, as of 8/4/06.)
22  BY MR. FRANK:
23   Q.  Is Exhibit 72 your response to
24  Mr. Tyler's letter dated June 29, 2001,

1  Exhibit 71?
2   A.  It is.
3   Q.  Okay.  And you -- the substance of the
4  response was that you were -- the absence of most
5  favored nation pricing applicable to the proposed
6  purchases in 2006 and 2007 was, in your view, at
7  least a potential problem?
8   A.  Yes.
9   Q.  Okay.  When you passed this higher up
10  in AVX, correct?
11   A.  Yes.
12   Q.  And you added a section -- am I correct
13  that you repeated the points that Mr. Tyler had
14  made except that you added a Section 8, which was
15  designed to provide AVX more flexibility with
16  respect to the particular type of flake powder
17  that it could purchase?
18   A.  Correct.
19   Q.  Okay.  And let me just make sure that
20  that's clear on the record.
21        I think you have told me that C255 and
22  C275 are flake powders and that everything else
23  we are seeing a nodular powder?
24   A.  Correct.

1   Q.  And that what you are looking for here
2  is greater flexibility with respect to purchases
3  as between C255 and C275?
4   A.  That's correct.
5   Q.  Did you pass this proposal up to a
6  higher level at AVX?
7   A.  I believe I did, but I can't recall.
8   Q.  Did you recommend it to those -- to
9  AVX's senior management?
10   A.  I believe I did.
11   Q.  Did -- was the response from AVX -- I
12  should ask you who senior management was that you
13  passed this up to?
14   A.  It would probably be Mr. Collis,
15  Mr. Kurt Cummings, and Mr. Gilbertson.
16   Q.  Do you recall a response?
17   A.  I don't.
18   Q.  Okay.  Does it refresh your memory if I
19  suggest that you were told that because there was
20  no most favored nation protection, most favored
21  customer protection for the years 2006 and 2007,
22  that AVX was not prepared to go forward with what
23  you and Mr. Chapple had agreed to?
24   A.  Mr. Tyler?

29 (Pages 110 to 113)

1 point of view was that AVX wanted the 2002 base
2 year limitation on most favored customer
3 treatment to be eliminated, correct?
4   A.  Correct.
5   Q.  Okay.  And another change that AVX
6 wanted, another improvement, was that most
7 favored customer protection be extended to
8 powders manufactured by CPM at facilities other
9 than its Boyertown Pennsylvania facility,
10 correct?
11   A.  Correct.
12   Q.  To that point, under the existing
13 contract, as you understood it, the most favored
14 customer treatment language in the 2001 agreement
15 was limited to sales by CPM from its Boyertown
16 facility, correct?
17   A.  Correct.
18   Q.  Do you remember Mr. Tyler's response to
19 this proposal?
20   A.  I am afraid I don't.
21   MR. FRANK:  Let me show you first a document
22 which I will have marked as Exhibit No. 77, Bates
23 numbers C(A) 07130 through 132.
24       (WHEREUPON, a certain document was

1       marked Deposition Exhibit No. 77,
2       for identification, as of 8/4/06.)
3 BY MR. FRANK:
4   Q.  Is Exhibit 77 a letter that you wrote
5 to Mr. Tyler on August 14, 2001?
6   A.  It is.
7   Q.  And is it correct that you repeated the
8 terms that were stated in Mr. Tyler's July 17
9 letter to you, Exhibit 75, but added a ninth
10 point, the second page?
11   A.  I believe so.
12   Q.  Okay.  And is that ninth point the
13 thing we had discussed just a moment ago, a
14 proposal by AVX to expand most favored nation --
15 most favored customer treatment to sales beyond
16 what was defined as base capacity and to sales by
17 CPM facilities other than its Boyertown,
18 Pennsylvania, facility?
19   A.  Correct.
20   Q.  I left something out I realized.
21       Did you also ask that most favored
22 customer treatment be extended to sales occurring
23 in the year 2002?
24   A.  Yes.

