# Exhibit #8

```
                                                        Page 1
 1            COMMONWEALTH OF MASSACHUSETTS

 2    SUFFOLK, SS                      SUPERIOR COURT

 3          CIVIL ACTION NO. 05-03816-BLS

 4

 5  AVX CORPORATION and AVX LIMITED,     )

 6          Plaintiffs And Defendants    )

 7          in Counterclaim,             )

 8      vs.                              )

 9  CABOT CORPORATION,                   )

10          Defendant and Plaintiff      )

11          In Counterclaim.             )

12

13

14              **CONFIDENTIAL**

15

16          The deposition of JOHN STERLING

17  GILBERTSON, called for examination, taken before

18  ANNETTE M. MONTALVO, a Notary Public within and

19  for the Commonwealth of Massachusetts, and a

20  Registered Merit Reporter of said state, at Suite

21  3400, Two International Place, Boston,

22  Massachusetts, on the 22nd day of August, A.D.

23  2006, at 9:30 a.m.

24
```

Page 2

1  PRESENT:
2
3  BODOFF & SLAVITT, LLP,
4  (225 Friend Street, 7th Floor,
5  Boston, Massachusetts 02114,
6  617-742-7300), by:
7  MR. EVAN SLAVITT,
8      appeared on behalf of the Plaintiffs
9      and Defendants in Counterclaim;
10
11  CHOATE, HALL & STEWART,
12  (Two International Place,
13  Boston, Massachusetts 02110,
14  617-248-5000), by:
15  MR. ROBERT S. FRANK, JR.,
16      appeared on behalf of the Defendant
17      and Plaintiff In Counterclaim.
18
19
20
21
22  REPORTED BY: ANNETTE M. MONTALVO, CSR, RMR,
23      RMR CERTIFICATE NO. 833506.
24

Page 3

1           I N D E X
2  WITNESS                    EXAMINATION
3  JOHN STERLING GILBERTSON
4     By Mr. Frank               5
5
6
7           E X H I B I T S
8  NUMBER                         PAGE
9  Deposition Exhibit
10
11  No. 165                       19
12  No. 166                       24
13  No. 167                       31
14  No. 168                       41
15  No. 169                       46
16  No. 170                       50
17  No. 171                       62
18  No. 172                       85
19  No. 173                       89
20  No. 174                       111
21  No. 175                       118
22  No. 176                       127
23  No. 177                       136
24  No. 178                       139

Page 4

1  INDEX (Continued)
2
3           E X H I B I T S
4  NUMBER                         PAGE
5  Deposition Exhibit
6
7  No. 179                       141
8  No. 180                       155
9  No. 181                       158
10  No. 182                       161
11  No. 183                       173
12  No. 184                       175
13  No. 185                       177
14  No. 186                       179
15  No. 187                       188
16  No. 188                       191
17  No. 189                       196
18  No. 190                       204
19
20
21
22
23
24

Page 5

1   MR. FRANK: Same stipulations?
2   MR. SLAVITT: Yes.
3       (WHEREUPON, the witness was duly
4       sworn.)
5       JOHN GILBERTSON,
6  called as a witness herein, having been first
7  satisfactorily identified and duly sworn, was
8  examined and testified as follows:
9           EXAMINATION
10 BY MR. FRANK:
11  Q.  Good morning, Mr. Gilbertson. Will you
12 state your name, please.
13  A.  John Gilbertson.
14  Q.  Where do you live, Mr. Gilbertson?
15  A.  I live in 517 North 13th Avenue, Surf
16 Side Beach, South Carolina, 29575.
17  Q.  Are you presently employed?
18  A.  Yes, I am employed.
19  Q.  By whom are you employed?
20  A.  AVX Corporation.
21  Q.  And what is your position with AVX
22 Corporation?
23  A.  I am the president of the company.
24  Q.  And the chief executive officer?

2 (Pages 2 to 5)

Page 6

1  A.  And chief executive officer.
2  Q.  Would you take a minute, sir, and tell
3 us your educational background.
4  A.  I received a bachelors of engineering
5 in general engineering from Oklahoma State
6 University in Stillwater, Oklahoma. I received a
7 masters in industrial management at the same
8 university.
9  Q.  When did you get your bachelors degree?
10  A.  I believe it was 1969.
11  Q.  And your masters degree?
12  A.  One year later.
13  Q.  When you finished school, when were you
14 first employed?
15  A.  When I finished the university, I went
16 into the military.
17  Q.  How long were you in the military?
18  A.  I was in the military for about
19 approximately 4 and one-half years.
20  Q.  And when you came out, what was your
21 first job?
22  A.  I worked for a company called Corning
23 Glass Works.
24  Q.  When did you start at Corning?

Page 7

1  A.  Immediately after getting out of the
2 Air Force.
3  Q.  So that would be about 1974?
4  A.  It would be close. It would be about
5 that time, yes.
6  Q.  How long were you at Corning?
7  A.  I was at Corning approximately nine
8 years.
9  Q.  And can you tell us what positions you
10 held at Corning and the order in which you held
11 them?
12  A.  I started out as an engineer in a glass
13 plant, then I was in charge of new product
14 development in regards to glass. Then I was a
15 department manager of a glass melting operation.
16 Then I was the production foreman, general
17 foreman of a glass build up process. Then I was
18 the production superintendent of an electronics
19 process company in that same firm.
20  Q.  When did you leave Corning?
21  A.  Approximately 1981.
22  Q.  Is it correct in 1981 you joined AVX?
23  A.  That's correct.
24  Q.  What was your first position at AVX?

Page 8

1  A.  I was the business manager of a product
2 line, product line was called Dip Guards.
3  Q.  How long were you in that position,
4 approximately?
5  A.  Two years.
6  Q.  And what did you do next for AVX?
7  A.  I was the business manager for all the
8 leaded product lines in that group that involved
9 the -- the Dip Guards were also in that line, and
10 I was the business manager for the entire group.
11  Q.  What are leaded products?
12  A.  Leaded products are capacitors that
13 have metal rods attached to them in order to be
14 inserted into circuit boards.
15  Q.  How long were you the business manager
16 of the leaded product group?
17  A.  I would just have to speculate three,
18 four years, something like that.
19  Q.  What did you do next?
20  A.  I think I was then probably the chief
21 operating officer of the company, and then I was
22 senior vice president of the company, and then I
23 was executive vice president of the company, and
24 then later president, CEO.

