# Exhibit #18

SPOTTS-4/3/08

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10467-RGS

***************************
AVX CORPORATION            *
and AVX LIMITED,           *
       Plaintiffs,         *
                           *
                           *
    v.                     *
                           *
                           *
CABOT CORPORATION,         *
       Defendant.          *
***************************

DEPOSITION OF MARLIN R. SPOTTS, JR.,
taken pursuant to Rule 30(b)(6) of the Federal Rules
of Civil Procedure, before Kristin M. Stedman, a
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Bodoff & Associates, 225 Friend Street,
Boston, Massachusetts, on Thursday, April 3, 2008, at
12:10 p.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MA  02116
(617) 426-6060

KACZYNSKI REPORTING

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3  RICHARD A. GOREN, ESQ.
   Bodoff & Associates
4  225 Friend Street
   Boston, MA  02114
5  (617) 742-7300
6  ON BEHALF OF THE DEFENDANT:
7  BRIAN A. DAVIS, ESQ.
   Choate Hall & Stewart LLP
8  Two International Place
   Boston, MA  02110
9  (617) 248-5000

Page 3

1              INDEX
2  EXAMINATION BY MR. GOREN ...................Page 4
3
4
5
6
7
8
9              EXHIBITS
10
   No.   Description              Page No.
11
    1   Notice of Deposition           4
12  2   List of Questions for Cabot's Rule  4
        30(b)(6) Witness, April 3, 2008
13  3   E-Mail, 8/9/00                 4
    4   E-Mail, 9/1/00                 4
14  5   Interoffice Memorandum, 9/21/00   4
    6   Supply Agreement               4
15  7   Tantalum Raw Material, AVX Corporation,  4
        9/98
16  8   E-Mail, 3/21/99                4
    9   Statistical Information       43
17  10  AVX Document                  82
    11  Proposed Answers to AVX's Written   86
18      Rule 30(b)(6) Deposition Questions,
        April 3, 2008
19  12  Tantalite Sales Contract       94
20
21
22
23
24

Page 4

1              PROCEEDINGS
2              - - - - -
3              (Marked Exhibit 1; Notice of Deposition.)
4              (Marked Exhibit 2; List of Questions for
5              Cabot's Rule 30(b)(6) Witness,
6              April 3, 2008.)
7              (Marked Exhibit 3; E-Mail, 8/9/00.)
8              (Marked Exhibit 4; E-Mail, 9/1/00.)
9              (Marked Exhibit 5; Interoffice Memorandum,
10             9/21/00.)
11             (Marked Exhibit 6; Supply Agreement.)
12             (Marked Exhibit 7; Tantalum Raw Material,
13             AVX Corporation, 9/98.)
14             (Marked Exhibit 8; E-Mail, 3/21/99.)
15             - - - - -
16             MARLIN R. SPOTTS, JR.,
17  having first been satisfactorily identified and
18             duly sworn by the Notary Public,
19         was examined and testified as follows:
20             - - - - -
21  EXAMINATION BY MR. GOREN:
22      Q.  Please state your name.
23      A.  Marlin Spotts.
24      Q.  Good afternoon, Mr. Spotts.

KACZYNSKI REPORTING

SPOTTS-4/3/08

Page 5

1  A. Good afternoon.
2  Q. We have met before?
3  A. Yes.
4  Q. I am putting in front of you a deposition
5  Exhibit No. 1, and this is the notice of deposition
6  for today's deposition. Have you been designated by
7  the defendant, Cabot Corporation, Mr. Spotts, to
8  testify as to topics two, twelve and eighteen as set
9  forth on Exhibit 1?
10 A. Yes.
11 Q. And have you been prepared by Cabot to
12 testify on its behalf on topics two, twelve and
13 eighteen?
14 A. Yes.
15 Q. Now, let's jump a little bit. I want to
16 put in front of you what has been marked as Exhibit
17 No. 2. These are the written questions. Let me
18 preface this, Mr. Spotts, at Mr. Davis's request,
19 Cabot's counsel, I did prepare, albeit, not as quickly
20 as Mr. Davis would have liked, a series of written
21 questions. Have you seen deposition Exhibit No. 2
22 before, that is the series of written questions?
23 A. Yes, yes, in substantially the same form,
24 yes.