1   MR. FRANK:  Please mark as Exhibit 78 a
2 document bearing Bates number C(A) 041997.
3       (WHEREUPON, a certain document was
4       marked Deposition Exhibit No. 78,
5       for identification, as of 8/4/06.)
6 BY MR. FRANK:
7   Q.  First, with respect to 77, I note that
8 it's signed on your behalf by Jana Walker?
9   A.  Yes.
10   Q.  She is your assistant?
11   A.  She is a buyer who's employed by us,
12 yes.
13   Q.  Do you understand Exhibit 78 to be a
14 response to Exhibit 77?
15   A.  I do.
16   Q.  Okay.  And is it correct -- am I -- and
17 is this an e-mail that you received on or about
18 August 14, 2001?
19   A.  I believe it is.
20   Q.  And is it correct that Mr. Tyler on
21 behalf of CPM is offering to agree to the new
22 most favored customer terms that you proposed
23 subject, however, to confirmation that those
24 terms were acceptable to AVX senior management in

1 Myrtle Beach, South Carolina?
2   A.  It is.
3   Q.  The reference to doing your thing with
4 the beach is Mr. Tyler urging you to seek and
5 obtain the agreement of senior management in
6 Myrtle Beach, correct?
7   A.  That's correct.
8   Q.  And it's correct, is it not, that
9 senior management in Myrtle Beach rejected
10 that -- rejected the amendment to the 2001 supply
11 agreement stated in your letter of August 14,
12 which includes the new most favored customer
13 provisions and which is Exhibit 77?
14   A.  I don't recall.
15   Q.  Do you recall that agreement -- that
16 final agreement was ever reached with respect to
17 the modification discussed in Exhibit 77?
18   A.  No agreement was reached, no.
19   Q.  Do you recall discussing that proposed
20 modification with senior management in Myrtle
21 Beach?
22   A.  I am afraid I don't.
23   Q.  Except as you have already testified,
24 do you recall any discussion with Mr. Tyler about

31 (Pages 118 to 121)

1 the amendment -- proposed amendment set forth in
2 Exhibit 77, your letter of August 14, 2001?
3    A.   I don't.
4    Q.   Did you take up the subject of an
5 amendment to the 2001 supply agreement at some
6 time after August of 2001?
7    A.   I don't recall.
8    MR. FRANK:  Mark, please, as Exhibit 79, a
9 document bearing Bates numbers AVX 2887 through
10 2890.
11         (WHEREUPON, a certain document was
12         marked Deposition Exhibit No. 79,
13         for identification, as of 8/4/06.)
14 BY MR. FRANK:
15    Q.   Do you recognize Exhibit 79 as a
16 memorandum that you provided to Mr. Collis on or
17 about October 19, 2001?
18    A.   I do.
19    Q.   This references a visit to Cabot in
20 October of 2001.  Can you now recall the visit?
21    A.   I can.
22    Q.   What was the purpose of the visit?
23    A.   The main visit was to conduct their
24 three-yearly audit and to have discussions --

1 commercial discussions going forward.
2    Q.   What do you do when you are doing an
3 audit?
4    A.   We have a large document going through
5 several disciplines, AVX requirements, and BS
6 requirements as well, okay.  And we score them
7 out of a certain number of points.
8    Q.   I am sure that the expression "BS
9 requirements" means something different to you
10 than to me.
11    A.   British standard requirements.
12    Q.   Thank you.
13         And is it correct that on an overall
14 basis Cabot's performance against those measures
15 had improved as of October 2001, as compared to
16 the audit that you had conducted three years
17 prior to that?
18    A.   Correct.
19    Q.   In the course of those visits did you
20 discuss a possible amendment to the 2001 supply
21 agreement?
22    A.   I did.
23    Q.   And did you request certain changes to
24 the contract?

1    A.   Can you repeat that question?
2    Q.   Sure.  Maybe I will make it easier.
3         If you turn to the second page of
4 Exhibit 79, the second paragraph, the one that
5 begins with the words "our contract," it says,
6 "our contract amendment request was discussed,
7 attachment 1, together with document changes as
8 follows."
9    A.   Yes.
10    Q.   And am I correct in understanding that
11 what's listed under A through D on the second
12 page, as well as what is shown on the attachment,
13 page 2890, is what AVX was proposing at that
14 stage?
15    A.   It was my interpretation, yes.
16    Q.   Okay.  Of what AVX was proposing?
17    A.   I was proposing this change.  Whether
18 it was acceptable to AVX above me, I didn't know.
19    Q.   Okay.  One of the things you were
20 requesting was the ability or the right to
21 substitute up to 30,000 pounds of flake powder?
22    A.   Correct.
23    Q.   For nodular powder, correct?
24    A.   Correct.