Page 9

1  Q.  Let me tell you the dates that I have
2 from publicly available sources and you tell me
3 if they sound right to you.
4     I have you as a vice president of the
5 company beginning in 1990; is that correct?
6  A.  That is correct. Just as a point of
7 clarification, there's two vice presidential
8 positions. There's a division vice president
9 position, which is essentially a business --
10 senior level business manager, and then there's a
11 corporate vice president position.
12  Q.  In the period 1990 to 1992, were you a
13 division vice president or a corporate vice
14 president?
15  A.  I would have to go back and look at the
16 data. I really can't remember that.
17  Q.  The publicly available --
18  A.  Right, it is publicly available.
19  Q.  The publicly available information
20 indicates you were executive vice president
21 beginning in 1992 and that you held that position
22 until 1997; does that sound right?
23  A.  That's correct, and that is a corporate
24 office.

Page 62

1 when you gave instructions to Mr. Chilton as to
2 how he should negotiate with Cabot?
3   A.   Yes. They were having a negotiation,
4 and I sent him a note on it, general comments.
5   MR. FRANK: Let me ask the reporter to mark
6 as Exhibit 171, an e-mail that bears Bates
7 numbers AVX 1439 and 1440.
8        (WHEREUPON, a certain document was
9        marked Exhibit No. 171, for
10       identification, as of 8/22/06.)
11 BY THE WITNESS:
12  A.   Yes.
13 BY MR. FRANK:
14  Q.   Is Exhibit 171 an e-mail that you sent
15 to Mr. Chilton and others on or about
16 September 18, 2000?
17  A.   Yes.
18  Q.   Okay. And Mr. Chilton's assistant was
19 a woman named Teresa Barber, correct?
20  A.   Yes.
21  Q.   And she was the conduit for e-mails to
22 Mr. Chilton at that time?
23  A.   Ernie did not have e-mail.
24  Q.   So, therefore, if you wanted to send an

Page 63

1 e-mail to Mr. Chilton, you sent it to Ms. Barber?
2   A.   That's correct.
3   Q.   To this point, September 18, had you
4 talked to anybody at Cabot?
5   A.   My recollection is I cannot remember
6 the first time or when specifically I talked to
7 someone at Cabot.
8   Q.   Let me put the question in a slightly
9 different context, which may assist you in
10 answering.
11       I showed you a moment ago a memorandum
12 by Mr. Chilton of the meeting between Messrs.
13 Chilton, Rosen, and Burns?
14  A.   Right.
15  Q.   And accept my representation that that
16 date of that meeting as reported by Mr. Chilton
17 was October 2, 2000. Is it correct that at least
18 up to that date you had not had any direct
19 contact with Cabot?
20  A.   My answer is, yes, my recollection is
21 no direct contact at that time.
22  Q.   By the time of this e-mail,
23 September 18, you had run to ground, had you not,
24 the question whether the document outstanding

Page 64

1 between Cabot and AVX was a letter of intent or a
2 contract?
3   MR. SLAVITT: Objection. You can answer.
4 BY THE WITNESS:
5   A.   I don't know what "run to ground"
6 means.
7 BY MR. FRANK:
8   Q.   You had formed -- you had investigated
9 the question whether the relationship between
10 Cabot and AVX was governed by a letter of intent
11 or a contract and formed your own understanding,
12 correct?
13  A.   Yes, I had formed my own understanding.
14  Q.   And your understanding was that the
15 arrangement between Cabot and AVX was the subject
16 of a letter of intent, correct?
17  MR. SLAVITT: Objection. You can answer.
18 BY THE WITNESS:
19  A.   My understanding was we had a contract.
20 BY MR. FRANK:
21  Q.   Okay. However, you told -- you
22 referred to the document in question in your
23 communication with Mr. Chilton as a letter of
24 intent, correct?

Page 65

1   A.   I copied what Mr. Chilton sent me and
2 attached it to that memo. The term "letter of
3 intent" was his term.
4   Q.   Okay. Is it your understanding that
5 you attached something to Exhibit 171 that
6 Mr. Chilton had sent to you?
7   A.   I don't believe so. I think the
8 purpose of this was just to give him a general
9 directive as to how he should work in the
10 negotiations.
11  Q.   Okay. The other addressees of this
12 e-mail were Mr. Cummings; is that correct?
13  A.   Correct.
14  Q.   Mr. Cummings was, at the time, the
15 chief financial officer of AVX?
16  A.   I am not sure he was. And I believe he
17 was not.
18  Q.   Okay. Was he the controller?
19  A.   He was the controller.
20  Q.   Okay. Who is Mr. Edwards? Or what was
21 his position?
22  A.   Mr. Edwards was the vice president of
23 strategic planning.
24  Q.   And Mr. Jackson was the marketing vice

Page 82

1 at the time, sir.
2   A.   The only understanding I remember would
3 be from this memo where I see a reliability issue
4 there.
5   Q.   Okay. And is it correct that
6 Mr. Collis told you that there was only 2 percent
7 of the output of Paignton that can only be made
8 from flake powder?
9   A.   It is not clear whether he is talking
10 about Paignton or is he talking about Paignton
11 and Biddeford in this statement. Since he was
12 mainly from Paignton, I could assume he is
13 talking about Paignton.
14   Q.   Did you ask him?
15   A.   I don't remember at the time.
16   Q.   Did Mr. Collis tell you there was about
17 an 80 percent overlap between C255 and FTW170
18 from Ningxia?
19   A.   He doesn't say "overlap." He said "we
20 had 80 percent cover with two suppliers, Cabot
21 and the Chinese." I don't know what he is
22 talking about in that regard.
23   Q.   In the third line of Exhibit 112, he
24 says "with 80 percent overlap between C255 and