Page 6

1  Q. Not verbatim?
2     MR. DAVIS: Richard, we took Exhibit 2 and
3  broke it down, so he has seen the content of it.
4  A. I have seen the content, yes.
5     MR. DAVIS: But we broke it down into
6  individual questions as best we could.
7  A. Bite-sized pieces.
8  Q. That would be appropriate.
9  A. Yes.
10 Q. Did Cabot prepare written answers to some
11 or all of the questions in Exhibit No. 2?
12    MR. DAVIS: Objection. May I explain what
13 we did in response?
14    MR. GOREN: Please.
15    MR. DAVIS: What we did was -- again, as
16 we got this list last week, a week ago today, and so
17 we have attempted in the time available to research
18 and obtain the information that is responsive to the
19 request. What we have done is we prepared Mr. Spotts,
20 he has prepared today and has with him some written
21 information that was collated by Cabot for purposes of
22 trying to respond to the questions, so he is prepared
23 to respond to the questions today orally, and in doing
24 so, he may in fact reference some written materials

Page 7

1  that we provided to him for that purpose.
2     As you know, Richard, a lot of the
3  information that you requested here is quite detailed,
4  and there is no way we could get anyone, including Mr.
5  Spotts, and this is not intended to be a slight to Mr.
6  Spotts in any way, to memorize or to know without
7  reference to any materials answers to all those
8  questions.
9     MR. GOREN: Ergo, the plaintiff's
10 receptivity to your suggestion of putting questions
11 into a written form, because they do seem simply data
12 in large part.
13 Q. Then let's start with topic number two,
14 Mr. Spotts, and while it's out of order, I am going to
15 ask you to look at Exhibit No. 6, please. This is the
16 supply agreement.
17    MR. GOREN: And Brian, I have for ease
18 simply taken the document as you filed it in
19 connection with Cabot's recent motion for summary
20 judgment.
21    MR. DAVIS: So are we marking this as
22 Exhibit 3?
23    MR. GOREN: I premarked it as Exhibit 6.
24 My mind works in unusual ways, as you well know.

Page 8

1  Q. Now, you have seen Exhibit 6 before, Mr.
2  Spotts, this is the supply agreement at issue in this
3  case?
4  A. Yes.
5  Q. Your role in the company hasn't changed
6  since you were here a few months ago to testify, is
7  that fair?
8  A. That's correct.
9  Q. Now, appendix A to the supply agreement,
10 that lists products to be purchased by AVX, correct?
11 A. Yes.
12 Q. And it lists flake products, correct?
13    MR. DAVIS: Among others.
14 A. Yes, I see flake there.
15 Q. Thank you. Among others, it lists nodular
16 products for the Biddeford operation, correct?
17 A. I see that, yes.
18 Q. And among others, it lists nodular
19 products for the European operation, which I will
20 simply called Euro, correct?
21 A. Yes.
22 Q. Listen carefully and then I am sure you
23 will hear from Mr. Davis, but my question is this, for
24 what reason or reasons did Cabot in this supply

2 (Pages 5 to 8)

Page 9

1  contract condition AVX's purchase of flake on AVX's
2  commitment to purchase nodular products over five
3  years?
4       MR. DAVIS: Objection. You can respond.
5  This is topic number two.
6       A. To my knowledge, there was no condition on
7  AVX to purchase nodular in relation to flake or flake
8  in relation to nodular. In fact, I think to the
9  contrary, wasn't that stated by AVX's president and
10 testified that they wanted more nodular powder? So it
11 wasn't a relationship between the two. They wanted, I
12 believe they wanted as much tantalum as they could
13 get, whether it be nodular, flake, KTaF.
14      Q. Does that complete your answer?
15      A. Sure.
16      Q. Does Cabot then deny that Cabot
17 conditioned AVX's purchase of flake products on AVX's
18 commitment to purchase nodular products over five
19 years?
20      MR. DAVIS: Objection. You can respond.
21      A. I believe so, yeah, we would deny that,
22 there was no conditioning between the two types of
23 tantalum products.
24      Q. Very similar question, slightly different,