1    Q.   And another thing you were proposing
2 was an improvement in the consignment terms of
3 the contract?
4    A.   Correct.
5    Q.   Okay.  Let me see if I can make sure
6 that I understand that.  Would you go back to
7 Exhibit 1.  And let me direct you, if I could, to
8 Section 4 of the contract, which begins on page
9 number 2.
10         Is it correct that AVX would order --
11 would issue a purchase order for certain
12 quantities of tantalum product, and that assuming
13 that that order were accepted by CPM, CPM would
14 then ship that quantity to AVX on assignment?
15    A.   Correct.
16    Q.   I misspoke.  On consignment, correct?
17    A.   Correct.
18    Q.   Okay.  Now, at that moment, at the time
19 of shipment and at the time of receipt by AVX,
20 there was no yet a sale of the product, correct?
21    A.   Correct.
22    Q.   Okay.  The product in question then
23 went into AVX's inventory, conceptually still
24 owned by CPM, correct?

32 (Pages 122 to 125)

Page 126

1  A.  Correct.

2  Q.  And then the arrangement was that the
3  sale would take place either -- stop.
4      It is correct, is it not, that AVX
5  would then notify CPM of an event, which under
6  the terms of the contract, was the event which
7  triggered the sale of the particular product in
8  question?

9  A.  Correct.

10  Q.  Okay.  And that event might be one of
11  two things; either the actual use of the product
12  by AVX, or the passage of a defined number of
13  days from the time that the -- from the first day
14  of the first full calendar month, beginning after
15  the date of receipt --

16  MR. SLAVITT:  Objection.

17  MR. FRANK:  Let me withdraw that because it
18  is impossible to follow.

19  BY MR. FRANK:

20  Q.  One thing that might trigger a sale was
21  AVX's use of the powder in question, right?

22  A.  Correct.

23  Q.  Okay.  Another thing was the passage of
24  a defined period of time without the use of that

Page 127

1  powder?

2  A.  Correct.

3  Q.  Okay.  Whichever occurred first is when
4  the sale would happen, right?

5  A.  Correct.

6  Q.  And the defined period of time appears
7  at the very bottom of page 2 of Exhibit 1.
8      And am I correct that at least for the
9  year 2001 the way that worked was that AVX would
10  receive the product on a particular day, that you
11  would then go to the first day of the month that
12  first occurred thereafter, and you would -- and
13  then the deadline for purchase, in effect, would
14  be 90 days thereafter?

15  A.  Correct.

16  Q.  Okay.  And was the deemed purchase upon
17  the giving of notice by AVX that the purchase
18  event had occurred, or was it the purchase event
19  itself?

20  A.  It was indicated by AVX.

21  Q.  Okay.  So it was when AVX gave notice
22  that the purchase event had occurred, one or the
23  other of the purchase events had occurred, that's
24  when the sale took place?

Page 128

1  A.  Correct.

2  Q.  Okay.  And am I correct that in the
3  contract as originally signed, for years after
4  2001, the period that you and I call "90 days"
5  that applied to the year 2001 was 45 days?

6  A.  Correct.

7  Q.  Now, after that struggle, let's come
8  back to Exhibit 79, page 2, item B.
9      Is it correct that you're proposing to
10  apply a 90-day period instead of a 45-day period
11  as the measure of the amount of time that
12  material could stay in inventory at AVX without a
13  sale having actually occurred?

14  A.  Correct.

15  Q.  Without an event which triggered an
16  obligation to give notice which is when the sale
17  would have occurred?

18  A.  Exactly.  Correct.

19  Q.  Okay.  Let me isolate that provision
20  from the rest of this and ask you whether CPM
21  agreed to that modification of the contract?