Page 83

1 FTW170." Do you see that?
2   A.   I see that.
3   Q.   Okay. Was it your understanding that
4 FTW170 for Ningxia could be used interchangeably
5 with C255 for 80 percent of the 10 percent of
6 Paignton's product that was serviced by the
7 5 tons of product purchased from Cabot and
8 Ningxia together?
9   MR. SLAVITT: Objection. You can answer.
10 BY THE WITNESS:
11   A.   No. Ningxia at the time had
12 reliability problems and still does until today.
13 BY MR. FRANK:
14   Q.   Okay. Would you -- do you believe that
15 Mr. Collis has a better understanding or you have
16 a better understanding of the substitutability of
17 FTW170 and C255?
18   A.   Mr. Collis has a better understanding.
19   Q.   And was it your understanding after you
20 had read Mr. Collis' memorandum that 10 percent
21 of the Paignton output was supported by the two
22 and a half tons of C255 or C275 purchased from
23 Cabot and Ningxia's FTW170 powder?
24   A.   My understanding then and today is

Page 84

1 Ningxia was not a reliable supplier on quality.
2 That was a big issue with the high CVs, the
3 materials that go into Biddeford and that go
4 in --
5   Q.   So I move that be stricken.
6   A.   Okay.
7   Q.   Read the question, and answer the
8 question, please, sir.
9         (WHEREUPON, the record was read by
10        the reporter as requested.)
11   MR. SLAVITT: Objection. You can answer.
12 BY THE WITNESS:
13   A.   No. No.
14 BY MR. FRANK:
15   Q.   Did you respond to Mr. Collis' e-mail,
16 Exhibit 112, and correct him or ask further about
17 the information provided by Mr. Collis in
18 Exhibit 112?
19   A.   I don't remember specifically that.
20   Q.   Do you have any memory of providing
21 such a correction?
22   A.   I don't have a memory of that.
23   Q.   During this period, during the
24 September 2000 period, did you keep Mr. Rosen

Page 85

1 apprised of what was going on?
2   A.   In what regard?
3   Q.   I'm sorry, did you keep Mr. Rosen
4 apprised of the Cabot supply situation?
5   A.   Yes.
6   Q.   And did you try to set forth for
7 Mr. Rosen your understanding of what AVX's needs
8 were and what its priorities were?
9   A.   I copied him on several notes.
10   Q.   Please answer my question: Did you try
11 to keep Mr. Rosen apprised of what AVX's needs
12 and priorities were?
13   MR. SLAVITT: Okay. You can answer.
14 BY THE WITNESS:
15   A.   Not in detail, I don't believe, as to
16 the actual powders. The answer is no. Not in
17 detail.
18   MR. FRANK: Please mark as Exhibit 172 a
19 document which bears Bates number AVX 0072.
20        (WHEREUPON, a certain document was
21         marked Deposition Exhibit No. 172,
22         for identification, as of
23         8/22/06.)
24 BY THE WITNESS:

22 (Pages 82 to 85)

Page 86

1  A.  Yes.
2  BY MR. FRANK:
3  Q.  In the second paragraph of Exhibit 172,
4  you refer to a company called Starck. Do you see
5  that?
6  A.  Yes.
7  Q.  And is it correct that Starck -- that
8  HC Starck was AVX's primary supplier of tantalum
9  powders and wires?
10 A.  Yes.
11 Q.  Immediately under that you set forth
12 your understanding of AVX's needs, is that
13 correct, and priorities?
14 A.  From Cabot, yes.
15 Q.  Okay. The first priority was the
16 Biddeford product, and you said 10 to 15 tons, do
17 you see that?
18 A.  Yes I do.
19 Q.  That would be 20 to 30,000 pounds of
20 the product that was used in Biddeford, correct?
21 A.  Yes.
22 Q.  Okay. The second priority was "54 tons
23 of raw that we will get processed elsewhere," and
24 that you say "which he is apparently stuck with."

Page 87

1  That's a reference to KTaF; is that correct?
2  A.  Yes.
3  Q.  And the third is "the flake that he
4  only sells to us for" -- the third priority was
5  "the flake that he only sells to us for high
6  voltage." The "he" there is a reference to
7  Cabot, correct?
8  A.  Yes.
9  Q.  About two or three lines down in the
10 memorandum you say, "Vishay is telling the story
11 in the field that they have bought all his
12 capacity to process material and this may be
13 true."
14     What had you been -- what had been
15 reported to you about what Vishay was saying in
16 the field?
17 A.  That they were telling in the field
18 that they had a contract with Cabot for all their
19 material, which turned out not to be true.
20 Q.  But -- withdrawn.
21     You informed Mr. Rosen, did you not,
22 that Cabot had verbally agreed to supply the
23 material that sometime prior to September 28 --
24 withdrawn.

Page 88

1     You informed Mr. Rosen, did you not,
2  that Cabot had verbally agreed on several
3  occasions prior to September 28, 2000 to supply
4  the material that Biddeford needed?
5  A.  Yes, that's what this e-mail says.
6  Q.  And did that accurately reflect your
7  understanding at the time?
8  A.  My understanding at the time.
9  Q.  I'm sorry?
10 A.  Yes, my understanding at the time.
11 Q.  Okay. And is it correct that with
12 respect to KTaF, Cabot had sent a price list and
13 confirming quote to AVX?
14 A.  I don't see the KTaF in here.
15 Q.  You refer to -- you will see a
16 reference to 54 tons, which above you had
17 referred to as "54 tons of raw"?
18 A.  Yes, okay.
19 Q.  Do you --
20 A.  That's KTaF, yes.
21 Q.  Okay. And did you also inform
22 Mr. Rosen that AVX was the only company that was
23 buying Cabot's flake powder at the time?
24 A.  That was my impression, yes.