Page 10

1  does Cabot deny that it conditioned AVX's purchase of
2  flake on AVX's commitment to purchase nodular products
3  for Euro?
4       MR. DAVIS: Objection. You can respond.
5       A. Are you speaking for just European
6  purchases then, the same concept but for one location?
7       Q. Yes.
8       A. My answer would be the same, yeah, there
9  was no conditioning based upon its geographical
10 destination.
11      Q. It is true, Mr. Spotts, that the contract
12 that you have in front of you, Exhibit 6, the supply
13 contract, that as we went through, it requires the
14 purchase of both products, correct? Let me rephrase.
15 Thank you.
16      It is true, is it not, that the supply
17 contract requires AVX to purchase both flake and
18 nodular products, that is what it recites, correct?
19      A. Yes, the contract contains flake, nodular,
20 wire, and KTaF for, not all sites, but for a variety
21 of sites there, so yes, the contract contains
22 requirements for the purchase of a variety of items,
23 including nodular and flake.
24      Q. Okay. Very similar question, I am sure

Page 11

1  the answer will be similar, but I must ask. The
2  contract then requires, among other things as Brian
3  would suggest, the purchase by AVX of flake and also
4  nodular for Europe, correct?
5       MR. DAVIS: Objection. You can respond.
6       A. Yes, I see on appendix A it has nodular
7  and flake for Europe.
8       Q. Exhibit 3, Mr. Spotts. Can you take a
9  moment and just glance through that?
10      A. Okay.
11      (Witness reviewing document.)
12      A. Okay.
13      Q. Now. In preparing to testify about topic
14 number two, did you look at documents preceding the
15 signing of the supply agreement that antedated
16 January, 2001?
17      A. Yes, yes.
18      Q. And did you talk to people at Cabot or
19 otherwise about events from the summer of 2000 up to
20 January, 2001?
21      A. Yes, that was in the time frame covered by
22 our conversations, yeah.
23      Q. Now, isn't it true, Mr. Spotts, August,
24 2000, that Cabot told AVX no product at all unless AVX

Page 12

1  signed a five-year contract?
2       MR. DAVIS: Objection. If you know.
3       A. You are saying all-or-nothing-type
4  proposal?
5       Q. Yes. No product at all, August, 2000,
6  there will be no product, AVX, in the year 2001 unless
7  AVX enters into a five-year contract?
8       MR. DAVIS: Richard, is this really in
9  dispute? I mean, so much of this has been covered in
10 prior depositions in this case, and the entire
11 negotiations and Cabot's insistence on a five-year
12 contract, that was all played out before, so I am
13 puzzled why we --
14      MR. GOREN: This is a mere predicate
15 question to the conditioning questions concerning
16 flake and nodular.
17      Q. May I have an answer, please?
18      A. To the best of my knowledge, I am not
19 aware of an all-or-nothing proposal like that
20 presented to AVX in August of 2000.
21      Q. To the best of your knowledge doesn't
22 quite do it for me.
23      Does Cabot have an answer as to whether in
24 August of 2000 it told AVX there will be no product in

### Page 61

1  note, consolidation accounting is generally required
2  at between twenty and fifty percent when you have
3  controlling interest, and we did not have controlling
4  interest, and that is why this relationship was still
5  a joint venture and we did not consolidate it, so in
6  their books, it would still be a purchase. In our
7  books, it would still be a sale. It would be an
8  external sale, it would not be an intercompany.
9       Post February of 2002 when we acquired the
10  other half of them, then these sales became
11  intercompany, and we classified them as such.
12      Q. Was the KTaF sold to Showa at cost?
13      A. I believe this was a -- there was a
14  contract price for this between Cabot and Showa Cabot.
15      Q. Did that contract price include a profit
16  to Cabot?
17      A. I believe it did, yeah. We were not
18  really in the business of losing money.
19      MR. DAVIS: At least not then.
20      THE WITNESS: Not then.
21      Q. Did you secure in response to these
22  questions what Showa paid from the '96, '97, '98, all
23  the way through 2003, what it paid Cabot for KTaF?
24      A. I believe it's in one of our documents