22  A.  I can't recall.

23  Q.  Now, look at, if you would, at sub (D)
24  on page 2 of Exhibit 79.

Page 129

1      Is it correct that you are again
2  proposing three modifications to the existing
3  most favored customer provision; first, that it
4  be extended to the year 2002; second, that it be
5  expanded to cover sales made from powder
6  manufactured at facilities other than CPM's
7  Boyertown, Pennsylvania, facility; and, third,
8  that the base year 2002 limitation be removed?

9  A.  Correct.

10  Q.  And is it correct -- who were you
11  meeting with?  You are describing here, I think,
12  a discussion you had with CPM people.  First,
13  were you accompanied by others from AVX?

14  A.  I was.

15  Q.  And who might that have been?

16  A.  I believe it was Dr. Colin McCracken,
17  an engineer.

18  Q.  And who was present at the discussions
19  about contract modification for CPM?

20  A.  I don't fully recall, but I believe it
21  was Mr. Hugh Tyler, and I don't recall anybody
22  else, but there may have been.

23  Q.  You report at the top of page 3 of
24  Exhibit 79 that "our request," referring, I

33 (Pages 126 to 129)

1 think, to items A, B, C, and D on the preceding
2 page, "with slight quantity changes yet to be
3 seen was acceptable." I beg your pardon I think
4 I have misasked the question.
5　　　You also asked for CPM to agree to
6 excuse AVX from purchasing 5,000 pounds of
7 nodular powder that would otherwise have had to
8 have been bought by AVX, correct?
9　A.　Correct.
10　Q.　And your report to Mr. Collis was that
11 your request with slight quantity changes yet to
12 be seen was, you thought, acceptable as were
13 items A, and B, and C, that's the items A, B, C on
14 page 2?
15　A.　Correct.
16　Q.　And as to item D, you say "MFN clause
17 change could be a problem"?
18　A.　I believe so.
19　Q.　Do you remember what was said by the
20 CPM people that caused you to draw that
21 conclusion?
22　A.　I don't, I'm afraid.
23　Q.　And did you understand that CPM was
24 amenable to relieving AVX of the 5,000 additional

1 pounds that are referenced on page 2 of
2 Exhibit 79?
3　A.　It was acceptable with strings.
4　Q.　Okay. And what was the string?
5　MR. SLAVITT: Objection.
6 BY THE WITNESS:
7　A.　Should the package be acceptable.
8 BY MR. FRANK:
9　Q.　Should the package be?
10　A.　Acceptable to Cabot.
11　Q.　Let me see if I just understand that
12 last answer.
13　　　Did you -- were you -- should I
14 understand the last answer to mean --
15　A.　I'm sorry, can I correct that? To AVX.
16 Not Cabot. To AVX.
17　Q.　Okay. And in interpreting that answer,
18 I understand it to mean, please correct me if I
19 am wrong, that you made it clear to the people at
20 CPM that it was one thing to agree with you, but
21 in order for this to be binding on AVX, it had to
22 be approved by senior management at AVX?
23　A.　Correct.
24　Q.　Okay. Was that proposal approved by

1 senior management at AVX?
2　A.　I don't recall, but I believe not.
3　Q.　Did you return to the subject of a
4 modification of the party's contract in November
5 and December of 2001?
6　A.　I don't recall the dates, but I know we
7 had several discussions on the subject.
8　MR. FRANK: Mark, please, as Exhibit 80, a
9 document numbered AVX 1391.
10　　　(WHEREUPON, a certain document was
11　　　marked Deposition Exhibit No. 80,
12　　　for identification, as of 8/4/06.)
13 BY MR. FRANK:
14　Q.　Do you recognize Exhibit 80 as an
15 e-mail to you from Mr. Tyler dated November 28,
16 2001 and your response to Mr. Tyler on or about
17 that date?
18　A.　I do.
19　Q.　And is it correct that you and he
20 agreed on behalf of the two companies that Cabot
21 would allow AVX not to purchase 5,000 pounds of
22 nodular powder, and that in exchange you were
23 agreeing to give Cabot some greater flexibility
24 with respect to within the purchase of flake