Page 89

1  Q.  Okay. And did you tell Mr. -- was it
2  your understanding that Cabot had provided a
3  quote and a purchase order with respect -- or had
4  accepted a purchase order with respect to wire,
5  tantalum wire?
6  A.  No. The statement I am trying to make
7  there is that we have a purchase order -- a quote
8  and purchase order from them for the wire which
9  wasn't an issue, okay.
10 Q.  The wire wasn't an issue?
11 A.  The wire wasn't thought to be an issue.
12 Q.  Okay.
13 A.  I'm getting the impression we are
14 talking about another lawsuit, not this one.
15 Could be?
16 MR. FRANK: I ask the reporter to mark as
17 Exhibit 173 a document bearing Bates numbers AVX
18 1460 and 61.
19     (WHEREUPON, a certain document was
20     marked Deposition Exhibit No. 173,
21     for identification, as of
22     8/22/06.)
23 BY MR. FRANK:
24 Q.  First, is Exhibit 173 a memorandum that

23 (Pages 86 to 89)

Page 98

1 received on or about -- does it include an e-mail
2 that you received on or about October 15, 2000?
3    A.   Yes, it does.
4    Q.   Okay. And did Mr. Collis report to you
5 that he met with Cabot people in London the
6 previous Saturday?
7    A.   Right.
8    Q.   He described the meeting as friendly
9 and constructive?
10   A.   Yes.
11   Q.   Toward the bottom of the page he
12 reports, quote, "Vishay have a signed deal at the
13 original price increases." Do you see that?
14   A.   Yes, I do.
15   Q.   Did you have an understanding as to
16 what he was talking about?
17   A.   I think he is implying that Vishay took
18 the contract offered to them by Cabot.
19   Q.   Okay. And what, as you understood it,
20 did the reference to the original prices mean?
21   A.   When Cabot first came out in the field,
22 they had a price multiplier. I don't remember
23 what it was, but it is in several of the e-mails.
24 It was a large number.

Page 99

1    Q.   But lower than the number that was
2 being talked about by mid October 2000?
3    A.   I don't remember.
4    Q.   Okay. And then he goes on to say,
5 "Cabot do not want to pull out of the flake
6 market, but the price needs to reflect the
7 capacity and additional operating costs for this
8 material." Do you see that?
9    A.   Yes.
10   Q.   Was it your understanding that Cabot
11 was saying that they wanted to sell flake, but
12 that it was a matter of price?
13   A.   There was a rumor going around at the
14 time --
15   Q.   Was it your understanding that Cabot
16 had said they wanted to sell flake, but it was a
17 matter of price?
18   A.   The way you phrased the question, I
19 think the answer is no.
20   Q.   Okay. Let me direct your attention to
21 the second page of Exhibit 114. About six or
22 seven lines down there's a reference to C420. Do
23 you see that?
24   A.   Right.

Page 100

1    Q.   It says, "C420, the alternative from
2 flake comes" -- I misread that. It says that
3 "C420, the alternative to flake, comes from this
4 root." Do you see that?
5    A.   Right.
6    Q.   Okay. Was it your understanding that
7 C420 was an alternate to flake?
8    A.   No. It was not.
9    Q.   Was it your understanding that AVX's
10 results to date suggested that C420 was an
11 alternate to C255, but not C275?
12   A.   I take this to say he is saying he has
13 not completed the testing and it is not so yet.
14   Q.   Did you follow up and ask him about the
15 results of that testing at any time thereafter?
16   A.   I cannot remember.
17   Q.   Okay. Further down on the second page
18 there's a sentence that begins with the words
19 "Hugh Tyler" about halfway down the page?
20   A.   Yes.
21   Q.   Did you understand that Hugh Tyler was
22 a Cabot person?
23   A.   Yes.
24   Q.   Mr. Collis reported that Hugh Tyler of

Page 101

1 Cabot had said that at a $180 per pound for KTaF,
2 the end powder price would be too expensive to be
3 economic, do you see that?
4    A.   Yes.
5    Q.   Did you -- what did you understand that
6 sentence to be conveying?
7    A.   That if we bought the KTaF at $180 and
8 had it tolled by someone else, we would not be
9 competitive.
10   Q.   Okay. And did you do anything to
11 investigate as to whether what Mr. Tyler had said
12 was correct?
13   A.   I am sure I did. At the time there was
14 a lot of confusion about $180 per pound, per
15 kilogram, or currency. And that was probably the
16 issue that I had in my mind at the time.
17   Q.   Okay. Obviously, $180 per pound is a
18 higher price than $180 per kilogram?
19   A.   Right. But there was a lot of
20 confusion at that time on the actual dollar
21 versus the units.
22   Q.   Okay. So --
23   A.   And the Euro.
24   Q.   Well, you don't understand the symbol

26 (Pages 98 to 101)

Page 102

1 that appears before the 180 --
2    A.    It says dollars, but I am saying that
3 we may have miscalculated some earlier number in
4 order to get the 180.
5    Q.    Okay. Now, up to the point where you
6 had -- when you received Exhibit 114, had you had
7 any direct communication, that is, by yourself,
8 with anyone from Cabot?
9    A.    You keep asking me that question. I
10 don't know the answer to that.
11    Q.    Okay. I am going to show you something
12 that may help.
13    A.    Okay.
14    Q.    Would you look at Exhibit 55. And for
15 the moment, you are welcome to read the whole
16 thing, but I am just going to show you the first
17 sentence to help you place what I think you have
18 previously referred to as a --
19    A.    This is the dinner. Yes, that's my
20 first recollection.
21    Q.    Okay. So is it fair to say that your
22 first direct communication of any type with
23 someone from Cabot was on October 16, 2000?
24    A.    No, because we had conversation

Page 103

1 regarding this trip, we wanted to work it out, we
2 wanted to meet face-to-face, where we would not
3 have to be in litigation. So there were several
4 conversations about that.
5    Q.    Okay. What are the first of those --
6 do you recall those conversations as involving
7 anything other than arranging a face-to-face
8 meeting?
9    A.    Very specifically, we both --
10    Q.    Answer my question.
11    A.    Ask it again.
12    MR. SLAVITT: Ask it again.
13    MR. FRANK: Sure.
14        (WHEREUPON, the record was read by
15        the reporter as requested.)
16 BY THE WITNESS:
17    A.    Yes.
18 BY MR. FRANK:
19    Q.    Who initiated the series of phone calls
20 that you described?
21    A.    I don't remember.
22    Q.    Did you take any notes in the course of
23 those conversations?
24    A.    At dinner? No.