### Page 62

1  here. We spoke about it at length, I believe. You
2  are talking about their purchase price, our selling
3  price to them?
4       Q. Yes. But these now are a request of
5  Showa, what does Showa's records show it paid Cabot,
6  1996 for each year for this material and the amounts,
7  do you have records of that?
8       A. I believe we do. That was part of what I
9  believe was supplied in hard-copy form.
10      Q. But that went -- pardon me, Mr. Spotts,
11  that only went up to January, 2001. I am looking on
12  deposition from '96 through 2003; in other words, what
13  was Showa's -- the total amount of KTaF each year and
14  what was paid?
15      MR. DAVIS: Actually, let me address this
16  for a moment. Cabot's sales of KTaF to Showa, which
17  is the other side of the equation, are all shown in
18  the sales documents that were produced. Those are on
19  the CD that was produced, and I can give you the exact
20  Bates number.
21      A. That was Cabot's sale transaction.
22      MR. GOREN: And included the sale price
23  and the quantity, Brian?
24      MR. DAVIS: Yes. It's all there. It's

### Page 63

1  in, the document number is, it's the CD that is Bates
2  numbered C(FED) 094721 through 094792. I believe that
3  is correct.
4       A. Are you asking then what was the
5  equivalent dollar value on the Showa side of that
6  transaction?
7       Q. I am assuming from what Brian says that it
8  shows up -- I beg your pardon, that it correlates
9  rather, I misspoke?
10      A. Yes.
11      Q. Thank you.
12      MR. DAVIS: Let me confirm the Bates
13  number on the CD. I will make sure -- I am fairly
14  certain that that is the number, but let me confirm
15  that.
16      MR. GOREN: So I can pass that on to
17  Gayatri to verify their numbers?
18      MR. DAVIS: Yes, it's in there.
19      Q. Now, Exhibit 8, Mr. Spotts, this is a 1999
20  Cabot e-mail, the first paragraph in particular, the
21  second paragraph as well.
22      A. Okay.
23      Q. Isn't it true that Cabot was obliged to
24  furnish Showa with the raw material or the KTaF that

### Page 64

1  Showa needed in order to produce its tantalum
2  products?
3       MR. DAVIS: Objection. You can respond.
4       A. We had a contract, I believe with, between
5  Cabot and Showa Cabot for KTaF.
6       Q. Correct.
7       A. Yes.
8       Q. And you see in Exhibit 8 that in 1999,
9  Cabot learned that Showa was acquiring KTaF from
10  Ningxia and also Starck, do you see that?
11      A. Yes.
12      Q. Did Cabot take steps to cause Showa to
13  cease purchasing KTaF from others?
14      A. Did Cabot cause Showa Cabot to cease
15  buying KTaF from somebody other than Cabot?
16      Q. Yes, sir.
17      A. To my knowledge, no. I believe we were
18  fully aware that there were other supplemental sources
19  of KTaF to Showa.
20      Q. Well, isn't it true that in the, I think
21  it was the spring or sometime in 2000, that Showa
22  informed AVX that it had excess capacity that was
23  going unused?
24      MR. DAVIS: Actually --