1 powder as between C275 and C255?
2　A.　Correct.
3　Q.　And is it correct that that agreement
4 was an agreement that could be and was made at
5 the Chapple-Tyler level in the two companies?
6　A.　Correct.
7　MR. FRANK: Mark, please, as Exhibit 81, a
8 document bearing Bates number C(A) 010515.
9　　　(WHEREUPON, a certain document was
10　　　marked Deposition Exhibit No. 81,
11　　　for identification, as of 8/4/06.)
12 BY MR. FRANK:
13　Q.　In the pile in front of you, you will
14 find Exhibit 77. Will you get out Exhibit 77,
15 please.
16　　　Is Exhibit 81 an e-mail that you
17 received from Mr. Tyler on December 11, 2001?
18　A.　It is.
19　Q.　And is it fair to say that you and he
20 were back in discussion about possible
21 modifications of -- different possible
22 modifications of the 2001 supply agreement?
23　A.　Correct.
24　Q.　This one would have involved spreading

34 (Pages 130 to 133)

Page 134

1  out AVX's purchase obligation with respect to
2  KTaF, among other things, correct?
3     A.   Correct.
4     Q.   In item 3, Mr. Tyler is proposing the
5  extension of most favored nation -- most favored
6  customer pricing to the calendar year 2002, but
7  not the other things that you had previously
8  proposed, correct?
9     A.   It appears so.
10    Q.   And he is offering, again, to provide
11 additional flexibility to AVX with respect to
12 AVX's right to swap flake for nodular and nodular
13 for flake?
14    A.   Correct.
15    Q.   And, further, he is offering to
16 substitute -- give AVX the right to substitute
17 certain purchases of wire, tantalum wire for
18 deemed equivalent amounts of KTaF?
19    A.   Yes.
20    Q.   And is it correct that at the
21 Tyler-Collis level there was agreement to that
22 proposal?
23    A.   I don't recall.
24    MR. FRANK:  Mark as Exhibit 82, a document

Page 135

1  bearing C(AII) 088951 through 952.
2        (WHEREUPON, a certain document was
3        marked Deposition Exhibit No. 82,
4        for identification, as of 8/4/06.)
5  BY MR. FRANK:
6     Q.   Is Exhibit 82 a copy of an e-mail that
7  you received on or about December 13, 2001 as
8  well as your response of that date?
9     A.   It is.
10    Q.   And you received that from Mr. Tyler
11 and responded to Mr. Tyler, correct?
12    A.   I did.
13    Q.   And Mr. Tyler reports that "as an
14 outcome of my discussion with you today, I am
15 pleased to report that we have agreement on the
16 following points, which would be incorporated in
17 an amendment to the supply agreement."
18       And was that a correct statement as it
19 relates to the conversations at the Tyler-Chapple
20 level?
21    A.   I believe it was.
22    Q.   And, again, the principal terms are
23 extending out -- spreading out AVX's KTaF
24 purchase obligation, AVX would purchase some

Page 136

1  additional wire.  There would be greater flex --
2  AVX would have the right to swap back and forth
3  between flake and nodular powder, and AVX could,
4  if it wished, purchase wire in lieu of KTaF at a
5  prescribed ratio?
6     A.   Correct.
7     Q.   And you agreed to take that -- to get
8  approved by -- to see if your management would
9  approve it, correct?
10    A.   Correct.
11    Q.   Did you recommend it to your
12 management?
13    A.   I don't recall.
14    Q.   Do you have any reason to believe that
15 you didn't?
16    A.   I have no reason to believe I didn't,
17 no.
18    Q.   And it is fair to say, is it not, that
19 if you reached agreement with Mr. Tyler at the
20 Tyler-Chapple level, it was your practice at
21 least to recommend that agreement to senior
22 management at AVX, correct?
23    A.   It was.
24    Q.   All right.  Was this agreement approved

Page 137

1  by senior management at AVX?
2     A.   I don't recall.
3     Q.   Do you believe that it was not --
4     A.   I believe it wasn't approved.
5     Q.   Now, during 2002, did you become aware
6  that there were lawsuits between CPM on the one
7  hand and Kemet on the other in a separate lawsuit
8  between CPM, on the one hand, and Vishay on the
9  other?
10    A.   I was aware, yes.
11    Q.   And did you do anything to monitor the
12 progress of those cases?
13    A.   Not that I recall.
14    Q.   Okay.  Did AVX do anything to monitor
15 the progress of those cases?
16    MR. SLAVITT:  Hold on a second.
17       Exclude from your answer anything that
18 you may directly or indirectly have learned from
19 counsel.
20 BY THE WITNESS:
21    A.   Not that I can recall.
22 BY MR. FRANK:
23    Q.   Did you become aware that the CPM
24 Vishay litigation was settled sometime in 2002?