Page 104

1    Q.    Did you take any notes in the course of
2 the telephone conversations?
3    A.    Not that I remember.
4    Q.    Okay. How many telephone conversations
5 were there?
6    A.    I do not remember.
7    Q.    Can you remember them separately?
8    A.    No.
9    Q.    Did you report them to anyone in any
10 writing?
11    A.    Not that I remember, but I did
12 remember -- obviously, when he called and wanted
13 it to be a conciliatory tone, as I took it, I
14 must have told both Chilton and Rosen that.
15    Q.    Would you tell me what -- what Mr. Odle
16 said to you and what you said to Mr. Odle in the
17 course of the conversation or conversations
18 leading up to the dinner meeting.
19    A.    My general impression was --
20    Q.    No. Please tell me what was said.
21    A.    Specifically, I cannot say.
22    Q.    What is the substance of what was said
23 by each of the persons?
24    A.    The substance, very conciliatory,

Page 105

1 "let's work this out. I have got my problems. I
2 want us to work together. You are going to be a
3 long-term supplier here. Let's see if we can't
4 work this out face-to-face."
5    Q.    Okay. Is that all you recall of those
6 telephone conversation?
7    A.    That's all I recall, something along
8 those lines.
9    Q.    Now, I take it you did meet with
10 Mr. Odle on the evening of October 16 in Myrtle
11 Beach?
12    A.    I think it was in Pennsylvania or
13 something.
14    Q.    I apologize. I drew an inference that
15 may be incorrect.
16    A.    I went there.
17    Q.    Okay. Who was present at the meeting
18 and dinner?
19    A.    Tom Odle was there, and his assistant,
20 whose name escapes me at the time.
21    Q.    I suggest Mike Fisher?
22    A.    That sounds very good. Mike Fisher,
23 yes.
24    Q.    Anyone else there from the AVX side

Page 150

1 understood them?
2  A.  As I then understood them.
3  Q.  Answer yes?
4  A.  Yes.
5  Q.  Okay. Did the covering portion of
6 Exhibit 98 accurately set forth your negotiating
7 objectives?
8  A.  Yes.
9  Q.  And did you provide a copy of the
10 pieces of paper that constitute the second,
11 third, fourth, and fifth pages of the e-mail to
12 Mr. Slavitt?
13  A.  Yes. My impression is yes.
14  Q.  And did you send to Mr. Odle the
15 proposal which starts on the third page of
16 Exhibit 98 and is dated October 30, 2000?
17  A.  I do not know that, my impression would
18 be no, because I was asking for an opinion.
19  Q.  Okay. Did you receive an opinion?
20  A.  I don't remember, but I think by this
21 letter I must have been asking for one.
22  Q.  After you got that opinion, did you
23 send the proposal?
24  A.  I do not remember.

Page 151

1  Q.  Okay. Do you -- did you discuss -- did
2 you receive a response by Mr. Slavitt to your
3 e-mail, which is the Exhibit 98?
4  A.  I asked for his thoughts. I must have.
5 I do not remember.
6  Q.  Okay. Did you talk to Mr. Slavitt?
7  A.  I don't remember, but I probably did.
8  Q.  Do you have notes of that conversation?
9  A.  No, I don't.
10  Q.  Did you in this period of time speak to
11 Mr. Slavitt about your -- about a most favored
12 customer contract provision or your objectives
13 with respect to such a provision?
14  A.  I don't remember specifically doing
15 that.
16  Q.  Okay. I judge from the body language
17 that you are not saying you didn't --
18  A.  I am definitely not saying I didn't, I
19 just don't remember.
20  Q.  Okay. Turning to the second page of
21 Exhibit 98, had you discussed the substance of
22 what appears on the third, fourth, and fifth
23 pages of Exhibit 98 with Mr. Odle to determine
24 whether the principles stated on those pages were

Page 152

1 something that he would recommend to his boss,
2 Mr. Burns?
3  A.  My impression is the answer would be
4 yes because we had several phone conversations
5 around these talking points, and there were
6 several talking points exchanged back and forth.
7  Q.  Do you believe that you said to
8 Mr. Odle in the course of those several telephone
9 calls substantially what appears on pages 3, 4,
10 and 5 of Exhibit 98?
11  A.  Yes.
12  Q.  Turn, if you would, to the third
13 page -- I'm sorry, to what is the fourth page of
14 the document. And I just want to call your
15 attention to one thing that is on that page.
16 Towards the bottom there's a reference to AVX's
17 capital expansion plans, perhaps four or five
18 paragraphs up from the very end?
19  A.  Right.
20  Q.  Would you just read that sentence to
21 yourself, and then my question is, what were the
22 capital expansion plans to which you made
23 reference?
24  A.  My point was that at that time there

Page 153

1 was a feeling that business would be very
2 aggressive in the next year, and we had spent a
3 lot of money based on getting this product, both
4 at Biddeford and at Paignton and Lanskroun.
5 Those were the capital expansion plans based on
6 getting material.
7  Q.  Go back, if you would, to the first
8 page, and let me just ask you to confirm that as
9 of October 30, it was your understanding that
10 Cabot had negotiated a contract with Vishay
11 earlier in 2000 that was at prices lower than the
12 prices that you were then discussing with Cabot?
13  A.  I am repeating in this part of the
14 document to him what they had relayed to me.
15 There have been several conflicting statements
16 about what they had negotiated and what they
17 hadn't.
18  Q.  Who is the "they" in that answer?
19  A.  Cabot had negotiated.
20  Q.  Okay. So Cabot had told you that
21 earlier in 2000, Cabot had negotiated a contract
22 with Vishay on terms more favorable than those
23 that were then being discussed between Cabot and
24 AVX, and Cabot told you that Vishay was coming

Page 158

1  Q. The first page are comments that you
2 received from your team at AVX on this proposal,
3 whoever made it; is that correct?
4  A. Say again? I'm sorry.
5  Q. Is this proposal -- I'm sorry.
6     Is the first page of Exhibit 58
7 comments made to you by members of your team
8 regarding the talking points which are the second
9 and third pages of Exhibit 58?
10  A. It doesn't have an attachment on it,
11 and it says page 1 of 1, so I think all I saw was
12 this front page. I am not certain of that.
13  Q. Okay.
14  A. I would read this to be he is saying
15 page 1 of 1, and then there's no mention of an
16 attachment here so I don't think these two go
17 together, but I don't know.
18  Q. Okay. I think this version of what may
19 be the same thing will help.
20  MR. FRANK: Please mark as Exhibit 181 C(A)
21 032972 through 74.
22     (WHEREUPON, a certain document was
23     marked Exhibit No. 181, for
24     identification, as of 8/22/06.)