Page 65

1   Q. It's over on the next page, the paragraph
2  beginning on excess or unused production capacity, and
3  the question is, isn't it true that in the year 2000,
4  Showa had excess or unused production capacity that
5  went unutilized or underutilized because Showa lacked
6  sufficient KTaF?
7   A. I don't believe Showa was ever in a
8  position where they were materially short on KTaF, as
9  there were other sources for that, obviously. We were
10 one source, but as you can see here, there were other
11 sources, Ningxia being one of them.
12  Q. Isn't it true that Cabot in 2000 told
13 Showa that it was going to limit its supply of KTaF
14 from Cabot?
15  A. In 2001?
16  Q. 2000, sir.
17  A. Yes, but that was related to a total
18 shortage of KTaF. I don't believe it was specifically
19 aimed directly at Showa. There was a shortage of, you
20 know, global shortage for that.
21  Q. Regardless of --
22    MR. DAVIS: Are you done with your answer?
23    THE WITNESS: Yeah.
24  Q. I beg your pardon. Regardless of the

Page 66

1  rationale or reasons for which you state, it is true
2  that Cabot in 2000 informed Showa that it was not
3  going to -- Cabot would not supply Showa with the
4  amount of KTaF that Showa requested?
5   A. Yeah, yes, Showa had some concerns about
6  getting enough KTaF at that time, pursuant to an
7  industry shortage at that time.
8   Q. Did Showa complain to Cabot at that time
9  that Cabot should supply the KTaF it requested, did it
10 complain about that?
11  A. It showed some concerns.
12  Q. That is a yes?
13  A. I wouldn't use the word complain, but like
14 any other relationship with your supplier, if there's
15 a forecasted shortage, you would not complain, but you
16 would voice your concerns to that supplier, and you
17 know, develop a strategy to get your raw material.
18  Q. Can you describe the communications or
19 discussions in 2000 between Showa and each of AVX,
20 Vishay, Kemet, and Epcos concerning Showa's inability
21 or limitation to meet demand because of insufficient
22 KTaF?
23  A. They may have had discussions with them at
24 that time, but the details I am not, I cannot recall

Page 67

1  at this time. It was late '90s, early 2000.
2   Q. I am talking about specifically in 2000?
3   A. I can't recall them at this time, no.
4     MR. DAVIS: We did inquire about that with
5  the folks in Japan, and the answer was they didn't
6  know.
7     MR. GOREN: Mr. Hiyashida, and I am
8  blanking out on the other fellow's name?
9     MR. DAVIS: But yes, we did talk to Mr.
10 Hiyashida.
11    MR. GOREN: And Mr. Ishi.
12    MR. DAVIS: Mr. Ishi, I believe is gone,
13 but Mr. Hiyashida is still there, and he was one of
14 the people that Mr. Spotts spoke with at length.
15  A. There was a strategy being developed at
16 that time for Showa to even possibly develop its own
17 KTaF production. You can imagine the concern, and the
18 strategy included even possibly producing their own
19 KTaF with a startup plan.
20  Q. Wasn't it part of Cabot's strategy in its
21 dealings with Showa in 2000 to put the squeeze on them
22 with KTaF and to eventually buy out the company,
23 wasn't that part of the strategy in 2000?
24    MR. DAVIS: Objection. You can respond.

Page 68

1   A. I don't know.
2   Q. For what reason or reasons did Cabot not
3  license or permit Showa to use the flake technology
4  prior to February 2002?
5     MR. DAVIS: Objection. You can respond.
6   A. It's my understanding that the joint
7  venture agreement from its inception had some
8  cross-licensing agreement in there that allowed them
9  to have access to the knowledge needed to produce
10 flake.
11  Q. For what reason or reasons did Showa not
12 use the flake technology then?
13  A. In our many conversations, the reason for
14 that was simply that the Asian market that Showa
15 served did not have -- there was no need for flake in
16 that market, that is the reason why they did not
17 produce flake.
18  Q. I want to go back to the KTaF, Mr. Spotts.
19 I forgot to ask a question. My understanding is that
20 when you took a pound of KTaF and Showa tolled it
21 into, for example, S506 or S300, that the yield was
22 about forty percent, is that Showa's understanding,
23 approximately, need not be precise?
24  A. Yeah, it's approximate, I think it's .462

17 (Pages 65 to 68)