35 (Pages 134 to 137)

Page 138

1    A.   I believe I may have heard that, yes.
2    MR. FRANK: Please mark as Exhibit 83 a
3  document that does not have a Bates number on it,
4  but is an e-mail from Mr. Collis to a number of
5  people, including Mr. Chapple.
6        (WHEREUPON, a certain document was
7        marked Deposition Exhibit No. 83,
8        for identification, as of 8/4/06.)
9  BY MR. FRANK:
10   Q.   Did you receive a copy of Exhibit 83 on
11 or about June 7, 2002?
12   A.   I did.
13   Q.   And did you read it at approximately
14 the time you received it?
15   A.   I believe I did.
16   Q.   This is, I believe, a copy of a press
17 release, and it states that Cabot Corporation
18 resolved its legal dispute with Vishay
19 Intertechnology, Inc., agreeing to amend a series
20 of long-term tantalum supply contracts, do you
21 see that?
22   A.   I do.
23   Q.   Did you understand then that there was
24 more than one contract between Cabot and -- or

Page 140

1        (WHEREUPON, a recess was had.)
2  BY MR. FRANK:
3    Q.   Is it correct that the most favored
4  customer provision of the 2001 supply agreement
5  became operative in 2003?
6    A.   Correct.
7    Q.   And did you have a conversation or
8  conversations with representatives of CPM with
9  respect to how that provision -- what that
10 provision meant or how it would operate?
11   A.   I believe I had an e-mail from Mr. Hugh
12 Tyler on that subject.
13   Q.   Apart from that e-mail, do you recall
14 any other conversation?
15   A.   Not that I can recall.
16   MR. FRANK: First, mark, please, as
17 Exhibit 84, a document bearing Bates numbers
18 C(AII) 085789 and 90.
19       (WHEREUPON, a certain document was
20       marked Deposition Exhibit No. 84,
21       for identification, as of 8/4/06.)
22 BY MR. FRANK:
23   Q.   Is that the e-mail to which you just
24 referred, sir?

Page 139

1  CPM and Vishay for the supply of tantalum
2  products?
3    A.   I don't seem to recollect that, the
4  meaning to -- having two contracts.
5    Q.   Okay. That wasn't exactly my question.
6        My question is, do you recall that
7  there was more than one contract between CPM and
8  Vishay?
9    A.   No, I don't recall that.
10   Q.   Do you recall learning as a result of
11 the announcement, Exhibit 83, that there was more
12 than one tantalum supply agreement between Vishay
13 and CPM?
14   A.   Subsequently, yes.
15   Q.   Did you learn that as a result of
16 reading Exhibit 83?
17   A.   Not that I can recall.
18   Q.   But you did -- obviously, you did read
19 Exhibit 83 when you got it, right?
20   MR. SLAVITT: Objection. You can answer.
21 BY THE WITNESS:
22   A.   Right.
23   MR. FRANK: Why don't we take a break. I am
24 going to change subjects.

Page 141

1    A.   It is.
2    MR. SLAVITT: Can I just note you have now
3  marked -- this is also Deposition Exhibit 14.
4    MR. FRANK: Thanks. I apologize for
5  cluttering the record.
6    MR. SLAVITT: That's okay.
7  BY MR. FRANK:
8    Q.   The -- apart from the receipt of
9  this -- well, first, did you discuss this e-mail
10 with Mr. Tyler or anyone else associated with
11 CPM?
12   A.   Not that I can recall.
13   Q.   Did you discuss any other aspect or did
14 you otherwise discuss the most favored nation
15 provision or how it would operate or what it
16 meant with anyone from CPM in 2003 or 2004?
17   A.   Not that I can recall.
18   Q.   Did you discuss with Mr. Tyler or
19 anyone else at CPM the question whether the most
20 favored customer provision should be implemented
21 on a monthly, quarterly, annual, or three-year
22 basis?
23   A.   I believe it says here each calendar
24 quarter.

36 (Pages 138 to 141)