Page 159

1 BY THE WITNESS:
2  A. Yes.
3 BY MR. FRANK:
4  Q. Is it Exhibit 181 an e-mail that you
5 received from Mr. Odle on or about November 2,
6 2000?
7  A. Yes, it appears to be so.
8  Q. Did you discuss this e-mail or the
9 subject matter of this e-mail with Mr. Odle on or
10 about November 2?
11  A. I think, as he says, this is a rough
12 working talking point and we must have discussed
13 it. I do not remember specifics of that
14 discussion.
15  Q. Let me call out a couple of aspects of
16 this proposal, and ask you, first, in your
17 proposal, Exhibit 3, and in the attachment to
18 your e-mail to Mr. Slavitt, Exhibit 98, you are
19 proposing to purchase 30,000 pounds of powder for
20 Biddeford per year.
21     In Exhibit 181, the number of pounds of
22 powder for Biddeford in 2001 has been reduced
23 from 30 to 25,000 pounds. Do you see that?
24  A. Right.

Page 160

1  Q. Okay. Is that something that Cabot
2 did?
3  A. Yes. Again, there was a negotiating
4 point, they knew we needed that very strongly,
5 and they reduced it on that point. Yes, I do
6 remember that.
7  Q. Okay. Let me direct your attention to
8 the line that's in the chart on the second page
9 of Exhibit 181.
10     In your proposal, Exhibit 3, you had
11 said in item 7 that if other powders are
12 available in years 2, beyond the Biddeford and
13 flake agreement, AVX would purchase 60,000 pounds
14 at $500 a pound. And substantially the same
15 thing is said in item 7, the attachment to
16 Exhibit 98?
17  A. Yes.
18  Q. Is it your understanding that -- who is
19 it that added the additional powder to the
20 line -- the horizontal line that says "nodular"
21 under the heading "Europe"? Was it AVX? Did AVX
22 add that, or did Cabot add it in response to the
23 proposal in Exhibit 58?
24  A. I can only say in looking at this

Page 161

1 document that it looked like Cabot added it.
2 This was his document to start talking.
3  Q. Did you understand that to be in
4 response to your request in Exhibit 3 for 60,000
5 additional pounds at $500 a pound?
6  A. I don't recollect.
7  Q. One way --
8  A. One way or the other.
9  Q. Okay. Did you reply to Mr. Cabot --
10 I'm sorry. I'm getting tired.
11     Did you reply to Mr. Odle's e-mail,
12 Exhibit 181?
13  A. I am sure I did.
14  Q. Okay. Do you remember any --
15  A. No specifics do I remember.
16 MR. FRANK: Okay. Please mark as
17 Exhibit 182, AVX 1493.
18     (WHEREUPON, a certain document was
19     marked Exhibit No. 182, for
20     identification, as of 8/22/06.)
21 BY MR. FRANK:
22  Q. Let me ask you to have in front of you
23 Exhibit 182 and Exhibit 2, and I will ask you
24 first if -- Mr. Slavitt suggested off the record

41 (Pages 158 to 161)

Page 162

1 that -- and neither he nor I know what the truth
2 is -- that 182 may be -- let me ask whether 182
3 was separate from Exhibit 2 or simply part of
4 Exhibit 2?
5   A.   If you are asking me?
6   Q.   Yes.
7   A.   It looks to me like it is -- it is part
8 of Exhibit 2.
9   Q.   Okay. So is it correct that Exhibit 2
10 is an e-mail that you sent to Mr. Odle on or
11 about October 2, 2002?
12   A.   Yes, that is correct.
13   Q.   Did you send it on the 2nd or the 3rd,
14 do you know?
15   A.   No, I do not know.
16   Q.   Under the heading -- you see there's
17 one message that starts with the word "Tom"?
18   A.   Yes.
19   Q.   And then a second message that starts
20 with the word "Tom" on Exhibit 2?
21   A.   Yes.
22   Q.   Alongside the second message beginning
23 with the word "Tom" it says -- well, first, let
24 me go above that. You see where it says

Page 163

1 "private"?
2   A.   Yes.
3   Q.   That's says "for discussion purposes
4 only subject in all respects to final negotiation
5 agreement by both parties"?
6   A.   Right.
7   Q.   That's your language?
8   A.   I don't know, but I doubt it.
9   Q.   It also appears in Exhibit 182. Do you
10 have any reason to think it isn't your language?
11   A.   That I didn't write it?
12   Q.   Well, that those -- that you wrote
13 those words?
14   A.   I wrote those words, I would say that,
15 yes, but I am saying that the actual language
16 probably came from the lawyer.
17   Q.   Okay. The said lawyer being
18 Mr. Slavitt?
19   A.   Yes.
20   Q.   Okay.
21   A.   But I don't know that --
22   Q.   Is that what you believe sitting here
23 today?
24   A.   That's what I believe, sitting here,

Page 164

1 yes.
2   Q.   Now, going to the second "Tom," you say
3 alongside that portion of the e-mail that you
4 have to have a level playing field. Do you see
5 that?
6   A.   Yes.
7   Q.   And is it correct that the level
8 playing field was your way of describing your
9 objective with respect to the most favored
10 customer provision?
11   A.   They were objecting to --
12   Q.   Please answer my question.
13   A.   Ask me the question again.
14       (WHEREUPON, the record was read by
15       the reporter as requested.)
16 BY THE WITNESS:
17   A.   No.
18 BY MR. FRANK:
19   Q.   Down below in the chart, in the bottom
20 portion of the first page of Exhibit 2, I note
21 that the chart in your e-mail now includes 25,000
22 pounds of nodular powder in 2001 and 30,000
23 pounds of nodular powder for Biddeford in 2002
24 through 2005, do you see that?