Page 69

1  to be approximate.
2       MR. DAVIS: That's better than
3  approximate.
4       Q. Is that for all products or the two that I
5  referenced or the --
6       A. That is only KTaF. That is the molecular
7  weight calculation. If you take the molecular weight
8  from your favorite periodic table from high school,
9  and you get the potassium tantalum fluoride, and you
10 add up those molecular weights, you get a compound
11 weight, and you take that and you divide it by one,
12 and you get the .462, that is pretty much how it
13 works.
14      Q. And that is your understanding of if Cabot
15 gave a pound of KTaF to Showa, that it would get back
16 approximately four-tenths or maybe as you say
17 four-and-a-half-tenths of a pound of finished product,
18 or is it slightly different?
19      A. I believe that is the gist of it, yeah.
20 It's not a one for one, if that is where you are going
21 with it.
22      Q. No, I understand, that there's some loss,
23 you started out with a pound of KTaF, they do the
24 processing on that and produced a finished material,

Page 70

1  and that finished material is less than a half a
2  pound?
3       A. Yes. I wouldn't call that -- are you
4  referring to that almost as yield loss?
5       Q. I am perhaps from ignorance calling it the
6  net yield. I started out with a pound of stuff, and I
7  end up with a finished product of less than half?
8       A. I think that, I believe, I am not a
9  scientist, obviously, but I believe it's more along
10 the lines of because of the weight of that, you need
11 two and a half pounds of KTaF to get one pound of
12 powder essentially because of the other elements in
13 there, the potassium and the fluoride, so you are not
14 -- there's always a yield loss in any process, of
15 course, but it's not, you are not losing, you know,
16 fifty-four percent.
17      Q. Just like refining petroleum, you take out
18 the other stuff?
19      A. The other stuff, yeah. It's more of a
20 process mechanism, it's not really a yield loss.
21      Q. Did Showa have a practice or custom of
22 having letters of intent for certain periods of time
23 with some of its larger customers? This is on
24 page one at the bottom.

Page 71

1       A. We covered this one at length. Here we
2  go. Letters of intent. Showa Cabot, we did not use
3  letters of intent. Actually in our conversations with
4  them, it was interesting to learn about their culture,
5  and that they rely heavily on just customer
6  relationships. I remember in business school there
7  was a great Japanese term for this, kurestsa, I think
8  it's called, and it's this pyramidal-type relationship
9  that they enjoy over there, and therefore, purchasing
10 relationships are very informal. In fact, I think we
11 had them telling us about their loyalty to their
12 vendors and customers, and customers would simply tell
13 a salesperson what their needs were for the next three
14 months and they would receive it, so it was far less
15 than what we would consider a formal letter of intent.
16      Q. So the Showa's practice was that the
17 customer would for some period of time inform Showa of
18 its anticipated need for certain finished products?
19      A. Uh-huh.
20      Q. Is that correct?
21      A. That is what we gathered from them, yeah.
22      Q. And would Showa indicate a price at which
23 they would sell that indicated need for that period of
24 time?

Page 72

1       A. I am not sure if the price was actually,
2  exact price was specified in those verbal agreements.
3  But that was the gist of what we learned from their
4  cultural practice over there was that anything
5  pertinent, we would consider as a hard-data element in
6  a purchase order was simply a verbal between two
7  companies over there, and they made good on that.
8       Q. After Showa became a wholly-owned
9  subsidiary in February 2002, did that practice change?
10      A. I believe it did. I believe it did, and
11 the reason for that is because now they fall under the
12 rules and regulations of a U.S. corporation and all of
13 the internal controls and policies that go along with
14 that, whereby they will start cutting purchase orders,
15 and basically following the U.S. methodology that we
16 have, especially after Sarbanes-Oxley, of course,
17 which was right around that time frame, the SOX came
18 out in, like, 2002, something like that.
19      Q. Prior to Showa's acquisition, Showa was
20 sometimes compensated for selling Cabot's products to
21 third parties, correct?
22      A. Yes.
23      Q. How were those commissions or compensation
24 reflected on the books of each of Showa and Cabot? I

18 (Pages 69 to 72)