Page 165

1   A.   Yes, I do.
2   Q.   And then you say in the text above the
3 chart: "I lowered the commitment to 25,000 pounds
4 in Biddeford. How about a statement that you
5 will try to add 5,000 pounds"?
6   A.   Yes.
7   Q.   Do you see that?
8   A.   Yes.
9   Q.   Is it fair to say that your objective
10 was, if you could, to purchase additional nodular
11 powder?
12   A.   Yes.
13   Q.   Okay. And is it -- directing your
14 attention to the continuation of the chart, the
15 second page, the very top of that chart there's a
16 listing of 10,000 pounds of nodular powder under
17 the heading Europe in the years 2002 through
18 2005, do you see that?
19   A.   I see that, yes. This was basically
20 Tom's chart, you know.
21   Q.   Okay. Now if you will look just above
22 the chart, and you will see it says, "change the
23 nodular to 10,000 pounds, which our side is very
24 uncomfortable with as a good faith from our

42 (Pages 162 to 165)

### Page 166

1 side." Do you see that? Just above the chart.
2   A.   I see that, yes.
3   Q.   Is it correct that you were
4 uncomfortable with the reduction from 60,000
5 pounds of nodular powder as shown on Mr. Odle's
6 e-mail, Exhibit 181, to the 10,000 pounds as
7 shown on Exhibit 2?
8   A.   Yes.
9   Q.   Because you wanted more if you could
10 get it?
11   A.   Right.
12   Q.   I'm sorry?
13   A.   Yes, correct.
14   Q.   Directing your attention Exhibit 2 to
15 the first full paragraph under the second "Tom,"
16 it says, "the most favored nation/customer in
17 some term in year 3 to 5 of the agreement is the
18 only way we have of ensuring that level playing
19 field."
20       Did you communicate to Mr. Odle that
21 the most favored customer provision that you were
22 suggesting was designed to create a level playing
23 field among AVX's -- between AVX and Cabot's
24 otherwise most favored customer?

### Page 167

1        MR. SLAVITT: Objection. You can answer.
2 BY THE WITNESS:
3   A.   The answer is, no, the way you phrased
4 that.
5 BY MR. FRANK:
6   Q.   Okay. Did you ask Mr. Odle to tilt the
7 playing field in AVX's favor?
8   A.   No.
9   Q.   And is it fair to say you understood at
10 that time that the level playing field that you
11 were asking for could not be absolutely level
12 because there was a prior Vishay contract at
13 lower prices?
14   A.   I realized that Vishay had a contract
15 at a lower price prior to our discussion.
16   Q.   And that was a pothole in the playing
17 field with which you had to live; is that fair?
18       MR. SLAVITT: Objection. You can answer.
19 BY THE WITNESS:
20   A.   I think that was one of our discussion
21 points as we went through the contract.
22 BY MR. FRANK:
23   Q.   Okay. Whether or not you would accept
24 that pothole in the playing field?

### Page 168

1   A.   Yes, yes.
2   Q.   I think the answer is yes?
3   A.   Yes. I am not sure if "pothole" is the
4 technical term.
5   Q.   Turn, please, to the second page of
6 Exhibit 2. And there is -- some of Exhibit 2 is
7 in all caps, and other parts are in mixed capital
8 letters and lowercased letters, do you see that?
9   A.   Yes.
10   Q.   Okay. And am I correct in
11 understanding that Exhibit 2 reflects kind of a
12 dialogue, an e-mail dialogue going back and forth
13 between you and Mr. Odle commenting on various --
14 of the talking points in Exhibit 2?
15   A.   Yes.
16   Q.   Okay. Now, help me to figure out, in
17 the paragraph that is numbered 3, who was the
18 author of the first four lines of Exhibit 3, if
19 you recall?
20   A.   I do not remember.
21   Q.   Okay.
22   A.   But I would -- I do not remember.
23   Q.   And who was the author of the all caps
24 comment that follows?

### Page 169

1   A.   I don't remember. Most likely that was
2 my comment, the caps being to denote where
3 something had changed -- we wanted changed.
4   Q.   Okay. Was it your -- was the point
5 that you were making that it was not your
6 position that if Cabot sold 1 pound of product at
7 a lower price, that Cabot would then have to --
8 let me put that again.
9       Is it correct that what you were trying
10 to convey in the capitalized language was that
11 if -- that it was not AVX's intention that if
12 Cabot sold to an AVX competitor 1 pound of
13 product at a lower price, it had to sell all of
14 the quantity of product that AVX was buying of
15 the same thing at that lower price?
16   A.   I am not sure I can answer that
17 statement, but would you let me propose what I
18 think I was trying to say, or you don't want me
19 to do that?
20   Q.   No, I will ask you a different
21 question.
22   A.   All right. Ask me a different
23 question.
24   Q.   Were you saying in Exhibit 2 that if

Page 170
1 Cabot sold 1 pound of product that AVX was also
2 buying to an AVX competitor, that Cabot should be
3 obligated to sell to AVX all of the volume of
4 that particular type of powder at the price that
5 had been given for 1 pound to the AVX competitor?
6     A.   I am not sure about the timing of this
7 particular example.
8     Q.   Please answer my question.
9     A.   Okay. In this context, no.
10    Q.   That was not your position?
11    A.   I am saying that in this context it
12 wasn't. Originally --
13    Q.   No. You have answered.
14    A.   Okay.
15    Q.   Do you remember -- I apologize if I
16 have asked you this.
17         Do you recall discussing Exhibit 2 with
18 Mr. Odle?
19    A.   I am sure I did.
20    Q.   Do you now recall any discussion except
21 as is reflected on the face of Exhibit 2?
22    A.   No.
23    MR. FRANK: Please mark as Exhibit 183 a
24 document bearing Bates number C(A) 032990 through

Page 171
1 98.
2         (WHEREUPON, a certain document was
3          marked Exhibit No. 183, for
4          identification, as of 8/22/06.)
5 BY MR. FRANK:
6     Q.   Let me direct your attention first --
7 or, first, is Exhibit 183 an e-mail that you
8 received from Mr. Odle on or about November 6,
9 apart from the very short portion of the e-mail
10 that's at the top of the first page?
11    A.   Yes.
12    Q.   Do you recall discussing Exhibit 183 or
13 the substance of Exhibit 183 with Mr. Odle?
14    A.   I am sure we did. I don't remember
15 specific details.
16    Q.   Let me direct your attention first to
17 the second page of the exhibit and to the
18 material that's at the bottom of that page. Did
19 Mr. Odle say to you in substance that he was
20 happy to offer additional pounds of the nodular
21 powder needed at Biddeford if those pounds were
22 available?
23    A.   Yes.
24    Q.   And, basically, he said he didn't want

Page 172
1 to lose the business, if he could help it,
2 correct?
3     A.   Right.
4     Q.   And did he tell you that the chart,
5 which is on the third page of Exhibit 3, now
6 reflected what Cabot thought it could produce and
7 actually deliver to AVX?
8     A.   Yes, that's the way I interpret this.
9     Q.   Okay. Now, let me ask you to turn, if
10 you would, to the page which has the Bates number
11 993 in the lower right corner?
12    A.   Yes.
13    Q.   Is it correct that Mr. Odle said to you
14 that a most favored nation provision not based on
15 volumes would be impossible to sell to the Cabot
16 side, and that Cabot was not prepared to agree
17 that if Cabot sold 1 pound to another customer
18 for under $500 a pound, all of AVX's volume of
19 comparable products would drop to that new price?
20    A.   Yes, that's what he said was their
21 position.
22    Q.   And did you agree to that position?
23    A.   That was his position, and that's --
24    Q.   Did you agree to that position?

Page 173
1     MR. SLAVITT: Objection.
2 BY THE WITNESS:
3     A.   I said -- this document here? He
4 countered in the document --
5 BY MR. FRANK:
6     Q.   Did you agree to what Mr. Odle was
7 saying?
8     A.   I agreed with him that he had a problem
9 selling that to his people, which it says.
10    Q.   Did you agree -- was it your position
11 in the discussions that if Cabot sold 1 pound of
12 product at less than $500 a pound, that all of
13 the product sold by Cabot of the particular type
14 of powder in question would have to be sold at
15 that lower price?
16    A.   That was my original negotiating
17 position with him, and he came back and said he
18 would not be able to sell that.
19    Q.   Okay. And did you give way on the
20 point?
21    A.   Eventually we gave way on the point to
22 the volume consideration. If he sold 200 pounds,
23 that the whole situation would not go that way,
24 yes.

### Page 174

1  Q.  Okay. Now, let me direct your
2  attention to another portion of this. At page
3  995 there's a note to you at the top of the page
4  that begins with the word "John." Just read that
5  to yourself and then I have a question about it.
6  A.  Yes, I remember this issue.
7  Q.  Okay. Is it correct that Cabot was
8  proposing that if and to the extent that it
9  produced or sold more than 550,000 pounds per
10 year, then the excess product would not be
11 subject to most favored customer treatment?
12     MR. SLAVITT: Objection. You can answer.
13 BY THE WITNESS:
14 A.  No.
15 BY MR. FRANK:
16 Q.  Okay. What as you understood it was
17 Cabot conveying with respect to the 550,000
18 pounds?
19 A.  He was trying to say they have an
20 install capacity of "X" thousand pounds a year,
21 then they go out and put new capital in place
22 beyond what they had in place, and that new
23 capacity would be offered to us first.
24 Q.  Okay.

### Page 175

1  A.  And there was a lot of argument about
2  what his capacity was. My argument back to him
3  was I have no way of knowing whether it is
4  550,000 pounds or -- so you had to show me some
5  real capacity increases.
6  Q.  Okay. So -- all right.
7      So expressing capacity in terms of
8  550,000 pounds a year was not something that you
9  wanted because you had no independent way of
10 verifying what 550,000 pounds was?
11 A.  I didn't know what the capacity of his
12 facility was at the time.
13 Q.  And is it correct that you expressed to
14 Mr. Odle in response to Exhibit 183 substantially
15 what you just said now?
16 A.  In general terms, yes.
17    MR. FRANK: Please mark as Exhibit 184 a
18 document bearing Bates number C(A) 032555 through
19 65.
20         (WHEREUPON, a certain document was
21         marked Exhibit No. 184, for
22         identification, as of 8/22/06.)
23    MR. FRANK: I misspoke. I believe what I had
24 marked is C(A) 032555 through 60.

### Page 176

1 BY MR. FRANK:
2  Q.  Is Exhibit 184 an e-mail and
3  essentially final proposal that you forwarded to
4  Mr. Odle on or about November 7, excluding only
5  the material which begins -- which appears at the
6  very top of the first page of Exhibit 184.
7  A.  Yes, it appears to be that.
8  Q.  Now, addressing -- looking at the first
9  page of Exhibit 184, you see the message beside
10 the word "Tom," first page of the document?
11 A.  Right.
12 Q.  Did that accurately reflect your view
13 at the time?
14 A.  My statement here means --
15 Q.  Did that accurately reflect your view
16 at the time?
17 A.  No.
18 Q.  Did you tell Mr. Odle that it did not
19 accurately reflect your view at the time?
20 A.  Mr. Odle was --
21 Q.  Did you tell Mr. Odle that it did not
22 accurately reflect your view at the time?
23 A.  No.
24 Q.  Was it your understanding that this

### Page 177

1 was -- that your back and forth with Mr. Odle was
2 substantially at an end at this point?
3  A.  Yes.
4  Q.  Okay. Up to the date of this e-mail,
5  have you told us all that you recall of your
6  conversations with Mr. Odle about the terms of a
7  future contract between Cabot and AVX or any of
8  the other subject matters discussed in
9  Exhibit 184?
10 A.  Yes, I can remember nothing else.
11    MR. FRANK: Okay. Please mark as Exhibit 185
12 a document bearing Bates number C(A) 023922
13 through 926.
14         (WHEREUPON, a certain document was
15         marked Exhibit No. 185, for
16         identification, as of 8/22/06.)
17 BY MR. FRANK:
18 Q.  Is Exhibit 185 an e-mail that you
19 received from Mr. Odle on or about November 8?
20 A.  I don't recognize it immediately. Let
21 me finish reading it, please.
22 Q.  Sure. I'm sorry.
23 A.  Yes.
24 Q.  So the question is, is this an e-mail